# EXHIBIT 2

## To Notice of Removal

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

COUNTY:  ( N )   K   S          CIVIL ACTION NUMBER: _____

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA, LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY,<br><br>  Defendants. | CIVIL CASE CODE:  CCLD _____<br><br>CIVIL CASE TYPE:<br> COMPLEX COMMERCIAL LITIGATION<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>NAME AND STATUS OF PARTY FILING DOCUMENT:<br>PLAINTIFF AMTRUST FINANCIAL SERVICES, INC. _____<br><br>DOCUMENT TYPE:(E.G., COMPLAINT, ANSWER WITH COUNTERCLAIM)<br>COMPLAINT<br><br>JURY DEMAND:  YES   X    NO ___ |
| ATTORNEY NAME(S):<br>DAVID J. BALDWIN (NO. 1010 _____<br>PETER C. MCGIVNEY (NO. 5779) _____<br>ZACHARY J. SCHNAPP (NO. 6914) _____<br>Firm Name:<br>BERGER HARRIS LLP _____<br>Address:<br>1105 N. MARKET STREET, 11th FLOOR _____<br>WILMINGTON, DE  19801 _____<br>Telephone Number: (302) 655-1140 _____<br><br>Fax Number: ____ (302) 655-1131 _____<br>E-Mail Address: dbaldwin@bergerharris.com _____<br>pmcgivney@bergerharris.com<br>zschnapp@bergerharris.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIAL<br>N/A.<br><br>EXPLAIN THE RELATIONSHIP(S): N/A.<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>N/A.<br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

553603

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)
# INSTRUCTIONS

## CIVIL CASE TYPE
Please select the appropriate civil case code and case type (e.g., **CODE - AADM** and **TYPE - Administrative Agency**) from the list below.  Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ACER - Certiorari
ACCP - Court of Common Pleas
AIAB -  Industrial Accident Board
APSC -  Public Service Commission
AUIB -  Unemployment Insurance Appeal Board

**COMPLAINTS**
CASB - Asbestos
CAAA - Auto Arb Appeal
CBEN - Benzene Cases
CMIS - Civil Miscellaneous
CACT - Class Action
CCON - Condemnation
CCLD - Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt/Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM - Ejectment
CATT - Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT -  Interpleader
CLEM - Lemon Law
CLIB -  Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPEL -  Pelvic Mesh
CPIN -  Personal Injury
CPIA -  Personal Injury Auto
CPRL - Products Liability
CPRD - Property Damage
CRPV - Replevin
CSER - Seroquel Cases
CSPD - Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery

**INVOLUNTARY COMMITMENTS**
INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF -  Application for Forfeiture
MAAT -  Appointment of Attorney
MGAR -  Appointment of Guardianship
MCED -  Cease and Desist Order
MCDR -  Child Death Review
MCON -  Civil Contempt/Capias
MCVP -  Civil Penalty
MSOJ -  Compel Satisfaction of Judgment
MSAM -  Compel Satisfaction of Mortgage
MCTO -  Consent Order
MIND -  Destruction of Indicia of Arrest *
MESP -  Excess Sheriff Proceeds
MHAC - Habeas Corpus
MTOX - Hazardous Substance Cleanup
MFOR -  Intercept of Forfeited Money
MISS -  Issuance of Subpoena
MLEX -  Lien Extension
MMAN - Mandamus
MWIT -  Material Witness *
MWOT - Material Witness - Out of State
MRAT -  Motion for Risk Assessment
MROP -  Petition for Return of Property
MCRO -  Petition Requesting Order
MROD -  Road Resolution
MSEL -  Sell Real Estate for Property Tax
MSEM -  Set Aside Satisfaction of Mortgage
MSSS -  Set Aside Sheriff's Sale
MSET -  Structured Settlement
MTAX -  Tax Ditches
MREF -  Tax Intercept
MLAG -  Tax Lagoons
MVAC -  Vacate Public Road
MPOS -  Writ of Possession
MPRO -  Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

## * Not eFiled

## DUTY OF THE PLAINTIFF
Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the complaint.

## DUTY OF THE DEFENDANT
Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the answer and/or first responsive pleading.

Revised 4/2012

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

# EXHIBIT A

Policy Number**:**   **US00080794DO17A**                **Indian Harbor Insurance Company**
Renewal of Number:   N/A                                         Members of the XL America Companies

<div style="border:1px solid">

# EXECUTIVE AND CORPORATE SECURITIES
# LIABILITY INSURANCE POLICY DECLARATIONS

</div>

**Regulatory Office**                                                    **Executive Offices**
505 Eagleview Blvd. Suite 100                                      70 Seaview Avenue
Dept: Regulatory                                              Stamford, CT 06902-6040
Exton, PA 19341-1120                                        Telephone 877-953-2636
Telephone 800-688-1840

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS.  THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.**

---

**Item 1. Name and Mailing Address of Parent Company**:
    Amtrust Financial Services, Inc.
    59 Maiden Lane, 43rd Floor
    New York, NY 10038

---

**Item 2. Policy Period**:  Inception Date: October 21, 2017        Expiration Date: October 21, 2018
              **At 12:01AM Standard Time at your Mailing Address Shown Above**

---

**Item 3. Limit of Liability**:

(A)  $250,000        Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B)  $5,000,000        Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Loss** from all **Claims**, **Investigation Demands** and **Interviews**

**Item 4. Retentions**:

|  |  |
|---|---|
| $0.00 | each **Insured Person** under INSURING AGREEMENT I (A) or (D) |
| $5,000,000 | each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or (E) |
| $5,000,000 | each **Securities Claim** under INSURING AGREEMENT I (B) or (C) |
| $0.00 | each **Investigation Demand** under INSURING AGREEMENT I (F) |

---

**Item 5. Optional Extension Period**:
    Length of Optional Extension Period:  One Yearafter the end of the **Policy Period**, if elected.
    Premium for Optional Extension Period:     $1,000,000.00

---

**Item 6. Pending and Prior Litigation Date**:       October 21, 2017

---

**Item 7. Notices required to be given to the Insurer must be addressed to**:
    XL Professional Insurance
    100 Constitution Plaza, 17th Floor
    Hartford, CT 06103
    Toll Free Telephone: 877-953-2636 or proclaimnewnotices@xlcatlin.com

---

**Item 8. Premium**:
    Taxes, Surcharges or Fees      $0.00
    Total Policy Premium              $500,000.00

---

*© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.*

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS**

**Item 9. Policy Form and Endorsements Attached at Issuance**:
BR 71 00 09 14   XL 80 24 03 03   IHIC-NYSOP (02/07)   BR 83 63 11 16   XL 83 13 05 00   BR 83 11 03 15
BR 83 106 07 17   XL 80 72 06 13   XL 80 74 07 13   XL 80 75 07 14

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

_____          _____
Joseph Tocco                                                            Toni Ann Perkins
President                                                                    Secretary

©2014 X.L. America, Inc.  All rights reserved.  May not copied without permission.

NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTRO ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 1017

©2017 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act:  The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.   Under your existing coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by federal law.  Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage.  The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:   **Indian Harbor Insurance Company**

Policy Number:   **US00080794DO17A**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

## NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;
- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

<u>Violation of the Privacy Policy</u>

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
|---|---|
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | **WARNING**:  Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| Pennsylvania | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| Puerto Rico | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

XL 80 24 03 03

**Endorsement No.: 1**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 2**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# SERVICE OF PROCESS ENDORSEMENT

Indian Harbor Insurance Company (hereafter referred to as "the Company") pursuant to the provisions of Regulation 41, promulgated by New York (11 NYCRR 27.16) by issuance of this policy hereby appoints the Superintendent of Insurance of the State of New York to be its true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of an insured or beneficiary arising out of this insurance policy. The Company hereby signifies its agreement that service of process in such manner is of the same legal force and validity as personal service of process in New York upon the Company.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

IHIC-NYSOP (02/07)

**BR 83 63 11 16**

**Endorsement No.: 3**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# GENERAL E&O EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss from any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 83 13 05 00

| | |
|---|---|
| **Endorsement No.: 4** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# INSURANCE COMPANY ERRORS AND OMISSIONS ENDORSEMENT

In consideration of the premium charged:

(1)     Whenever used in this endorsement, the term "Insurance Contract" means any policy or agreement of insurance, reinsurance or indemnity, including but not limited to bonds, annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

(2)     No coverage will be available under this Policy for Loss, including Defense Expenses, resulting from any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(a)     any actual or alleged refusal to offer, issue or renew, or the cancellation of, any Insurance Contract;

(b)     any actual or alleged failure or refusal to pay or in the delay in the payment of, benefits due or alleged to have been due under any Insurance Contract;

(c)     any actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any Insurance Contract, or in the brokering or underwriting of insurance policies or risks;

(d)     any actual or alleged conduct of the Company or of any Insured Person as an insurance agent or broker in the negotiation, placement or maintenance of any Insurance Contract; or

(e)     any actual or alleged failure to effect or maintain reinsurance.

All other terms, conditions and limitations of this Policy remain unchanged.

**BR 83 11 03 15**

| | |
|---|---|
| **Endorsement No.: 5** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available for any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty or Wrongful Act committed or allegedly committed prior to October 21, 2017.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 83 106 07 17

| | |
|---|---|
| **Endorsement No.: 6** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT ENDORSEMENT

In consideration of the premium charged, without in any way limiting the effectiveness of Section III Exclusions (B)(1) and (2) of the Policy, no coverage shall be available under this Policy for any Loss in connection with: (i) any of the Claim(s), Interview(s), Investigation Demand(s), notices, events, investigations or actions set forth in subparagraph (1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16) (hereinafter "Events"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event; or (b) any Claim, Interview or Investigation Demand arising from any Event; or (iii) any Wrongful Act, underlying facts, circumstances, acts or omissions in any way relating to any Event.

EVENT(S)

(1)   Erk Erginer, Derivatively on Behalf of Nominal Defendant AmTrust Financial Services, Inc., Plaintiff, v. Michael Karfunkel, George Karfunkel, Barry D. Zyskind, Donald T. DeCarlo, Abraham Gulkowitz, Isaac M. Neuberger, Jay J. Miller, Max G. Caviet, Ronald E. Pipoly, Jr., Maiden Holdings, Ltd., Maiden Insurance Company, Ltd., Defendants and AmTrust Financial Services, Inc., Nominal Defendant. Listed on 10k filed on 3/15/2009
(2)   Tower Group Stockholder Derivative Lawsuit received by AIG on 4/22/2017, Case Number: 13-cv-5852-AT (S.D.N.Y.)
(3)   Cambridge Retirement Systems Stockholder Derivative Action filed on 4/07/2017, Case Number: 10879-CB
(4)   Shaya Lerner Stockholder Derivative Action received by AIG on 2/08/2018, Index Number: 650538/2016
(5)   David Shaev Profit Sharing Plan Stockholder Derivative Action filed on 04/27/2017
(6)   Lily Ding Stockholder Derivative Action filed on 4/19/2017, Case Number : 1:17-cv-00433
(7)   Benjamin Miller Class Action lawsuit recived by AIG on 3/08/2017, Case Number: 2:17-cv-01608
(8)   West Palm Beach Police Pension Fund Stockholder Derivative Action filed on 5/11/2017, Case Number: 1:17-cv-00553
(9)   City of Lauderhill Police Officers Retirement Plan Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(10)  Pompano Beach Police & Firefighters Retirement System Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(11)  *In re AmTrust Financial Services, Inc. Securities Litigation* listed on 10Q filed 8/09/2017
(12)  *Miller v. AmTrust, Zyskind, and Pipoly* listed on 10Q filed 8/09/2017
(13)  *Rubel v. AmTrust, Zyskind, and Pipoly*; *Sachetti v. AmTrust, Zyskind, and Pipoly* listed on 10Q 8/09/2017
(14)  *Albano v. AmTrust Financial Services, Inc. et al.* listed on 10Q filed 8/09/2017
(15)  Rikhard Dauber, Pompano Beach Police & Firefighters Retirement System, Nestor Shust, and the City of Lauderhill Police Officers' Retirement Plan Books and Records demands filed in April, May and June, 2017
(16)  Trust Risk Group Dispute listed on 10k filed on 02/29/2016

It is further understood and agreed that no coverage shall be available under this Policy for any Loss in connection with:

(A)   any restatement, retraction, amendment or revision of in part or in whole:

(i)   any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but limited to any 10Ks, 10Qs or annual reports); or

(ii)  any written or oral statement made regarding the assets, revenues, sales or financial conditions of the Company,

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Event or the resolution of said Event; and

B)    any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Interrelated Wrongful Act, regardless of whether or not such Claim, Interview or Investigation Demand involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 80 72 06 13

**Endorsement No.: 7**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# LINKED LIMIT ENDORSEMENT

In consideration of the premium charged, the Insured agrees with the Insurer that the total of all limits of liability under this Policy and any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled hereunder to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies") shall not exceed the amount of the Program Aggregate Limit indicated below:

**Program Aggregate Limit**:  $5,000,000

**Schedule of Program Policies:** (list all policies below):

|  | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|---|---|---|---|---|
| Policy 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| Policy 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| Policy 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| Policy 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| Policy 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

In the event that any payment is made under this Policy or any other Program Policy with the effect that the Program Aggregate Limit is exceeded, the Insured under this Policy shall immediately upon the request of the Insurer pay to the Insurer the sum of such excess.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**XL 80 74 07 13**

| | |
|---|---|
| **Endorsement No.: 8** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# SIMULTANEOUS TERMINATION ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if this Policy is canceled pursuant to Section VI General Conditions (E)(1) or (E)(2) of the Policy, any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled below to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies"), shall be deemed terminated and cancelled automatically and simultaneously with this Policy.

**Schedule of Program Policies:**

| # | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|---|---|---|---|---|
| 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 80 75 07 14

**Endorsement No.: 9**                              **Effective: October 21, 2017**
**Named Insured: Amtrust Financial Services, Inc.**   **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**                      **Insurer: Indian Harbor Insurance Company**

# WORLDWIDE COVERAGE ENDORSEMENT

In consideration of the premium charged, coverage available under this Policy shall extend outside the United States of America, its territories or possessions anywhere in the world where legally permissible on an admitted basis or under the following alternate bases of coverage:

 A.  Permissible Unlicensed Coverage

Coverage shall be provided on an unlicensed basis under Section I Insuring Agreements (A), (B) and (C) of the Policy within jurisdictions where the Insurer's provision of coverage on an unlicensed basis is permissible via non-admitted, difference in condition, difference in limits coverage and/or pursuant to any relevant law or regulation applicable to the placement of coverage in the relevant jurisdiction;

 or

 B.  Financial Interest Coverage

Coverage shall be provided to the Parent Company for its financial interests pursuant to Section I Insuring Agreements (B) and (C) of the Policy located within jurisdictions where:

 (i)  applicable law or regulation do not, to the best of the Insurer's good faith knowledge, allow it to provide coverage;  and/or

 (ii)  the Parent Company has elected that the Policy will not cover such entity directly but will cover the Parent Company's own financial interest in such entity.

Where the financial interest coverage basis is triggered to indemnify the Parent Company under this Policy, the Insurer and Parent Company agree that:

 (iii)  the Parent Company has a financial interest in the Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy because the Parent Company benefits financially from the continued operation of these Companies and/or would be prejudiced by loss to, or damage to, or liability incurred by, or to Companies in the operation of its business.  Financial interest includes, but is not limited to, the value of any direct or indirect shareholding of the Parent Company in such Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy;

 (iv)  subject to the terms, conditions, limitations and exceptions of this Policy, the Insurer shall indemnify, by way of agreed valuation, the Parent Company in respect of its loss to its financial interest, by payment to the Parent Company of a sum equal to that which would be payable to the Companies intended to be covered under Section I Insuring Agreements (B) and  (C) of the Policy as if a policy with the same terms and conditions of this Policy has been issued to such Companies in respect of its own interest, less the amount of any indemnity actually received under any policy insuring such Companies in respect of the same interest.

In all events this Endorsement shall not provide coverage to any entity or individual not otherwise provided coverage under the terms, conditions and limitations of the Policy nor is this Endorsement intended to extend or broaden the coverage otherwise available hereunder.

All other terms, conditions and limitations of the Policy shall remain unchanged.

XL 80 75 07 14                                                                                      Page 1 of 1
© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the "Insurer"), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I. INSURING AGREEMENTS

(A) The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B) The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

(C) The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act.**

(D) The Insurer shall pay on behalf of the **Insured Persons Defense Expenses** resulting from an **Interview**, except for **Defense Expenses** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(E) The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Insured Persons** resulting from an **Interview** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** such **Defense Expenses**.

(F) The Insurer shall pay on behalf of the **Company Defense Expenses** incurred by the **Company** resulting from any **Investigation Demand** first made during the **Policy Period**.

## II. DEFINITIONS

(A) "**Application**" means:

    (1) any application, including attachments thereto, or any written information or representation, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

    (2) any publicly available document filed by the **Company** with the U.S. Securities and Exchange Commission or any state, local or foreign equivalent during the twelve (12) months preceding this Policy's Inception Date.

(B) "**Change In Control**" means:

    (1) the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity; or

    (2) any person, entity or an affiliated group of persons or entities acting together,  acquire (a) interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of the majority of the directors, management committee members or members of the board of managers of the **Parent Company**, as applicable to its organization, or (b) such rights pursuant to written contract or the by-laws, charter, operating agreement or similar document of the **Parent Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(C)   "**Claim**" means:

    (1)   any written demand (other than an **Investigation Demand**) for:

        (a)   monetary or non-monetary relief, including injunctive relief; or

        (b)   arbitration,  mediation or other alternative dispute resolution proceeding;

    (2)   any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)   service of a complaint or similar pleading;

        (b)   return of an indictment, information, notice of charges or similar document;

        (c)   an official written request for extradition of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of extradition**;**

    (3)   any investigation of an **Insured Person** commenced by a written statement from an **Enforcement Authority** identifying such **Insured Person** as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)   any subpoena served upon an **Insured Person** for testimony or documents in connection with a formal or informal investigation of the **Company** by any **Enforcement Authority**; and

    (5)   any **Corporate Manslaughter Charge**.

(D)   "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.

(E)   "**Corporate Manslaughter Charge**" means a formal criminal proceeding commenced in the United Kingdom against an **Insured Person** of the **Company** domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**.

(F)   "**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

    (1)   incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim, Investigation Demand** or **Interview**, including any preparation for such an **Interview**;

    (2)   incurred due to the arrest and detainment or incarceration of any **Insured Person** in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**;

    (3)   incurred in connection with any **Claim** under section 304 of the Sarbanes-Oxley Act of 2002 or imposed pursuant to section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

    (4)   incurred in the defense of any **Corporate Manslaughter Charge**;

**Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)     "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)     wrongful termination of employment whether actual or constructive;

    (2)     employment discrimination of any kind, including violation of any federal, state or local law involving employment or discrimination in employment, which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

    (3)     sexual or other harassment in the workplace; or

    (4)     wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to employ or promote, demotion, wrongful discipline or evaluation, refusal to hire, negligent hiring, or negligent supervision.

(H)     "**Enforcement Authority**" means any federal, state, local or foreign law enforcement or governmental regulatory authority, including the United States Departments of Justice and Labor, Securities and Exchange Commission, attorneys general, or the enforcement unit of any securities exchange or similar self-regulatory organization.

(I)      "**Insured**" means the **Insured Persons** and the **Company**.

(J)      "**Insured Person**" means:

    (1)     any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)     any past, present or future natural person employee of the **Company** (other than an individual described in (J)(1) above) to the extent any **Claim** is: (a) a **Securities Claim**, or (b) made and maintained against both such employee and an **Insured Person** as defined in (J)(1) above;

    (3)     an individual identified in (J)(1) above who, with the consent of the **Company**, is or was serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

    (4)     any individual identified in (J)(1) above who, with the consent of the **Company** is or was serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

In addition:

In the event of the death, incapacity or bankruptcy of any individual identified above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

The coverage otherwise available under this Policy to any **Insured Person** will be extended to such **Insured Person's** lawful spouse or domestic partner, but only to the extent such spouse or domestic partner is a party to any **Claim** solely in his or her capacity as a spouse or domestic partner of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Acts**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(L)   "**Interview**" means:

    (1)   a written request first received by an **Insured Person** during the **Policy Period** for a voluntary interview, meeting or sworn statement by:

        (a)   any **Enforcement Authority**; or

        (b)   the **Company** in connection with an **Investigation Demand** or an investigation or other inquiry of the **Company** by an **Enforcement Authority**; or

    (2)   an arrest or confinement of an **Insured Person** during the **Policy Period** to a specified residence or secure custodial premises operated by an **Enforcement Authority**, but only in connection with the business of the **Company** or an **Insured Person's** capacity as such or due to his/her status as such;

provided that **Interview** will not include: any document production or discovery in a legal proceeding; any request that is part of any routine or regularly scheduled oversight, compliance, audit, inspection or examination; or any request that is part of an employment-related investigation or **Claim**.  Any **Interview** as defined in (L)(1) above first received, or as defined in (L)(2) above, occurring, prior to the Inception Date of this Policy are not covered under this Policy.

(M)   "**Investigation Demand**" means an investigation by the **Company** to determine whether it is in its best interest to prosecute the allegations made by a security holder of the **Company** in a derivative demand or action.  An **Investigation Demand** shall be deemed first made upon the earlier of: receipt of such allegations by the **Company** or service of a civil complaint or similar proceeding setting forth such allegations.

(N)   "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

    (1)   owns or controls at least thirty-three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the present right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

    (2)   has the right, by written contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty-three percent (33%) of those persons described in (N)(1) above.

(O)   "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees.  **Loss** will not include that portion which constitutes:

    (1)   fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

        (a)   civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

        (b)   solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company;**

    (2)   costs incurred by an **Insured** to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)     any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

(4)     any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

(5)     any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity;

(6)     the return of any amounts required to be paid by an **Insured Person** pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:   With respect to judgments in which punitive, exemplary or multiplied damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured**.

(P)     "**Non-Profit Entity**" means any not-for-profit entity or not-for-profit organization.

(Q)     "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(R)     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.  **Policy Period** will include any Optional Extension Period, if applicable.

(S)     "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)     made against any **Insured** for any actual or alleged violation of any federal, state or local statute,  regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)     brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or

(b)     brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**; or

(2)     brought derivatively on behalf of the **Company** by a security holder of the **Company**.

Notwithstanding the foregoing, the term **Securities Claim** shall include an administrative or regulatory proceeding against, or a formal investigation of, the **Company**, but only if and only during the time that such formal investigation or proceeding is also maintained against an **Insured Person**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(T)   "**Subsidiary**" means any entity during any time in which the **Parent Company** holds directly or indirectly:

    (1)   more than fifty percent (50%) of the voting rights or issued share capital of such entity;

    (2)   between twenty percent (20%) and fifty percent (50%) of the voting rights or issued share capital, together with control of the management of such entity; or

    (3)   the right to appoint or remove a majority of the Board of Directors of such entity.

(U)   "**Wrongful Act**" means:

    (1)   any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

    (2)   solely with respect to a **Claim** as defined in Definition (C)(4) of the Policy, any other matter concerning an **Insured Person** solely by reason of his or her capacity as such or due to his or her status as such;

    (3)   solely with respect to Insuring Agreement (C) of the **Policy,** any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**; or

    (4)   any **Employment Practices Wrongful Act** by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such.

Solely with respect to determining whether a securities holder derivative lawsuit which names the **Company** as a defendant (including as a nominal defendant) is a **Securities Claim** against such **Company** for purposes of Insuring Agreement (C) of the Policy, any **Wrongful Act** as defined in subparagraph (U)(1) above will also be deemed to be a **Wrongful Act** of the **Company**; provided that this provision shall not be deemed to create coverage under this Policy for **Loss** from any **Investigation Demand** pursuant to Insuring Agreement (F) of the Policy.  Any such coverage shall only be available pursuant to Insuring Agreement (F) of the Policy.

## III.   EXCLUSIONS

(A)   No coverage shall be available under this Policy for that portion of any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any property including loss of use thereof; however, this Exclusion (A)(1) will not apply to: (a) any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of a **Claim** for an **Employment Practices Wrongful Act**;  (b) any **Securities Claim**; (c) for **Corporate Manslaughter Charges**; or (d) any **Claim** to the extent coverage is provided under Insuring Agreement, (A) of the Policy;

    (2)   for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation in connection with any pension, profit sharing or employee benefit program established and/or sponsored by the **Company** in whole or in part for the benefit of the directors, officers or employees of the **Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)      by, on behalf of, or at the direction of the **Company,** or any **Joint Venture** or **Non-Profit Entity** (but with respect to the **Joint Venture** or **Non-Profit Entity**, only against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Joint Venture** or **Non-Profit Entity**, or  as a person occupying an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated of the **Joint Venture**); however, this Exclusion (A)(3) will not apply to:

    (a)      the extent a **Claim** is brought derivatively by a security holder of the **Company**, or by any **Joint Venture** or **Non-Profit Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured Person** unless such solicitation, assistance, participation or intervention is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute**,** or the **Company**, or any **Joint Venture** or **Non-Profit Entity**;

    (b)      the extent a **Claim** or **Interview** is brought by the Bankruptcy Trustee or Examiner of the **Company**, or by  any **Joint Venture** or **Non-Profit Entity** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company, Joint Venture**, or **Non-Profit Entity**;

    (c)      the extent a **Claim** is brought and maintained in a non-common law jurisdiction outside the United States of America, including its territories and possessions;

    (d)      the extent a **Claim** or **Interview** is brought by a Creditors Committee of the **Company**, or any **Joint Venture** or **Non-Profit Entity** in the event the **Company, Joint Venture**, or **Non-Profit Entity** files for relief under Title 11 of the United States Code;

    (e)      **Defense Expenses** covered under Insuring Agreement (A) or (D).

(B)      No coverage shall be available under this Policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

(1)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(2)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(3)      brought about or contributed to in fact by any:

    (a)      deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an **Insured**; or

    (b)      profit or remuneration gained by an **Insured** to which such **Insured** is not legally entitled,

     as determined by a final, non-appealable adjudication in the underlying action; however this Exclusion (B)(3) will not apply to: (i) allegations in a **Claim** asserted against an **Insured** under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the **Company's** securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933); or (ii) **Defense Expenses** incurred in connection with a

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**Claim** alleging violations of section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

No conduct of any **Insured** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. Only the conduct of the chief executive officer and/or chief financial officer of the **Company** will be imputed to the **Company**.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3(B) of the Declarations.

(B)    The amount set forth in ITEM 3(B) of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy whether any **Loss** is covered under one or more Insuring Agreements. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)    The amount set forth in Item 3(A) of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy resulting from all **Investigation Demands** first made during the **Policy Period**, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for the Policy as set forth in Item 3(B) of the Declarations.

(D)    With respect to the **Company**'s indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to require indemnification to the **Insured Persons** to the fullest extent permitted by law.

(E)    No Retention will be applicable to **Loss**, including **Defense Expenses**, under Insuring Agreements, (A), (D) or (F).  In the event of financial insolvency of the **Company**, no Retention shall apply.

(F)    In the event the **Company** is obligated under the Policy to pay any Retention, the **Company** may satisfy such Retention from any source. As a precondition to such recognition of the erosion of the Retention from any source other than by payment by the **Company**, the **Company** shall provide the Insurer with written proof, to the Insurer's satisfaction, that payment of such Retention has been made.

(G)    If more than one retention is applicable to different portions of **Loss**, including **Defense Expenses**, the applicable Retention(s) will be applied separately to each portion of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

## V.    DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)    It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim**, **Interview** or **Investigation Demand** under this Policy.

(B)    No **Insured** may incur any **Defense Expenses** in connection with any **Claim, Interview** or **Investigation Demand**, or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably delayed or withheld; however, the **Insured** may settle a **Claim** without such consent, if the total amount of such settlement and **Defense Expenses** does not exceed fifty percent (50%) of the amount of the applicable Retention(s) for such **Claim**.

(C)    Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis, but no less so than quarterly, excess of the applicable Retention, before the disposition of the **Claim, Interview** or **Investigation Demand** for which this Policy provides coverage. As a condition of the advancement of **Defense Expenses**, each **Insured** agrees that if and to the extent it is determined that such **Defense Expenses** are not insured under this Policy, such **Defense Expenses** shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(D)   If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim, Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim, Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim, Interview** or **Investigation Demand** by, the **Insured** and others.

(E)   In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

(A)   **NOTICE**

(1)   As a condition precedent to any right to payment under this Policy with respect to any **Claim** or **Investigation Demand**, the **Insured** shall give written notice to the Insurer of each **Claim** or **Investigation Demand** as soon as practicable after it is first made, including but not limited to written notice as soon as practicable of each **Claim** or **Investigation Demand** deemed to constitute a single **Claim** or **Investigation Demand** pursuant to Section VI (B) below.  Such notice shall be provided as soon as practicable after the risk management or general counsel departments of the **Parent Company** first becomes aware of such **Claim** or **Investigation Demand**.  In the event that the **Insureds** fail to provide timely notice to the Insurer under this Section VI (A)(1), the Insurer shall not be entitled to deny coverage solely based on such untimely notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such untimely notice.

(2)   As a condition precedent to any right to payment under this Policy with respect to any **Interview**, the **Insured** may elect to give the Insurer written notice thereof during the **Policy Period** pursuant to Section VI (A)(4) below.

(3)   If, during the **Policy Period,** the **Insured** provides the Insurer with written notice of:

(a)   a specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**;

(b)   its receipt of a request to toll or waive a statute of limitations in connection with a **Wrongful Act**; or

(c)   an **Interview** first received during the **Policy Period**,

then any **Claim** or **Investigation Demand** subsequently made arising out of such **Wrongful Act**, request to toll or waive a statute of limitation or **Interview** will be treated as if it had been first made during the **Policy Period**, provided written notice of any subsequent **Claim** or **Investigation Demand** is provided to the Insurer as soon as practicable after such **Claim** or **Investigation Demand** is made.

(4)   All notices under Section VI (A)(1),(2) and (3) above must be sent by:

(a)   first class U.S. mail, overnight mail or the equivalent to the address set forth in ITEM 7 of the Declarations:  Attention Claim Department; or

(b)   electronic mail (email) to the address shown in ITEM 7 of the Declarations.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(B)   **INTERRELATED CLAIMS**

All **Claims, Investigation Demands, Interviews** or requests to toll or waive a statute of limitations, arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim, Investigation Demand** or **Interview** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim, Investigation Demand**, or **Interview** is made or deemed to have been made pursuant to Section VI (A) above.

(C)   **OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)   Subject to Section IV LIMIT OF LIABILITY INDEMNIFICATION AND RETENTIONS (F), all coverage under this Policy will be specifically excess of and will not contribute with any other valid and collectible management liability insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy, or a personal umbrella policy or personal directorship liability policy purchased by an **Insured Person**. This Policy will not be subject to the terms of any other insurance policy.

(2)   All coverage under this Policy for **Loss** from **Claims** and **Interviews** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of his or her service as such.

(D)   **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)   If during the **Policy Period** the **Company** acquires any entity by merger, consolidation or otherwise such that the entity becomes a **Subsidiary**, coverage shall be provided for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)   If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed thirty-five percent (35%) of the total assets or liabilities, respectively, of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond such period will be provided only if:

(a)   the Insurer receives written notice containing full details of the transaction(s); and

(b)   the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)   With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity as described in (D)(1) and (2) above, there will be no coverage available to the **Company**, an **Insured Person**, or to the acquired entity under this Policy for **Claims** made against the **Company** , an **Insured Person**, or the acquired entity, for a **Wrongful Act** committed any time during which such entity, is not an **Insured** .

(4)   If any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(5)     If during the **Policy Period** there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)     coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)     the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

(E)     **CANCELLATION AND RENEWAL OF COVERAGE**

(1)     Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)     The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)     The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)     **OPTIONAL EXTENSION PERIOD**

(1)     If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** or any **Insured Person** shall be entitled, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** or **Investigation Demand** first made or deemed first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date. Any such **Claim** or **Investigation Demand** shall be deemed to have been made during the **Policy Period**.

(2)     As a condition precedent to the right to purchase the Optional Extension Period, the total premium for this Policy must have been paid in full. The right of the **Parent Company** or any **Insured Person** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** or **Insured Person** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)     If the **Parent Company** or **Insured Person** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)     The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims**, **Interviews** and **Investigation Demands** made during the **Policy Period.**

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

    (1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request in connection with any **Claim**, **Investigation Demand** or **Interview** that is reasonably likely to be covered under this Policy, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery against any party.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment of **Loss** to all of the **Insured's** rights of recovery; provided that the Insurer will be subrogated to any **Insured's** potential or actual rights of recovery against any **Insured Person** only in the event that Exclusion (B)(3) of the Policy is applicable to such **Insured Person** in connection with such **Loss**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in its name, and will provide all other assistance and cooperation which the Insurer may reasonably require. It is understood that the failure of any **Insured Person** to give the Insurer cooperation and information as required in this paragraph shall not impair the rights of the **Company**, or any other **Insured Person** under this Policy.

    (3)    In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limits of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery.  It is understood and agreed that the Insurer shall have no duty to seek such a recovery.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned and, subject to Section VI General Condition (G)(3), all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

    (1)    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy.

    (2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

    (3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(4)     Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(K)     **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)     the payment of the premiums;

(2)     the receiving of any return premiums that may become due under this Policy;

(3)     the giving of all notices to the Insurer as provided herein; and

(4)     the receiving of all notices from the Insurer.

(L)     **PRIORITY OF PAYMENTS**

In the event of **Loss**, including **Defense Expenses**, payable under more than one of the Insuring Agreements of the Policy, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such **Loss** as follows:

(1)     first, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Insured Persons** which the **Company** is not permitted nor required to pay on behalf of the **Insured Persons** as indemnification;

(2)     second, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Company** which the **Company** is permitted or required to pay on behalf of the **Insured Persons**; and

(3)     third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreements (C) and/or (F) or otherwise.

(M)     **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of any of its obligations under this Policy.  In such event, including any liquidation or reorganization proceeding of the **Company**, then each **Insured** and the Insurer hereby agree not to oppose or object to any efforts by any **Insured Person** to obtain relief from any stay or injunction.

(N)     **ENTIRE AGREEMENT – WORLDWIDE COVERAGE**

(1)     The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application**, shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.  The coverage afforded by the Policy shall apply anywhere in the world.

(2)     If the **Parent Company** requests management or directors and officers liability policies for issuance to its foreign **Subsidiaries** in their own countries, the Insurer or a subsidiary or affiliate of XL Group plc shall provide a quote to the **Parent Company** for such policies; provided that the Insurer or a subsidiary or affiliate of XL Group plc can support or facilitate the issuance of the policies to such foreign **Subsidiaries** in their applicable foreign countries. Any coordination of coverage under such policies with coverage under this Policy shall be set forth in an endorsement attached to this Policy.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(O)     **CURRENCY**

All premiums, limits of liability, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than the United States of America, payment of covered **Loss** due under this Policy, subject to its terms, conditions and limitations, will be made either in such other currency (at the option of the Insurer and with the agreement of the **Parent Company**), or, in the United States of America dollars at the rate of exchange most recently published in The Wall Street Journal on the date of the Insurer's obligation to pay such **Loss** is established.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

# EXHIBIT B





**XL Catlin - Professional Insurance**
100 Constitution Plaza
17th Floor
Hartford, CT 06103
Phone     860-246-1863
Fax         860-246-1899

October 15, 2018

Timothy Molineux
Marsh
1166 Avenue of the Americas
New York, NY  10036

**Re:  Amtrust Financial Services, Inc.**
      **Executive and Corporate Securities Liability Endorsement**

Dear Timothy,

Enclosed, please find the endorsement for **Amtrust Financial Services, Inc.**  Thank you for choosing XL Catlin - Insurance. Please call if you have any questions or concerns.

Sincerely,

Michael Linehan

Policy Number**:**     **US00080794DO17A**                                      **Indian Harbor Insurance Company**
Renewal of Number:     N/A                                                                         **Members of the XL America Companies**

---

# EXECUTIVE AND CORPORATE SECURITIES
# LIABILITY INSURANCE POLICY DECLARATIONS

---

**Regulatory Office**                                                                        **Executive Offices**
505 Eagleview Blvd. Suite 100                                                        70 Seaview Avenue
Dept: Regulatory                                                                     Stamford, CT 06902-6040
Exton, PA 19341-1120                                                                Telephone 877-953-2636
Telephone 800-688-1840

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS.  THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.**

---

**Item 1. Name and Mailing Address of Parent Company**:
    Amtrust Financial Services, Inc.
    59 Maiden Lane, 43rd Floor
    New York, NY 10038

---

**Item 2. Policy Period**:  Inception Date: October 21, 2017          Expiration Date: October 21, 2018
    **At 12:01AM Standard Time at your Mailing Address Shown Above**

---

**Item 3. Limit of Liability**:

(A)  $250,000          Maximum Aggregate Sublimit of Liability each **Policy Period** for all **Investigation Demands**

(B)  $5,000,000       Maximum  Aggregate  Limit  of  Liability  each  **Policy Period**  (including  **Defense Expenses**)  for  all **Loss** from all **Claims**, **Investigation Demands** and **Interviews**

**Item 4. Retentions**:

    $0.00                each **Insured Person** under INSURING AGREEMENT I (A) or (D)
    $5,000,000       each **Claim**, other than a **Securities Claim**, under INSURING AGREEMENT I (B) or (E)
    $5,000,000       each **Securities Claim** under INSURING AGREEMENT I (B) or (C)
    $0.00                each **Investigation Demand** under INSURING AGREEMENT I (F)

**Item 5. Optional Extension Period**:
    Length of Optional Extension Period:  One Yearafter the end of the **Policy Period**, if elected.
    Premium for Optional Extension Period:     $1,000,000.00

---

**Item 6. Pending and Prior Litigation Date**:          October 21, 2017

---

**Item 7. Notices required to be given to the Insurer must be addressed to**:
    XL Professional Insurance
    100 Constitution Plaza, 17th Floor
    Hartford, CT 06103
    Toll Free Telephone: 877-953-2636 or proclaimnewnotices@xlcatlin.com

**Item 8. Premium**:
    Taxes, Surcharges or Fees     $0.00
    Total Policy Premium             $500,000.00

---

*©2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.*

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE POLICY DECLARATIONS**

**Item 9. Policy Form and Endorsements Attached at Issuance**:
BR 71 00 09 14   XL 80 24 03 03   IHIC-NYSOP (02/07)   BR 83 63 11 16   XL 83 13 05 00   BR 83 11 03 15
BR 83 106 07 17   XL 80 72 06 13   XL 80 74 07 13   XL 80 75 07 14

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

| | |
|---|---|
| Joseph Tocco | Toni Ann Perkins |
| President | Secretary |

©2014 X.L. America, Inc.  All rights reserved.  May not copied without permission.

## NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTRO ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 1017

©2017 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your existing coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is:**
**$ waived. Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:  **Indian Harbor Insurance Company**

Policy Number:  **US00080794DO17A**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

## NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1.  We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2.  We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3.  We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4.  We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5.  We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6.  We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7.  We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8.  We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;
- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

<u>Violation of the Privacy Policy</u>

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 1015

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
|---|---|
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| New Mexico | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New York** | **General:  All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation. |
| | **All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation. |
| | **Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. |
| | The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING**:  Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |
| | **Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

© 2017 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2017 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

**XL 80 24 03 03**

| | |
|---|---|
| Endorsement No.: 1 | Effective: October 21, 2017 |
| Named Insured: Amtrust Financial Services, Inc. | 12:01 A.M. Standard Time |
| Policy No.:  US00080794DO17A | Insurer: Indian Harbor Insurance Company |

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 2**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# SERVICE OF PROCESS ENDORSEMENT

Indian Harbor Insurance Company (hereafter referred to as "the Company") pursuant to the provisions of Regulation 41, promulgated by New York (11 NYCRR 27.16) by issuance of this policy hereby appoints the Superintendent of Insurance of the State of New York to be its true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of an insured or beneficiary arising out of this insurance policy. The Company hereby signifies its agreement that service of process in such manner is of the same legal force and validity as personal service of process in New York upon the Company.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

IHIC-NYSOP (02/07)

BR 83 63 11 16

**Endorsement No.: 3**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# GENERAL E&O EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss from any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 83 13 05 00

| | |
|---|---|
| **Endorsement No.: 4** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# INSURANCE COMPANY ERRORS AND OMISSIONS ENDORSEMENT

In consideration of the premium charged:

(1)     Whenever used in this endorsement, the term "Insurance Contract" means any policy or agreement of insurance, reinsurance or indemnity, including but not limited to bonds, annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

(2)     No coverage will be available under this Policy for Loss, including Defense Expenses, resulting from any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (a)     any actual or alleged refusal to offer, issue or renew, or the cancellation of, any Insurance Contract;

    (b)     any actual or alleged failure or refusal to pay or in the delay in the payment of, benefits due or alleged to have been due under any Insurance Contract;

    (c)     any actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any Insurance Contract, or in the brokering or underwriting of insurance policies or risks;

    (d)     any actual or alleged conduct of the Company or of any Insured Person as an insurance agent or broker in the negotiation, placement or maintenance of any Insurance Contract; or

    (e)     any actual or alleged failure to effect or maintain reinsurance.

All other terms, conditions and limitations of this Policy remain unchanged.

**BR 83 11 03 15**

| | |
|---|---|
| **Endorsement No.: 5** | **Effective: October 21, 2017** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available for any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty or Wrongful Act committed or allegedly committed prior to October 21, 2017.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.*

BR 83 106 07 17

| | |
|---|---|
| Endorsement No.: 6 | Effective: October 21, 2017 |
| Named Insured: Amtrust Financial Services, Inc. | 12:01 A.M. Standard Time |
| Policy No.: US00080794DO17A | Insurer: Indian Harbor Insurance Company |

# SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT ENDORSEMENT

In consideration of the premium charged, without in any way limiting the effectiveness of Section III Exclusions (B)(1) and (2) of the Policy, no coverage shall be available under this Policy for any Loss in connection with: (i) any of the Claim(s), Interview(s), Investigation Demand(s), notices, events, investigations or actions set forth in subparagraph (1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16) (hereinafter "Events"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event; or (b) any Claim, Interview or Investigation Demand arising from any Event; or (iii) any Wrongful Act, underlying facts, circumstances, acts or omissions in any way relating to any Event.

EVENT(S)

(1)   Erk Erginer, Derivatively on Behalf of Nominal Defendant AmTrust Financial Services, Inc., Plaintiff, v. Michael Karfunkel, George Karfunkel, Barry D. Zyskind, Donald T. DeCarlo, Abraham Gulkowitz, Isaac M. Neuberger, Jay J. Miller, Max G. Caviet, Ronald E. Pipoly, Jr., Maiden Holdings, Ltd., Maiden Insurance Company, Ltd., Defendants and AmTrust Financial Services, Inc., Nominal Defendant. Listed on 10k filed on 3/15/2009
(2)   Tower Group Stockholder Derivative Lawsuit received by AIG on 4/22/2017, Case Number: 13-cv-5852-AT (S.D.N.Y.)
(3)   Cambridge Retirement Systems Stockholder Derivative Action filed on 4/07/2017, Case Number: 10879-CB
(4)   Shaya Lerner Stockholder Derivative Action received by AIG on 2/08/2018, Index Number: 650538/2016
(5)   David Shaev Profit Sharing Plan Stockholder Derivative Action filed on 04/27/2017
(6)   Lily Ding Stockholder Derivative Action filed on 4/19/2017, Case Number : 1:17-cv-00433
(7)   Benjamin Miller Class Action lawsuit recived by AIG on 3/08/2017, Case Number: 2:17-cv-01608
(8)   West Palm Beach Police Pension Fund Stockholder Derivative Action filed on 5/11/2017, Case Number: 1:17-cv-00553
(9)   City of Lauderhill Police Officers Retirement Plan Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(10)  Pompano Beach Police & Firefighters Retirement System Stockholder Derivative Action filed on 6/28/2017 U.S. District Court for the District of Delaware case number 1:17-cv-00843-UNA
(11)  *In re AmTrust Financial Services, Inc. Securities Litigation* listed on 10Q filed 8/09/2017
(12)  *Miller v. AmTrust, Zyskind, and Pipoly* listed on 10Q filed 8/09/2017
(13)  *Rubel v. AmTrust, Zyskind, and Pipoly*; *Sachetti v. AmTrust, Zyskind, and Pipoly* listed on 10Q 8/09/2017
(14)  *Albano v. AmTrust Financial Services, Inc. et al.* listed on 10Q filed 8/09/2017
(15)  Rikhard Dauber, Pompano Beach Police & Firefighters Retirement System, Nestor Shust, and the City of Lauderhill Police Officers' Retirement Plan Books and Records demands filed in April, May and June, 2017
(16)  Trust Risk Group Dispute listed on 10k filed on 02/29/2016

It is further understood and agreed that no coverage shall be available under this Policy for any Loss in connection with:

(A)   any restatement, retraction, amendment or revision of in part or in whole:

(i)     any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but limited to any 10Ks, 10Qs or annual reports); or

(ii)    any written or oral statement made regarding the assets, revenues, sales or financial conditions of the Company,

BR 83 106 07 17

© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Event or the resolution of said Event; and

B)   any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Interrelated Wrongful Act, regardless of whether or not such Claim, Interview or Investigation Demand involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*© 2017 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.*

XL 80 72 06 13

**Endorsement No.: 7**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# LINKED LIMIT ENDORSEMENT

In consideration of the premium charged, the Insured agrees with the Insurer that the total of all limits of liability under this Policy and any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled hereunder to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies") shall not exceed the amount of the Program Aggregate Limit indicated below:

**Program Aggregate Limit**:  $5,000,000

**Schedule of Program Policies:** (list all policies below):

|  | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|---|---|---|---|---|
| Policy 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| Policy 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| Policy 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| Policy 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| Policy 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

In the event that any payment is made under this Policy or any other Program Policy with the effect that the Program Aggregate Limit is exceeded, the Insured under this Policy shall immediately upon the request of the Insurer pay to the Insurer the sum of such excess.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 80 74 07 13

**Endorsement No.: 8**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: October 21, 2017**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# SIMULTANEOUS TERMINATION ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if this Policy is canceled pursuant to Section VI General Conditions (E)(1) or (E)(2) of the Policy, any and all other insurance policies issued or reinsured by the Insurer or its affiliates scheduled below to the Insured or any of the Insured's worldwide affiliates, officers, directors, or employees, (this Policy together with all such other policies being referred to herein as "Program Policies"), shall be deemed terminated and cancelled automatically and simultaneously with this Policy.

**Schedule of Program Policies:**

| # | Named Insured | Issuing XL Group Insurer | Policy Number | Policy Period |
|---|---|---|---|---|
| 1 | Amtrust Europe Ltd | XL Insurance Company SE | GB00072074DO17A | October 21, 2017 – October 21, 2018 |
| 2 | Shanghai First Response Serivce Company Limited | Ping An Property & Casualty Insurance Company of China, Ltd. | HK00015582DO17A | October 21, 2017 – October 21, 2018 |
| 3 | Amtrust International Underwriters, LTD | XL Insurance Company SE | IE00018434DO17A | October 21, 2017 – October 21, 2018 |
| 4 | Amtrust Insurance Luxembourg SA | XL Insurance Company SE | NL00007339DO17A | October 21, 2017 – October 21, 2018 |
| 5 | All Insurance Management Limited | XL Specialty Insurance Company | US00081230DO17A | October 21, 2017 – October 21, 2018 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 74 07 13

Page 1 of 1

© 2013 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

XL 80 75 07 14

Endorsement No.: 9
Named Insured: Amtrust Financial Services, Inc.
Policy No.:  US00080794DO17A

Effective: October 21, 2017
12:01 A.M. Standard Time
Insurer: Indian Harbor Insurance Company

# WORLDWIDE COVERAGE ENDORSEMENT

In consideration of the premium charged, coverage available under this Policy shall extend outside the United States of America, its territories or possessions anywhere in the world where legally permissible on an admitted basis or under the following alternate bases of coverage:

A.  Permissible Unlicensed Coverage

Coverage shall be provided on an unlicensed basis under Section I Insuring Agreements (A), (B) and (C) of the Policy within jurisdictions where the Insurer's provision of coverage on an unlicensed basis is permissible via non-admitted, difference in condition, difference in limits coverage and/or pursuant to any relevant law or regulation applicable to the placement of coverage in the relevant jurisdiction;

or

B.  Financial Interest Coverage

Coverage shall be provided to the Parent Company for its financial interests pursuant to Section I Insuring Agreements (B) and (C) of the Policy located within jurisdictions where:

(i)  applicable law or regulation do not, to the best of the Insurer's good faith knowledge, allow it to provide coverage;  and/or

(ii)  the Parent Company has elected that the Policy will not cover such entity directly but will cover the Parent Company's own financial interest in such entity.

Where the financial interest coverage basis is triggered to indemnify the Parent Company under this Policy, the Insurer and Parent Company agree that:

(iii)  the Parent Company has a financial interest in the Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy because the Parent Company benefits financially from the continued operation of these Companies and/or would be prejudiced by loss to, or damage to, or liability incurred by, or to Companies in the operation of its business.  Financial interest includes, but is not limited to, the value of any direct or indirect shareholding of the Parent Company in such Companies intended to be covered under Section I Insuring Agreements (B) and (C) of the Policy;

(iv)  subject to the terms, conditions, limitations and exceptions of this Policy, the Insurer shall indemnify, by way of agreed valuation, the Parent Company in respect of its loss to its financial interest, by payment to the Parent Company of a sum equal to that which would be payable to the Companies intended to be covered under Section I Insuring Agreements (B) and  (C) of the Policy as if a policy with the same terms and conditions of this Policy has been issued to such Companies in respect of its own interest, less the amount of any indemnity actually received under any policy insuring such Companies in respect of the same interest.

In all events this Endorsement shall not provide coverage to any entity or individual not otherwise provided coverage under the terms, conditions and limitations of the Policy nor is this Endorsement intended to extend or broaden the coverage otherwise available hereunder.

All other terms, conditions and limitations of the Policy shall remain unchanged.

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**BR 80 74 11 15**

**Endorsement No.: 10**       **Effective: October 21, 2018**
**Named Insured: Amtrust Financial Services, Inc.**  **12:01 A.M. Standard Time**
**Policy No.:  US00080794DO17A**     **Insurer: Indian Harbor Insurance Company**

# AMEND POLICY PERIOD ENDORSEMENT

In consideration of an additional premium of $41,000.00 charged:

(1)  Item 2 of the Declarations is amended to read as follows:

   Item 2. Policy Period: Inception Date: October 21, 2017  Expiration Date: November 20, 2018
   At 12:01 AM Standard Time at your Mailing Address Shown Above.

(2)  It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended above.

(3)  Item 8 of the Declarations is amended to read as follows:

   Item 8.  Premium:

     Taxes, Surcharges or Fees:   $0.00
     Total Policy Premium:    $541,000.00

(4)  The term "Application," as used in this Policy, shall be deemed to include any additional application and any updated or supplemental information relating to the application for this Policy attached to and forming part of this Policy, including any materials submitted therewith, all of which are on file with the Insurer and are a part of the Policy, as if physically attached.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 74 11 15

**Endorsement No.: 11**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: November 20, 2018**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# AMEND POLICY PERIOD ENDORSEMENT

In consideration of an additional premium of $56,000.00 charged:

(1)     Item 2 of the Declarations is amended to read as follows:

Item 2. Policy Period: Inception Date: October 21, 2017     Expiration Date: December 31, 2018
At 12:01 AM Standard Time at your Mailing Address Shown Above.

(2)     It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended above.

(3)     Item 8 of the Declarations is amended to read as follows:

Item 8.  Premium:

| | |
|---|---|
| Taxes, Surcharges or Fees: | $0.00 |
| Total Policy Premium: | $597,000.00 |

(4)     The term "Application," as used in this Policy, shall be deemed to include any additional application and any updated or supplemental information relating to the application for this Policy attached to and forming part of this Policy, including any materials submitted therewith, all of which are on file with the Insurer and are a part of the Policy, as if physically attached.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**XL 80 20 01 02**

**Endorsement No.: 12**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.:  US00080794DO17A**

**Effective: November 29, 2018**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# ADD/DELETE AN ENDORSEMENT
# (FOR ADDITIONAL PREMIUM)

In consideration of an additional premium of $1,000,000.00 charged:

(1)     Endorsement No. 3 and Endorsement No. 4 are deleted from this Policy.

(2)     Item 8. of the Declarations is amended to read in its entirety as follows:

"Item 8. Premium:  $1,597,000.00 Total Policy Premium"

All other terms, conditions and limitations of this Policy shall remain unchanged.

BR 83 43 02 16

**Endorsement No.: 13**                        **Effective: November 29, 2018**
**Named Insured: Amtrust Financial Services, Inc.**   **12:01 A.M. Standard Time**
**Policy No.: US00080794DO17A**                 **Insurer: Indian Harbor Insurance Company**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

# GENERAL E&O EXCLUSION

In consideration of the premium charged:

(1)    No coverage will be available under this Policy for Loss from any Claim, Interview or Investigation Demand based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

(2)    Paragraph (1) above is not intended, however, nor shall it be construed, to apply to Loss in connection with any Securities Claim brought by a security holder of the Company, or a derivative action brought by or on behalf of, or in the name or right of, the Company, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

DO 83 74 06 03

| | |
|---|---|
| **Endorsement No.: 14** | **Effective: November 29, 2018** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.:  US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |

# INSURANCE ERRORS & OMISSIONS EXCLUSION

In consideration of the premium charged:

(1)     Whenever used in this endorsement, the term "Insurance Contract" means any policy or agreement of insurance, reinsurance or indemnity, including but not limited to bonds, annuities, endowments, pension contracts and risk management self-insurance programs, pools or similar programs.

(2)     No coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

  (a)     the actual or alleged refusal to offer, issue or renew, or the cancellation of, any Insurance Contract;

  (b)     the actual or alleged failure or refusal to pay, or delay in the payment of, benefits due or alleged to have been due under any Insurance Contract;

  (c)     the actual or alleged lack of good faith or unfair dealing in the handling of any claim or obligation under any Insurance Contract, or the brokering or underwriting of insurance policies or risks;

  (d)     the actual or alleged conduct of the Company or any Insured Person as an insurance agent or insurance broker in the negotiation, placement or maintenance of any Insurance Contract;

  (e)     the rendering of professional services for others in the Company's capacity as investment counselor, manager or advisor, investment banker, securities broker or dealer, financial planner or analyst, insurance agent or broker, general partner, limited partner or partnership unit distributor, or any similar capacity;

  (f)     the sponsorship, ownership, control, management or operation of any investment company required to be registered with the United States Securities and Exchange Commission by the Investment Company Act of 1940;

  (g)     the offering or sale of shares in any unit investment trust or management investment company or of variable annuity plans;

  (h)     any diminution of assets in connection with the activities described in subparagraphs (2)(f) and (2)(g) above; or

  (i)     any actual or alleged failure to effect or maintain reinsurance.

(3)     Paragraph (2) above is not intended, however, nor shall it be construed, to apply to Loss in connection with any Securities Claim brought by a security holder of the Company, or a derivative action brought by or on behalf of, or in the name or right of, the Company, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**BRX 80 152 09 18**

**Endorsement No.: 15**
**Named Insured: Amtrust Financial Services, Inc.**
**Policy No.: US00080794DO17A**
**Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY**

**Effective: November 29, 2018**
**12:01 A.M. Standard Time**
**Insurer: Indian Harbor Insurance Company**

# AMEND PRIOR ACTS EXCLUSION ENDORSEMENT

In consideration of the premium charged:

(1)     Solely with respect to Claims, Interviews or Investigation Demands first made on or after the Effective Date of this Endorsement, Endorsement No. 5 to this Policy shall be deleted in its entirety.

(2)     It is understood and agreed that with respect to Claims, Interviews or Investigation Demands made on or after the Effective Date of this Endorsement, no coverage will be available under this Policy for Claims, Interviews or Investigation Demands based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before such Effective Date, was the subject of any notice given under this or any other Management Liability policy, Directors and Officers liability policy or similar policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2018 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

BR 80 179 08 16

| | |
|---|---|
| **Endorsement No.: 16** | **Effective: November 29, 2018** |
| **Named Insured: Amtrust Financial Services, Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: US00080794DO17A** | **Insurer: Indian Harbor Insurance Company** |
| **Policy Form: EXECUTIVE AND CORPORATE SECURITIES LIABILITY** | |

# CONVERT TO RUN-OFF ENDORSEMENT

In consideration of an additional premium of $1,000,000.00 (the "Run-off Premium"):

(1)    The amount of unearned premium for the Original Policy Period, as defined below, is $43,680.00

(2)    Item 2 of the Declarations is amended to read in its entirety as follows:

"Item 2. Policy Period:   From: October 21, 2017   To: November 29, 2024
At 12:01 AM Standard Time at your Mailing Address Shown Above"

(3)    It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph (2) above.

(4)    Item 5 of the Declarations is deleted in its entirety.

(5)    Item 8 of the Declarations is amended to read in its entirety as follows:

"Item 8.  Premium:

| | |
|---|---|
| Original Premium: | $597,000.00 |
| Run-off Premium: | $1,000,000.00 |
| Unearned Premium: | $43,680.00 |
| Taxes, Surcharges or Fees: | $0.00 |
| Total Policy Premium: | $1,553,320.00 |

(6)    No coverage will be available under this Policy for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any a Wrongful Act committed or allegedly committed on or after November 29, 2018 or with respect to any Interview or Investigation demand in connection with any act, fact, circumstance, transaction, or event taking place on or after November 29, 2018.

(7)    Section VI General Conditions (D)(5) of the Policy is deleted in its entirety.

(8)    Section VI General Conditions (E)(1) of the Policy is amended to read in its entirety as follows:

"(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice stating when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations."

(9)    Section VI General Conditions (F) of the Policy is deleted in its entirety.  All other references in the Policy to the Optional Extension Period are deleted.

(10)    The entire premium for this Policy shall as set forth in paragraph (5) above be deemed fully earned as of November 29, 2018.

(11)    Section VI General Conditions (A)(3) of the Policy is deleted in its entirety.

(12)    Solely for the purposes of this endorsement, the term Original Policy Period means the period of time from October 21, 2017 to November 29, 2018.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2016 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**EXECUTIVE AND CORPORATE SECURITIES LIABILITY INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the "**Insurer**"), including the **Application**, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the **Insurer**, the **Insured Persons** and the **Company** agree as follows:

I.    **INSURING AGREEMENTS**

(A)    The **Insurer** shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The **Insurer** shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification.

(C)    The **Insurer** shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act.**

(D)    The **Insurer** shall pay on behalf of the **Insured Persons Defense Expenses** resulting from an **Interview**, except for **Defense Expenses** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(E)    The **Insurer** shall pay on behalf of the **Company Defense Expenses** incurred by the **Insured Persons** resulting from an **Interview** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** such **Defense Expenses**.

(F)    The **Insurer** shall pay on behalf of the **Company Defense Expenses** incurred by the **Company** resulting from any **Investigation Demand** first made during the **Policy Period**.

II.    **DEFINITIONS**

(A)    "**Application**" means:

(1)    any application, including attachments thereto, or any written information or representation, provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting of this Policy; and

(2)    any publicly available document filed by the **Company** with the U.S. Securities and Exchange Commission or any state, local or foreign equivalent during the twelve (12) months preceding this Policy's Inception Date.

(B)    "**Change In Control**" means:

(1)    the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity; or

(2)    any person, entity or an affiliated group of persons or entities acting together,  acquire (a) interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of the majority of the directors, management committee members or members of the board of managers of the **Parent Company**, as applicable to its organization, or (b) such rights pursuant to written contract or the by-laws, charter, operating agreement or similar document of the **Parent Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(C)  "**Claim**" means:

    (1)  any written demand (other than an **Investigation Demand**) for:

        (a)  monetary or non-monetary relief, including injunctive relief; or

        (b)  arbitration,  mediation or other alternative dispute resolution proceeding;

    (2)  any civil, criminal, administrative or regulatory proceeding commenced by:

        (a)  service of a complaint or similar pleading;

        (b)  return of an indictment, information, notice of charges or similar document;

        (c)  an official written request for extradition of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of extradition**;**

    (3)  any investigation of an **Insured Person** commenced by a written statement from an **Enforcement Authority** identifying such **Insured Person** as the subject of an investigation, including any target letter, Wells Notice or similar document;

    (4)  any subpoena served upon an **Insured Person** for testimony or documents in connection with a formal or informal investigation of the **Company** by any **Enforcement Authority**; and

    (5)  any **Corporate Manslaughter Charge**.

(D)  "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D). The term **Company** shall include any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or any equivalent provision in any foreign jurisdiction.

(E)  "**Corporate Manslaughter Charge**" means a formal criminal proceeding commenced in the United Kingdom against an **Insured Person** of the **Company** domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**.

(F)  "**Defense Expenses**" means reasonable and necessary legal fees, expenses and other costs (including experts' fees):

    (1)  incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim, Investigation Demand** or **Interview**, including any preparation for such an **Interview**;

    (2)  incurred due to the arrest and detainment or incarceration of any **Insured Person** in his or her capacity as a director or officer of the **Company** and directly related to the business of the **Company**;

    (3)  incurred in connection with any **Claim** under section 304 of the Sarbanes-Oxley Act of 2002 or imposed pursuant to section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act; or

    (4)  incurred in the defense of any **Corporate Manslaughter Charge**;

**Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)     "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)     wrongful termination of employment whether actual or constructive;

    (2)     employment discrimination of any kind, including violation of any federal, state or local law involving employment or discrimination in employment, which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

    (3)     sexual or other harassment in the workplace; or

    (4)     wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, refusal to hire, negligent hiring, or negligent supervision.

(H)     "**Enforcement Authority**" means any federal, state, local or foreign law enforcement or governmental regulatory authority, including the United States Departments of Justice and Labor, Securities and Exchange Commission, attorneys general, or the enforcement unit of any securities exchange or similar self-regulatory organization.

(I)     "**Insured**" means the **Insured Persons** and the **Company**.

(J)     "**Insured Person**" means:

    (1)     any past, present or future natural person director or officer, or member or manager of the board of managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)     any past, present or future natural person employee of the **Company** (other than an individual described in (J)(1) above) to the extent any **Claim** is: (a) a **Securities Claim**, or (b) made and maintained against both such employee and an **Insured Person** as defined in (J)(1) above;

    (3)     an individual identified in (J)(1) above who, with the consent of the **Company**, is or was serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

    (4)     any individual identified in (J)(1) above who, with the consent of the **Company** is or was serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

In addition:

In the event of the death, incapacity or bankruptcy of any individual identified above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

The coverage otherwise available under this Policy to any **Insured Person** will be extended to such **Insured Person's** lawful spouse or domestic partner, but only to the extent such spouse or domestic partner is a party to any **Claim** solely in his or her capacity as a spouse or domestic partner of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Acts**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(L)   "**Interview**" means:

(1)   a written request first received by an **Insured Person** during the **Policy Period** for a voluntary interview, meeting or sworn statement by:

(a)   any **Enforcement Authority**; or

(b)   the **Company** in connection with an **Investigation Demand** or an investigation or other inquiry of the **Company** by an **Enforcement Authority**; or

(2)   an arrest or confinement of an **Insured Person** during the **Policy Period** to a specified residence or secure custodial premises operated by an **Enforcement Authority**, but only in connection with the business of the **Company** or an **Insured Person's** capacity as such or due to his/her status as such;

provided that **Interview** will not include: any document production or discovery in a legal proceeding; any request that is part of any routine or regularly scheduled oversight, compliance, audit, inspection or examination; or any request that is part of an employment-related investigation or **Claim**. Any **Interview** as defined in (L)(1) above first received, or as defined in (L)(2) above, occurring, prior to the Inception Date of this Policy are not covered under this Policy.

(M)   "**Investigation Demand**" means an investigation by the **Company** to determine whether it is in its best interest to prosecute the allegations made by a security holder of the **Company** in a derivative demand or action. An **Investigation Demand** shall be deemed first made upon the earlier of: receipt of such allegations by the **Company** or service of a civil complaint or similar proceeding setting forth such allegations.

(N)   "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the **Parent Company**, either directly or through one or more **Subsidiary(s)**;

(1)   owns or controls at least thirty-three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the present right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(2)   has the right, by written contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty-three percent (33%) of those persons described in (N)(1) above.

(O)   "**Loss**" means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any **Insured** is legally obligated to pay and **Defense Expenses**, including that portion of any settlement which represents the claimant's attorneys' fees. **Loss** will not include that portion which constitutes:

(1)   fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

(a)   civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

(b)   solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company;**

(2)   costs incurred by an **Insured** to comply with an order for non-monetary relief (including injunctive relief) or with any agreement to provide such relief;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3)　any amount which is uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement or judgment in a **Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933);

(4)　any amount arising out of the cleanup, containing, treating, testing, removing, disposing, assessing, monitoring or similar costs relating to pollution, contaminants, waste of any kind, pollutants, product defects that result in the release of hazardous materials or pollutants, or any other hazardous materials;

(5)　any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the **Company** in connection with its purchase of any securities or assets of any person, group of persons, or entity;

(6)　the return of any amounts required to be paid by an **Insured Person** pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or promulgated under Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

NOTE:　With respect to judgments in which punitive, exemplary or multiplied damage are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive, exemplary or multiplied damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured**.

(P)　"**Non-Profit Entity**" means any not-for-profit entity or not-for-profit organization.

(Q)　"**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(R)　"**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date. **Policy Period** will include any Optional Extension Period, if applicable.

(S)　"**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

(1)　made against any **Insured** for any actual or alleged violation of any federal, state or local statute,  regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:

(a)　brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or

(b)　brought by a security holder of the **Company** with respect to such security holder's interest in securities of the **Company**; or

(2)　brought derivatively on behalf of the **Company** by a security holder of the **Company**.

Notwithstanding the foregoing, the term **Securities Claim** shall include an administrative or regulatory proceeding against, or a formal investigation of, the **Company**, but only if and only during the time that such formal investigation or proceeding is also maintained against an **Insured Person**.

(T)  "**Subsidiary**" means any entity during any time in which the **Parent Company** holds directly or indirectly:

    (1)  more than fifty percent (50%) of the voting rights or issued share capital of such entity;

    (2)  between twenty percent (20%) and fifty percent (50%) of the voting rights or issued share capital, together with control of the management of such entity; or

    (3)  the right to appoint or remove a majority of the Board of Directors of such entity.

(U)  "**Wrongful Act**" means:

    (1)  any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such;

    (2)  solely with respect to a **Claim** as defined in Definition (C)(4) of the Policy, any other matter concerning an **Insured Person** solely by reason of his or her capacity as such or due to his or her status as such;

    (3)  solely with respect to Insuring Agreement (C) of the **Policy,** any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the **Company**; or

    (4)  any **Employment Practices Wrongful Act** by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such.

Solely with respect to determining whether a securities holder derivative lawsuit which names the **Company** as a defendant (including as a nominal defendant) is a **Securities Claim** against such **Company** for purposes of Insuring Agreement (C) of the Policy, any **Wrongful Act** as defined in subparagraph (U)(1) above will also be deemed to be a **Wrongful Act** of the **Company**; provided that this provision shall not be deemed to create coverage under this Policy for **Loss** from any **Investigation Demand** pursuant to Insuring Agreement (F) of the Policy.  Any such coverage shall only be available pursuant to Insuring Agreement (F) of the Policy.

## III.  EXCLUSIONS

(A)  No coverage shall be available under this Policy for that portion of any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)  for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any property including loss of use thereof; however, this Exclusion (A)(1) will not apply to: (a) any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of a **Claim** for an **Employment Practices Wrongful Act**;  (b) any **Securities Claim**; (c) for **Corporate Manslaughter Charges**; or (d) any **Claim** to the extent coverage is provided under Insuring Agreement, (A) of the Policy;

    (2)  for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation in connection with any pension, profit sharing or employee benefit program established and/or sponsored by the **Company** in whole or in part for the benefit of the directors, officers or employees of the **Company**;

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(3) by, on behalf of, or at the direction of the **Company,** or any **Joint Venture** or **Non-Profit Entity** (but with respect to the **Joint Venture** or **Non-Profit Entity**, only against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Joint Venture** or **Non-Profit Entity,** or  as a person occupying an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated of the **Joint Venture**); however, this Exclusion (A)(3) will not apply to:

(a) the extent a **Claim** is brought derivatively by a security holder of the **Company**, or by any **Joint Venture** or **Non-Profit Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured Person** unless such solicitation, assistance, participation or intervention is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute**,** or the **Company**, or any **Joint Venture** or **Non-Profit Entity**;

(b) the extent a **Claim** or **Interview** is brought by the Bankruptcy Trustee or Examiner of the **Company**, or by  any **Joint Venture** or **Non-Profit Entity** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company, Joint Venture**, or **Non-Profit Entity**;

(c) the extent a **Claim** is brought and maintained in a non-common law jurisdiction outside the United States of America, including its territories and possessions;

(d) the extent a **Claim** or **Interview** is brought by a Creditors Committee of the **Company**, or any **Joint Venture** or **Non-Profit Entity** in the event the **Company**, **Joint Venture**, or **Non-Profit Entity** files for relief under Title 11 of the United States Code;

(e) **Defense Expenses** covered under Insuring Agreement (A) or (D).

(B) No coverage shall be available under this Policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

(1) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(2) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(3) brought about or contributed to in fact by any:

(a) deliberately fraudulent or deliberately criminal act or omission or any willful violation of any statute, rule or law by an **Insured**; or

(b) profit or remuneration gained by an **Insured** to which such **Insured** is not legally entitled,

as determined by a final, non-appealable adjudication in the underlying action; however this Exclusion (B)(3) will not apply to: (i) allegations in a **Claim** asserted against an **Insured** under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the **Company's** securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933); or (ii) **Defense Expenses** incurred in connection with a

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

**Claim** alleging violations of section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act;

No conduct of any **Insured** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. Only the conduct of the chief executive officer and/or chief financial officer of the **Company** will be imputed to the **Company**.

## IV.   LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)   The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3(B) of the Declarations.

(B)   The amount set forth in ITEM 3(B) of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy whether any **Loss** is covered under one or more Insuring Agreements. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)   The amount set forth in Item 3(A) of the Declarations shall be the maximum aggregate limit of liability of the Insurer under this Policy resulting from all **Investigation Demands** first made during the **Policy Period**, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for the Policy as set forth in Item 3(B) of the Declarations.

(D)   With respect to the **Company**'s indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to require indemnification to the **Insured Persons** to the fullest extent permitted by law.

(E)   No Retention will be applicable to **Loss**, including **Defense Expenses**, under Insuring Agreements, (A), (D) or (F).  In the event of financial insolvency of the **Company**, no Retention shall apply.

(F)   In the event the **Company** is obligated under the Policy to pay any Retention, the **Company** may satisfy such Retention from any source. As a precondition to such recognition of the erosion of the Retention from any source other than by payment by the **Company**, the **Company** shall provide the Insurer with written proof, to the Insurer's satisfaction, that payment of such Retention has been made.

(G)   If more than one retention is applicable to different portions of **Loss**, including **Defense Expenses**, the applicable Retention(s) will be applied separately to each portion of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

## V.   DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)   It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim**, **Interview** or **Investigation Demand** under this Policy.

(B)   No **Insured** may incur any **Defense Expenses** in connection with any **Claim, Interview** or **Investigation Demand**, or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably delayed or withheld; however, the **Insured** may settle a **Claim** without such consent, if the total amount of such settlement and **Defense Expenses** does not exceed fifty percent (50%) of the amount of the applicable Retention(s) for such **Claim**.

(C)   Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis, but no less so than quarterly, excess of the applicable Retention, before the disposition of the **Claim, Interview** or **Investigation Demand** for which this Policy provides coverage. As a condition of the advancement of **Defense Expenses**, each **Insured** agrees that if and to the extent it is determined that such **Defense Expenses** are not insured under this Policy, such **Defense Expenses** shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(D)    If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim, Interview** or **Investigation Demand** made against the **Insured** contains both covered and uncovered matters, or because a **Claim, Interview** or **Investigation Demand** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim, Interview** or **Investigation Demand** by, the **Insured** and others.

(E)    In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

(A)    **NOTICE**

(1)    As a condition precedent to any right to payment under this Policy with respect to any **Claim** or **Investigation Demand**, the **Insured** shall give written notice to the Insurer of each **Claim** or **Investigation Demand** as soon as practicable after it is first made, including but not limited to written notice as soon as practicable of each **Claim** or **Investigation Demand** deemed to constitute a single **Claim** or **Investigation Demand** pursuant to Section VI (B) below.  Such notice shall be provided as soon as practicable after the risk management or general counsel departments of the **Parent Company** first becomes aware of such **Claim** or **Investigation Demand**.  In the event that the **Insureds** fail to provide timely notice to the Insurer under this Section VI (A)(1), the Insurer shall not be entitled to deny coverage solely based on such untimely notice unless the Insurer can demonstrate its interests were materially prejudiced by reason of such untimely notice.

(2)    As a condition precedent to any right to payment under this Policy with respect to any **Interview**, the **Insured** may elect to give the Insurer written notice thereof during the **Policy Period** pursuant to Section VI (A)(4) below.

(3)    If, during the **Policy Period,** the **Insured** provides the Insurer with written notice of:

(a)    a specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**;

(b)    its receipt of a request to toll or waive a statute of limitations in connection with a **Wrongful Act**; or

(c)    an **Interview** first received during the **Policy Period**,

then any **Claim** or **Investigation Demand** subsequently made arising out of such **Wrongful Act**, request to toll or waive a statute of limitation or **Interview** will be treated as if it had been first made during the **Policy Period**, provided written notice of any subsequent **Claim** or **Investigation Demand** is provided to the Insurer as soon as practicable after such **Claim** or **Investigation Demand** is made.

(4)    All notices under Section VI (A)(1),(2) and (3) above must be sent by:

(a)    first class U.S. mail, overnight mail or the equivalent to the address set forth in ITEM 7 of the Declarations:  Attention Claim Department; or

(b)    electronic mail (email) to the address shown in ITEM 7 of the Declarations.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(B)     **INTERRELATED CLAIMS**

All **Claims, Investigation Demands, Interviews** or requests to toll or waive a statute of limitations, arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim, Investigation Demand** or **Interview** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim, Investigation Demand**, or **Interview** is made or deemed to have been made pursuant to Section VI (A) above.

(C)     **OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)     Subject to Section IV LIMIT OF LIABILITY INDEMNIFICATION AND RETENTIONS (F), all coverage under this Policy will be specifically excess of and will not contribute with any other valid and collectible management liability insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy, or a personal umbrella policy or personal directorship liability policy purchased by an **Insured Person**. This Policy will not be subject to the terms of any other insurance policy.

(2)     All coverage under this Policy for **Loss** from **Claims** and **Interviews** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of his or her service as such.

(D)     **MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)     If during the **Policy Period** the **Company** acquires any entity by merger, consolidation or otherwise such that the entity becomes a **Subsidiary**, coverage shall be provided for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)     If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the assets or liabilities so acquired or so assumed as a result of such acquisition, exceed thirty-five percent (35%) of the total assets or liabilities, respectively, of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days or to the Expiration Date, whichever occurs first, for any **Loss** involving a **Claim, Interview** or **Investigation Demand** for a **Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond such period will be provided only if:

(a)     the Insurer receives written notice containing full details of the transaction(s); and

(b)     the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)     With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity as described in (D)(1) and (2) above, there will be no coverage available to the **Company**, an **Insured Person**, or to the acquired entity under this Policy for **Claims** made against the **Company** , an **Insured Person**, or the acquired entity, for a **Wrongful Act** committed any time during which such entity, is not an **Insured**.

(4)     If any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(5)  If during the **Policy Period** there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

    (a)  coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (b)  the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

(E)  **CANCELLATION AND RENEWAL OF COVERAGE**

(1)  Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)  The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)  The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)  **OPTIONAL EXTENSION PERIOD**

(1)  If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** or any **Insured Person** shall be entitled, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** or **Investigation Demand** first made or deemed first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date. Any such **Claim** or **Investigation Demand** shall be deemed to have been made during the **Policy Period**.

(2)  As a condition precedent to the right to purchase the Optional Extension Period, the total premium for this Policy must have been paid in full. The right of the **Parent Company** or any **Insured Person** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** or **Insured Person** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)  If the **Parent Company** or **Insured Person** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)  The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims**, **Interviews** and **Investigation Demands** made during the **Policy Period**.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request in connection with any **Claim**, **Investigation Demand** or **Interview** that is reasonably likely to be covered under this Policy, and further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery against any party.

(2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment of **Loss** to all of the **Insured's** rights of recovery; provided that the Insurer will be subrogated to any **Insured's** potential or actual rights of recovery against any **Insured Person** only in the event that Exclusion (B)(3) of the Policy is applicable to such **Insured Person** in connection with such **Loss**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in its name, and will provide all other assistance and cooperation which the Insurer may reasonably require. It is understood that the failure of any **Insured Person** to give the Insurer cooperation and information as required in this paragraph shall not impair the rights of the **Company**, or any other **Insured Person** under this Policy.

(3)    In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limits of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery.  It is understood and agreed that the Insurer shall have no duty to seek such a recovery.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned and, subject to Section VI General Condition (G)(3), all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person**.  With respect to **Claims** made under Insuring Agreement (C) only, no knowledge or information possessed by any **Insured Person** other than a past or present chief executive officer or chief financial officer of the **Parent Company** will be imputed to the **Company**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

This Policy shall not be rescinded by the Insurer; provided that nothing herein shall limit or waive any other rights or remedies available under the Policy or applicable law.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this Policy.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(4)     Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement.

(K)     **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)     the payment of the premiums;

(2)     the receiving of any return premiums that may become due under this Policy;

(3)     the giving of all notices to the Insurer as provided herein; and

(4)     the receiving of all notices from the Insurer.

(L)     **PRIORITY OF PAYMENTS**

In the event of **Loss**, including **Defense Expenses**, payable under more than one of the Insuring Agreements of the Policy, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such **Loss** as follows:

(1)     first, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Insured Persons** which the **Company** is not permitted nor required to pay on behalf of the **Insured Persons** as indemnification;

(2)     second, the Insurer shall pay that **Loss**, if any, which the Insurer may be liable to pay on behalf of the **Company** which the **Company** is permitted or required to pay on behalf of the **Insured Persons**; and

(3)     third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreements (C) and/or (F) or otherwise.

(M)     **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of any of its obligations under this Policy.  In such event, including any liquidation or reorganization proceeding of the **Company**, then each **Insured** and the Insurer hereby agree not to oppose or object to any efforts by any **Insured Person** to obtain relief from any stay or injunction.

(N)     **ENTIRE AGREEMENT – WORLDWIDE COVERAGE**

(1)     The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application**, shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.  The coverage afforded by the Policy shall apply anywhere in the world.

(2)     If the **Parent Company** requests management or directors and officers liability policies for issuance to its foreign **Subsidiaries** in their own countries, the Insurer or a subsidiary or affiliate of XL Group plc shall provide a quote to the **Parent Company** for such policies; provided that the Insurer or a subsidiary or affiliate of XL Group plc can support or facilitate the issuance of the policies to such foreign **Subsidiaries** in their applicable foreign countries. Any coordination of coverage under such policies with coverage under this Policy shall be set forth in an endorsement attached to this Policy.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

(O)     **CURRENCY**

All premiums, limits of liability, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than the United States of America, payment of covered **Loss** due under this Policy, subject to its terms, conditions and limitations, will be made either in such other currency (at the option of the Insurer and with the agreement of the **Parent Company**), or, in the United States of America dollars at the rate of exchange most recently published in The Wall Street Journal on the date of the Insurer's obligation to pay such **Loss** is established.

© 2014 X.L. America, Inc.  All Rights Reserved May not be copied without permission.

# EXHIBIT C



Dear Policyholder,

Thank you for choosing Zurich for your Management Liability Product(s).  We truly appreciate your business and welcome the opportunity to work with you.

We wanted to inform you that under the terms of this transaction you are entitled to online services and resources that are designed just for management solutions customers.  These resources are available at no additional cost to you and include loss mitigation tips and techniques, industry-related articles and more. Here are just some examples of what is available to you:

- **eDiscovery website** – a real-time information tool, including a readiness assessment for this rapidly growing phenomena
- **Thought leadership materials** – dedicated to your top-of-mind needs, including timely webinars and engaging white papers, even specific to your industry segment
- **Security & Privacy readiness self assessment** – this exposure makes headlines daily.  How ready is your organization for this fast-growing threat?
- **Strategic Risk Services and Enterprise Risk Management** – on-line information source for related hot topics and ERM videos to minimize barriers to achieving expected business outcomes

To access this information and all other resources, simply visit www.ZurichMgmtSolutions.com.  Please be sure to have your policy number handy.

***Deliver for our customers when it matters most***. At Zurich, that's the promise we make every day.  I thank you again for choosing Zurich.

Sincerely,

Frank Baron
Executive Vice President, Specialty Products

© 2011 Zurich American Insurance Company. All rights reserved.



# New York Free Trade Zone Notice

**NYFTZ Class:    1      Class Code:   1-60888**

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**



# Important Notice - In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President

Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours:  8 a.m. - 4 p.m. [CT])
**Email:** info.source@zurichna.com

---

NYFTZ Class:    1     Class Code:  1-60888

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**Insured Name:**    AMTRUST FINANCIAL SERVICES, INC.

**Policy Number:**   DOC 1074701-00
**Effective Date:**  10/21/2017



<div align="center">

**THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.**

# DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

</div>

| |
|---|
| Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA:<br><br>$4,455 |

\*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of premium attributable is shown in the Schedule above. The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share will decrease by 5% from 85% to 80% over a five year period while the insurer share increases by the same amount during the same period. The schedule below illustrates the decrease in the federal share:

January 1, 2015 – December 31, 2015 federal share: 85%

January 1, 2016 – December 31, 2016 federal share: 84%

January 1, 2017 – December 31, 2017 federal share: 83%

January 1, 2018 – December 31, 2018 federal share: 82%

January 1, 2019 – December 31, 2019 federal share: 81%

January 1, 2020 – December 31, 2020 federal share: 80%

**C. Disclosure of $100 Billion Cap on All Insurer and Federal Obligations**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**D. Availability**

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

<div align="center">

Copyright © 2015 Zurich American Insurance Company
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

</div>

**E.  Definition of Act of Terrorism under TRIA**

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism.  The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.**  To be an act of terrorism;

**2.**  To be a violent act or an act that is dangerous to human life, property or infrastructure;

**3.**  To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.**  To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

Copyright © 2015 Zurich American Insurance Company
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



# Disclosure Statement

It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.


This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.



# Zurich Excess Select Insurance Policy

**Declarations**

Insurance is provided by:

Zurich-American Insurance Company
1299 Zurich Way
Schaumburg, Illinois 60196-1056
(The "Underwriter")

THIS POLICY FOLLOWS TO THE TERMS, CONDITIONS, AND LIMITATIONS OF THE FOLLOWED POLICY. COVERAGE IS LIMITED TO LOSS FROM CLAIMS AGAINST THE POLICYHOLDER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD, IF EXERCISED, AND REPORTED TO THE UNDERWRITER PURSUANT TO SUBSECTION III.A. THE LIMIT OF LIABILITY SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS AND/OR CLAIMS EXPENSES, IF APPLICABLE. PLEASE READ THIS POLICY CAREFULLY. DEFINED TERMS APPEAR IN BOLD AND HAVE THE MEANING SET FORTH IN THE DECLARATIONS.

ALL COVERAGE UNDER THIS POLICY CEASES UPON TERMINATION OF COVERAGE, EXCEPT FOR THE AUTOMATIC EXTENSION PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF PURCHASED.

UPON TERMINATION OF COVERAGE, AN AUTOMATIC EXTENSION PERIOD IS WILL BE GRANTED FOR SIXTY (60) DAYS. AN OPTIONAL EXTENDED REPORTING PERIOD IS AVAILABLE DURING THIS PERIOD, BUT ONLY BY ENDORSEMENT AND FOR AN ADDITIONAL PREMIUM. THIS EXTENDED REPORTING PERIOD WILL BE FOR A TIME PERIOD OF AT LEAST ONE (1) YEAR.

POTENTIAL COVERAGE GAPS MAY ARISE UPON EXPIRATION OF THE AUTOMATIC EXTENSION PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD.

DURING THE FIRST SEVERAL YEARS OF THE CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND ANNUAL PREMIUM INCREASES CAN BE EXPECTED INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

Policy Number:   DOC 1074701-00

**NYFTZ Class:   1   Class Code:  1-60888**

---

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

---

Item 1.   **Policyholder** and Mailing Address:      AMTRUST FINANCIAL SERVICES, INC.
                                                     59 Maiden Lane
                                                     43rd Floor
                                                     New York, NY  10038-4639

Item 2.   Aggregate Limit of Liability:      $5,000,000

Item 3.   **Underlying Insurance:**

| A. | Followed Policy | Policy Type | Policy Number | Limit of Liability | Attachment |
|---|---|---|---|---|---|
| | Indian Harbor Insurance Company | Primary | ELU152497-17 | $5,000,000 | $5,000,000 |

| B. | Other Underlying Insurance | Policy Number | Limit of Liability | Attachment |
|---|---|---|---|---|
| | N/A | N/A | N/A | N/A |

Item 4.   **Policy Period**:   From:  12:01 A.M. on 10/21/2017   To:  12:01 A.M. on 10/21/2018
                              Policy incepts and expires at the local time at the address shown in Item 1.

Item 5.   Notice to Underwriter:

   A. Address for Notice of Claim or Potential Claim        B. Address for All Other Notices:

      Attn:  Zurich North America - MSG Claims              Attn:  Northeast, MASE & West Region Underwriting
             P.O. Box 968041                                       Regional Manager
             Schaumburg, IL  60196-8041                            One Liberty Plaza – 30th Floor
             Fax:  866-255-2962                                    New York, NY 10006
             Email: msgclms@zurichna.com                          Email: NEsubmissions@zurichna.com

Item 6.   Premium:   $450,000

Item 7.   Optional Extended Reporting Period:

          <u>Additional Premium</u>                              <u>Additional Period</u>

          Option 1     200.00% of the policy premium            1 year

          Option 2     % of the policy premium                  3 years

Item 8.   Endorsements Effective at Inception:     See Attached Schedule of Forms and Endorsements



# Form and Endorsement Schedule

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC 1074701-00 | 10/21/2017 | 10/21/2018 | 10/21/2017 | | |

**Policyholder:**   AMTRUST FINANCIAL SERVICES, INC.


This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| New York Free Trade Zone Notice | U-GU-1029-B NY | (11/12) | |
| Important Notice - In-Witness Clause | U-GU-319-F NY | (01/09) | |
| Disclosure of Important Information Relating to Terrorism Risk Insurance Act | U-GU-630-D CW | (01/15) | |
| Zurich Excess Select Insurance Policy Declarations | U-FLXS-D-100-A NY | (07/16) | |
| Zurich Excess Select Insurance Policy | U-FLXS-100-A CW | (08/11) | |
| Sanctions Exclusion Endorsement | U-GU-1191-A CW | (03/15) | 01 |
| Cap on Losses From Certified Acts of Terrorism | U-GU-767-B CW | (01/15) | 02 |

All other terms, conditions, provisions and exclusions of this policy remain the same.



# Zurich Excess Select Insurance Policy

The Underwriter issues this policy in reliance upon the statements made in the application, warranty, if permitted, representations or statements made by the **Policyholder** to the Underwriter, in the application to the insurers of the **Underlying Insurance** and any binder of **Underlying Insurance**.   All terms in bold below shall have the meaning provided in the Declarations. In consideration of payment of the premium and subject to the Declarations and the definitions, limitations, conditions, provisions and other terms of this policy and any endorsements hereto, the Underwriter and the **Policyholder** agree as follows:

I.    INSURING CLAUSE – The Underwriter shall provide the **Policyholder** with insurance coverage during the **Policy Period** excess of the **Underlying Insurance**.   The **Policyholder** may have the right to purchase an extended reporting period for purposes of reporting claims during the extended reporting period.   Coverage under this policy shall attach only after:

A.  all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or

B.  the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.

Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other **Underlying Insurance**.   In no event shall coverage under this policy be broader than coverage under any **Underlying Insurance**.   In the event of reduction or exhaustion of all the Limits of Liability of the **Underlying Insurance** solely as a result of the payment of covered loss(es), this policy shall:  (1) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the **Underlying Insurance**, or (2) in the event of exhaustion, continue in force as primary or governing insurance excess of the applicable deductible(s) or retention amount(s) in the **Followed Policy**, which deductible(s) or retention(s) shall be applied to any subsequent covered loss as specified in the **Followed Policy**.

II.   LIMIT OF LIABILITY

The amount set forth in Item 2. of the Declarations shall be the Underwriter's maximum aggregate liability under this policy with respect to all claims.  Defense costs and/or claims expenses, if applicable, are part of and not in addition to the Limit of Liability and the payment by the Underwriter of such defense costs and/or claims expenses, if applicable, reduce the Limit of Liability.

Any coverage under the **Followed Policy** that provides for a maximum Limit of Liability that is less than the Limit of Liability stated in Item 3. of the Declarations for such **Underlying Insurance** ("Sublimit of Liability") shall not be provided by this policy.  Provided, however, any actual payment of covered loss(es) made under the **Followed Policy** or other **Underlying Insurance** on account of any claim, for which coverage is subject to a Sublimit of Liability, shall be recognized by the Underwriter as contributing to the reduction or exhaustion of the Limit(s) of Liability designated in Item 3. of the Declarations.

III.  CONDITIONS

A.  Reporting and Notice – As a condition precedent to exercising any rights under this policy, the **Policyholder** shall give the Underwriter written notice of any claim or any potential claim under this policy or any **Underlying Insurance** in the same manner required by the terms and conditions of the **Followed Policy**.   Notwithstanding the foregoing, notice to the insurer(s) of the **Followed Policy** or other **Underlying Insurance** does not constitute notice to the Underwriter.  Written notice of any claim or potential claim shall be provided to the Underwriter at the address set forth in Item 5.A. of the Declarations.

The Underwriter shall be given notice in writing to the address set forth in Item 5.B. of the Declarations as soon as practicable in the event of (1) termination of any **Underlying Insurance**, (2) any additional or return premiums charged or allowed in connection with any **Underlying Insurance**, or (3) any change to any of the **Underlying Insurance**.

B.  Alteration – No change in, modification of, or assignment of interest under this policy or **Underlying Insurance** shall be effective except when made by a written agreement or endorsement to this policy by an authorized representative of the Underwriter. To the extent such **Underlying Insurance** is modified or altered, the Underwriter shall not recognize any new or modified coverage to which it has not consented.

C.  Maintenance of Underlying Insurance – As a condition precedent to coverage under this policy, the **Policyholder** agrees to maintain the **Underlying Insurance** during the **Policy Period** in full effect with solvent insurers.  To the extent such **Underlying Insurance** is not maintained, then the **Policyholder** shall be deemed self-insured for the amount of the Limit(s) of Liability of any such **Underlying Insurance**.

**Endorsement #**   01



# Sanctions Exclusion Endorsement

**Policyholder:**   AMTRUST FINANCIAL SERVICES, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

**Endorsement #** 02

# Cap On Losses From Certified Acts Of Terrorism



| Insured's Name | Policy Number | Effective Date | Endorsement Number |
|---|---|---|---|
| AMTRUST FINANCIAL SERVICES, INC. | DOC 1074701-00 | 10/21/2017 | 02 |

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies your insurance.
**Zurich Excess Select Insurance Policy**

**A.  Cap on Losses From Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.**  To be an act of terrorism;

**2.**  To be a violent act or an act that is dangerous to human life, property or infrastructure;

**3.**  To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.**  To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

If aggregate insured losses attributable to one or more "certified acts of terrorism" exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**B.  Application of Other Exclusions**

The terms and limitations of a terrorism exclusion or any other exclusion, or the inapplicability or omission of a terrorism exclusion or any other exclusion, do not serve to create coverage which would otherwise be excluded, limited or restricted under this policy.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

# EXHIBIT D



Dear Policyholder,

Thank you for choosing Zurich for your Management Liability Product(s). We truly appreciate your business and welcome the opportunity to work with you.

We wanted to inform you that under the terms of this transaction you are entitled to online services and resources that are designed just for management solutions customers. These resources are available at no additional cost to you and include loss mitigation tips and techniques, industry-related articles and more. Here are just some examples of what is available to you:

- **eDiscovery website** – a real-time information tool, including a readiness assessment for this rapidly growing phenomena
- **Thought leadership materials** – dedicated to your top-of-mind needs, including timely webinars and engaging white papers, even specific to your industry segment
- **Security & Privacy readiness self assessment** – this exposure makes headlines daily. How ready is your organization for this fast-growing threat?
- **Strategic Risk Services and Enterprise Risk Management** – on-line information source for related hot topics and ERM videos to minimize barriers to achieving expected business outcomes

To access this information and all other resources, simply visit www.ZurichMgmtSolutions.com. Please be sure to have your policy number handy.

***Deliver for our customers when it matters most***. At Zurich, that's the promise we make every day. I thank you again for choosing Zurich.

Sincerely,

*Frank Baron*

Frank Baron
Executive Vice President, Specialty Products

© 2011 Zurich American Insurance Company. All rights reserved.



## New York Free Trade Zone Notice

**NYFTZ Class:   1     Class Code:  1-60888**

| |
|---|
| NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. |



# Important Notice - In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President                                          Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours:  8 a.m. - 4 p.m. [CT])
**Email:** info.source@zurichna.com

---

NYFTZ Class:    1     Class Code:  1-60888

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**Insured Name:**    AMTRUST FINANCIAL SERVICES, INC.

**Policy Number:**   DOC 1074701-00
**Effective Date:**  10/21/2017



### THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.

# DISCLOSURE OF IMPORTANT INFORMATION
# RELATING TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| |
|---|
| Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA: |
| $4,455 |

*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of premium attributable is shown in the Schedule above. The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share will decrease by 5% from 85% to 80% over a five year period while the insurer share increases by the same amount during the same period. The schedule below illustrates the decrease in the federal share:

January 1, 2015 – December 31, 2015 federal share: 85%

January 1, 2016 – December 31, 2016 federal share: 84%

January 1, 2017 – December 31, 2017 federal share: 83%

January 1, 2018 – December 31, 2018 federal share: 82%

January 1, 2019 – December 31, 2019 federal share: 81%

January 1, 2020 – December 31, 2020 federal share: 80%

**C. Disclosure of $100 Billion Cap on All Insurer and Federal Obligations**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**D. Availability**

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

Copyright © 2015 Zurich American Insurance Company
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**E. Definition of Act of Terrorism under TRIA**

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.** To be an act of terrorism;

**2.** To be a violent act or an act that is dangerous to human life, property or infrastructure;

**3.** To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.** To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.



# Disclosure Statement

It is our pleasure to present the enclosed policy to you
for presentation to your customer.


**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.



# Zurich Excess Select Insurance Policy
**Declarations**

Insurance is provided by:

<div align="center">

Zurich-American Insurance Company
1299 Zurich Way
Schaumburg, Illinois 60196-1056
(The "Underwriter")

</div>

THIS POLICY FOLLOWS TO THE TERMS, CONDITIONS, AND LIMITATIONS OF THE FOLLOWED POLICY. COVERAGE IS LIMITED TO LOSS FROM CLAIMS AGAINST THE POLICYHOLDER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD, IF EXERCISED, AND REPORTED TO THE UNDERWRITER PURSUANT TO SUBSECTION III.A. THE LIMIT OF LIABILITY SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS AND/OR CLAIMS EXPENSES, IF APPLICABLE. PLEASE READ THIS POLICY CAREFULLY. DEFINED TERMS APPEAR IN BOLD AND HAVE THE MEANING SET FORTH IN THE DECLARATIONS.

ALL COVERAGE UNDER THIS POLICY CEASES UPON TERMINATION OF COVERAGE, EXCEPT FOR THE AUTOMATIC EXTENSION PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF PURCHASED.

UPON TERMINATION OF COVERAGE, AN AUTOMATIC EXTENSION PERIOD IS WILL BE GRANTED FOR SIXTY (60) DAYS. AN OPTIONAL EXTENDED REPORTING PERIOD IS AVAILABLE DURING THIS PERIOD, BUT ONLY BY ENDORSEMENT AND FOR AN ADDITIONAL PREMIUM. THIS EXTENDED REPORTING PERIOD WILL BE FOR A TIME PERIOD OF AT LEAST ONE (1) YEAR.

POTENTIAL COVERAGE GAPS MAY ARISE UPON EXPIRATION OF THE AUTOMATIC EXTENSION PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD.

DURING THE FIRST SEVERAL YEARS OF THE CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND ANNUAL PREMIUM INCREASES CAN BE EXPECTED INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

Policy Number:   DOC 1074701-00

**NYFTZ Class:   1     Class Code:   1-60888**

<div style="border:1px solid black; padding:8px">

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

</div>

Item 1.   **Policyholder** and Mailing Address:       AMTRUST FINANCIAL SERVICES, INC.

59 Maiden Lane

43rd Floor

New York, NY  10038-4639

Item 2.   Aggregate Limit of Liability:          $5,000,000

Item 3.   **Underlying Insurance:**

| A. | **Followed Policy** | **Policy Type** | **Policy Number** | **Limit of Liability** | **Attachment** |
|---|---|---|---|---|---|
| | Indian Harbor Insurance Company | Primary | ELU152497-17 | $5,000,000 | $5,000,000 |

| B. | **Other Underlying Insurance** | **Policy Number** | **Limit of Liability** | **Attachment** |
|---|---|---|---|---|
| | N/A | N/A | N/A | N/A |

Item 4.   **Policy Period**:     From:  12:01 A.M. on 10/21/2017   To:  12:01 A.M. on 10/21/2018
Policy incepts and expires at the local time at the address shown in Item 1.

Item 5.   Notice to Underwriter:

A. Address for Notice of Claim or Potential Claim          B. Address for All Other Notices:

Attn:   Zurich North America - MSG Claims
P.O. Box 968041
Schaumburg, IL  60196-8041
Fax:  866-255-2962
Email: msgclms@zurichna.com

Attn:   Northeast, MASE & West Region Underwriting
Regional Manager
One Liberty Plaza – 30th Floor
New York, NY 10006
Email: NEsubmissions@zurichna.com

Item 6.   Premium:   $450,000

Item 7.   Optional Extended Reporting Period:

| Additional Premium | | Additional Period |
|---|---|---|
| Option 1 | 200.00% of the policy premium | 1 year |
| Option 2 | % of the policy premium | 3 years |

Item 8.   Endorsements Effective at Inception:     See Attached Schedule of Forms and Endorsements



# Form and Endorsement Schedule

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC 1074701-00 | 10/21/2017 | 10/21/2018 | 10/21/2017 | | |

**Policyholder:**   AMTRUST FINANCIAL SERVICES, INC.

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| New York Free Trade Zone Notice | U-GU-1029-B NY | (11/12) | |
| Important Notice - In-Witness Clause | U-GU-319-F NY | (01/09) | |
| Disclosure of Important Information Relating to Terrorism Risk Insurance Act | U-GU-630-D CW | (01/15) | |
| Zurich Excess Select Insurance Policy Declarations | U-FLXS-D-100-A NY | (07/16) | |
| Zurich Excess Select Insurance Policy | U-FLXS-100-A CW | (08/11) | |
| Sanctions Exclusion Endorsement | U-GU-1191-A CW | (03/15) | 01 |
| Cap on Losses From Certified Acts of Terrorism | U-GU-767-B CW | (01/15) | 02 |

All other terms, conditions, provisions and exclusions of this policy remain the same.

# Zurich Excess Select Insurance Policy



The Underwriter issues this policy in reliance upon the statements made in the application, warranty, if permitted, representations or statements made by the **Policyholder** to the Underwriter, in the application to the insurers of the **Underlying Insurance** and any binder of **Underlying Insurance**.   All terms in bold below shall have the meaning provided in the Declarations. In consideration of payment of the premium and subject to the Declarations and the definitions, limitations, conditions, provisions and other terms of this policy and any endorsements hereto, the Underwriter and the **Policyholder** agree as follows:

I.   INSURING CLAUSE – The Underwriter shall provide the **Policyholder** with insurance coverage during the **Policy Period** excess of the **Underlying Insurance**.   The **Policyholder** may have the right to purchase an extended reporting period for purposes of reporting claims during the extended reporting period.   Coverage under this policy shall attach only after:

A.   all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or

B.   the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.

Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other **Underlying Insurance**.   In no event shall coverage under this policy be broader than coverage under any **Underlying Insurance**.   In the event of reduction or exhaustion of all the Limits of Liability of the **Underlying Insurance** solely as a result of the payment of covered loss(es), this policy shall:  (1) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the **Underlying Insurance**, or (2) in the event of exhaustion, continue in force as primary or governing insurance excess of the applicable deductible(s) or retention amount(s) in the **Followed Policy**, which deductible(s) or retention(s) shall be applied to any subsequent covered loss as specified in the **Followed Policy**.

II.   LIMIT OF LIABILITY

The amount set forth in Item 2. of the Declarations shall be the Underwriter's maximum aggregate liability under this policy with respect to all claims.   Defense costs and/or claims expenses, if applicable, are part of and not in addition to the Limit of Liability and the payment by the Underwriter of such defense costs and/or claims expenses, if applicable, reduce the Limit of Liability.

Any coverage under the **Followed Policy** that provides for a maximum Limit of Liability that is less than the Limit of Liability stated in Item 3. of the Declarations for such **Underlying Insurance** ("Sublimit of Liability") shall not be provided by this policy.   Provided, however, any actual payment of covered loss(es) made under the **Followed Policy** or other **Underlying Insurance** on account of any claim, for which coverage is subject to a Sublimit of Liability, shall be recognized by the Underwriter as contributing to the reduction or exhaustion of the Limit(s) of Liability designated in Item 3. of the Declarations.

III.   CONDITIONS

A.   Reporting and Notice – As a condition precedent to exercising any rights under this policy, the **Policyholder** shall give the Underwriter written notice of any claim or any potential claim under this policy or any **Underlying Insurance** in the same manner required by the terms and conditions of the **Followed Policy**.   Notwithstanding the foregoing, notice to the insurer(s) of the **Followed Policy** or other **Underlying Insurance** does not constitute notice to the Underwriter.   Written notice of any claim or potential claim shall be provided to the Underwriter at the address set forth in Item 5.A. of the Declarations.

The Underwriter shall be given notice in writing to the address set forth in Item 5.B. of the Declarations as soon as practicable in the event of (1) termination of any **Underlying Insurance**, (2) any additional or return premiums charged or allowed in connection with any **Underlying Insurance**, or (3) any change to any of the **Underlying Insurance**.

B.  Alteration – No change in, modification of, or assignment of interest under this policy or **Underlying Insurance** shall be effective except when made by a written agreement or endorsement to this policy by an authorized representative of the Underwriter. To the extent such **Underlying Insurance** is modified or altered, the Underwriter shall not recognize any new or modified coverage to which it has not consented.

C.  Maintenance of Underlying Insurance – As a condition precedent to coverage under this policy, the **Policyholder** agrees to maintain the **Underlying Insurance** during the **Policy Period** in full effect with solvent insurers.  To the extent such **Underlying Insurance** is not maintained, then the **Policyholder** shall be deemed self-insured for the amount of the Limit(s) of Liability of any such **Underlying Insurance**.

**Endorsement #** 01



# Sanctions Exclusion Endorsement

**Policyholder:**   AMTRUST FINANCIAL SERVICES, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

**Endorsement #** 02

# Cap On Losses From Certified Acts Of Terrorism



| Insured's Name | Policy Number | Effective Date | Endorsement Number |
|---|---|---|---|
| AMTRUST FINANCIAL SERVICES, INC. | DOC 1074701-00 | 10/21/2017 | 02 |

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies your insurance.
**Zurich Excess Select Insurance Policy**

**A. Cap on Losses From Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.** To be an act of terrorism;

**2.** To be a violent act or an act that is dangerous to human life, property or infrastructure;

**3.** To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.** To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

If aggregate insured losses attributable to one or more "certified acts of terrorism" exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**B. Application of Other Exclusions**

The terms and limitations of a terrorism exclusion or any other exclusion, or the inapplicability or omission of a terrorism exclusion or any other exclusion, do not serve to create coverage which would otherwise be excluded, limited or restricted under this policy.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

Endorsement # 03

# Policy Period Amended Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC 4565460-00 | 10/21/2018 | 12/31/2018 | 11/20/2018 | $50,400.00 | |

**Policyholder:**  AMTRUST FINANCIAL SERVICES, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

In consideration of the premium charged, it is hereby understood and agreed that Item 4 of the Declarations is deleted and replaced by the following:

Item 4. **Policy Period:**  From: 12:01 A.M. on 10/21/2018   To: 12:01 A.M. on 12/31/2018
Policy incepts and expires at the local time at the address shown in Item1.

The amendment of the **Policy Period** pursuant to this endorsement does not reinstate or increase the applicable Limits of Liability as set forth in Items 2 of the Declarations.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

**Endorsement # 04**



# Cancellation Endorsement

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC 4565460-00 | 10/21/2018 | 12/31/2018 | 11/29/2018 | | -$39,312 |

**Policyholder:**  AMTRUST FINANCIAL SERVICES, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

It is agreed that this policy is cancelled effective 11/29/2018:

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY SHALL APPLY AND REMAIN UNCHANGED.**

**Endorsement # 05**

# Run-Off Coverage Policy Purchased Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| DOC 4565460-00 | 10/21/2018 | 11/29/2018 | 11/29/2018 | $900,000 | |

**Policyholder:**  AMTRUST FINANCIAL SERVICES, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

It is agreed that:

In accordance with the run-off coverage election terms of the Followed Policy, the Policyholder has purchased the following run-off coverage period ("Additional Period") for the following Additional Premium:

        A.   Additional Premium:     $900,000

        B.   Additional Period: 12:01 A.M. on  11/29/2018   to 12:01 A.M. on  11/29/2024.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

# EXHIBIT E



**AXIS INSURANCE COMPANY**
Administrative Office – 11680 Great Oaks Way, Suite 500
Alpharetta, Georgia 30022
(a stock company hereinafter the "Insurer")

## Excess Policy

### NEW YORK DECLARATIONS PAGE – CLAIMS MADE POLICY

SUBJECT TO THE PROVISIONS OF THE **FOLLOWED POLICY**, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE WHILE THE POLICY IS IN EFFECT. COVERAGE UNDER THE POLICY CEASES UPON TERMINATION OF THE POLICY, EXCEPT FOR THE AUTOMATIC EXTENDED REPORTING PERIOD, UNLESS THE **INSUREDS** PURCHASE ADDITIONAL EXTENDED REPORTING PERIOD COVERAGE, AS SET FORTH IN THE **FOLLOWED POLICY**. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE APPLICABLE EXTENDED REPORTING PERIOD, WHICH MAY RESULT IN A COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT PROVIDED BY ANOTHER INSURER.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS MAY BE REDUCED AND EXHAUSTED BY PAYMENT OF DEFENSE COSTS OR CLAIMS EXPENSES AND THE INSURER SHALL NOT BE LIABLE FOR DEFENSE COSTS, CLAIMS EXPENSES OR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT AFTER THE LIMIT IS EXHAUSTED.

Policy Number: MNN626501/01/2017          Renewal of Policy Number: N/A

Item 1. **Policyholder** and Mailing Address:   AmTrust Financial Services, Inc.
59 Maiden Lane
New York, NY 10038

Item 2. **Policy Period**:  From: 12:01 a.m. on October 21, 2017 to: 12:01 a.m. on October 21, 2018 local time at the address in Item 1.

Item 3. Limit of Liability for the **Policy Period**: $5,000,000 excess of $10,000,000.

Item 4. **Underlying Insurance**: See attached Schedule of Underlying Insurance.

Item 5. Forms and Endorsements: See attached Schedule of Forms and Endorsements.

Item 6. Notices to Insurer:

| A.  Notice of claims or potential claims: | B.  All other notices: |
|---|---|
| AXIS Insurance Company<br>Professional Lines Claims<br>300 Connell Dr., P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Toll Free Fax: (866) 770-5630<br>E-mail: USClaimNoticeBH@axiscapital.com | AXIS Insurance Company<br>Professional Lines<br>300 Connell Dr., P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Fax: (908) 508-4301 |

Item 7.  Premium: $405,000 (No additional premium for TRIA).

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

Class: 2-14176

# Schedule of Underlying Insurance

| Followed Policy | | |
|---|---|---|
| Excess Directors & Officers Liability | | |
| Insurer Name | Policy Number | Limit |
| Indian Harbor Insurance Company | ELU152497-17 | $5,000,000 |
| | | |
| Other **Underlying Insurance** | | |
| Insurer Name | Policy Number | Limit |
| Zurich American Insurance Company | DOC 1074701-00 | $5,000,000 |

# Schedule of Forms and Endorsements

| Notices, Forms and Disclosures: | |
|---|---|
| Signature Page | AXIS 102 AIC (06 15) |
| Excess Policy | XS 0001 (12 10) |
| Policyholder Notice Economic and Trade Sanctions | AXIS 906 (03 16) |
| | |

| Endorsements: | | |
|---|---|---|
| No. | Endorsement Name | Form Number |
| | N/A | |



# SIGNATURE PAGE

IN WITNESS WHEREOF, the Insurer has caused this policy to be issued by affixing hereto the facsimile signatures of its President and Secretary.

Secretary

Andrew Weissert, Secretary

President

Carlton Maner, President



# Excess Policy

In consideration of the premium paid and in reliance upon all information and representations provided or made available by the **Insureds** to the Insurer in connection with the underwriting of this Policy, and subject to the provisions of this Policy and the Declarations and any Schedules and Endorsements attached hereto, all of which are made a part of this Policy, the Insurer and **Policyholder**, on behalf of all **Insureds**, agree as follows:

I.  INSURING AGREEMENT

This Policy shall provide insurance excess of the **Underlying Insurance**. Liability shall attach to the Insurer only after (i) the insurers of the **Underlying Insurance**, the **Insureds** or others on behalf of the **Insureds** shall have paid in legal currency amounts covered under the respective **Underlying Insurance** equal to the full amount of the **Underlying Limit**, and (ii) the retention or deductible, if any, applicable under the **Underlying Insurance** has been satisfied. Except as specifically set forth herein, coverage under this Policy shall apply in conformance with all provisions of the **Followed Policy**.

II.  DEFINITIONS

When used in this Policy, whether in the singular or in the plural:

A.  **Insureds** means all persons and entities covered under the **Followed Policy**.

B.  **Followed Policy** means the insurance policy(ies) identified as such in the Schedule of Underlying Insurance attached hereto.

C.  **Policy Period** means the period set forth in Item 2 of the Declarations.

D.  **Policyholder** means the person(s) or entity(ies) set forth in Item 1 of the Declarations.

E.  **Underlying Insurance** means the **Followed Policy** and all other policies, if any, identified as such in the Schedule of Underlying Insurance attached hereto.

F.  **Underlying Limit** means an amount equal to the aggregate of all limits of liability set forth in the Schedule of Underlying Insurance attached hereto.

III.  CONDITIONS AND LIMITATIONS

A.  The Limit of Liability set forth in Item 3 of the Declarations shall be the maximum amount payable by the Insurer in excess of the **Underlying Limit**.

B.  If any amount covered under the **Underlying Insurance** is subject to a sublimit of liability, this Policy shall not apply to such amount, but the Insurer shall recognize payment of such amount in any manner described in Section I. Insuring Agreement as reducing the **Underlying Limit** by such amount.

C.  The **Insureds** shall give written notice to the Insurer if any **Underlying Insurance** is changed or terminated or if any insurer of the **Underlying Insurance** becomes financially unable to pay any amount covered under the **Underlying Insurance**. No such event shall affect coverage under this Policy, unless the Insurer so agrees in writing. The failure of the **Insureds** to comply with this section shall not invalidate coverage. However, the Insurer shall not be liable to a greater extent than it would have been had no such event occurred.

D.  Notice to the Insurer shall be given at the respective address shown in Item 6 of the Declarations. Notice to any other insurer shall not constitute notice to the Insurer unless also given to the Insurer as provided above.

E.  The Insurer may, at its sole discretion, elect to participate in the investigation, defense and settlement of any claim or other matter to which the coverage under this Policy could apply even if the **Underlying Limit** has not been exhausted. The **Insureds** shall provide the Insurer with information, assistance and cooperation as the Insurer reasonably requests and shall do nothing to prejudice the Insurer's position or potential rights of recovery. No action by any other insurer shall bind the Insurer under this Policy.

**POLICYHOLDER NOTICE**

**ECONOMIC AND TRADE SANCTIONS**

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the Office of Foreign Assets Control (OFAC).

**THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") OF THE US DEPARTMENT OF THE TREASURY ADMINISTERS AND ENFORCES ECONOMIC AND TRADE SANCTIONS BASED ON US FOREIGN POLICY AND NATIONAL SECURITY GOALS AGAINST TARGETED FOREIGN COUNTRIES AND REGIMES, TERRORISTS, INTERNATIONAL NARCOTICS TRAFFICKERS, THOSE ENGAGED IN ACTIVITIES RELATED TO THE PROLIFERATION OF WEAPONS OF MASS DESTRUCTION, AND OTHER THREATS TO THE NATIONAL SECURITY, FOREIGN POLICY OR ECONOMY OF THE UNITED STATES.**

**WHENEVER COVERAGE PROVIDED BY THIS POLICY WOULD BE IN VIOLATION OF ANY U.S. ECONOMIC OR TRADE SANCTIONS, SUCH COVERAGE SHALL BE NULL AND VOID.**

**FOR MORE INFORMATION, PLEASE REFER TO:**

*HTTPS://WWW.TREASURY.GOV/RESOURCE-CENTER/SANCTIONS/PAGES/DEFAULT.ASPX*

# EXHIBIT F



**AXIS INSURANCE COMPANY**
Administrative Office – 11680 Great Oaks Way, Suite 500
Alpharetta, Georgia 30022
(a stock company hereinafter the "Insurer")

## Excess Policy

**NEW YORK DECLARATIONS PAGE – CLAIMS MADE POLICY**

SUBJECT TO THE PROVISIONS OF THE **FOLLOWED POLICY**, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE WHILE THE POLICY IS IN EFFECT. COVERAGE UNDER THE POLICY CEASES UPON TERMINATION OF THE POLICY, EXCEPT FOR THE AUTOMATIC EXTENDED REPORTING PERIOD, UNLESS THE **INSUREDS** PURCHASE ADDITIONAL EXTENDED REPORTING PERIOD COVERAGE, AS SET FORTH IN THE **FOLLOWED POLICY**. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE APPLICABLE EXTENDED REPORTING PERIOD, WHICH MAY RESULT IN A COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT PROVIDED BY ANOTHER INSURER.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS MAY BE REDUCED AND EXHAUSTED BY PAYMENT OF DEFENSE COSTS OR CLAIMS EXPENSES AND THE INSURER SHALL NOT BE LIABLE FOR DEFENSE COSTS, CLAIMS EXPENSES OR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT AFTER THE LIMIT IS EXHAUSTED.

Policy Number: MNN626501/01/2017          Renewal of Policy Number: N/A

Item 1. **Policyholder** and Mailing Address:          AmTrust Financial Services, Inc.
59 Maiden Lane
New York, NY 10038

Item 2. **Policy Period**: From: 12:01 a.m. on October 21, 2017 to: 12:01 a.m. on October 21, 2018 local time at the address in Item 1.

Item 3. Limit of Liability for the **Policy Period**: $5,000,000 excess of $10,000,000.

Item 4. **Underlying Insurance**: See attached Schedule of Underlying Insurance.

Item 5. Forms and Endorsements: See attached Schedule of Forms and Endorsements.

Item 6. Notices to Insurer:

| A.    Notice of claims or potential claims: | B.    All other notices: |
|---|---|
| AXIS Insurance Company<br>Professional Lines Claims<br>300 Connell Dr., P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Toll Free Fax: (866) 770-5630<br>E-mail: USClaimNoticeBH@axiscapital.com | AXIS Insurance Company<br>Professional Lines<br>300 Connell Dr., P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Fax: (908) 508-4301 |

Item 7. Premium: $405,000 (No additional premium for TRIA).

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

Class: 2-14176

# Schedule of Underlying Insurance

| Followed Policy | | |
|---|---|---|
| Excess Directors & Officers Liability | | |
| Insurer Name | Policy Number | Limit |
| Indian Harbor Insurance Company | ELU152497-17 | $5,000,000 |
| | | |
| Other **Underlying Insurance** | | |
| Insurer Name | Policy Number | Limit |
| Zurich American Insurance Company | DOC 1074701-00 | $5,000,000 |

# Schedule of Forms and Endorsements

| Notices, Forms and Disclosures: | |
|---|---|
| Signature Page | AXIS 102 AIC (06 15) |
| Excess Policy | XS 0001 (12 10) |
| Policyholder Notice Economic and Trade Sanctions | AXIS 906 (03 16) |
| | |

| Endorsements: | | |
|---|---|---|
| No. | Endorsement Name | Form Number |
| | N/A | |

# SIGNATURE PAGE

IN WITNESS WHEREOF, the Insurer has caused this policy to be issued by affixing hereto the facsimile signatures of its President and Secretary.

Secretary

Andrew Weissert, Secretary

President

Carlton Maner, President



# Excess Policy

In consideration of the premium paid and in reliance upon all information and representations provided or made available by the **Insureds** to the Insurer in connection with the underwriting of this Policy, and subject to the provisions of this Policy and the Declarations and any Schedules and Endorsements attached hereto, all of which are made a part of this Policy, the Insurer and **Policyholder**, on behalf of all **Insureds**, agree as follows:

## I.   INSURING AGREEMENT

This Policy shall provide insurance excess of the **Underlying Insurance**. Liability shall attach to the Insurer only after (i) the insurers of the **Underlying Insurance**, the **Insureds** or others on behalf of the **Insureds** shall have paid in legal currency amounts covered under the respective **Underlying Insurance** equal to the full amount of the **Underlying Limit**, and (ii) the retention or deductible, if any, applicable under the **Underlying Insurance** has been satisfied. Except as specifically set forth herein, coverage under this Policy shall apply in conformance with all provisions of the **Followed Policy**.

## II.   DEFINITIONS

When used in this Policy, whether in the singular or the plural:

A.   **Insureds** means all persons and entities covered under the **Followed Policy**.

B.   **Followed Policy** means the insurance policy(ies) identified as such in the Schedule of Underlying Insurance attached hereto.

C.   **Policy Period** means the period set forth in Item 2 of the Declarations.

D.   **Policyholder** means the person(s) or entity(ies) set forth in Item 1 of the Declarations.

E.   **Underlying Insurance** means the **Followed Policy** and all other policies, if any, identified as such in the Schedule of Underlying Insurance attached hereto.

F.   **Underlying Limit** means an amount equal to the aggregate of all limits of liability set forth in the Schedule of Underlying Insurance attached hereto.

## III.   CONDITIONS AND LIMITATIONS

A.   The Limit of Liability set forth in Item 3 of the Declarations shall be the maximum amount payable by the Insurer in excess of the **Underlying Limit**.

B.   If any amount covered under the **Underlying Insurance** is subject to a sublimit of liability, this Policy shall not apply to such amount, but the Insurer shall recognize payment of such amount in any manner described in Section I. Insuring Agreement as reducing the **Underlying Limit** by such amount.

C.   The **Insureds** shall give written notice to the Insurer if any **Underlying Insurance** is changed or terminated or if any insurer of the **Underlying Insurance** becomes financially unable to pay any amount covered under the **Underlying Insurance**. No such event shall affect coverage under this Policy, unless the Insurer so agrees in writing. The failure of the **Insureds** to comply with this section shall not invalidate coverage. However, the Insurer shall not be liable to a greater extent than it would have been had no such event occurred.

D.   Notice to the Insurer shall be given at the respective address shown in Item 6 of the Declarations. Notice to any other insurer shall not constitute notice to the Insurer unless also given to the Insurer as provided above.

E.   The Insurer may, at its sole discretion, elect to participate in the investigation, defense and settlement of any claim or other matter to which the coverage under this Policy could apply even if the **Underlying Limit** has not been exhausted. The **Insureds** shall provide the Insurer with information, assistance and cooperation as the Insurer reasonably requests and shall do nothing to prejudice the Insurer's position or potential rights of recovery. No action by any other insurer shall bind the Insurer under this Policy.

**POLICYHOLDER NOTICE**

**ECONOMIC AND TRADE SANCTIONS**

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the Office of Foreign Assets Control (OFAC).

**THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") OF THE US DEPARTMENT OF THE TREASURY ADMINISTERS AND ENFORCES ECONOMIC AND TRADE SANCTIONS BASED ON US FOREIGN POLICY AND NATIONAL SECURITY GOALS AGAINST TARGETED FOREIGN COUNTRIES AND REGIMES, TERRORISTS, INTERNATIONAL NARCOTICS TRAFFICKERS, THOSE ENGAGED IN ACTIVITIES RELATED TO THE PROLIFERATION OF WEAPONS OF MASS DESTRUCTION, AND OTHER THREATS TO THE NATIONAL SECURITY, FOREIGN POLICY OR ECONOMY OF THE UNITED STATES.**

**WHENEVER COVERAGE PROVIDED BY THIS POLICY WOULD BE IN VIOLATION OF ANY U.S. ECONOMIC OR TRADE SANCTIONS, SUCH COVERAGE SHALL BE NULL AND VOID.**

**FOR MORE INFORMATION, PLEASE REFER TO:**

*HTTPS://WWW.TREASURY.GOV/RESOURCE-CENTER/SANCTIONS/PAGES/DEFAULT.ASPX*



| Endorsement No. | Effective Date | Policy Number | Additional  Premium |
|---|---|---|---|
| 1 | 12:01 a.m. on  October 21, 2018 | MNN626501/01/2017 | $33,210 |

# POLICY PERIOD EXTENDED ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## Excess Policy

In consideration of the above premium, it is agreed that Item 2 of the Declarations is replaced with the following:

**Policy Period**: From 12:01 a.m. on October 21, 2017  to 12:01 a.m. on November 20, 2018, at the address in Item 1.

All other provisions of the Policy remain unchanged.

_____
Authorized Representative

October 17, 2018_____
Date



| Endorsement No. | Effective Date | Policy Number | Additional  Premium |
|---|---|---|---|
| 2 | 12:01 a.m. on  November 20, 2018 | MNN626501/01/2017 | $45,360 |

# POLICY PERIOD EXTENDED ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## Excess Policy

In consideration of the above premium, it is agreed that Item 2 of the Declarations is replaced with the following:

**Policy Period**: From 12:01 a.m. on October 21, 2017 to 12:01 a.m. on December 31, 2018, at the address in Item 1.

All other provisions of the Policy remain unchanged.



| Endorsement No. | Effective Date | Policy Number | Additional Premium |
|---|---|---|---|
| 3 | 12:01 a.m. on November 29, 2018 | MNN626501/01/2017 | $810,000 |

# FOLLOW CHANGE TO FOLLOWED POLICY ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## Excess Policy

In consideration of the above premium, it is agreed that:

This Policy shall provide excess insurance coverage in conformance with Endorsement No(s). 16 Convert To Run-Off Endorsement of the **Followed Policy**.

All other provisions of the Policy remain unchanged.

# EXHIBIT G

## Price Forbes and Partners Limited                     **507 PRF**

UMR: B0507 N17FA23130

---

### RISK DETAILS

| | |
|---|---|
| **TYPE:** | EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE |
| **INSURED:** | **AMTRUST FINANCIAL SERVICES, INC.** |
| **MAILING ADDRESS:** | 59 Maiden Lane, 43rd Floor<br>New York<br>New York<br>10038<br>United States of America |
| **PERIOD:** | From:   21st October 2017<br>To:      21st October 2018<br>Both days at 12:01am local standard time, at the mailing address of the Insured. |
| **INTEREST:** | Excess Directors and Officers Liability and Company Reimbursement Insurance as more fully defined in the wording referenced herein. |
| **LIMIT OF LIABILITY:** | USD 10,000,000 in the aggregate<br><br>In excess of:<br><br>USD 15,000,000 in the aggregate, which in turn in excess of underlying primary retention(s) |
| **TERRITORIAL LIMITS:** | Worldwide |
| **CONDITIONS:** | 1.   Excess Form as attached<br>2.   Retroactive date inception. Wording as attached.<br>3.   Short Rate Cancellation Table NMA 45 as attached<br>4.   Small AP/RP Clause NMA 1168 as attached<br>5.   Nuclear Incident Exclusion NMA 1256 as attached<br>6.   Radioactive Contamination Exclusion Clause NMA 1477 as attached<br>7.   War and Terrorism Exclusion NMA 2918 as attached.<br>8.   TRIA Clause LMA 5019 as attached.<br>9.   Sanctions Clause as attached.<br>10.  Premium Payment Clause LSW 3000 as attached. |
| **SUBJECTIVITIES:** | None |
| **CHOICE OF LAW & JURISDICTION:** | This insurance shall be governed by and construed in accordance with the law of New York and each party agrees to submit to the exclusive jurisdiction of the courts of the United States of America |

24
10
17

HIS
33

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

| | |
|---|---|
| **PREMIUM:** | USD 800,000 (100%) Annual |
| **PREMIUM PAYMENT TERMS:** | Premium Payment Clause LSW 3000 (45 days) |
| **TAXES PAYABLE BY INSURED AND ADMINISTERED BY INSURER(S):** | None applicable |
| **INSURER CONTRACT DOCUMENTATION:** | This document details the contract terms entered into by the insurer(s), and constitutes the contract documentation. |

.

**507 PRF**
**Price Forbes & Partners Limited**



UMR : B0507 N17FA23130

---

**DECLARATIONS**

**EXCESS INSURANCE POLICY**

**SUBJECT TO ALL OF THE TERMS, CONDITIONS AND LIMITATIONS OF THE FOLLOWED POLICY, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS COSTS AND EXPENSES INCURRED IN THE DEFENSE OR SETTLEMENT OF CLAIMS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY AMOUNTS AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Policy Number:**     **B0507 N17FA23130**

Item 1.     **Named Insured**:

AMTRUST FINANCIAL SERVICES, INC.

Principal Address:

59 Maiden Lane, 43rd Floor
New York
New York
10038
United States of America

Item 2.     **Policy Period**:

From:     21st October 2017

To:     21st October 2018

Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.

Item 3.     **Limit of Liability**:

USD 10,000,000   Each claim, including costs and expenses incurred in the defense or settlement of such claim.



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



PRICE FORBES

USD 10,000,000   in the Aggregate for the **Policy Period**, including costs and expenses incurred in the defense or settlement of all claims.

Item 4. **Premium:**

USD 800,000

Item 5. **Notification pursuant to Clause VI. shall be given to:**

Hiscox, Attention Public D&O Claims
101 California Street
Suite 1950
San Francisco
California 94111
United States of America

Or:
Hiscox, Syndicate 33, using the following e-mail address:
Londonmarketd&oclaims@hiscox.com

Item 6. **Underlying Insurance**:

Primary Policy Number ELU152497-17 issued by Indian Harbor Insurance Company for a limit of  USD 5,000,000 in the aggregate

First Excess Policy Number DOC 1074701-00 issued by Zurich-American Insurance Company for a limit of USD 5,000,000 in the aggregate

Second Excess Policy Number MNN626501/01/01/2017 issued by Axis Insurance Company for a limit of USD 5,000,000  in the aggregate

Item 7. **Endorsements Effective at Inception:**

1. Retroactive date inception.
2. Short Rate Cancellation Table NMA 45.
3. Small AP/RP Clause NMA 1168.
4. Nuclear Incident Exclusion NMA 1256.
5. Radioactive Contamination Exclusion Clause NMA 1477.
6. War and Terrorism Exclusion NMA 2918.
7. TRIA Clause LMA 5019.
8. Sanctions Clause.
9. Premium Payment Clause LSW 3000.




**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**EXCESS INSURANCE POLICY**

In consideration of the payment of the premium, in reliance upon all information and representations provided or made available by the **Insureds** to the Underwriters in connection with the underwriting of this Policy, the Underwriters and **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.  INSURING CLAUSE**

This Policy shall provide coverage in accordance with all of the terms, conditions and limitations (including, but not limited to, the exclusions and notice requirements) of the **Followed Policy** except for the Limit of Liability, the premium or as otherwise set forth herein.  Coverage hereunder shall attach only after all of the **Underlying Limits** have been exhausted through payments by, or on behalf of, or in place of the insurers of the **Underlying Insurance** of amounts under the **Underlying Insurance**. The risk of uncollectibility of any **Underlying Insurance** (in whole or in part), whether because of financial impairment or insolvency of an insurer of the **Underlying Insurance** or for any other reason, is expressly retained by the **Insureds** and is not insured by or assumed by the Underwriters.

**II.  DEFINITIONS**

A.  **Followed Policy** means the insurance policy identified in Item 6. of the Declarations.

B.  **Insureds** mean all persons and entities covered under the **Followed Policy.**

C.  **Named Insured** means all persons and entities set forth in Item 1. of the Declarations.

D.  **Policy Period** means the period set forth in Item 2. of the Declarations.

E.  **Underlying Insurance** means the **Followed Policy** and all other underlying insurance policies, if any, identified in Item 7. of the Declarations.

F.  **Underlying Limits** mean an amount equal to the aggregate of all limits of liability of the **Underlying Insurance**.

**III.  LIMIT OF LIABILITY**

The amount set forth in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriters for all coverage under this Policy, regardless of the number of claims made against the **Insureds** or the time of payment and regardless of whether or not an extended reporting period applies.

**IV.  CHANGES TO UNDERLYING INSURANCE AND DEPLETION OF UNDERLYING LIMITS**

If, subsequent to the inception date of this Policy, the terms, conditions or limitations of an **Underlying Insurance** are modified, the **Insureds** must notify the Underwriters in writing, as soon as practicable, of such modification. If any changes to the **Followed Policy**: (a) expand coverage, (b) change the policyholder name or address, or (c) modify premium, this Policy shall not follow those changes unless the Underwriters agree in writing to do so.  If any coverage under any **Underlying Insurance** is subject to a sub-limit, then this Policy provides no coverage excess of such sub-limit, but the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount. Furthermore, if any amount covered under any policy issued to the **Insureds** outside of the United States of America (a "Foreign Policy") and the **Underlying Insurance** expressly provides for the reduction of the **Underlying Limit** by reason of payment of such amount under the applicable Foreign Policy, then the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount.

**V.  UNDERWRITERS RIGHTS**

The Underwriters have the same rights and protections as the insurer of the **Followed Policy** and shall have the right, but not the obligation, at their sole discretion, to elect to participate in the investigation, settlement, prosecution or defense of any claim.

**VI.  NOTICES**




**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



Where notice is permitted or required by the **Followed Policy**, the **Insureds** have the same rights and obligations to notify the Underwriters under this Policy, except that such notice shall be given to the Underwriters at the address set forth in Item 5. of the Declarations. Notice to any other insurer shall not constitute notice to the Underwriters unless also given to the Underwriters as provided above.

01/14
LSW4003

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## <u>RETROACTIVE DATE INCEPTION</u>

In consideration of the premium charged for this Policy, it is hereby understood and agreed that this Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.      any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017,

2.      any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

3.      any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

All other terms and conditions of this Policy remain unchanged.

**507 PRF**
**Price Forbes & Partners Limited**



UMR : B0507 N17FA23130

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:

## SHORT RATE CANCELLATION TABLE

**A.**    **For insurance written for one year:-**

| Days Insurance In Force | % of One Year Premium | Days Insurance In Force | % of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154 - 156 | 53 |
| 2 | 6 | 157 - 160 | 54 |
| 3 - 4 | 7 | 161 - 164 | 55 |
| 5 - 6 | 8 | 165 - 167 | 56 |
| 7 - 8 | 9 | 168 - 171 | 57 |
| 9 - 10 | 10 | 172 - 175 | 58 |
| 11 - 12 | 11 | 176 - 178 | 59 |
| 13 - 14 | 12 | 179 - 182 (6 Months) | 60 |
| 15 - 16 | 13 | 183 - 187 | 61 |
| 17 - 18 | 14 | 188 - 191 | 62 |
| 19 - 20 | 15 | 192 - 196 | 63 |
| 21 - 22 | 16 | 197 - 200 | 64 |
| 23 - 25 | 17 | 201 - 205 | 65 |
| 26 - 29 | 18 | 206 - 209 | 66 |
| 30 - 32 (1 Month) | 19 | 210 - 214 (7 Months) | 67 |
| 33 - 36 | 20 | 215 - 218 | 68 |
| 37 - 40 | 21 | 219 - 223 | 69 |
| 41 - 43 | 22 | 224 - 228 | 70 |
| 44 - 47 | 23 | 229 - 232 | 71 |
| 48 - 51 | 24 | 233 - 237 | 72 |
| 52 - 54 | 25 | 238 - 241 | 73 |
| 55 - 58 | 26 | 242 - 246 (8 Months) | 74 |
| 59 - 62 (2 Months) | 27 | 247 - 250 | 75 |
| 63 - 65 | 28 | 251 - 255 | 76 |
| 66 - 69 | 29 | 256 - 260 | 77 |
| 70 - 73 | 30 | 261 - 264 | 78 |
| 74 - 76 | 31 | 265 - 269 | 79 |
| 77 - 80 | 32 | 270 - 273 (9 Months) | 80 |
| 81 - 83 | 33 | 274 - 278 | 81 |
| 84 - 87 | 34 | 279 - 282 | 82 |
| 88 - 91 (3 Months) | 35 | 283 - 287 | 83 |
| 92 - 94 | 36 | 288 - 291 | 84 |
| 95 - 98 | 37 | 292 - 296 | 85 |
| 99 - 102 | 38 | 297 - 301 | 86 |
| 103 - 105 | 39 | 302 - 305 (10 Months) | 87 |
| 106 - 109 | 40 | 306 - 310 | 88 |
| 110 - 113 | 41 | 311 - 314 | 89 |
| 114 - 116 | 42 | 315 - 319 | 90 |
| 117 - 120 | 43 | 320 - 323 | 91 |
| 121 - 124 (4 Months) | 44 | 324 - 328 | 92 |
| 125 - 127 | 45 | 329 - 332 | 93 |
| 128 - 131 | 46 | 333 - 337 (11 Months) | 94 |
| 132 - 135 | 47 | 338 - 342 | 95 |
| 136 - 138 | 48 | 343 - 346 | 96 |
| 139 - 142 | 49 | 347 - 351 | 97 |
| 143 - 146 | 50 | 352 - 355 | 98 |
| 147 - 149 | 51 | 356 - 360 | 99 |
| 150 - 153 (5 Months) | 52 | 361 - 366 (12 Months) | 100 |



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

**B.**      **For Insurances written for more or less than one year:-**

1.      If insurance has been in force for 12 months or less, apply the short rate table to the full annual premium determined as for an insurance written for a term of one year.

2.      If insurance has been in force for more than 12:-

   a)      Determine full annual premium as for an insurance written for a term of one year.

   b)      Deduct such premium from the full insurance premium and on the remainder calculate the pro-rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

   c)      Add premium produced in accordance with items a) and b) to obtain earned premium during the full period of insurance that has been in force.

**NMA 45**



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

### SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

NMA1168

507 PRF
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

      (a)  with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

      (a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:



507 PRF
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256




**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130


**PRICE FORBES**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## War and Terrorism Exclusion Endorsement

Notwithstanding any provision to the contrary within this Policy or any Endorsement thereto it is agreed that this Policy excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1)     war, invasion, acts of foreign enemies, hostilities or warlike operations (whether  war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2)     any act of terrorism.
        For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this policy, the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**




**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## <u>TRIA Clause</u>

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% (85% in respect of losses occurring after 31 December 2006) of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. The portion of your annual premium that is attributable to coverage for certified acts of terrorism as defined in the Terrorism Risk insurance Act is: 1%

LMA 5019



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

## <u>SANCTIONS CLAUSE</u>

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the insurer, or its ultimate holding company, to any sanction, prohibition or restriction implemented pursuant to  resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United Kingdom, or United States of America.

All other terms and conditions remain unaltered



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 45 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 45th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 10 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parts if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130


**PRICE FORBES**

## **INFORMATION**

2017 submission as received from Brown & Brown.
AmTrust Inc. Conference call dated 20th October 2017

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## SECURITY DETAILS

**INSURER'S LIABILITY:**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



**PRICE FORBES**

| | |
|---|---|
| **ORDER HEREON:** | 100% |
| **BASIS OF WRITTEN LINES:** | Percentage of Whole |
| | NMA 2419 Lines Clause, if applicable. |

**SIGNING PROVISIONS:**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured, or the (re)insured's representatives, and the Slip Leader. Such variation to be in accordance with provision a) above with the resulting variation in signed lines commencing from the date set out in that agreement.

Any other variation to the contracts will take effect only by the documented agreement of the (re)insured, or the (re)insured's representatives, and all (re)insurers whose lines are to be varied. Such variation to the contracts will take effect only when all such (re)insurers have agreed with the resulting variation in signed lines commencing from the date set out in that agreement.

**LINE CONDITIONS:**     None



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23130



## WRITTEN LINES

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the slip leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Signed Line
per cent (%)



100%

# EXHIBIT H



## MARKEL BERMUDA LIMITED

## PROFESSIONAL LIABILITY EXCESS LIABILITY INSURANCE POLICY DECLARATIONS

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**ITEM 1:**  INSURED:  Amtrust Financial Services, Inc.
ADDRESS:  59 Maiden Lane, 43rd Floor, New York, NY 10038 United States

**ITEM 2:**  POLICY PERIOD:  November 29, 2018 to November 29, 2024  (12:01 a.m. prevailing time at the address stated in Item 1)

**ITEM 3:**  LIMIT OF LIABILITY:  US$ 2,500,000 po US$ 5,000,000  in the aggregate (including Defense Costs)
(Not subject to any reinstatement provision that may be provided under the Followed Policy)

EXCESS OF TOTAL UNDERLYING LIMITS OF:  US$ 15,000,000  in the aggregate (including Defense Costs)

**ITEM 4:**  FOLLOWED POLICY: Indian Harbor Insurance Company Policy No.: US00080794DO17A

**ITEM 5:**  UNDERLYING INSURANCE

**SEE ENDORSEMENT NO. 1 FOR COMPLETE SCHEDULE**

**ITEM 6**  PENDING OR PRIOR DATE:  as per FOLLOWED POLICY

To the extent the FOLLOWED POLICY contains an exclusion regarding pending or prior litigation, administrative, regulatory or other proceedings, investigations, demands, suits, orders, decrees or judgments, this Policy shall follow such exclusion.  The applicable date for determining whether any such matter is "pending or prior" for the purpose of such exclusion in this policy shall be the PENDING OR PRIOR DATE set forth in this Item 6 of the Declarations.

**ITEM 7:**  PREMIUM:  $ 400,000

**ITEM 8:** ADDRESS OF INSURER(S) FOR ALL NOTICES UNDER THIS POLICY:

Markel Bermuda Limited
2 Front Street
P.O. Box 2565
Hamilton HM KX Bermuda
Telephone 441 296 8800
Email: PLBermudaClaims@markelcorp.com

**ITEM 9:** A. DISCOVERY PERIOD PREMIUM:    as per FOLLOWED POLICY

B. DISCOVERY PERIOD:            as per FOLLOWED POLICY

**ITEM 10:** ENDORSEMENTS EFFECTIVE AT INCEPTION:
1.    Schedule of Underlying Insurance
2.    Prior Notice / Prior Claim Exclusion Endorsement
3.    Tie in of Limits Endorsement
4.    Run-off Endorsement

**ITEM 11:** POLICY NUMBER:    MKLB25GPL0000702

**ITEM 12:** PRIMARY POLICY SELF-INSURED RETENTION: $5,000,000

The INSURER hereby causes this policy to be signed on the Declarations page by a duly authorized representative of the Insurer.

_____
**Chris Jansma, Senior Vice President**

January 16, 2019
**Date**



MARKEL®

**MARKEL BERMUDA LIMITED FOLLOW FORM**
**EXCESS LIABILITY INSURANCE POLICY**

In consideration of the premium paid, and in reliance on all statements made and information furnished to Markel Bermuda Limited herein called the "Insurer" and subject to the Declarations and endorsements made a part hereof and the terms, conditions and limitations set forth herein, the Insurer and the Insured Entity, on its behalf and on behalf of all persons and entity(s) entitled to coverage hereunder, agree as follows:

**I.      INSURING CLAUSE**

The Insurer shall pay the Insured for loss upon exhaustion of all applicable underlying limits by actual payments by the insurers of the UNDERLYING INSURANCE, the Insured, any insurer of a difference-in-conditions policy that is excess of this policy, and/or any other source, subject to: the terms and conditions of the FOLLOWED POLICY (excluding any such terms and conditions that are inconsistent with the terms of this policy); the Limit of Liability as stated in Item 3 of the Declarations; and the terms and conditions of, and the endorsements attached to, this policy.  In no event will this policy provide coverage broader than that provided by any UNDERLYING INSURANCE, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in an endorsement to this policy.

**II.     TERMS AND CONDITIONS**

A.      NOTICE AND LOSS PROVISIONS

1.    Any notice required to be given by the terms of the FOLLOWED POLICY shall be given to the Insurer at the address indicated in Item 8 of the Declarations.
2.    This policy shall follow the notice of claim and/or notice of circumstance provisions of the FOLLOWED POLICY, except as stated otherwise herein.
3.    With respect to the defense and settlement of any claim that appears to be reasonably likely to involve the Insurer, the Insured shall give the Insurer such information, assistance and cooperation as the Insurer may reasonably request and as shall be in the Insured's power and shall do nothing that would prejudice the Insurer's position or potential rights of recovery.
4.    Only those settlements, stipulated judgments and defense costs which have been consented to by the Insurer shall be recoverable as loss under the terms of this policy.  The Insurer's consent shall not be unreasonably withheld, provided the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim.

B.      FOLLOWING FORM

1.    This policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the FOLLOWED POLICY in all respects as of the effective date of this policy. The Insured agrees that should any mid-term change to the FOLLOWED POLICY be made by rewrite or endorsement, such change shall not be effective as to this policy without the written consent of the Insurer, which consent shall not be unreasonably withheld.  It is further agreed that should the Insurer consent to any change of this policy, the premium hereon may be adjusted accordingly.
2.    In the event of the depletion of the limits of liability of the UNDERLYING INSURANCE solely as a result of actual payment of losses thereunder this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such UNDERLYING INSURANCE. In the event of the exhaustion of all of the limits of liability of such UNDERLYING INSURANCE the remaining limits available under this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue for subsequent losses as primary insurance and any retention specified in the FOLLOWED POLICY shall be imposed under this policy. Payments made by insurers issuing such UNDERLYING INSURANCE in accordance with any State Amendatory endorsement or sub-limit of liability shall be deemed to apply toward exhaustion of the limits of liability of the UNDERLYING INSURANCE but this policy shall not follow such state amendatory endorsement or sub-limit of liability.
3.    This policy, subject to all its terms, conditions and endorsements, will not drop down to make payment for loss in place of UNDERLYING INSURANCE for any reason.



C.    CANCELLATION CLAUSE

The Insured shall give notice to the Insurer when practicable of the cancellation of any UNDERLYING INSURANCE. In the event any UNDERLYING INSURANCE is cancelled by the insurer thereon, this policy shall continue in full force and effect for the remainder of the POLICY PERIOD and the Insurer shall be liable to the same extent that it would have been liable if such UNDERLYING INSURANCE had remained in effect.

This policy shall follow the cancellation terms of the FOLLOWED POLICY except that in the event the Insurer cancels this policy for non-payment of premium, this policy shall be void as of the inception date of the POLICY PERIOD.

D.    PUNITIVE DAMAGES

This policy shall cover punitive damages unless such damages are excluded under the terms and conditions of the FOLLOWED POLICY. Furthermore, if the FOLLOWED POLICY is determined not to cover punitive damages solely due to the insurability of such damages under applicable law, then this policy shall nonetheless provide coverage for punitive damages as if all UNDERLYING INSURANCE had provided such coverage. This policy will not drop down to provide coverage for punitive damages in place of UNDERLYING INSURANCE.

E.    ALTERNATIVE DISPUTE RESOLUTION

1.    It is agreed that any dispute arising out of or in connection with this policy, including any question regarding its existence, validity or termination, shall be referred to and finally resolved solely by Arbitration or Alternative Dispute Resolution (ADR).

2.    This policy shall follow the terms of the FOLLOWED POLICY with respect to Arbitration or ADR only when said terms require the dispute to proceed in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada.

3.    In the event the applicable FOLLOWED POLICY does not provide for Arbitration or ADR in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada, the Insured shall select one of the following venues and procedural laws for such Arbitration or ADR:

(i)    Arbitration held in Hamilton, Bermuda under The Bermuda International Conciliation and Arbitration Act of 1993 (exclusive of the Conciliation Part of such act) as may be amended and supplemented, or under the English Arbitration Act of 1996 as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause, or

(ii)    Arbitration held in London, England under the English Arbitration Act of 1996, as may be amended and supplemented, which Act is deemed incorporated by reference into this clause, or

(iii)    Arbitration held in Toronto or Vancouver, Canada under the English Arbitration Act of 1996, as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause.

4.    Where the Insured and Insurer are parties to the dispute, the Insured shall make the selection referenced in paragraph 3 above. Where the Insurer and a party deriving rights through or asserting rights on behalf of the Insured are parties to a dispute, the Insurer shall make the selection referenced in paragraph 3 above.

5.    The number of arbitrators shall be three.

6.    Each party shall bear the costs of its own arbitrator. The remaining cost of arbitration shall be borne equally by the parties.

7.    All awards made by the Arbitration Board shall be final and no right of appeal shall lie from any award rendered by the Arbitration Board.

8.    No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insured to determine the Insured's liability, nor shall the Insurer be impleaded by the Insured or their legal representatives. The Insurer and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Insurer by any of the Insured's other insurers in a jurisdiction or forum other than that set forth in this clause, the Insured will in good faith take all reasonable steps requested by the Insurer to assist the Insurer in obtaining a dismissal of these claims (other than on the merits). The Insured will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Insurer would have been liable to such insurers for indemnity or contribution pursuant to this policy. The Insured shall be entitled to assert claims against the Insurer for coverage under this policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other



insurers in respect of such claims for indemnity or contribution, in an arbitration between the Insurer and the Insured pursuant to this clause; provided, however, that the Insurer in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this policy and any other defenses (other than jurisdiction defenses) as it would have been entitled to raise in the action or proceeding with such insurers.

F.      CHOICE OF LAW

This policy shall be construed and enforced in accordance with the applicable law determined under the FOLLOWED POLICY (with the exception of the procedural law required under this policy's Alternative Dispute Resolution clause E.), except insofar as such laws may prohibit payment hereunder in respect of punitive damages, in which case, the laws of England and Wales shall apply.



## SCHEDULE OF UNDERLYING INSURANCE

It is hereby understood and agreed that Item 5 of the Declarations reads as follows:

**Item 5:**  Schedule of Underlying Insurance:

| | Carrier | Policy Period | Limits | Attachment |
|---|---|---|---|---|
| i. | Indian Harbor Insurance Company | November 29, 2018 – November 29, 2024 | $5M | as per ITEM 12 on Dec page. |
| ii. | Zurich American Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $5M |
| iii. | Axis Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $10M |
| | Quota Share Participant(s) | | | |
| iv. | Allianz Global Risk US Insurance Company | November 29, 2018 – November 29, 2024 | $2.5M po $5M | $15 |

**All other terms and conditions of the policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.  MKLB25GPL0000702
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 16, 2019

End No.:          1



## PRIOR NOTICE / PRIOR CLAIM EXCLUSION ENDORSEMENT

It is hereby agreed that Sections III.B(1) and B(2) of the FOLLOWED POLICY are deleted and replaced by the following:

**B.** No coverage shall be available under this policy for any Claim, Interview or Investigation Demand made against an Insured:

    (1)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an Insured which was brought prior to the Inception Date of this policy as set forth in ITEM 2 of the Declarations;

    (2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this policy as set forth in ITEM 2 of the Declarations, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000702
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:     January 16, 2019

End No.:        2



## TIE IN OF LIMITS ENDORSEMENT

It is hereby agreed that it is expressly acknowledged by the Insured and the Insurer that the premium for this policy has been negotiated with the understanding that this policy and the policy # 17CKP170ADAA issued to the Insured by Hiscox – Financial Lines (the "Other Policy") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a)  Subject to the terms and conditions of the coverage provided by the Other Policy and this policy, in the event that loss or damages is required to be paid under both this policy and the Other Policy, the coverage provided under this policy shall be in excess of the coverage provided under the Other Policy in that:

    i.  any loss or damages required to be paid under the Other Policy shall be fully paid prior to the payment of any loss or damages under this policy; and

    ii.  any payment of loss or damages under the Other Policy will proportionally reduce the maximum aggregate limit of liability for all loss or damages on account of all claims for this policy. Such proportion shall be the amount paid under the Other Policy divided by the Other Policy's overall limit of liability.

b)  The Insurer will have no obligation under this policy to make any payment of loss or damages to the extent that the Other Policy's aggregate limit of liability is fully exhausted.

c)  If the paid loss or damages under this policy are in an aggregate amount equaling $2,500,000, any and all obligations of the Insurer under this policy will be completely fulfilled and extinguished, and the Insurer will have no further obligations of any kind or nature whatsoever under this policy.

d)  Nothing in this endorsement is intended, nor shall be construed, to obligate or require the Insurer to pay loss or damages under this policy in excess of $2,500,000 which is the limit of liability set forth under Item 3 of the Declarations of this policy.

e)  In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this policy, the term, condition or limitation of this endorsement shall govern.

**All other terms and conditions remain unchanged**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.: MKLB25GPL0000702
of MARKEL BERMUDA LIMITED.

Issued to:      Amtrust Financial Services, Inc.

Date of Issue:    January 31, 2019

End No.        3



## RUN-OFF ENDORSEMENT

In consideration of the payment of the additional premium of $400,000, it is hereby understood and agreed that:

1.      The Insurer shall not be liable for loss on account of any claim based upon, arising out of, or attributable to or directly or indirectly resulting from any wrongful act, including any interrelated wrongful acts, taking place in whole or in part subsequent to November 29, 2018.

2.      The policy is amended at by deleting Section **II TERMS AND CONDITIONS** C.  CANCELLATION CLAUSE in its entirety.

3.      The premium shall be fully earned and non-refundable upon inception.

Nothing herein shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of this policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated herein.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000702
of MARKEL BERMUDA LIMITED.

Issued to:       Amtrust Financial Services, Inc.

Date of Issue:   January 16, 2019

End No.:         4



# EXHIBIT I



Allianz Global Corporate & Specialty®

# Allianz
## Insurance
## Policy





<u>**DECLARATIONS**</u>

**EXCESS PROTECT**

**EXCESS LIABILITY INSURANCE**

**NOTICE: THIS POLICY, SUBJECT TO ITS TERMS, APPLIES TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND THE DISCOVERY PERIOD, IF APPLICABLE. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS. SEE CONSUMER INFORMATION NOTICE BELOW FOR FURTHER DETAILS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY OF THE INSUREDS.**

**PLEASE READ THIS POLICY CAREFULLY**

The Declarations along with the Policy and with endorsements attached, if any, shall constitute the contract between the **Insureds** and the **Insurer**.

Policy Number:    USF00237518

| | | |
|---|---|---|
| Item 1. | **Policyholder**: | AmTrust Financial Services, Inc. |
| | Principal Address: | 59 Maiden Ln |
| | | New York, NY 10038-4502 |

Item 2.   **Policy Period**:   From:   November 29, 2018
                                 To:       November 29, 2024
                       The **Policy Period** incepts and expires as of 12:01 AM at the **Policyholder's** principal address.

Item 3.   **Limit of Liability:**   $2,500,000       In the aggregate for the **Policy Period**

Item 4.   **Premium:**       $400,000         For the **Policy Period**

Item 5.   **Followed Policy**: See Below

| | | | |
|---|---|---|---|
| Insurer: | Indian Harbor Insurance Company | Policy No.: | US00080794DO17A |
| Limit of Liability: | $5,000,000 | | |
| Retention: | $5,000,000 | | |
| Policy Period: | From:   October 21, 2017 | To: | November 29, 2024 |

---

# NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIRMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF NEW YORK LAWS AND REGULATIONS.

---

New York Free Trade Zone (Risk- Code):  **2-13000**

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



Item 6.  **Underlying**      See Below
         **Insurance:**
                            1st Excess Policy

1st Excess Policy

| | | | |
|---|---|---|---|
| Insurer: | Zurich American Insurance Company | Policy No.: | DOC 4565460-00 |
| Limit of Liability: | $5,000,000 | | |
| Excess of Limit of Liability: | $5,000,000 | | |
| Policy Period: | From: November 29, 2018 | To: | November 29, 2024 |

2nd Excess Policy

| | | | |
|---|---|---|---|
| Insurer: | Axis Insurance Company | Policy No.: | MNN626501/01/2017 |
| Limit of Liability: | $5,000,000 | | |
| Excess of Limit of Liability: | $10,000,000 | | |
| Policy Period: | From: November 29, 2018 | To: | November 29, 2024 |

Item 7.  **Insurer:**   (Coverage is provided in the following company, a stock company)

Allianz Global Risks US Insurance Company
225 West Washington Street, Suite 1800
Chicago, IL 60606-3484
Phone Number:  1-888-466-7883

Notification to the **Insurer** of a **Claim** or circumstance pursuant to Section 2.5 of this Policy shall be given to:

Allianz Global Risks US Insurance Company
Attention:  Claims Department
One Progress Point Parkway, 2nd Floor
O'Fallon, MO 63368
Email: NewLoss@agcs.allianz.com
Phone Number: 1-800-558-1606
Fax Number: 1-888-323-6450

Item 8.   Currency:            USD

Item 9.   Endorsements attached at issuance:  See Schedule of Forms and Endorsements, DO1200-MU

Marsh USA, Inc.
1166 Avenue of the Americas
New York, NY 10011

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



## New York Addendum

### *CONSUMER INFORMATION NOTICE - PLEASE READ CAREFULLY*

### Claims Made Coverage
[11 NYCRR 73 (Reg. 121)]

This policy is written on a claims-made basis and provides no coverage for claims which took place prior to the retroactive or prior acts date stated in the policy, if any.

This Policy covers only claims actually made against the insured while the policy remains in effect, and all coverage under the policy ceases upon the termination of the policy. Claims may, however, be reported to the company during an automatic sixty (60) day Discovery Period, or any additional Discovery Period purchased by the Policyholder.

Any coverage for the Discovery Period under this Policy applies only to the extent such is provided by the Underlying Insurance.

During the first several years of the claims made relationship, claims made rates are comparatively lower than occurrence rates. Be advised that substantial annual premium increases, independent of overall rate level increases, should be expected if the policyholder is written at a less than mature rate. This disparity lessens the longer the claims made relationship exists.

There is a potential for coverage gaps that may arise upon expiration of any Discovery Period.

Coverage under this policy may apply for acts, errors, or omissions which occurred prior to the effective date of this Policy if a Claim for Loss or Damages resulting therefrom is first reported during the Policy Period or during any applicable Discovery Period; provided, however that on or before such date the Insured did not know or could not have reasonably foreseen that such Wrongful Act could lead to a Claim. IF THIS POLICY CONTAINS A PRIOR ACTS EXCLUSION, THERE IS NO COVERAGE FOR CLAIMS FIRST REPORTED TO THE INSURER ARISING OUT OF ACTS, ERRORS OR OMISSIONS THAT OCCURRED PRIOR TO THE INCEPTION DATE OF THIS POLICY.

### Defense Costs:  Limit of Liability
[11 NYCRR 71 (Reg. 107)]

**Defense Costs** are part of, and not in addition to, the **Limit of Liability** and may be exhausted by amounts incurred as legal defense costs. The **Insurer** will not be liable for further legal defense costs or for the amount of any judgment or settlement after exhaustion of the **Limit of Liability**.

The **Policyholder**, on behalf of all **Insureds** has a right to an accounting, upon request, of legal defense costs actually expended.

 © 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



# Schedule of Forms and Endorsements

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder:  AmTrust Financial Services, Inc.**

| Form Name | Form Number |
|---|---|
| Excess Protect Excess Liability Insurance Policy | PX4100FL (08/15) |
| Notice of Terrorism Insurance Coverage | PHN7157-MU (03/17) |
| New York Amendatory Endorsement | PX3110NY (03/16) |
| Conformance with State Statutes Endorsement(Full Conformance) | DOXMAN(1209)-MU (8/15) |
| Sanctions Clause | PX3108 (08/15) |
| Cap on Losses from Certified Acts of Terrorism | 145989 (03/17) |
| Excess Protect Amendatory Endorsement | DOXMAN(1257)-MU (08/15) |
| Pending and Prior Litigation Exclusion | PX3101 (08/15) |
| Claims Handling Clause Amended Endorsement | DOXMAN(1257)-MU (08/15) |
| Quota Share Participation | PX3106 (08/15) |
| Run Off Coverage | PX3107 (08/15) |



**EXCESS PROTECT**
**EXCESS LIABILITY INSURANCE POLICY**

**THIS IS A FOLLOW FORM, CLAIMS MADE, INSURANCE POLICY THAT MUST BE READ IN CONJUNCTION WITH ALL UNDERLYING INSURANCE POLICIES TO BE UNDERSTOOD.**

In consideration of payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "**Insurer**"), including the statements made in the **Application** and subject to all terms, conditions and limitations of this Policy, the **Insurer**, the **Policyholder** and the **Insureds** agree as follows:

**1.        Insuring Agreement**

This Policy provides the **Insureds** with insurance excess of the **Underlying Insurance** for **Claims** first made against the **Insured** during the **Policy Period** or **Discovery Period**, if applicable, and reported to the **Insurer** pursuant to the provisions of this Policy. Except as specifically set forth in this Policy or in any written endorsement attached to this Policy, the coverage afforded by this Policy applies in conformance with: (1) the terms, conditions, warranties, exclusions and limitations of the **Followed Policy** as they existed on the inception date of this Policy; and (2) any narrower or more restrictive terms of the other **Underlying Insurance**, to the extent the coverage of the **Followed Policy** is limited or restricted by the terms of such other **Underlying Insurance**. This Policy shall not provide coverage broader than that provided by the **Followed Policy** unless the **Insurer** specifically agrees to grant such broader coverage herein or by written endorsement attached to this Policy.

**2.        General Conditions**

The conditions set forth in this Section 2. General Conditions are in addition to those set forth in the **Followed Policy**, and are specific to the coverage provided by this Policy.

2.1     Coverage under this Policy shall attach only after exhaustion of the limits of liability of the **Underlying Insurance**. The limits of liability of the **Underlying Insurance** shall be exhausted by payment, in legal currency, of **Loss** by the insurers of the **Underlying Insurance**, the **Insureds** or any **DIC Insurer** (if such **DIC Insurer** is sitting excess of this Policy). The **Insurer** shall recognize any contribution in legal currency by or on behalf of an **Insured** to such exhaustion of the limits of liability of the **Underlying Insurance**.

2.2     The **Limit of Liability** as stated in Item 3 of the Declarations shall be the maximum amount payable under this Policy for all covered **Loss**, including without limitation, defense costs.

2.3     If the limits of liability of the **Underlying Insurance** are reduced solely due to actual payment in legal currency of the **Underlying Insurance**, this Policy shall continue in force as excess insurance above the remaining amount of the limits of liability of the **Underlying Insurance**.   If the limits of liability of the **Underlying Insurance** are exhausted as described in Section 2.1, this Policy shall continue in force as primary insurance, subject to any applicable retention.

2.4     This Policy shall pay only in the event of reduction or the exhaustion of limit of the **Underlying Insurance** as described above and shall not drop down for any reason including, but not limited to, the uncollectibility in whole or in part of the **Underlying Insurance** or any insurance provided by a **DIC Insurer**. This Policy does not provide excess insurance above any sub-limit of liability available under any **Underlying Insurance**; however, the **Insurer** shall recognize the payment of such sub-limit of liability as erosion or reduction of the limits of liability of the **Underlying Insurance**.

2.5     Where any **Underlying Insurance** permits or requires notice to its insurer, including notice of a **Claim**, then as a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall, contemporaneously with and according to the terms of the **Followed Policy**, give the same written notice to the **Insurer** at the applicable address set forth in Item 7 of the Declarations.

2.6     The **Insurer** may elect to, but is not obligated to, effectively associate in the investigation, settlement, defense or appeal of any **Claim** or matter that the **Insurer** believes, in its sole opinion, is reasonably likely to involve or to be covered under this Policy.

2.7     Any change in or modification to the **Underlying Insurance** or this Policy or assignment of interest under this Policy must be agreed upon in writing by the **Insurer**, and in no event shall any such change, modification or assignment affect this Policy's excess position or attachment point.

 © 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



2.8   All **Underlying Insurance** shall be maintained in full force and effect.  Failure to maintain any **Underlying Insurance** shall: (1) result in the **Insureds** becoming self-insured for the limit of liability of any such **Underlying Insurance**; and (2) not relieve the **Insurer** of any obligations under this Policy.

2.9   This Policy shall terminate immediately upon the effective date of the termination for any reason of the **Followed Policy**, (except by reason of the complete exhaustion of the **Followed Policy** as set forth above) whether by the **Insureds** or by the insurer of such policy.

## 3.      Definitions

3.1   Any term used in this Policy, including **Application**, **Claim, Loss** and **Insured(s)** that is defined in the **Followed Policy** shall have the same meaning as assigned to such term in the **Followed Policy**.

3.2   **DIC Insurer** means any insurer of an insurance policy written specifically excess of this Policy that is contractually obligated to drop down and pay covered **Loss** that is not paid by any **Underlying Insurance**. This Policy does not follow form to the provisions of the policy of such **DIC Insurer**.

3.3   **Discovery Period** means the Discovery Period or Extended Reporting Period as described in the **Underlying Insurance**.  In no event shall this Policy provide a **Discovery Period** unless, and then only to the extent, it is provided by the **Underlying Insurance**.

3.4   **Followed Policy** means the insurance policy stated as such in Item 5 of the Declarations.

3.5   **Insurer** means the entity stated in Item 7 of the Declarations.

3.6   **Policyholder** means the entity stated in Item 1 of the Declarations.

3.7   **Policy Period** means the period stated as such in Item 2 of the Declarations.

3.8   **Underlying Insurance** means the **Followed Policy** and any other insurance policies stated as such in Item 6 of the Declarations.

IN WITNESS WHEREOF, the **Insurer** has caused this Policy to be signed by its President and Secretary.

*Secretary*                                                  *President*



# IMPORTANT DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE
_____

This notice applies to all type(s) of insurance provided under this policy that are subject to the Terrorism Risk Insurance Act ("The Act"), as amended.  This policy makes available and provides at a premium of $0 insurance coverage for losses resulting from acts of terrorism.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.


YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS $0 AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.


YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.



Endorsement Number 1

# New York Amendatory

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

I.    The header on the 1st page of the policy form is hereby deleted in its entirety and replaced with the following:

      **THIS IS A CLAIMS MADE POLICY WITH DEFENSE COSTS INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

II.    The following Subsections are added to the General Conditions:

    A.    <u>Discovery Period Upon Termination of Coverage</u>

        1.    Upon any **Termination of Coverage** for reasons other than nonpayment of premium or fraud within the first year of claims-made coverage with the **Insurer**, the **Policyholder** shall have the right to a **Discovery Period**. The **Insurer** will advise the **Policyholder** in writing of the Automatic Discovery Period and the availability of, the premium for, and the importance of purchasing, the Optional Discovery Period. This notice will be sent no earlier than the date of notification of **Termination of Coverage**, and no later than thirty (30) days after the effective date of the **Termination of Coverage**.

        2.    The **Policyholder** shall have the right to a period of sixty (60) days following **Termination of Coverage** (hereinafter the Automatic **Discovery Period**), in which to give notice to the **Insurer** of **Claims** first made against any **Insured** during said sixty (60) day period, for any **Wrongful Act** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy.

        3.    The **Policyholder** shall have the option to purchase, upon payment of an additional premium equal to 100% of the total annual premium, an Optional Discovery Period (hereinafter Optional **Discovery Period**). The Optional **Discovery Period** shall cover **Claims** first made against any **Insured** during the period of twelve (12) months for **Wrongful Acts** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy. The **Policyholder** shall have the option to purchase, upon payment of an additional premium equal to 100% of the total annual premium, an Optional Discovery Period (hereinafter Optional **Discovery Period**). The Optional **Discovery Period** shall cover **Claims** first made against any **Insured** during the period of twelve (12) months for **Wrongful Acts** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy.

        4.    Where premium is due to the **Insurer** for coverage under this Policy, any monies received by the **Insurer** from the **Policyholder** as payment for the Optional **Discovery Period** shall first be applied to such premium owing for the Policy. All premiums paid with respect to the Optional **Discovery Period** shall be deemed fully earned as of the first day of the Optional **Discovery Period**.

        5.    The additional premium for the Optional **Discovery Period** shall be based upon the rates in effect at the beginning of the **Policy Period**. The **Policyholder** may purchase for an additional premium an

 © 2016 Allianz Global Corporate & Specialty SE.<br>All rights reserved.



additional Optional **Discovery Period** of one, two, or three years following the termination of this Policy. The applicable required additional premium is set forth in (a)-(c) of the SCHEDULE below.

6. The **Policyholder** must notify the **Insurer** in writing of its intent to purchase an Optional **Discovery Period** and must pay the additional premium. The **Policyholder** shall have the greater of the following in which to submit such notice to the **Insurer**:

   a. sixty (60) days after the effective date of **Termination of Coverage**; or

   b. thirty (30) days after the date that the **Insurer** mails notice advising the **Policyholder** of the availability of the Optional Discovery Period.

   If the **Policyholder** elects to purchase the Optional **Discovery Period**, the Optional **Discovery Period** coverage will not take effect until the premium owed for the Policy is paid in full, and the premium owed for the Optional **Discovery Period** coverage is paid in full and promptly when due.

7. The aggregate **Limit of Liability** for the Optional **Discovery Period** shall be at least equal to the amount of coverage remaining in the Policy's aggregate **Limit of Liability**.

8. During a claims-made relationship and any Optional **Discovery Period**, a person employed or otherwise affiliated with the **Policyholder** and covered by the **Policyholder's** claims-made policy during such affiliation, shall continue to be covered under such policy and any Optional **Discovery Period** after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

   A claims-made policy issued to a corporation, partnership or other entity shall provide Optional **Discovery Period** coverage upon **Termination of Coverage** to any person covered under the policy, if:

   a. such entity has been placed in liquidation or bankruptcy or permanently ceases operations;

   b. the entity or its designated trustee does not purchase Optional **Discovery Period** coverage; and

   c. such person requests the Optional **Discovery Period** coverage within 120 days of the **Termination of Coverage**.

   The **Insurer** shall have no obligation to provide any notice to any such person of the availability of the Optional **Discovery Period** coverage. The **Insurer** may charge the person for whom Optional **Discovery Period** coverage is provided a premium commensurate with such coverage.

9. The additional premium for the Optional **Discovery Period** shall be based upon the rates in effect at the beginning of the **Policy Period**. The **Policyholder** may purchase for an additional premium an additional Optional **Discovery Period** of one, two, or three years following the termination of this Policy. The premium for the additional Optional **Discovery Period** will be as follows:

SCHEDULE

| (a) | 12 Months: | 125% | of the Policy **Premium** |
| (b) | 24 Months: | 175% | of the Policy **Premium** |
| (c) | 36 Months: | 200% | of the Policy **Premium** |

10. Where premium is due to the **Insurer** for coverage under this Policy, any monies received by the **Insurer** from the **Policyholder** as payment for the Optional **Discovery Period** shall first be applied to such premium owing for the Policy. All premiums paid with respect to the Optional **Discovery Period** shall be deemed fully earned as of the first day of the Optional **Discovery Period**.

B. Cancellation/Non-Renewal or Conditional Renewal

   1. Cancellation

      a. This Policy may be cancelled by the **Policyholder** by surrender thereof to the **Insurer** or by providing written notice to the **Insurer** stating when thereafter cancellation shall be effective. If this Policy is cancelled by the **Policyholder**, the **Insurer** shall retain the customary short rate proportion of the premium.

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.

**Allianz (ⅠⅠ)**

b. If this Policy has been in effect for sixty (60) days or less, and is not a renewal of a policy previously issued by the **Insurer**, this Policy may be cancelled by or on behalf of the **Insurer** by mailing or delivering to the **Policyholder's** authorized agent or broker and to the **Policyholder** at the address shown in Item 1. of the Declarations written notice of cancellation stating the reason for cancellation at least twenty (20) days before the effective date of cancellation. If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.

After this Policy has been in effect for more than sixty (60) days or after the effective date of renewal, this Policy may only be cancelled by or on behalf of the **Insurer** for one of the following reasons:

(1) nonpayment of premium;

(2) conviction of a crime arising out of acts increasing the hazard insured against;

(3) discovery of fraud or material misrepresentation in obtaining the Policy or in the presentation of a **Claim** thereunder;

(4) after issuance of this Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period**;

(5) a determination by the Superintendent that the **Insurer's** continuation of the present premium volume would jeopardize the **Insurer's** solvency or be hazardous to the interests of the **Insurer's** policyholders, the **Insurer's** creditors or the public; or

(6) a determination by the Superintendent that the continuation of the Policy would violate, or would place the Insurer in violation of New York law.

Cancellation shall be effected by mailing or delivering to the **Policyholder's** authorized agent or broker and to the **Policyholder** at the address shown in Item 1. of the Declarations written notice of cancellation specifying the grounds for cancellation at least fifteen (15) days before the effective date of cancellation. If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due. If the **Insurer** cancels this policy, the earned premium shall be computed pro rata.

2. <u>Nonrenewal or Conditional Renewal</u>

Should the **Insurer** decide to nonrenew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Policyholder** at the principal address shown in Item 1. of the Declarations and to the **Policyholders** authorized agent or broker, if applicable, at least sixty (60) days but not more than one hundred and twenty (120) days before the end of the Policy **Period**. Such notice shall contain the specific reasons for the nonrenewal or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in this section, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered unless the **Policyholder**, during this 60-day period, has replaced the coverage or elects to cancel in which event such cancellation shall be on a pro rata premium basis; provided, however, that if the **Insurer** elects to renew on the basis of the conditional renewal notice, then such terms, conditions and rates shall govern the Policy upon expiration of such sixty (60) day period unless such notice was provided at least thirty (30) days prior to the expiration date of the Policy, in which event the terms, conditions and rates set forth in the conditional renewal notice shall apply as of the renewal date.

If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior **Policy Period's** rates, unless the **Policyholder**,

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



during the additional **Policy Period**, has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

The **Insurer** will not send the **Policyholder** notice of nonrenewal or conditional renewal if the **Policyholder**, the **Policyholder's** authorized agent or another insurer of the **Policyholder** mails or delivers notice that the Policy has been replaced or is no longer desired.

If the **Policyholder** elects to accept the terms, conditions and rates of the conditional renewal notice pursuant to the cancellation provisions, a new limit of insurance shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

III.   The following Subsections in General Conditions are amended:

    A.   The following is added to Subsection 2.2:

        Transfer of Duties When a Limit of Liability is Exhausted

        1.   If the **Insurer** concludes that, based on incidents, occurrences, offenses, **Claims** or suits which have been reported to the **Insurer** and to which this insurance may apply, that any limit (each **Claim**, each incident, each occurrence, aggregate, or other) under the Policy is likely to be exhausted in the payment of judgments, settlements or **Defense Costs**, the **Insurer** will notify the **Policyholder** and **Insureds**, in writing, to that effect.

        2.   When a Limit of Liability described above has actually been exhausted in the payment of judgments, settlements or **Defense Costs**:

            a.   If the **Insurer** concludes that, based on incidents, occurrences, offenses, claims or suits which have been reported to the **Insurer** and to which this insurance may apply, that any limit (each claim, each incident, each occurrence, aggregate, or other) under the policy is likely to be exhausted in the payment of judgments or settlements and/or

            b.   The **Insurer** will notify the **Policyholder** and **Insureds**, in writing, as soon as practicable, that:

                (1)   such a limit has actually been exhausted; and

                (2)   the **Insurer's** duty to defend suits seeking damages subject to that limit has ended.

            c.   The **Insurer** will initiate, and cooperate in, the transfer of control, to any appropriate **Insured**, of all **Claims** seeking damages which are subject to that limit and which are reported to the **Insurer** before that limit is exhausted.  That **Insured** must cooperate in the transfer of control of said **Claims**.

                The **Insurer** agrees to take such steps, as the **Insurer** deems appropriate, to avoid a default in, or continue the defense of, such **Claims** until such transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.  The **Insurer** has no obligation to take any action whatsoever with respect to any **Claim** seeking damages that would have been subject to that limit, had it not been exhausted, if the **Claim** is reported to the **Insurer** after that Limit of Liability has exhausted.

            d.   The **Insured** involved in a **Claim** seeking damages subject to that limit, must arrange for the defense of such **Claim** within such time period as agreed to between the appropriate **Insured** and the **Insurer**.  Absent any such agreement, arrangements for the defense of such **Claim** must be made as soon as practicable.

            e.   The **Insured** will reimburse the **Insurer** for expenses the **Insurer** incurs in taking those steps the **Insurer** deems appropriate in accordance with paragraph 2.b. above.

            f.   The duty of the **Insured** to reimburse the **Insurer** will begin on:

                (1)   the date on which the applicable Limit of Liability is exhausted, if the **Insurer** sent notice in accordance with paragraph 1 above; or

                (2)   the date on which the **Insurer** sent notice in accordance with paragraph 2.a. above, if the **Insurer** did not send notice in accordance with paragraph 1 above.

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



(3)     The exhaustion of any **Limit of Liability** by the payments of judgments, settlements or **Defense Costs**, and the resulting end of the **Insurer's** duty to defend, will not be affected by the **Insurer's** failure to comply with any of the provisions of this condition.

B.     The following is added to Subsection 2.5:

<u>Failure to Provide Timely Notice of Claim – Prejudice Requirement</u>

Notice of any **Claim** or potential **Claim** given by or on behalf of the **Insured** to any licensed agent of the **Insurer's** in the state of New York, with particulars sufficient to identify the **Insured**, shall be deemed notice to the **Insurer**. Failure to give notice to the **Insurer** as required under this policy shall not invalidate any **Claim** made by the **Insured** injured person or any other claimant, unless the failure to provide such timely notice has prejudiced the **Insurer**. However, no **Claim** made by the **Insured**, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

If the **Insurer** disclaims liability or denies coverage based upon the failure to provide timely notice with respect to a **Claim** arising out of death or personal injury of any person, then the injured person or other claimant may maintain an action directly against the **Insurer**, in which the sole question is the **Insurer's** disclaimer or denial based on the failure to provide timely notice, unless within sixty (60) days following such disclaimer or denial, the **Insurer** or the **Insured** initiate an action to declare the rights of the parties under this Policy and named the injured person or other claimant as a party to the action.

C.     The following is added to Subsection 2.6:

This Policy affords coverage for **Defense Costs** even if allegations are groundless false or fraudulent, subject to terms, conditions and limitations of this Policy and any applicable **Underlying Insurance**.

IV.     The Definitions Section is amended as to add the following:

**Termination of Coverage** means:

A.     any cancellation or nonrenewal of the Policy, whether by the **Insurer** or **Policyholder**; or

B.     decrease in limits, reduction of coverage, increased deductible, new exclusion, or any other change in coverage less favorable to the **Policyholder**.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 2

# Conformance with State Statutes Endorsement
## (Full Conformance)

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

In the event of any inconsistency between the state amendatory attached to this Policy and any term or condition of this Policy, the **Insurer** will resolve the inconsistency by applying the provision that is more favorable to the **Insured**, to the extent permitted by applicable law.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.



Endorsement Number 3

# Sanctions Clause

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following General Condition is added:

Where coverage provided by this Policy would be in violation of any foreign or **U.S.** economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 4

## Cap on Losses from Certified Acts of Terrorism

| Policy Number | Effective Date |
|---|---|
| USF00237518 | November 29, 2018 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following provisions are added:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the Insurer (the company providing coverage under this Policy) has met its Insurer deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.



Endorsement Number 5

# Excess Protect Amendatory Endorsement

| Policy Number | Effective Date |
|---|---|
| USF00237518 | November 29, 2018 |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

(A)   The Preamble to the Policy is deleted in its entirety and replaced with the following:

In consideration of payment of the premium and in reliance upon all written statements made in the **Application** and subject to all terms, conditions and limitations of this Policy, the **Insurer**, the **Policyholder** and the **Insureds** agree as follows:

(B)   The Insuring Agreement is deleted in its entirety and replaced with the following:

This Policy provides the **Insureds** with insurance excess of the **Underlying Insurance** for **Claims** first made against the **Insured** during the **Policy Period** or **Discovery Period**, if applicable, and reported to the **Insurer** pursuant to the provisions of this Policy. The coverage afforded by this Policy applies in conformance with the terms, conditions, warranties, exclusions and limitations of the **Followed Policy**.

(C)   General Conditions is amended as follows:

1)   Subsection 2.1 is deleted in its entirety and replaced with the following:

Coverage under this Policy shall attach only after exhaustion of the limits of liability of the **Underlying Insurance**. The limits of liability of the **Underlying Insurance** shall be exhausted by payment, in legal currency, of **Loss** by the insurers of the **Underlying Insurance**, the **Insureds**, **DIC Insurer**, or any other source.  The **Insurer** shall recognize any contribution in legal currency by or on behalf of an **Insured** to such exhaustion of the limits of liability of the **Underlying Insurance**.

2)   Subsection 2.2 is deleted in its entirety and replaced with the following:

The **Limit of Liability** as stated in Item 3 of the Declarations shall be the maximum amount payable under this Policy for all **Loss**, including without limitation, defense costs.

3)   Subsection 2.4 is amended to add the following:

The **Insurer** shall recognize reduction or exhaustion of **Underlying Insurance**, including any applicable retentions, as a result of payments under any other policy that is tied in to the **Underlying Insurance**.

4)   Subsection 2.5 is deleted in its entirety and replaced with the following:

Where the **Followed Policy** permits or requires notice to its insurer, including notice of a **Claim**, the **Insureds** shall, according to the terms of the **Followed Policy**, give the same written notice to the **Insurer** at the applicable address set forth in Item 7 of the Declarations.

                    © 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



5)   Subsection 2.7 is deleted in its entirety and replaced with the following:

Any change in or modification to the **Followed Policy** or this Policy or assignment of interest under this Policy must be agreed upon in writing by the **Insurer**.

6)   Subsections 2.8 and 2.9 are deleted in their entirety.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 6

# Pending and Prior Litigation Exclusion

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provisions are added:

The **Insurer** shall not be liable for any **Loss** arising out of, based upon or attributable to:

A.  any demand, suit, proceeding or investigation occurring prior to, or pending as of, October 21, 2017 or

B.  any **Wrongful Act** which gave rise to such prior or pending demand, suit, proceeding or investigation or any **Interrelated Wrongful Acts** thereto.


ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

Endorsement Number:  7

# Claims Handling Clause Amended Endorsement

| Policy Number | Effective Date |
|---|---|
| USF00237518 | November 29, 2018 |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that

Section 2.6 in General Conditions is deleted in its entirety and replaced with the following:

2.6  The **Insurer** shall have the sole right to investigate, adjust, and settle its portion of any **Claims** or **Losses** arising under this Policy and it shall not be bound by the **Claim** or **Loss** decisions made by any other insurer. The **Insurer** shall have the right, in its sole discretion, but not the obligation, to effectively associate with the **Insured** in the defense and settlement of any **Claim** that appears to be reasonably likely to involve this Policy, including but not limited to effectively associating in the negotiation of a settlement. Only those settlements, stipulated judgments and defense costs which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this Policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim** in order to reach a decision as to reasonableness.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 8

## Quota Share Participation

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provisions are added:

A. This Policy is part of a quota share participation arrangement involving a total limit of liability of $ 5,000,000 involving the following insurers:

| Quota Share Participant | Policy Number | Limit of Liability |
|---|---|---|
| Allianz Global Risks US Insurance Company | USF00237518 | $2,500,000 |
| Markel Bermuda Limited | MKLB25GPL0000702 | $2,500,000 |

B. The **Insurer's** percentage in the quota share arrangement is 50%.  Notwithstanding any other provision of this Policy, the Insurer shall only be liable for its percentage participation of covered **Loss**.

C. The liability of each participating insurer is several and not joint.  The failure of any participating insurer to pay its share of covered **Loss** shall not increase the liability of any other participating insurer.

D. Each participating insurer shall make its own determination of whether **Loss** is covered under its policy.  No participating insurer shall have any authority to bind any other participating insurer regarding any matter submitted for coverage.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 9

## Run Off Coverage

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following provisions are added:

A.   The expiration date of the **Policy Period** set forth in Item 2 of the Declarations is extended from **November 29, 2018** to **November 29, 2024.**

B.   This **Insurer** shall not pay **Loss** for any **Wrongful Act** occurring on or after **November 29, 2018**.

C.   The entire premium for this Policy shall be deemed fully earned as of the inception of this Policy.

D.   The **Insureds** shall have no right under this Policy to purchase any additional discovery or extended reporting period.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

**About Allianz**

Your insurance company is part of the Allianz Group – an organization with a 125-year history of partnering with clients and delivering exceptional insurance products around the world.

Allianz is the world's largest property & casualty insurance company by revenue and has one of the strongest financial ratings of the leading global property & casualty insurers. The strength of its financial ratings and quality of its people make Allianz the insurer of choice for thousands of mid-size businesses and the majority of Global Fortune 500 companies.

Allianz is also ranked "one of the world's most admired companies" by Fortune and "one of the top 100 global brands" by Interbrand.

agcs.allianz.com

700030-4-15



Endorsement Number 10

## TIE IN OF LIMITS ENDORSEMENT

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provisions are added:

It is hereby agreed that it is expressly acknowledged by the **Insured** and the **Insurer** that the premium for this **Policy** has been negotiated with the understanding that this **Policy** and the policy # 17CKP170ADAA issued to the **Insured** by Hiscox – Financial Lines (the "**Other Policy**") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a) Subject to the terms and conditions of the coverage provided by the **Other Policy** and this **Policy**, in the event that loss or damages is required to be paid under both this **Policy** and the **Other Policy**, the coverage provided under this **Policy** shall be in excess of the coverage provided under the **Other Policy** in that:

   i. any loss or damages required to be paid under the **Other Policy** shall be fully paid prior to the payment of any loss or damages under this **Policy**; and

   ii. any payment of **Loss** or damages under the **Other Policy** will proportionally reduce the maximum aggregate limit of liability for all **Loss** or damages on account of all claims for this **Policy**. Such proportion shall be the amount paid under the **Other Policy** divided by the **Other Policy's** overall **Limit of Liability.**

b) The **Insurer** will have no obligation under this **Policy** to make any payment of **Loss** or damages to the extent that the **Other Policy's** aggregate limit of liability is fully exhausted.

c) If the paid **Loss** or damages under this **Policy** are in an aggregate amount equaling $2,500,000, any and all obligations of the **Insurer** under this **Policy** will be completely fulfilled and extinguished, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this **Policy**.

d) Nothing in this endorsement is intended, nor shall be construed, to obligate or require the **Insurer** to pay **Loss** or damages under this **Policy** in excess of $2,500,000 which is the **Limit of Liability** set forth under Item 3 of the Declarations of this **Policy**.

e) In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this **Policy**, the term, condition or limitation of this endorsement shall govern.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 10

# TIE IN OF LIMITS ENDORSEMENT

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provisions are added:

It is hereby agreed that it is expressly acknowledged by the **Insured** and the **Insurer** that the premium for this **Policy** has been negotiated with the understanding that this **Policy** and the policy # 17CKP170ADAA issued to the **Insured** by Hiscox – Financial Lines (the "**Other Policy**") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a) Subject to the terms and conditions of the coverage provided by the **Other Policy** and this **Policy**, in the event that loss or damages is required to be paid under both this **Policy** and the **Other Policy**, the coverage provided under this **Policy** shall be in excess of the coverage provided under the **Other Policy** in that:

   i. any loss or damages required to be paid under the **Other Policy** shall be fully paid prior to the payment of any loss or damages under this **Policy**; and

   ii. any payment of **Loss** or damages under the **Other Policy** will proportionally reduce the maximum aggregate limit of liability for all **Loss** or damages on account of all claims for this **Policy**. Such proportion shall be the amount paid under the **Other Policy** divided by the **Other Policy's** overall **Limit of Liability.**

b) The **Insurer** will have no obligation under this **Policy** to make any payment of **Loss** or damages to the extent that the **Other Policy's** aggregate limit of liability is fully exhausted.

c) If the paid **Loss** or damages under this **Policy** are in an aggregate amount equaling $2,500,000, any and all obligations of the **Insurer** under this **Policy** will be completely fulfilled and extinguished, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this **Policy**.

d) Nothing in this endorsement is intended, nor shall be construed, to obligate or require the **Insurer** to pay **Loss** or damages under this **Policy** in excess of $2,500,000 which is the **Limit of Liability** set forth under Item 3 of the Declarations of this **Policy**.

e) In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this **Policy**, the term, condition or limitation of this endorsement shall govern.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

# EXHIBIT J

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **1** of **24** |

| RISK DETAILS |
|---|

**UNIQUE MARKET REFERENCE:**  B0509FINFW1800559

**TYPE:**  EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE

**INSURED:**  AMTRUST FINANCIAL SERVICES, INC.

**PRINCIPAL ADDRESS:**
59 Maiden Lane
43rd Floor
New York 10038
United States of America

**PERIOD:**  From: 29th November 2018
To:    29th November 2024
Both days at 12.01 am Local Standard Time at the Principal Address.

**INTEREST:**  Excess Directors and Officers Liability and Company Reimbursement Insurance as more fully defined in the wording referenced herein.

**LIMIT OF LIABILITY:**  USD 5,000,000 in the aggregate

In excess of:

USD 20,000,000 in the aggregate, which in turn in excess of underlying primary retention(s)

**TERRITORIAL LIMITS:**  Worldwide.

**CONDITIONS:**
1. Excess Wording, as attached.
2. Schedule of underlying insurance

**Primary Contract**
Policy No: ELU152497-17
Insurer: Indian Harbor Insurance Company
Limit: USD 5,000,000

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **2** of **24** |

**First Excess Contract**
Policy No: DOC1074701
Insurer: Zurich American Insurance Company
Limit: USD 5,000,000

**Second Excess Contract**
Policy No: MNN626501/01/01/2017
Insurer: Axis Insurance Company
Limit: USD 5,000,000

**Third Excess Contract**
Policy No: USF00255018
Insurer: Allianz Global Corporate Specialty
Limit: USD 5,000,000

3. Small AP/RP Clause NMA 1168, as attached.
4. Nuclear Incident Exclusion NMA 1256, as attached.
5. Radioactive Contamination Exclusion Clause NMA 1477, as attached.
6. War and Terrorism Exclusion NMA 2918, as attached.
7. Sanction Limitation and Exclusion Clause LMA3100, as attached.
8. Tie in of limits clause, Prior Policy Endorsement, as attached.
9. Premium Payment Clause LSW3000, as attached.
10. LMA 9105 (amended) – Policyholder Disclosure Notice of Terrorism Insurance Coverage, as attached.

Special Cancellation/Insurer Downgrade Clause as attached.

IUA 09-054 Foreign Account Tax Compliance Act ('FATCA') - only to apply in respect of FATCA in scope contracts, as attached.

Where the terms '(Re)Insurer' and/or 'contract period' and/or '(Re)Insured' do not appear in the Risk Details or attached Policy wording the functional equivalents of these terms shall be deemed incorporated herein.

**CHOICE OF LAW & JURISDICTION:** Unless stated herein to the contrary, this (Re)Insurance shall be governed by and construed in accordance with the laws of US  New York and the exclusive jurisdiction of the US  New York courts.

**PREMIUM:** USD 800,000.00 (100%)

**PREMIUM PAYMENT TERMS:** Premium Payment Clause LSW 3000



If placed via PPL this box will not be signed

---

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **3** of **24** |

**TAXES PAYABLE BY THE INSURED AND ADMINISTERED BY INSURERS:** None

**TAXES PAYABLE BY THE INSURERS AND ADMINISTERED BY INSURED OR THEIR AGENT:** None

**RECORDING, TRANSMITTING AND STORING INFORMATION:** Where Marsh Ltd maintains risk and claim data, information or documents, Marsh Ltd may hold such data, information or documents electronically.

**INSURER CONTRACT DOCUMENTATION:** This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

This contract is subject to US state Surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the Insured. In the event that the surplus lines notice is not affixed to the contract document the Insured should contact the surplus lines broker.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **4** of **24** |

## MARSH EXCESS LAYER POLICY

In consideration of the **Insured** having paid or having promised to pay the premium, and subject to all of the terms, conditions and limitations of this excess policy, the insurers described in the SECURITY DETAILS of this policy ('**Insurer**') and the **Insured** agree as follows:

1.      **Insuring agreement**

1.1     The **Insurer** will provide the **Insured** with insurance coverage upon the terms, conditions and limitations of the **Primary Policy** except insofar as express provision for any matter is set out in this excess policy, and only insofar as necessary, the terms conditions and limitations set out in this excess policy will prevail over the corresponding terms, conditions and limitations of the **Primary Policy**.

1.2     Subject to the **Limit of Liability** the **Insurer** will pay to or on behalf of the **Insured** that proportion of the loss which exceeds the **Underlying Insurance**.

1.3     Subject to the provisions of sub-clause 1.4, unless and to the extent that clause 4 of this excess policy applies, the **Insurer** will have no liability under this excess policy unless and until all of the **Underlying Insurance** has been exhausted by the payment of losses under the **Underlying Insurance**.

1.4     For the purposes of this excess policy, losses shall be deemed to have been paid under an **Underlying Insurance** if all or any of the insurers subscribing thereto have paid, or have agreed to pay such losses, or have had their liability to pay such losses established by judgment, arbitration award or other final binding adjudication.  Such payment will, for the purposes of this excess policy, be deemed to have been made on the date of payment, agreement or adjudication, whichever occurs first.

        Furthermore:

        (a)     If a payment in respect of a loss is made under an **Underlying Insurance** of an amount which is less than the applicable limit of liability under that **Underlying Insurance** (but the relevant covered loss of the **Insured** exceeds the applicable limit of liability under that **Underlying Insurance**), then such payment will, for the purposes of determining the application of this excess policy to such covered loss, be deemed to exhaust the applicable limit of liability of that **Underlying Insurance** provided the **Insurer** will be liable to pay only that part of the covered loss which exceeds the **Underlying Insurance**.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **5** of **24** |

(b)     If any insurer participating on an **Underlying Insurance** is or becomes **Insolvent** then, for the purposes of this excess policy, such **Insolvent** insurer will be deemed to have paid in full the amount of its liability for losses under such **Underlying Insurance**, but only in the event that either:

(i)      any other insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication, whichever occurs first; or

(ii)     an **Insured** establishes that the **Insurer** would be liable hereunder but for the **Insolvency**.

(c)     The **Insurer** will recognise the erosion of **Underlying Insurance** whether or not cover provided in such **Underlying Insurance** is also provided by this excess policy.

## 2.     Definitions

2.1     **Insolvent** or **Insolvency** means that any step, application, order, proceeding or appointment has been taken or made in respect of an entity for composition or arrangement with creditors, winding-up, dissolution, administration, receivership (administrative or otherwise) or bankruptcy, or that the entity is unable to pay its debts.

2.2     **Insured** means all persons, organisations and entities as are insured under the **Primary Policy** for their own separate insurable interests.

2.3     **Insurer** means those entities and/or syndicates who are identified as underwriters or insurers by affixing of their seal or stamp in the SECURITY DETAILS section of this contract.

2.4     **Limit of Liability** means the amount set forth in the RISK DETAILS of this policy, which will be the maximum sum the **Insurer** is liable to pay under this excess policy.

2.5     **Primary Policy** means the primary contract identified in the RISK DETAILS of this policy.

2.6     **Policy Period** means the period specified in the RISK DETAILS of this policy.

2.7     **Underlying Insurance** means the **Primary Policy** together with any and all excess policies providing together the amount of cover specified at item (b) of the limit of liability in the RISK DETAILS of this policy, and any policies replacing any of them.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **6** of **24** |

3. **Maintenance of Underlying Insurance**

3.1 Subject to sub-clauses 3.2 to 3.4 below, all of the **Underlying Insurance** will be maintained during the **Policy Period** in full effect, except for any depletion of underlying limits.

3.2 The **Insured's** failure to maintain **Underlying Insurance** by reason of an action by an insurer subscribing to the **Underlying Insurance** (other than in relation to cancellation for the non-payment of premium by the **Insured**) will not invalidate this excess policy but, and subject to the application of clause 4, the **Insurer** will not be liable to a greater extent or at an earlier point in time than if sub-clause 3.1 had been complied with.  Nothing in this clause will negate clause 6 of this excess policy.

3.3 In the event of a failure by the **Insured** to give notice or to exercise any extension under any **Underlying Insurance** the **Insurer** will not be liable under this excess policy to a greater extent or at an earlier point in time than they would have been in the absence of such failure.

3.4 In the event of the **Insolvency** of any insurer participating on any **Underlying Insurance** the **Insured** shall not be in breach of the obligations under sub-clause 3.1 above if the **Underlying Insurance** is no longer in full force and effect as a result of that **Insolvency**.

4. **Depletion of Underlying Limits**

4.1 In the event and to the extent of the depletion or exhaustion of any limit of liability of the **Underlying Insurance** other than as provided for in sub-clause 4.2 below, and as a result of payment of a loss or losses under the **Underlying Insurance**, this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue and operate for subsequent losses as excess insurance over the amount of the relevant limit of liability remaining under such **Underlying Insurance**.

4.2 In the event of the exhaustion of any aggregate limit of liability applicable under the **Underlying Insurance** as a result of the payment of loss or losses under the **Underlying Insurance** this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue for subsequent losses as primary insurance in respect of any subsequent loss or losses that would otherwise have been covered by such **Underlying Insurance** but for the exhaustion of that aggregate limit of liability.

4.3 In the event that this excess policy is required to operate as primary insurance by virtue of sub-clause 4.2 above:

(a) any excess or retention specified in the **Primary Policy** shall apply to this excess policy, otherwise no excess or retention shall apply to this excess policy;

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **7** of **24** |

    (b)      in respect of any loss or losses for which the **Primary Policy** imposed a sub-limit of liability, this excess policy will provide cover for such loss or losses, including any unpaid portion of that sub-limit.

4.4      For the purposes of this clause 4, the determination of whether there has been any payment of losses under and/or exhaustion of any **Underlying Insurance** will be made in accordance with sub-clause 1.4.  However, and for the purposes of this clause 4 only:

    (a)      if and to the extent that paragraph 1.4(a) above applies, any and all amounts representing the difference between:

        (i)      any applicable limit of liability of any **Underlying Insurance** and

        (ii)      the amount paid by that **Underlying Insurance**

        will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above

    and

    (b)      if and to the extent that sub-paragraph 1.4(b)(i) above applies, any and all amounts representing the difference between:

        (i)      any applicable limit of liability of any **Underlying Insurance** and

        (ii)      the amount that any insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication

        will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above.

4.5      An **Underlying Insurance** will not be deemed exhausted solely by reason of the **Insolvency** of an insurer participating thereon.

5.      **Claims**

5.1      Any first notice of a claim or circumstance (or equivalent term by which the **Primary Policy** identifies matters potentially giving rise to notifications thereunder in respect of a loss or losses) required to be given under the terms of the **Primary Policy**, will also be given to the **Insurer** under this excess policy.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **8** of **24** |

5.2     In respect of any matter notified pursuant to sub-clause 5.1 above:

(a)     the **Insured** will inform the **Insurer** of any material developments in relation to such matter;

(b)     without prejudice to paragraph 5.2(a) above the rights and obligations set out in any claims investigation, claims co-operation, claims handling, claims defence, claims assessment and/or claims settlement provisions of the **Primary Policy** will be incorporated into this excess policy, but will not be enforceable for the purpose of this excess policy unless and until the loss or losses (including any defence costs or other fees incurred by the **Insured** for which indemnity is available under the **Primary Policy**) likely to arise from such matter have the potential to deplete the **Underlying Insurance** such that the policy immediately underlying this excess policy will be eroded to the extent of 50% or more of the limit of liability of such immediately underlying policy.

6.     **Alteration**

6.1     No amendment to the **Primary Policy** during the **Policy Period** will be effective in extending the scope of this excess policy, until agreed in writing by the **Insurer**.

6.2     No claim payment made as a consequence of an amendment to the **Primary Policy** during the **Policy Period** will operate to deplete or exhaust any limit of liability of the **Underlying Insurance** unless such amendment has been agreed in writing by the **Insurer**.

7.     **Governing Law and Jurisdiction**

7.1     The constructions, interpretation and meaning of the terms, exclusions limitations and conditions of this excess policy shall be determined in accordance with the laws of the state or country specified in the RISK DETAILS of this policy, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the courts of the state or country specified in the RISK DETAILS of this policy.

8.     **Dispute Resolution**

8.1     In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy, the provisions of the **Primary Policy** are incorporated into this excess policy for the purposes of determining the dispute resolution procedures applicable to this excess policy.

8.2     In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy in relation to matters that are also the subject of a dispute between the **Insured** and the insurers of any **Underlying Insurance** then those disputes shall be heard together in the same court or arbitration proceedings.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **9** of **24** |

## <u>SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)</u>

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.
NMA1168

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **10** of 24 |

### <u>NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)</u>

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

<u>This Policy</u>* does not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **11** of **24** |

the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.
* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **12** of **24** |

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **13** of **24** |

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.  any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.


08/10/01
NMA2918

**MARSH LTD**

| CONTRACT NUMBER | | |
|---|---|---|
| B0509FINFW1800559 | | Page **14** of **24** |

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **15** of **24** |

## TIE-IN OF LIMITS CLAUSE – POLICIES

It is agreed that:

In consideration of the premium charged, it is hereby understood and agreed that the Limit of Liability of the **Insurer** for **Loss** under this Policy, UMR B0509FINFW1800559, and the prior Policy, UMR B0509FINFW1800152 (amended from UMR B0507N17FA23130), shall be combined.

Accordingly, the Limit of Liability for **Loss** under either Policy mentioned above shall be reduced by **Loss** incurred under either Policy.


All other terms, conditions and exclusions remain unchanged.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **16** of **24** |

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 60 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 60th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **17** of **24** |

### Special Cancellation/Insurer Downgrade Clause

1   The Underwriter shall give notice to the Insured's representative, as identified in this Contract, as soon as practicable and in any event within 14 days, or as soon as permitted by its regulator if later, where the Underwriter:

   (i)  a.  ceases underwriting entirely; or

   b.  ceases underwriting the type of insurance provided by this policy in a territory where the Insured is domiciled; or

   c.  formally announces its intention to cease underwriting as per (i)a or (i)b above; or

   (ii)  voluntarily or involuntarily elects to wind up, run off its business, enter a scheme of arrangement or enter into any form of bankruptcy protection or related formal or informal termination of its insurance operations; or

   (iii) has its authority to carry on insurance business withdrawn.

2   The Insured or the Insured's representative may terminate an Underwriter's participation on this risk by giving written notice:

   (i)  When one of the events identified above at Condition 1 takes place; or

   (ii)  In the event that an Underwriter has its financial strength rating downgraded below BBB by Standard & Poor's or A- by AM Best. For Lloyd's syndicates it is the financial strength rating of Lloyd's as a whole which is considered.

   The effective date of termination shall not be earlier than the date notice is actually given by the Insured or the Insured's representative.

Upon notice of cancellation having been given by the Insured or the Insured's representative to the Underwriter, the Underwriter shall pay to the Insured a pro rata return premium for the unexpired period of the policy. Such pro rata return premium shall be paid in accordance with the terms of trade previously agreed between the Insured's representative and the Underwriter to whom notice of cancellation has been given.

In the event that there are any notifications under this policy or the Underwriter has made any payments pursuant to any policy term or condition providing coverage under this policy to the Insured, the premium shall be deemed fully earned unless the Insured withdraws such notifications and/or reimburses the Underwriter for any payment(s) made.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **18** of **24** |

**POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE**

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020; of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. However, your policy may contain certain exclusions which might affect your coverage, such as exclusion for nuclear events. The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.

YOU ARE HEREBY NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, AS AMENDED, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER YOUR  POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES, SUBJECT TO A $100 BILLION CAP, AND YOU HAVE BEEN NOTIFIED OF THE AMOUNT OF THE  PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

The premium allocated for this coverage is 1% of the overall premium charged for your policy.

**Option to reject terrorism insurance coverage**

*Your policy automatically provides coverage for claims arising out of acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 at no additional cost to you. If you would prefer not to have such coverage please check the box below, sign where indicated and return this form to your insurance broker or intermediary.* ***Please note that there will be no reduction in premium if terrorism coverage is removed from your policy.***

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **19** of **24** |

| | I hereby elect not to have TRIA coverage under this policy.  I understand that I will have no coverage for losses arising from certified acts of terrorism. |
|---|---|

_____        _____

***Policyholder / Applicants Signature***                    ***Name of Assured***

_____

***Print Name***                                                       ***Policy Number***

_____/_____/_____

***Date***

LMA9105 (amended)

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER B0509FINFW1800559 | | Page **20** of **24** |

## FOREIGN ACCOUNT TAX COMPLIANCE ACT ('FATCA')

Each (Re)Insurer hereby acknowledges the requirements of Sections 1471-1474 US Internal Revenue Code of 1986, as amended, and the Treasury regulations and other guidance issued from time to time thereunder ('FATCA') and the obligation of each of them to provide to Marsh Ltd a valid Internal Revenue Service ('IRS') Form W8-BEN-E, W-9 or other documentation meeting the requirements of the FATCA regulations to establish they are not subject to any withholding requirement pursuant to FATCA (the 'Required Documentation').

Furthermore:

a)   If a (Re)Insurer becomes non-compliant with FATCA during the contract period or has not provided the Broker with the Required Documentation 14 days prior to any premium due date, the Withholding Agent (as defined in U.S. Treasury Regulation Section 1.1471-1(b)(147)) shall withhold 30% of the premium (to the extent all or a portion of that premium is subject to withholding pursuant to FATCA) due to that (Re)Insurer under this contract on that premium due date and shall promptly notify that (Re)Insurer via the Broker.

b)   The withholding of premium by virtue of (a) above shall not be, and shall not be treated by the (Re)Insurer as a breach of any premium payment condition, warranty or other clause whether or not entitling the (Re)Insurer to cancel, terminate or restrict this contract, refuse, restrict or delay payment of any claim or invoke any interest, penalty or other late payment provision. The (Re)Insurer shall be liable under this contract as if no such withholding had been made.

c)   The (Re)Insurer shall not recoup sums withheld under (a) above by deducting equivalent sums from any payments due to the (Re)Insured or by set off against any other sums owed by the (Re)Insurer and any general or contractual right of set-off enjoyed by the (Re)Insurer is hereby varied and qualified to that extent.

d)   Where premium is withheld in error, has not yet been paid to the IRS and the (Re)Insurer has been paid only the net premium following such withholding, the broker will cooperate with the (Re)insurer to process the requisite refund.

IUA 09-054 (FATCA)

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **21** of **24** |

| **INFORMATION** |
|---|

None.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800559 | | Page **22** of **24** |

| SECURITY DETAILS |
|---|

**(RE)INSURER'S LIABILITY:**

**LMA3333**
**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning 'signing' below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is 'signing' (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its 'written line'.

Where this contract permits, written lines, or certain written lines, may be adjusted ('signed'). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's

| If placed via PPL this<br>box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **23** of **24** |

syndicate taken together) is referred to as a 'signed line'. The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to 'this contract' in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**   100% of 100%

**BASIS OF WRITTEN LINES:**   Percentage of Whole

**SIGNING PROVISIONS:**   In the event that the written lines hereon exceed 100% of the order, any lines written 'To Stand' will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (Re)Insurers.

However:

a)   in the event that the placement of the order is not completed by the commencement date of the period of (Re)Insurance then all lines written by that date will be signed in full;

b)   the (Re)Insured may elect for the disproportionate signing of (Re)Insurers' lines, without further specific agreement of (Re)Insurers, providing that any such variation is made prior to the commencement date of the period of (Re)insurance, and that lines written 'To Stand' may not be varied without the documented agreement of those (Re)Insurers;

c)   the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of (Re)Insurance, by the documented agreement of the (Re)Insured and all (Re)Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (Re)Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **24** of **24** |

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the leading (re)insurer.

(Re)Insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

(Re)insurers confirm and agree that where NCAD (Notice of Cancellation at Anniversary Date) is embedded in their stamp/line this is deemed to read and mean NCED (Notice of Cancellation at Expiry Date). This does not affect the right of the (re)insurer to issue a Notice of Cancellation in accordance with the contract terms.

**WRITTEN LINES:**

As shown below and, where placed electronically either wholly or in part via Placing Platform Limited (PPL), in the PPL SECURITY DETAILS.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **1** of **10** |

## CONTRACT ADMINISTRATION

## AND

## ADVISORY DETAILS

If placed via PPL this
box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **2** of **10** |

**SUBSCRIPTION AGREEMENT**

**CONTRACT LEADER:**  HIS 0033

In respect of placements completed using PPL, the Contract Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

Wherever the term 'Slip Leader' appears throughout this contract it is amended to read and mean 'Contract Leader'.

**BUREAU LEADER:**  The first Lloyd's bureau stamp on this contract.
The first Company bureau stamp on this contract

In respect of placements completed using PPL, the Bureau Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

**BASIS OF AGREEMENT TO CONTRACT CHANGES:**  GUA (February 2014) with Non-Marine Schedule (October 2001).

31 days extension, if required by the (Re)Insured/Policyholder, at terms and conditions to be agreed by the Contract Leader on behalf of all (Re)Insurers hereon.

All Notice of Cancellation at Anniversary Date terms are amended to provide Notice of Cancellation at Expiry Date, including subsequent period extensions.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which (a) is binding upon the following (Re)Insurers with the agreement of the Contract Leader only (and any additional agreement party if present), and (b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR**



| If placed via PPL this<br>box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **3** of **10** |

**PART 2 GUA CHANGES ONLY:**
Unless any other (Re)Insurers are specified below, the Agreement Parties for Part Two changes will be the Contract Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY:**
None, unless any (Re)Insurers are specified here.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which

a) is binding upon the following (Re)Insurers with the agreement of only the Contract Leader (and any additional agreement party if present), and

b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader

**BASIS OF CLAIMS AGREEMENT:**
As specified under the CLAIMS AGREEMENT PARTIES and to be managed in accordance with:

i) The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS - LMA9150 for claims or circumstances assigned as Single Claims Agreement Party Claims (SCAP Claims) or, where it is not applicable, then the following shall apply as appropriate:

ii) The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

iii) International Underwriting Association of London IUA claims agreement practices.

For non-bureau (re)insurers only, the contract leader only and to be binding for non-bureau (re)insurers.

**CLAIMS AGREEMENT PARTIES:**
A. Claims falling within the scope of the LMA9150 to be agreed by



If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **4** of **10** |

Contract Leader only on behalf of all (re)insurers subscribing (1) to this Contract on the same contractual terms (other than premium and brokerage) and (2) to these Arrangements.

For the purposes of calculating the Threshold Amount, the sterling rate on the date that a financial value of the claim is first established by the Contract Leader shall be used and the rate of exchange shall be the Bank of England spot rate for the purchase of sterling at the time of the deemed conversion.

B.  For all other claims:

i)  For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate.

Where applicable, the second Lloyd's syndicate is deemed to be the first syndicate stamp to appear after the leading Lloyd's syndicate. For PPL the 2nd claims agreement party will be agreed by endorsement.

ii)  Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii below.

The first IUA company and, where required by IUA practices, the second IUA company.

iii)  Those companies that have specifically elected to agree claims in respect of their own participation.

iv)  All other subscribing (re)insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

v)  Notwithstanding anything contained in the above to the contrary, any ex gratia payments to be agreed by each (re)insurer for their own participation.

**CLAIMS ADMINISTRATION:**  Marsh Ltd and (re)insurers agree that any claims hereunder (including any claims related costs/fees) that are in scope and supported by Electronic Claims File (ECF) will be notified and administered via ECF with any payment(s) processed via CLASS, unless both parties agree to do otherwise.

Where claims or circumstances are not administered via ECF,



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **5** of **10** |

notification, administration and payment(s) will be email or paper file.

Where a Lloyd's syndicate or IUA company is not an agreement party to the claim or circumstance (per CLAIMS AGREEMENT PARTIES A. above), they agree to accept correct ECF sequences for administrative purposes to ensure information is circulated to all subscribing parties.

Claims, or any element thereof, settled in a currency for which Marsh Ltd do not hold a banking account will be agreed using a notional rate of exchange which is subject to adjustment. Any difference greater than GBP1,000 per payment or in the aggregate, to be paid by or refunded to (re)insurers as appropriate.

Extension of time to file a proof of loss to be agreed

a)   if the contract leader is a non-Lloyd's (re)insurer, by the contract leader and Lloyd's Claims Agreement Parties only;

b)   if the contract leader is a Lloyd's (re)insurer, by the Lloyd's Claims Agreement Parties only.

Notwithstanding any contrary provisions concerning notification contained in applicable contract documentation to which this agreement applies and in the absence of a condition specifically nominating a party to whom notice must be given (other than (re)insurers) and provided that notification otherwise fully satisfies policy conditions then the (re)insured will be regarded as having complied with contract notification provisions when Marsh Ltd or its subsidiary or successor entities receives notification by email, facsimile or post.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY:**   None, unless otherwise specified here by any other claims agreement parties shown above.

**EXPERT(S) FEES COLLECTION:**   Expert fees payable by (Re)Insurers for services performed on their behalf to be collected by the expert or their appointed fee collection service provider.

**SETTLEMENT DUE DATE:**   28th January 2019

If placed via PPL this box will not be signed

Contract Leader



| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **6** of **10** |

**BUREAU(X) ARRANGEMENTS:**   De-linked accounts to be presented by Marsh Ltd to Xchanging Ins-sure Services (XIS).

Bureau re(insurers) agree to allow XIS not to 'group' associated de-linked signings. Each individual de-linked signing may be released for settlement to XIS independently of any other associated items.

Presentation to XIS of a contract with a premium payment warranty (PPW), premium payment condition (PPC) or prompt payment condition for a signing number and date within the timeframe specified within the warranty or condition shall be sufficient evidence of compliance and payment to all (re)insurers participating hereon. Subsequent rejection shall not affect the fact that the warranty/condition and/or the settlement due date (SDD) has been met by the original presentation and therefore no further update of the due date is required.

In respect of the LSW3001 (amended) or any other Premium Payment Clause, the SDD will automatically be amended to the date the premium is paid to (re)insurers.

Where any SDD, PPW or PPC due date falls on a weekend or public holiday, presentation to XIS on the next working day will be deemed to be in compliance with such SDD, PPW or PPC.

(Re)Insurers agree that the second and subsequent premium instalments are taken down as additional premiums, other than annual re-signings.

In respect of additional premium signings the SDD will follow the same payment period allowed under the original premium payment terms. However, the payment period shall commence from the date of the final agreement of the endorsement or the effective date, whichever is the later.

Claims and/or return premiums may be collected and taken down on production of a copy (including a photocopy) and/or duplicate of the applicable contract or policy.

In respect of non –settlement currencies:
XIS to accept settlement of premium in Pounds Sterling (GBP) converted at the rate of exchange at the date of receipt of payment by Marsh Ltd. However, in the event Marsh Ltd are paid in Pounds Sterling (GBP), U.S. Dollars (USD) or EUROS (EUR) then settlement will be made via XIS in GBP, USD or EUR as received by Marsh Ltd.



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800559 | | Page **7** of **10** |

Bureau (re)insurers agree to accept an interim For Declaration Only (FDO) signing.

In the event the Settlement Due Date (as detailed in Subscription Agreement) and/or the Allocation of Premium to Coding and/or Year of Account (as detailed in Fiscal and Regulatory) differ from those shown in the PPL SECURITY DETAILS, the information recorded in the PPL SECURITY DETAILS shall take precedence.

**PLACING PLATFORM LIMITED (PPL) ARRANGEMENTS:**   (Re)insurers instruct Xchanging to accept any attachments and additional information as detailed in this Market Reform Contract and any subsequent endorsements thereto, without sight of agreement from (re)insurers on the understanding that Marsh Ltd has obtained agreement thereto from the applicable (re)insurers.

**NON–BUREAUX ARRANGEMENTS:**   Where any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, payment of premium by telegraphic transfer or any other relevant electronic settlement method on the next working day will be deemed to be in compliance with such PPW or PPC.

Where (Re)Insurers have agreed to regular (weekly/ monthly/ quarterly) accounting the Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date shall be overridden by the accounting agreement.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **8** of **10** |

| **FISCAL AND REGULATORY** |
|---|

**TAX PAYABLE BY INSURER(S):**  None

**COUNTRY OF ORIGIN:**  United States of America

**OVERSEAS BROKER:**  Marsh USA Incorporated
1166 Avenue of the Americas
New York 10036-2774
United States of America

**BROKER:**  Marsh Ltd
Tower Place
London
EC3R 5BU

**SURPLUS LINE BROKER:**  **Surplus Line Broker Name and Licence No.**
Thomas Orrico #892706

**Surplus Line Broker address:**
1166 Avenue of the Americas
New York,
NY 100362708
United States of America

**US CLASSIFICATION:**  US Surplus Lines.

**ALLOCATION OF PREMIUM TO CODING:**  In respect of the premium allocated to the USA:
99% D2
1% 7T

In respect of the premium allocated to the Rest of the World:
100% D2

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
| --- | --- | --- |
| CONTRACT NUMBER<br><br>B0509FINFW1800559 | | Page **9** of **10** |

**REGULATORY**
**CLIENT**
**CLASSIFICATION:**   Large Risk

**MARSH LTD**

| CONTRACT NUMBER | | |
|---|---|---|
| B0509FINFW1800559 | | Page **10** of **10** |

| **BROKER REMUNERATION AND DEDUCTIONS** |
|---|

**FEE PAYABLE BY CLIENT:**          No

**TOTAL BROKERAGE:**          21.5%

**OTHER DEDUCTIONS FROM PREMIUM:**          None.

---

If placed via PPL this box will not be signed

Contract Leader

Policy Number: (UMR) B0509FINFW1800559

## SECURITY DETAILS

**REFERENCES**

UMR (Unique Market Reference): B0509FINFW1800559

Date contract printed to PDF: 17:45 06 December 2018

## SIGNED UNDERWRITERS

**Hiscox Syndicates**

Gary Lill

| | | | |
|---|---|---|---|
| **Written Line** | 100.00% | **Signed Line** | 100.00% |
| **Agreed on** | 17:22 06 December 2018 | | |

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Lloyd's Underwriter Syndicate No. 0033 HIS, London, England | | 100.00% | 100.00% |

**Bound as Slip Leader, Lloyd's Leader**

| | |
|---|---|
| *Lloyd's Stamp:* | 0033 |
| *LORS Code:* | L0033 |
| *Reference:* | 17D3B180ADAA |
| *Description:* | 34 D&O |
| *Risk Code(s):* | 7T, D4 |

Policy Number: (UMR) B0509FINFW1800559

## SETTLEMENT INFORMATION

**Allocation of Premium to Coding**

7T at 1.00%

D4 at 99.00%

**Allocation of Premium to Year of Account**

2018

**Terms of Settlement**

| | |
|---|---|
| Settlement Due Date: | 28 January 2019 |
| Instalment Premium Period of Credit: | 0 day(s) |
| Adjustment Premium Period of Credit: | 0 day(s) |

Lloyd's Underwriter Syndicate No. 0033 HIS, London, England
**Bureau Leader and Lloyd's Leader**
Gary Lill

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

# EXHIBIT K

## Price Forbes and Partners Limited          **507 PRF**

UMR: B0507 N17FA23160

---

## RISK DETAILS

| | |
|---|---|
| **TYPE:** | EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE |

**INSURED:**              **AMTRUST FINANCIAL SERVICES, INC.**

**MAILING
ADDRESS:**                59 Maiden Lane, 43rd Floor
New York
New York
10038
United States of America

**PERIOD:**                From:    21st October 2017
                          To:      21st October 2018
                          Both days at 12:01am local standard time, at the mailing address of the
                          Insured.

**INTEREST:**              Excess Directors and Officers Liability and Company Reimbursement
                          Insurance as more fully defined in the wording referenced herein.

**LIMIT OF
LIABILITY:**               USD 15,000,000 in the aggregate

                          In excess of:

                          USD 25,000,000 in the aggregate, which in turn in excess of underlying primary
                          retention(s)

**TERRITORIAL
LIMITS:**                  Worldwide

**CONDITIONS:**
1.  Excess Form as attached
2.  Retroactive date inception. Wording as attached.
3.  Short Rate Cancellation Table NMA 45 as attached
4.  Small AP/RP Clause NMA 1168 as attached
5.  Nuclear Incident Exclusion NMA 1256 as attached
6.  Radioactive Contamination Exclusion Clause NMA 1477 as attached
7.  War and Terrorism Exclusion NMA 2918 as attached.
8.  TRIA Clause LMA 5019 as attached.
9.  Sanctions Clause as attached.
10. Premium Payment Clause LSW 3000 as attached.

**SUBJECTIVITIES:**        None.

**CHOICE OF LAW
& JURISDICTION:**          This insurance shall be governed by and construed in accordance with the law
                          of New York and each party agrees to submit to the exclusive jurisdiction of the
                          courts of the United States of America

**507 PRF**
**Price Forbes & Partners Limited**

**PRICE FORBES**

UMR : B0507 N17FA23160

**PREMIUM:**        USD 1,000,000 (100%) Annual

**PREMIUM**
**PAYMENT TERMS:**    Premium Payment Clause LSW 3000 (60 days)

**TAXES PAYABLE**
**BY INSURED AND**
**ADMINISTERED**
**BY INSURER(S):**    None applicable

**INSURER**
**CONTRACT**
**DOCUMENTATION:**    This document details the contract terms entered into by the insurer(s), and constitutes the contract documentation.

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

---

**DECLARATIONS**

**EXCESS INSURANCE POLICY**

**SUBJECT TO ALL OF THE TERMS, CONDITIONS AND LIMITATIONS OF THE FOLLOWED POLICY, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS COSTS AND EXPENSES INCURRED IN THE DEFENSE OR SETTLEMENT OF CLAIMS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY AMOUNTS AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Policy Number:     B0507 N17FA23160**

Item 1.     **Named Insured**:

AMTRUST FINANCIAL SERVICES, INC.

Principal Address:

59 Maiden Lane, 43rd Floor
New York
New York
10038
United States of America

Item 2.     **Policy Period**:

From:     21st October 2017

To:     21st October 2018

Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.

Item 3.     **Limit of Liability**:

USD 15,000,000   Each claim, including costs and expenses incurred in the defense or settlement of such claim.



**PRICE FORBES**

USD 25,000,000   Aggregate for the **Policy Period**, including costs and expenses incurred in the defense or settlement of all claims.

### Item 4.   **Premium:**

USD 1,000,000

### Item 5.   **Notification pursuant to Clause VI. shall be given to:**

Underwriters, via:
Price Forbes and Partners
2 Minster Court
Mincing Lane
London EC3R 7PD

Attention:
juliarobinson@priceforbes.com

### Item 6.   **Underlying Insurance**:

Primary Policy Number ELU152497-17 issued by Indian Harbor Insurance Company for a limit of USD 5,000,000 in the aggregate

First Excess Policy Number DOC 1074701-00 issued by Zurich-American Insurance Company for a limit of USD 5,000,000 in the aggregate

Second Excess Policy Number MNN626501/01/01/2017 issued by Axis Insurance Company for a limit of USD 5,000,000 in the aggregate

Third Excess Policy Number B0507 N17FA23130 issued by Hiscox (Syndicate 33 at Lloyd's) for a limit of USD 10,000,000 in the aggregate

### Item 7.   **Endorsements Effective at Inception:**

1.   Retroactive date inception.
2.   Short Rate Cancellation Table NMA 45.
3.   Small AP/RP Clause NMA 1168.
4.   Nuclear Incident Exclusion NMA 1256.
5.   Radioactive Contamination Exclusion Clause NMA 1477.
6.   War and Terrorism Exclusion NMA 2918.
7.   TRIA Clause LMA 5019.
8.   Sanctions Clause.
9.   Premium Payment Clause LSW 3000.

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

### EXCESS INSURANCE POLICY

In consideration of the payment of the premium, in reliance upon all information and representations provided or made available by the **Insureds** to the Underwriters in connection with the underwriting of this Policy, the Underwriters and **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.   INSURING CLAUSE**

This Policy shall provide coverage in accordance with all of the terms, conditions and limitations (including, but not limited to, the exclusions and notice requirements) of the **Followed Policy** except for the Limit of Liability, the premium or as otherwise set forth herein. Coverage hereunder shall attach only after all of the **Underlying Limits** have been exhausted through payments by, or on behalf of, or in place of the insurers of the **Underlying Insurance** of amounts under the **Underlying Insurance**. The risk of uncollectibility of any **Underlying Insurance** (in whole or in part), whether because of financial impairment or insolvency of an insurer of the **Underlying Insurance** or for any other reason, is expressly retained by the **Insureds** and is not insured by or assumed by the Underwriters.

**II.   DEFINITIONS**

A.   **Followed Policy** means the insurance policy identified in Item 6. of the Declarations.

B.   **Insureds** mean all persons and entities covered under the **Followed Policy.**

C.   **Named Insured** means all persons and entities set forth in Item 1. of the Declarations.

D.   **Policy Period** means the period set forth in Item 2. of the Declarations.

E.   **Underlying Insurance** means the **Followed Policy** and all other underlying insurance policies, if any, identified in Item 7. of the Declarations.

F.   **Underlying Limits** mean an amount equal to the aggregate of all limits of liability of the **Underlying Insurance.**

**III.   LIMIT OF LIABILITY**

The amount set forth in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriters for all coverage under this Policy, regardless of the number of claims made against the **Insureds** or the time of payment and regardless of whether or not an extended reporting period applies.

**IV.   CHANGES TO UNDERLYING INSURANCE AND DEPLETION OF UNDERLYING LIMITS**

If, subsequent to the inception date of this Policy, the terms, conditions or limitations of an **Underlying Insurance** are modified, the **Insureds** must notify the Underwriters in writing, as soon as practicable, of such modification. If any changes to the **Followed Policy**: (a) expand coverage, (b) change the policyholder name or address, or (c) modify premium, this Policy shall not follow those changes unless the Underwriters agree in writing to do so. If any coverage under any **Underlying Insurance** is subject to a sub-limit, then this Policy provides no coverage excess of such sub-limit, but the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount. Furthermore, if any amount covered under any policy issued to the **Insureds** outside of the United States of America (a "Foreign Policy") and the **Underlying Insurance** expressly provides for the reduction of the **Underlying Limit** by reason of payment of such amount under the applicable Foreign Policy, then the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount.

**V.   UNDERWRITERS RIGHTS**

The Underwriters have the same rights and protections as the insurer of the **Followed Policy** and shall have the right, but not the obligation, at their sole discretion, to elect to participate in the investigation, settlement, prosecution or defense of any claim.

**VI.   NOTICES**

CGM
2488

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



Where notice is permitted or required by the **Followed Policy**, the **Insureds** have the same rights and obligations to notify the Underwriters under this Policy, except that such notice shall be given to the Underwriters at the address set forth in Item 5. of the Declarations. Notice to any other insurer shall not constitute notice to the Underwriters unless also given to the Underwriters as provided above.

01/14
LSW4003



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160


**PRICE FORBES**

## RETROACTIVE DATE INCEPTION

In consideration of the premium charged for this Policy, it is hereby understood and agreed that this Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.      any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017.

2.      any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

3.      any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

All other terms and conditions of this Policy remain unchanged.

CGM
2488

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



PRICE FORBES

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:

## SHORT RATE CANCELLATION TABLE

**A.**  **For insurance written for one year:-**

| Days Insurance In Force | % of One Year Premium | Days Insurance In Force | % of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154 - 156 | 53 |
| 2 | 6 | 157 - 160 | 54 |
| 3 - 4 | 7 | 161 - 164 | 55 |
| 5 - 6 | 8 | 165 - 167 | 56 |
| 7 - 8 | 9 | 168 - 171 | 57 |
| 9 - 10 | 10 | 172 - 175 | 58 |
| 11 - 12 | 11 | 176 - 178 | 59 |
| 13 - 14 | 12 | 179 - 182 (6 Months) | 60 |
| 15 - 16 | 13 | 183 - 187 | 61 |
| 17 - 18 | 14 | 188 - 191 | 62 |
| 19 - 20 | 15 | 192 - 196 | 63 |
| 21 - 22 | 16 | 197 - 200 | 64 |
| 23 - 25 | 17 | 201 - 205 | 65 |
| 26 - 29 | 18 | 206 - 209 | 66 |
| 30 - 32 (1 Month) | 19 | 210 - 214 (7 Months) | 67 |
| 33 - 36 | 20 | 215 - 218 | 68 |
| 37 - 40 | 21 | 219 - 223 | 69 |
| 41 - 43 | 22 | 224 - 228 | 70 |
| 44 - 47 | 23 | 229 - 232 | 71 |
| 48 - 51 | 24 | 233 - 237 | 72 |
| 52 - 54 | 25 | 238 - 241 | 73 |
| 55 - 58 | 26 | 242 - 246 (8 Months) | 74 |
| 59 - 62 (2 Months) | 27 | 247 - 250 | 75 |
| 63 - 65 | 28 | 251 - 255 | 76 |
| 66 - 69 | 29 | 256 - 260 | 77 |
| 70 - 73 | 30 | 261 - 264 | 78 |
| 74 - 76 | 31 | 265 - 269 | 79 |
| 77 - 80 | 32 | 270 - 273 (9 Months) | 80 |
| 81 - 83 | 33 | 274 - 278 | 81 |
| 84 - 87 | 34 | 279 - 282 | 82 |
| 88 - 91 (3 Months) | 35 | 283 - 287 | 83 |
| 92 - 94 | 36 | 288 - 291 | 84 |
| 95 - 98 | 37 | 292 - 296 | 85 |
| 99 - 102 | 38 | 297 - 301 | 86 |
| 103 - 105 | 39 | 302 - 305 (10 Months) | 87 |
| 106 - 109 | 40 | 306 - 310 | 88 |
| 110 - 113 | 41 | 311 - 314 | 89 |
| 114 - 116 | 42 | 315 - 319 | 90 |
| 117 - 120 | 43 | 320 - 323 | 91 |
| 121 - 124 (4 Months) | 44 | 324 - 328 | 92 |
| 125 - 127 | 45 | 329 - 332 | 93 |
| 128 - 131 | 46 | 333 - 337 (11 Months) | 94 |
| 132 - 135 | 47 | 338 - 342 | 95 |
| 136 - 138 | 48 | 343 - 346 | 96 |
| 139 - 142 | 49 | 347 - 351 | 97 |
| 143 - 146 | 50 | 352 - 355 | 98 |
| 147 - 149 | 51 | 356 - 360 | 99 |
| 150 - 153 (5 Months) | 52 | 361 - 366 (12 Months) | 100 |



CGM
2488

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160


**PRICE FORBES**

B.   **For Insurances written for more or less than one year:-**

    1.   If insurance has been in force for 12 months or less, apply the short rate table to the full annual premium determined as for an insurance written for a term of one year.

    2.   If insurance has been in force for more than 12:-

        a)   Determine full annual premium as for an insurance written for a term of one year.

        b)   Deduct such premium from the full insurance premium and on the remainder calculate the pro-rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

        c)   Add premium produced in accordance with items a) and b) to obtain earned premium during the full period of insurance that has been in force.

**NMA 45**

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

## SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

NMA1168

CGM
2488

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:




**PRICE FORBES**

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160


**PRICE FORBES**

## War and Terrorism Exclusion Endorsement

Notwithstanding any provision to the contrary within this Policy or any Endorsement thereto it is agreed that this Policy excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1)     war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2)     any act of terrorism.
        For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this policy, the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 **N17FA23160**



**PRICE FORBES**

## TRIA Clause

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% (85% in respect of losses occurring after 31 December 2006) of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. The portion of your annual premium that is attributable to coverage for certified acts of terrorism as defined in the Terrorism Risk insurance Act is: 1%

LMA 5019

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160


**PRICE FORBES**

## SANCTIONS CLAUSE

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the insurer, or its ultimate holding company, to any sanction, prohibition or restriction implemented pursuant to resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United Kingdom, or United States of America.

All other terms and conditions remain unaltered



**507 PRF**
**Price Forbes & Partners Limited**



**PRICE FORBES**

UMR : B0507 N17FA23160

## **PREMIUM PAYMENT CLAUSE**

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 60 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 60th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 10 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parts if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

## INFORMATION

2017 submission as received from Brown & Brown.
AmTrust Inc. Conference call dated 20th October 2017



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

## SECURITY DETAILS

### INSURER'S LIABILITY:

#### (Re)insurer's liability several not joint

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

#### Proportion of liability

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007

**507 PRF**
**Price Forbes & Partners Limited**



**PRICE FORBES**

UMR : B0507 N17FA23160

---

**ORDER HEREON:**   100%

**BASIS OF**
**WRITTEN LINES:**   Percentage of Whole

NMA 2419 Lines Clause, if applicable.

**SIGNING**
**PROVISIONS:**   In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured, or the (re)insured's representatives, and the Slip Leader. Such variation to be in accordance with provision a) above with the resulting variation in signed lines commencing from the date set out in that agreement.

Any other variation to the contracts will take effect only by the documented agreement of the (re)insured, or the (re)insured's representatives, and all (re)insurers whose lines are to be varied. Such variation to the contracts will take effect only when all such (re)insurers have agreed with the resulting variation in signed lines commencing from the date set out in that agreement.

**LINE CONDITIONS:**   None



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160


**PRICE FORBES**

## WRITTEN LINES

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the slip leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Signed Line
per cent (%)

21.3965%.

CHUBB     CGM 2488

**Chubb Global Markets - Financial Lines**
a trading name of Chubb Underwriting Agencies Ltd

A K D 8 6 H T R 7 4 2 0 D4

21.3901 %

ASPEN     ASP 4711

F I A 9 8 2 U 1 7 A Ø w

Fw: F.J

10.6918%.

Pembroke     PEM 4000

2 5 8 2 7 P 1 7 A A D+

**T. A. B. H. GLOVER & OTHERS**

SC                    S.IF

**Barbican Financial & Professional Lines Consortium**
9562

14.4398/   0 4 1 0 5 7 0 1 1 7 0 0

for AP
6/11/17.

All underwriters as per LPSO Registered Consortium No 9562
being Lloyd's Syndicates BAR 1955 (66.66%) &
AML 2001 (16.67%) & EVB 2786 (16.67%)

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA23160



**PRICE FORBES**

### WRITTEN LINES

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the slip leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Signed Line
per cent (%)

10·6918%

TALBOT
VALIDUS GROUP *(CGLC)* 7/4/17

TAL
1183

C F D 2 4 8 7 7 2 A 1 7 D4

A A A N N N N N N A N N

FI@talbotuw.com S 100%

21·39%

Forge
*Underwriting*

1 7 B F I O 1 3 8 8 9 0 0 5 7

S4F

Security: PartnerRe Ireland Insurance dac

8/11/17

# EXHIBIT L

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **1** of **24** |

| RISK DETAILS |
|---|

**UNIQUE MARKET REFERENCE:**   B0509FINFW1800560

**TYPE:**   EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE

**INSURED:**   AMTRUST FINANCIAL SERVICES, INC.

**PRINCIPAL ADDRESS:**
59 Maiden Lane
43rd Floor
New York 10038
United States of America

**PERIOD:**   From: 29th November 2018
To:    29th November 2024
Both days at 12.01 am Local Standard Time at the Principal Address.

**INTEREST:**   Excess Directors and Officers Liability and Company Reimbursement Insurance as more fully defined in the wording referenced herein.

**LIMIT OF LIABILITY:**   USD 15,000,000 in the aggregate

In excess of:

USD 25,000,000 in the aggregate, which in turn in excess of underlying primary retention(s)

**TERRITORIAL LIMITS:**   Worldwide.

**CONDITIONS:**
1. Excess Wording, as attached.
2. Schedule of underlying Insurance:

**Primary Contract**
Policy No: ELU152497-17
Insurer: Indian Harbor Insurance Company
Limit: USD 5,000,000

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **2** of **24** |

**First Excess Contract**
Policy No: DOC1074701
Insurer: Zurich American Insurance Company
Limit: USD 5,000,000

**Second Excess Contract**
Policy No: MNN626501/01/01/2017
Insurer: Axis Insurance Company
Limit: USD 5,000,000

**Third Excess Contract**
Policy No: USF00255018
Insurer: Allianz Global Corporate Specialty
Limit: USD 5,000,000

**Fourth Excess Contract**
Policy No: FINFW1800559
Insurer: Lloyds Syndicate 033
Limit: USD 5,000,000

3.  Small AP/RP Clause NMA 1168, as attached.
4.  Nuclear Incident Exclusion NMA 1256, as attached.
5.  Radioactive Contamination Exclusion Clause NMA 1477, as attached.
6.  War and Terrorism Exclusion NMA 2918, as attached.
7.  Sanction Limitation and Exclusion Clause LMA3100, as attached.
8.  Tie in of limits clause, Prior Policy Endorsement, as attached
9.  Premium Payment Clause LSW3000, as attached.
10. LMA 9105 (amended) – Policyholder Disclosure Notice of Terrorism Insurance Coverage, as attached.

Special Cancellation/Insurer Downgrade Clause as attached.

IUA 09-054 Foreign Account Tax Compliance Act ('FATCA') - only to apply in respect of FATCA in scope contracts, as attached.

Where the terms '(Re)Insurer' and/or 'contract period' and/or '(Re)Insured' do not appear in the Risk Details or attached Policy wording the functional equivalents of these terms shall be deemed incorporated herein.

**CHOICE OF LAW & JURISDICTION:**    Unless stated herein to the contrary, this (Re)Insurance shall be governed by and construed in accordance with the laws of US  New York and the exclusive jurisdiction of the US  New York courts.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |



| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **3** of **24** |

**PREMIUM:**  USD 2,000,000.00 (100%)

**PREMIUM PAYMENT TERMS:**  Premium Payment Clause LSW 3000

**TAXES PAYABLE BY THE INSURED AND ADMINISTERED BY INSURERS:**  None

**TAXES PAYABLE BY THE INSURERS AND ADMINISTERED BY INSURED OR THEIR AGENT:**  None

**RECORDING, TRANSMITTING AND STORING INFORMATION:**  Where Marsh Ltd maintains risk and claim data, information or documents, Marsh Ltd may hold such data, information or documents electronically.

**INSURER CONTRACT DOCUMENTATION:**  This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

This contract is subject to US state Surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the Insured. In the event that the surplus lines notice is not affixed to the contract document the Insured should contact the surplus lines broker.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **4** of **24** |

### MARSH EXCESS LAYER POLICY

In consideration of the **Insured** having paid or having promised to pay the premium, and subject to all of the terms, conditions and limitations of this excess policy, the insurers described in the SECURITY DETAILS of this policy ('**Insurer**') and the **Insured** agree as follows:

1.  **Insuring agreement**

1.1  The **Insurer** will provide the **Insured** with insurance coverage upon the terms, conditions and limitations of the **Primary Policy** except insofar as express provision for any matter is set out in this excess policy, and only insofar as necessary, the terms conditions and limitations set out in this excess policy will prevail over the corresponding terms, conditions and limitations of the **Primary Policy**.

1.2  Subject to the **Limit of Liability** the **Insurer** will pay to or on behalf of the **Insured** that proportion of the loss which exceeds the **Underlying Insurance**.

1.3  Subject to the provisions of sub-clause 1.4, unless and to the extent that clause 4 of this excess policy applies, the **Insurer** will have no liability under this excess policy unless and until all of the **Underlying Insurance** has been exhausted by the payment of losses under the **Underlying Insurance**.

1.4  For the purposes of this excess policy, losses shall be deemed to have been paid under an **Underlying Insurance** if all or any of the insurers subscribing thereto have paid, or have agreed to pay such losses, or have had their liability to pay such losses established by judgment, arbitration award or other final binding adjudication.  Such payment will, for the purposes of this excess policy, be deemed to have been made on the date of payment, agreement or adjudication, whichever occurs first.

Furthermore:

(a)  If a payment in respect of a loss is made under an **Underlying Insurance** of an amount which is less than the applicable limit of liability under that **Underlying Insurance** (but the relevant covered loss of the **Insured** exceeds the applicable limit of liability under that **Underlying Insurance**), then such payment will, for the purposes of determining the application of this excess policy to such covered loss, be deemed to exhaust the applicable limit of liability of that **Underlying Insurance** provided the **Insurer** will be liable to pay only that part of the covered loss which exceeds the **Underlying Insurance**.

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **5** of **24** |

(b)    If any insurer participating on an **Underlying Insurance** is or becomes **Insolvent** then, for the purposes of this excess policy, such **Insolvent** insurer will be deemed to have paid in full the amount of its liability for losses under such **Underlying Insurance**, but only in the event that either:

    (i)    any other insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication, whichever occurs first; or

    (ii)    an **Insured** establishes that the **Insurer** would be liable hereunder but for the **Insolvency**.

(c)    The **Insurer** will recognise the erosion of **Underlying Insurance** whether or not cover provided in such **Underlying Insurance** is also provided by this excess policy.

## 2.    Definitions

2.1    **Insolvent** or **Insolvency** means that any step, application, order, proceeding or appointment has been taken or made in respect of an entity for composition or arrangement with creditors, winding-up, dissolution, administration, receivership (administrative or otherwise) or bankruptcy, or that the entity is unable to pay its debts.

2.2    **Insured** means all persons, organisations and entities as are insured under the **Primary Policy** for their own separate insurable interests.

2.3    **Insurer** means those entities and/or syndicates who are identified as underwriters or insurers by affixing of their seal or stamp in the SECURITY DETAILS section of this contract.

2.4    **Limit of Liability** means the amount set forth in the RISK DETAILS of this policy, which will be the maximum sum the **Insurer** is liable to pay under this excess policy.

2.5    **Primary Policy** means the primary contract identified in the RISK DETAILS of this policy.

2.6    **Policy Period** means the period specified in the RISK DETAILS of this policy.

2.7    **Underlying Insurance** means the **Primary Policy** together with any and all excess policies providing together the amount of cover specified at item (b) of the limit of liability in the RISK DETAILS of this policy, and any policies replacing any of them.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **6** of **24** |

3.      **Maintenance of Underlying Insurance**

3.1     Subject to sub-clauses 3.2 to 3.4 below, all of the **Underlying Insurance** will be maintained during the **Policy Period** in full effect, except for any depletion of underlying limits.

3.2     The **Insured's** failure to maintain **Underlying Insurance** by reason of an action by an insurer subscribing to the **Underlying Insurance** (other than in relation to cancellation for the non-payment of premium by the **Insured**) will not invalidate this excess policy but, and subject to the application of clause 4, the **Insurer** will not be liable to a greater extent or at an earlier point in time than if sub-clause 3.1 had been complied with.  Nothing in this clause will negate clause 6 of this excess policy.

3.3     In the event of a failure by the **Insured** to give notice or to exercise any extension under any **Underlying Insurance** the **Insurer** will not be liable under this excess policy to a greater extent or at an earlier point in time than they would have been in the absence of such failure.

3.4     In the event of the **Insolvency** of any insurer participating on any **Underlying Insurance** the **Insured** shall not be in breach of the obligations under sub-clause 3.1 above if the **Underlying Insurance** is no longer in full force and effect as a result of that **Insolvency**.

4.      **Depletion of Underlying Limits**

4.1     In the event and to the extent of the depletion or exhaustion of any limit of liability of the **Underlying Insurance** other than as provided for in sub-clause 4.2 below, and as a result of payment of a loss or losses under the **Underlying Insurance**, this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue and operate for subsequent losses as excess insurance over the amount of the relevant limit of liability remaining under such **Underlying Insurance**.

4.2     In the event of the exhaustion of any aggregate limit of liability applicable under the **Underlying Insurance** as a result of the payment of loss or losses under the **Underlying Insurance** this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue for subsequent losses as primary insurance in respect of any subsequent loss or losses that would otherwise have been covered by such **Underlying Insurance** but for the exhaustion of that aggregate limit of liability.

4.3     In the event that this excess policy is required to operate as primary insurance by virtue of sub-clause 4.2 above:

(a)      any excess or retention specified in the **Primary Policy** shall apply to this excess policy, otherwise no excess or retention shall apply to this excess policy;

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **7** of **24** |

(b) in respect of any loss or losses for which the **Primary Policy** imposed a sub-limit of liability, this excess policy will provide cover for such loss or losses, including any unpaid portion of that sub-limit.

4.4 For the purposes of this clause 4, the determination of whether there has been any payment of losses under and/or exhaustion of any **Underlying Insurance** will be made in accordance with sub-clause 1.4.  However, and for the purposes of this clause 4 only:

(a) if and to the extent that paragraph 1.4(a) above applies, any and all amounts representing the difference between:

(i) any applicable limit of liability of any **Underlying Insurance** and

(ii) the amount paid by that **Underlying Insurance**

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above

and

(b) if and to the extent that sub-paragraph 1.4(b)(i) above applies, any and all amounts representing the difference between:

(i) any applicable limit of liability of any **Underlying Insurance** and

(ii) the amount that any insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above.

4.5 An **Underlying Insurance** will not be deemed exhausted solely by reason of the **Insolvency** of an insurer participating thereon.

5. **Claims**

5.1 Any first notice of a claim or circumstance (or equivalent term by which the **Primary Policy** identifies matters potentially giving rise to notifications thereunder in respect of a loss or losses) required to be given under the terms of the **Primary Policy**, will also be given to the **Insurer** under this excess policy.



If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **8** of **24** |

5.2     In respect of any matter notified pursuant to sub-clause 5.1 above:

(a)     the **Insured** will inform the **Insurer** of any material developments in relation to such matter;

(b)     without prejudice to paragraph 5.2(a) above the rights and obligations set out in any claims investigation, claims co-operation, claims handling, claims defence, claims assessment and/or claims settlement provisions of the **Primary Policy** will be incorporated into this excess policy, but will not be enforceable for the purpose of this excess policy unless and until the loss or losses (including any defence costs or other fees incurred by the **Insured** for which indemnity is available under the **Primary Policy**) likely to arise from such matter have the potential to deplete the **Underlying Insurance** such that the policy immediately underlying this excess policy will be eroded to the extent of 50% or more of the limit of liability of such immediately underlying policy.

6.     **Alteration**

6.1     No amendment to the **Primary Policy** during the **Policy Period** will be effective in extending the scope of this excess policy, until agreed in writing by the **Insurer**.

6.2     No claim payment made as a consequence of an amendment to the **Primary Policy** during the **Policy Period** will operate to deplete or exhaust any limit of liability of the **Underlying Insurance** unless such amendment has been agreed in writing by the **Insurer**.

7.     **Governing Law and Jurisdiction**

7.1     The constructions, interpretation and meaning of the terms, exclusions limitations and conditions of this excess policy shall be determined in accordance with the laws of the state or country specified in the RISK DETAILS of this policy, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the courts of the state or country specified in the RISK DETAILS of this policy.

8.     **Dispute Resolution**

8.1     In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy, the provisions of the **Primary Policy** are incorporated into this excess policy for the purposes of determining the dispute resolution procedures applicable to this excess policy.

8.2     In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy in relation to matters that are also the subject of a dispute between the **Insured** and the insurers of any **Underlying Insurance** then those disputes shall be heard together in the same court or arbitration proceedings.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **9** of **24** |

### SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.
NMA1168

If placed via PPL this
box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **10** of 24 |

## <u>NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)</u>

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

<u>This Policy</u>* does not apply:

I.  Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **11** of **24** |

the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.
* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **12** of **24** |

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **13** of **24** |

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.  any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **14** of **24** |

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **15** of **24** |

## TIE-IN OF LIMITS CLAUSE – POLICIES

It is agreed that:

In consideration of the premium charged, it is hereby understood and agreed that the Limit of Liability of the **Insurer** for **Loss** under this Policy, UMR B0509FINFW1800560, and the prior Policy, UMR B0509FINFW1800153 (amended from UMR B0507N17FA23160), shall be combined.

Accordingly, the Limit of Liability for **Loss** under either Policy mentioned above shall be reduced by **Loss** incurred under either Policy.


All other terms, conditions and exclusions remain unchanged.

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **16** of **24** |

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 60 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 60th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

| If placed via PPL this<br>box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **17** of **24** |

## Special Cancellation/Insurer Downgrade Clause

1   The Underwriter shall give notice to the Insured's representative, as identified in this Contract, as soon as practicable and in any event within 14 days, or as soon as permitted by its regulator if later, where the Underwriter:

  (i)  a.   ceases underwriting entirely; or

     b.   ceases underwriting the type of insurance provided by this policy in a territory where the Insured is domiciled; or

     c.   formally announces its intention to cease underwriting as per (i)a or (i)b above; or

  (ii)  voluntarily or involuntarily elects to wind up, run off its business, enter a scheme of arrangement or enter into any form of bankruptcy protection or related formal or informal termination of its insurance operations; or

  (iii) has its authority to carry on insurance business withdrawn.

2   The Insured or the Insured's representative may terminate an Underwriter's participation on this risk by giving written notice:

  (i)  When one of the events identified above at Condition 1 takes place; or

  (ii)  In the event that an Underwriter has its financial strength rating downgraded below BBB by Standard & Poor's or A- by AM Best. For Lloyd's syndicates it is the financial strength rating of Lloyd's as a whole which is considered.

  The effective date of termination shall not be earlier than the date notice is actually given by the Insured or the Insured's representative.

Upon notice of cancellation having been given by the Insured or the Insured's representative to the Underwriter, the Underwriter shall pay to the Insured a pro rata return premium for the unexpired period of the policy. Such pro rata return premium shall be paid in accordance with the terms of trade previously agreed between the Insured's representative and the Underwriter to whom notice of cancellation has been given.

In the event that there are any notifications under this policy or the Underwriter has made any payments pursuant to any policy term or condition providing coverage under this policy to the Insured, the premium shall be deemed fully earned unless the Insured withdraws such notifications and/or reimburses the Underwriter for any payment(s) made.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **18** of **24** |

### POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020; of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. However, your policy may contain certain exclusions which might affect your coverage, such as exclusion for nuclear events. The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.

YOU ARE HEREBY NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, AS AMENDED, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER YOUR  POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES, SUBJECT TO A $100 BILLION CAP, AND YOU HAVE BEEN NOTIFIED OF THE AMOUNT OF THE  PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

The premium allocated for this coverage is 1% of the overall premium charged for your policy.

**Option to reject terrorism insurance coverage**

*Your policy automatically provides coverage for claims arising out of acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 at no additional cost to you. If you would prefer not to have such coverage please check the box below, sign where indicated and return this form to your insurance broker or intermediary.* ***Please note that there will be no reduction in premium if terrorism coverage is removed from your policy.***

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **19** of **24** |

| | I hereby elect not to have TRIA coverage under this policy.  I understand that I will have no coverage for losses arising from certified acts of terrorism. |
|---|---|

_____        _____

*Policyholder / Applicants Signature*                          *Name of Assured*

_____

*Print Name*                                                  *Policy Number*

_____/_____/_____
*Date*

LMA9105 (amended)



| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **20** of **24** |

## FOREIGN ACCOUNT TAX COMPLIANCE ACT ('FATCA')

Each (Re)Insurer hereby acknowledges the requirements of Sections 1471-1474 US Internal Revenue Code of 1986, as amended, and the Treasury regulations and other guidance issued from time to time thereunder ('FATCA') and the obligation of each of them to provide to Marsh Ltd a valid Internal Revenue Service ('IRS') Form W8-BEN-E, W-9 or other documentation meeting the requirements of the FATCA regulations to establish they are not subject to any withholding requirement pursuant to FATCA (the 'Required Documentation').

Furthermore:

a)   If a (Re)Insurer becomes non-compliant with FATCA during the contract period or has not provided the Broker with the Required Documentation 14 days prior to any premium due date, the Withholding Agent (as defined in U.S. Treasury Regulation Section 1.1471-1(b)(147)) shall withhold 30% of the premium (to the extent all or a portion of that premium is subject to withholding pursuant to FATCA) due to that (Re)Insurer under this contract on that premium due date and shall promptly notify that (Re)Insurer via the Broker.

b)   The withholding of premium by virtue of (a) above shall not be, and shall not be treated by the (Re)Insurer as a breach of any premium payment condition, warranty or other clause whether or not entitling the (Re)Insurer to cancel, terminate or restrict this contract, refuse, restrict or delay payment of any claim or invoke any interest, penalty or other late payment provision. The (Re)Insurer shall be liable under this contract as if no such withholding had been made.

c)   The (Re)Insurer shall not recoup sums withheld under (a) above by deducting equivalent sums from any payments due to the (Re)Insured or by set off against any other sums owed by the (Re)Insurer and any general or contractual right of set-off enjoyed by the (Re)Insurer is hereby varied and qualified to that extent.

d)   Where premium is withheld in error, has not yet been paid to the IRS and the (Re)Insurer has been paid only the net premium following such withholding, the broker will cooperate with the (Re)insurer to process the requisite refund.

IUA 09-054 (FATCA)

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **21** of **24** |

| **INFORMATION** |
|---|

None.

| MARSH LTD | | |
| --- | --- | --- |
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **22** of **24** |

| SECURITY DETAILS |
| --- |

**(RE)INSURER'S LIABILITY:**

**LMA3333**
**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning 'signing' below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is 'signing' (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its 'written line'.

Where this contract permits, written lines, or certain written lines, may be adjusted ('signed'). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's

| If placed via PPL this box will not be signed |
| --- |
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **23** of **24** |

syndicate taken together) is referred to as a 'signed line'. The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to 'this contract' in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**   58% of 100%

**BASIS OF WRITTEN LINES:**   Percentage of Whole

**SIGNING PROVISIONS:**   In the event that the written lines hereon exceed 100% of the order, any lines written 'To Stand' will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (Re)Insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of (Re)Insurance then all lines written by that date will be signed in full;

b) the (Re)Insured may elect for the disproportionate signing of (Re)Insurers' lines, without further specific agreement of (Re)Insurers, providing that any such variation is made prior to the commencement date of the period of (Re)insurance, and that lines written 'To Stand' may not be varied without the documented agreement of those (Re)Insurers;

c) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of (Re)Insurance, by the documented agreement of the (Re)Insured and all (Re)Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (Re)Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **24** of **24** |

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the leading (re)insurer.

(Re)Insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

(Re)insurers confirm and agree that where NCAD (Notice of Cancellation at Anniversary Date) is embedded in their stamp/line this is deemed to read and mean NCED (Notice of Cancellation at Expiry Date). This does not affect the right of the (re)insurer to issue a Notice of Cancellation in accordance with the contract terms.

**WRITTEN LINES:**

As shown below and, where placed electronically either wholly or in part via Placing Platform Limited (PPL), in the PPL SECURITY DETAILS.





| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **1** of **10** |

## CONTRACT ADMINISTRATION

## AND

## ADVISORY DETAILS

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **2** of **10** |

| SUBSCRIPTION AGREEMENT |
|---|

**CONTRACT LEADER:**     Lloyd's Syndicate 4711

In respect of placements completed using PPL, the Contract Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

Wherever the term 'Slip Leader' appears throughout this contract it is amended to read and mean 'Contract Leader'.

**BUREAU LEADER:**     The first Lloyd's bureau stamp on this contract.
The first Company bureau stamp on this contract

In respect of placements completed using PPL, the Bureau Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

**BASIS OF AGREEMENT TO CONTRACT CHANGES:**     GUA (February 2014) with Non-Marine Schedule (October 2001).

31 days extension, if required by the (Re)Insured/Policyholder, at terms and conditions to be agreed by the Contract Leader on behalf of all (Re)Insurers hereon.

All Notice of Cancellation at Anniversary Date terms are amended to provide Notice of Cancellation at Expiry Date, including subsequent period extensions.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which (a) is binding upon the following (Re)Insurers with the agreement of the Contract Leader only (and any additional agreement party if present), and (b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR**



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **3** of **10** |

**PART 2 GUA CHANGES ONLY:** Unless any other (Re)Insurers are specified below, the Agreement Parties for Part Two changes will be the Contract Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY:** None, unless any (Re)Insurers are specified here.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which

- a) is binding upon the following (Re)Insurers with the agreement of only the Contract Leader (and any additional agreement party if present), and

- b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader

**BASIS OF CLAIMS AGREEMENT:** As specified under the CLAIMS AGREEMENT PARTIES and to be managed in accordance with:

- i) The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS - LMA9150 for claims or circumstances assigned as Single Claims Agreement Party Claims (SCAP Claims) or, where it is not applicable, then the following shall apply as appropriate:

- ii) The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

- iii) International Underwriting Association of London IUA claims agreement practices.

For non-bureau (re)insurers only, the contract leader only and to be binding for non-bureau (re)insurers.

**CLAIMS AGREEMENT PARTIES:** A. Claims falling within the scope of the LMA9150 to be agreed by



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **4** of **10** |

Contract Leader only on behalf of all (re)insurers subscribing (1) to this Contract on the same contractual terms (other than premium and brokerage) and (2) to these Arrangements.

For the purposes of calculating the Threshold Amount, the sterling rate on the date that a financial value of the claim is first established by the Contract Leader shall be used and the rate of exchange shall be the Bank of England spot rate for the purchase of sterling at the time of the deemed conversion.

B.   For all other claims:

i)   For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate.

Where applicable, the second Lloyd's syndicate is deemed to be the first syndicate stamp to appear after the leading Lloyd's syndicate. For PPL the 2nd claims agreement party will be agreed by endorsement.

ii)   Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii below.

The first IUA company and, where required by IUA practices, the second IUA company.

iii)   Those companies that have specifically elected to agree claims in respect of their own participation.

iv)   All other subscribing (re)insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

v)   Notwithstanding anything contained in the above to the contrary, any ex gratia payments to be agreed by each (re)insurer for their own participation.

**CLAIMS ADMINISTRATION:**   Marsh Ltd and (re)insurers agree that any claims hereunder (including any claims related costs/fees) that are in scope and supported by Electronic Claims File (ECF) will be notified and administered via ECF with any payment(s) processed via CLASS, unless both parties agree to do otherwise.

Where claims or circumstances are not administered via ECF,




If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **5** of **10** |

notification, administration and payment(s) will be email or paper file.

Where a Lloyd's syndicate or IUA company is not an agreement party to the claim or circumstance (per CLAIMS AGREEMENT PARTIES A. above), they agree to accept correct ECF sequences for administrative purposes to ensure information is circulated to all subscribing parties.

Claims, or any element thereof, settled in a currency for which Marsh Ltd do not hold a banking account will be agreed using a notional rate of exchange which is subject to adjustment. Any difference greater than GBP1,000 per payment or in the aggregate, to be paid by or refunded to (re)insurers as appropriate.

Extension of time to file a proof of loss to be agreed

a)   if the contract leader is a non-Lloyd's (re)insurer, by the contract leader and Lloyd's Claims Agreement Parties only;

b)   if the contract leader is a Lloyd's (re)insurer, by the Lloyd's Claims Agreement Parties only.

Notwithstanding any contrary provisions concerning notification contained in applicable contract documentation to which this agreement applies and in the absence of a condition specifically nominating a party to whom notice must be given (other than (re)insurers) and provided that notification otherwise fully satisfies policy conditions then the (re)insured will be regarded as having complied with contract notification provisions when Marsh Ltd or its subsidiary or successor entities receives notification by email, facsimile or post.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY:**      None, unless otherwise specified here by any other claims agreement parties shown above.

**EXPERT(S) FEES COLLECTION:**      Expert fees payable by (Re)Insurers for services performed on their behalf to be collected by the expert or their appointed fee collection service provider.

**SETTLEMENT DUE DATE:**      20th December 2018



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **6** of **10** |

**BUREAU(X)**
**ARRANGEMENTS:**   De-linked accounts to be presented by Marsh Ltd to Xchanging Ins-sure Services (XIS).

Bureau re(insurers) agree to allow XIS not to 'group' associated de-linked signings. Each individual de-linked signing may be released for settlement to XIS independently of any other associated items.

Presentation to XIS of a contract with a premium payment warranty (PPW), premium payment condition (PPC) or prompt payment condition for a signing number and date within the timeframe specified within the warranty or condition shall be sufficient evidence of compliance and payment to all (re)insurers participating hereon. Subsequent rejection shall not affect the fact that the warranty/condition and/or the settlement due date (SDD) has been met by the original presentation and therefore no further update of the due date is required.

In respect of the LSW3001 (amended) or any other Premium Payment Clause, the SDD will automatically be amended to the date the premium is paid to (re)insurers.

Where any SDD, PPW or PPC due date falls on a weekend or public holiday, presentation to XIS on the next working day will be deemed to be in compliance with such SDD, PPW or PPC.

(Re)Insurers agree that the second and subsequent premium instalments are taken down as additional premiums, other than annual re-signings.

In respect of additional premium signings the SDD will follow the same payment period allowed under the original premium payment terms. However, the payment period shall commence from the date of the final agreement of the endorsement or the effective date, whichever is the later.

Claims and/or return premiums may be collected and taken down on production of a copy (including a photocopy) and/or duplicate of the applicable contract or policy.

In respect of non –settlement currencies:
XIS to accept settlement of premium in Pounds Sterling (GBP) converted at the rate of exchange at the date of receipt of payment by Marsh Ltd. However, in the event Marsh Ltd are paid in Pounds Sterling (GBP), U.S. Dollars (USD) or EUROS (EUR) then settlement will be made via XIS in GBP, USD or EUR as received by Marsh Ltd.



If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **7** of **10** |

Bureau (re)insurers agree to accept an interim For Declaration Only (FDO) signing.

In the event the Settlement Due Date (as detailed in Subscription Agreement) and/or the Allocation of Premium to Coding and/or Year of Account (as detailed in Fiscal and Regulatory) differ from those shown in the PPL SECURITY DETAILS, the information recorded in the PPL SECURITY DETAILS shall take precedence.

**PLACING PLATFORM LIMITED (PPL) ARRANGEMENTS:**   (Re)insurers instruct Xchanging to accept any attachments and additional information as detailed in this Market Reform Contract and any subsequent endorsements thereto, without sight of agreement from (re)insurers on the understanding that Marsh Ltd has obtained agreement thereto from the applicable (re)insurers.

**NON–BUREAUX ARRANGEMENTS:**   Where any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, payment of premium by telegraphic transfer or any other relevant electronic settlement method on the next working day will be deemed to be in compliance with such PPW or PPC.

Where (Re)Insurers have agreed to regular (weekly/ monthly/ quarterly) accounting the Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date shall be overridden by the accounting agreement.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **8** of **10** |

| **FISCAL AND REGULATORY** |
|---|

**TAX PAYABLE BY
INSURER(S):**    None

**COUNTRY OF
ORIGIN:**    United States of America

**OVERSEAS
BROKER:**    Marsh USA Incorporated
1166 Avenue of the Americas
New York 10036-2774
United States of America

**BROKER:**    Marsh Ltd
Tower Place
London
EC3R 5BU

**SURPLUS LINE
BROKER:**    **Surplus Line Broker Name and Licence No.**
Thomas Orrico #892706

**Surplus Line Broker address:**
1166 Avenue of the Americas
New York,
NY 100362708
United States of America

**US
CLASSIFICATION:**    US Surplus Lines.

**ALLOCATION OF
PREMIUM TO
CODING:**    In respect of the premium allocated to the USA:
99% D2
1% 7T

In respect of the premium allocated to the Rest of the World:
100% D2

If placed via PPL this
box will not be signed
--------------------------------
Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **9** of **10** |

**REGULATORY**
**CLIENT**
**CLASSIFICATION:**     Large Risk

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **10** of **10** |

| **BROKER REMUNERATION AND DEDUCTIONS** |
|---|

**FEE PAYABLE BY CLIENT:**            No

**TOTAL BROKERAGE:**            21.5%

**OTHER DEDUCTIONS FROM PREMIUM:**            None.

Policy Number: (UMR) B0509FINFW1800560

# SECURITY DETAILS

**REFERENCES**

UMR (Unique Market Reference): B0509FINFW1800560

Date contract printed to PDF: 10:05 04 December 2018

# SIGNED UNDERWRITERS

**Aspen Insurance Ltd (Insurance)**

Simon Inzani

| | | | |
|---|---|---|---|
| **Written Line** | 36.61% | **Signed Line** | 36.61% |
| **Agreed on** | 11:38 30 November 2018 | | |

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Lloyd's Underwriter Syndicate No. 4711, London, England | | 36.61% | 36.61% |

**Bound as Slip Leader, Lloyd's Leader**

| | | |
|---|---|---|
| *Lloyd's Stamp:* | 4711 | |
| *LORS Code:* | L4711 | |
| *Reference:* | FIA982U18A0W | |
| *Description:* | | |
| *Risk Code(s):* | 7T, D2 | |

---

**Aggregated Offline Market - Proportional Signing**

Non PPL Underwriter

| | | | |
|---|---|---|---|
| **Written Line** | 21.39% | **Signed Line** | 21.39% |

| **For and on behalf of:** | **Written Line** | **Signed Line** |
|---|---|---|
| Aggregated Offline Market - Proportional Signing | 21.39% | 21.39% |

**Bound Offline - Evidence held on file**

| | |
|---|---|
| *Reference:* | as per signed slip |
| *Description:* | 18BF10107410117 |

Policy Number: (UMR) B0509FINFW1800560

## SETTLEMENT INFORMATION

**Allocation of Premium to Coding**

7T at 1.00%

D2 at 99.00%

**Allocation of Premium to Year of Account**

2018

**Terms of Settlement**

| | |
|---|---|
| Settlement Due Date: | 20 December 2018 |
| Instalment Premium Period of Credit: | 0 day(s) |
| Adjustment Premium Period of Credit: | 0 day(s) |

Lloyd's Underwriter Syndicate No. 4711, London, England
**Bureau Leader and Lloyd's Leader**
Simon Inzani

# EXHIBIT M



## ARCH INSURANCE COMPANY
(A Missouri Corporation)

Home Office Address:
2345 Grand Blvd, Suite 900
Kansas City, MO 64108

Administrative Address:
Harborside 3, 210 Hudson Street, Suite 300
Jersey City, NJ 07311-1107
Tel: (866) 413-5550

# ARCH ESSENTIAL EXCESS POLICY®
## FOLLOW FORM EXCESS LIABILITY INSURANCE POLICY

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.**

# DECLARATIONS

**Policy No.:** DOX1000029-00

**Item 1. Named Insured & Address:**
AmTrust Financial Services, Inc.
59 Maiden Lane, 43rd Floor
New York, NY 10038

**Item 2.  Policy Period:**
From:        November 20, 2018
To:           December 31, 2018
12:01 a.m. local time at the address stated in Item 1

**Item 3.    Limit of Liability:**     $2,700,000 Part Of $15,000,000 Excess Of $25,000,000

**Item 4.    Underlying Insurance:**

**Primary Policy**

| Insurer: | Policy No.: | Limit of Liability: | Attachment: |
|---|---|---|---|
| Indian Harbor Insurance Company | US00080794DO17A | $5,000,000 | |

**Underlying**
**Excess**

| | | | | |
|---|---|---|---|---|
| First Excess | Zurich American Insurance Company | DOC 1074701-00 | $5,000,000 | $5,000,000 |
| Second Excess | AXIS Insurance Company | MNN626501/01/2017 | $5,000,000 | $10,000,000 |
| Third Excess | Allianz Global Risks US Insurance Company | USF00237518 | $2,500,000 Part Of $5,000,000 | $15,000,000 |
| | Markel Bermuda Limited | MKLB25GPL0000702 | $2,500,000 Part Of $5,000,000 | $15,000,000 |
| Fourth Excess | Lloyds Syndicate 0033 | B0509FINFW1800559 | $5,000,000 | $20,000,000 |

**Item 5.** **Extended Reporting Period:**
Additional Period:     1 Year
Additional Premium: 200.00% of Policy Premium

**Item 6.** **Notices to Insurer:**

Notice Of **Claim(s)** To Be Sent To:

Arch Insurance Company
Executive Assurance Claims
1299 Farnam Street, Suite 500
Omaha, NE 68102
P.O. Box 542033
Omaha, NE 68154
Phone: 877 688-ARCH (2724)
Fax: 866 266-3630
E-mail: Claims@ArchInsurance.com

All Other Notices To Be Sent To:

Arch Insurance Company
Executive Assurance Underwriting
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (212) 651-6499

**Item 7.** **Policy Premium:**                                                                    $364,425.00
Taxes, Surcharges and other Assessments, if applicable                    $0.00
Premium Attributable to Terrorism Risk Insurance                              $0.00

Included In Policy Premium    ☐
In Addition To Policy Premium    ☐

**Item 8.** **Endorsements:** See attached schedule of endorsements and notices.



Signature Page

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

John Mentz
President

Patrick K. Nails
Secretary

## SCHEDULE OF FORMS AND ENDORSEMENTS

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**INSURED:** AmTrust Financial Services, Inc.          **TERM:** November 20, 2018 **to** December 31, 2019
**POLICY NUMBER:** DOX1000030-00

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 05 ML0002 00 12 14 | SIGNATURE PAGE (ARCH INSURANCE) |
| | 00 DOX0204 00 10 09 | ARCH ESSENTIAL EXCESS POLICY |
| 1 | 00 DOX0122 00 12 09 | QUOTA SHARE PARTICIPATION |
| 2 | 00 DOX0047 00 12 09 | PRIOR AND PENDING LITIGATION EXCLUSION |
| 3 | 00 DOX0309 00 01 13 | RUN-OFF ENDORSEMENT |
| 4 | 00 ME3693 00 03 16 | SPECIFIC FOLLOW FORM ENDORSEMENT |
| | 00 MLE0013 33 12 08 | NEW YORK INSURANCE LAW SECTION 3420 REQUIRED CLAIM NOTICE PROVISIONS (CLAIMS MADE POLICIES) |
| | 00 DOX0186 00 10 06 | EXCESS POLICY ISSUANCE NOTICE |
| | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT S OFFICE OF FOREIGN ASSETS CONTROL ( OFAC ) |
| | 00 MLT0027 00 01 15 | TERRORISM COVERAGE DISCLOSURE NOTICE |

# ARCH ESSENTIAL EXCESS POLICY®

## FOLLOW FORM EXCESS LIABILITY INSURANCE POLICY

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

In consideration of the payment of the premium and in reliance upon the **Application**, the Insurer specified in the Declarations (the **"Insurer"**) and the **Insureds** agree as follows:

**1.   INSURING AGREEMENT**

This Policy provides excess coverage after exhaustion of the **Underlying Limit**. Except as otherwise provided in this Policy, coverage under this Policy shall follow form to, and apply in conformance with, the provisions of the **Primary Policy** as of the inception of this Policy. Notwithstanding the foregoing, this Policy shall provide no broader coverage than the most restrictive policy of **Underlying Insurance**.

**2.   EXHAUSTION OF THE UNDERLYING LIMIT**

A.   The **Underlying Limit** shall be exhausted by payment, in legal currency, of covered **Loss** by the insurers of **Underlying Insurance**, the **Insureds**, or any **DIC Insurer**.

B.   If this Policy becomes primary insurance because of the exhaustion of the **Underlying Limit**, the applicable deductible or retention of the **Primary Policy** shall apply to each **Claim** handled by the **Insurer** on a primary insurance basis. No deductible or retention shall apply to any **Claim** handled by the **Insurer** on an excess insurance basis.

C.   If any policy of **Underlying Insurance** grants any coverage subject to a sub-limit of liability, this Policy shall not offer such coverage. However, this Policy shall recognize any reduction of the **Underlying Limit** by any payment under such coverage.

**3.   DEFINITIONS**

Whether used in the singular or plural, the following terms shall have the meanings specified below:

A.   **"Application"**, **"Claim"**, and **"Loss"** shall have the same meaning specified for such terms in the **Primary Policy**.

B.   **"DIC Insurer"** means any insurer of an insurance policy written specifically excess of this Policy that is contractually obligated to drop down and pay covered **Loss** that is not paid by any **Underlying Insurance**. This Policy does not follow form to the provisions of the policy of such **DIC Insurer**.

C.   **"Insureds"** means all persons and entities entitled to coverage under the **Primary Policy**.

D.   **"Primary Policy"** and any **"Underlying Excess Policies"** are identified in Item 4 of the Declarations.

E.   **"Underlying Insurance"** means the Primary Policy and any Underlying Excess Policies.

**F.** **"Underlying Limit"** means the aggregate sum of all limits of liability of all **Underlying Insurance**.

**4.** **LIMIT OF LIABILITY**

The Limit of Liability specified in Item 3 of the Declarations is the maximum aggregate amount that the **Insurer** shall pay under this Policy for all covered **Loss**, including, without limitation, defense costs.

**5.** **DUTIES IN THE EVENT OF A CLAIM**

The **Insureds** shall give notice to the **Insurer** of any **Claim** or potential **Claim** in conformance with the notice provisions of the **Primary Policy** except that such notice shall be delivered to the address specified in Item 6 of the Declarations. The **Insurer** shall have the right to participate in the investigation, settlement and defense of any **Claim** noticed under this Policy, even if the **Underlying Limit** has not been exhausted. The **Insureds** shall give the **Insurer** all information and cooperation as the **Insurer** may reasonably request.

**6.** **EXTENDED REPORTING PERIOD**

If the **Insureds** elect and are granted an extended reporting period or discovery period under all **Underlying Insurance**, then the **Insureds** shall also be entitled to elect an extended reporting period under this Policy. Such extended reporting period shall follow form to, and apply in conformance with, the provisions of the **Primary Policy** provided that the premium and duration of such extended reporting period shall be as specified in Item 5 of the Declarations.

**7.** **MAINTENANCE OF UNDERLYING INSURANCE**

All **Underlying Insurance** shall be maintained in full effect. Failure to maintain any **Underlying Insurance** shall: (i) result in the **Insureds** becoming self-insured for the limit of liability of any such **Underlying Insurance**; and (ii) not relieve the **Insurer** of any obligation under this Policy.

**8.** **CHANGES**

This Policy shall not be changed or assigned in any manner except by written agreement of the **Insurer**.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**QUOTA SHARE PARTICIPATION**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

1. This Policy is part of a quota share participation arrangement involving a total limit of liability of $15,000,000 involving the following insurers:

| Quota Share Participant | Policy Number | Limit of Liability |
|---|---|---|
| Arch Insurance Company | DOX1000029-00 | $2,700,000 |
| Lloyd's Syndicate 4711 | B0509FINFW1800560 | $5,500,000 |
| Forge Underwriting | B0509FINFW1800560 | $3,200,000 |
| Markel Bermuda Limited | MKLB25GPL0000685 | $6,600,000 |

2. The **Insurer's** percentage participation in the quota share arrangement is 18%. Notwithstanding any other provision of this Policy, the **Insurer** shall only be liable for its percentage participation of covered **Loss**.

3. The liability of each participating insurer is several and not joint. The failure of any participating insurer to pay its share of covered **Loss** shall not increase the liability of any other participating insurer.

4. Each participating insurer shall make its own determination of whether **Loss** is covered under its policy. No participating insurer shall have any authority to bind any other participating insurer regarding any matter submitted for coverage.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 1

Policy Number: DOX1000029-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 20, 2018

Class 2 - 14176

00 DOX0122 00 12 09                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIOR OR PENDING LITIGATION EXCLUSION**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

**1.** The **Insurer** shall not be liable to pay **Loss** arising out of, based upon or attributable to:

  A. any demand, suit, formal or informal investigation occurring prior to, or pending as of October 21, 2017; or

  B. any **Wrongful Act** which gave rise to such prior or pending demand, suit or formal investigation or any **Interrelated Wrongful Acts** thereto.

**2.** **"Wrongful Act"** and **"Interrelated Wrongful Acts"** shall have the same meaning specified for such terms in the **Primary Policy**.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 2

Policy Number: DOX1000029-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 20, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**RUN-OFF COVERAGE**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

**1.**     Item 2 of the Declarations is deleted and replaced with:

> **Item 2:   Policy Period**
> From:    12:01 A.M. November 20, 2018
> To:        12:01 A.M. November 29, 2024
> Standard time at the address shown in Item 1.

**2.**     Section 6 of this Policy is deleted.

**3.**     This Policy shall follow form to and apply in conformance with Endorsement 16 of the **Primary Policy**.

**4.**     The entire premium for this Policy shall be deemed earned as of the inception of this Policy.

All other terms and conditions of this Policy remain unchanged.


Endorsement Number 3:

Policy Number: DOX1000029-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 29, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TIE IN OF LIMITS OF LIABILITY BETWEEN CONSECUTIVE POLICIES (AMTRUST)**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

1. This Policy has been negotiated with the understanding that this Policy and policy # B0507N17FA23160 issued to the **Insured** by Price Forbes and Partners Limited (the "Other Policy") have a linked limit of liability.

2. Any payment of **Loss** under the Other Policy shall reduce the Limit of Liability available under this Policy by an amount equal to such payment times the **Insurer's** quota share participation regarding the Limit of Liability.

All other terms and conditions of this Policy remain unchanged.


Endorsement Number: 4

Policy Number: DOX1000029-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 29, 2018

**NEW YORK INSURANCE LAW SECTION 3420**
**REQUIRED CLAIM NOTICE PROVISIONS**
**(CLAIMS MADE POLICIES)**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

Notwithstanding any other provision of this policy, it is agreed that:

1. No claim made by an insured, injured person or other claimant during the Policy Period or any applicable Extended Reporting Period or Discovery Period shall be invalidated because of a failure to give notice of such claim within the time prescribed in the policy if it shall be shown: (i) not to have been reasonably possible to have given notice within the prescribed time; and (ii) notice was given as soon as was reasonably possible.

2. No claim made by an insured, injured person or other claimant during the Policy Period or any applicable Extended Reporting Period or Discovery Period shall be invalidated because of a failure to give notice of such claim within the time prescribed in the policy unless the late notice has prejudiced the insurer. Notwithstanding the foregoing, the insurer may deny coverage for a claim to the extent that notice of such claim was given to the insurer after the Policy Period or any applicable Extended Reporting Period or Discovery Period.

All other terms and conditions of the policy continue to apply.

## EXCESS POLICY ISSUANCE NOTICE

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**NOTICE: This excess policy has been issued prior to our receipt of any underlying insurance policy. This excess policy has been issued based upon the underlying insurance policy information specified in the application for this policy or in the underlying insurance binders furnished to us. By issuing this excess policy, we do not waive our rights to seek appropriate legal remedies based upon any discrepancies between the underlying insurance policy information furnished to us at the time that this excess policy was bound and the actual policy provisions of any underlying insurance furnished to us after the issuance of our binder.**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Class 2 - 14176
00 ML0065 00 06 07      Includes copyrighted material of Insurance Services Office, Inc.,      Page 1 of 1
with its permission.

# TERRORISM COVERAGE DISCLOSURE NOTICE

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015 (collectively referred to as the "Act") established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. An act of terrorism is defined as any act certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism. The policy's other provisions will still apply to such an act. Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism. In those states, if terrorism results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium <u>will</u> include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 85% in 2015, 84% in 2016, 83% in 2017, 82% in 2018, 81% in 2019, and 80% in 2020 of that portion of the amount of such insured losses that exceeds the applicable insurer deductible during Calendar Year 2015 and each Calendar Year thereafter through 2020.**

### DISCLOSURE OF CAP ON ANNUAL LIABILITY

If the aggregate insured terrorism losses of all insurers exceed $100,000,000,000 during any Calendar Year provided in the Act, the Secretary of the Treasury shall not make any payments for any portion of the amount of such losses that exceed $100,000,000,000, and if we have met our insurer deductible, we shall not be liable for the payment of any portion of such losses that exceeds $100,000,000,000.

### DISCLOSURE OF PREMIUM

Your premium for terrorism coverage is: $0.00
(This charge/amount is applied to obtain the final premium.)
**You may choose to reject the offer by signing the statement below and returning it to us. Your policy will be changed to exclude the described coverage.** If you chose to accept this offer, this form does not have to be returned.

### REJECTION STATEMENT

I hereby decline to purchase coverage for certified acts of terrorism. I understand that an exclusion of certain terrorism losses will be made part of this policy.

AmTrust Financial Services, Inc.

Policyholder/Legal Representative/Applicant's
Signature

Named Insured

Print Name of Policyholder/Legal
Representative /Applicant

Arch Insurance Company
Insurance Company

Date:

Policy Number: DOX1000030-00

# EXHIBIT N



## MARKEL BERMUDA LIMITED

### PROFESSIONAL LIABILITY EXCESS LIABILITY INSURANCE POLICY DECLARATIONS

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**ITEM 1:** INSURED:         Amtrust Financial Services, Inc.
ADDRESS:      59 Maiden Lane, 43rd Floor, New York, NY 10038 United States

**ITEM 2:** POLICY PERIOD:      November 20, 2018 to December 31, 2018      (12:01 a.m. prevailing time
                                                                            at the address stated in Item 1)

**ITEM 3:** LIMIT OF LIABILITY:  US$ 3,600,000 po US$ 15,000,000                  in the aggregate
                                                                             (including Defense Costs)
         (Not subject to any reinstatement provision that may be provided under the Followed Policy)

         EXCESS OF TOTAL UNDERLYING LIMITS OF:  US$ 25,000,000       in the aggregate
                                                                     (including Defense Costs)

**ITEM 4:** FOLLOWED POLICY: Indian Harbor Insurance Company Policy No.: US00080794DO17A

**ITEM 5:** UNDERLYING INSURANCE

         **SEE ENDORSEMENT NO. 1 FOR COMPLETE SCHEDULE**

**ITEM 6:** PENDING OR PRIOR DATE:   as per FOLLOWED POLICY

         To the extent the FOLLOWED POLICY contains an exclusion regarding pending or prior litigation, administrative, regulatory or other proceedings, investigations, demands, suits, orders, decrees or judgments, this Policy shall follow such exclusion.  The applicable date for determining whether any such matter is "pending or prior" for the purpose of such exclusion in this policy shall be the PENDING OR PRIOR DATE set forth in this Item 6 of the Declarations.

**ITEM 7:** PREMIUM:  $ 26,880

**ITEM 8:**   ADDRESS OF INSURER(S) FOR ALL NOTICES UNDER THIS POLICY:

Markel Bermuda Limited
2 Front Street
P.O. Box 2565
Hamilton HM KX Bermuda
Telephone 441 296 8800
Email: PLBermudaClaims@markelcorp.com

**ITEM 9:**   A. DISCOVERY PERIOD PREMIUM:   as per FOLLOWED POLICY

B. DISCOVERY PERIOD:   as per FOLLOWED POLICY

**ITEM 10:** ENDORSEMENTS EFFECTIVE AT INCEPTION:
1. Prior Notice/Prior Claims Exclusion Endorsement
2. Tie in Limits Endorsement
3. Retroactive Date Exclusion
4. Sanctions Endorsement
5. Amendment Endorsement
6. Convert to Run-off Endorsement
7. Schedule of Underlying Insurance

**ITEM 11:** POLICY NUMBER:   MKLB25GPL0000685

**ITEM 12:** PRIMARY POLICY SELF-INSURED RETENTION: $5,000,000

The INSURER hereby causes this policy to be signed on the Declarations page by a duly authorized representative of the Insurer.

_____
**Chris Jansma, Senior Vice President**

January 15, 2019
**Date**



**MARKEL BERMUDA LIMITED FOLLOW FORM**
**EXCESS LIABILITY INSURANCE POLICY**

In consideration of the premium paid, and in reliance on all statements made and information furnished to Markel Bermuda Limited herein called the "Insurer" and subject to the Declarations and endorsements made a part hereof and the terms, conditions and limitations set forth herein, the Insurer and the Insured Entity, on its behalf and on behalf of all persons and entity(s) entitled to coverage hereunder, agree as follows:

**I.      INSURING CLAUSE**

The Insurer shall pay the Insured for loss upon exhaustion of all applicable underlying limits by actual payments by the insurers of the UNDERLYING INSURANCE, the Insured, any insurer of a difference-in-conditions policy that is excess of this policy, and/or any other source, subject to: the terms and conditions of the FOLLOWED POLICY (excluding any such terms and conditions that are inconsistent with the terms of this policy); the Limit of Liability as stated in Item 3 of the Declarations; and the terms and conditions of, and the endorsements attached to, this policy.  In no event will this policy provide coverage broader than that provided by any UNDERLYING INSURANCE, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in an endorsement to this policy.

**II.     TERMS AND CONDITIONS**

A.      NOTICE AND LOSS PROVISIONS

1.      Any notice required to be given by the terms of the FOLLOWED POLICY shall be given to the Insurer at the address indicated in Item 8 of the Declarations.
2.      This policy shall follow the notice of claim and/or notice of circumstance provisions of the FOLLOWED POLICY, except as stated otherwise herein.
3.      With respect to the defense and settlement of any claim that appears to be reasonably likely to involve the Insurer, the Insured shall give the Insurer such information, assistance and cooperation as the Insurer may reasonably request and as shall be in the Insured's power and shall do nothing that would prejudice the Insurer's position or potential rights of recovery.
4.      Only those settlements, stipulated judgments and defense costs which have been consented to by the Insurer shall be recoverable as loss under the terms of this policy.  The Insurer's consent shall not be unreasonably withheld, provided the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim.

B.      FOLLOWING FORM

1.      This policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the FOLLOWED POLICY in all respects as of the effective date of this policy. The Insured agrees that should any mid-term change to the FOLLOWED POLICY be made by rewrite or endorsement, such change shall not be effective as to this policy without the written consent of the Insurer, which consent shall not be unreasonably withheld.  It is further agreed that should the Insurer consent to any change of this policy, the premium hereon may be adjusted accordingly.
2.      In the event of the depletion of the limits of liability of the UNDERLYING INSURANCE solely as a result of actual payment of losses thereunder this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such UNDERLYING INSURANCE. In the event of the exhaustion of all of the limits of liability of such UNDERLYING INSURANCE the remaining limits available under this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue for subsequent losses as primary insurance and any retention specified in the FOLLOWED POLICY shall be imposed under this policy. Payments made by insurers issuing such UNDERLYING INSURANCE in accordance with any State Amendatory endorsement or sub-limit of liability shall be deemed to apply toward exhaustion of the limits of liability of the UNDERLYING INSURANCE but this policy shall not follow such state amendatory endorsement or sub-limit of liability.
3.      This policy, subject to all its terms, conditions and endorsements, will not drop down to make payment for loss in place of UNDERLYING INSURANCE for any reason.



C.      CANCELLATION CLAUSE

The Insured shall give notice to the Insurer when practicable of the cancellation of any UNDERLYING INSURANCE. In the event any UNDERLYING INSURANCE is cancelled by the insurer thereon, this policy shall continue in full force and effect for the remainder of the POLICY PERIOD and the Insurer shall be liable to the same extent that it would have been liable if such UNDERLYING INSURANCE had remained in effect.

This policy shall follow the cancellation terms of the FOLLOWED POLICY except that in the event the Insurer cancels this policy for non-payment of premium, this policy shall be void as of the inception date of the POLICY PERIOD.

D.      PUNITIVE DAMAGES

This policy shall cover punitive damages unless such damages are excluded under the terms and conditions of the FOLLOWED POLICY. Furthermore, if the FOLLOWED POLICY is determined not to cover punitive damages solely due to the insurability of such damages under applicable law, then this policy shall nonetheless provide coverage for punitive damages as if all UNDERLYING INSURANCE had provided such coverage.  This policy will not drop down to provide coverage for punitive damages in place of UNDERLYING INSURANCE.

E.      ALTERNATIVE DISPUTE RESOLUTION

1.      It is agreed that any dispute arising out of or in connection with this policy, including any question regarding its existence, validity or termination, shall be referred to and finally resolved solely by Arbitration or Alternative Dispute Resolution (ADR).

2.      This policy shall follow the terms of the FOLLOWED POLICY with respect to Arbitration or ADR only when said terms require the dispute to proceed in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada.

3.      In the event the applicable FOLLOWED POLICY does not provide for Arbitration or ADR in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada, the Insured shall select one of the following venues and procedural laws for such Arbitration or ADR:

    (i)      Arbitration held in Hamilton, Bermuda under The Bermuda International Conciliation and Arbitration Act of 1993 (exclusive of the Conciliation Part of such act) as may be amended and supplemented, or under the English Arbitration Act of 1996 as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause, or

    (ii)      Arbitration held in London, England under the English Arbitration Act of 1996, as may be amended and supplemented, which Act is deemed incorporated by reference into this clause, or

    (iii)      Arbitration held in Toronto or Vancouver, Canada under the English Arbitration Act of 1996, as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause.

4.      Where the Insured and Insurer are parties to the dispute, the Insured shall make the selection referenced in paragraph 3 above.  Where the Insurer and a party deriving rights through or asserting rights on behalf of the Insured are parties to a dispute, the Insurer shall make the selection referenced in paragraph 3 above.

5.      The number of arbitrators shall be three.

6.      Each party shall bear the costs of its own arbitrator. The remaining cost of arbitration shall be borne equally by the parties.

7.      All awards made by the Arbitration Board shall be final and no right of appeal shall lie from any award rendered by the Arbitration Board.

8.      No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insured to determine the Insured's liability, nor shall the Insurer be impleaded by the Insured or their legal representatives. The Insurer and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Insurer by any of the Insured's other insurers in a jurisdiction or forum other than that set forth in this clause, the Insured will in good faith take all reasonable steps requested by the Insurer to assist the Insurer in obtaining a dismissal of these claims (other than on the merits).  The Insured will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Insurer would have been liable to such insurers for indemnity or contribution pursuant to this policy. The Insured shall be entitled to assert claims against the Insurer for coverage under this policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other



insurers in respect of such claims for indemnity or contribution, in an arbitration between the Insurer and the Insured pursuant to this clause; provided, however, that the Insurer in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this policy and any other defenses (other than jurisdiction defenses) as it would have been entitled to raise in the action or proceeding with such insurers.

F.      CHOICE OF LAW

This policy shall be construed and enforced in accordance with the applicable law determined under the FOLLOWED POLICY (with the exception of the procedural law required under this policy's Alternative Dispute Resolution clause E.), except insofar as such laws may prohibit payment hereunder in respect of punitive damages, in which case, the laws of England and Wales shall apply.



**PRIOR NOTICE / PRIOR CLAIM EXCLUSION ENDORSEMENT**

It is hereby agreed that Sections III.B(1) and B(2) of the FOLLOWED POLICY are deleted and replaced by the following:

**B.**      No coverage shall be available under this policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

(1)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Inception Date of this policy as set forth in ITEM 2 of the Declarations;

(2)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this policy as set forth in ITEM 2 of the Declarations, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:      Amtrust Financial Services, Inc.

Date of Issue:      January 15, 2019

End No.:      1



**TIE IN OF LIMITS ENDORSEMENT**

It is hereby agreed that it is expressly acknowledged by the Insured and the Insurer that the premium for this policy has been negotiated with the understanding that this policy and the policy # AKDB6HTR7420D4 issued to the Insured by Chubb Global Markets – Financial Lines (the "Other Policy") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a)   Subject to the terms and conditions of the coverage provided by the Other Policy and this policy, in the event that loss or damages is required to be paid under both this policy and the Other Policy, the coverage provided under this policy shall be in excess of the coverage provided under the Other Policy in that:

    i.   any loss or damages required to be paid under the Other Policy shall be fully paid prior to the payment of any loss or damages under this policy; and

    ii.   any payment of loss or damages under the Other Policy will proportionally reduce the maximum aggregate limit of liability for all loss or damages on account of all claims for this policy. Such proportion shall be the amount paid under the Other Policy divided by the Other Policy's overall limit of liability.

b)   The Insurer will have no obligation under this policy to make any payment of loss or damages to the extent that the Other Policy's aggregate limit of liability is fully exhausted.

c)   If the paid loss or damages under this policy are in an aggregate amount equaling $3,600,000, any and all obligations of the Insurer under this policy will be completely fulfilled and extinguished, and the Insurer will have no further obligations of any kind or nature whatsoever under this policy.

d)   Nothing in this endorsement is intended, nor shall be construed, to obligate or require the Insurer to pay loss or damages under this policy in excess of $3,600,000 which is the limit of liability set forth under Item 3 of the Declarations of this policy.

e)   In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this policy, the term, condition or limitation of this endorsement shall govern.

**All other terms and conditions remain unchanged**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.: MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:     January 31, 2019

End No.             2



**RETROACTIVE DATE EXCLUSION ENDORSEMENT**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that this Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1. any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017.

2. any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

3. any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

All other terms and conditions of this Policy remain unchanged.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:          3



**SANCTIONS CLAUSE ENDORSEMENT**

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the insurer, or its ultimate holding company, to any sanction, prohibition or restriction implemented pursuant to  resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United  Kingdom, or United States of America.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:            4



**AMENDMENT ENDORSEMENT**

It is hereby declared and agreed that Item 2. and Item 7 of the Declaration page are deleted in their entirety and replaced with the following:-

**ITEM 2:**   POLICY PERIOD:   November 20, 2018 to November 29, 2018   (12:01 a.m. prevailing time at the address stated in Item 1)

**ITEM 7:**   AMENDED PREMIUM: $ 5,914

Nothing herein shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of this Policy, except as expressly stated herein. This endorsement is part of such Policy and incorporated herein.

**All other terms and conditions of this policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:            5



## CONVERT TO RUN-OFF ENDORSEMENT

In consideration of an additional premium of $480,000 (the "Run-Off Premium"):

1.  It is hereby declared and agreed that Item 2. of the Declaration page is amended in its entirety and replaced with the following:-

    **Item 2.** POLICY PERIOD:

    From:               November 29, 2018
    To:                 November 29, 2024          (12:01 a.m. prevailing time
                                                   at the address stated in Item 1)

2.  It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph 2 above, and subject to all terms and conditions of Endorsement No. 3 to the Policy.

3.  Item 7 of the Declarations is amended to read in its entirety as follows:

    Item 7:
        Original Premium:        $26,880
        Amended Premium:         $5,914
        Run-Off Premium:         $480,000
        Total Policy Premium:    $485,914

4.  No coverage will be available under this Policy for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed on or after November 29, 2018, or with respect to any Interview or Investigation demand in connection with any act, fact, circumstance, transaction, or event taking place on or after November 29, 2018. Nothing herein shall serve to limit or waive Endorsement No. 2 to the Policy, which shall continue in full force and effect.

5.  The policy is amended by deleting Section **II TERMS AND CONDITIONS** C.  CANCELLATION CLAUSE in its entirety.

6.  The premium shall be fully earned and non-refundable as of November 29, 2018.

7.  Solely for the purposes of this endorsement, the term Original Policy Period means the period of time from November 20, 2018 to November 29, 2018.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:          6



## SCHEDULE OF UNDERLYING INSURANCE

It is hereby understood and agreed that Item 5 of the Declarations reads as follows:

**Item 5:** Schedule of Underlying Insurance:

| | Carrier | Policy Period | Limits | Attachment |
|---|---|---|---|---|
| i. | Indian Harbor Insurance Company | November 29, 2018 – November 29,2024 | $5M | as per ITEM 12 on Dec page. |
| ii. | Zurich American Insurance Company | November 29, 2018 – November 29,2024 | $5M | $5M |
| iii. | Axis Insurance Company | November 29, 2018 – November 29,2024 | $5M | $10M |
| iv. | Allianz Global Risk US Insurance Company | November 29, 2018 – November 29,2024 | $2.5M po $5M | $15 |
| v. | Markel Bermuda Limited | November 29, 2018 – November 29,2024 | $2.5M po $5M | $15M |
| vi. | Lloyd's Underwriter - Hiscox | November 29, 2018 – November 29,2024 | $5M | $20M |
| | Quota Share Participant(s) | | | |
| vii. | Lloyd's Underwriters – Aspen (Lead) | November 29, 2018 – November 29,2024 | $11.4M po $15M | $25M |

**All other terms and conditions of the policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.  MKLB25GPL0000685
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:     January 15, 2019

End No.:            7



# EXHIBIT O

## Price Forbes and Partners Limited                                          **507 PRF**

UMR: B0507 N17FA24460

---

## QUOTE DETAILS

| | |
|---|---|
| **TYPE:** | EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE |

**INSURED:**          **AMTRUST FINANCIAL SERVICES, INC.**

**MAILING
ADDRESS:**           59 Maiden Lane, 43rd Floor
New York
New York
10038
United States of America

**PERIOD:**           From:      21st October 2017
To:         21st October 2018
Both days at 12:01am local standard time, at the mailing address of the
Insured.

**INTEREST:**         Excess Directors and Officers Liability and Company Reimbursement
Insurance as more fully defined in the wording referenced herein.

**LIMIT OF
LIABILITY:**          USD 10,000,000 in the aggregate

In excess of:

USD 40,000,000 in the aggregate, which in turn in excess of underlying primary
retention(s)

**TERRITORIAL
LIMITS:**             Worldwide

**CONDITIONS:**
1.    Excess Form as attached
2.    Retroactive date 21st October 2017.
3.    Short Rate Cancellation Table NMA 45 as attached
4.    Small AP/RP Clause NMA 1168 as attached
5.    Nuclear Incident Exclusion NMA 1256 as attached
6.    Radioactive Contamination Exclusion Clause NMA 1477 as
       attached
7.    War and Terrorism Exclusion NMA 2918 as attached.
8.    TRIA Clause LMA 5019 as attached.
9.    Sanctions Clause as attached.
10.   Premium Payment Clause LSW 3000 as attached.

**SUBJECTIVITIES:**   None

**CHOICE OF LAW
& JURISDICTION:**     This insurance shall be governed by and construed in accordance with the law
of New York and each party agrees to submit to the exclusive jurisdiction of the
courts of the United States of America

CGM
2488

**507 PRF**
**Price Forbes & Partners Limited**

**PRICE FORBES**

UMR : B0507 N17FA24460

---

**PREMIUM:**                     USD 600,000 (100%) Annual

**PREMIUM**
**PAYMENT TERMS:**               Premium Payment Clause LSW 3000 (75 days)

**TAXES PAYABLE**
**BY INSURED AND**
**ADMINISTERED**
**BY INSURER(S):**               None applicable

**INSURER**
**CONTRACT**
**DOCUMENTATION:**               This document details the contract terms entered into by the insurer(s), and
                                 constitutes the contract documentation.

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

**DECLARATIONS**

**EXCESS INSURANCE POLICY**

**SUBJECT TO ALL OF THE TERMS, CONDITIONS AND LIMITATIONS OF THE FOLLOWED POLICY, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS COSTS AND EXPENSES INCURRED IN THE DEFENSE OR SETTLEMENT OF CLAIMS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY AMOUNTS AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Policy Number:    B0507 N17FA24460**

Item 1.    **Named Insured:**

AMTRUST FINANCIAL SERVICES, INC.

Principal Address:

59 Maiden Lane, 43rd Floor
New York
New York
10038
United States of America

Item 2.    **Policy Period:**

From:    21ˢᵗ October 2017

To:    21ˢᵗ October 2018

Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.

Item 3.    **Limit of Liability:**

USD 10,000,000    Each claim, including costs and expenses incurred in the defense or settlement of such claim.



**PRICE FORBES**

USD 10,000,000   in the Aggregate for the **Policy Period**, including costs and expenses
incurred in the defense or settlement of all claims.

Item 4.    **Premium:**

USD 600,000

Item 5.    **Notification pursuant to Clause VI. shall be given to:**

Underwriters, via:

Price Forbes & Partners ltd,
2 Minster Court,
Mincing Lane.
London EC3R 7PD

Attention; juliarobinson@priceforbes.com

item 6.

**Underlying Insurance:**

PRIMARY Policy number ELU152497-17 issued by Indian Harbour Insurance Company for a
limit of USD 5,000,000 in the aggregate.

First Excess Policy number DOC 1074701-00 issued by Zurich-American Insurance Company
for a limit of USD 5,000,000 in the aggregate.

Second Excess Policy number MNN626501/01/01/2017 issued by Axis Insurance Company
for a limit of USD 5,000,000 in the aggregate.

Third Excess Policy number B0507N17FA23130 issued by Hiscox (Syndicate 33 at Lloyd's)
for a limit of USD 10,000,000 in the aggregate

Forth Excess Policy number B0507N17FA23160 issued by various Insurers at Lloyd's and
Other insurers as per schedule attached therein.



tem 7.    **Endorsements Effective at Inception:**

1.    Retroactive date 21st October 2017
2.    Short Rate Cancellation Table NMA 45.
3.    Small AP/RP Clause NMA 1168.



**PRICE FORBES**

4.     Nuclear Incident Exclusion NMA 1256.
5.     Radioactive Contamination Exclusion Clause NMA 1477.
6.     War and Terrorism Exclusion NMA 2918.
7.     TRIA Clause LMA 5019.
8.     Sanctions Clause.
9.     Premium Payment Clause LSW 3000.

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460


**PRICE FORBES**

## EXCESS INSURANCE POLICY

In consideration of the payment of the premium, in reliance upon all information and representations provided or made available by the **Insureds** to the Underwriters in connection with the underwriting of this Policy, the Underwriters and **Named Insured**, on behalf of all **Insureds**, agree as follows:

### I.   INSURING CLAUSE

This Policy shall provide coverage in accordance with all of the terms, conditions and limitations (including, but not limited to, the exclusions and notice requirements) of the **Followed Policy** except for the Limit of Liability, the premium or as otherwise set forth herein. Coverage hereunder shall attach only after all of the **Underlying Limits** have been exhausted through payments by, or on behalf of, or in place of the insurers of the **Underlying Insurance** of amounts under the **Underlying Insurance**. The risk of uncollectibility of any **Underlying Insurance** (in whole or in part), whether because of financial impairment or insolvency of an insurer of the **Underlying Insurance** or for any other reason, is expressly retained by the **Insureds** and is not insured by or assumed by the Underwriters.

### II.   DEFINITIONS

A.   **Followed Policy** means the insurance policy identified in Item 6. of the Declarations.

B.   **Insureds** mean all persons and entities covered under the **Followed Policy**.

C.   **Named Insured** means all persons and entities set forth in Item 1. of the Declarations.

D.   **Policy Period** means the period set forth in Item 2. of the Declarations.

E.   **Underlying Insurance** means the **Followed Policy** and all other underlying insurance policies, if any, identified in Item 7. of the Declarations.

F.   **Underlying Limits** mean an amount equal to the aggregate of all limits of liability of the **Underlying Insurance**.

### III.   LIMIT OF LIABILITY

The amount set forth in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriters for all coverage under this Policy, regardless of the number of claims made against the **Insureds** or the time of payment and regardless of whether or not an extended reporting period applies.

### IV.   CHANGES TO UNDERLYING INSURANCE AND DEPLETION OF UNDERLYING LIMITS

If, subsequent to the inception date of this Policy, the terms, conditions or limitations of an **Underlying Insurance** are modified, the **Insureds** must notify the Underwriters in writing, as soon as practicable, of such modification. If any changes to the **Followed Policy**: (a) expand coverage, (b) change the policyholder name or address, or (c) modify premium, this Policy shall not follow those changes unless the Underwriters agree in writing to do so. If any coverage under any **Underlying Insurance** is subject to a sub-limit, then this Policy provides no coverage excess of such sub-limit, but the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount. Furthermore, if any amount covered under any policy issued to the **Insureds** outside of the United States of America (a "Foreign Policy") and the **Underlying Insurance** expressly provides for the reduction of the **Underlying Limit** by reason of payment of such amount under the applicable Foreign Policy, then the Underwriters shall recognize payment of such amount as reducing the **Underlying Limit** by such amount.

### V.   UNDERWRITERS RIGHTS

The Underwriters have the same rights and protections as the insurer of the **Followed Policy** and shall have the right, but not the obligation, at their sole discretion, to elect to participate in the investigation, settlement, prosecution or defense of any claim.

### VI.   NOTICES

Where notice is permitted or required by the **Followed Policy**, the **Insureds** have the same rights and obligations to notify the Underwriters under this Policy, except that such notice shall be given to the Underwriters at the address set

**507 PRF**
**Price Forbes & Partners Limited**



UMR : B0507 N17FA24460

forth in Item 5. of the Declarations. Notice to any other insurer shall not constitute notice to the Underwriters unless also given to the Underwriters as provided above.

01/14
LSW4003



**507 PRF**
**Price Forbes & Partners Limited**



UMR : B0507 N17FA24460

## **RETROACTIVE DATE**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that this Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.      any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017,

2.      any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

3.      any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

All other terms and conditions of this Policy remain unchanged.

**507 PRF**
**Price Forbes & Partners Limited**


**PRICE FORBES**

UMR : B0507 N17FA24460

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this insurance is written it is agreed that in the event of cancellation thereof by the Assured the earned premium shall be computed as follows:

# SHORT RATE CANCELLATION TABLE

A.    For insurance written for one year:-

| Days Insurance In Force | % of One Year Premium | Days Insurance In Force | % of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154 – 156 | 53 |
| 2 | 6 | 157 – 160 | 54 |
| 3 - 4 | 7 | 161 – 164 | 55 |
| 5 - 6 | 8 | 165 – 167 | 56 |
| 7 - 8 | 9 | 168 – 171 | 57 |
| 9 - 10 | 10 | 172 – 175 | 58 |
| 11 - 12 | 11 | 176 – 178 | 59 |
| 13 - 14 | 12 | 179 – 182 (6 Months) | 60 |
| 15 - 16 | 13 | 183 – 187 | 61 |
| 17 - 18 | 14 | 188 – 191 | 62 |
| 19 - 20 | 15 | 192 – 196 | 63 |
| 21 - 22 | 16 | 197 – 200 | 64 |
| 23 - 25 | 17 | 201 – 205 | 65 |
| 26 - 29 | 18 | 206 – 209 | 66 |
| 30 - 32 (1 Month) | 19 | 210 – 214 (7 Months) | 67 |
| 33 - 36 | 20 | 215 – 218 | 68 |
| 37 - 40 | 21 | 219 – 223 | 69 |
| 41 - 43 | 22 | 224 – 228 | 70 |
| 44 - 47 | 23 | 229 – 232 | 71 |
| 48 - 51 | 24 | 233 – 237 | 72 |
| 52 - 54 | 25 | 238 – 241 | 73 |
| 55 - 58 | 26 | 242 – 246 (8 Months) | 74 |
| 59 - 62 (2 Months) | 27 | 247 – 250 | 75 |
| 63 - 65 | 28 | 251 – 255 | 76 |
| 66 - 69 | 29 | 256 – 260 | 77 |
| 70 - 73 | 30 | 261 – 264 | 78 |
| 74 - 76 | 31 | 265 – 269 | 79 |
| 77 - 80 | 32 | 270 – 273 (9 Months) | 80 |
| 81 - 83 | 33 | 274 – 278 | 81 |
| 84 - 87 | 34 | 279 – 282 | 82 |
| 88 - 91 (3 Months) | 35 | 283 – 287 | 83 |
| 92 - 94 | 36 | 288 – 291 | 84 |
| 95 - 98 | 37 | 292 – 296 | 85 |
| 99 - 102 | 38 | 297 – 301 | 86 |
| 103 - 105 | 39 | 302 – 305 (10 Months) | 87 |
| 106 - 109 | 40 | 306 – 310 | 88 |
| 110 - 113 | 41 | 311 – 314 | 89 |
| 114 - 116 | 42 | 315 – 319 | 90 |
| 117 - 120 | 43 | 320 – 323 | 91 |
| 121 - 124 (4 Months) | 44 | 324 – 328 | 92 |
| 125 - 127 | 45 | 329 – 332 | 93 |
| 128 - 131 | 46 | 333 – 337 (11 Months) | 94 |
| 132 - 135 | 47 | 338 – 342 | 95 |
| 136 - 138 | 48 | 343 – 346 | 96 |
| 139 - 142 | 49 | 347 – 351 | 97 |
| 143 - 146 | 50 | 352 – 355 | 98 |
| 147 - 149 | 51 | 356 – 360 | 99 |
| 150 - 153 (5 Months) | 52 | 361 – 366 (12 Months) | 100 |



**507 PRF**
**Price Forbes & Partners Limited**



UMR : B0507 N17FA24460

---

**B.**     **For Insurances written for more or less than one year:-**

    1.     If insurance has been in force for 12 months or less, apply the short rate table to the full annual premium determined as for an insurance written for a term of one year.

    2.     If insurance has been in force for more than 12:-

        a)     Determine full annual premium as for an insurance written for a term of one year.

        b)     Deduct such premium from the full insurance premium and on the remainder calculate the pro-rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

        c)     Add premium produced in accordance with items a) and b) to obtain earned premium during the full period of insurance that has been in force.

**NMA 45**



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

## SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

NMA1168



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460


**PRICE FORBES**

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.   Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

**507 PRF**
**Price Forbes & Partners Limited**



**PRICE FORBES**

UMR : B0507 N17FA24460

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

## War and Terrorism Exclusion Endorsement

Notwithstanding any provision to the contrary within this Policy or any Endorsement thereto it is agreed that this Policy excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1)   war, invasion, acts of foreign enemies, hostilities or warlike operations (whether  war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2)   any act of terrorism.
For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this policy, the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**NMA2918**
**08/10/2001**



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

### TRIA Clause

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% (85% in respect of losses occurring after 31 December 2006) of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. The portion of your annual premium that is attributable to coverage for certified acts of terrorism as defined in the Terrorism Risk insurance Act is: 1%

LMA 5019



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



## SANCTIONS CLAUSE

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the insurer, or its ultimate holding company, to any sanction, prohibition or restriction implemented pursuant to resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United Kingdom, or United States of America.

All other terms and conditions remain unaltered

**507 PRF**
**Price Forbes & Partners Limited**



**PRICE FORBES**

UMR : B0507 N17FA24460

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 45 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 45th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 10 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parts if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000



**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

## **INFORMATION**

2017 submission as received from Brown & Brown.
AmTrust Inc. Conference call dated 20th October 2017
NCD dated 3rd November 2017

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460


**PRICE FORBES**

## SECURITY DETAILS

### INSURER'S LIABILITY:

#### (Re)insurer's liability several not joint

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

#### Proportion of liability

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007

**507 PRF**
**Price Forbes & Partners Limited**



**PRICE FORBES**

UMR : B0507 N17FA24460

---

**ORDER HEREON:**        100%

**BASIS OF
WRITTEN LINES:**        Percentage of Whole

Now NMA 2419 Lines Clause, if applicable.

**SIGNING
PROVISIONS:**        In the event that the written lines hereon exceed 100% of the order, any lines
written "to stand" will be allocated in full and all other lines will be signed down
in equal proportions so that the aggregate signed lines are equal to 100% of
the order without further agreement of any of the (re)insurers.

However:

a) in the event that the placement of the order is not completed by the
commencement date of the period of insurance then all lines written by that
date will be signed in full;

b) the signed lines resulting from the application of the above provisions can
be varied, before or after the commencement date of the period of
insurance, by the documented agreement of the (re)insured, or the
(re)insured's representatives, and the Slip Leader. Such variation to be in
accordance with provision a) above with the resulting variation in signed
lines commencing from the date set out in that agreement.

Any other variation to the contracts will take effect only by the documented
agreement of the (re)insured, or the (re)insured's representatives, and all
(re)insurers whose lines are to be varied. Such variation to the contracts
will take effect only when all such (re)insurers have agreed with the
resulting variation in signed lines commencing from the date set out in that
agreement.

**LINE CONDITIONS:**        None

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460



**PRICE FORBES**

## WRITTEN LINES

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the slip leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Signed Line
per cent (%)

17-858        17.9%

**CHUBB**  **CGM 2488**

**Chubb Global Markets – Financial Lines**
a trading name of Chubb Underwriting Agencies Ltd

A K D E 6 H T R 7 7 0 2 D h
SiF        NCD over 3/11/17

17-858        17.9%

**ASPEN**  **ASP 4711**

F I A 9 A 3 8 1 7 A 0 G        6/11/17
PM : F.J

13-929        13.962%

**Pembroke**  **PEM 4000**

2 6 3 7 9 P 1 7 A A D4
**T. A. B. H. GLOVER & OTHERS**
SC        S:IF

pary 06/11/17

7-482        7.5%

**Barbican Financial & Professional Lines Consortium**
**9562**

0 4 1 0 5 7 0 2 1 7 0 0

All underwriters as per LPSO Registered Consortium No 9562
being Lloyd's Syndicates BAR 1955 (66.66%) &
AML 2001 (16.67%) & EVE 2786 (16.67%)

for AP
6/11/17

**507 PRF**
**Price Forbes & Partners Limited**

UMR : B0507 N17FA24460


**PRICE FORBES**

## <u>WRITTEN LINES</u>

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the slip leader.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Signed Line
per cent (%)



25-000   25%.
07
11
17.



17-873

17·9157

# EXHIBIT P

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **1** of **24** |

| RISK DETAILS |
|---|

**UNIQUE MARKET REFERENCE:**    B0509FINFW1800561

**TYPE:**    EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE

**INSURED:**    AMTRUST FINANCIAL SERVICES, INC.

**PRINCIPAL ADDRESS:**
59 Maiden Lane
43rd Floor
New York 10038
United States of America

**PERIOD:**    From: 29th November 2018
To:    29th November 2024
Both days at 12.01 am Local Standard Time at the Principal Address.

**INTEREST:**    Excess Directors and Officers Liability and Company Reimbursement Insurance as more fully defined in the wording referenced herein.

**LIMIT OF LIABILITY:**    USD 10,000,000 in the aggregate

In excess of:

USD 40,000,000 in the aggregate, which in turn in excess of underlying primary retention(s)

**TERRITORIAL LIMITS:**    Worldwide.

**CONDITIONS:**    1.  Excess Wording, as attached.
2.  Schedule of underlying Insurance:

**Primary Contract**
Policy No: ELU152497-17
Insurer: Indian Harbor Insurance Company
Limit: USD 5,000,000



If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800561 | | Page **2** of **24** |

**First Excess Contract**
Policy No: DOC1074701
Insurer: Zurich American Insurance Company
Limit: USD 5,000,000

**Second Excess Contract**
Policy No: MNN626501/01/01/2017
Insurer: Axis Insurance Company
Limit: USD 5,000,000

**Third Excess Contract**
Policy No: USF00255018
Insurer: Allianz Global Corporate Specialty
Limit: USD 5,000,000

**Fourth Excess Contract**
Policy No: FINFW1800559
Insurer: Lloyds Syndicate 033
Limit: USD 5,000,000

**Fifth Excess Contract**
Policy No: FINFW18001800560
Insurer: Lloyds Syndicate 4711
Limit: USD 5,000,000

3. Small AP/RP Clause NMA 1168, as attached.
4. Nuclear Incident Exclusion NMA 1256, as attached.
5. Radioactive Contamination Exclusion Clause NMA 1477, as attached.
6. War and Terrorism Exclusion NMA 2918, as attached.
7. Sanction Limitation and Exclusion Clause LMA3100, as attached.
8. Tie in of limits clause, Prior Policy Endorsement, as attached
9. Premium Payment Clause LSW3000, as attached.
10. LMA 9105 (amended) – Policyholder Disclosure Notice of Terrorism Insurance Coverage, as attached.

Special Cancellation/Insurer Downgrade Clause as attached.

IUA 09-054 Foreign Account Tax Compliance Act ('FATCA') - only to apply in respect of FATCA in scope contracts, as attached.

Where the terms '(Re)Insurer' and/or 'contract period' and/or '(Re)Insured' do not appear in the Risk Details or attached Policy wording the functional equivalents of these terms shall be deemed incorporated herein.



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **3** of **24** |

**CHOICE OF LAW & JURISDICTION:** Unless stated herein to the contrary, this (Re)Insurance shall be governed by and construed in accordance with the laws of US  New York and the exclusive jurisdiction of the US  New York courts.

**PREMIUM:** USD 1,200,000.00 (100%)

**PREMIUM PAYMENT TERMS:** Premium Payment Clause LSW 3000

**TAXES PAYABLE BY THE INSURED AND ADMINISTERED BY INSURERS:** None

**TAXES PAYABLE BY THE INSURERS AND ADMINISTERED BY INSURED OR THEIR AGENT:** None

**RECORDING, TRANSMITTING AND STORING INFORMATION:** Where Marsh Ltd maintains risk and claim data, information or documents, Marsh Ltd may hold such data, information or documents electronically.

**INSURER CONTRACT DOCUMENTATION:** This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

This contract is subject to US state Surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the Insured. In the event that the surplus lines notice is not affixed to the contract document the Insured should contact the surplus lines broker.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **4** of **24** |

### MARSH EXCESS LAYER POLICY

In consideration of the **Insured** having paid or having promised to pay the premium, and subject to all of the terms, conditions and limitations of this excess policy, the insurers described in the SECURITY DETAILS of this policy ('**Insurer**') and the **Insured** agree as follows:

1. **Insuring agreement**

1.1 The **Insurer** will provide the **Insured** with insurance coverage upon the terms, conditions and limitations of the **Primary Policy** except insofar as express provision for any matter is set out in this excess policy, and only insofar as necessary, the terms conditions and limitations set out in this excess policy will prevail over the corresponding terms, conditions and limitations of the **Primary Policy**.

1.2 Subject to the **Limit of Liability** the **Insurer** will pay to or on behalf of the **Insured** that proportion of the loss which exceeds the **Underlying Insurance**.

1.3 Subject to the provisions of sub-clause 1.4, unless and to the extent that clause 4 of this excess policy applies, the **Insurer** will have no liability under this excess policy unless and until all of the **Underlying Insurance** has been exhausted by the payment of losses under the **Underlying Insurance**.

1.4 For the purposes of this excess policy, losses shall be deemed to have been paid under an **Underlying Insurance** if all or any of the insurers subscribing thereto have paid, or have agreed to pay such losses, or have had their liability to pay such losses established by judgment, arbitration award or other final binding adjudication. Such payment will, for the purposes of this excess policy, be deemed to have been made on the date of payment, agreement or adjudication, whichever occurs first.

Furthermore:

(a) If a payment in respect of a loss is made under an **Underlying Insurance** of an amount which is less than the applicable limit of liability under that **Underlying Insurance** (but the relevant covered loss of the **Insured** exceeds the applicable limit of liability under that **Underlying Insurance**), then such payment will, for the purposes of determining the application of this excess policy to such covered loss, be deemed to exhaust the applicable limit of liability of that **Underlying Insurance** provided the **Insurer** will be liable to pay only that part of the covered loss which exceeds the **Underlying Insurance**.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **5** of **24** |

(b) If any insurer participating on an **Underlying Insurance** is or becomes **Insolvent** then, for the purposes of this excess policy, such **Insolvent** insurer will be deemed to have paid in full the amount of its liability for losses under such **Underlying Insurance**, but only in the event that either:

    (i) any other insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication, whichever occurs first; or

    (ii) an **Insured** establishes that the **Insurer** would be liable hereunder but for the **Insolvency**.

(c) The **Insurer** will recognise the erosion of **Underlying Insurance** whether or not cover provided in such **Underlying Insurance** is also provided by this excess policy.

## 2. Definitions

2.1 **Insolvent** or **Insolvency** means that any step, application, order, proceeding or appointment has been taken or made in respect of an entity for composition or arrangement with creditors, winding-up, dissolution, administration, receivership (administrative or otherwise) or bankruptcy, or that the entity is unable to pay its debts.

2.2 **Insured** means all persons, organisations and entities as are insured under the **Primary Policy** for their own separate insurable interests.

2.3 **Insurer** means those entities and/or syndicates who are identified as underwriters or insurers by affixing of their seal or stamp in the SECURITY DETAILS section of this contract.

2.4 **Limit of Liability** means the amount set forth in the RISK DETAILS of this policy, which will be the maximum sum the **Insurer** is liable to pay under this excess policy.

2.5 **Primary Policy** means the primary contract identified in the RISK DETAILS of this policy.

2.6 **Policy Period** means the period specified in the RISK DETAILS of this policy.

2.7 **Underlying Insurance** means the **Primary Policy** together with any and all excess policies providing together the amount of cover specified at item (b) of the limit of liability in the RISK DETAILS of this policy, and any policies replacing any of them.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **6** of **24** |

3.    **Maintenance of Underlying Insurance**

3.1    Subject to sub-clauses 3.2 to 3.4 below, all of the **Underlying Insurance** will be maintained during the **Policy Period** in full effect, except for any depletion of underlying limits.

3.2    The **Insured's** failure to maintain **Underlying Insurance** by reason of an action by an insurer subscribing to the **Underlying Insurance** (other than in relation to cancellation for the non-payment of premium by the **Insured**) will not invalidate this excess policy but, and subject to the application of clause 4, the **Insurer** will not be liable to a greater extent or at an earlier point in time than if sub-clause 3.1 had been complied with.  Nothing in this clause will negate clause 6 of this excess policy.

3.3    In the event of a failure by the **Insured** to give notice or to exercise any extension under any **Underlying Insurance** the **Insurer** will not be liable under this excess policy to a greater extent or at an earlier point in time than they would have been in the absence of such failure.

3.4    In the event of the **Insolvency** of any insurer participating on any **Underlying Insurance** the **Insured** shall not be in breach of the obligations under sub-clause 3.1 above if the **Underlying Insurance** is no longer in full force and effect as a result of that **Insolvency**.

4.    **Depletion of Underlying Limits**

4.1    In the event and to the extent of the depletion or exhaustion of any limit of liability of the **Underlying Insurance** other than as provided for in sub-clause 4.2 below, and as a result of payment of a loss or losses under the **Underlying Insurance**, this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue and operate for subsequent losses as excess insurance over the amount of the relevant limit of liability remaining under such **Underlying Insurance**.

4.2    In the event of the exhaustion of any aggregate limit of liability applicable under the **Underlying Insurance** as a result of the payment of loss or losses under the **Underlying Insurance** this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue for subsequent losses as primary insurance in respect of any subsequent loss or losses that would otherwise have been covered by such **Underlying Insurance** but for the exhaustion of that aggregate limit of liability.

4.3    In the event that this excess policy is required to operate as primary insurance by virtue of sub-clause 4.2 above:

(a)    any excess or retention specified in the **Primary Policy** shall apply to this excess policy, otherwise no excess or retention shall apply to this excess policy;

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **7** of **24** |

(b)    in respect of any loss or losses for which the **Primary Policy** imposed a sub-limit of liability, this excess policy will provide cover for such loss or losses, including any unpaid portion of that sub-limit.

4.4    For the purposes of this clause 4, the determination of whether there has been any payment of losses under and/or exhaustion of any **Underlying Insurance** will be made in accordance with sub-clause 1.4.  However, and for the purposes of this clause 4 only:

(a)    if and to the extent that paragraph 1.4(a) above applies, any and all amounts representing the difference between:

(i)    any applicable limit of liability of any **Underlying Insurance** and

(ii)    the amount paid by that **Underlying Insurance**

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above

and

(b)    if and to the extent that sub-paragraph 1.4(b)(i) above applies, any and all amounts representing the difference between:

(i)    any applicable limit of liability of any **Underlying Insurance** and

(ii)    the amount that any insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above.

4.5    An **Underlying Insurance** will not be deemed exhausted solely by reason of the **Insolvency** of an insurer participating thereon.

5.    **Claims**

5.1    Any first notice of a claim or circumstance (or equivalent term by which the **Primary Policy** identifies matters potentially giving rise to notifications thereunder in respect of a loss or losses) required to be given under the terms of the **Primary Policy**, will also be given to the **Insurer** under this excess policy.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **8** of **24** |

5.2    In respect of any matter notified pursuant to sub-clause 5.1 above:

(a)    the **Insured** will inform the **Insurer** of any material developments in relation to such matter;

(b)    without prejudice to paragraph 5.2(a) above the rights and obligations set out in any claims investigation, claims co-operation, claims handling, claims defence, claims assessment and/or claims settlement provisions of the **Primary Policy** will be incorporated into this excess policy, but will not be enforceable for the purpose of this excess policy unless and until the loss or losses (including any defence costs or other fees incurred by the **Insured** for which indemnity is available under the **Primary Policy**) likely to arise from such matter have the potential to deplete the **Underlying Insurance** such that the policy immediately underlying this excess policy will be eroded to the extent of 50% or more of the limit of liability of such immediately underlying policy.

6.    **Alteration**

6.1    No amendment to the **Primary Policy** during the **Policy Period** will be effective in extending the scope of this excess policy, until agreed in writing by the **Insurer**.

6.2    No claim payment made as a consequence of an amendment to the **Primary Policy** during the **Policy Period** will operate to deplete or exhaust any limit of liability of the **Underlying Insurance** unless such amendment has been agreed in writing by the **Insurer**.

7.    **Governing Law and Jurisdiction**

7.1    The constructions, interpretation and meaning of the terms, exclusions limitations and conditions of this excess policy shall be determined in accordance with the laws of the state or country specified in the RISK DETAILS of this policy, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the courts of the state or country specified in the RISK DETAILS of this policy.

8.    **Dispute Resolution**

8.1    In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy, the provisions of the **Primary Policy** are incorporated into this excess policy for the purposes of determining the dispute resolution procedures applicable to this excess policy.

8.2    In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy in relation to matters that are also the subject of a dispute between the **Insured** and the insurers of any **Underlying Insurance** then those disputes shall be heard together in the same court or arbitration proceedings.



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

**MARSH LTD**

| CONTRACT NUMBER | | |
|---|---|---|
| B0509FINFW1800561 | | Page **9** of **24** |

## <u>SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)</u>

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.
NMA1168

If placed via PPL this
box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **10** of **24** |

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction:

 (a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

 (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

 (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

 (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

 (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **11** of **24** |

the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.
* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **12** of **24** |

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **13** of **24** |

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

If placed via PPL this box will not be signed

Contract Leader

**MARSH LTD**

| CONTRACT NUMBER | | |
|---|---|---|
| B0509FINFW1800561 | | Page **14** of **24** |

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **15** of **24** |

## TIE-IN OF LIMITS CLAUSE – POLICIES

It is agreed that:

In consideration of the premium charged, it is hereby understood and agreed that the Limit of Liability of the **Insurer** for **Loss** under this Policy, UMR B0509FINFW1800561, and the prior Policy, UMR B0509FINFW1800154 (amended from UMR B0507N17FA24460), shall be combined.

Accordingly, the Limit of Liability for **Loss** under either Policy mentioned above shall be reduced by **Loss** incurred under either Policy.


All other terms, conditions and exclusions remain unchanged.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **16** of **24** |

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 60 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 60th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **17** of **24** |

### Special Cancellation/Insurer Downgrade Clause

1   The Underwriter shall give notice to the Insured's representative, as identified in this Contract, as soon as practicable and in any event within 14 days, or as soon as permitted by its regulator if later, where the Underwriter:

   (i)  a.   ceases underwriting entirely; or

       b.   ceases underwriting the type of insurance provided by this policy in a territory where the Insured is domiciled; or

       c.   formally announces its intention to cease underwriting as per (i)a or (i)b above; or

   (ii)  voluntarily or involuntarily elects to wind up, run off its business, enter a scheme of arrangement or enter into any form of bankruptcy protection or related formal or informal termination of its insurance operations; or

   (iii)  has its authority to carry on insurance business withdrawn.

2   The Insured or the Insured's representative may terminate an Underwriter's participation on this risk by giving written notice:

   (i)  When one of the events identified above at Condition 1 takes place; or

   (ii)  In the event that an Underwriter has its financial strength rating downgraded below BBB by Standard & Poor's or A- by AM Best. For Lloyd's syndicates it is the financial strength rating of Lloyd's as a whole which is considered.

   The effective date of termination shall not be earlier than the date notice is actually given by the Insured or the Insured's representative.

Upon notice of cancellation having been given by the Insured or the Insured's representative to the Underwriter, the Underwriter shall pay to the Insured a pro rata return premium for the unexpired period of the policy. Such pro rata return premium shall be paid in accordance with the terms of trade previously agreed between the Insured's representative and the Underwriter to whom notice of cancellation has been given.

In the event that there are any notifications under this policy or the Underwriter has made any payments pursuant to any policy term or condition providing coverage under this policy to the Insured, the premium shall be deemed fully earned unless the Insured withdraws such notifications and/or reimburses the Underwriter for any payment(s) made.

| If placed via PPL this<br>box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **18** of **24** |

### POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020; of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. However, your policy may contain certain exclusions which might affect your coverage, such as exclusion for nuclear events. The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.

YOU ARE HEREBY NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, AS AMENDED, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER YOUR  POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES, SUBJECT TO A $100 BILLION CAP, AND YOU HAVE BEEN NOTIFIED OF THE AMOUNT OF THE  PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

The premium allocated for this coverage is 1% of the overall premium charged for your policy.

**Option to reject terrorism insurance coverage**

*Your policy automatically provides coverage for claims arising out of acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 at no additional cost to you. If you would prefer not to have such coverage please check the box below, sign where indicated and return this form to your insurance broker or intermediary.* ***Please note that there will be no reduction in premium if terrorism coverage is removed from your policy.***

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800561 | | Page **19** of **24** |

| | I hereby elect not to have TRIA coverage under this policy.  I understand that I will have no coverage for losses arising from certified acts of terrorism. |
|---|---|

_____
*Policyholder / Applicants Signature*

_____
*Name of Assured*

_____
*Print Name*

*Policy Number*

_____/_____/_____
*Date*

LMA9105 (amended)

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **20** of **24** |

## FOREIGN ACCOUNT TAX COMPLIANCE ACT ('FATCA')

Each (Re)Insurer hereby acknowledges the requirements of Sections 1471-1474 US Internal Revenue Code of 1986, as amended, and the Treasury regulations and other guidance issued from time to time thereunder ('FATCA') and the obligation of each of them to provide to Marsh Ltd a valid Internal Revenue Service ('IRS') Form W8-BEN-E, W-9 or other documentation meeting the requirements of the FATCA regulations to establish they are not subject to any withholding requirement pursuant to FATCA (the 'Required Documentation').

Furthermore:

a) If a (Re)Insurer becomes non-compliant with FATCA during the contract period or has not provided the Broker with the Required Documentation 14 days prior to any premium due date, the Withholding Agent (as defined in U.S. Treasury Regulation Section 1.1471-1(b)(147)) shall withhold 30% of the premium (to the extent all or a portion of that premium is subject to withholding pursuant to FATCA) due to that (Re)Insurer under this contract on that premium due date and shall promptly notify that (Re)Insurer via the Broker.

b) The withholding of premium by virtue of (a) above shall not be, and shall not be treated by the (Re)Insurer as a breach of any premium payment condition, warranty or other clause whether or not entitling the (Re)Insurer to cancel, terminate or restrict this contract, refuse, restrict or delay payment of any claim or invoke any interest, penalty or other late payment provision. The (Re)Insurer shall be liable under this contract as if no such withholding had been made.

c) The (Re)Insurer shall not recoup sums withheld under (a) above by deducting equivalent sums from any payments due to the (Re)Insured or by set off against any other sums owed by the (Re)Insurer and any general or contractual right of set-off enjoyed by the (Re)Insurer is hereby varied and qualified to that extent.

d) Where premium is withheld in error, has not yet been paid to the IRS and the (Re)Insurer has been paid only the net premium following such withholding, the broker will cooperate with the (Re)insurer to process the requisite refund.

IUA 09-054 (FATCA)

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **21** of **24** |

| **INFORMATION** |
|---|

None.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **22** of **24** |

| SECURITY DETAILS |
|---|

**(RE)INSURER'S LIABILITY:**

**LMA3333**
**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning 'signing' below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is 'signing' (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its 'written line'.

Where this contract permits, written lines, or certain written lines, may be adjusted ('signed'). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **23** of **24** |

syndicate taken together) is referred to as a 'signed line'. The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to 'this contract' in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**     38% of 100%

**BASIS OF WRITTEN LINES:**     Percentage of Whole

**SIGNING PROVISIONS:**     In the event that the written lines hereon exceed 100% of the order, any lines written 'To Stand' will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (Re)Insurers.

However:

a)     in the event that the placement of the order is not completed by the commencement date of the period of (Re)Insurance then all lines written by that date will be signed in full;

b)     the (Re)Insured may elect for the disproportionate signing of (Re)Insurers' lines, without further specific agreement of (Re)Insurers, providing that any such variation is made prior to the commencement date of the period of (Re)insurance, and that lines written 'To Stand' may not be varied without the documented agreement of those (Re)Insurers;

c)     the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of (Re)Insurance, by the documented agreement of the (Re)Insured and all (Re)Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (Re)Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **24** of **24** |

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the leading (re)insurer.

(Re)Insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

(Re)insurers confirm and agree that where NCAD (Notice of Cancellation at Anniversary Date) is embedded in their stamp/line this is deemed to read and mean NCED (Notice of Cancellation at Expiry Date). This does not affect the right of the (re)insurer to issue a Notice of Cancellation in accordance with the contract terms.

**WRITTEN LINES:**

As shown below and, where placed electronically either wholly or in part via Placing Platform Limited (PPL), in the PPL SECURITY DETAILS.



Security: PartnerRe Ireland Insurance dac



| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **1** of **10** |

## CONTRACT ADMINISTRATION

## AND

## ADVISORY DETAILS

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **2** of **10** |

| **SUBSCRIPTION AGREEMENT** |
|---|

**CONTRACT LEADER:**   Lloyds Syndicate 4711

In respect of placements completed using PPL, the Contract Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

Wherever the term 'Slip Leader' appears throughout this contract it is amended to read and mean 'Contract Leader'.

**BUREAU LEADER:**   The first Lloyd's bureau stamp on this contract.
The first Company bureau stamp on this contract

In respect of placements completed using PPL, the Bureau Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

**BASIS OF AGREEMENT TO CONTRACT CHANGES:**   GUA (February 2014) with Non-Marine Schedule (October 2001).

31 days extension, if required by the (Re)Insured/Policyholder, at terms and conditions to be agreed by the Contract Leader on behalf of all (Re)Insurers hereon.

All Notice of Cancellation at Anniversary Date terms are amended to provide Notice of Cancellation at Expiry Date, including subsequent period extensions.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which (a) is binding upon the following (Re)Insurers with the agreement of the Contract Leader only (and any additional agreement party if present), and (b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR**

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **3** of **10** |

**PART 2 GUA CHANGES ONLY:** Unless any other (Re)Insurers are specified below, the Agreement Parties for Part Two changes will be the Contract Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY:** None, unless any (Re)Insurers are specified here.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which

a) is binding upon the following (Re)Insurers with the agreement of only the Contract Leader (and any additional agreement party if present), and

b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader

**BASIS OF CLAIMS AGREEMENT:** As specified under the CLAIMS AGREEMENT PARTIES and to be managed in accordance with:

i) The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS - LMA9150 for claims or circumstances assigned as Single Claims Agreement Party Claims (SCAP Claims) or, where it is not applicable, then the following shall apply as appropriate:

ii) The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

iii) International Underwriting Association of London IUA claims agreement practices.

For non-bureau (re)insurers only, the contract leader only and to be binding for non-bureau (re)insurers.

**CLAIMS AGREEMENT PARTIES:** A. Claims falling within the scope of the LMA9150 to be agreed by



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **4** of **10** |

Contract Leader only on behalf of all (re)insurers subscribing (1) to this Contract on the same contractual terms (other than premium and brokerage) and (2) to these Arrangements.

For the purposes of calculating the Threshold Amount, the sterling rate on the date that a financial value of the claim is first established by the Contract Leader shall be used and the rate of exchange shall be the Bank of England spot rate for the purchase of sterling at the time of the deemed conversion.

B.  For all other claims:

i)  For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate.

Where applicable, the second Lloyd's syndicate is deemed to be the first syndicate stamp to appear after the leading Lloyd's syndicate. For PPL the 2nd claims agreement party will be agreed by endorsement.

ii)  Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii below.

The first IUA company and, where required by IUA practices, the second IUA company.

iii)  Those companies that have specifically elected to agree claims in respect of their own participation.

iv)  All other subscribing (re)insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

v)  Notwithstanding anything contained in the above to the contrary, any ex gratia payments to be agreed by each (re)insurer for their own participation.

**CLAIMS ADMINISTRATION:**    Marsh Ltd and (re)insurers agree that any claims hereunder (including any claims related costs/fees) that are in scope and supported by Electronic Claims File (ECF) will be notified and administered via ECF with any payment(s) processed via CLASS, unless both parties agree to do otherwise.

Where claims or circumstances are not administered via ECF,



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **5** of **10** |

notification, administration and payment(s) will be email or paper file.

Where a Lloyd's syndicate or IUA company is not an agreement party to the claim or circumstance (per CLAIMS AGREEMENT PARTIES A. above), they agree to accept correct ECF sequences for administrative purposes to ensure information is circulated to all subscribing parties.

Claims, or any element thereof, settled in a currency for which Marsh Ltd do not hold a banking account will be agreed using a notional rate of exchange which is subject to adjustment. Any difference greater than GBP1,000 per payment or in the aggregate, to be paid by or refunded to (re)insurers as appropriate.

Extension of time to file a proof of loss to be agreed

a)   if the contract leader is a non-Lloyd's (re)insurer, by the contract leader and Lloyd's Claims Agreement Parties only;

b)   if the contract leader is a Lloyd's (re)insurer, by the Lloyd's Claims Agreement Parties only.

Notwithstanding any contrary provisions concerning notification contained in applicable contract documentation to which this agreement applies and in the absence of a condition specifically nominating a party to whom notice must be given (other than (re)insurers) and provided that notification otherwise fully satisfies policy conditions then the (re)insured will be regarded as having complied with contract notification provisions when Marsh Ltd or its subsidiary or successor entities receives notification by email, facsimile or post.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY:**   None, unless otherwise specified here by any other claims agreement parties shown above.

**EXPERT(S) FEES COLLECTION:**   Expert fees payable by (Re)Insurers for services performed on their behalf to be collected by the expert or their appointed fee collection service provider.

**SETTLEMENT DUE DATE:**   TBC



If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **6** of **10** |

**BUREAU(X) ARRANGEMENTS:** De-linked accounts to be presented by Marsh Ltd to Xchanging Insure Services (XIS).

Bureau re(insurers) agree to allow XIS not to 'group' associated de-linked signings. Each individual de-linked signing may be released for settlement to XIS independently of any other associated items.

Presentation to XIS of a contract with a premium payment warranty (PPW), premium payment condition (PPC) or prompt payment condition for a signing number and date within the timeframe specified within the warranty or condition shall be sufficient evidence of compliance and payment to all (re)insurers participating hereon. Subsequent rejection shall not affect the fact that the warranty/condition and/or the settlement due date (SDD) has been met by the original presentation and therefore no further update of the due date is required.

In respect of the LSW3001 (amended) or any other Premium Payment Clause, the SDD will automatically be amended to the date the premium is paid to (re)insurers.

Where any SDD, PPW or PPC due date falls on a weekend or public holiday, presentation to XIS on the next working day will be deemed to be in compliance with such SDD, PPW or PPC.

(Re)Insurers agree that the second and subsequent premium instalments are taken down as additional premiums, other than annual re-signings.

In respect of additional premium signings the SDD will follow the same payment period allowed under the original premium payment terms. However, the payment period shall commence from the date of the final agreement of the endorsement or the effective date, whichever is the later.

Claims and/or return premiums may be collected and taken down on production of a copy (including a photocopy) and/or duplicate of the applicable contract or policy.

In respect of non –settlement currencies:
XIS to accept settlement of premium in Pounds Sterling (GBP) converted at the rate of exchange at the date of receipt of payment by Marsh Ltd. However, in the event Marsh Ltd are paid in Pounds Sterling (GBP), U.S. Dollars (USD) or EUROS (EUR) then settlement will be made via XIS in GBP, USD or EUR as received by Marsh Ltd.



| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **7** of **10** |

Bureau (re)insurers agree to accept an interim For Declaration Only (FDO) signing.

In the event the Settlement Due Date (as detailed in Subscription Agreement) and/or the Allocation of Premium to Coding and/or Year of Account (as detailed in Fiscal and Regulatory) differ from those shown in the PPL SECURITY DETAILS, the information recorded in the PPL SECURITY DETAILS shall take precedence.

**PLACING PLATFORM LIMITED (PPL) ARRANGEMENTS:** (Re)insurers instruct Xchanging to accept any attachments and additional information as detailed in this Market Reform Contract and any subsequent endorsements thereto, without sight of agreement from (re)insurers on the understanding that Marsh Ltd has obtained agreement thereto from the applicable (re)insurers.

**NON–BUREAUX ARRANGEMENTS:** Where any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, payment of premium by telegraphic transfer or any other relevant electronic settlement method on the next working day will be deemed to be in compliance with such PPW or PPC.

Where (Re)Insurers have agreed to regular (weekly/ monthly/ quarterly) accounting the Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date shall be overridden by the accounting agreement.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800561 | | Page **8** of **10** |

| FISCAL AND REGULATORY |
|---|

**TAX PAYABLE BY INSURER(S):**  None

**COUNTRY OF ORIGIN:**  United States of America

**OVERSEAS BROKER:**  Marsh USA Incorporated
1166 Avenue of the Americas
New York 10036-2774
United States of America

**BROKER:**  Marsh Ltd
Tower Place
London
EC3R 5BU

**SURPLUS LINE BROKER:**  **Surplus Line Broker Name and Licence No.**
Thomas Orrico #892706

**Surplus Line Broker address:**
1166 Avenue of the Americas
New York,
NY 100362708
United States of America

**US CLASSIFICATION:**  US Surplus Lines.

**ALLOCATION OF PREMIUM TO CODING:**  In respect of the premium allocated to the USA:
99% D2
1% 7T

In respect of the premium allocated to the Rest of the World:
100% D2

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800561 | | Page **9** of **10** |

**REGULATORY
CLIENT
CLASSIFICATION:**     Large Risk

---

If placed via PPL this
box will not be signed

Contract Leader

**MARSH LTD**

| CONTRACT NUMBER | | |
|---|---|---|
| B0509FINFW1800561 | | Page **10** of **10** |

## BROKER REMUNERATION AND DEDUCTIONS

**FEE PAYABLE BY
CLIENT:**  No

**TOTAL
BROKERAGE:**  21.5%

**OTHER
DEDUCTIONS
FROM PREMIUM:**  None.

If placed via PPL this
box will not be signed

Contract Leader

Policy Number: (UMR) B0509FINFW1800561

## SECURITY DETAILS

**REFERENCES**

UMR (Unique Market Reference): B0509FINFW1800561

Date contract printed to PDF: 12:10 07 December 2018

## SIGNED UNDERWRITERS

**Aspen Insurance Ltd (Insurance)**

Simon Inzani

| **Written Line** | 20.085% | **Signed Line** | 20.085% |
|---|---|---|---|
| **Agreed on** | 11:39 30 November 2018 | | |

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Lloyd's Underwriter Syndicate No. 4711, London, England | | 20.085% | 20.085% |

**Bound as Slip Leader, Lloyd's Leader**

| | | |
|---|---|---|
| *Lloyd's Stamp:* | 4711 | |
| *LORS Code:* | L4711 | |
| *Reference:* | FIA9A3818A0G | |
| *Description:* | | |
| *Risk Code(s):* | 7T, D2 | |

---

**Aggregated Offline Market - Proportional Signing**

Non PPL Underwriter

| **Written Line** | 18.00% | **Signed Line** | 17.915% |
|---|---|---|---|

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Aggregated Offline Market - Proportional Signing | | 18.00% | 17.915% |

**Bound Offline - Evidence held on file**

| | |
|---|---|
| *Reference:* | reference per slip |
| *Description:* | 18BF10198260118 |

Policy Number: (UMR) B0509FINFW1800561

## SETTLEMENT INFORMATION

**Allocation of Premium to Coding**

7T at 1.00%

D2 at 99.00%

**Allocation of Premium to Year of Account**

2018

**Terms of Settlement**

| | |
|---|---|
| Settlement Due Date: | 20 December 2018 |
| Instalment Premium Period of Credit: | 0 day(s) |
| Adjustment Premium Period of Credit: | 0 day(s) |

Lloyd's Underwriter Syndicate No. 4711, London, England
**Bureau Leader and Lloyd's Leader**
Simon Inzani

# EXHIBIT Q



## ARCH INSURANCE COMPANY
(A Missouri Corporation)

Home Office Address:
2345 Grand Blvd, Suite 900
Kansas City, MO 64108

Administrative Address:
Harborside 3, 210 Hudson Street, Suite 300
Jersey City, NJ 07311-1107
Tel: (866) 413-5550

# ARCH ESSENTIAL EXCESS POLICY®
## FOLLOW FORM EXCESS LIABILITY INSURANCE POLICY

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.

## DECLARATIONS

**Policy No.:** DOX1000030-00

**Item 1. Named Insured & Address:**
AmTrust Financial Services, Inc.
59 Maiden Lane, 43rd Floor
New York, NY 10038

**Item 2.    Policy Period:**
From:        November 20, 2018
To:            December 31, 2018
12:01 a.m. local time at the address stated in Item 1

**Item 3.    Limit of Liability:**    $2,200,000 Part Of $10,000,000 Excess Of $40,000,000

**Item 4.    Underlying Insurance:**

**Primary Policy**

| Insurer: | Policy No.: | Limit of Liability: | Attachment: |
|---|---|---|---|
| Indian Harbor Insurance Company | US00080794DO17A | $5,000,000 | |

**Underlying**

**Excess**

| | | | | |
|---|---|---|---|---|
| First Excess | Zurich American Insurance Company | DOC 1074701-00 | $5,000,000 | $5,000,000 |
| Second Excess | AXIS Insurance Company | MNN626501/01/2017 | $5,000,000 | $10,000,000 |
| Third Excess | Allianz Global Risks US Insurance Company | USF00237518 | $2,500,000 Part Of $5,000,000 | $15,000,000 |
| | Markel Bermuda Limited | MKLB25GPL0000702 | $2,500,000 Part Of $5,000,000 | $15,000,000 |
| Fourth Excess | Lloyds Syndicate 0033 | B0509FINFW1800559 | $5,000,000 | $20,000,000 |
| Fifth Excess | Arch Insurance Company | DOX1000029-00 | $2,700,000 Part Of $15,000,000 | $25,000,000 |
| | Lloyds Syndicate 4711 | B0509FINFW1800560 | $5,500,000 Part Of $15,000,000 | $25,000,000 |
| | Markel Bermuda Limited | MKLB25GPL0000685 | $3,600,000 Part Of $15,000,000 | $25,000,000 |
| | Forge Underwriting | B0509FINFW1800560 | $3,200,000 Part Of $15,000,000 | $25,000,000 |

**Item 5.** **Extended Reporting Period:**
Additional Period:      1 Year
Additional Premium: 200.00% of Policy Premium

**Item 6.** **Notices to Insurer:**

Notice Of **Claim(s)** To Be Sent To:

Arch Insurance Company
Executive Assurance Claims
1299 Farnam Street, Suite 500
Omaha, NE 68102
P.O. Box 542033
Omaha, NE 68154
Phone: 877 688-ARCH (2724)
Fax: 866 266-3630
E-mail: Claims@ArchInsurance.com

All Other Notices To Be Sent To:

Arch Insurance Company
Executive Assurance Underwriting
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (212) 651-6499

**Item 7.**    **Policy Premium:**                                                    $267,245.00
                  Taxes, Surcharges and other Assessments, if applicable          $0.00
                  Premium Attributable to Terrorism Risk Insurance                $0.00

                  Included In Policy Premium     ☐
                  In Addition To Policy Premium  ☐

**Item 8.**    **Endorsements:** See attached schedule of endorsements and notices.



Signature Page

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

John Mentz
President

Patrick K. Nails
Secretary

## SCHEDULE OF FORMS AND ENDORSEMENTS

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**INSURED:** AmTrust Financial Services, Inc.  **TERM:** November 20, 2018 **to** December 31, 2019
**POLICY NUMBER:** DOX1000030-00

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 05 ML0002 00 12 14 | SIGNATURE PAGE (ARCH INSURANCE) |
| | 00 DOX0204 00 10 09 | ARCH ESSENTIAL EXCESS POLICY |
| 1 | 00 DOX0122 00 12 09 | QUOTA SHARE PARTICIPATION |
| 2 | 00 DOX0047 00 12 09 | PRIOR AND PENDING LITIGATION EXCLUSION |
| 3 | 00 DOX0309 00 01 13 | RUN-OFF ENDORSEMENT |
| 4 | 00 ME3693 00 03 16 | SPECIFIC FOLLOW FORM ENDORSEMENT |
| | 00 MLE0013 33 12 08 | NEW YORK INSURANCE LAW SECTION 3420 REQUIRED CLAIM NOTICE PROVISIONS (CLAIMS MADE POLICIES) |
| | 00 DOX0186 00 10 06 | EXCESS POLICY ISSUANCE NOTICE |
| | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT S OFFICE OF FOREIGN ASSETS CONTROL ( OFAC ) |
| | 00 MLT0027 00 01 15 | TERRORISM COVERAGE DISCLOSURE NOTICE |

# ARCH ESSENTIAL EXCESS POLICY®

## FOLLOW FORM EXCESS LIABILITY INSURANCE POLICY

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

In consideration of the payment of the premium and in reliance upon the **Application**, the Insurer specified in the Declarations (the **"Insurer"**) and the **Insureds** agree as follows:

**1.    INSURING AGREEMENT**

This Policy provides excess coverage after exhaustion of the **Underlying Limit**. Except as otherwise provided in this Policy, coverage under this Policy shall follow form to, and apply in conformance with, the provisions of the **Primary Policy** as of the inception of this Policy. Notwithstanding the foregoing, this Policy shall provide no broader coverage than the most restrictive policy of **Underlying Insurance**.

**2.    EXHAUSTION OF THE UNDERLYING LIMIT**

A.    The **Underlying Limit** shall be exhausted by payment, in legal currency, of covered **Loss** by the insurers of **Underlying Insurance**, the **Insureds**, or any **DIC Insurer**.

B.    If this Policy becomes primary insurance because of the exhaustion of the **Underlying Limit**, the applicable deductible or retention of the **Primary Policy** shall apply to each **Claim** handled by the **Insurer** on a primary insurance basis. No deductible or retention shall apply to any **Claim** handled by the **Insurer** on an excess insurance basis.

C.    If any policy of **Underlying Insurance** grants any coverage subject to a sub-limit of liability, this Policy shall not offer such coverage. However, this Policy shall recognize any reduction of the **Underlying Limit** by any payment under such coverage.

**3.    DEFINITIONS**

Whether used in the singular or plural, the following terms shall have the meanings specified below:

A.    **"Application"**, **"Claim"**, and **"Loss"** shall have the same meaning specified for such terms in the **Primary Policy**.

B.    **"DIC Insurer"** means any insurer of an insurance policy written specifically excess of this Policy that is contractually obligated to drop down and pay covered **Loss** that is not paid by any **Underlying Insurance**. This Policy does not follow form to the provisions of the policy of such **DIC Insurer**.

C.    **"Insureds"** means all persons and entities entitled to coverage under the **Primary Policy**.

D.    **"Primary Policy"** and any **"Underlying Excess Policies"** are identified in Item 4 of the Declarations.

E.    **"Underlying Insurance"** means the Primary Policy and any Underlying Excess Policies.

F.     **"Underlying Limit"** means the aggregate sum of all limits of liability of all **Underlying Insurance**.

## 4.     LIMIT OF LIABILITY

The Limit of Liability specified in Item 3 of the Declarations is the maximum aggregate amount that the **Insurer** shall pay under this Policy for all covered **Loss**, including, without limitation, defense costs.

## 5.     DUTIES IN THE EVENT OF A CLAIM

The **Insureds** shall give notice to the **Insurer** of any **Claim** or potential **Claim** in conformance with the notice provisions of the **Primary Policy** except that such notice shall be delivered to the address specified in Item 6 of the Declarations. The **Insurer** shall have the right to participate in the investigation, settlement and defense of any **Claim** noticed under this Policy, even if the **Underlying Limit** has not been exhausted. The **Insureds** shall give the **Insurer** all information and cooperation as the **Insurer** may reasonably request.

## 6.     EXTENDED REPORTING PERIOD

If the **Insureds** elect and are granted an extended reporting period or discovery period under all **Underlying Insurance**, then the **Insureds** shall also be entitled to elect an extended reporting period under this Policy. Such extended reporting period shall follow form to, and apply in conformance with, the provisions of the **Primary Policy** provided that the premium and duration of such extended reporting period shall be as specified in Item 5 of the Declarations.

## 7.     MAINTENANCE OF UNDERLYING INSURANCE

All **Underlying Insurance** shall be maintained in full effect. Failure to maintain any **Underlying Insurance** shall: (i) result in the **Insureds** becoming self-insured for the limit of liability of any such **Underlying Insurance**; and (ii) not relieve the **Insurer** of any obligation under this Policy.

## 8.     CHANGES

This Policy shall not be changed or assigned in any manner except by written agreement of the **Insurer**.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**QUOTA SHARE PARTICIPATION**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

1.  This Policy is part of a quota share participation arrangement involving a total limit of liability of $10,000,000 involving the following insurers:

| Quota Share Participant | Policy Number | Limit of Liability |
|---|---|---|
| Arch Insurance Company | DOX1000030-00 | $2,200,000 |
| Lloyd's Syndicate 4711 | B0509FINFW1800561 | $2,000,000 |
| Forge Underwriting | B0509FINFW1800561 | $1,800,000 |
| Markel Bermuda Limited | MKLB25GPL0000686 | $1,400,000 |
| Allianz Global Risks US Insurance Company | USF00255018 | $2,600,000 |

2.  The **Insurer's** percentage participation in the quota share arrangement is 22%. Notwithstanding any other provision of this Policy, the **Insurer** shall only be liable for its percentage participation of covered **Loss**.

3.  The liability of each participating insurer is several and not joint. The failure of any participating insurer to pay its share of covered **Loss** shall not increase the liability of any other participating insurer.

4.  Each participating insurer shall make its own determination of whether **Loss** is covered under its policy. No participating insurer shall have any authority to bind any other participating insurer regarding any matter submitted for coverage.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 1

Policy Number: DOX1000030-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 20, 2018

Class 2 - 14176

00 DOX0122 00 12 09                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIOR OR PENDING LITIGATION EXCLUSION**

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

It is agreed that:

**1.**    The **Insurer** shall not be liable to pay **Loss** arising out of, based upon or attributable to:

    A.    any demand, suit, formal or informal investigation occurring prior to, or pending as of October 21, 2017; or

    B.    any **Wrongful Act** which gave rise to such prior or pending demand, suit or formal investigation or any **Interrelated Wrongful Acts** thereto.

**2.**    **"Wrongful Act"** and **"Interrelated Wrongful Acts"** shall have the same meaning specified for such terms in the **Primary Policy**.

All other terms and conditions of this Policy remain unchanged.


Endorsement Number: 2

Policy Number: DOX1000030-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 20, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**RUN-OFF COVERAGE**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

**1.**     Item 2 of the Declarations is deleted and replaced with:

> **Item 2:   Policy Period**
> From:    12:01 A.M. November 20, 2018
> To:        12:01 A.M. November 29, 2024
> Standard time at the address shown in Item 1.

**2.**     Section 6 of this Policy is deleted.

**3.**     This Policy shall follow form to and apply in conformance with Endorsement 16 of the **Primary Policy**.

**4.**     The entire premium for this Policy shall be deemed earned as of the inception of this Policy.

All other terms and conditions of this Policy remain unchanged.


Endorsement Number 3:

Policy Number: DOX1000030-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 29, 2018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TIE IN OF LIMITS OF LIABILITY BETWEEN CONSECUTIVE POLICIES (AMTRUST)**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

It is agreed that:

1. This Policy has been negotiated with the understanding that this Policy and policy #B0507N17FA24460 issued to the **Insured** by Price Forbes and Partners Limited (the "Other Policy") have a linked limit of liability.

2. Any payment of **Loss** under the Other Policy shall reduce the Limit of Liability available under this Policy by an amount equal to such payment times the **Insurer's** quota share participation regarding the Limit of Liability.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 4

Policy Number: DOX1000030-00

Named Insured: AmTrust Financial Services, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: November 29, 2018

**NEW YORK INSURANCE LAW SECTION 3420**
**REQUIRED CLAIM NOTICE PROVISIONS**
**(CLAIMS MADE POLICIES)**

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

Notwithstanding any other provision of this policy, it is agreed that:

1.  No claim made by an insured, injured person or other claimant during the Policy Period or any applicable Extended Reporting Period or Discovery Period shall be invalidated because of a failure to give notice of such claim within the time prescribed in the policy if it shall be shown: (i) not to have been reasonably possible to have given notice within the prescribed time; and (ii) notice was given as soon as was reasonably possible.

2.  No claim made by an insured, injured person or other claimant during the Policy Period or any applicable Extended Reporting Period or Discovery Period shall be invalidated because of a failure to give notice of such claim within the time prescribed in the policy unless the late notice has prejudiced the insurer. Notwithstanding the foregoing, the insurer may deny coverage for a claim to the extent that notice of such claim was given to the insurer after the Policy Period or any applicable Extended Reporting Period or Discovery Period.

All other terms and conditions of the policy continue to apply.

## EXCESS POLICY ISSUANCE NOTICE

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**NOTICE: This excess policy has been issued prior to our receipt of any underlying insurance policy. This excess policy has been issued based upon the underlying insurance policy information specified in the application for this policy or in the underlying insurance binders furnished to us. By issuing this excess policy, we do not waive our rights to seek appropriate legal remedies based upon any discrepancies between the underlying insurance policy information furnished to us at the time that this excess policy was bound and the actual policy provisions of any underlying insurance furnished to us after the issuance of our binder.**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Class 2 - 14176
00 ML0065 00 06 07      Includes copyrighted material of Insurance Services Office, Inc.,      Page 1 of 1
with its permission.

# TERRORISM COVERAGE DISCLOSURE NOTICE

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015 (collectively referred to as the "Act") established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. An act of terrorism is defined as any act certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism. The policy's other provisions will still apply to such an act. Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism. In those states, if terrorism results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium will include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 85% in 2015, 84% in 2016, 83% in 2017, 82% in 2018, 81% in 2019, and 80% in 2020 of that portion of the amount of such insured losses that exceeds the applicable insurer deductible during Calendar Year 2015 and each Calendar Year thereafter through 2020.**

### DISCLOSURE OF CAP ON ANNUAL LIABILITY

If the aggregate insured terrorism losses of all insurers exceed $100,000,000,000 during any Calendar Year provided in the Act, the Secretary of the Treasury shall not make any payments for any portion of the amount of such losses that exceed $100,000,000,000, and if we have met our insurer deductible, we shall not be liable for the payment of any portion of such losses that exceeds $100,000,000,000.

### DISCLOSURE OF PREMIUM

Your premium for terrorism coverage is: $0.00
(This charge/amount is applied to obtain the final premium.)
**You may choose to reject the offer by signing the statement below and returning it to us. Your policy will be changed to exclude the described coverage.** If you chose to accept this offer, this form does not have to be returned.

### REJECTION STATEMENT

I hereby decline to purchase coverage for certified acts of terrorism. I understand that an exclusion of certain terrorism losses will be made part of this policy.

AmTrust Financial Services, Inc.

_____     _____

Policyholder/Legal Representative/Applicant's
Signature

Named Insured

Print Name of Policyholder/Legal
Representative /Applicant

Arch Insurance Company
Insurance Company

Date:

Policy Number: DOX1000030-00

# EXHIBIT R



## MARKEL BERMUDA LIMITED

### PROFESSIONAL LIABILITY EXCESS LIABILITY INSURANCE POLICY DECLARATIONS

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**ITEM 1:**  INSURED:          Amtrust Financial Services, Inc.
              ADDRESS:        59 Maiden Lane, 43rd Floor, New York, NY 10038 United States

**ITEM 2:**  POLICY PERIOD:        November 20, 2018 to December 31, 2018        (12:01 a.m. prevailing time
                                                                                  at the address stated in Item 1)

**ITEM 3:**   LIMIT OF LIABILITY:  US$ 1,400,000 po US$ 10,000,000                      in the aggregate
                                                                                  (including Defense Costs)
              (Not subject to any reinstatement provision that may be provided under the Followed Policy)

              EXCESS OF TOTAL UNDERLYING LIMITS OF:  US$ 40,000,000            in the aggregate
                                                                                  (including Defense Costs)

**ITEM 4:**  FOLLOWED POLICY: Indian Harbor Insurance Company Policy No.: US00080794DO17A

**ITEM 5:**  UNDERLYING INSURANCE

              **SEE ENDORSEMENT NO. 1 FOR COMPLETE SCHEDULE**

**ITEM 6**  PENDING OR PRIOR DATE:   as per FOLLOWED POLICY

              To the extent the FOLLOWED POLICY contains an exclusion regarding pending or prior litigation, administrative, regulatory or other proceedings, investigations, demands, suits, orders, decrees or judgments, this Policy shall follow such exclusion.  The applicable date for determining whether any such matter is "pending or prior" for the purpose of such exclusion in this policy shall be the PENDING OR PRIOR DATE set forth in this Item 6 of the Declarations.

**ITEM 7:**  PREMIUM:  $ 9,408

**ITEM 8:**   ADDRESS OF INSURER(S) FOR ALL NOTICES UNDER THIS POLICY:

> Markel Bermuda Limited
> 2 Front Street
> P.O. Box 2565
> Hamilton HM KX Bermuda
> Telephone 441 296 8800
> Email: PLBermudaClaims@markelcorp.com

**ITEM 9:**   A. DISCOVERY PERIOD PREMIUM:   as per FOLLOWED POLICY

           B. DISCOVERY PERIOD:   as per FOLLOWED POLICY

**ITEM 10:** ENDORSEMENTS EFFECTIVE AT INCEPTION:
1. Prior Notice/Prior Claims Exclusion Endorsement
2. Tie in Limits Endorsement
3. Retroactive Date Exclusion
4. Sanctions Endorsement
5. Amendment Endorsement
6. Convert to Run-off Endorsement
7. Schedule of Underlying Insurance

**ITEM 11:** POLICY NUMBER:   MKLB25GPL0000686

**ITEM 12:** PRIMARY POLICY SELF-INSURED RETENTION: $5,000,000

The INSURER hereby causes this policy to be signed on the Declarations page by a duly authorized representative of the Insurer.

                          _____
                          **Chris Jansma, Senior Vice President**

                          January 15, 2019
                          **Date**



**MARKEL BERMUDA LIMITED FOLLOW FORM**
**EXCESS LIABILITY INSURANCE POLICY**

In consideration of the premium paid, and in reliance on all statements made and information furnished to Markel Bermuda Limited herein called the "Insurer" and subject to the Declarations and endorsements made a part hereof and the terms, conditions and limitations set forth herein, the Insurer and the Insured Entity, on its behalf and on behalf of all persons and entity(s) entitled to coverage hereunder, agree as follows:

**I.      INSURING CLAUSE**

The Insurer shall pay the Insured for loss upon exhaustion of all applicable underlying limits by actual payments by the insurers of the UNDERLYING INSURANCE, the Insured, any insurer of a difference-in-conditions policy that is excess of this policy, and/or any other source, subject to: the terms and conditions of the FOLLOWED POLICY (excluding any such terms and conditions that are inconsistent with the terms of this policy); the Limit of Liability as stated in Item 3 of the Declarations; and the terms and conditions of, and the endorsements attached to, this policy.  In no event will this policy provide coverage broader than that provided by any UNDERLYING INSURANCE, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in an endorsement to this policy.

**II.     TERMS AND CONDITIONS**

A.      NOTICE AND LOSS PROVISIONS

1.      Any notice required to be given by the terms of the FOLLOWED POLICY shall be given to the Insurer at the address indicated in Item 8 of the Declarations.
2.      This policy shall follow the notice of claim and/or notice of circumstance provisions of the FOLLOWED POLICY, except as stated otherwise herein.
3.      With respect to the defense and settlement of any claim that appears to be reasonably likely to involve the Insurer, the Insured shall give the Insurer such information, assistance and cooperation as the Insurer may reasonably request and as shall be in the Insured's power and shall do nothing that would prejudice the Insurer's position or potential rights of recovery.
4.      Only those settlements, stipulated judgments and defense costs which have been consented to by the Insurer shall be recoverable as loss under the terms of this policy.  The Insurer's consent shall not be unreasonably withheld, provided the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim.

B.      FOLLOWING FORM

1.      This policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the FOLLOWED POLICY in all respects as of the effective date of this policy. The Insured agrees that should any mid-term change to the FOLLOWED POLICY be made by rewrite or endorsement, such change shall not be effective as to this policy without the written consent of the Insurer, which consent shall not be unreasonably withheld.  It is further agreed that should the Insurer consent to any change of this policy, the premium hereon may be adjusted accordingly.
2.      In the event of the depletion of the limits of liability of the UNDERLYING INSURANCE solely as a result of actual payment of losses thereunder this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such UNDERLYING INSURANCE. In the event of the exhaustion of all of the limits of liability of such UNDERLYING INSURANCE the remaining limits available under this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue for subsequent losses as primary insurance and any retention specified in the FOLLOWED POLICY shall be imposed under this policy. Payments made by insurers issuing such UNDERLYING INSURANCE in accordance with any State Amendatory endorsement or sub-limit of liability shall be deemed to apply toward exhaustion of the limits of liability of the UNDERLYING INSURANCE but this policy shall not follow such state amendatory endorsement or sub-limit of liability.
3.      This policy, subject to all its terms, conditions and endorsements, will not drop down to make payment for loss in place of UNDERLYING INSURANCE for any reason.



C.     CANCELLATION CLAUSE

     The Insured shall give notice to the Insurer when practicable of the cancellation of any UNDERLYING INSURANCE. In the event any UNDERLYING INSURANCE is cancelled by the insurer thereon, this policy shall continue in full force and effect for the remainder of the POLICY PERIOD and the Insurer shall be liable to the same extent that it would have been liable if such UNDERLYING INSURANCE had remained in effect.

     This policy shall follow the cancellation terms of the FOLLOWED POLICY except that in the event the Insurer cancels this policy for non-payment of premium, this policy shall be void as of the inception date of the POLICY PERIOD.

D.     PUNITIVE DAMAGES

     This policy shall cover punitive damages unless such damages are excluded under the terms and conditions of the FOLLOWED POLICY. Furthermore, if the FOLLOWED POLICY is determined not to cover punitive damages solely due to the insurability of such damages under applicable law, then this policy shall nonetheless provide coverage for punitive damages as if all UNDERLYING INSURANCE had provided such coverage. This policy will not drop down to provide coverage for punitive damages in place of UNDERLYING INSURANCE.

E.     ALTERNATIVE DISPUTE RESOLUTION

1.     It is agreed that any dispute arising out of or in connection with this policy, including any question regarding its existence, validity or termination, shall be referred to and finally resolved solely by Arbitration or Alternative Dispute Resolution (ADR).

2.     This policy shall follow the terms of the FOLLOWED POLICY with respect to Arbitration or ADR only when said terms require the dispute to proceed in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada.

3.     In the event the applicable FOLLOWED POLICY does not provide for Arbitration or ADR in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada, the Insured shall select one of the following venues and procedural laws for such Arbitration or ADR:

     (i)     Arbitration held in Hamilton, Bermuda under The Bermuda International Conciliation and Arbitration Act of 1993 (exclusive of the Conciliation Part of such act) as may be amended and supplemented, or under the English Arbitration Act of 1996 as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause, or

     (ii)     Arbitration held in London, England under the English Arbitration Act of 1996, as may be amended and supplemented, which Act is deemed incorporated by reference into this clause, or

     (iii)     Arbitration held in Toronto or Vancouver, Canada under the English Arbitration Act of 1996, as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause.

4.     Where the Insured and Insurer are parties to the dispute, the Insured shall make the selection referenced in paragraph 3 above. Where the Insurer and a party deriving rights through or asserting rights on behalf of the Insured are parties to a dispute, the Insurer shall make the selection referenced in paragraph 3 above.

5.     The number of arbitrators shall be three.

6.     Each party shall bear the costs of its own arbitrator. The remaining cost of arbitration shall be borne equally by the parties.

7.     All awards made by the Arbitration Board shall be final and no right of appeal shall lie from any award rendered by the Arbitration Board.

8.     No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insured to determine the Insured's liability, nor shall the Insurer be impleaded by the Insured or their legal representatives. The Insurer and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Insurer by any of the Insured's other insurers in a jurisdiction or forum other than that set forth in this clause, the Insured will in good faith take all reasonable steps requested by the Insurer to assist the Insurer in obtaining a dismissal of these claims (other than on the merits). The Insured will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Insurer would have been liable to such insurers for indemnity or contribution pursuant to this policy. The Insured shall be entitled to assert claims against the Insurer for coverage under this policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other



insurers in respect of such claims for indemnity or contribution, in an arbitration between the Insurer and the Insured pursuant to this clause; provided, however, that the Insurer in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this policy and any other defenses (other than jurisdiction defenses) as it would have been entitled to raise in the action or proceeding with such insurers.

F.      CHOICE OF LAW

This policy shall be construed and enforced in accordance with the applicable law determined under the FOLLOWED POLICY (with the exception of the procedural law required under this policy's Alternative Dispute Resolution clause E.), except insofar as such laws may prohibit payment hereunder in respect of punitive damages, in which case, the laws of England and Wales shall apply.



**PRIOR NOTICE / PRIOR CLAIM EXCLUSION ENDORSEMENT**

It is hereby agreed that Sections III.B(1) and B(2) of the FOLLOWED POLICY are deleted and replaced by the following:

**B.**    No coverage shall be available under this policy for any **Claim**, **Interview** or **Investigation Demand** made against an **Insured**:

    (1)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an **Insured** which was brought prior to the Inception Date of this policy as set forth in ITEM 2 of the Declarations;

    (2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this policy as set forth in ITEM 2 of the Declarations, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:          1



## TIE IN OF LIMITS ENDORSEMENT

It is hereby agreed that it is expressly acknowledged by the Insured and the Insurer that the premium for this policy has been negotiated with the understanding that this policy and the policy # AKDE6HTR7702D4 issued to the Insured by Chubb Global Markets – Financial Lines (the "Other Policy") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a) Subject to the terms and conditions of the coverage provided by the Other Policy and this policy, in the event that loss or damages is required to be paid under both this policy and the Other Policy, the coverage provided under this policy shall be in excess of the coverage provided under the Other Policy in that:

i. any loss or damages required to be paid under the Other Policy shall be fully paid prior to the payment of any loss or damages under this policy; and

ii. any payment of loss or damages under the Other Policy will proportionally reduce the maximum aggregate limit of liability for all loss or damages on account of all claims for this policy. Such proportion shall be the amount paid under the Other Policy divided by the Other Policy's overall limit of liability.

b) The Insurer will have no obligation under this policy to make any payment of loss or damages to the extent that the Other Policy's aggregate limit of liability is fully exhausted.

c) If the paid loss or damages under this policy are in an aggregate amount equaling $1,400,000 any and all obligations of the Insurer under this policy will be completely fulfilled and extinguished, and the Insurer will have no further obligations of any kind or nature whatsoever under this policy.

d) Nothing in this endorsement is intended, nor shall be construed, to obligate or require the Insurer to pay loss or damages under this policy in excess of $1,400,000 which is the limit of liability set forth under Item 3 of the Declarations of this policy.

e) In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this policy, the term, condition or limitation of this endorsement shall govern.


**All other terms and conditions remain unchanged**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.: MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:      January 30, 2019

End No.             2



**RETROACTIVE DATE EXCLUSION ENDORSEMENT**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that this Policy excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.    any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01am Local Time on 21st October 2017.

    2.    any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or

    3.    any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

All other terms and conditions of this Policy remain unchanged.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:      Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:       3



## SANCTIONS CLAUSE ENDORSEMENT

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the insurer, or its ultimate holding company, to any sanction, prohibition or restriction implemented pursuant to  resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United  Kingdom, or United States of America.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 20, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:          Amtrust Financial Services, Inc.

Date of Issue:      January 15, 2019

End No.:            4



**AMENDMENT ENDORSEMENT**

It is hereby declared and agreed that Item 2. and Item 7. of the Declaration page are deleted in their entirety and replaced with the following:-

**ITEM 2:**  POLICY PERIOD:        November 20, 2018 to November 29, 2018        (12:01 a.m. prevailing time
                                                                                                                     at the address stated in Item 1)

**ITEM 7:**  PREMIUM:  $ 2,070

Nothing herein shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of this Policy, except as expressly stated herein.  This endorsement is part of such Policy and incorporated herein.

**All other terms and conditions of this policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 15, 2019

End No.:          5



**CONVERT TO RUN-OFF ENDORSEMENT**

In consideration of an additional premium of $168,000 (the "Run-Off Premium"):

1.  It is hereby declared and agreed that Item 2. of the Declaration page is amended in its entirety and replaced with the following:-

    **Item 2.** POLICY PERIOD:

|        |                    |                                |
|--------|--------------------|--------------------------------|
| From:  | November 29, 2018  |                                |
| To:    | November 29, 2024  | (12:01 a.m. prevailing time    |
|        |                    | at the address stated in Item 1) |

2.  It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph 2 above, and subject to all terms and conditions of Endorsement No. 3 to the Policy.

3.  Item 7 of the Declarations is amended to read in its entirety as follows:

    Item 7:

|                       |          |
|-----------------------|----------|
| Original Premium:     | $9,408   |
| Amended Premium:      | $2,070   |
| Run-Off Premium:      | $168,000 |
| Total Policy Premium: | $170,070 |

4.  No coverage will be available under this Policy for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed on or after November 29, 2018, or with respect to any Interview or Investigation demand in connection with any act, fact, circumstance, transaction, or event taking place on or after November 29, 2018. Nothing herein shall serve to limit or waive Endorsement No. 2 to the Policy, which shall continue in full force and effect.

5.  The policy is amended by deleting Section **II TERMS AND CONDITIONS** C.  CANCELLATION CLAUSE in its entirety.

6.  The premium shall be fully earned and non-refundable as of November 29, 2018.

7.  Solely for the purposes of this endorsement, the term Original Policy Period means the period of time from November 20, 2018 to November 29, 2018.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

|                |                                   |
|----------------|-----------------------------------|
| Issued to:     | Amtrust Financial Services, Inc.  |
| Date of Issue: | January 15, 2019                  |
| End No.:       | 6                                 |



## SCHEDULE OF UNDERLYING INSURANCE

It is hereby understood and agreed that Item 5 of the Declarations reads as follows:

**Item 5:**  Schedule of Underlying Insurance:

| | Carrier | Policy Period | Limits | Attachment |
|---|---|---|---|---|
| i. | Indian Harbor Insurance Company | November 29, 2018 – November 29, 2024 | $5M | as per ITEM 12 on Dec page. |
| ii. | Zurich American Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $5M |
| iii. | Axis Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $10M |
| iv. | Allianz Global Risk US Insurance Company | November 29, 2018 – November 29, 2024 | $2.5M po $5M | $15M |
| v. | Markel Bermuda Limited | November 29, 2018 – November 29, 2024 | $2.5M po $5M | $15M |
| vi. | Lloyd's Underwriter - Hiscox | November 29, 2018 – November 29, 2024 | $5M | $20M |
| vii. | Lloyd's Underwriters – Aspen (Lead) | November 29, 2018 – November 29, 2024 | $11.4M po $15M | $25M |
| viii. | Markel Bermuda Limited | November 29, 2018 – November 29, 2024 | $3.6M po $15M | $25M |
| | Quota Share Participant(s) | | | |
| ix. | Lloyd's Underwriter – Aspen (Lead) | November 29, 2018 – November 29, 2024 | $8.6M po $10M | $40M |

**All other terms and conditions of the policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.  MKLB25GPL0000686
of MARKEL BERMUDA LIMITED.

Issued to:  Amtrust Financial Services, Inc.

Date of Issue:  January 15, 2019

End No.:  7



# EXHIBIT S



Allianz Global Corporate & Specialty®

# **Allianz**
# Insurance
# Policy





**<u>DECLARATIONS</u>**

**EXCESS PROTECT**

**EXCESS LIABILITY INSURANCE**

**NOTICE: THIS POLICY, SUBJECT TO ITS TERMS, APPLIES TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND THE DISCOVERY PERIOD, IF APPLICABLE. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS. SEE CONSUMER INFORMATION NOTICE BELOW FOR FURTHER DETAILS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY OF THE INSUREDS.**

**PLEASE READ THIS POLICY CAREFULLY**

The Declarations along with the Policy and with endorsements attached, if any, shall constitute the contract between the **Insureds** and the **Insurer**.

Policy Number:     USF00255018

| Item 1. | **Policyholder**:<br>Principal Address: | AmTrust Financial Services, Inc.<br>59 Maiden Ln<br>New York, NY 10038-4502 | | |
|---|---|---|---|---|

Item 2.  **Policy Period**:     From:     November 20, 2018
                                 To:        December 31, 2018
                                 The **Policy Period** incepts and expires as of 12:01 AM at the **Policyholder's** principal address.

Item 3.  **Limit of Liability:**     $2,600,000          In the aggregate for the **Policy Period**

Item 4.  **Premium:**          $315,844          For the **Policy Period**

Item 5.  **Followed Policy**: See Below
          Insurer:              Indian Harbor Insurance Company     Policy No.:     US00080794DO17A
          Limit of Liability:    $5,000,000
          Retention:           $5,000,000
          Policy Period:       From:     November 29, 2018          To:     November 29, 2024

---

# NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIRMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF NEW YORK LAWS AND REGULATIONS.

New York Free Trade Zone (Risk- Code):  **2-13000**

---

© 2016 Allianz Global Corporate & Specialty SE.<br>All rights reserved.



| Item 6. | **Underlying Insurance:** | See Schedule of Underlying, PX3100 | | |
|---|---|---|---|---|
| | 1st Excess Policy | | | |

Item 6.  **Underlying Insurance:**   See Schedule of Underlying, PX3100
1st Excess Policy

Insurer:                                                                    Policy No.:
Limit of Liability:
Excess of Limit of Liability:
Policy Period:          From:                                     To:

Item 7.     **Insurer:**     (Coverage is provided in the following company, a stock company)

Allianz Global Risks US Insurance Company
225 West Washington Street, Suite 1800
Chicago, IL 60606-3484
Phone Number:  1-888-466-7883

Notification to the **Insurer** of a **Claim** or circumstance pursuant to Section 2.5 of this Policy shall be given to:
Allianz Global Risks US Insurance Company
Attention:  Claims Department
One Progress Point Parkway, 2nd Floor
O'Fallon, MO 63368
Email: NewLoss@agcs.allianz.com
Phone Number: 1-800-558-1606
Fax Number: 1-888-323-6450

Item 8.     Currency:                     USD

Item 9.     Endorsements attached at issuance:  See Schedule of Forms and Endorsements, DO1200-MU

Marsh USA, Inc.
1166 Avenue of the Americas
New York, NY 10011

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



## New York Addendum

### *CONSUMER INFORMATION NOTICE - PLEASE READ CAREFULLY*

### Claims Made Coverage
[11 NYCRR 73 (Reg. 121)]

This policy is written on a claims-made basis and provides no coverage for claims which took place prior to the retroactive or prior acts date stated in the policy, if any.

This Policy covers only claims actually made against the insured while the policy remains in effect, and all coverage under the policy ceases upon the termination of the policy. Claims may, however, be reported to the company during an automatic sixty (60) day Discovery Period, or any additional Discovery Period purchased by the Policyholder.

Any coverage for the Discovery Period under this Policy applies only to the extent such is provided by the Underlying Insurance.

During the first several years of the claims made relationship, claims made rates are comparatively lower than occurrence rates. Be advised that substantial annual premium increases, independent of overall rate level increases, should be expected if the policyholder is written at a less than mature rate. This disparity lessens the longer the claims made relationship exists.

There is a potential for coverage gaps that may arise upon expiration of any Discovery Period.

Coverage under this policy may apply for acts, errors, or omissions which occurred prior to the effective date of this Policy if a Claim for Loss or Damages resulting therefrom is first reported during the Policy Period or during any applicable Discovery Period; provided, however that on or before such date the Insured did not know or could not have reasonably foreseen that such Wrongful Act could lead to a Claim. IF THIS POLICY CONTAINS A PRIOR ACTS EXCLUSION, THERE IS NO COVERAGE FOR CLAIMS FIRST REPORTED TO THE INSURER ARISING OUT OF ACTS, ERRORS OR OMISSIONS THAT OCCURRED PRIOR TO THE INCEPTION DATE OF THIS POLICY.

### Defense Costs: Limit of Liability
[11 NYCRR 71 (Reg. 107)]

**Defense Costs** are part of, and not in addition to, the **Limit of Liability** and may be exhausted by amounts incurred as legal defense costs. The **Insurer** will not be liable for further legal defense costs or for the amount of any judgment or settlement after exhaustion of the **Limit of Liability**.

The **Policyholder**, on behalf of all **Insureds** has a right to an accounting, upon request, of legal defense costs actually expended.



## Schedule of Underlying Insurance

Item 6.     **Underlying Insurance:**

Primary Policy
Insurer:  Indian Harbor Insurance Company                    Policy No.:    US00080794DO17A
Limit of Liability:  $5,000,000
Retention: $5,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

1st Excess Policy
Insurer:  Zurich American Insurance Company                  Policy No.:    DOC 4565460-00
Limit of Liability:  $5,000,000
Excess of Limit
of Liability: $5,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

2nd Excess Policy
Insurer:  Axis Insurance Company                             Policy No.:    MNN626501/01/2017
Limit of Liability:  $5,000,000
Excess of Limit
of Liability: $10,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

3rd Excess Policy(Quota Share)
Insurer:  Allianz Global Risk US Insurance Company           Policy No.:    USF00237518
Limit of Liability:  $2,500,000
Excess of Limit
of Liability:  $15,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

Insurer:  Markel Bermuda Limited                             Policy No.:    MKLB25GPL0000686
Limit of Liability:  $2,500,000
Excess of Limit
of Liability:  $15,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

4th Excess Policy
Insurer:  Lloyd's Syndicate 0033                             Policy No.:    B0509FINFW1800559
Limit of Liability:  $5,000,000
Excess of Limit
of Liability:  $20,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

5th Excess Policy(Quota Share)
Insurer:  Lloyd's Syndicate 4711                             Policy No.:    B0509FINFW1800560
Limit of Liability:  $5,500,000 part of $15,000,000
Excess of Limit
of Liability:  $25,000,000
Policy Period:               From:     November 29, 2018        To:    November 29, 2024

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Insurer:  Markel Bermuda Limited                                    Policy No.:    MKLB25GPL0000685
Limit of Liability:  $3,600,000 part of $15,000,000
Excess of Limit
of Liability:  $25,000,000
Policy Period:          From:      November 29, 2018          To:    November 29, 2024

Insurer:  Arch Insurance Company                                  Policy No.:    DOX1000029-00
Limit of Liability:  $2,700,000 part of $15,000,000
Excess of Limit
of Liability: $25,000,000
Policy Period:          From:      November 29, 2018          To:    November 29, 2024

Insurer:  Forge Underwriting                                        Policy No.:    B0509FINFW1800560
Limit of Liability:  $3,200,000 part of $15,000,000
Excess of Limit
of Liability: $25,000,000
Policy Period:          From:      November 29, 2018          To:    November 29, 2024

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



## Schedule of Forms and Endorsements

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 20, 2018 | Marsh USA, Inc. |

**Policyholder:  AmTrust Financial Services, Inc.**

| Form Name | Form Number |
|---|---|
| Schedule of Underlying Insurance | PX3100 (08/15) |
| Excess Protect Excess Liability Insurance Policy | PX4100FL (08/15) |
| Notice of Terrorism Insurance Coverage | PHN7157-MU (03/17) |
| New York Amendatory Endorsement | PX3110NY (03/16) |
| Conformance with State Statutes Endorsement(Full Conformance) | DOXMAN(1209)-MU (8/15) |
| Sanctions Clause | PX3108 (08/15) |
| Cap on Losses from Certified Acts of Terrorism | 145989 (03/17) |
| Excess Protect Amendatory Endorsement | DOXMAN(1253)-MU (08/15) |
| Pending and Prior Litigation Exclusion | PX3101 (08/15) |
| Claims Handling Clause Amended Endorsement | DOXMAN(1257)-MU (08/15) |
| Quota Share Participation | PX3106 (08/15) |
| Run Off Coverage | PX3107 (08/15) |
| Cancellation Endorsement (Return Premium) | DOMAN(1383)-MU (08/15) |

DO1200-MU (08/15)          Page 1 of 1



**EXCESS PROTECT**
**EXCESS LIABILITY INSURANCE POLICY**

**THIS IS A FOLLOW FORM, CLAIMS MADE, INSURANCE POLICY THAT MUST BE READ IN CONJUNCTION WITH ALL UNDERLYING INSURANCE POLICIES TO BE UNDERSTOOD.**

In consideration of payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (the "**Insurer**"), including the statements made in the **Application** and subject to all terms, conditions and limitations of this Policy, the **Insurer**, the **Policyholder** and the **Insureds** agree as follows:

**1.        Insuring Agreement**

This Policy provides the **Insureds** with insurance excess of the **Underlying Insurance** for **Claims** first made against the **Insured** during the **Policy Period** or **Discovery Period**, if applicable, and reported to the **Insurer** pursuant to the provisions of this Policy. Except as specifically set forth in this Policy or in any written endorsement attached to this Policy, the coverage afforded by this Policy applies in conformance with: (1) the terms, conditions, warranties, exclusions and limitations of the **Followed Policy** as they existed on the inception date of this Policy; and (2) any narrower or more restrictive terms of the other **Underlying Insurance**, to the extent the coverage of the **Followed Policy** is limited or restricted by the terms of such other **Underlying Insurance**. This Policy shall not provide coverage broader than that provided by the **Followed Policy** unless the **Insurer** specifically agrees to grant such broader coverage herein or by written endorsement attached to this Policy.

**2.        General Conditions**

The conditions set forth in this Section 2. General Conditions are in addition to those set forth in the **Followed Policy**, and are specific to the coverage provided by this Policy.

2.1     Coverage under this Policy shall attach only after exhaustion of the limits of liability of the **Underlying Insurance**. The limits of liability of the **Underlying Insurance** shall be exhausted by payment, in legal currency, of **Loss** by the insurers of the **Underlying Insurance**, the **Insureds** or any **DIC Insurer** (if such **DIC Insurer** is sitting excess of this Policy). The **Insurer** shall recognize any contribution in legal currency by or on behalf of an **Insured** to such exhaustion of the limits of liability of the **Underlying Insurance**.

2.2     The **Limit of Liability** as stated in Item 3 of the Declarations shall be the maximum amount payable under this Policy for all covered **Loss**, including without limitation, defense costs.

2.3     If the limits of liability of the **Underlying Insurance** are reduced solely due to actual payment in legal currency of the **Underlying Insurance**, this Policy shall continue in force as excess insurance above the remaining amount of the limits of liability of the **Underlying Insurance**.  If the limits of liability of the **Underlying Insurance** are exhausted as described in Section 2.1, this Policy shall continue in force as primary insurance, subject to any applicable retention.

2.4     This Policy shall pay only in the event of reduction or the exhaustion of limit of the **Underlying Insurance** as described above and shall not drop down for any reason including, but not limited to, the uncollectibility in whole or in part of the **Underlying Insurance** or any insurance provided by a **DIC Insurer**. This Policy does not provide excess insurance above any sub-limit of liability available under any **Underlying Insurance**; however, the **Insurer** shall recognize the payment of such sub-limit of liability as erosion or reduction of the limits of liability of the **Underlying Insurance**.

2.5     Where any **Underlying Insurance** permits or requires notice to its insurer, including notice of a **Claim**, then as a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall, contemporaneously with and according to the terms of the **Followed Policy**, give the same written notice to the **Insurer** at the applicable address set forth in Item 7 of the Declarations.

2.6     The **Insurer** may elect to, but is not obligated to, effectively associate in the investigation, settlement, defense or appeal of any **Claim** or matter that the **Insurer** believes, in its sole opinion, is reasonably likely to involve or to be covered under this Policy.

2.7     Any change in or modification to the **Underlying Insurance** or this Policy or assignment of interest under this Policy must be agreed upon in writing by the **Insurer**, and in no event shall any such change, modification or assignment affect this Policy's excess position or attachment point.

            © 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



2.8    All **Underlying Insurance** shall be maintained in full force and effect.  Failure to maintain any **Underlying Insurance** shall: (1) result in the **Insureds** becoming self-insured for the limit of liability of any such **Underlying Insurance**; and (2) not relieve the **Insurer** of any obligations under this Policy.

2.9    This Policy shall terminate immediately upon the effective date of the termination for any reason of the **Followed Policy**, (except by reason of the complete exhaustion of the **Followed Policy** as set forth above) whether by the **Insureds** or by the insurer of such policy.

**3.     Definitions**

3.1    Any term used in this Policy, including **Application**, **Claim, Loss** and **Insured(s)** that is defined in the **Followed Policy** shall have the same meaning as assigned to such term in the **Followed Policy**.

3.2    **DIC Insurer** means any insurer of an insurance policy written specifically excess of this Policy that is contractually obligated to drop down and pay covered **Loss** that is not paid by any **Underlying Insurance**. This Policy does not follow form to the provisions of the policy of such **DIC Insurer**.

3.3    **Discovery Period** means the Discovery Period or Extended Reporting Period as described in the **Underlying Insurance**.  In no event shall this Policy provide a **Discovery Period** unless, and then only to the extent, it is provided by the **Underlying Insurance**.

3.4    **Followed Policy** means the insurance policy stated as such in Item 5 of the Declarations.

3.5    **Insurer** means the entity stated in Item 7 of the Declarations.

3.6    **Policyholder** means the entity stated in Item 1 of the Declarations.

3.7    **Policy Period** means the period stated as such in Item 2 of the Declarations.

3.8    **Underlying Insurance** means the **Followed Policy** and any other insurance policies stated as such in Item 6 of the Declarations.

IN WITNESS WHEREOF, the **Insurer** has caused this Policy to be signed by its President and Secretary.

*Secretary*                                                *President*



# IMPORTANT DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

---

This notice applies to all type(s) of insurance provided under this policy that are subject to the Terrorism Risk Insurance Act ("The Act"), as amended. This policy makes available and provides at a premium of $0 insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS $0 AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.



Endorsement Number 1

# New York Amendatory

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 20, 2018 | Marsh USA, Inc. |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

I.     The header on the 1st page of the policy form is hereby deleted in its entirety and replaced with the following:

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE COSTS INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.**

II.    The following Subsections are added to the General Conditions:

A.    <u>Discovery Period Upon Termination of Coverage</u>

1.    Upon any **Termination of Coverage** for reasons other than nonpayment of premium or fraud within the first year of claims-made coverage with the **Insurer**, the **Policyholder** shall have the right to a **Discovery Period**.  The **Insurer** will advise the **Policyholder** in writing of the Automatic Discovery Period and the availability of, the premium for, and the importance of purchasing, the Optional Discovery Period.  This notice will be sent no earlier than the date of notification of **Termination of Coverage**, and no later than thirty (30) days after the effective date of the **Termination of Coverage**.

2.    The **Policyholder** shall have the right to a period of sixty (60) days following **Termination of Coverage** (hereinafter the Automatic **Discovery Period**), in which to give notice to the **Insurer** of **Claims** first made against any **Insured** during said sixty (60) day period, for any **Wrongful Act** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy.

3.    The **Policyholder** shall have the option to purchase, upon payment of an additional premium equal to 100% of the total annual premium, an Optional Discovery Period (hereinafter Optional **Discovery Period**).  The Optional **Discovery Period** shall cover **Claims** first made against any **Insured** during the period of twelve (12) months for **Wrongful Acts** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy. The **Policyholder** shall have the option to purchase, upon payment of an additional premium equal to 100% of the total annual premium, an Optional Discovery Period (hereinafter Optional **Discovery Period**). The Optional **Discovery Period** shall cover **Claims** first made against any **Insured** during the period of twelve (12) months for **Wrongful Acts** committed on or after the retroactive date and prior to the effective date of **Termination of Coverage**, and otherwise covered by this Policy.

4.    Where premium is due to the **Insurer** for coverage under this Policy, any monies received by the **Insurer** from the **Policyholder** as payment for the Optional **Discovery Period** shall first be applied to such premium owing for the Policy.  All premiums paid with respect to the Optional **Discovery Period** shall be deemed fully earned as of the first day of the Optional **Discovery Period**.

5.    The additional premium for the Optional **Discovery Period** shall be based upon the rates in effect at the beginning of the **Policy Period**.  The **Policyholder** may purchase for an additional premium an

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



additional Optional **Discovery Period** of one, two, or three years following the termination of this Policy. The applicable required additional premium is set forth in (a)-(c) of the SCHEDULE below.

6. The **Policyholder** must notify the **Insurer** in writing of its intent to purchase an Optional **Discovery Period** and must pay the additional premium.  The **Policyholder** shall have the greater of the following in which to submit such notice to the **Insurer**:

   a. sixty (60) days after the effective date of **Termination of Coverage**; or

   b. thirty (30) days after the date that the **Insurer** mails notice advising the **Policyholder** of the availability of the Optional Discovery Period.

   If the **Policyholder** elects to purchase the Optional **Discovery Period**, the Optional **Discovery Period** coverage will not take effect until the premium owed for the Policy is paid in full, and the premium owed for the Optional **Discovery Period** coverage is paid in full and promptly when due.

7. The aggregate **Limit of Liability** for the Optional **Discovery Period** shall be at least equal to the amount of coverage remaining in the Policy's aggregate **Limit of Liability**.

8. During a claims-made relationship and any Optional **Discovery Period**, a person employed or otherwise affiliated with the **Policyholder** and covered by the **Policyholder's** claims-made policy during such affiliation, shall continue to be covered under such policy and any Optional **Discovery Period** after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

   A claims-made policy issued to a corporation, partnership or other entity shall provide Optional **Discovery Period** coverage upon **Termination of Coverage** to any person covered under the policy, if:

   a. such entity has been placed in liquidation or bankruptcy or permanently ceases operations;

   b. the entity or its designated trustee does not purchase Optional **Discovery Period** coverage; and

   c. such person requests the Optional **Discovery Period** coverage within 120 days of the **Termination of Coverage**.

   The **Insurer** shall have no obligation to provide any notice to any such person of the availability of the Optional **Discovery Period** coverage.  The **Insurer** may charge the person for whom Optional **Discovery Period** coverage is provided a premium commensurate with such coverage.

9. The additional premium for the Optional **Discovery Period** shall be based upon the rates in effect at the beginning of the **Policy Period**.  The **Policyholder** may purchase for an additional premium an additional Optional **Discovery Period** of one, two, or three years following the termination of this Policy. The premium for the additional Optional **Discovery Period** will be as follows:

SCHEDULE

| | | | |
|---|---|---|---|
| (a) | 12 Months: | 125% | of the Policy **Premium** |
| (b) | 24 Months: | 175% | of the Policy **Premium** |
| (c) | 36 Months: | 200% | of the Policy **Premium** |

10. Where premium is due to the **Insurer** for coverage under this Policy, any monies received by the **Insurer** from the **Policyholder** as payment for the Optional **Discovery Period** shall first be applied to such premium owing for the Policy.  All premiums paid with respect to the Optional **Discovery Period** shall be deemed fully earned as of the first day of the Optional **Discovery Period**.

B. Cancellation/Non-Renewal or Conditional Renewal

   1. Cancellation

      a. This Policy may be cancelled by the **Policyholder** by surrender thereof to the **Insurer** or by providing written notice to the **Insurer** stating when thereafter cancellation shall be effective.  If this Policy is cancelled by the **Policyholder**, the **Insurer** shall retain the customary short rate proportion of the premium.

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



b.  If this Policy has been in effect for sixty (60) days or less, and is not a renewal of a policy previously issued by the **Insurer**, this Policy may be cancelled by or on behalf of the **Insurer** by mailing or delivering to the **Policyholder's** authorized agent or broker and to the **Policyholder** at the address shown in Item 1. of the Declarations written notice of cancellation stating the reason for cancellation at least twenty (20) days before the effective date of cancellation.  If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.

After this Policy has been in effect for more than sixty (60) days or after the effective date of renewal, this Policy may only be cancelled by or on behalf of the **Insurer** for one of the following reasons:

(1)  nonpayment of premium;

(2)  conviction of a crime arising out of acts increasing the hazard insured against;

(3)  discovery of fraud or material misrepresentation in obtaining the Policy or in the presentation of a **Claim** thereunder;

(4)  after issuance of this Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period**;

(5)  a determination by the Superintendent that the **Insurer's** continuation of the present premium volume would jeopardize the **Insurer's** solvency or be hazardous to the interests of the **Insurer's** policyholders, the **Insurer's** creditors or the public; or

(6)  a determination by the Superintendent that the continuation of the Policy would violate, or would place the Insurer in violation of New York law.

Cancellation shall be effected by mailing or delivering to the **Policyholder's** authorized agent or broker and to the **Policyholder** at the address shown in Item 1. of the Declarations written notice of cancellation specifying the grounds for cancellation at least fifteen (15) days before the effective date of cancellation.  If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.  If the **Insurer** cancels this policy, the earned premium shall be computed pro rata.

2.  <u>Nonrenewal or Conditional Renewal</u>

Should the **Insurer** decide to nonrenew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Policyholder** at the principal address shown in Item 1. of the Declarations and to the **Policyholders** authorized agent or broker, if applicable, at least sixty (60) days but not more than one hundred and twenty (120) days before the end of the Policy **Period**.  Such notice shall contain the specific reasons for the nonrenewal or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in this section, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered unless the **Policyholder**, during this 60-day period, has replaced the coverage or elects to cancel in which event such cancellation shall be on a pro rata premium basis; provided, however, that if the **Insurer** elects to renew on the basis of the conditional renewal notice, then such terms, conditions and rates shall govern the Policy upon expiration of such sixty (60) day period unless such notice was provided at least thirty (30) days prior to the expiration date of the Policy, in which event the terms, conditions and rates set forth in the conditional renewal notice shall apply as of the renewal date.

If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior **Policy Period's** rates, unless the **Policyholder**,

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



during the additional **Policy Period**, has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

The **Insurer** will not send the **Policyholder** notice of nonrenewal or conditional renewal if the **Policyholder**, the **Policyholder's** authorized agent or another insurer of the **Policyholder** mails or delivers notice that the Policy has been replaced or is no longer desired.

If the **Policyholder** elects to accept the terms, conditions and rates of the conditional renewal notice pursuant to the cancellation provisions, a new limit of insurance shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

III.   The following Subsections in General Conditions are amended:

A.   The following is added to Subsection 2.2:

Transfer of Duties When a Limit of Liability is Exhausted

1.   If the **Insurer** concludes that, based on incidents, occurrences, offenses, **Claims** or suits which have been reported to the **Insurer** and to which this insurance may apply, that any limit (each **Claim**, each incident, each occurrence, aggregate, or other) under the Policy is likely to be exhausted in the payment of judgments, settlements or **Defense Costs**, the **Insurer** will notify the **Policyholder** and **Insureds**, in writing, to that effect.

2.   When a Limit of Liability described above has actually been exhausted in the payment of judgments, settlements or **Defense Costs**:

a.   If the **Insurer** concludes that, based on incidents, occurrences, offenses, claims or suits which have been reported to the **Insurer** and to which this insurance may apply, that any limit (each claim, each incident, each occurrence, aggregate, or other) under the policy is likely to be exhausted in the payment of judgments or settlements and/or

b.   The **Insurer** will notify the **Policyholder** and **Insureds**, in writing, as soon as practicable, that:

(1)   such a limit has actually been exhausted; and

(2)   the **Insurer's** duty to defend suits seeking damages subject to that limit has ended.

c.   The **Insurer** will initiate, and cooperate in, the transfer of control, to any appropriate **Insured**, of all **Claims** seeking damages which are subject to that limit and which are reported to the **Insurer** before that limit is exhausted.   That **Insured** must cooperate in the transfer of control of said **Claims**.

The **Insurer** agrees to take such steps, as the **Insurer** deems appropriate, to avoid a default in, or continue the defense of, such **Claims** until such transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.   The **Insurer** has no obligation to take any action whatsoever with respect to any **Claim** seeking damages that would have been subject to that limit, had it not been exhausted, if the **Claim** is reported to the **Insurer** after that Limit of Liability has exhausted.

d.   The **Insured** involved in a **Claim** seeking damages subject to that limit, must arrange for the defense of such **Claim** within such time period as agreed to between the appropriate **Insured** and the **Insurer**.   Absent any such agreement, arrangements for the defense of such **Claim** must be made as soon as practicable.

e.   The **Insured** will reimburse the **Insurer** for expenses the **Insurer** incurs in taking those steps the **Insurer** deems appropriate in accordance with paragraph 2.b. above.

f.   The duty of the **Insured** to reimburse the **Insurer** will begin on:

(1)   the date on which the applicable Limit of Liability is exhausted, if the **Insurer** sent notice in accordance with paragraph 1 above; or

(2)   the date on which the **Insurer** sent notice in accordance with paragraph 2.a. above, if the **Insurer** did not send notice in accordance with paragraph 1 above.

                    © 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



(3)   The exhaustion of any **Limit of Liability** by the payments of judgments, settlements or **Defense Costs**, and the resulting end of the **Insurer's** duty to defend, will not be affected by the **Insurer's** failure to comply with any of the provisions of this condition.

B.   The following is added to Subsection 2.5:

<u>Failure to Provide Timely Notice of Claim – Prejudice Requirement</u>

Notice of any **Claim** or potential **Claim** given by or on behalf of the **Insured** to any licensed agent of the **Insurer's** in the state of New York, with particulars sufficient to identify the **Insured**, shall be deemed notice to the **Insurer**.  Failure to give notice to the **Insurer** as required under this policy shall not invalidate any **Claim** made by the **Insured** injured person or any other claimant, unless the failure to provide such timely notice has prejudiced the **Insurer**.  However, no **Claim** made by the **Insured**, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

If the **Insurer** disclaims liability or denies coverage based upon the failure to provide timely notice with respect to a **Claim** arising out of death or personal injury of any person, then the injured person or other claimant may maintain an action directly against the **Insurer**, in which the sole question is the **Insurer's** disclaimer or denial based on the failure to provide timely notice, unless within sixty (60) days following such disclaimer or denial, the **Insurer** or the **Insured** initiate an action to declare the rights of the parties under this Policy and named the injured person or other claimant as a party to the action.

C.   The following is added to Subsection 2.6:

This Policy affords coverage for **Defense Costs** even if allegations are groundless false or fraudulent, subject to terms, conditions and limitations of this Policy and any applicable **Underlying Insurance**.

IV.   The Definitions Section is amended as to add the following:

**Termination of Coverage** means:

A.   any cancellation or nonrenewal of the Policy, whether by the **Insurer** or **Policyholder**; or

B.   decrease in limits, reduction of coverage, increased deductible, new exclusion, or any other change in coverage less favorable to the **Policyholder**.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2016 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 2

## Conformance with State Statutes Endorsement
## (Full Conformance)

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 20, 2018 | Marsh USA, Inc. |

**Policyholder:  AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

In the event of any inconsistency between the state amendatory attached to this Policy and any term or condition of this Policy, the **Insurer** will resolve the inconsistency by applying the provision that is more favorable to the **Insured**, to the extent permitted by applicable law.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 3

## Sanctions Clause

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 20, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following General Condition is added:

Where coverage provided by this Policy would be in violation of any foreign or **U.S.** economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 4

## Cap on Losses from Certified Acts of Terrorism

| Policy Number | Effective Date |
|---|---|
| USF00255018 | November 20, 2018 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following provisions are added:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the Insurer (the company providing coverage under this Policy) has met its Insurer deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.



Endorsement Number 5

# Excess Protect Amendatory Endorsement

| Policy Number | Effective Date |
|---|---|
| USF00255018 | November 20, 2018 |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that:

(A)     The Preamble to the Policy is deleted in its entirety and replaced with the following:

In consideration of payment of the premium and in reliance upon all written statements made in the **Application** and subject to all terms, conditions and limitations of this Policy, the **Insurer**, the **Policyholder** and the **Insureds** agree as follows:

(B)     The Insuring Agreement is deleted in its entirety and replaced with the following:

This Policy provides the **Insureds** with insurance excess of the **Underlying Insurance** for **Claims** first made against the **Insured** during the **Policy Period** or **Discovery Period**, if applicable, and reported to the **Insurer** pursuant to the provisions of this Policy. The coverage afforded by this Policy applies in conformance with the terms, conditions, warranties, exclusions and limitations of the **Followed Policy**.

(C)     General Conditions is amended as follows:

   1)     Subsection 2.1 is deleted in its entirety and replaced with the following:

Coverage under this Policy shall attach only after exhaustion of the limits of liability of the **Underlying Insurance**. The limits of liability of the **Underlying Insurance** shall be exhausted by payment, in legal currency, of **Loss** by the insurers of the **Underlying Insurance**, the **Insureds**, **DIC Insurer**, or any other source.  The **Insurer** shall recognize any contribution in legal currency by or on behalf of an **Insured** to such exhaustion of the limits of liability of the **Underlying Insurance**.

   2)     Subsection 2.2 is deleted in its entirety and replaced with the following:

The **Limit of Liability** as stated in Item 3 of the Declarations shall be the maximum amount payable under this Policy for all **Loss**, including without limitation, defense costs.

   3)     Subsection 2.4 is amended to add the following:

The **Insurer** shall recognize reduction or exhaustion of **Underlying Insurance**, including any applicable retentions, as a result of payments under any other policy that is tied in to the **Underlying Insurance**.

   4)     Subsection 2.5 is deleted in its entirety and replaced with the following:

Where the **Followed Policy** permits or requires notice to its insurer, including notice of a **Claim**, the **Insureds** shall, according to the terms of the **Followed Policy**, give the same written notice to the **Insurer** at the applicable address set forth in Item 7 of the Declarations.

                     © 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



5)      Subsection 2.7 is deleted in its entirety and replaced with the following:

Any change in or modification to the **Followed Policy** or this Policy or assignment of interest under this Policy must be agreed upon in writing by the **Insurer**.

6)      Subsections 2.8 and 2.9 are deleted in their entirety.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 6

## Pending and Prior Litigation Exclusion

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 20, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following provisions are added:

The **Insurer** shall not be liable for any **Loss** arising out of, based upon or attributable to:

A. any demand, suit, proceeding or investigation occurring prior to, or pending as of, October 21, 2017 or

B. any **Wrongful Act** which gave rise to such prior or pending demand, suit, proceeding or investigation or any **Interrelated Wrongful Acts** thereto.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

Endorsement Number:  7

# Claims Handling Clause Amended Endorsement

| Policy Number | Effective Date |
|---|---|
| USF00255018 | November 20, 2018 |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

It is agreed that

Section 2.6 in General Conditions is deleted in its entirety and replaced with the following:

2.6 The **Insurer** shall have the sole right to investigate, adjust, and settle its portion of any **Claims** or **Losses** arising under this Policy and it shall not be bound by the **Claim** or **Loss** decisions made by any other insurer. The **Insurer** shall have the right, in its sole discretion, but not the obligation, to effectively associate with the **Insured** in the defense and settlement of any **Claim** that appears to be reasonably likely to involve this Policy, including but not limited to effectively associating in the negotiation of a settlement. Only those settlements, stipulated judgments and defense costs which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this Policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim** in order to reach a decision as to reasonableness.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.



Endorsement Number 8

## Quota Share Participation

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00237518 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The following provisions are added:

A.  This Policy is part of a quota share participation arrangement involving a total limit of liability of $ 10,000,000 involving the following insurers:

| Quota Share Participant | Policy Number | Limit of Liability |
|---|---|---|
| Allianz Global Risks US Insurance Company | USF00255018 | $2,600,000 |
| Lloyd's Syndicate 4711 | B0509FINFW1800561 | $2,000,000 |
| Arch Insurance Company | DOX1000030-00 | $2,200,000 |
| Forge Underwriting | B0509FINFW1800561 | $1,800,000 |
| Markel Bermuda Limited | MKLB25GPL0000686 | $1,400,000 |

B.  The **Insurer's** percentage in the quota share arrangement is 26%.  Notwithstanding any other provision of this Policy, the Insurer shall only be liable for its percentage participation of covered **Loss**.

C.  The liability of each participating insurer is several and not joint.  The failure of any participating insurer to pay its share of covered **Loss** shall not increase the liability of any other participating insurer.

D.  Each participating insurer shall make its own determination of whether **Loss** is covered under its policy.  No participating insurer shall have any authority to bind any other participating insurer regarding any matter submitted for coverage.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.



Endorsement Number 9

## Run Off Coverage

| Policy Number | Effective Date |
|---|---|
| USF00255018 | November 20, 2018 |

**Policyholder: AmTrust Financial Services, Inc.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

In consideration of the payment of the additional net premium of $312,000, it is agreed that:

I.  Item 2 of the Declarations is deleted in its entirety and replaced with the following:

**Policy Period**:          From:                    November 20, 2018
                            To:                      November 29, 2024
The **Policy Period** incepts and expires as of 12:01 AM at the **Policyholder's** principal address

II. The following provisions are added:

A.  This **Insurer** shall not pay **Loss** for any **Wrongful Act** occurring on or after November 29, 2018.

B.  The entire premium for this Policy shall be deemed fully earned as of the inception of the **Policy Period**.

C.  The **Insureds** shall have no right under this Policy to purchase any additional discovery or extended reporting period.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2017 Allianz Global Risks US Insurance Company
All rights reserved.



Endorsement Number 10

## Cancellation Endorsement
### (Return Premium)

| Policy Number | Effective Date |
|---|---|
| USF00255018 | November 20, 2018 |

**Policyholder:  AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**Excess Protect**

In consideration of the return premium of $13,628, it is agreed that:

Coverage under this Policy shall be cancelled as of the effective date of this Endorsement, and the **Policy Period** as stated in Item 2. of the Declarations shall be deleted in its entirety and replaced with the following:

Item 2.  **Policy Period**:       From:   November 29, 2018

To:      December 31, 2018
The **Policy Period** incepts and expires as of 12:01 AM at the **Policyholder's** principal address.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

**About Allianz**

Your insurance company is part of the Allianz Group – an organization with a 125-year history of partnering with clients and delivering exceptional insurance products around the world.

Allianz is the world's largest property & casualty insurance company by revenue and has one of the strongest financial ratings of the leading global property & casualty insurers. The strength of its financial ratings and quality of its people make Allianz the insurer of choice for thousands of mid-size businesses and the majority of Global Fortune 500 companies.

Allianz is also ranked "one of the world's most admired companies" by Fortune and "one of the top 100 global brands" by Interbrand.

agcs.allianz.com

700030-4-15



Endorsement Number 11

## TIE IN OF LIMITS ENDORSEMENT

| Policy Number | Effective Date | Producer |
|---|---|---|
| USF00255018 | November 29, 2018 | Marsh USA, Inc. |

**Policyholder: AmTrust Financial Services, Inc.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provisions are added:

It is hereby agreed that it is expressly acknowledged by the **Insured** and the **Insurer** that the premium for this **Policy** has been negotiated with the understanding that this **Policy** and the policy # AKDE6HTR7702D4 issued to the **Insured** by Chubb Global Markets– Financial Lines (the "**Other Policy**") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a)  Subject to the terms and conditions of the coverage provided by the **Other Policy** and this **Policy**, in the event that loss or damages is required to be paid under both this **Policy** and the **Other Policy**, the coverage provided under this **Policy** shall be in excess of the coverage provided under the **Other Policy** in that:

   i.  any loss or damages required to be paid under the **Other Policy** shall be fully paid prior to the payment of any loss or damages under this **Policy**; and

   ii.  any payment of **Loss** or damages under the **Other Policy** will proportionally reduce the maximum aggregate limit of liability for all **Loss** or damages on account of all claims for this **Policy**.  Such proportion shall be the amount paid under the **Other Policy** divided by the **Other Policy's** overall **Limit of Liability.**

b)  The **Insurer** will have no obligation under this **Policy** to make any payment of **Loss** or damages to the extent that the **Other Policy's** aggregate limit of liability is fully exhausted.

c)  If the paid **Loss** or damages under this **Policy** are in an aggregate amount equaling $2,600,000, any and all obligations of the **Insurer** under this **Policy** will be completely fulfilled and extinguished, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this **Policy**.

d)  Nothing in this endorsement is intended, nor shall be construed, to obligate or require the **Insurer** to pay **Loss** or damages under this **Policy** in excess of $2,600,000 which is the **Limit of Liability** set forth under Item 3 of the Declarations of this **Policy**.

e)  In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this **Policy**, the term, condition or limitation of this endorsement shall govern.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

© 2015 Allianz Global Corporate & Specialty SE.
All rights reserved.

# EXHIBIT T

# EXCESS LIABILITY POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| L | HS674647 | N/A |

●THIS IS A CLAIMS MADE POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED'S NAME AND MAILING ADDRESS                    PRODUCER'S NAME AND ADDRESS

AMTRUST FINANCIAL SERVICES, INC.

59 MAIDEN LANE

43RD FLOOR

NEW YORK, NY 10038

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM     11/28/2017     TO     10/21/2018     12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. LIMIT OF LIABILITY:**     $     10,000,000     (A) Aggregate Limit of Liability each policy period

$     50,000,000     (B) Underlying Limits of Liability

**ITEM 4. PREMIUM:**     $   400,000.00

**ITEM 5. COVERAGE:**     Directors and Officers Liability

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE RSG 230013 0807 - SUPPLEMENTAL DECLARATIONS - SCHEDULE OF UNDERLYING INSURANCE; RSG 230014 1007 - SUPPLEMENTAL DECLARATIONS - SCHEDULE OF ENDORSEMENTS; RSG 231007 0609 - EXCESS LIABILITY POLICY - 2009

**ITEM 7. FOLLOWED POLICY**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| Indian Harbor Insurance Company | ELU152497-17 | 5,000,000 | $500,000.00 |

**ITEM 8. UNDERLYING INSURANCE**

**(A) Primary Policy:**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| Indian Harbor Insurance Company | ELU152497-17 | 5,000,000 | $500,000.00 |

**(B) Underlying Excess Policy(ies):**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| Zurich-American Insurance Company | DOC 1074701-00 | 5,000,000 excess 5,000,000 | $450,000.00 |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     January 09, 2018     _____
                                                    DATE                    AUTHORIZED REPRESENTATIVE

A member of Alleghany Insurance Holdings LLC

# EXCESS LIABILITY POLICY SUPPLEMENTAL DECLARATIONS

_RSUI_

POLICY NUMBER:   LHS674647

SCHEDULE OF UNDERLYING EXCESS POLICY(IES):

| INSURER | POLICY NUMBER | LIMITS | PREMIUM |
|---|---|---|---|
| AXIS Insurance Company | MNN626501/01/2017 | 5,000,000 excess 10,000,000 | $405,000.00 |
| Hiscox (Syndicate 33 at Lloyd's) | B0507 N17FA23130 | 10,000,000 excess 15,000,000 | $800,000.00 |
| Various Insurers at Lloyd's and Other Insurers (see Schedule of Underlying Manuscript) | B0507 N17FA23160 | 15,000,000 excess 25,000,000 | $1,000,000.00 |
| Various Insurers at Lloyd's and Other Insurers (see Schedule of Underlying Manuscript) | B0507 N17FA24460 | 10,000,000 excess 40,000,000 | $600,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

RSG 230013 0807

# EXCESS LIABILITY POLICY SUPPLEMENTAL DECLARATIONS

*RSUI*

POLICY NUMBER:    LHS674647

## SCHEDULE OF ENDORSEMENTS

| TITLE | FORM NUMBER |
|-------|-------------|
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0116 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204081 0315 |
| Exclusion - Prior Acts | RSG 206069 1009 |
| Recognize DIC Payments as Underlying Insurance | RSG 234026 0608 |
| Schedule of Underlying Manuscript | |

RSG 230014 1007

**LANDMARK AMERICAN INSURANCE COMPANY**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT.  THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

| | |
|---|---|
| **Terrorism Premium** | **$0.00** |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*\*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.*

### A. Disclosure of Premium

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.  The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

### B. Disclosure of Federal Participation in Payment of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

### C. Cap Insurer Participation in Payment of Terrorism Losses

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**Policy No.:** LHS674647      **Effective:** 11/28/2017

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy. Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY – NOT FOR PROFIT ORGANIZATIONS
DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY
DIRECTORS AND OFFICERS LIABILITY POLICY - PRIVATE COMPANY
EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
EXCESS LIABILITY POLICY**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHS674647     **Effective:** 11/28/2017

RSG 204081 0315

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY - NOT FOR PROFIT ORGANIZATION**
**DIRECTORS AND OFFICERS LIABILITY POLICY - PRIVATE COMPANY**
**DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY**
**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**
**EXCESS LIABILITY POLICY**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to November 28, 2017.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHS674647      **Effective:** 11/28/2017

RSG 206069 1009

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# RECOGNIZE DIC PAYMENT AS UNDERLYING INSURANCE

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY POLICY**

SECTION III. - LIMIT OF LIABILITY AND PAYMENTS UNDER UNDERLYING INSURANCE, A. is deleted and replaced by the following:

**A.** The Insurer shall be liable to pay **Loss** only after all Insurers that issued the **Underlying Insurance**, the **Insureds** and/or the Insurers of any excess DIC Side A policy specifically excess of this policy shall have paid the full amount of the limits provided by the **Underlying Insurance**.  The Insurer shall then be liable to pay only such additional amount up to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

SECTION IV. – MAINTENANCE OF UNDERLYING INSURANCE, B. and C. are deleted and replaced by the following:

**B.** The **Underlying Insurance** shall be maintained in full effect while this policy is in force, except for any reduction of the aggregate limits contained therein (as provided for in this Endorsement, or otherwise in this policy), and such maintenance shall be a condition precedent to the attachment of any liability of the Insurer under this policy. To the extent that any **Underlying Insurance** is not maintained in full effect while this policy is in force and no difference in conditions carrier paid, the **Insured** shall be deemed to be self-insured for the amount of the **Underlying Insurance** limit (s) that is not maintained.

**C.** The Insurer's obligation under this policy shall not be increased, expanded or otherwise modified or changed as a result of the receivership, insolvency, inability or refusal to pay any **Underlying Insurance**. It is agreed that the Insurer shall not pay any amount until all retentions and all **Underlying Insurance** limits have actually been paid by Insurers that issued the **Underlying Insurance**, the **Insureds** and/or the Insurers of any excess DIC Side A policy specifically excess of this policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHS674647      **Effective:** 11/28/2017

RSG 234026 0608

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SCHEDULE OF UNDERLYING MANUSCRIPT

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY - NOT FOR PROFIT ORGANIZATION
DIRECTORS AND OFFICERS LIABILITY POLICY - PRIVATE COMPANY
DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY
EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
EXCESS LIABILITY POLICY**

In regards to the limit of liability that is $15,000,000 excess of 25,000,000 and $10,000,000 excess of $40,000,000 the various Insurers at Lloyd's and other insurers as per schedule are as listed below:

**N17FA23160** $15,000,000 excess of $25,000,000:

  21.3958% Lloyd's Syndicate CGM 2488 Chubb Global Markets

  21.3901% Lloyd's Syndicate ASP 4711 Aspen

  10.6918% Lloyd's syndicate PEM 4000 Pembroke

  14.4398% Barbican Financial & Professional Lines consortium 9562 (BAR 1955 -66.66% (barbican)/AML 2001 - 16.67% (MS AMLIN) & EVE 2786 16.67% (Everest) )

  10.6918% Lloyd's syndicate TAL 1183 (Talbot Validus group)

  21.39% Forge Underwriting - for Partner Re Ireland Insurance


**N17FA24460** $10,000,000 excess of $40,000,000:

  17.9% Lloyd's Syndicate CGM 2488 Chubb Global Markets

  17.9% Lloyd's Syndicate ASP 4711 Aspen

  13.962% Lloyd's syndicate PEM 4000 Pembroke

  7.5% Barbican Financial & Professional Lines consortium 9562 (BAR 1955 -66.66% (barbican)/AML 2001 - 16.67% (MS AMLIN) & EVE 2786 16.67% (Everest) )

  25% Lloyd's syndicate HIS 33 - Hiscox

  17.915% Forge Underwriting - for Partner Re Ireland Insurance

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LHS674647    **Effective:** 11/28/2017

**LANDMARK AMERICAN INSURANCE COMPANY**

# NEW YORK REGULATION 121
# DISCLOSURE SUPPLEMENT

The words "Us" and "We" as used in this Supplement means the Company issuing this policy. "You" or "Your" means the Insured named on the Declarations Page of this policy.

1. **Claims-Made Relationship**

   "Claims-made Relationship" means the period of time between the effective date of the first claims-made policy between Us and You and the cancellation and nonrenewal of the last consecutive claims-made policy between Us and You, where there has been no gap in coverage and does not include any period covered by Discovery Period coverage.

   During the first several years of this "claims-made relationship", claims-made rates are comparatively lower than rates for occurrence policies. However, You can expect substantial annual premium increases; independent of overall rate level increases, until the "claims made relationship" reaches maturity.

2. **Prior Act(s) Exclusion**

   Coverage under this policy may apply for acts, errors or omissions which occurred prior to the effective date of this policy if a Claim for Damages resulting therefrom is first reported during the Policy Period or during any applicable Discovery Period; provided, however, that, on or before such date You did not know or could not have reasonably foreseen that such Wrongful Act could lead to a Claim. If this policy contains a Prior Act(s) Exclusion, THERE IS NO COVERAGE FOR CLAIMS FIRST REPORTED TO US ARISING OUT OF ACTS, ERRORS OR OMISSIONS THAT OCCURRED PRIOR TO THE INCEPTION DATE OF THIS POLICY.

3. **Claims-Made Policy**

   Under a Claims-Made policy, coverage is provided for liability ONLY IF THE CLAIM FOR DAMAGES IS FIRST MADE AGAINST THE INSURED AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD, ANY SUBSEQUENT RENEWAL AND ANY APPLICABLE DISCOVERY PERIOD. All coverage ceases upon termination of this policy, except for the Automatic Discovery Period, and if You purchase an Optional Discovery Period.

4. **Discovery Period Coverage**

   The Discovery Period will increase the time in which a Claim may be eligible for this policy's coverage. This time period helps to prevent the occurrence of a Claim not being covered because of the cancellation or nonrenewal of this policy or other termination of the coverage provided by this policy. It provides a period of time after termination of coverage during which Claims first made against You and reported to Us in writing, for acts, error, or missions that occurred before the termination of coverage and otherwise covered under this policy,(subject to the terms conditions and exclusions of this policy), will be covered. An Automatic Discovery Period goes into effect immediately upon termination of coverage, at no additional premium charge to You. This Automatic Discovery Period lasts only sixty (60) days if You are not a "public entity," or ninety (90) days if You are a "public entity." "Public entity" is defined under Section 107(a)(5 I) of the New York Insurance Laws.

   During the time the Automatic Discovery Period is in effect, You will have the option of purchasing an Optional Discovery Period. The length of time under the Optional Discovery Period is one (1) year if You are a for profit organization and three (3) years if You are a not for profit organization. The Optional Discovery Periods are available to You for an additional premium charge. The Optional Discovery Periods are not available, however, if coverage is terminated by Us because of non-payment of premium or fraud by You, or if, at the time coverage terminates, a "claims-made relationship" has been in effect for less than one year.

   At the end of the Discovery Period, You may have a gap in Your insurance coverage unless You have obtained the appropriate coverage to fill the gap. UPON TERMINATION OF COVERAGE, IT IS VERY IMPORTANT THAT YOU CONSULT WITH YOUR INSURANCE AGENT OR BROKER OR OTHER PROFESSIONAL INSURANCE ADVISOR.

**Premium Charge for the Optional Discovery Period**

The length of the Optional Discovery Period offered in this policy and the premium charge for it is as follows (please see the policy and relevant endorsements for complete details):

If You are a "for profit organization," You may purchase an Optional Discovery Period of one (1) year for an additional premium charge of one hundred percent (100%) of the expiring policy Premium.

If You are a "not for profit organization," You may purchase an Optional Discovery Period of three (3) years for an additional premium charge of two hundred percent (200%) of the expiring policy Premium.

**THIS SUPPLEMENTAL DISCLOSURE GENERALLY DISCUSSES CERTAIN IMPORTANT FEATURES OF THE POLICY.   PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS IT WITH YOUR INSURANCE AGENT OR BROKER OR OTHER PROFESSIONAL INSURANCE ADVISOR.  THE PROVISIONS OF THE POLICY AND THE ENDORSEMENTS ATTACHED THERETO ARE CONTROLLING.**



**Landmark American Insurance Company**

**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# EXCESS LIABILITY POLICY

**NOTICE:** THIS IS A **CLAIMS** MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** AND REPORTED TO THE INSURER DURING THE **POLICY PERIOD**.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** MAY BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES. PLEASE REFER TO THE **FOLLOWED POLICY** FOR MORE INFORMATION.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

**Mail notices to:**   RSUI Group, Inc.
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

**Fax notices to:**   **(404) 231-3755**
**Attn: Claims Department**

**E-mail notices to:**   **reportclaims@rsui.com**

*A member of Alleghany Insurance Holdings LLC*

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION II. - DEFINITIONS.

**I.   INSURING AGREEMENT**

The Insurer designated on the Declarations Page, in consideration of the payment of the premium and in reliance upon all applications, documents and information provided or made available to it by or on behalf of the **Insured**, and subject to all of the terms, conditions and other provisions of this policy, including endorsements hereto, agrees with the **Insured** that the Insurer shall provide the **Insured** with insurance during the **Policy Period** which is in excess of the total limits of liability and any retention or deductible amounts under the **Underlying Insurance**, as set forth in Item 8. of the Declarations Page, and shall pay **Loss** arising from a **Claim** for a **Wrongful Act** first made during the **Policy Period.**

**II.   DEFINITIONS**

**A.   Followed Policy** means the policy indicated in Item 7. of the Declarations page**.**

**B.   Insured** means any natural person or entity designated as such in the **Underlying Insurance**.

**C.   Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or any earlier cancellation or termination date.

**D.   Underlying Insurance** means the **Primary Policy** and **Underlying Excess Policy(ies)** listed in Item 8. of the Declarations page.

**E.   **The terms **Wrongful Act**, **Loss** and **Claim** shall each have the same meaning as defined in the **Primary Policy**.

**III.   LIMIT OF LIABILITY AND PAYMENTS UNDER UNDERLYING INSURANCE**

**A.   **The Insurer shall be liable to pay **Loss** only after any combination of the **Insured** and all Insurers that issued the **Underlying Insurance** shall have paid the full amount of the limits provided by the **Underlying Insurance**.   The Insurer shall then be liable to pay only such additional amount up to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

**B.   **Any **Claim**, **Loss** or coverage that is subject to any Sublimit shall not be considered a covered **Loss** under this policy, but shall, for purposes of this policy's attachment, be deemed to have reduced or exhausted the **Underlying Insurance** limits.

**C.   **In the event of the reduction or exhaustion of the aggregate limits of liability in the **Underlying Insurance** by reason of **Loss** paid thereunder for **Claim(s)** first made during the **Policy Period**, this policy shall (1) in the event of reduction, continue in force in excess of the remaining amount of **Underlying Insurance**; or (2) in the event of total exhaustion, continue in force as would the **Followed Policy**, subject to all terms, conditions and other provisions of this policy, including endorsements hereto; provided that in the event of this policy becoming primary insurance, it shall only pay excess of the retention or deductible amount, if any, that would be applicable in the absence of **Underlying Insurance** exhaustion, which retention or deductible amount shall be applied to any subsequent **Loss**. Notice of reduction or exhaustion of any limits of liability within the **Underlying Insurance** shall be given to the Insurer promptly upon such reduction or exhaustion. Nothing herein shall be construed to provide for any duty on the part of the Insurer to defend any **Insured** or to pay defense costs or any other part of **Loss** in addition to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

**IV.   MAINTENANCE OF UNDERLYING INSURANCE**

**A.   **This policy is subject to the same terms, conditions, other provisions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided herein) as are contained in the **Followed Policy** as such policy has been represented to the Insurer to be issued, or as may be added at a later time to restrict coverage. Any changes made to such **Followed Policy** to expand or broaden it shall be effective as part of this policy solely where accepted in writing by the Insurer.

**B.   **The **Underlying Insurance** shall be maintained in full effect while this policy is in force, except for any reduction of the aggregate limits contained therein (as provided for in Section III. C. above), and such maintenance shall be a condition precedent to the attachment of any liability of the Insurer under this policy. To the extent that any **Underlying Insurance** is not maintained in full effect while this policy is in force, the **Insured** shall be deemed to be self-insured for the amount of the **Underlying Insurance** limit(s) that is not maintained.

**C.   **The Insurer's obligation under this policy shall not be increased, expanded or otherwise modified or changed as a result of the receivership, insolvency, inability or refusal to pay any **Underlying Insurance**.  It is agreed that the Insurer shall not pay any amount until all retentions and all **Underlying Insurance** limits have actually been paid by any combination of the **Insured** and all Insurers constituting the **Underlying Insurance**.

**V.   CLAIM AND OTHER NOTICES**

The Insurer shall be given notice in writing as soon as practicable: (a) in the event of cancellation or non-renewal of any **Underlying Insurance**; and (b) of any additional or return premiums assessed in connection with any **Underlying Insurance**. Any changes in policy provisions in the **Underlying Insurance** or any changes in the **Insured** that would require notice under the **Underlying Insurance** shall be reported to the Insurer in writing as soon as practicable, provided always that the Insurer shall not be bound by any such changes without its consent.

Written notice of **Claim** made against any **Insured** or any circumstances or matters that might later result in a **Claim** shall be given to the Insurer in the same manner and at the same time as given to the **Followed Policy**.

**In Witness Whereof**, the Insurer has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

Secretary

President

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

# EXHIBIT U



## MARKEL BERMUDA LIMITED

## PROFESSIONAL LIABILITY EXCESS LIABILITY INSURANCE POLICY DECLARATIONS

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**ITEM 1:** INSURED:        Amtrust Financial Services, Inc.
         ADDRESS:      59 Maiden Lane, 43rd Floor, New York, NY 10038 United States

**ITEM 2:** POLICY PERIOD:     November 29, 2018 to November 29, 2024  (12:01 a.m. prevailing time
                                           at the address stated in Item 1)

**ITEM 3:**  LIMIT OF LIABILITY:  US$ 2,500,000 po US$ 10,000,000                   in the aggregate
                                              (including Defense Costs)
          (Not subject to any reinstatement provision that may be provided under the Followed Policy)

        EXCESS OF TOTAL UNDERLYING LIMITS OF:  US$ 50,000,000        in the aggregate
                                                (including Defense Costs)

**ITEM 4:** FOLLOWED POLICY: Indian Harbor Insurance Company Policy No.: US00080794DO17A

**ITEM 5:** UNDERLYING INSURANCE

        **SEE ENDORSEMENT NO. 1 FOR COMPLETE SCHEDULE**

**ITEM 6:** PENDING OR PRIOR DATE:  as per FOLLOWED POLICY

        To the extent the FOLLOWED POLICY contains an exclusion regarding pending or prior litigation, administrative, regulatory or other proceedings, investigations, demands, suits, orders, decrees or judgments, this Policy shall follow such exclusion.  The applicable date for determining whether any such matter is "pending or prior" for the purpose of such exclusion in this policy shall be the PENDING OR PRIOR DATE set forth in this Item 6 of the Declarations.

**ITEM 7:** PREMIUM:  $ 200,000

**Markel Bermuda Limited**
Markel House, 2 Front Street, Hamilton HM 11, Bermuda
P.O. Box HM 2565, Hamilton HM KX, Bermuda 441 296 8800
www.markelcorp.com

**ITEM 8:**   ADDRESS OF INSURER(S) FOR ALL NOTICES UNDER THIS POLICY:

      Markel Bermuda Limited
      2 Front Street
      P.O. Box 2565
      Hamilton HM KX Bermuda
      Telephone 441 296 8800
      Email: <u>PLBermudaClaims@markelcorp.com</u>

**ITEM 9:**   A. DISCOVERY PERIOD PREMIUM:   as per FOLLOWED POLICY

      B. DISCOVERY PERIOD:   as per FOLLOWED POLICY

**ITEM 10:** ENDORSEMENTS EFFECTIVE AT INCEPTION:
      1.    Schedule of Underlying Insurance
      2.    Prior Notice / Prior Claim Exclusion Endorsement
      3.    Tie in of Limits Endorsement
      4.    Run-off Endorsement

**ITEM 11:** POLICY NUMBER:   MKLB25GPL0000703

**ITEM 12:** PRIMARY POLICY SELF-INSURED RETENTION: $5,000,000

The INSURER hereby causes this policy to be signed on the Declarations page by a duly authorized representative of the Insurer.

      _____
      **Chris Jansma, Senior Vice President**

      <u>January 16, 2019</u>
      **Date**



**MARKEL BERMUDA LIMITED FOLLOW FORM**
**EXCESS LIABILITY INSURANCE POLICY**

In consideration of the premium paid, and in reliance on all statements made and information furnished to Markel Bermuda Limited herein called the "Insurer" and subject to the Declarations and endorsements made a part hereof and the terms, conditions and limitations set forth herein, the Insurer and the Insured Entity, on its behalf and on behalf of all persons and entity(s) entitled to coverage hereunder, agree as follows:

**I.     INSURING CLAUSE**

The Insurer shall pay the Insured for loss upon exhaustion of all applicable underlying limits by actual payments by the insurers of the UNDERLYING INSURANCE, the Insured, any insurer of a difference-in-conditions policy that is excess of this policy, and/or any other source, subject to: the terms and conditions of the FOLLOWED POLICY (excluding any such terms and conditions that are inconsistent with the terms of this policy); the Limit of Liability as stated in Item 3 of the Declarations; and the terms and conditions of, and the endorsements attached to, this policy.  In no event will this policy provide coverage broader than that provided by any UNDERLYING INSURANCE, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in an endorsement to this policy.

**II.    TERMS AND CONDITIONS**

A.     NOTICE AND LOSS PROVISIONS

1.   Any notice required to be given by the terms of the FOLLOWED POLICY shall be given to the Insurer at the address indicated in Item 8 of the Declarations.
2.   This policy shall follow the notice of claim and/or notice of circumstance provisions of the FOLLOWED POLICY, except as stated otherwise herein.
3.   With respect to the defense and settlement of any claim that appears to be reasonably likely to involve the Insurer, the Insured shall give the Insurer such information, assistance and cooperation as the Insurer may reasonably request and as shall be in the Insured's power and shall do nothing that would prejudice the Insurer's position or potential rights of recovery.
4.   Only those settlements, stipulated judgments and defense costs which have been consented to by the Insurer shall be recoverable as loss under the terms of this policy.  The Insurer's consent shall not be unreasonably withheld, provided the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim.

B.     FOLLOWING FORM

1.   This policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the FOLLOWED POLICY in all respects as of the effective date of this policy. The Insured agrees that should any mid-term change to the FOLLOWED POLICY be made by rewrite or endorsement, such change shall not be effective as to this policy without the written consent of the Insurer, which consent shall not be unreasonably withheld.  It is further agreed that should the Insurer consent to any change of this policy, the premium hereon may be adjusted accordingly.
2.   In the event of the depletion of the limits of liability of the UNDERLYING INSURANCE solely as a result of actual payment of losses thereunder this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such UNDERLYING INSURANCE. In the event of the exhaustion of all of the limits of liability of such UNDERLYING INSURANCE the remaining limits available under this policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this policy, continue for subsequent losses as primary insurance and any retention specified in the FOLLOWED POLICY shall be imposed under this policy. Payments made by insurers issuing such UNDERLYING INSURANCE in accordance with any State Amendatory endorsement or sub-limit of liability shall be deemed to apply toward exhaustion of the limits of liability of the UNDERLYING INSURANCE but this policy shall not follow such state amendatory endorsement or sub-limit of liability.
3.   This policy, subject to all its terms, conditions and endorsements, will not drop down to make payment for loss in place of UNDERLYING INSURANCE for any reason.



C.    CANCELLATION CLAUSE

The Insured shall give notice to the Insurer when practicable of the cancellation of any UNDERLYING INSURANCE. In the event any UNDERLYING INSURANCE is cancelled by the insurer thereon, this policy shall continue in full force and effect for the remainder of the POLICY PERIOD and the Insurer shall be liable to the same extent that it would have been liable if such UNDERLYING INSURANCE had remained in effect.

This policy shall follow the cancellation terms of the FOLLOWED POLICY except that in the event the Insurer cancels this policy for non-payment of premium, this policy shall be void as of the inception date of the POLICY PERIOD.

D.    PUNITIVE DAMAGES

This policy shall cover punitive damages unless such damages are excluded under the terms and conditions of the FOLLOWED POLICY. Furthermore, if the FOLLOWED POLICY is determined not to cover punitive damages solely due to the insurability of such damages under applicable law, then this policy shall nonetheless provide coverage for punitive damages as if all UNDERLYING INSURANCE had provided such coverage. This policy will not drop down to provide coverage for punitive damages in place of UNDERLYING INSURANCE.

E.    ALTERNATIVE DISPUTE RESOLUTION

1.    It is agreed that any dispute arising out of or in connection with this policy, including any question regarding its existence, validity or termination, shall be referred to and finally resolved solely by Arbitration or Alternative Dispute Resolution (ADR).

2.    This policy shall follow the terms of the FOLLOWED POLICY with respect to Arbitration or ADR only when said terms require the dispute to proceed in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada.

3.    In the event the applicable FOLLOWED POLICY does not provide for Arbitration or ADR in Hamilton, Bermuda; London, England; or Toronto or Vancouver, Canada, the Insured shall select one of the following venues and procedural laws for such Arbitration or ADR:

(i)    Arbitration held in Hamilton, Bermuda under The Bermuda International Conciliation and Arbitration Act of 1993 (exclusive of the Conciliation Part of such act) as may be amended and supplemented, or under the English Arbitration Act of 1996 as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause, or

(ii)    Arbitration held in London, England under the English Arbitration Act of 1996, as may be amended and supplemented, which Act is deemed incorporated by reference into this clause, or

(iii)    Arbitration held in Toronto or Vancouver, Canada under the English Arbitration Act of 1996, as may be amended and supplemented, which Acts are deemed incorporated by reference into this clause.

4.    Where the Insured and Insurer are parties to the dispute, the Insured shall make the selection referenced in paragraph 3 above. Where the Insurer and a party deriving rights through or asserting rights on behalf of the Insured are parties to a dispute, the Insurer shall make the selection referenced in paragraph 3 above.

5.    The number of arbitrators shall be three.

6.    Each party shall bear the costs of its own arbitrator. The remaining cost of arbitration shall be borne equally by the parties.

7.    All awards made by the Arbitration Board shall be final and no right of appeal shall lie from any award rendered by the Arbitration Board.

8.    No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insured to determine the Insured's liability, nor shall the Insurer be impleaded by the Insured or their legal representatives. The Insurer and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Insurer by any of the Insured's other insurers in a jurisdiction or forum other than that set forth in this clause, the Insured will in good faith take all reasonable steps requested by the Insurer to assist the Insurer in obtaining a dismissal of these claims (other than on the merits). The Insured will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Insurer would have been liable to such insurers for indemnity or contribution pursuant to this policy. The Insured shall be entitled to assert claims against the Insurer for coverage under this policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other



insurers in respect of such claims for indemnity or contribution, in an arbitration between the Insurer and the Insured pursuant to this clause; provided, however, that the Insurer in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this policy and any other defenses (other than jurisdiction defenses) as it would have been entitled to raise in the action or proceeding with such insurers.

F.      CHOICE OF LAW

This policy shall be construed and enforced in accordance with the applicable law determined under the FOLLOWED POLICY (with the exception of the procedural law required under this policy's Alternative Dispute Resolution clause E.), except insofar as such laws may prohibit payment hereunder in respect of punitive damages, in which case, the laws of England and Wales shall apply.



## SCHEDULE OF UNDERLYING INSURANCE

It is hereby understood and agreed that Item 5 of the Declarations reads as follows:

**Item 5:**  Schedule of Underlying Insurance:

|  | Carrier | Policy Period | Limits | Attachment |
|---|---|---|---|---|
| i. | Indian Harbor Insurance Company | November 29, 2018 – November 29, 2024 | $5M | as per ITEM 12 on Dec page. |
| ii. | Zurich American Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $5M |
| iii. | Axis Insurance Company | November 29, 2018 – November 29, 2024 | $5M | $10M |
| iv. | Allianz Global Risk US Insurance Company | November 29, 2018 – November 29, 2024 | $2.5M po $5M | $15M |
| v. | Markel Bermuda Limited | November 29, 2018 – November 29, 2024 | $2.5M po $5M | $15M |
| vi. | Lloyd's Underwriters – Hiscox (Lead) | November 29, 2018 – November 29, 2024 | $5M | $20M |
| vii. | Lloyd's Underwriters – Aspen Insurance Ltd (Lead) | November 29, 2018 – November 29, 2024 | $15M | $25M |
| viii. | Allianz Global Risks US Insurance Company | November 29, 2018 – November 29, 2024 | $2.6M po $10M | $40M |
| ix. | Lloyd's Underwriters – Aspen Insurance Ltd (Lead) | November 29, 2018 – November 29, 2024 | $7.4M po $10M | $40M |
| | Quota Share Participant(s) | | | |
| x. | Ironshore Indemnity Inc. | November 29, 2018 – November 29, 2024 | $5M po $10M | $50M |
| xi. | U.S. Specialty Insurance Company | November 29, 2018 – November 29, 2024 | $2.5M po $10M | $50M |

**All other terms and conditions of the policy remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.  MKLB25GPL0000703
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 16, 2019

End No.:          1



**PRIOR NOTICE / PRIOR CLAIM EXCLUSION ENDORSEMENT**

It is hereby agreed that Sections III.B(1) and B(2) of the FOLLOWED POLICY are deleted and replaced by the following:

**B.**     No coverage shall be available under this policy for any Claim, Interview or Investigation Demand made against an Insured:

      (1)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against an Insured which was brought prior to the Inception Date of this policy as set forth in ITEM 2 of the Declarations;

      (2)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this policy as set forth in ITEM 2 of the Declarations, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000703
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 16, 2019

End No.:          2



**TIE IN OF LIMITS ENDORSEMENT**

It is hereby agreed that it is expressly acknowledged by the Insured and the Insurer that the premium for this policy has been negotiated with the understanding that this policy and the policy # HS674647 issued to the Insured by RSUI – Financial Lines (the "Other Policy") have a linked limit of liability. Therefore, in consideration of the premium charged, it is understood and agreed that;

a) Subject to the terms and conditions of the coverage provided by the Other Policy and this policy, in the event that loss or damages is required to be paid under both this policy and the Other Policy, the coverage provided under this policy shall be in excess of the coverage provided under the Other Policy in that:

    i. any loss or damages required to be paid under the Other Policy shall be fully paid prior to the payment of any loss or damages under this policy; and

    ii. any payment of loss or damages under the Other Policy will proportionally reduce the maximum aggregate limit of liability for all loss or damages on account of all claims for this policy. Such proportion shall be the amount paid under the Other Policy divided by the Other Policy's overall limit of liability.

b) The Insurer will have no obligation under this policy to make any payment of loss or damages to the extent that the Other Policy's aggregate limit of liability is fully exhausted.

c) If the paid loss or damages under this policy are in an aggregate amount equaling $2,500,000, any and all obligations of the Insurer under this policy will be completely fulfilled and extinguished, and the Insurer will have no further obligations of any kind or nature whatsoever under this policy.

d) Nothing in this endorsement is intended, nor shall be construed, to obligate or require the Insurer to pay loss or damages under this policy in excess of $2,500,000 which is the limit of liability set forth under Item 3 of the Declarations of this policy.

e) In the event that any term, conditions or limitation of this endorsement conflicts with any term condition or limitation of this policy, the term, condition or limitation of this endorsement shall govern.

**All other terms and conditions remain unchanged**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No.: MKLB25GPL0000703
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:     January 31, 2019

End No.          3



**RUN-OFF ENDORSEMENT**

In consideration of the payment of the additional premium of $400,000, it is hereby understood and agreed that:

1.    The Insurer shall not be liable for loss on account of any claim based upon, arising out of, or attributable to or directly or indirectly resulting from any wrongful act, including any interrelated wrongful acts, taking place in whole or in part subsequent to November 29, 2018.

2.    The policy is amended at by deleting Section **II TERMS AND CONDITIONS** C.  CANCELLATION CLAUSE in its entirety.

3.    The premium shall be fully earned and non-refundable upon inception.

Nothing herein shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of this policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated herein.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is November 29, 2018
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. MKLB25GPL0000703
of MARKEL BERMUDA LIMITED.

Issued to:        Amtrust Financial Services, Inc.

Date of Issue:    January 16, 2019

End No.:          4



# EXHIBIT V



## IRONSHORE INDEMNITY INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

This Policy is issued by the stock insurance company listed above (herein "Insurer").

## EXCESS LIABILITY INSURANCE POLICY DECLARATIONS — NEW YORK

THE LIMITS OF LIABILITY AVAILABLE TO PAY JUDGMENT OR SETTLEMENT AMOUNTS MAY BE REDUCED AND TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.

TO THE EXTENT THAT THE POLICY LIMITS ARE EXCEEDED, WE SHALL NOT BE LIABLE FOR LEGAL DEFENSE COSTS OR FOR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT.

UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS AND PROVIDES NO COVERAGE FOR CLAIMS ARISING OUT OF INCIDENTS, OCCURRENCES OR ALLEGED WRONGFUL ACTS WHICH TOOK PLACE PRIOR TO THE RETROACTIVE DATE, IF ANY, STATED IN THE POLICY.

**Policy No.** 003892500

ITEM 1.    **INSURED COMPANY PRINCIPAL ADDRESS:**

AmTrust Financial Services, Inc.
59 Maiden Lane 43rd Floor
New York, NY  10038

ITEM 2.    **COVERAGE PROVIDED:**   Excess Public Company Directors, Officers And Securities Liability

ITEM 3.    **FOLLOWED POLICY:** Executive And Corporate Securities Liability Insurance
**INSURER:** Indian Harbor Insurance Company
**POLICY NUMBER:** US00080794DO17A

ITEM 4.    **POLICY PERIOD:**

**From:** November 29, 2018 12:01 A.M. **To:** November 29, 2024 12:01 A.M.
(Local time at the address shown in Item 1.)

ITEM 5.    **PREMIUM:** $400,000.00

Extended Reporting Period (if elected): N/A

**ITEM 6.**   **LIMIT OF LIABILITY/AGGREGATE LIMIT:** $5,000,000 for all Loss under all Coverages combined.

**ITEM 7.**   **UNDERLYING POLICY LIMITS/ATTACHMENT POINT:** $50,000,000

**ITEM 8.**   **PENDING & PRIOR LITIGATION DATE:** October 21, 2017

**ITEM 9.**   **NOTICE TO INSURER:**

   **A.**   Notice of Claim, Wrongful Act or Loss:

      Send to Company Indicated Above
      c/o Ironshore Insurance Services, LLC
      28 Liberty  Street
      5th Floor
      New York, NY 10005

   **B.**   All other notices:

      Send to Company Indicated Above
      c/o Ironshore Insurance Services, LLC
      28 Liberty  Street
      5th Floor
      New York, NY 10005

**ITEM 10.   BROKER ADDRESS:**

      Timothy Molineux
      Marsh USA, Inc. (NYC)
      1166 Avenue of the Americas, 38th floor
      New York, NY  10036

**ITEM 11.   FORMS AND ENDORSEMENTS:**

      1. EDO NY (0108) New York Amendatory Endorsement
      2. IRON.PN.001 (0513) OFAC Compliance Notice
      3. EXC.PN.001 NY (0913) Claims-Made Policyholder Notice- New York
      4. IRON.END.ALL.016 NYFTZ (0317) Insurer Street Address Change
      5. EDO 003; Edited (0707) Pending and Prior Litigation Endorsement
      6. EDO.008 (708) Quota Share Amendment of Declarations (Excess)
      7. EXC.EXMT.619 (0519) Tie In Of Limits

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, FOR THIS POLICY AND THE FOLLOWED POLICY, INCLUDING INFORMATION FURNISHED IN CONNECTION THEREWITH WHETHER DIRECTLY OR THROUGH PUBLIC FILING, AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

Date:  June 5, 2019
      MO/DAY/YR

                                                    Authorized Representative

# OFFEREE DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
**(new policies and renewals with no terrorism
exclusion or sublimit and no premium charge)**

You are hereby notified that, under the Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, we are making available to you insurance for losses arising out of certain acts of international terrorism.  The policy you are purchasing already includes insurance for such acts. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act.  Under this formula, the United States pays 90% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.  The portion of the offered policy's annual premium that is attributable to insurance for acts of terrorism is: **$ -0-.**

If you have any questions about this notice, please contact your agent or broker.



## IRONSHORE INDEMNITY INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Policy Number:** 003892500

## EXCESS LIABILITY INSURANCE POLICY – NEW YORK

**IMPORTANT NOTICE**
**(CLAIM EXPENSES ARE WITHIN THE LIMIT OF LIABILITY)**

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY JUDGMENT OR SETTLEMENT AMOUNTS MAY BE REDUCED AND TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  TO THE EXTENT THAT THE POLICY LIMITS ARE EXCEEDED, WE SHALL NOT BE LIABLE FOR LEGAL DEFENSE COSTS OR FOR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT.**

**PLEASE READ THE POLICY CAREFULLY.**

**I.   INSURING AGREEMENT**

In consideration of the payment of the premium and in reliance upon all statements made in the application for this Policy and the Followed Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be otherwise provided in this Policy.

**II.   LOSS PAYABLE PROVISION**

It is agreed the Insurer shall pay on behalf of the Insured as defined in the Followed Policy for Loss by reason of exhaustion of all Underlying Policy Limits, without regard to whether or not the underlying amounts have actually been paid, of all underlying policies by the underlying insurers issuing such underlying policies and/or the Insureds, subject to i) the terms and conditions of the Followed Policy as that form is submitted to the Insurer; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy. In no event shall this Policy grant broader coverage than would be provided by the Followed Policy.

**III.   DEFINITIONS**

**A.**   The Terms "Insurer" and "Followed Policy" shall have the meanings attributed to them in the Declarations.

**B.**   The term "Insureds" means those individuals and entities insured by the Followed Policy.

**C.**   The term "Policy Period" means the period set forth in Item 4 of the Declarations.

**D.**   The term "Underlying Policy Limits/Attachment Point" means an amount equal to the aggregate of all limits of liability as set forth in Item 7 of the Declarations for all Underlying Policies, plus the uninsured retention, if any, applicable to the Underlying Policies.

**IV.   POLICY TERMS**

**A.**   This Policy is subject to the same representations contained in the Application for the Followed Policy and has the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and as may be otherwise in this Policy) as are contained in the Followed Policy.

**B.**   If during the Policy Period or any Discovery Period the terms, conditions, exclusions or limitations of the Followed Policy are changed in any manner, the Insureds shall give to the Insurer written notice of the full particulars thereof and secure the Insurer's affirmative consent to such modification before coverage will be effective.

**C.**   As a condition precedent to their rights under this Policy, the Insureds shall give to the Insurer as soon as practicable written notice in accordance with the terms, conditions, definitions, exclusions and limitations of the Followed Policy.

**D.**   Notwithstanding any of the terms of this Policy which might be construed otherwise, this Policy shall drop down only in the event of reduction or exhaustion of the Underlying Limit and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) of any Underlying Limits.   The risk of uncollectibility of such Underlying Limits (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the carrier.

**V.   POLICY CONDITIONS**

**A.   FOLLOWING FORM**

Notwithstanding anything to the contrary in this Policy, the insurance coverage afforded by this Policy as respects operations in New York State shall conform to the requirements of the applicable New York State Insurance Laws and the applicable New York State Insurance Department Regulations; provided, however, that the limits of liability as stated in this Policy shall be excess of the limits of liability of any underlying insurance as stated in the Declarations or in any endorsement attached hereto.

This provision still applies when the underlying insurance is issued by an unlicensed company.

**B.   BANKRUPTCY**

The bankruptcy or insolvency of any Insured or of the Insured's estate will not relieve the Insurer of its obligations under this Policy.

**C.   CANCELLATION/NONRENEWAL/CONDITIONAL RENEWAL**

CANCELLATION

This Policy may be cancelled by the Insured by surrender thereof to the Insurer or by providing written notice to the Insurer stating when thereafter cancellation shall be effective.   If this Policy is cancelled by the Insured, the Insurer shall retain the customary short rate proportion of the premium.

If this Policy has been in effect for sixty (60) days or less, and is not a renewal of a policy previously issued by the Insurer, this Policy may be cancelled by or on behalf of the Insurer by mailing or delivering to the Insured's authorized agent or broker and to the Insured at the address shown in Item 1. of the Declarations written notice of cancellation stating the reason for cancellation at least twenty (20) days before the effective date of cancellation.   If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.

After this Policy has been in effect for more than sixty (60) days or after the effective date of renewal, this Policy may only be cancelled by or on behalf of the Insurer for one of the following reasons:

1)   nonpayment of premium;

2)   conviction of a crime arising out of acts increasing the hazard insured against;

3)   discovery of fraud or material misrepresentation in obtaining the policy or in the presentation of a Claim thereunder;

4)   after issuance of this Policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current Policy Period;

5)   a determination by the Superintendent that the Insurer's continuation of the present premium volume would jeopardize the Insurer's solvency or be hazardous to the interests of the Insurer's policyholders, the Insurer's creditors or the public; or

6)   a determination by the Superintendent that the continuation of the Policy would violate, or would place the Insurer in violation of New York law.

Cancellation shall be effected by mailing or delivering to the Insured's authorized agent or broker and to the Insured at the address shown in Item 1. of the Declarations written notice of cancellation specifying the grounds for cancellation at least fifteen (15) days before the effective date of cancellation.  If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.  If the Insurer cancels this Policy, the earned premium shall be computed pro rata.

NONRENEWAL AND RENEWAL

Should the Insurer decide to nonrenew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the Insured at the principal address shown in Item 1. of the Declarations and to the Insured's authorized agent or broker, if applicable, at least sixty (60) days but not more than one hundred and twenty (120) days before the end of the of the Policy Period.  Such notice shall contain the specific reasons for the nonrenewal or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the Insurer does not provide notice of nonrenewal or conditional renewal as provided in this section, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered unless the Insured, during this 60-day period, has replaced the coverage or elects to cancel in which event such cancellation shall be on a pro rata premium basis; provided, however, that if the Insurer elects to renew on the basis of the conditional renewal notice, then such terms, conditions and rates shall govern the Policy upon expiration of such sixty (60) day period unless such notice was provided at least thirty (30) days prior to the expiration date of the Policy, in which event the terms, conditions and rates set forth in the conditional renewal notice shall apply as of the renewal date.

If the Insurer provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another Policy Period, at the lower of the current rates or the prior Policy Period's rates, unless the Insured, during the additional Policy Period, has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

The Insurer will not send the Insured notice of nonrenewal or conditional renewal if the Insured, the Insured's authorized agent or another insurer of the Insured mails or delivers notice that the Policy has been replaced or is no longer desired.

If the Insureds elect to accept the terms, conditions and rates of the conditional renewal notice pursuant to the Cancellation provisions, a new limit of insurance shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

**D.    DUTY TO DEFEND**

The Insurer shall have the right and duty to defend any Claim against the Insured seeking sums payable under this Policy, even if the allegations of the Claim are groundless, false or fraudulent. The Insurer shall make such investigation and settlement of any Claim as it deems expedient, but the Insurer shall not be obligated to pay any Claim or judgment or continue to defend any Claim after the applicable Limit of Liability has been exhausted by payment of Loss and/or Defense Costs.

**E.   ACTION AGAINST INSURER**

If judgment against an Insured is not satisfied within thirty (30) days, an action can be brought against the Insurer.  No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured or by written agreement of the Insured, the claimant and the Insurer.

**F.   TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS EXHAUSTED**

1)   If the Insurer concludes that, based on incidents, occurrences, offenses, claims or suits which have been reported to the Insurer and to which this insurance may apply, that any limit (each claim, each incident, each occurrence, aggregate, or other) under the Policy is likely to be exhausted in the payment of judgments or settlements and/or Defense Costs, the Insurer will notify the Insured, in writing, to that effect.

2)   When a Limit of Liability described above has actually been exhausted in the payment of judgments or settlements and/or Defense Costs:

(a)   The Insurer will notify the Insureds, in writing, as soon as practicable, that:

(i)    such a limit has actually been exhausted; and

(ii)   the Insurer's duty to defend suits seeking damages subject to that limit has ended.

(b)   The Insurer will initiate, and cooperate in, the transfer of control, to any appropriate Insured, of all claims seeking damages which are subject to that limit and which are reported to the Insurer before that limit is exhausted.  That Insured must cooperate in the transfer of control of said claims.

The Insurer agrees to take such steps, as the Insurer deems appropriate, to avoid a default in, or continue the defense of, such claims until such transfer is completed, provided the appropriate Insured is cooperating in completing such transfer.  The Insurer has no obligation to take any action whatsoever with respect to any claim seeking damages that would have been subject to that limit, had it not been exhausted, if the claim is reported to the Insurer after that Limit of Liability has been exhausted.

(c)   The Insured involved in a claim seeking damages subject to that limit, must arrange for the defense of such claim within such time period as agreed to between the appropriate Insured and the Insurer.  Absent any such agreement, arrangements for the defense of such claim must be made as soon as practicable.

3)   The Insured will reimburse the Insurer for expenses the Insurer incurs in taking those steps the Insurer deems appropriate in accordance with paragraph 2)(b) above.

The duty of the Insured to reimburse the Insurer will begin on:

(a)   the date on which the applicable Limit of Liability is exhausted, if the Insurer sent notice in accordance with paragraph 1) above; or

(b)   the date on which the Insurer sent notice in accordance with paragraph 2)(a) above, if the Insurer did not send notice in accordance with paragraph 1) above.

4) The exhaustion of any Limit of Liability by the payments of judgments or settlements and/or Defense Costs, and the resulting end of the Insurer's duty to defend, will not be affected by the Insurer's failure to comply with any of the provisions of this condition.

**G.    NOTICE**

Unless otherwise provided in the Followed Policy, this is a Claims Made Policy.  This Policy covers only those Claims first made against the Insured during the Policy Period or Discovery Period.

All notices to the Insurer shall refer to the Policy Number and shall be given in writing and sent by mail, prepaid express courier or by facsimile, to the address listed in the Declarations and shall be effective upon receipt.

The Insured shall give written notice to the Insurer at the address or facsimile number listed in the Declarations of a Claim made against an Insured as soon as practicable after the Insured first becomes aware of the Claim, but in all events no later than sixty (60) days after the end of the Policy Period or the Discovery Period.

Notice of any Claim or potential Claim given by or on behalf of the Insured, or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the Insurer in the state of New York, with particulars sufficient to identify the Insured, shall be deemed notice to the Insurer.

Failure to give notice to the Insurer in the time prescribed will not invalidate any Claim made by the Insured, an injured person, or any other claimant, unless the failure to provide such timely notice has prejudiced the Insurer. However, no Claim made by the Insured, an injured person, or any other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as reasonably possible thereafter.  If the Insurer disclaims liability or denies coverage based upon the failure to provide timely notice of a Claim, then the injured person or other claimant may maintain an action directly against the Insurer, in which the sole question is the Insurer's disclaimer or denial based on the failure to provide timely notice, unless within sixty (60) days following such disclaimer or denial, the Insurer or the Insured:

(a) Initiate an action to declare the rights of the parties under this Policy and

(b) Name the injured person or other claimant as a party to the action.

**H.    OTHER INSURANCE**

This insurance is excess over any other valid and collective insurance whether such insurance is primary, excess, contingent, or otherwise; unless such other insurance is written to be specifically excess over the insurance provided by this Policy.

Ironshore Indemnity Inc. by:

Secretary                                                            President



**IRONSHORE INDEMNITY INC.**

(A Stock Company)

Mailing Address:

PO Box 3407

New York, NY  10008

(877) IRON411

**Endorsement #** 1

**Policy Number:** 003892500                      **Effective Date of Endorsement:** November 29, 2018

**Insured Name:**  AmTrust Financial Services, Inc.

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NEW YORK AMENDATORY ENDORSEMENT

Endorsement forming part of and attaching to this Excess Liability Insurance Policy as stated above.

It is hereby understood and agreed that:

1.      The following introductory paragraphs are added to the policy:

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY JUDGMENT OR SETTLEMENT AMOUNTS MAY BE REDUCED AND TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.**

**TO THE EXTENT THAT THE POLICY LIMITS ARE EXCEEDED, WE SHALL NOT BE LIABLE FOR LEGAL DEFENSE COSTS OR FOR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT.**

**PLEASE READ THE POLICY CAREFULLY.**

2.      The following provision is added to the policy and supersedes anything to the contrary:

**FOLLOWING FORM**

Notwithstanding anything to the contrary in this policy, the insurance coverage afforded by this policy as respects operations in New York State shall conform to the requirements of the applicable New York State Insurance Laws

and the applicable New York State Insurance Department Regulations; provided, however, that the limits of liability as stated in this policy shall be excess of the limits of liability of any underlying insurance as stated in the Declarations or in any endorsement attached hereto.

This provision still applies when the **underlying insurance** is issued by an unlicensed company.

3.      Section **I. INSURING AGREEMENT** is hereby deleted in its entirety and replaced by the following:
In consideration of the payment of the premium and in reliance upon all statements made in the application for this Policy and the Followed Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this policy, the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be otherwise provided in this Policy.

4.      Section **II. LOSS PAYABLE PROVISION** is hereby deleted in its entirety and replaced by the following:
It is agreed the Insurer shall pay on behalf of the Insured as defined in the Followed Policy for Loss by reason of exhaustion of all Underlying Policy Limits, without regard to whether or not the underlying amounts have actually been paid, of all underlying policies by the underlying insurers issuing such underlying policies and/or the Insureds, subject to i) the terms and conditions of the Followed Policy as that form is submitted to the Insurer; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy. In no event shall this policy grant broader coverage than would be provided by the Followed Policy.

5.      Paragraph B. of Section **IV. POLICY TERMS** is hereby deleted in its entirety and replaced by the following:
If during the Policy Period or any Discovery Period the terms, conditions, exclusions or limitations of the Followed Policy are changed in any manner, the Insureds shall give to the Insurer written notice of the full particulars thereof and secure the Insurers affirmative consent to such modification before coverage will be effective.

6.      The following provision is added to Section **IV. POLICY TERMS:**

**BANKRUPTCY**

The bankruptcy or insolvency of any Insured or of the Insured's estate will not relieve the Insurer of its obligations under this policy.

7.      The following provision is added to Section **IV. POLICY TERMS:**

**CANCELLATION/NONRENEWAL/CONDITIONAL RENEWAL**

*Cancellation*

This policy may be cancelled by the Insured by surrender thereof to the Insurer or by providing written notice to the Insurer stating when thereafter cancellation shall be effective.  If this policy is cancelled by the Insured, the Insurer shall retain the customary short rate proportion of the premium.
If this policy has been in effect for sixty (60) days or less, and is not a renewal of a policy previously issued by the Insurer, this policy may be cancelled by or on behalf of the Insurer by mailing or delivering to the Insured's authorized agent or broker and to the Insured at the address shown in Item 1. of the Declarations written notice of cancellation stating the reason for cancellation at least twenty (20) days before the effective date of cancellation. If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.

After this policy has been in effect for more than sixty (60) days or after the effective date of renewal, this policy may only be cancelled by or on behalf of the Insurer for one of the following reasons:

1)      nonpayment of premium;

2)      conviction of a crime arising out of acts increasing the hazard insured against;

3)      discovery of fraud or material misrepresentation in obtaining the policy or in the presentation of a Claim thereunder;

4)      after issuance of this policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current Policy Period;

5)      a determination by the Superintendent that the Insurer's continuation of the present premium volume would jeopardize the Insurer's solvency or be hazardous to the interests of the Insurer's policyholders, the Insurer's creditors or the public; or

6)      a determination by the Superintendent that the continuation of the Policy would violate, or would place the Insurer in violation of New York law.

Cancellation shall be effected by mailing or delivering to the Insured's authorized agent or broker and to the Insured at the address shown in Item 1. of the Declarations written notice of cancellation specifying the grounds for cancellation at least fifteen (15) days before the effective date of cancellation.  If cancellation is for nonpayment of premium, the notice of cancellation shall include the amount of premium that is due.  If the Insurer cancels this policy, the earned premium shall be computed pro rata.

*Nonrenewal and Renewal*

Should the Insurer decide to nonrenew this policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the Insured at the principal address shown in Item 1. of the Declarations and to the Insured's authorized agent or broker, if applicable, at least sixty (60) days but not more than one hundred and twenty (120) days before the end of the of the Policy Period.  Such notice shall contain the specific reasons for the nonrenewal or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the Insurer does not provide notice of nonrenewal or conditional renewal as provided in this section, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered unless the Insured, during this 60-day period, has replaced the coverage or elects to cancel in which event such cancellation shall be on a pro rata premium basis; provided, however, that if the Insurer elects to renew on the basis of the conditional renewal notice, then such terms, conditions and rates shall govern the policy upon expiration of such sixty (60) day period unless such notice was provided at least thirty (30) days prior to the expiration date of the policy, in which event the terms, conditions and rates set forth in the conditional renewal notice shall apply as of the renewal date.
If the Insurer provides notice of nonrenewal or conditional renewal on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another Policy Period, at the lower of the current rates or the prior Policy Period's rates, unless the Insured, during the additional Policy Period, has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

The Insurer will not send the Insured notice of nonrenewal or conditional renewal if the Insured, the Insured's authorized agent or another insurer of the Insured mails or delivers notice that the policy has been replaced or is no longer desired.

If the Insured's elects to accept the terms, conditions and rates of the conditional renewal notice pursuant to the Cancellation provisions, a new limit of insurance shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

8.     The following provision is added to Section **IV. POLICY TERMS:**

**DUTY TO DEFEND**

The Insurer shall have the right and duty to defend any Claim against the Insured seeking sums payable under this policy, even if the allegations of the Claim are groundless, false or fraudulent.  The Insurer shall make such investigation and settlement of any Claim as it deems expedient, but the Insurer shall not be obligated to pay any Claim or judgment or continue to defend any Claim after the applicable Limit of Liability has been exhausted by payment of Loss and/or Defense Costs.

9.   The following provision is added to Section **IV. POLICY TERMS:**

**ACTION AGAINST INSURER**

If judgment against an Insured is not satisfied within thirty (30) days, an action can be brought against the Insurer. No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, and the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured or by written agreement of the Insured**,** the claimant and the Insurer.

10.   The following provision is added to Section **IV. POLICY TERMS:**

**TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS EXHAUSTED**

1.   If the Insurer concludes that, based on incidents, occurrences, offenses, claims or suits which have been reported to the Insurer and to which this insurance may apply, that any limit (each claim, each incident, each occurrence, aggregate, or other) under the policy is likely to be exhausted in the payment of judgments or settlements and/or Defense Costs , the Insurer will notify the Insured, in writing, to that effect.

2.   When a Limit of Liability described above has actually been exhausted in the payment of judgments or settlements and/or Defense Costs:

   (a)   The Insurer will notify the Insureds, in writing, as soon as practicable, that:

      (i)   such a limit has actually been exhausted; and

      (ii)   the Insurer's duty to defend suits seeking damages subject to that limit has ended.

   (b)   The Insurer will initiate, and cooperate in, the transfer of control, to any appropriate Insured, of all claims seeking damages which are subject to that limit and which are reported to us before that limit is exhausted.  That **Insured** must cooperate in the transfer of control of said claims.
   The Insurer agrees to take such steps, as the Insurer deems appropriate, to avoid a default in, or continue the defense of, such claims until such transfer is completed, provided the appropriate Insured is cooperating in completing such transfer.  The Insurer has no obligation to take any action whatsoever with respect to any claim seeking damages that would have been subject to that limit, had it not been exhausted, if the claim is reported to the Insurer after that Limit of Liability has exhausted.

   (c)   The Insured involved in a claim seeking damages subject to that limit, must arrange for the defense of such claim within such time period as agreed to between the appropriate Insured and the Insurer.  Absent any such agreement, arrangements for the defense of such claim must be made as soon as practicable.

3.   The Insured will reimburse the Insurer for expenses the Insurer incurs in taking those steps the Insurer deems appropriate in accordance with paragraph 2.b. above.

   The duty of the Insured to reimburse the Insurer will begin on:

      (a)     the date on which the applicable Limit of Liability is exhausted, if the Insurer sent notice in accordance with paragraph 1. above; or

      (b)     the date on which the Insurer sent notice in accordance with paragraph 2.a. above, if the Insurer did not send notice in accordance with paragraph 1. above.

4.     The exhaustion of any Limit of Liability by the payments of judgments or settlements and/or Defense Costs, and the resulting end of the Insurer's duty to defend, will not be affected by the Insurer's failure to comply with any of the provisions of this condition.

11.     The following provision is added to Section **IV. POLICY TERMS:**

**NOTICE**

Unless otherwise provided in the Followed Policy, this is a Claims Made Policy.  This policy covers only those Claims first made against the Insured during the Policy Period or Discovery Period.

All notices to the Insurer shall refer to the Policy Number and shall be given in writing and sent by mail, prepaid express courier or by facsimile, to the address listed in the Declarations and shall be effective upon receipt.

The Insured shall give written notice to the Insurer at the address or facsimile number listed in the Declarations of a Claim made against an Insured as soon as practicable after the Insured first becomes aware of the Claim**,** but in all events no later than sixty (60) days after the end of the Policy Period or the Discovery Period.

Notice of any Claim or potential Claim given by or on behalf of the Insured, or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the Insurer in the state of New York, with particulars sufficient to identify the Insured, shall be deemed notice to the Insurer.

Failure to give any notice required by this policy within the time prescribed shall not invalidate any Claim made by the Insured if it shall be shown not to have been reasonably possible for the Insured to give such notice within the prescribed time and that notice was given as soon as was reasonably possible.

12.     The following provision is added to Section **IV. POLICY TERMS:**

**OTHER INSURANCE**

This insurance is excess over any other valid and collective insurance whether such insurance is primary, excess, contingent, or otherwise; unless such other insurance is written to be specifically excess over the insurance provided by this policy.

ALL OTHER TERMS AND CONDITIONS SHALL REMAIN THE SAME.

_____       June 5, 2019
Authorized Representative                  Date



**IRONSHORE INDEMNITY INC.**
(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement #** 2

**Policy Number:** 003892500                                    **Effective Date of Endorsement:** November 29, 2018
**Insured Name:**  AmTrust Financial Services, Inc.

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

## OFAC COMPLIANCE NOTICE

Payment of Loss under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").



**IRONSHORE INDEMNITY INC.**
(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement #** 3

**Policy Number:** 003892500                    **Effective Date of Endorsement:** November 29, 2018
**Insured Name:**  AmTrust Financial Services, Inc.

> **NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

## CLAIMS-MADE POLICYHOLDER NOTICE – NEW YORK

### EXCESS LIABILITY INSURANCE POLICY

UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS AND PROVIDES NO COVERAGE FOR CLAIMS ARISING OUT OF INCIDENTS, OCCURRENCES OR ALLEGED WRONGFUL ACTS WHICH TOOK PLACE PRIOR TO THE RETROACTIVE DATE, IF ANY, STATED IN THE POLICY.

THIS POLICY COVERS ONLY CLAIMS ACTUALLY MADE AGAINST AN INSURED UNDER THE POLICY WHILE THE POLICY REMAINS IN EFFECT OR WHILE THE AUTOMATIC EXTENDED REPORTING PERIOD OR ANY ADDITIONAL EXTENDED REPORTING PERIOD THE INSURED MAY PURCHASE, IS IN EFFECT. ALL OTHER COVERAGE UNDER THIS POLICY CEASES UPON THE TERMINATION OF THE POLICY.

DURING THE FIRST SEVERAL YEARS OF THE CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES.  SUBSTANTIAL ANNUAL PREMIUM INCREASES CAN BE EXPECTED, INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

UPON TERMINATION OF COVERAGE FOR ANY REASON, A SIXTY (60) DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL BE GRANTED AT NO ADDITIONAL CHARGE.  THE INSURED WILL BE ABLE TO PURCHASE ADDITIONAL EXTENDED REPORTING PERIOD COVERAGE FOR A MINIMUM OF ONE (1) YEAR OR AS IN THE FOLLOWED POLICY INCLUSIVE OF THE SIXTY (60) DAY PERIOD SPECIFIED ABOVE, UNLESS DURING THE FIRST YEAR OF COVERAGE THIS POLICY IS TERMINATED FOR NON-PAYMENT OF PREMIUM OR FRAUD.

WITHIN THIRTY (30) DAYS AFTER TERMINATION OF COVERAGE, THE INSURER WILL GIVE WRITTEN NOTIFICATION TO THE INSURED THAT THE AUTOMATIC EXTENDED REPORTING PERIOD APPLIES, WHICH NOTICE WILL STATE THE IMPORTANCE OF PURCHASING AN ADDITIONAL EXTENDED REPORTING PERIOD AND THE PREMIUM FOR SUCH ADDITIONAL COVERAGE.  NO SUCH NOTICE WILL BE SENT IF THIS POLICY HAS BEEN IN EFFECT FOR ONE YEAR OR MORE AND HAS BEEN TERMINATED FOR NONPAYMENT OF PREMIUM OR FRAUD.

THERE IS A POTENTIAL FOR COVERAGE GAPS THAT MAY ARISE UPON EXPIRATION OF ANY EXTENDED REPORTING PERIOD COVERAGE IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER INSURER.

THE INSURED SHALL HAVE THE GREATER OF SIXTY (60) DAYS FROM THE EFFECTIVE DATE OF TERMINATION OF COVERAGE OR THIRTY (30) DAYS FROM THE DATE OF MAILING OR DELIVERY OF THE NOTICE MENTIONED ABOVE TO SUBMIT WRITTEN ACCEPTANCE OF THE EXTENDED REPORTING PERIOD.



**IRONSHORE INDEMNITY INC.**
(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement #** 4

**Policy Number:** 003892500                    **Effective Date of Endorsement:** November 29, 2018
**Insured Name:**  AmTrust Financial Services, Inc.

---

> # NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INSURER STREET ADDRESS CHANGE

There is no change in the mailing address or telephone number shown above.

It is hereby understood and agreed that the street address of the Insurer's main administrative office is changed to:
28 Liberty Street, 5th Floor
New York, NY 10005

The street address for delivery of any Notice to Insurer, Representative of the Insurer and Notice of Claim reporting is changed to:
c/o Ironshore Insurance Services LLC.
28 Liberty Street, 5th Floor
New York, NY 10005

The street address for the Service of Process/Suit provision in this policy is changed to:
c/o Ironshore Insurance Services LLC.
28 Liberty Street, 4th Floor
New York, NY 10005

For the purposes of this endorsement:

1.    "Insurer" means the "Insurer", "Underwriter" or "Company" or other name specifically ascribed in this policy as the insurance company or underwriter for this policy.

2.      "Notice of Claim reporting" means any "notice of claim/circumstance", "notice of loss", "notice of wrongful act", or other such reference in the policy designated for the reporting of claims, loss, acts, occurrences or situations that may give rise or result in loss under this policy.

3.      "Policy" means the policy, bond or other insurance product to which this endorsement is added.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____        June 5, 2019
Authorized Representative                        Date



## IRONSHORE INDEMNITY INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement #** 5

**Policy Number:** 003892500        **Effective Date of Endorsement:** November 29, 2018
**Insured Name:** AmTrust Financial Services, Inc.

---

## NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PENDING AND PRIOR LITIGATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY INSURANCE POLICY

It is understood and agreed that the Limits of Liability shall not apply to claims made against the Insured based upon, arising from, or in consequence of any demand, suit, or other proceeding pending, or order, decree or judgment entered against any Insured prior to October 21, 2017, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
Authorized Representative

June 5, 2019
Date



**IRONSHORE INDEMNITY INC.**

(A Stock Company)

Mailing Address:

PO Box 3407

New York, NY  10008

(877) IRON411

**Endorsement #** 6

**Policy Number:** 003892500                              **Effective Date of Endorsement:** November 29, 2018

**Insured Name:**  AmTrust Financial Services, Inc.

---

> # NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## QUOTA SHARE AMENDMENT OF DECLARATIONS (EXCESS)

In consideration of the premium charged, it is hereby understood and agreed that:

1.  Item 6. of the Declarations is deleted and replaced by the following:

    Item 6.      Aggregate Quota Share Layer Limit of Liability:      $10,000,000

    Maximum aggregate Limit of Liability for all Claims made during the Policy Period.

    Subject to all of its terms and conditions, this Policy shall provide coverage for Claims in excess of the Underlying Insurance, up to the Insurer's quota share participation of the aggregate maximum limit stated above. Any Loss within the Aggregate Quota Share Layer Limit of Liability stated above shall be paid pro rata by each of the insurers subscribing to this Aggregate Quota Share Layer Limit of Liability in accordance with the proportion set forth in the Participation Agreement entered into by each such insurer. The participation of such insurers is set forth below in Item 7. of the Declarations. The obligations of such insurers who subscribe to the quota share arrangement are several and not joint, and are limited to the extent of their individual subscriptions. No subscribing insurers is responsible for the obligation of any co-subscribing insurer.

    The Insurer's participation is set forth at Item 12. of the Declarations. The Insurer has full claims and underwriting control of its portion of the quota share arrangement and no action or omission by any of the co-subscribing insurers shall bind the Insurer or be deemed a waiver of any coverage defense the Insurer has under this Policy or available at law. The Insurer shall act on its own behalf with respect to all other matters concerning this Policy, and no other insurer subscribing to the Policy may act on behalf of or bind the Insurer with respect to the Policy terms or any matter concerning the Policy. All notices by an Insured to the Insurer under this Policy shall be provided to the Insurer at the address specified in the Declarations.

2.    The Declarations are amended by the addition of the following:

**Item 12.**

**Insurer's Quota-Share Participation:**    50%
**Insurer's Limit of Liability:**    $5,000,000

The Insurer agrees to pay on behalf of the Insured under the Policy that proportion of covered Loss set forth above in the manner provided under Item 3. of the Declarations and in full conformance with all the terms and conditions of the Policy.

3.    Item 7. of the Declarations is amended by adding the following:

| Quota Share Layer Attachment Point: | $50,000,000 | |
|---|---|---|
| **Quota Share Participant** | **Policy Number** | **Limit of Liability** |
| Markel Bermuda Limited | MKLB25GPL000070 | $2,500,000 po $10,000,000 |
| HCC | TBD | $2,500,000 po $10,000,000 |
| Ironshore Insurance Company | 003892500 | $5,000,000 po $10,000,000 |

4.    Item 5. of the Declarations is deleted and replaced by the following:

Item 5.    Total Quota Share Layer Premium:    $800,000

Insurer's Quota-Share Participation Premium:    $400,000

The Total Quota Share Layer Premium is payable pro rata to each of the insurers subscribing to this Quota Share Layer in accordance with the proportion set forth in its Participation Agreement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____    June 5, 2019
Authorized Representative    Date



### IRONSHORE INDEMNITY INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement # 7**

**Policy Number:** 003892500                          **Effective Date of Endorsement:** November 29, 2018
**Insured Name:**  AmTrust Financial Services, Inc.

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TIE IN OF LIMITS

It is hereby understood and agreed that the Policy is amended as follows:

I.        The following is added to section III. Definitions:

- The term "Other Policy" means policy # HS674647 issued to the Insured by Landmark American Insurance Company.

II.       Section IV. Policy Conditions is amended by adding the following:

Notwithstanding any other terms and conditions of this Policy:

1)   Any coverage provided under this Policy shall be specifically in excess of the coverage provided under the Other Policy, and any loss or damages required to be paid under the Other Policy shall be fully paid prior to the payment of any loss or damages under this Policy;

2)   Any payment of loss or damages under the Other Policy will proportionally reduce the maximum aggregate limit of liability for all loss or damages on account of all claims for this Policy. Such proportion shall be the amount paid under the Other Policy divided by the Other Policy's aggregate limit of liability;

3) The Insurer will have no obligation under this Policy to make any payment of loss or damages if the Other Policy's aggregate limit of liability is fully exhausted;

4) If the paid loss or damages paid under this Policy are in an aggregate amount equaling $5,000,000, any and all obligations of the Insurer under this Policy will be completely fulfilled and extinguished, and the Insurer will have no further obligations of any kind or nature whatsoever under this Policy; and

5) Nothing in this endorsement is intended, nor shall be construed, to obligate or require the Insurer to pay loss or damages under this Policy in excess of the Policy aggregate limit of liability set forth in the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
Authorized Representative

June 5, 2019
Date

# EXHIBIT W

# U.S. SPECIALTY INSURANCE COMPANY

**THIS IS A CLAIMS MADE EXCESS POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE EXPENSES.**

## DECLARATIONS

## EXCESS INDEMNITY POLICY

POLICY NUMBER: 24-MGU-18-A45519                    RENEWAL OF: N/A

ITEM 1.     **INSURED:**          Amtrust Financial Services, Inc.
                                  59 Maiden Lane 43rd Floor
                                  New York, NY 10038

ITEM 2.   **POLICY PERIOD**:
               (a)     Inception Date:   11/29/2018
               (b)     Expiration Date:  11/29/2024
               at 12:01 a.m. at the Principal Address stated in ITEM 1.

ITEM 3.   **LIMIT OF LIABILITY (INCLUSIVE OF DEFENSE EXPENSES)**:
               $2,500,000 Limit of Liability part of $10,000,000 excess of $50,000,000 Underlying Limits

ITEM 4.   **SCHEDULE OF UNDERLYING INSURANCE:**
               See Attached Schedule of Underlying Insurance.

ITEM 5.   **PREMIUM**:  $200,000.00

ITEM 6.   **NOTICES REQUIRED TO BE GIVEN TO INSURER MUST BE ADDRESSED TO**:

| Street Address: | Facsimile Number: | E-mail Address: |
|---|---|---|
| Tokio Marine HCC – D&O Group | (860) 676-1737 | usclaims@tmhcc.com |
| 8 Forest Park Drive | | |
| Farmington, CT  06032 | | |
| Attn:  Claims Manager | | |

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-13000

ITEM 7.   **ENDORSEMENTS ATTACHED AT ISSUANCE**
          994-917  NY9  NY10  NY11  NY12  NY13  994-922  80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its
President, a Secretary and a duly authorized representative of the Insurer.

            Secretary                        President                    Authorized Representative

Date: December 26, 2018                                          USSIC 993 (04/2002)

ENDORSEMENT NUMBER: 1

**SCHEDULE OF UNDERLYING INSURANCE**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby agreed and understood that the Schedule of Underlying Insurance on the Declarations page is amended to read as follows:

| | **Insurer** | **Policy Number** | **Limits** |
|---|---|---|---|
| **Primary** | Indian Harbor Insurance Company | US00080794DO17A | $5,000,000 |
| **1st Excess** | Zurich American Insurance Company | DOC 4565460-00 | $5,000,000 |
| **2nd Excess** | AXIS Insurance Company | MNN626501/01/2017 | $5,000,000 |
| **3rd Excess** | Markel Bermuda Limited | MKLB25GPL0000702 | $2,500,000 |
| **3rd Excess** | Allianz Global Risks US Insurance Company | USF00237518 | $2,500,000 |
| **4th Excess** | Hiscox Insurance Company Inc. | B0509FINFW1800559 | $5,000,000 |
| **5th Excess** | Lloyd's of London | B0509FINFW1800560 | $8,700,000 |
| **5th Excess** | Arch Insurance Company | DOX100002900 | $2,700,000 |
| **5th Excess** | Markel Bermuda Limited | MKLB25GPL0000685 | $3,600,000 |
| **6th Excess** | Lloyd's of London | B0509FINFW1800561 | $3,800,000 |
| **6th Excess** | Arch Insurance Company | DOX100003000 | $2,200,000 |
| **6th Excess** | Markel Bermuda Limited | MKLB25GPL0000686 | $1,400,000 |
| **6th Excess** | Allianz Global Risks US Insurance Company | USF00238018 | $2,600,000 |

**Schedule of Quota Share Participants**
**Aggregate Limit for all quota share participants: $10,000,000**

| | **Insurer** | **Policy Limits** | **Policy Number** |
|---|---|---|---|
| Participant | Ironshore Indemnity I*nc.* | $5,000,000 | 003892500 |
| Participant | Markel Bermuda Limited | $2,500,000 | MKLB25GPL0000703 |

All other terms, conditions and limitations of this Policy will remain unchanged, including but not limited to the maximum aggregate **Limit of Liability** set forth in ITEM 3. of the Declarations.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
                        Attorney-in-Fact

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

ENDORSEMENT NUMBER:  2

**NEW YORK AMENDATORY ENDORSEMENT:**
**COMPLIANCE WITH NEW YORK INSURANCE LAW**

  To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to
Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is hereby understood and agreed that, notwithstanding anything
in this Policy to the contrary, with respect to such insurance as is afforded by this Policy, the terms of this
Policy as respects coverage for operations in the State of New York shall conform to the coverage
requirements of the applicable insurance laws of the State of New York or the applicable regulations of the
New York Insurance Department; provided, however, that the Insurer's limit of liability as stated in this
Policy shall be excess of the limits of liability of any underlying insurance or self-insurance as stated in the
Declarations or in any endorsement attached hereto.

All other terms, conditions and limitations of this Policy shall remain unchanged.

        _____
          Authorized Representative

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT
FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND
REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-13000
NY9
Ed. 11/00

ENDORSEMENT NUMBER:  3

**NEW YORK AMENDATORY ENDORSEMENT:
NOTICES**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, Section VIII. NOTICES is amended to read as follows:

VIII.    NOTICES

A.    If the **Insureds** give any notice of any matter under the **Underlying Insurance**, the **Insureds** must also give the Insurer written notice of such matter in the same manner as required by the terms and conditions of the **Primary Policy**, except that such written notice must be sent to the Insurer at the address set forth in ITEM 6 of the Declarations.

B.    Notice of any matter, whether by or on behalf of any person or entity entitled to coverage under this Policy or by or on behalf of any claimant against any such person or entity, will be deemed written notice to the Insurer if given to any licensed agent of the Insurer in this state, with particulars sufficient to identify the person or entity entitled to coverage.

C.    Failure by any person or entity entitled to coverage under this Policy to give any notice required to be given within any prescribed time will not invalidate any coverage that would otherwise have been available if it is shown that (a) it was not reasonably possible to give such notice within the prescribed time and (b) notice was given as soon as reasonably possible.  Notice given during any applicable Discovery Period will be deemed notice during the **Policy Period**.

D.    The **Insureds** shall give the Insurer notice in writing as soon as practicable of:

1.    the cancellation of any **Underlying Insurance**, or

2.    any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

ENDORSEMENT NUMBER:  4

**NEW YORK AMENDATORY ENDORSEMENT:**
**REGULATION 121 – DECLARATIONS PAGE SUPPLEMENT**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     This is a "claims-made" policy which means, generally, that coverage applies under this Policy for only those claims first made against the **Insured** during the **Policy Period**.

(2)     This Policy provides no coverage for claims arising out of incidents, occurrences or alleged wrongful acts which took place prior to the retroactive date, if any, stated in the Policy.

(3)     This Policy covers only claims actually made against the **Insured** while the Policy remains in effect and all coverage under the Policy ceases upon the termination of the Policy, except for any automatic discovery period coverage that may be available pursuant to the provisions of the **Underlying Insurance**, unless the **Insured** purchases additional discovery period coverage available pursuant to the provisions of the **Underlying Insurance**.

(4)     During the first several years of being covered under a "claims-made" policy, claims-made premium rates are comparatively lower than rates on other types of policies.  You can expect substantial annual premium increases, independent of overall rate level increases, until the claims-made relationship reaches maturity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

ENDORSEMENT NUMBER:  5

**NEW YORK AMENDATORY ENDORSEMENT:**
**REGULATION 121 – APPLICATION SUPPLEMENT**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     This is a "claims-made" policy which means, generally, that coverage applies under this Policy for only those claims first made against the **Insured** during the **Policy Period**.

(2)     This Policy provides no coverage for claims arising out of incidents, occurrences or alleged wrongful acts which took place prior to the retroactive date, if any, stated in the Policy.

(3)     This Policy covers only claims actually made against the **Insured** while the Policy remains in effect and all coverage under the Policy ceases upon the termination of the Policy, except for any automatic discovery period coverage that may be available pursuant to the provisions of the **Underlying Insurance**, unless the **Insured** purchases additional discovery period coverage available pursuant to the provisions of the **Underlying Insurance**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

ENDORSEMENT NUMBER:  6

**NEW YORK AMENDATORY ENDORSEMENT:**
**REGULATION 162**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     To the extent this Policy provides coverage for Defense Expenses incurred defending a criminal proceeding, such coverage is limited to that permitted by Section 726 of the Business Corporation Law, Section 726 of the Not-for-Profit Corporation Law, and Section 7023 of the Banking Law, whichever is applicable.

(2)     There is no coverage under this Policy for legal services insurance with respect to any claim that is an administrative proceeding or seeks injunctive or other non-pecuniary relief if such claim:

        (a)     involves entitlement to non-employment related benefits, provided directly or indirectly, from any government, governmental agency or political subdivision pursuant to an entitlement program; or

        (b)     is initiated or instituted by a large commercial insured, as defined in Section 71.1 of Department Regulation No. 107.

(3)     No more than twenty-five percent (25%) of this Policy's Limit of Liability may be reduced by the payment of loss constituting legal services insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-13000
NY13                              Page 1 of 1
Ed. 11/00

ENDORSEMENT NUMBER:  7

**RUN-OFF COVERAGE FROM INCEPTION**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, 100% of which is hereby deemed to be fully earned as of the effective date of this endorsement, and notwithstanding anything in this Policy to the contrary, it is agreed that:

(1)      The coverage provided under this Policy will apply only to losses, including defense costs or expenses, from claims for acts, errors, omissions, misstatements, misleading statements, neglect or breaches of duty committed or attempted, or allegedly committed or attempted, before the inception date set forth in ITEM 2 of the Declarations.  No coverage will be available under this Policy for losses, including defense costs or expenses, from any claim for or arising out of, based upon or attributable to any act, error, omission, misstatement, misleading statement, neglect or breach of duty committed or attempted, or allegedly committed or attempted, on or after the inception date set forth in ITEM 2 of the Declarations.

(2)      The **Insureds** will have no right to any Discovery Period, Extended Reporting Period or Optional Extension Period upon any cancellation or nonrenewal of this Policy, and the coverage provided under this Policy will not apply in conformance with, or subject to, any terms, conditions, limitations and endorsements of the **Primary Policy** under which the **Insureds** may have any such right.

(3)      The Insurer may not cancel this Policy except for non-payment of premium and, because the entire premium for this Policy shall be deemed fully earned as of the effective date of this endorsement, the **Insureds** will be entitled to no adjustment or refund of premium in the event of cancellation by the **Insureds**.  Section IX of this Policy will be deemed to have been amended accordingly.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:  _____
         Attorney-in-Fact

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

ENDORSEMENT NUMBER:  8

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

Your Policy contains coverage for certain losses caused by terrorism.  We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act, as amended in 2015 (hereinafter "TRIA").  TRIA also requires us to provide disclosure of federal participation in payment of terrorism losses resulting from an "act of terrorism" as defined by Section 102(1) of TRIA.

Section 102(1) of TRIA defines the term "act of terrorism" as any act that is certified by the Secretary of the Treasury of the United States – in concurrence with the Secretary of Homeland Security and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Please be advised that the actual coverage provided by your Policy for acts of terrorism, as is true for all coverages, is limited by the terms, conditions, exclusions, limits and other provisions of your Policy, any endorsements to the Policy and generally applicable rules of law.

YOU SHOULD KNOW THAT, WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW.  UNDER THIS FORMULA, THE UNITED STATES GOVERNMENT generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.  The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-13000
80016
Ed. 01/15

certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.  If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The amount of your premium that is attributable to coverage for terrorist acts certified under TRIA is $0.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
             Attorney-in-Fact

# U.S. SPECIALTY INSURANCE COMPANY

# Excess Indemnity Policy



**D&O Group**
8 Forest Park Drive, Farmington, Connecticut 06032
main 860 674 1900   facsimile 860 676 1737

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# U.S. SPECIALTY INSURANCE COMPANY

### EXCESS INDEMNITY POLICY

**This is a claims made policy.  Please read it carefully.**

In consideration of the payment of the premium, and in reliance upon all statements made and information furnished to the Insurer and to the issuers of the **Underlying Insurance** and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the **Insureds** agree as follows:

I.      INSURING AGREEMENT

The Insurer shall provide the **Insureds** with insurance excess of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations.  Except as specifically set forth in the terms, conditions or endorsements of this Policy, coverage hereunder shall apply in conformance with the terms, conditions, limitations and endorsements of the policy immediately underlying this Policy, except that coverage hereunder shall attach only after all **Underlying Insurance** has been exhausted by actual payment of claims or losses thereunder.

II.     PRIMARY AND UNDERLYING INSURANCE

A.      Maintenance of **Underlying Insurance**

All of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations shall be maintained during the **Policy Period** in full effect except for any reduction of the limits of liability available under the **Underlying Insurance** solely by reason of actual payment of claims or losses thereunder.  Subject at all times to Section II.B of this Policy, the Insurer shall not be liable under this policy earlier or to any greater extent than it would have been if the **Insureds** had complied with this condition.

B.      Cancellation of **Underlying Insurance**

This Policy shall terminate immediately upon the cancellation of any one or more of the policies scheduled in ITEM 4 of the Declarations, whether cancelled by the **Insureds** or the applicable insurer.  Notice of cancellation or non-renewal of any such policies duly given by any of the applicable insurers shall serve as notice of the cancellation or non-renewal of this Policy by the Insurer.

C.      Amendment of **Underlying Insurance**

No amendment to any **Underlying Insurance** during the **Policy Period** shall be effective in extending the coverage or limits of liability afforded by this Policy unless the Insurer so agrees in writing.

III.    DEFINITIONS

A.      **Insured** means any person or organization insured under the policy immediately underlying this Policy.

B.      **Policy Period** means the period from the inception date to the expiration date set forth in ITEM 2 of the Declarations, or to any earlier cancellation date.

C.      **Primary Policy** means the policy scheduled as such in ITEM 4 of the Declarations.

**U.S. SPECIALTY INSURANCE COMPANY**

    D.      **Underlying Insurance** means all policies scheduled in ITEM 4 of the Declarations and any policies replacing them.

IV.     LIMITS OF LIABILITY

    A.      The amount or amounts stated in ITEM 3 of the Declarations are the limits of the Insurer's liability and shall be the maximum amount(s) payable by the Insurer under this Policy.  The limits of liability available under this Policy to pay damages or settlements shall be reduced, and may be exhausted, by the payment of defense expenses.

    B.      In the event of the reduction of the limits of liability of the **Underlying Insurance** solely as the result of actual payment of claims or losses thereunder by the applicable insurers, this Policy shall, subject to the Insurer's limits of liability and to the other terms, conditions and endorsements of this Policy, continue to apply to claims or losses as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

    C.      In the event of the exhaustion of all of the limits of liability of such **Underlying Insurance** solely as the result of actual payment of claims or losses thereunder, the remaining limits available under this Policy shall, subject to the Insurer's limits of liability and to the other terms, conditions and endorsements of this Policy, continue for subsequent claims or losses as primary insurance.  Under such circumstances, any retention or deductible specified in the **Primary Policy** shall also apply to this Policy.

V.     SETTLEMENT

The **Insureds** shall not admit liability for or settle any claim for any amount that would involve the coverage afforded by this Policy without the Insurer's prior written consent.

VI.    CLAIM PARTICIPATION

The Insurer may, at its sole discretion, elect to participate in the investigation, settlement and/or defense of any claim against the **Insureds** even if the **Underlying Insurance** has not been exhausted.

VII.   SUBROGATION AND RECOVERIES

    A.      In the event of any payment under this Policy, the Insurer shall be subrogated to all the **Insureds'** rights of recovery against any person or organization, and the **Insureds** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights.

    B.      Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment.  The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

VIII.  NOTICES

    A.      If the **Insureds** give any notice of any matter under the **Underlying Insurance**, the **Insureds** must also give the Insurer written notice of such matter in the same manner as required by the terms and conditions of the **Primary Policy**, except that such written notice must be sent to the Insurer at the address set forth in ITEM 6 of the Declarations.

    B.      The **Insureds** shall give the Insurer notice in writing as soon as practicable of:

**U.S. SPECIALTY INSURANCE COMPANY**

1.      the cancellation of any **Underlying Insurance**, or

2.      any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

IX.    POLICY TERMINATION

A.    This Policy may be canceled by the **Insureds** at any time either by surrender of this Policy or by written notice stating when thereafter such cancellation is to be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this policy shall terminate at the date and hour specified in such notice.

B.    The Insurer shall refund the unearned premium computed at the customary short rate if the Policy is canceled by the **Insureds**.

X.    CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

XI.    AUTHORIZATION AND NOTICES

The person or entity named in ITEM 1 of the Declarations shall be the sole agent, and shall act on behalf, of the **Insureds** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communication, effecting or accepting any endorsements to or notice of cancellation of this Policy, paying premium and receiving any return premiums.

XII.    NO ALTERATIONS WITHOUT ENDORSEMENT

No change in or modification of this Policy shall be effective unless made by endorsement signed by an authorized employee of the Insurer or any of its agents relating to this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary            President

ENDORSEMENT NUMBER:  9

**FOLLOW FORM OF SPECIFIC QUOTA SHARE PARTICIPANT ENDORSEMENT**

To be attached to and made a part of Policy No. 24-MGU-18-A45519, issued to Amtrust Financial Services, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)    Coverage under this Policy is amended in accordance with Endorsement No. 3 , titled "TIE IN OF LIMITS ENDORSEMENT," which has been added to the following Quota Share Participant policy:

Policy number MKLB25GPL0000703 issued by Markel Bermuda Limited.

(2)    For purposes of this endorsement, "Quota Share Participant" means those insurers described as such in Endorsement No. 994-917, titled "Schedule of Underlying Insurance," of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement: 11/29/2018

By:_____
Attorney-in-Fact

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# EXHIBIT X

## SETTLEMENT AND RELEASE AGREEMENT

This is a Settlement and Release Agreement ("Agreement") between XL Specialty Insurance Company ("XL Specialty"), Catlin Specialty Insurance Company ("Catlin"), and Indian Harbor Insurance Company ("Indian Harbor") (collectively, "XL") on the one hand, and AmTrust Financial Services, Inc. ("AmTrust"), Evergreen Parent, L.P. ("Evergreen"), as well as Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, Michael Karfunkel, Jay J. Miller, Barry Zyskind, Leah Karfunkel,  Raul Rivera, Adam Karkowsky, Mark Serock, John F. Shettle Jr., and Chris Stroup (collectively, the "Individual Defendants"),  on the other hand.   The signatories to this Agreement will be referred to singularly  or  collectively  as,  respectively,  a "Party" or the "Parties."  AmTrust, Evergreen, and the Individual Defendants who are Parties to this Agreement, are collectively referred to as the "Insureds."

**WHEREAS**, XL Specialty issued Policy No. ELU136322-14 to AmTrust for the period of September 30, 2014 to September 30, 2015 (the "14-15 XL Policy");

**WHEREAS**, Catlin issued Policy No. XSP-690901-0914 to AmTrust for the period of September 30, 2014 to September 30, 2015 (the "14-15 Catlin Policy");

**WHEREAS**, Indian Harbor issued Policy No. US00080794DO17A, which was originally issued to AmTrust for the period of October 21, 2017 to October 21, 2018, and, per endorsement, is now issued to AmTrust for the period of October 21, 2017 to November 29, 2024 (the "17-24 Indian Harbor Policy");

**WHEREAS**, Indian Harbor issued Policy No. ELU152511-17 to AmTrust for the period of October 21, 2017 to October 21, 2018, and, per endorsement, is now issued to AmTrust for the period of October 21, 2017 to November 29, 2024 (the "17-24 Indian Harbor A-Side Policy")

**WHEREAS**, Indian Harbor issued Policy No. US00087433DO18A to Evergreen for the period of November 29, 2018 to November 29, 2019 (the "18-19 Indian Harbor Policy");

**WHEREAS**, Indian Harbor issued Policy No. ELU158988-18 to Evergreen for the period of November 29, 2018 to November 29, 2019 (the "18-19 Indian Harbor A-Side Policy") (together with the 14-15 XL Policy, the 14-15 Catlin Policy, the 17-24 Indian Harbor Policy, the 17-18 Indian Harbor A-Side Policy, and the 18-19 Indian Harbor Policy, the "XL Policies");

**WHEREAS**, the Insureds have sought coverage from XL in connection with the lawsuits listed in **Exhibit A**, including any and all claim(s) asserted in or in connection with such lawsuits (collectively, the "Claims");

**WHEREAS**, the Insureds and XL dispute whether and/or to what extent the XL Policies provide coverage for the Claims;

**WHEREAS**, AmTrust and the Individual Defendants named in the Consolidated Stockholder Litigation and Martinek Delisting Action (as defined in Exhibit A) are in  negotiations to settle those Claims for amounts in excess of the Retention and Limits of Liability of the 17-24 Indian Harbor Policy;

**WHEREAS**, the Parties to this Agreement agree and acknowledge that this Agreement shall not be construed as an admission by any Party of any liability, coverage, or responsibility with regard to the Consolidated Stockholder Litigation or the Martinek Delisting Action, the Parties now wish to, and hereby do, resolve all disputes between and among them with regard to coverage for the Consolidated Stockholder Litigation and the Martinek Delisting Action under the 17-24 Indian Harbor Policy, which, upon the disbursement of the Settlement Payment under this Agreement, shall be fully released, exhausted, and extinguished as set forth herein;

**WHEREAS**, the Parties further desire to settle all of their disputes between and among them with regard to coverage for all the Claims under the XL Policies, which, upon the disbursement of the Settlement Payment under this Agreement, shall be fully released, exhausted, and extinguished as set forth herein.

**NOW THEREFORE**, in consideration of and in reliance upon the respective representations, covenants, terms and conditions herein contained, as well as other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Settlement Payment**

    A.   In exchange for the consideration reflected in this Agreement, XL shall pay Ten Million Dollars ($10,000,000) to AmTrust, for use in the satisfaction of the settlement of AmTrust's and the Individual Defendants' obligations under the Consolidated Stockholder Litigation and/or the Martinek Delisting Action (the "Settlement Payment").

    B.   The Settlement Payment shall be made within fifteen (15) business days of the Effective Date of this Agreement and receipt by XL of a W-9 for the payee of the Settlement Payment, whichever date is later, and in accordance with the wire transfer instructions attached hereto as **Exhibit B**.

    C.   Upon payment of the Settlement Payment by XL, the Parties acknowledge that: (a) the legal liability and obligations of XL under the XL Policies shall be fully satisfied; (b) the XL Policies shall be deemed fully exhausted and released; and (c) XL shall bear no further obligations, duties, or responsibilities under the XL Policies or for the Claims.

2.  **Releases**.

    Upon XL's payment of the Settlement Payment, the Parties hereby discharge each other and their respective affiliates, parents, subsidiaries, predecessors, successors, agents, officers, directors, employees, attorneys, reinsurers, representatives and agents, heirs, beneficiaries, and assigns and any person acting on his, her or its behalf from any and all claims, actions, causes of action, rights or obligations, whether known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise that the Parties now have or may have against each other arising out of, related to, based upon, by reason of, or in any way involving:

    (a)   the XL Policies;

(b)     the Claims, or any claim or matter arising from the same "Interrelated Wrongful Acts" (as defined in the 17-24 Indian Harbor Policy) as the Claims (the "Related Claims"); or

(c)     any claim for misrepresentations, fraud, indemnity, contribution, breach of contract, breach of duty, negligence, "bad faith," violation of statute or regulation, unfair claims handling, or damages of any kind whatsoever arising out of or relating to the XL Policies or the Claims or the Related Claims, except claims to enforce the terms of this Agreement.

3.     **Express Waiver of Rights by the Parties**.  This Agreement shall be effective as a full and final accord and satisfaction and a general release of the matters released by this Agreement except as specifically set forth by the terms of this Agreement.  In furtherance of this intention, the Parties, for themselves and their respective affiliates, parents, subsidiaries, predecessors, successors, agents, officers, directors, employees, attorneys, reinsurers, representatives and agents, heirs, beneficiaries, and assigns and any person acting on his, her or its behalf, and each of them, expressly waive any and all rights they may have under any statute or provision of common law limiting releases of unknown claims.

4.     **Warranties**.

(a)     The Parties represent and warrant that they have not assigned to any other person or entity any claims released pursuant to this Agreement.  If, contrary to this representation and warranty, a Party assigns or has assigned such rights to any other person or entity, that Party shall defend, indemnify, and hold harmless the other Party with respect to any claim or action brought by any assignee of any interest assigned contrary to this representation and warranty.

(b)     Each Party to this Agreement acknowledges that this Agreement is made and executed by such Party's own free will and in accordance with such Party's own judgment and upon advice of counsel.  No Party has been influenced, coerced, or induced to make this compromise and settlement by improper actions by any other Party.

(c)     Each of the Parties represents and warrants that he, she or it is authorized to enter into this Agreement; that the execution and delivery of this Agreement and the consummation of this transaction will not conflict with or result in any violation or default under any provision of its articles of incorporation, charter, by-laws or partnership agreement or of any decree, statute, law, ordinance, rule or regulation; and that no further consent, approval, order, authorization or filing with any governmental authority is required in connection with the execution and delivery of this Agreement or the consummation of the transactions described in this Agreement.

(d)     Each signatory of this Agreement declares, warrants, and represents that he, she or it has general and specific authority to enter into and to execute this Agreement.

3

(e)     Each Party understands, acknowledges, and agrees that if any fact now believed to be true is found to be other than, or different from, that which is now believed, each expressly assumes the risk of such difference and agrees that this Agreement will remain effective notwithstanding any such difference in fact.

5.     **No Admission of Liability**.  Nothing in this Agreement shall be an admission of any liability on the part of any Party to this Agreement.

6.     **Complete Agreement**.  All agreements and understandings between the Parties are embodied in and expressed in this Agreement, and any prior agreements or understandings are fully superseded by this Agreement.   The Parties acknowledge that, except for those representations in the Agreement, no representations have been made to them by any of the other Parties to induce the execution of this Agreement.

7.     **Construction of Agreement**.  The Parties and their counsel each have contributed to this Agreement.  The language used in this Agreement is language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  This Agreement shall not be construed against any one Party as drafter and instead shall be construed as if all Parties participated equally in the drafting of the Agreement. Each Party agrees that this Agreement will be binding on and inure to the benefit of the Parties and any corporation, partnership or other entity into which any Party may merge, consolidate, or reorganize. The Parties further agree that nothing in this Agreement shall be construed as a waiver or release of, or to otherwise affect any obligations that any Party has or may have, with respect to any other Party under any other contract, agreement or arrangement, or under applicable law, including, but not limited to, any contractual or legal rights to indemnification and advancement of legal fees and expenses.

8.     **Modifications**.  This Agreement shall not be modified, altered, or discharged except by a writing signed by each of the Parties.

9.     **Notices**.  Any notices under this agreement will be delivered via either email or commercial overnight delivery as follows:

| | |
|---|---|
| *If to XL:* | *If to the Insureds:* |
| Vicky Juliano | Michael T. Rasnick |
| AXA XL | AmTrust Financial Services, Inc. |
| 100 Constitution Plaza | 59 Maiden Lane, 43rd Floor |
| Hartford, CT 06103 | New York, NY 10038 |
| vicky.juliano@axaxl.com | michael.rasnick@amtrustgroup.com |
| | |
| *with a copy to*: | *with a copy to*: |
| | |
| David H. Topol | Peter M. Gillon |
| Wiley Rein LLP | Pillsbury Winthrop Shaw Pittman LLP |
| 1776 K St NW | 1200 Seventeenth Street NW |
| Washington, DC 20006 | Washington, DC 200036 |
| dtopol@wileyrein.com | peter.gillon@pillsburylaw.com |

10.     **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.  This Agreement shall be effective and finally executed on the date that identical counterparts, when taken together bear the signature of all Parties, have been delivered to counsel or representatives for all the Parties, either by e-mail or overnight delivery service (the "Effective Date").  Copies of all or part(s) of this Agreement, including signature pages which are transmitted by e-mail, are valid.

11.     **Headings and Captions**.  The headings and captions used in this Agreement are for convenience only, are not a part of this Agreement, and will not alter or determine any rights or obligations under this Agreement.

12.     **Authority of Signatures**.  The individuals executing this Agreement on behalf of XL, AmTrust, Evergreen, and the Individual Defendants represent and warrant that they are authorized to enter into and execute this Agreement on behalf of their respective Parties, that the appropriate corporate resolutions or other consents have been passed and/or obtained, and that this Agreement will be binding on XL, AmTrust, Evergreen, and the Individual Defendants.  AmTrust and Evergreen further represent and warrant that they are authorized to enter into and execute this Agreement on behalf of the Individual Defendants.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

**IN WITNESS WHEREOF**, the Parties have signed this Agreement by their respective authorized officers, representatives, or counsel.

**XL SPECIALTY INSURANCE COMPANY, CATLIN SPECIALTY INSURANCE COMPANY, AND INDIAN HARBOR INSURANCE COMPANY**

By: _Victoria Juliani_                                          DATE: _5/28/21_

Title: _Assistant Vice President_


**AMTRUST FINANCIAL SERVICES, INC.**

_____                    DATE: _____

By:

Title:


**EVERGREEN PARENT, L.P.**

_____                    DATE: _____

By:

Title:

6

**IN WITNESS WHEREOF**, the Parties have signed this Agreement by their respective authorized officers, representatives, or counsel.

**XL SPECIALTY INSURANCE COMPANY, CATLIN SPECIALTY INSURANCE COMPANY, AND INDIAN HARBOR INSURANCE COMPANY**

By: _____     DATE: _____
Title:

**AMTRUST FINANCIAL SERVICES, INC.**

By: _David Saks_____     DATE: _5/27/21_____
Title: _CLO_

**EVERGREEN PARENT, L.P.**

By: _Barry Zyskind_____     DATE: _5/27/21_____
Title:

6

# EXHIBIT A

1. *Cambridge Retirement System v. Donald T. DeCarlo,* No. 10879-CB (Del. Ch. Ct.);

2. *Cambridge Retirement System v. AmTrust Financial Services, Inc.,* No. 2019-0829 (Del. Ch. Ct.);

3. *In re AmTrust Financial Services, Inc. Derivative Litigation,* No. 17-cv-553 (D. Del.);

4. *City of Lauderhill Police Officers Retirement Plan and Pompano Beach Police & Firefighters Retirement System et al v. Zyskind et al.,* No. 17-cv-00843 (D.Del.);

5. *David Shaev Profit Sharing Plan v. Donald T. DeCarlo et al.,* No. 652273/2017;

6. *In Re AmTrust Financial Services, Inc. Stockholder Litigation,* No. 2018-0396-AGB (Del. Ch. Ct.) (the "Consolidated Stockholder Litigation");

7. *Cambridge Retirement System v. Donald D. DeCarlo,* No. 2018-0402 (Del. Ch. Ct.);

8. *Arca Investments et al. v. Barry S. Zyskind et al.,* No. 2019-0144-AGB (Del. Ch. Ct.);

9. *Mark Gottlieb v. Barry D. Zyskind et al.,* No. 2019-0091 (Del. Ch. Ct.);

10. *Keefe, Bruyette & Woods Inc. v. AmTrust Financial Services, Inc.,* No. 650695/2019 (N.Y. Supp. Ct.);

11. *Lonny Matlick et al. v. AmTrust Financial Services., Inc.,* No. 651349/2019 (N.Y. Sup. Ct.); and

12. *Jan Martinek et al. v. AmTrust Financial Services, Inc. et al.,* No. 19-cv-8030 (S.D.N.Y.)(the "Martinek Delisting Action").

**EXHIBIT B**

**AmTrust Financial Services, Inc.  Wire Transfer Instructions**

| | |
|---|---|
| **Bank Name** | JP Morgan Chase |
| **Bank Address** | 270 Park Avenue, New York, NY 10017 |
| **SWIFT Code** | CHASUS33 |
| **ABA/Routing #** | 021000021 |
| **A/C** | ███6457 |
| **Account Name** | AmTrust Financial Services, Inc. |

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

► Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send it to the IRS.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

AmTrust Financial Service, Inc.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC

☑ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ► _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner.  Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)  5

Exemption from FATCA reporting code (if any)  _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

800 Superior Ave E, Floor 21

**6** City, state, and ZIP code

Cleveland, OH  44114

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type.*
*See **Specific Instructions** on page 3.*

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

| | | | – | | | – | | | | |

**or**

**Employer identification number**

| 0 | 4 | – | 3 | 1 | 0 | 6 | 3 | 8 | 9 |

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** | **Signature of U.S. person ►** *Jeffrey A. Johnson VP - Tax* | **Date ►** 8/21/2020

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

# EXHIBIT Z

## SETTLEMENT AGREEMENT AND MUTUAL CLAIM/POLICY RELEASE

This Settlement Agreement and Mutual Claim/Policy Release (the "Agreement") is made and entered into by and between (1) AXIS Insurance Company ("AXIS") and (2) AmTrust Financial Services, Inc., George Karfunkel, Leah Karfunkel, Abraham Gulkowitz, Susan C. Fisch, Donald T. DeCarlo, Raul Rivera, Jay Miller, Barry D. Zyskind, and Ronald E. Pipoly, Jr., (the "**Insureds**"[1]). AXIS and the **Insureds** collectively are referred to as the "Parties," and each, individually, as a "Party." This Agreement will become effective on the final date it is executed by all Parties.

**WHEREAS**, AXIS issued excess insurance policy number MNN626501/01/2017 (the "AXIS Excess Policy") to the **Insureds** for the October 21, 2017 to November 29, 2024 Policy Period, which provides a $5 million Limit of Liability excess of $5 million provided by Zurich Insurance Company excess insurance policy number  DOC 1074701-00 (the "Zurich First Excess Policy"), which is excess of $5 million provided by Indian Harbor Insurance Company primary insurance policy number US0008794DO17A (the "XL Primary Policy"), to which the AXIS Excess Policy follows form (the XL Primary Policy and the Zurich First Excess Policy collectively are referred to as the "Underlying Insurance");

**WHEREAS**, during the Policy Period, the **Insureds** provided notice of the following lawsuits captioned *In re AmTrust Financial Services, Inc. Stockholder Litigation,* No. 2018-0396-AGB (Del. Ch. Ct.), and *Jan Martinek v. AmTrust Financial Services, Inc., et. al.*, Case No. 1:19-cv-8030, U.S. Dist. Ct., S.D.N.Y. (the "Submitted Matters");

**WHEREAS**, the XL Primary Policy and Zurich First Excess Policy have been or will be exhausted by payments of **Loss**; and

---

[1] Terms in **bold** are defined in the AXIS Excess Policy and/or the XL Primary Policy.

1

**WHEREAS**, the Parties desire to resolve any and all issues between them with respect to coverage under the AXIS Excess Policy for the Submitted Matters.

**NOW, THEREFORE**, for full and valuable consideration and on the terms, conditions, and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **The AXIS Payment**

Within ten (10) days after complete execution of this Agreement, receipt of wire transfer instructions, and completed W-9 Form, AXIS will wire transfer Four Million Five Hundred Thousand Dollars and 00/100 cents ($4,500,000.00) to AmTrust in accordance with the wire transfer instructions attached hereto as **Exhibit A**.

AmTrust will use AXIS' payment either to pay Loss or Defense Costs incurred in connection with the Submitted Matters that exceed the $10 million in collective limits of liability under the Underlying Insurance.

2. **Mutual Releases**

(a) Effective on the date of AXIS' payment of the AXIS Payment, the **Insureds**, on behalf of themselves and all of their respective officers, directors, employees, agents, shareholders, parents, subsidiaries, shareholders, representatives, administrators, successors, heirs, executors, estates, beneficiaries, attorneys, and assigns (the "**Insured** Related Persons and Entities"), do hereby release, remise, acquit and forever discharge AXIS and its predecessors and successors in interest, affiliates, representatives, subsidiaries, parents, divisions, claims managers, heirs, assigns, insurers, reinsurers, shareholders, creditors, liquidators, administrators, executors, former, present and future directors and officers, and all employees, principals, attorneys or agents of all of the foregoing in their capacity as such (the "AXIS Related Persons and Entities") of and from any and

all claims, actions or causes of action (including without limitation any claims for contract or tort damages, punitive damages, fraud, misrepresentation, violation of statute, breach of the duty of good faith, extra-contractual damages, and any other damages or loss or other form of relief), debts, demands, payments, rights, obligations, loss, judgments, awards, attorneys' fees, costs, interests, damages, liabilities, benefits and causes of action of whatever kind or character, known or unknown, suspected, fixed or contingent, past, present, or future, in law or in equity, that they have, have had, or may have against AXIS and the AXIS Related Persons and Entities arising out of, based upon, relating to, or in any way involving the Submitted Matters, the **Wrongful Acts** alleged in the Submitted Matters or the AXIS Excess Policy.

(b) Effective on the date of the AXIS Payment, AXIS, on behalf of itself and the AXIS Related Parties and Entities, does hereby release, remise, acquit and forever discharge the **Insureds** and the **Insured** Related Persons and Entities of and from any and all claims, actions or causes of action (including without limitation any claims for contract or tort damages, punitive damages, fraud, misrepresentation, violation of statute, breach of the duty of good faith, extra-contractual damages, and any other damages or loss or other form of relief), debts, demands, payments, rights, obligations, loss, judgments, awards, attorneys' fees, costs, interests, damages, liabilities, benefits and causes of action of whatever kind or character, known or unknown, suspected, fixed or contingent, past, present, or future, in law or in equity, that they have, have had, or may have against the **Insureds** and the **Insured** Related Persons and Entities arising out of, based upon, relating to, or in any way involving the Submitted Matters, the **Wrongful Acts** alleged in the Submitted Matters or the AXIS Excess Policy.

**3.**      <u>**No Assignment**</u>

Each of the Parties represents and warrants that it or he has not sold, assigned or otherwise transferred any interest in the claims, demands, rights, actions, causes of action or liabilities that are the subject of the releases contained in this Agreement, and each agrees to indemnify and hold harmless the other from any liabilities, claims, demands, damages, costs, expenses and/or attorneys' fees incurred as a result of any such assignment or transfer.

**4.**      <u>**No Admission of Liability or Coverage**</u>

The Parties acknowledge and agree that neither the execution nor the performance of any of the terms of this Agreement will constitute or be construed as an admission by either of the Parties of any liability, an admission of coverage or lack of coverage under the AXIS Excess Policy, or an admission of the validity or enforceability of any matters that are released pursuant to this Agreement. The Parties acknowledge and agree that this Agreement will not be taken or used, nor will this Agreement be admissible in evidence, in any action, cause of action or proceeding, except in an action to enforce the terms of this Agreement.

**5.**      <u>**Authority & Policy Release**</u>

AXIS and the **Insureds** each represent and warrant that the individuals executing this Agreement are authorized to enter into and execute this Agreement on behalf of their respective Parties and that the appropriate corporate resolutions or other consents have been passed and/or obtained. This Agreement will be binding on AXIS and the **Insureds**. AmTrust further warrants that it is authorized to provide the policy release of the AXIS Excess Policy on behalf of all **Insureds**.

6.      **Construction of Agreement**

This Agreement will not be construed against the Party preparing it but will be construed as if all Parties had prepared it, and it will not be construed against AXIS merely because AXIS is an insurance company.  The Parties agree that this Agreement will be binding on and inure to the benefit of the Parties and their Related Persons and Entities and any corporation, partnership or other entity into which either Party may merge, consolidate or reorganize.

7.      **Entire Agreement**

This Agreement constitutes the entire agreement between the Parties with respect to the matters addressed herein and supersedes all prior oral or written agreements that address these matters, other than the AXIS Excess Policy. This Agreement cannot be amended, altered or modified, except by an instrument in writing signed by both Parties.

8.      **Headings and Captions**

The headings and captions used in this Agreement are for convenience only, are not a part of this Agreement, and will not alter or determine any rights or obligations under this Agreement.

9.      **Choice of Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflict of law principles.

10.     **Execution in Counterparts**

This Agreement may be executed in counterparts, each of which will be deemed an original, and both of which, together, will constitute but one and the same instrument, which instrument will for all purposes be sufficiently evidenced by either counterpart.  A pdf, DocuSign or other electronic signature shall be deemed the same as, and the equivalent of, an original signature.

**IN WITNESS WHEREOF**, each of the undersigned Parties has caused this Agreement to

be duly executed on its behalf.

AXIS INSURANCE COMPANY

By: _____

Dated: _____

Its: _____

AMTRUST FINANCIAL SERVICES, INC.

By: _____

Dated: 6/2/21

Its: Executive Vice President

6

**IN WITNESS WHEREOF**, each of the undersigned Parties has caused this Agreement to be duly executed on its behalf.

AXIS INSURANCE COMPANY

Dated: 6/8/2021 _____

By: Magedoff, Ari _____

Digitally signed by: Magedoff, Ari
DN: CN = Magedoff, Ari email = ari.
magedoff@axiscapital.com OU = ClientsV2,
BerkeleyHeights, Users
Date: 2021.06.08 14:09:27 -04'00'

Its: Head of Management Liability Claims _____

AMTRUST FINANCIAL SERVICES, INC.

Dated: _____

By: _____

Its: _____

**<u>EXHIBIT A</u>**

**AmTrust Financial Services, Inc.  Wire Transfer Instructions**

| | |
|---|---|
| **Bank Name** | JP Morgan Chase |
| **Bank Address** | 270 Park Avenue, New York, NY 10017 |
| **SWIFT Code** | CHASUS33 |
| **ABA/Routing #** | 021000021 |
| **A/C** | ████6457 |
| **Account Name** | AmTrust Financial Services, Inc. |

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send it to the IRS.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

AmTrust Financial Service, Inc.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☑ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner.  Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)   5

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

800 Superior Ave E, Floor 21

**6** City, state, and ZIP code

Cleveland, OH  44114

Requester's name and address (optional)

**7** List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

| Social security number |
| --- |
| ☐ ☐ ☐ – ☐ ☐ – ☐ ☐ ☐ ☐ |

or

| Employer identification number |
| --- |
| 0 4 – 3 1 0 6 3 8 9 |

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**   Signature of U.S. person ▶   *Jeffrey A. Johnson VP – Tax*   Date ▶ 8/21/2020

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

# EXHIBIT CC

EFiled: Apr 07 2015 12:04PM EDT
Transaction ID 57000168
Case No. 10879-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CAMBRIDGE RETIREMENT SYSTEM, derivatively on behalf of nominal defendant AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. _____ |
| DONALD D. DECARLO, SUSAN C. FISCH, ABRAHAM GULKOWITZ, GEORGE KARFUNKEL, MICHAEL KARFUNKEL, JAY J. MILLER, BARRY ZYSKIND, LEAH KARFUNKEL, and ACP RE, LTD., | |
| Defendants, | |
| and | |
| AMTRUST FINANCIAL SERVICES, INC., a Delaware corporation, | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE

If You Are Not Authorized By Court Order To View Or Retrieve This Document Read No Further Than This Page.  You Should Contact The Following Person(s):

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

OF COUNSEL:                              Christine S. Azar (#4170)
                                         Ned Weinberger (#5256)
Christopher J. Keller                    LABATON SUCHAROW LLP
Eric J. Belfi                            300 Delaware Ave., Suite 1340
Michael W. Stocker                       Wilmington, DE  19801
LABATON SUCHAROW LLP                     (302) 573-2540
140 Broadway
New York, NY  10005                      *Counsel for Plaintiff*
(212) 907-0700

Jeremy Friedman
Spencer Oster
FRIEDMAN OSTER PLLC
240 East 79th Street, Suite A
New York, NY  10075
Tel:  (888) 529-1108

*Counsel for Plaintiff*

Dated:  April 7, 2015


**A public version of this document will be filed on or before April 10, 2015.**

-2-

THE DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CAMBRIDGE RETIREMENT
SYSTEM, derivatively on behalf of
nominal defendant AMTRUST
FINANCIAL SERVICES, INC.,

        Plaintiff,

v.

DONALD D. DECARLO, SUSAN C.
FISCH, ABRAHAM GULKOWITZ,
GEORGE KARFUNKEL, MICHAEL
KARFUNKEL, JAY J. MILLER,
BARRY ZYSKIND, LEAH
KARFUNKEL, and ACP RE, LTD.,

        Defendants,

    and

AMTRUST FINANCIAL SERVICES,
INC., a Delaware corporation,

        Nominal Defendant.

C.A. No. _____

## **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Cambridge Retirement System ("Cambridge" or "Plaintiff"), for the

benefit of nominal defendant AmTrust Financial Services, Inc. ("AmTrust" or the

"Company"), brings the following Verified Stockholder Derivative Complaint (the

"Complaint") against the members of the board of directors of AmTrust (the

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

"Board" or "AmTrust Board"), ACP Re, Ltd. ("ACP"), and Leah Karfunkel.  The allegations of the Complaint are based on the knowledge of Plaintiff as to itself, and on information and belief, including the investigation of counsel and review of publicly available information and internal Company documents produced in response to Plaintiff's demands for the inspection of books and records pursuant to Section 220 of the Delaware General Corporation Law (the "Section 220 Demand"), as to all other matters.

## **INTRODUCTION**

1.     This case arises from a usurpation of corporate opportunity by AmTrust's controlling stockholder group, the Karfunkel Family,[1] in connection with a series of transactions involving property and casualty insurer Tower Group International, Ltd. ("Tower").

2.     AmTrust is a property and casualty insurer that was founded by members of the Karfunkel Family.  As of March 25, 2015, the Karfunkel Family owned approximately 51.8% of AmTrust's outstanding common stock.  Furthermore, members of the Karfunkel Family – specifically, Michael Karfunkel and his son-in-law Zyskind – currently occupy the Company's Board Chairman

---

[1]  As used herein, the "Karfunkel Family" means George Karfunkel, Michael Karfunkel, Leah Karfunkel, and Barry Zyskind ("Zyskind"), collectively.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

and Chief Executive Officer ("CEO") positions, respectively.   A majority of AmTrust's seven-member Board also consists of either Karfunkel Family members – including Zyskind, Michael Karfunkel, and Michael Karfunkel's younger brother George Karfunkel – or their loyalists.

3.     In the fall of 2013, AmTrust submitted a letter of intent to acquire then-struggling property and casualty insurer, Tower.  Shortly thereafter, however, members of the Karfunkel Family unilaterally decided that AmTrust would withdraw its bid and that ACP, a Bermuda insurer owned by The Michael Karfunkel 2005 Grantor Retained Annuity Trust (the "Michael Karfunkel Trust"),[2] would buy Tower instead.

4.     *After* ACP submitted an offer for Tower, AmTrust's CEO and member of the Karfunkel Family, Zyskind, informed the Board that AmTrust would no longer be pursuing the Tower transaction and that AmTrust management now contemplated that Zyskind's father-in-law's company, ACP, would pursue the acquisition in AmTrust's stead.

5.     Following only approximately one hour of deliberation, and based solely on representations by the plainly conflicted Zyskind that an AmTrust

---

[2] Leah Karfunkel is the sole trustee of the Michael Karfunkel Trust.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

acquisition of Tower would purportedly be undesirable for the Company, the Board approved the Karfunkel Family's purchase of Tower through ACP. As explained below, that purchase included a series of other related transactions, including AmTrust's purchase from ACP of Tower's commercial lines insurance business upon closing of the ACP/Tower acquisition.

6.      In light of, among other things, AmTrust's prior interest in acquiring Tower and its financial ability to consummate a purchase, ACP's purchase of Tower constituted a usurpation of AmTrust's corporate opportunity. Similarly, the AmTrust Board breached its fiduciary duties by (a) failing to meaningfully explore whether an acquisition of Tower by AmTrust remained in the Company's best interests, and (b) relying solely on the representations of a conflicted executive whose family was simultaneously competing with AmTrust for the opportunity to acquire Tower.

7.      Following the execution of the transaction documents, members of the Karfunkel Family continued to work largely outside of the Board's view to modify the deal terms to their benefit. Among other things, members of the Karfunkel Family dictated that AmTrust and National General Holdings Corp. ("NGHC"), another public company affiliated with Karfunkel Family, would loan ACP $250

-4-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

million to facilitate ACP's acquisition of Tower.  With little to no meaningful deliberation, the AmTrust Board rubber-stamped the revised transaction structure.

8.     Although the Board ultimately retained a financial advisor, the advisor's mandate was effectively limited to assisting the Board in setting the specific terms (*e.g.*, the interest rate) for the massive related-party loan to ACP.

9.     The Karfunkel Family's abuse of AmTrust, and the Board's acquiescence thereto, continued.  For instance, the Karfunkel Family was able to negotiate a purchase price reduction from Tower.  Instead of passing along some or all of the cost savings to AmTrust (*i.e.*, the publicly-traded entity from which the Karfunkel Family had misappropriated the opportunity in the first instance), the Karfunkel Family sought a potential additional payment from AmTrust in the form of an "earn-out."

10.    As with the other aspects of the Tower-related transactions, the AmTrust Board indulged the Karfunkel Family and ultimately agreed to provide ACP an "earn-out" payment of up to $30 million.

11.    Through this action, Plaintiff seeks to hold (a) the Karfunkel Family accountable for their breaches of fiduciary duty, including their usurpation of AmTrust's corporate opportunity, in their capacity as AmTrust's controlling

-5-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

stockholder; and (b) the AmTrust Board accountable for their breaches of fiduciary duty.

## THE PARTIES

12.    Plaintiff Cambridge is a stockholder of AmTrust and has owned shares of AmTrust continuously at all times relevant to this action.

13.    Nominal defendant AmTrust underwrites and provides property and casualty insurance products, including workers' compensation, commercial automobile, general liability and extended service and warranty coverage, in the United States and internationally, to niche customer groups.   AmTrust is headquartered at 59 Maiden Lane, New York, NY, 10038.   AmTrust's common stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the symbol "AFSI."

14.    Defendant Donald D. DeCarlo ("DeCarlo") has served as a member of the AmTrust Board since 2006.   DeCarlo also serves on NGHC's board of directors.

15.    Defendant Susan C. Fisch ("Fisch") has served as a member of the AmTrust Board since 2010.

16.    Defendant Abraham Gulkowitz ("Gulkowitz") has served as a

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

member of the AmTrust Board since 2006.

17.     Defendant George Karfunkel has served as a member of the AmTrust Board since 1998.  George Karfunkel is one of the co-founders of AmTrust.  As of March 25, 2015, George Karfunkel beneficially owned 16,419,204 shares, or 20.0%, of the Company's outstanding common stock.   George Karfunkel is Michael Karfunkel's younger brother.

18.     Defendant Michael Karfunkel has served as Chairman of the AmTrust Board since 1998.  Michael Karfunkel is one of the co-founders of AmTrust.  As of March 25, 2015, Michael Karfunkel beneficially owned 1,096,412 shares, or 1.3%, of the Company's outstanding common stock.  Michael Karfunkel is also currently the Chairman, President and CEO of NGHC.  Additionally, the Michael Karfunkel Trust owns 99% of the outstanding stock of ACP's parent company.[3]  Michael Karfunkel is George Karfunkel's brother, Leah Karfunkel's husband, and Zyskind's father-in-law.

19.     Defendant Jay Miller ("Miller") has served as a member of the AmTrust Board since 1998 and was AmTrust's corporate secretary (without compensation) from 1998 to 2005.  Miller also serves as a director of several of

_____

[3] ACP is 100% owned by ACP Re Holdings, LLC, which is 99.9% owned by the Michael Karfunkel Trust.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

AmTrust's wholly-owned subsidiaries, including Security National Insurance Company, Technology Insurance Company, AmTrust North America of Florida Inc. and AmTrust North America of Texas Inc. Additionally, Miller is the Chairman of the board of directors of Gulf USA Corporation, a property and natural resource company controlled by the Karfunkels. Furthermore, Miller is the trustee of The George Karfunkel 2007 Grantor Retained Annuity Trust #1 and The George Karfunkel 2007 Grantor Retained Annuity Trust #2 (together, the "George Karfunkel Trusts"). Moreover, Miller serves as an advisor to GK Acquisition, a private investment company co-founded by George Karfunkel.

20.    Defendant Zyskind has served as a director of the Company since 1998 and currently serves as AmTrust's CEO and President. Zyskind has held senior management positions with the Company since 1998. Zyskind also serves as an officer and director of many of AmTrust's wholly-owned subsidiaries. Zyskind is a member of NGHC's board of directors. Zyskind is Michael Karfunkel and Leah Karfunkel's son-in-law. As of March 25, 2015, Zyskind beneficially owned 15,058,164 shares, or 18.3%, of the Company's outstanding common stock.

21.    The defendants listed in paragraphs 14 through 20 above are

-8-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

collectively referred to herein as the "Director Defendants."

22.     Defendant Leah Karfunkel is a member of AmTrust's controlling stockholder group, the Karfunkel Family.  Leah Karfunkel is the wife of Michael Karfunkel.  As of March 25, 2015, Leah Karfunkel beneficially owned 10,029,637 shares – or 12.2% – of the Company's outstanding common stock.

23.     Defendant ACP is a Bermuda insurer owned by the Michael Karfunkel Trust.

## SUBSTANTIVE ALLEGATIONS

### I.     History of AmTrust

24.     Brothers George Karfunkel and Michael Karfunkel, along with AmTrust's CEO and Michael Karfunkel's son-in-law, Zyskind, founded AmTrust in 1998 to provide property and casualty insurance to small businesses.  Through a combination of acquisitions and organic growth, AmTrust grew into a multinational property and casualty insurer specializing in coverage for small to mid-sized businesses.

25.     In November 2006, AmTrust conducted its initial public offering and began trading on the NASDAQ under the symbol "AFSI."

26.     AmTrust continues to be controlled by the Karfunkel Family.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

According to the Company's Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on March 2, 2015 (the "2015 10-K"):

> Based on the number of shares outstanding as of December 31, 2014, Barry D. Zyskind, Michael Karfunkel, Leah Karfunkel (wife of Michael Karfunkel and sole trustee of the Trust) and George Karfunkel [*i.e.,* the Karfunkel Family], directly or indirectly, collectively own or control approximately 57% of our outstanding common stock.[4] As a result, these stockholders, acting together, have the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions. These stockholders may have interests that are different from other stockholders. In addition, we are a "controlled company" as defined in NASDAQ Listing Rule 5615(c).

27.    Similarly, the Company's annual meeting proxy statement filed with the SEC on March 31, 2015 (the "2015 Proxy") states:

> ***We are a "controlled company"*** as defined in Rule 5615(c)(1) of NASDAQ's listing standards because George Karfunkel, Michael Karfunkel, Leah Karfunkel and Barry Zyskind, directly or indirectly, collectively beneficially own or control approximately 51.8% of our voting power . . . Therefore, we are exempt from the requirements of NASDAQ Marketplace Rule 5605[.]

(Emphasis added)

28.    In addition to the Karfunkel Family's majority equity stake, they also

---

[4] Between December 31, 2014 and March 25, 2015, the Karfunkel Family's collective ownership stake in AmTrust decreased from 57% to 51.8%.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

occupy a number of the Company's most powerful and influential positions, including the following:

    a.    Zyskind is the Company's CEO and President;

    b.    Michael Karfunkel is the Board's Chairman;

    c.    Michael Karfunkel and George Karfunkel, together with Zyskind, form the Board's Executive Committee; and

    d.    Michael Karfunkel and Miller, a longtime Karfunkel Family associate and advisor, comprise two-thirds of the Board's Nominating and Corporate Governance Committee.

29.    The Company also engages in a number of related-party transactions with the Karfunkel Family and entities they control or in which they have a significant interest, all of which constitute further indicia of control over AmTrust and its operations.  These related-party transactions include:

    a.    Various reinsurance and service agreements between AmTrust and Maiden Holdings, Ltd. ("Maiden").  Maiden is a publicly-held Bermuda insurance holding company formed by Michael Karfunkel, George Karfunkel, and Zyskind.  The Karfunkel Family owns roughly 30% of Maiden.

    b.    AmTrust leases its New York headquarters from 59 Maiden Lane Associates, LLC, an entity that is wholly-owned by Michael Karfunkel and George Karfunkel.

    c.    The Company provides NGHC and its affiliates with

-11-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

information technology development services.

d.   AmTrust provides investment management services to ACP, as well as accounting and administrative services.

e.   The Company's wholly-owned subsidiary, AmTrust Underwriters, Inc. ("AUI"), is a party to an aircraft time share agreement with each of Maiden and NGHC. For personal travel, Zyskind and Michael Karfunkel each entered into an aircraft reimbursement agreement with AUI.

## II.   Tower's Struggles Push The Company's Stock Price To Bargain Levels

30.   Prior to 2013 (and ACP's acquisition of Tower), Tower was a publicly-traded, diversified casualty and property insurance company that was highly regarded within the industry and broader market.

31.   On August 7, 2013, Tower announced that it was indefinitely suspending the release of its second quarter 2013 earnings. As a result, insurance rating agency A.M. Best placed Tower "under review" and indicated it would treat the announcement negatively. At or around the same time, Tower began exploring its strategic alternatives and retained J.P. Morgan to serve as its lead financial advisor.

32.   On September 23, 2013, Tower entered into various reinsurance agreements to reduce its exposure to adverse loss development.

-12-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

33.     On October 5, 2013, Tower's board of directors publicly expressed concern over the company's liquidity, capital, and business prospects.

34.     On October 7, 2013, Tower announced a goodwill impairment charge of $215 million, and stated its intention to increase loss reserves by $365 million. Also on October 7, 2013, Fitch Ratings downgraded Tower's issuer default rating from "BBB" to "B," and reduced Tower's operating subsidiaries' insurer financial strength ratings from "A-" to "BB".

35.     On October 8, 2013, A.M. Best downgraded the financial strength rating of Tower's insurance subsidiaries from A- (Excellent) to B++ (Good), and issuer credit ratings from "a-" to "bbb."   A.M. Best also downgraded the issuer credit rating and debt rating for Tower's Convertible Notes from "bbb-" to "bb".

36.     Under heavy pressure from the ratings downgrades, Tower's stock price tumbled.  Between October 7, 2013 and October 8, 2013, Tower's stock price declined from $7.41 per share to $4.39 per share, a decrease of 40.8%.

III.   **Tower's Troubles Pique AmTrust's Interest**

37.     On or around October 31, 2013, AmTrust submitted a letter of intent to Tower contemplating (a) the sale of two of Tower's insurance subsidiaries (the "Tower Subsidiaries") to AmTrust in exchange for cash consideration of $50

-13-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

million, (b) a $100 million preferred stock investment by AmTrust in Tower, and (c) a managing general agent ("MGA") agreement between Tower and the two Tower Subsidiaries, pursuant to which the Tower Subsidiaries would exclusively write business produced by Tower.

38.     On November 5, 2013, the AmTrust Board convened a regularly-scheduled meeting, during which Zyskind reported on discussions with Tower. The meeting minutes, however, do not indicate that the Board engaged in any discussion or deliberation concerning the potential Tower transaction. Furthermore, as explained below, the Board would not meet again until **after** AmTrust management (*i.e.*, members of the Karfunkel Family) had already (a) submitted two revised proposals to acquire Tower and (b) ultimately determined to drop its bid entirely for Tower in favor of ACP.

39.     On November 14, 2013, Tower announced its intention to restate its financial statements for 2011 and 2012 in order to fix accounting errors in the company's premium balances.  Tower also expressed doubt that it would be able to continue as a "going concern."

40.     The struggling company revealed that Tower's management had "concluded . . . that material weaknesses exist in internal control over financial

-14-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

reporting related to the company's loss reserving and premiums receivable reconciliation processes," and expressed doubt that it would be able to continue as a "going concern." Tower concluded that "its internal control over financial reporting was not effective as of Dec. 31, 2012 and disclosure controls procedures were not effective as of Dec. 31, 2012."

41.    On November 22, 2013, Tower announced a net loss for the second quarter of 2013 of over $507 million, driving the Company's stock price below $4 per share. Tower therefore was in an extremely vulnerable position and "ripe" for a takeover at a heavily distressed price.

42.    AmTrust management subsequently decided to revise the Company's proposal to Tower. On November 28, 2013, AmTrust's CEO, Zyskind, indicated to Tower (and in separate conversations, to Tower's advisors at J.P. Morgan) that AmTrust would be interested in an acquisition of Tower *in its entirety*.

43.    On December 2, 2013, AmTrust submitted a letter of intent to acquire Tower. AmTrust's letter of intent reflected a proposal for AmTrust to acquire Tower for $5.50 per share.

44.    During the course of the following week, AmTrust conducted several due diligence sessions with representatives from Tower and J.P. Morgan.

-15-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

45.     On December 5, 2013, AmTrust provided a revised letter of intent that expressly permitted Tower to consummate the sale of its stake in Canopius Group Limited and thus exclude that asset from AmTrust's acquisition of Tower.

46.     On December 10, 2013, AmTrust sent Tower a draft merger agreement.

47.     In a sudden turn of events, on December 12, 2013, AmTrust management, led by Karfunkel Family member Zyskind, decided to withdraw AmTrust's indication of interest in acquiring Tower.   Documents produced in response to Plaintiff's Section 220 Demand indicate that this decision was never considered – much less approved – by any independent directors.   Nevertheless, management proceeded to advise Tower that the Company was withdrawing its bid.

## IV.     Tower's Stock Price Continues To Slide, Making A Potential Acquisition Of Tower By AmTrust Even More Attractive

48.     On December 17, 2013, Tower indicated that it would increase its loss reserves for the third quarter of 2013.   On December 20, 2013, A.M. Best again downgraded Tower's credit rating.

49.     By December 20, 2013, Tower was trading at $2.65 per share—a 35% decrease from its trading price when AmTrust submitted its December 2, 2013

-16-

THE DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

letter of intent to acquire Tower for $5.50 per share.  Thus, over the course of just a

few weeks, an acquisition of Tower took on a whole new investment profile, as its

market capitalization had dropped significantly.  At this point, the AmTrust Board

should have revisited the possibility of acquiring Tower outright, as the target

company was now seemingly available at a fraction of the price it could have

commanded just weeks earlier.

50.     But the AmTrust Board never did.  To the contrary, as indicated

below, by the time the Board finally reconvened, AmTrust management, without

Board knowledge or approval, had already agreed to forgo an acquisition of Tower

and had begun to facilitate an alternative transaction between the Karfunkel

Family-owned ACP and Tower.

## V.     The Karfunkel Family Usurps A Corporate Opportunity From AmTrust

51.     Leveraging the information gathered while evaluating Tower as a

potential acquisition target on behalf of the Company, members of the Karfunkel

Family formulated their own bid for Tower in December 2013.  According to

Tower's public SEC filings, sometime before December 29, 2013, Zyskind told

J.P. Morgan that AmTrust intended to immediately withdraw its existing proposal,

and that ACP proposed to acquire Tower for $3.00 per share instead.  The proposal

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

included reinsurance side agreements with AmTrust and NGHC that, at that time, had been neither deliberated upon nor authorized by the AmTrust Board.

52.     On December 30, 2013, Tower's counsel sent ACP a draft merger agreement that was merely a revised version of the draft agreement AmTrust had sent to Tower weeks earlier when AmTrust had proposed acquiring the company.

53.     Also on December 30, 2013, Zyskind finally (and simultaneously) informed the Board about (a) AmTrust's withdrawal of its bid to acquire Tower and (b) ACP's pending bid to acquire Tower.  Specifically, during a telephonic Board meeting that lasted only 25 minutes, Zyskind reported that, through due diligence, management had purportedly become concerned about an acquisition of Tower.  As a result, management contemplated that ACP – not AmTrust – would acquire Tower, and that AmTrust would then purchase certain assets of Tower directly from ACP upon ACP's acquisition of the insurer.

54.     By presenting this information to the Board *after* (a) AmTrust had withdrawn its bid and (b) ACP had tendered its proposal to Tower, Zyskind and members of the Karfunkel Family effectively deprived the Board of the ability to (c) determine whether an acquisition of Tower, particularly in light of its plummeting stock price, still presented a value proposition for AmTrust and (d)

-18-

THE DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

explore alternative transaction structures that did not contemplate the Karfunkel Family's entity, ACP, acquiring Tower.

55.     At the conclusion of the December 30, 2013 meeting, the Board approved AmTrust senior management's (*i.e.*, Zyskind's) continuation of negotiations with Tower.

56.     The AmTrust Board met again on January 3, 2014.  The meeting lasted for approximately fifteen minutes.  Zyskind explained that ACP would acquire Tower for $3.00 per share and that AmTrust and NGCH would then acquire Tower's underlying commercial lines and personal lines businesses, respectively, from Tower.  Zyskind expected that AmTrust would pay between $100 million and $125 million for the asset purchase.

57.     At the end of the meeting, Zyskind asked each Board member to offer any opinions before the full Board made a recommendation to the AmTrust Audit Committee.[5]  With three members of the Karfunkel Family (George Karfunkel, Michael Karfunkel, and Zyskind) and AmTrust's senior management team in attendance, this was an unacceptable substitute for independent deliberation.

58.     Immediately after the Board meeting concluded, a 15-minute Audit

---

[5] The AmTrust Audit Committee consists of directors DeCarlo, Fisch, and Gulkowitz.

-19-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

Committee meeting commenced.  Karfunkel Family member Zyskind explained that AmTrust purportedly could not acquire Tower directly, but expected that the Company could ultimately purchase Tower's statutory companies from ACP for $100 million to $125 million.

59.    Despite the fact that (a) the Audit Committee had only recently learned about the Company's withdrawal of its bid for Tower and ACP's substitute offer, and (b) the Audit Committee's only source of information was a member of the Karfunkel Family who was directly interested in the transaction, the Audit Committee failed to hit the "pause button" or seek to play an active role in the conflicted process.  According to minutes produced by the Company, the Audit Committee did not even *inquire* about retaining independent legal or financial advisors to help determine whether it was actually unadvisable for AmTrust to acquire Tower, or whether an acquisition of Tower by AmTrust – as opposed to ACP – for $3.00 per share would have been in the best interest of the Company.[6] Instead, the Audit Committee simply approved the transaction structure as fed to it

---

[6] Indeed, if an acquisition of Tower by AmTrust for $5.50 per share was compelling in early December 2013, it is reasonable to assume that an acquisition of Tower by AmTrust for $3.00 per share would have been compelling approximately one month later.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

by Zyskind.[7]

60.     Indeed, the Audit Committee was obligated to, but did not, take steps to confirm that abandoning a potential acquisition of Tower and ceding it to AmTrust's controlling stockholder was in the best interests of the Company. Instead, the Audit Committee relied entirely on the conflicted Karfunkel Family as their sole source of information and guidance.

61.     On January 3, 2014, ACP and Tower executed a merger agreement (the "Original Merger Agreement") for ACP to acquire all of Tower for $3.00 per share, which valued Tower at approximately $172.1 million.  Concurrently with execution of the Original Merger Agreement, AmTrust and ACP entered into a commercial lines stock and asset purchase agreement (the "CL SPA"), by which AmTrust agreed to purchase from ACP the renewal rights and certain other assets related to Tower's commercial lines insurance operations ("Commercial Lines

_____

[7] Any argument that an acquisition of Tower by AmTrust was too risky or that an acquisition was not financially attractive is undercut by the fact that the Karfunkel Family was eager to acquire Tower in its entirety in their personal capacity.  Had the Karfunkel Family truly believed that acquiring Tower for $3.00 per share represented a losing proposition, the Karfunkel Family would not have agreed to acquire Tower through a vehicle in which they hold 100% of the equity.  The reality is that the Karfunkel Family realized that Tower represented a tremendous opportunity and they wanted to divert a larger percentage of the potential upside to themselves.

-21-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Assets"), including certain of Tower's U.S.-domiciled insurance companies, for a purchase price equal to the tangible book value of the companies, which was expected to be $125 million.

62.    In connection with the entry into the CL SPA with AmTrust, ACP also entered into a personal lines stock and asset purchase agreement (the "PL SPA") with NGHC, by which NGHC agreed to purchase from ACP the renewal rights and certain other assets related to Tower's personal lines insurance operations ("Personal Lines Assets"), including certain of Tower's U.S.-domiciled insurance companies, for a purchase price equal to the tangible book value of the companies, which also was anticipated to be $125 million.

## VI.    Members Of The Karfunkel Family Work To Restructure The Terms Of The Tower Transaction Outside Of The AmTrust Board's View

63.    Over the next several months, the Karfunkel Family considered potential changes to the structure and financing of ACP's acquisition of Tower. Despite the impact of these potential changes on AmTrust, members of the Karfunkel Family neglected to raise them at the February 2014 and March 2014 AmTrust Board meetings.

64.    On April 7, 2014, Zyskind finally informed the Audit Committee that

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

the Karfunkel Family had decided to modify the deal structure for ACP's acquisition of Tower.  Zyskind proposed a new structure whereby ACP would purchase Tower and all of its subsidiaries, but the Company would retain the renewal rights.  The revised structure called for the Company to finance ACP's acquisition through a loan.

65.   After meeting for less than half an hour – and without the benefit of independent financial or legal advisors, or even any prepared materials – the Audit Committee somehow determined that it was in the best interests of the Company and its unaffiliated stockholders to approve and proceed with the newly-structured transaction with ACP.  The Audit Committee also agreed to the Company's termination of the stock and asset purchase agreement, its entry into the master agreement, and an AmTrust loan to ACP of up to $125 million.

66.   The very next day, AmTrust, ACP, and NGHC agreed to revise the transaction structure.  Under the terms of the new arrangement, AmTrust, ACP and NGHC agreed that (a) Tower (*i.e.*, ACP upon consummation of the Tower acquisition) would retain ownership of all of Tower's U.S. insurance companies, and (b) AmTrust and NGHC would (i) acquire the Commercial Lines Assets and the Personal Lines Assets; (ii) administer the run-off of Tower's historical

-23-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

commercial lines claims and personal lines claims at cost; (iii) in their discretion, place commercial lines business and personal lines business with the Tower insurance companies, which they would exclusively manage and fully reinsure for a net 2% ceding fee payable to the Tower insurance companies; (iv) retain the expirations on all business written by the Tower insurance companies through AmTrust and NGHC, as managers; and (v) receive the agreement of the Tower insurance companies and ACP not to compete with respect to the commercial lines business and personal lines business (the "Revised Plan").

67.    In connection with the Revised Plan, AmTrust and NGHC expected to provide ACP with financing in an aggregate principal amount of up to $125 million each, subject to terms that were to be negotiated (but that would have a term of no shorter than seven years), and would pay a market interest rate.  In addition, AmTrust and NGHC agreed to issue a $250 million aggregate stop-loss reinsurance agreement to Tower by which each company, as reinsurers, would provide, severally, $125 million of stop-loss coverage (the "Stop-Loss").

68.    AmTrust also terminated the CL SPA and entered into a commercial lines master agreement with ACP (the "Master Agreement"), which provided for the implementation of the Revised Plan and AmTrust's acquisition of the

-24-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Commercial Line Assets.

69.     All of these transactions were structured and agreed upon without any independent financial or legal advice, and without any independent negotiation on behalf of AmTrust.  The only item that the Audit Committee sought to negotiate – or seek advice on – was the Company's $125 million related-party loan to ACP.

## VII.   Members Of The Karfunkel Family Negotiate A Purchase Price Reduction For Tower

70.     In late April 2014, Zyskind and AmTrust's mergers and acquisitions executive Adam Karkowsky began negotiations with Tower to reduce ACP's previously agreed-upon $3.00 per share proposal.  Over the next week, ACP and Tower continued negotiations on a revised transaction even though nobody was representing AmTrust's interests in those discussions or taking any steps to protect the Company's interests as the third party in the new deal structure.

71.     On May 2, 2014, Michael Karfunkel, on behalf of ACP, offered Tower a revised purchase price of $2.50 per share of Tower common stock.

72.     Between May 6, 2014 and May 8, 2014, Tower and ACP negotiated the specific terms of an amendment to the Original Merger Agreement (the "Merger Agreement Amendment").  In its final form, the Merger Agreement Amendment, among other things, (a) reduced the merger consideration from $3.00

-25-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

per share to $2.50 per share, (b) reduced the termination fee in an amount proportionate to the reduction in the merger consideration, and (c) made a series of changes to the material adverse effect provision in the Original Merger Agreement to exempt from the provision deterioration in Tower's financial performance.

73.    On May 8, 2014, more than four months after learning about a potential transaction involving Tower and AmTrust, and after a handful of material changes in the deal structure and terms, the Audit Committee finally retained a financial advisor.

74.    The Audit Committee retained as its financial advisor Griffin Partners ("Griffin"), a corporate advisory firm that has a business history with the Karfunkel Family and AmTrust, and agreed to pay Griffin $175,000.[8]  There is no indication that the Audit Committee met with or considered any alternative advisors.

## VIII.  The Karfunkels Continue To Seek Improved Terms For ACP At The Expense Of The Company

75.    On May 29, 2014, the Audit Committee convened a conference call. DeCarlo sought to recuse himself from the call on the basis that in addition to

---

[8] Griffin advised Mutual Insurers Holding Company in its 2013 sale to AmTrust. Stevens & Lee, an affiliate of Griffin, advised First Nonprofit Companies, Inc. in a stock sale to AmTrust.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

serving on AmTrust's Board, he also serves as a member of NGHC's board of directors.  The Audit Committee then decided to form a subcommittee consisting of directors Gulkowitz and Fisch (the "Subcommittee").

76.    On June 26, 2014, the Subcommittee convened for a conference call to discuss ACP's comments to the credit facility term sheet, as well as feedback from Griffin and Michael Karfunkel relating to the Company's loan to ACP.

77.    The Subcommittee met on July 1, 2014 and discussed that ACP had proposed an earn-out structure as one possible means of contingent consideration that would be based on renewal rights of Tower's commercial and personal lines businesses.  The very next day, the Subcommittee authorized an earn-out payment to ACP.

78.    By July 10, 2014, AmTrust and ACP were preparing to present their agreements to insurance regulators, even though the terms were purportedly still being negotiated.

## IX.    The Audit Committee Approves The Terms Of The Credit Agreement And Stop-Loss Retrocession

79.    On July 22, 2014, the Subcommittee approved the terms of the credit agreement between AmTrust, ACP and NGHC (the "Credit Agreement").  The Credit Agreement contemplated a $250 million secured loan with a seven-year

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

term and a 7% annual interest rate.

80.     That same day, the Subcommittee also approved the terms of the Stop-Loss and Retrocession.  The Stop-Loss premium will be equal to $56 million, payable five years following the closing of the Tower Merger (the "Stop-Loss Premium").  The Retrocession premium will be equal to the Stop-Loss Premium, less a fee of 5.5% of the Stop-Loss Premium to be retained by AmTrust and NGHC.

81.     On August 7, 2014, the Audit Committee met and reviewed a summary of the terms of the earn-out payment to be made to ACP.  The Audit Committee also agreed to cause the Company to either sub-lease or assume certain office leases from ACP.

82.     On September 15, 2014, AmTrust entered into various agreements with Tower (then-owned by ACP) including, primarily, a renewal rights agreement and a quota share reinsurance agreement.  Based on the terms of the renewal rights agreement, AmTrust is required to pay ACP an earn-out of up to $30 million over a three-year period based on 3% of the gross written premiums of the Tower commercial lines business (the "Earn-Out").  The quota share agreement replaced the Cut-Through Reinsurance Agreement.  Additionally, AmTrust entered into the

-28-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Credit Agreement to finance ACP's purchase of Tower.

83.     Thus, not only did the Karfunkel Family usurp from AmTrust the corporate opportunity presented by an acquisition of Tower, but they also (i) saved money as a result of the reduced purchase price, and (ii) extracted improved terms from the Company.  Instead of passing along some of the cost savings to AmTrust, the Karfunkel Family again enriched itself to the detriment of the Company.

## DERIVATIVE ALLEGATIONS

84.     Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of breaches of fiduciary duties by Defendants and usurpation of corporate opportunity by ACP and the Karfunkel Family.

85.     Plaintiff has owned AmTrust stock continuously during this relevant period.

86.     Plaintiff will adequately and fairly represent the interests of AmTrust and its stockholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in stockholder derivative litigation.

## DEMAND ON THE AMTRUST BOARD IS EXCUSED AS FUTILE

87.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

-29-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

88.     Plaintiff has not made a demand on the AmTrust Board to investigate or initiate the claims asserted herein because demand is excused as futile.

89.     Such demand would be futile and useless, and is thereby excused, because the allegations herein, at a minimum, permit the inference that a majority of the members of the AmTrust Board are either interested in the Tower Transactions,[9] or lack the requisite independence from the Karfunkel Family to determine fairly whether to pursue claims relating to the Tower Transactions that would be adverse to the Karfunkel Family's economic interests.  Additionally, the Board's decision to consummate the Tower Transactions was not the product of a valid exercise of business judgment.

90.     The AmTrust Board is comprised of seven directors.  Three of the members of the AmTrust Board are members of the Karfunkel Family – George Karfunkel, Michael Karfunkel and Zyskind.  As detailed herein, the Karfunkel Family, through their ownership of ACP, was interested in the Tower Transactions.

91.     Additionally, George Karfunkel, Michael Karfunkel and Zyskind are not independent for demand futility purposes.  Indeed, the 2015 Proxy concedes

---

[9] As used herein, the term "Tower Transactions" means, collectively, (a) ACP's acquisition of Tower, (b) the CL SPA, (c) the PL SPA, (d) the Revised Plan, (e) the Stop-Loss, (f) the Master Agreement, (g) the Credit Agreement and (h) the Earn-Out.

-30-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

that "Barry Zyskind, George Karfunkel, and Michael Karfunkel do not qualify as independent directors."

92.    A fourth member of the Board, Defendant Miller, is not independent of the Karfunkels, and in turn, is not independent for purposes of determining whether to pursue claims relating to the Tower Transactions.  Miller has served on the AmTrust Board since the Karfunkel Family founded the Company in 1998. Miller also serves as director or advisor on a number of other entities controlled by, or partially-owned by, the Karfunkel Family, including as director of American Stock Transfer & Trust Co., Security National Insurance Company, Technology Insurance Company, AmTrust North America of Florida Inc. and AmTrust North America of Texas Inc.

93.    Furthermore, Miller is the trustee of the George Karfunkel Trusts.  As trustee for the George Karfunkel Trusts, Miller is a fiduciary of George Karfunkel. Miller is therefore ethically obligated to protect and advance the interests of George Karfunkel, and could not independently consider a demand on the Board to investigate or prosecute the claims alleged herein.

94.    Additionally, Miller serves as an "advisor" to George Karfunkel's personal investment vehicle – GK Acquisition.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

95.    Miller's role as trustee and advisor for George Karfunkel evidences George Karfunkel's faith in Miller's loyalty and ability to safeguard and advance George Karfunkel's interests.

96.    Miller's loyalty to the Karfunkel Family is also evidenced by Miller's unpaid service as AmTrust's corporate secretary from 1998 to 2005.

97.    Miller's long-term and multifaceted personal and professional relationship with the Karfunkel Family makes him incapable of properly and disinterestedly considering a demand on the AmTrust Board to investigate or prosecute the claims alleged herein.

98.    Miller's loyalty to, and mutually beneficial relationship with, the Karfunkel Family is also evidenced by his outsized compensation for serving on the AmTrust Board.  For the fiscal year ended December 31, 2014, Miller received a total of $291,958 in cash and equity awards for his Board service.

99.    Indeed, all of the purportedly independent AmTrust directors enjoy outsized director compensation.  For the fiscal year ended December 31, 2014, Gulkowitz received $246,480 in cash and equity awards for his Board service; Fisch received $234,480 in cash and equity awards for her Board service; and DeCarlo received $348,480 in cash and equity awards for his Board service.

-32-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

100.   In light of the foregoing, demand on the AmTrust Board to investigate or prosecute the claims alleged herein is excused as futile.

## COUNT I

**DERIVATIVE CLAIM FOR**
**BREACH OF FIDUCIARY DUTY AGAINST THE KARFUNKEL FAMILY**
**IN THEIR CAPACITY AS**
**AMTRUST'S CONTROLLING STOCKHOLDER**

101.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

102.   As detailed herein, the Karfunkel Family is AmTrust's controlling stockholder.   As a controlling stockholder, the Karfunkel Family owes the Company and its stockholders the utmost fiduciary duties of due care, good faith, candor, and loyalty.

103.   AmTrust had an interest in acquiring Tower, as evidenced by the Company's overtures to Tower and its advisors, including but not limited to the offer to purchase Tower submitted by the Company in December 2013.

104.   An acquisition of Tower was a business opportunity that AmTrust was financially able to undertake.

105.   Without first informing the AmTrust Board, the Karfunkel Family

-33-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

improperly and selfishly caused the Company to abandon its pursuit of Tower and instead initiated its own pursuit of Tower on behalf of ACP (*i.e.,* the Karfunkel Family's personal entity).

106. In connection with the Tower Transactions, the Karfunkel Family's improper conduct included, among other things, (a) usurping a corporate opportunity from the Company through ACP, (b) initially revising the transaction terms without Board input, (c) causing the Company to participate in a $250 million loan to ACP to facilitate its acquisition of Tower, and (d) demanding the Earn-Out Payment. This conduct constitutes a breach of the Karfunkel Family's fiduciary duties owed to the Company and its stockholders.

107. AmTrust has been and continues to be harmed by the Karfunkel Family's improper usurpation of the Company's corporate opportunity to acquire Tower and breaches of fiduciary duty in causing the Company to enter into related agreements unfair to the Company, including the term loan and Earn-Out Payment.

108. The Company is entitled to restitution including disgorgement of any profits received by ACP or the Karfunkel Family (in their personal capacity rather than their capacity as AmTrust stockholders) as a result of the Tower Transactions.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

## COUNT II

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS

109.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

110.   The Director Defendants, as AmTrust directors and officers, owe the Company the utmost fiduciary duties of due care, good faith, candor and loyalty. By virtue of their positions as directors and/or officers of AmTrust and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Director Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.  Each of the Director Defendants was required to, among other things:  (a) use their ability to control and manage AmTrust in a fair, just and equitable manner; and (b) act in furtherance of the best interests of AmTrust and its stockholders, and not in furtherance of their own.

111.   The Director Defendants breached their fiduciary duties by failing to inform themselves regarding AmTrust's strategic alternatives with respect to Tower and instead allowing conflicted fiduciaries to dominate and control the Company's deliberations about and negotiations with Tower.

-35-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

112.   The Director Defendants breached their fiduciary duties in agreeing to the Revised Plan, the Earn-Out and the Credit Agreement on terms unfair to the Company.

113.   The Director Defendants also breached their fiduciary duties by failing to safeguard the Company's interests in the face of a clearly conflicted series of transactions.

## COUNT III

### DERIVATIVE CLAIM AGAINST THE KARFUNKEL FAMILY AND ACP FOR UNJUST ENRICHMENT

114.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

115.   The Tower Transactions were the product of breaches of fiduciary duty by the Director Defendants and/or the usurpation of a corporate opportunity by ACP and the Karfunkel Family.

116.   The terms of the Tower Transactions are unfair to the Company and provide improper benefits to the Karfunkel Family and ACP.

117.   The process by which the Tower Transactions were orchestrated was also improper, and unduly influenced by the Karfunkel Family.

118.   The Karfunkel Family and ACP were – and continue to be – the direct

-36-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

recipients of the benefits flowing from the Tower Transactions.  Those benefits were derived by improper and unlawful means.

119.   It would be unconscionable for the Karfunkel Family and ACP to be permitted to retain these benefits that were derived by improper and unlawful means.

120.   The Karfunkel Family and ACP have therefore been unjustly enriched as a result of the Tower Transactions and the Company is entitled to restitution.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment as follows:

a.     Finding that demand on the AmTrust Board is excused as futile;

b.     Finding the Karfunkel Family, in their capacity as controlling stockholder of AmTrust, liable for breaching their fiduciary duties owed to AmTrust and it stockholders, by among other things, usurping a corporate opportunity from AmTrust;

c.     Finding the Director Defendants liable for breaching their fiduciary duties;

d.     Finding the Karfunkel Family and ACP liable for unjust enrichment;

-37-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

e.    Requiring AmTrust to improve its corporate governance practices and/or change the composition of the Board to better protect the Company and its stockholders from the undue influence of the Karfunkel Family;

f.    Awarding the Company compensatory damages, together with pre-and post-judgment interest;

g.    Requiring ACP and the Karfunkel Family to account for and disgorge all profits resulting from the Tower Transactions;

h.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

i.    Awarding such other and further relief as is just and equitable.

Dated:  April 7, 2015

LABATON SUCHAROW LLP

By */s/ Ned Weinberger*

    Christine S. Azar (#4170)
    Ned Weinberger (#5256)
    300 Delaware Ave., Suite 1340
    Wilmington, DE  19801
    (302) 573-2540

OF COUNSEL:

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
(212) 907-0700

*Counsel for Plaintiff*

-38-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

Jeremy Friedman
Spencer Oster
FRIEDMAN OSTER PLLC
240 East 79th Street, Suite A
New York, NY  10075
Tel:  (888) 529-1108

*Counsel for Plaintiff*

-39-

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY THE COURT.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

DAVID SHAEV PROFIT SHARING PLAN                    Index No:

                                    Plaintiff,

        -against-

                                                   **⌐SUMMONS⌐**

DONALD T. DECARLO, SUSAN FISCH,
ABRAHAM GULKOWITZ, JAY J. MILLER,
MICHAEL KARFUNKEL, RONALD E. PYZALY, JR.
BARRY D. ZYSKING AND
AMTRUST FINANCIAL SERVICES, INC.                   Date Index No. Purchased:

                                    Defendants.

-----------------------------------------------------------------------X

To the above named Defendants:

        You are hereby summoned to answer the Complaint in this action and to serve a copy of your
answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the
Plaintiff's attorney within twenty days after service of this summons, exclusive of the day of service,
or within thirty days after service is complete if this summons is not personally delivered to you
within the State of New York. In case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded in the complaint.

        The basis of the venue designated is New York County which is Defendants' office.

Dated: New York, New York
        April 26, 2017

                                        Ballon Stoll Bader & Nadler, P.C.

                                        By: _____
                                            Irving Bizar

                                        Attorneys for Plaintiff
                                        David Shaev Profit Sharing Plan
                                        729 Seventh Avenue, 17th Fl.
                                        New York, NY 10019
                                        (212) 575-7900

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

---

DAVID SHAEV PROFIT SHARING PLAN

                Plaintiff,

      -against-                                                   **COMPLAINT**

DONALD T. DECARLO, SUSAN FISCH,

ABRAHAM GULKOWITZ, JAY J. MILLER,

MICHAEL KARFUNKEL, RONALD E. PYZALY, JR.

BARRY D. ZYSKIND AND AMTRUST FINANCIAL

SERVICES, INC.

                Defendant.

---

       Plaintiff, David Shaev Profit Sharing Plan ("Plaintiff"), by and through its undersigned

attorneys for its Complaint (the "Complaint") against the defendants, alleges upon information

and belief, except as to paragraphs 1 and 4 which are alleged on knowledge:

1. Plaintiff is a stockholder of Defendant AmTrust Financial Services, Inc. ("AmTrust"
   hereinafter) having acquired its shares prior to the times and events alleged herein and
   has continually owned its shares since its acquisition.

2. The individual defendants are the directors of defendant AmTrust and were its directors
   throughout the times hereinafter alleged with defendant Michael Karfunkel as the
   chairman of the Board of Directors and its chairman throughout the times alleged below.
   He is the father in law of defendant Barry D. Zyskind.

3. Defendant Zyskind is the President and Chief Executive officer of AmTrust.

1

4. Defendant AmTrust is a corporation organized and existing under the laws of the State of Delaware with its principal place and executive offices in New York City at 59 Maiden Lane and actively doing and authorized to do business in New York. As part of that authorization, it agreed to be bound by and obey the laws of New York.

5. AmTrust's business is to underwrite and provide property and casualty insurance.

6. It owns a 12% interest in National General Holdings Corp. ("NYHC") which operates fifteen insurance companies in the United States providing a variety of insurance products.

7. Defendants Michael Karfunkel and the Michael Karfunkel 2003 Family Trust are the two largest shareholders of NYHC. One of the beneficiaries of that family trust is defendant Zyskind's wife.

8. As a public company, AmTrust was required to file truthful statements with the Securities and Exchange Commission and to have appropriate controls over its financial reporting.

9. All financial reports were appropriately filed with the various regulatory bodies, including the Securities and Exchange Commission, and they contained certifications that the internal control over its financial reporting was in place and effective. They also contained certifications that the financial information and the comments provided in the statements were true and correct.

10. Subsequently, it was learned that the financial statements the Company had issued for the years 2014, 2015 and the first three quarters of 2016 pursuant to the Sarbanes Oxley Act, were erroneous, false and misleading. Corrected statements to be filed were promised. Those subsequently filed statements reflected the fact that the Company had filed incorrect financial statements due to material weaknesses in the internal control

2

Case 1:23-cv-01210-UNA Document 2-1 Filed 09/15/22 Page 570 of 1049 PageID #: 582

over financial reporting. Corrections were expected to be made in the prior public
financial statements.

11. The filing of false and incorrect financial statements violated federal and state law.

12. The market price of the publicly traded shares of the Company rapidly declined by at least
$5 per share.

13. Class action suits have been commenced, targeting the Company.

14. The Company has been and will likely be substantially damaged and will likely pay
substantial monies in connection with the foregoing suits both in damages and legal
expense.

15. Demand upon the Board to bring or authorize this suit is not necessary for the following
reasons:

    a.  The Board authorized and/or permitted the improper conduct which violated
        the law.

    b.  The individual defendants as members of the Board having authorized or
        approved the improper acts are liable and cannot make an impartial decision to
        sue themselves.

**WHEREFORE**, plaintiff demands judgment against the individual defendants for an
accounting of all the damages sustained and to be sustained by AmTrust and for
reasonable attorneys' fees and reimbursement of costs.

Ballon Stoll Bader & Nadler, P.C.

By

Attorneys for Plaintiff
729 Seventh Avenue
New York, NY 10019

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

IN RE AMTRUST FINANCIAL SERVICES,
INC. DERIVATIVE LITIGATION

Case No. 1:17-CV-00553-GMS

**DEMAND FOR JURY TRIAL**

## VERIFIED SECOND AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
David Wales
John Vielandi
1251 Avenue of the Americas
44th Floor
New York, NY  10020
 (212) 554-1400
davidw@blbglaw.com
John.Vielandi@blbglaw.com

**SAXENA WHITE P.A.**
Joseph E. White, III
Jorge A. Amador
Adam D. Warden
150 East Palmetto Park Road
Suite 600
Boca Raton, Florida 33432
(561) 394-3382
jwhite@saxenawhite.com
jamador@saxenawhite.com
awarden@saxenawhite.com

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576
ssinger@saxenawhite.com

*Counsel for Co-Lead Plaintiffs*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (Del I.D. No. 2864)
Michael J. Barry (Del I.D. No. 4368)
Kyle J. McGee (Del I.D. No. 5558)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
jeisenhofer@gelaw.com
mbarry@gelaw.com
kmcgee@gelaw.com

*Counsel for Co-Lead Plaintiffs*

# TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ............................................................................. 10

PARTIES ........................................................................................................... 11

    I.      Plaintiffs ................................................................................................ 11

    II.     Nominal Defendant ............................................................................. 11

    III.    Officer Defendants ............................................................................. 12

    IV.    Director Defendants ............................................................................ 13

    V.     Relevant Non-Parties ......................................................................... 16

SUBSTANTIVE ALLEGATIONS ...................................................................... 19

    I.      Defendants Both Encouraged and Failed to Address the Fraudulent Accounting Scheme ........................................................... 19

        A.    Defendants Ignored Blatant Red Flags of Improper Accounting ............ 21

            1.    *Geo Investing* December 2013 Article ........................................... 21

            2.    *Barron's* February 2014 Article.................................................... 22

            3.    *Barron's* May 2014 Article........................................................... 24

            4.    The Alistair Capital Letter ............................................................. 26

            5.    *Barron's* April 2016 Article.......................................................... 30

        B.    Defendants Ignored Red Flags Regarding The Specific Fraudulent Accounting Practices, Internal Controls Weaknesses, and Auditor Deficiencies that Led to the 2017 Financial Restatements ...................... 31

            1.    Red Flags Concerning AmTrust's Auditor ................................... 31

            2.    Red Flags Regarding Internal Control ......................................... 32

            3.    Red Flags Regarding Reserves ...................................................... 34

            4.    Red Flags Regarding Improper Accounting for Deferred Acquisition Costs ...................................................................... 40

    II.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO REPURCHASE STOCK AT INFLATED PRICES, AND, IN THE CASE OF THE SELLING DEFENDANTS, BY SELLING STOCK TO THE COMPANY AT INFLATED PRICES ................................... 41

        A.    Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program .................................................................................................... 42

        B.    The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By Selling Back Shares to the Company at Artificially Inflated Prices ...................................................................................................... 44

C. In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading Statements ........................................................................ 47

III. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ........................................................................................... 49

A. False Statements ........................................................................ 50

    1. First Quarter 2014 Financial Results .................................. 50

    2. Second Quarter 2014 Financial Results ............................... 53

    3. Third Quarter 2014 Financial Results .................................. 55

    4. Fourth Quarter and Full Year 2014 Financial Results ........... 56

    5. First Quarter 2015 Financial Results .................................. 59

    6. Second Quarter 2015 Financial Results ............................... 61

    7. Third Quarter 2015 Financial Results .................................. 63

    8. Fourth Quarter and Full Year 2015 Financial Results ........... 64

    9. First Quarter 2016 Financial Results .................................. 67

    10. Second Quarter 2016 Financial Results ............................... 69

    11. Third Quarter 2016 Financial Results .................................. 71

B. False Accounting and Breaches of Fiduciary Duty Start to be Revealed ................................................................................... 72

    1. February 27, 2017 Press Release ....................................... 72

    2. February 27, 2017 Conference Call .................................... 73

    3. March 16, 2017 Press Release ........................................... 74

    4. April 4, 2017 Disclosures .................................................. 75

C. AmTrust's Financial Reporting Through the Relevant Period was Materially False and Misleading in Violation of GAAP and SEC Regulations Governing Financial Reporting ................................... 76

    1. AmTrust Admitted Its Financial Statements Were Materially False and Misleading ........................................................ 78

    2. Defendants Overstated AmTrust's Reported Revenue ........... 81

    3. Defendants Understated AmTrust's Reported Expenses ......... 82

        a. Defendants Improperly Deferred Bonuses ....................... 83

        b. Defendants Improperly Capitalized Certain Deferred Acquisition Costs ........................................................ 83

|  |  | c. | Defendants Improperly Capitalized Internal Software Costs and Other Expenses........................................................... 84 |
|  | 4. |  | Defendants Improperly Accounted for Interest Expense.............. 85 |
|  |  | a. | Defendants Failed to Record Other Expense Items .......... 85 |
|  | 5. |  | Defendants' Other GAAP Violations ........................................... 86 |
|  |  | a. | Defendants' Improper Accounting and Reporting of Foreign Currency Gains and Losses ................................. 86 |
|  |  | b. | Defendants Improper Accounting of Certain Balance Sheet Items........................................................................................ 86 |
|  | 6. |  | AmTrust's Contravention of GAAP Violated SEC Regulations ................................................................................... 86 |
| D. |  |  | AmTrust's Material Weaknesses in Internal Controls............................. 88 |
| E. |  |  | Further Fallout from Defendants' Accounting Manipulation.................. 92 |
|  | 1. |  | Wall Street Journal April 11, 2017 Article .................................. 92 |
|  | 2. |  | Keefe, Bruyette & Woods' May 2017 Note ................................. 93 |
| F. |  |  | Additional Allegations Contributing to a Strong Inference of Scienter ................................................................................................ 94 |
| G. |  |  | Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply to Defendants' Misrepresentations ................................................. 95 |
| H. |  |  | The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions................................................................................................ 96 |
| I. |  |  | Defendants' Misstatements and Omissions Caused Damage to AmTrust ................................................................................................. 97 |

DERIVATIVE ALLEGATIONS ...................................................................................... 98

DEMAND IS EXCUSED AS FUTILE ............................................................................ 98

| I. | Demand is Excused as to the Control Group and Those That Lack Independence From It ...................................................................................................... 99 |
| II. | Demand is Excused as to the Insider Selling Defendants.................................. 109 |
| III. | Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability on the Claims Asserted Herein...................................... 110 |
| IV. | Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Related Violations of Federal Securities Laws ............................................................................................................. 114 |

PLAINTIFFS ATTEMPTED TO UTILIZE THE 220 PROCESS TO OBTAIN DOCUMENTS FROM AMTRUST ................................................................................. 115

DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS ......................................................... 117

| I. | Duties of All Defendants ................................................................................. 117 |

II.     Conspiracy, Aiding and Abetting, and Concerted Action ................................... 119

III.    The Company's Code of Business Ethics .......................................................... 120

IV.    The Audit Committee ...................................................................................... 121

CLAIMS FOR RELIEF ............................................................................................... 123

PRAYER FOR RELIEF ............................................................................................... 133

JURY TRIAL DEMANDED ........................................................................................ 135

Co-Lead Plaintiffs City of Lauderhill Police Officers' Retirement Plan, Pompano Beach Police & Firefighters' Retirement System, and West Palm Beach Police Pension Fund ("Plaintiffs"), stockholders of AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), bring this action on AmTrust's behalf seeking relief under federal and state law for the misconduct perpetrated against the Company by the current and former officers and directors identified below (collectively, "Defendants") arising from AmTrust's long-running and wide-ranging accounting manipulation, leading the Company to understate the Company's loss reserves, overstate line items including revenue, total service and fee income, and net income, and misrepresent its loss reserve practices and financial results.[1] Plaintiffs, through their counsel, have conducted an investigation into the facts supporting the allegations in this Complaint and believe discovery will elicit further evidentiary support for their allegations.[2]

## NATURE AND SUMMARY OF THE ACTION

1.     This stockholder derivative action arises from the actions of AmTrust's controlling stockholders (the "Control Group") to fraudulently misstate the company's financial performance. The Control Group's fraudulent conduct allowed the Company to raise enormous amounts of investor capital – which was used to grow the Company and the value of the Control Group's holdings – and engage in lucrative related party transactions. Further, because the compensation of the CEO – who is a member of the Control Group family – was tied to the

---

[1] While AmTrust is named as a nominal defendant, any reference to "Defendants" does not encompass the Company.

[2] Plaintiffs' investigation included a review of: (i) filings by AmTrust with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other publications disseminated by certain of the Defendants and other related non-parties; (iii) news articles, shareholder communications, conference call transcripts, and postings on AmTrust's website concerning the Company's public statements; and (iv) other publicly available information concerning AmTrust and the Defendants.

Company's financial results, the Control Group was incentivized to inflate the Company's financials, resulting in excessive compensation for the CEO.

2.      From at least December 12, 2013 to the present (the "Relevant Period"), AmTrust used a wide range of fraudulent techniques to understate the Company's loss reserves and overstate its financial results.  Defendants – who include the Company's CEO, CFO, controlling shareholders, and the three members of the Company's Audit Committee – either actively participated in the accounting manipulation or consciously disregarded it, to the point that, in 2017, the Company was forced to restate nearly three years' worth of revenue, total service and fee income, net income, and other important metrics by double-digit percentages.

3.      Certain of the Defendants, including Chief Financial Officer ("CFO") Ron Pipoly ("Pipoly"), actively participated in manipulating the Company's financials, while other Defendants, who sat on the Board and its Audit Committee, deferred to the Control Group and consciously abdicated their duties to ensure legal compliance and strong internal controls over financial reporting.  The Audit Committee members also failed to properly oversee the Company's auditor, BDO USA, LLP ("BDO"), who, based on evidence collected by a whistleblower within BDO, appears to have participated in the accounting fraud, and whose adequacy was called into doubt by a New York Department of Financial Services ("NYDFS") letter to AmTrust in late 2014.[3]

4.      In addition to causing massive and devastating financial restatements, Defendants' accounting manipulation has led to investigations of AmTrust by the Federal Bureau of Investigation ("FBI"), the United States Securities and Exchange Commission ("SEC") and

---

[3] BDO is also named as a co-Defendant in federal securities litigation against AmTrust and certain officers and directors of the Company.  *See In re AmTrust Financial Services, Inc. Securities Litigation*, No. 1:17-cv-01545-LAK (S.D.N.Y.).

NYDFS. Defendants' misconduct has dramatically eroded the Company's stock price, caused securities fraud litigation, and harmed the Company's reputation and business. It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation. Moreover, the misconduct caused insurance rating agency A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

5. Further, certain Defendants not only actively participated in or willfully overlooked the Company's pervasive accounting manipulation, but profited from it at the Company's expense. Specifically, the Board improperly approved stock buybacks that led AmTrust to repurchase over 8 million shares at artificially inflated prices. In approving these buybacks at inflated prices, Defendants breached their fiduciary duties to the Company and wasted corporate assets. In addition, three Defendants – CFO Ronald E. Pipoly, Jr. ("Pipoly"), and Audit Committee members Abraham Gulkowitz ("Gulkowitz") and Donald T. DeCarlo ("DeCarlo") – sold a combined $5.6 million worth of stock at inflated prices during the Relevant Period. In selling their stock prior to the public disclosure of this restatement, defendants used their insider information to personally profit.

6. The Company's culture of accounting manipulation and internal control weaknesses were fostered by AmTrust's controlling shareholder family – co-founder and director George Karfunkel ("G. Karfunkel"), director Leah Karfunkel ("L. Karfunkel"), and CEO and director Barry Zyskind ("Zyskind"), who is married to the daughter of L. Karfunkel and deceased co-founder Michael Karfunkel ("M. Karfunkel"). Together, these three own or control approximately 44% of the Company's common stock, and control and dominate the

Company's Board. The Karfunkels and Zyskind have a long history of pushing the Company into transactions with related entities that they also control, for their own benefit, and of using those other entities to foster AmTrust's accounting manipulation and under-reserving. The so-called "independent" directors on the Board have consistently rubber-stamped these transactions with little deliberation. As such, they are incapable of evaluating a demand to bring the claims asserted herein because they are dominated by the conflicted Control Group and, as a result of their conscious disregard of the Company's fraudulent accounting, face a substantial likelihood of liability for violating federal securities law and breaching their fiduciary duties.

7.      In fact, throughout the Relevant Period, Defendants consciously disregarded a plethora of including red flags regarding the Company's internal controls over financial reporting, as well as red flags regarding that specifically warned Defendants about the issues that led to the 2017 restatements. For example, on February 8, 2014, financial publication *Barron's* issued the first of three scathing articles about AmTrust's accounting, suggesting that management is using "complicated" accounting schemes to "make the business look much better than it really is." The article, titled "An Insurer's Feat: Turning Losses Into Gains" discussed, *inter alia*, how AmTrust's management uses an intricate "web of related-party deals with the Karfunkels" to mask insurance losses and boost profits by "deferring costs more aggressively than the matching revenues" using a balance sheet line item called "deferred policy acquisition costs." *Barron's* reporting about AmTrust's fraudulent accounting for deferred acquisition costs was ultimately proven correct, as it was one of the stated reasons for the Company's 2017 financial restatements. Defendants not only obviously were aware of this article, but Defendant Zyskind specifically spoke with *Barron's* for purposes of the article. Yet Defendants took no steps to remedy the issues raised by the article.

8.      On May 31, 2014, *Barron's* again questioned AmTrust's accounting, including the adequacy of its reserves, suggesting that AmTrust selected unusually low estimates for its eventual losses.  *Barron's* explained that AmTrust paid out a higher percentage of its original estimate for losses on accidents in the years 2006 through 2012 than its peers in the workers' compensation insurance industry.  This explained why the Company's premium revenue as of March 31, 2014 was more than five times tangible book value, an exorbitant rate considering the industry average was 1.4.  In spite of this red flag, Defendants took no action to investigate or remedy the issues raised.

9.      On September 16, 2014, the Company filed a Form 8-K with the SEC disclosing that NYDFS had, *inter alia*, indicated that BDO would no longer have the resources necessary to serve as the Company's auditor.  NYDFS had demanded that "[i]n light of AmTrust's growth and increased geographic footprint, AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015."  Yet AmTrust retained ignored the NYDFS and retained BDO for its 2015 audit and did not dismiss BDO until April 2016, when it replaced them with KPMG LLP ("KPMG").  KPMG's first audit of AmTrust would lead to the Company's 2017 financial restatements.

10.     On December 18, 2014, Alistair Capital Management, LLC ("Alistair Capital"), a sophisticated institutional investor, sent a 16-page letter (the "Alistair Capital Letter") directly to the Audit Committee of the Board, alerting them to a panoply of accounting issues.  The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts

reported by AmTrust and the amounts reported by a related-party for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions. Five pages of the letter were devoted to signs that the Company's overall internal controls over financial reporting were weak. These signs were "indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care in diligently monitoring the Company's control environment." This red flag warning was borne out by the Company's later disclosures and financial restatements. Indeed, on February 27, 2017, the Company disclosed that it had identified material weaknesses in its internal controls, as well as accounting problems relating to its deferred acquisition costs. Notably, prior to the Alistair Capital Letter, the Company had recently sued Alistair Capital for alleged defamatory statements, and Alistair Capital had sent the letter in response. After receiving the letter, AmTrust quietly dismissed its defamation suit, likely because it feared that the truth of Alistair Capital's claims would be revealed if the litigation continued.

11. On April 23, 2016, after continued inaction and silence by AmTrust's Board, *Barron's* took the extraordinary step of questioning—for the third time—the adequacy of AmTrust's reserves and its accounting. In this article, *Barron's* asserted that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside." *Barron's* further noted that even analysts at AmTrust's investment banker, Keefe, Bruyette & Woods, Inc. ("KBW"), wondered in various notes whether the insurer's underwriting margins were overstated. The Board not only failed to meaningfully acknowledge

6

the red flags raised in the *Barron's* articles and Alistair Capital Letter, but instead vehemently attacked their credibility and decided against proactively investigating these potential issues.

12.     In response to repeated questions regarding its accounting and the adequacy of its reserves, AmTrust consistently responded that its processes were rigorous and that it was more than adequately reserved.  Even worse, rather than investigating the myriad of issues outlined in the *Barron's* articles, the Board approved an increase in the Company's stock buyback program of $200 million in April 2016.  AmTrust proceeded to engage in a massive buying spree of Company stock at tremendously inflated prices over the next four months, purchasing nearly 5.5 million shares at a cost of $135 million from April to July 2016.

13.     As was inevitable, on February 27, 2017, AmTrust finally disclosed a litany of accounting issues in its fourth quarter 2016 earnings press release, including inadequate reserves, material weaknesses in its internal controls, and the need to make adjustments to previously issued financial statements.  For Q4 2016, AmTrust reported financial results that fell well short of Wall Street expectations in large part because of the $65 million reserve charge primarily related to strengthening prior-year loss and loss-adjustment reserves in its "Specialty Program" segment.  AmTrust also indicated it would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016.  The Company not only warned that additional adjustments and/or material weaknesses could be identified but disclosed a multitude of accounting errors dating back to at least 2012 pertaining to improperly accrued bonuses, incorrect foreign exchange calculations, and wrongfully booked revenue.

14.     In reaction to these disclosures, AmTrust's share price plummeted $5.32 per share, or 19%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on

Monday, February 27, 2017—wiping out over $900 million in market capitalization in one trading day.

15.     Just weeks later, on March 16, 2017, AmTrust disclosed that it needed additional time to complete its consolidated financial statements for fiscal year 2016.   The Company revealed that its consolidated financial statements for fiscal years 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon.   The Form 10-K filing delay and the restatements largely related to the timing of recognition of revenue.

16.     Investors were stunned by these disclosures and AmTrust's share price was punished anew as a result, dropping $4.03 per share, or 18.6%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017—wiping out over $686 million in Company market capitalization.

17.     On April 4, 2017, the Company filed its 2016 Annual Report on Form 10-K which included restated financial statements for 2014 and 2015.   The restated financials reduced 2014 and 2015 net income by 7.2% and 11.2%, respectively.   The Form 10-K also revealed that the Company had taken additional reserve charges beyond the $65 million originally disclosed in February.   In fact, the Form 10-K disclosed that for the year ended December 31, 2016, total charges related to prior period adverse development amounted to $257.9 million.

18.     Then, on April 11, 2017, *The Wall Street Journal* reported that the SEC, the FBI, and the NYDFS, were each probing AmTrust's accounting practices.   According to *The Wall Street Journal*, a former BDO auditor-turned-whistleblower casually walked around BDO's offices in 2014 striking up conversations with colleagues about BDO's audits of AmTrust. Unknown to his colleagues, the whistleblower was recording all conversations for the FBI.   The

whistleblower claimed to be in possession of documents demonstrating that AmTrust shifted $277 million in losses to an "offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount." Although the FBI's investigation concerns whether BDO tried to bury poor accounting practices in its AmTrust audits, the SEC's investigation is ultimately centered on AmTrust's accounting practices themselves.

19.     In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

20.     On November 6, 2017, Amtrust made additional disclosures that further confirmed the issues that had been raised by *Barron's*, Alistair Capital and others. Specifically, on that day Amtrust announced that it would be forced to increase reserves for the third quarter ended September 30, 2017 by a staggering $327 million. The increase was so large that it wiped out more than 2/3 of the net income that the Company reported for all of 2016, and was more than five times greater than the $61.6 million in net income the Company reported for the first six months of 2017.

21.     Significantly, precisely as *Barron's* had warned 18 months earlier, the massive reserve increase confirmed that the Company had materially understated its reserves in prior years. Indeed, the Company admitted that the reserve increase was not necessitated by some recent developments, but was instead attributable to cases that had existed for years, and as far back as 2013. As *Barron's* noted on November 7, 2017, "[n]umbers contained in the latest announcement suggest that most of the newly-announced adverse development occurred on cases already known to the company – something we warned about in 2016." Following that announcement, the price of Amtrust's stock fell almost 25%, or more than $3, on heavy volume.

9

22.     In short, Defendants failed—repeatedly and brazenly—to serve the best interests of AmTrust and its stockholders.  Despite overwhelming and specific warnings about the Company's accounting, internal controls and related-party dealings, including a letter written directly to the Board's Audit Committee, Defendants failed to properly investigate these matters. By engaging in a massive stock repurchase program at inflated prices just months before ultimately revealing the very issues the Board was on notice about, Defendants caused enormous damage to the Company.  As a result of their misconduct, Defendants are liable to the Company for breaches of their fiduciary duties of care, good faith and loyalty under Delaware law, and for violations of Sections 10(b), 20A and/or 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as other violations of state and federal law.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because AmTrust is incorporated in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.  In addition, pursuant to AmTrust's Amended and Restated By-Laws, all derivative proceedings brought on behalf of the corporation shall be litigated in a "state or federal court located within the State of Delaware."

10

## PARTIES

### I.     Plaintiffs

25.     Co-Lead Plaintiff City of Lauderhill Police Officers' Retirement Plan ("Lauderhill") is a current stockholder of AmTrust.  Lauderhill has continuously held AmTrust common stock since January 2014.

26.     Co-Lead Plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach") is a current stockholder of AmTrust.  Pompano Beach has continuously held AmTrust common stock since January 2014.

27.     Co-Lead Plaintiff West Palm Beach Police Pension Fund ("West Palm") is a current stockholder of AmTrust.  West Palm has continuously held AmTrust common stock since August 2014.

### II.    Nominal Defendant

28.     Nominal Defendant AmTrust Financial Services, Inc. ("AmTrust" or the "Company") is a Delaware corporation with its principal executive offices located at 59 Maiden Lane, 43rd Floor, New York, NY 10038.  AmTrust's shares trade on the NASDAQ under the ticker symbol "AFSI."

29.     AmTrust was founded in 1998 by brothers George and Michael Karfunkel ("G. Karfunkel" and "M. Karfunkel" respectively).  Defendant Barry Zyskind ("Zyskind"), son-in-law of the late M. Karfunkel, and members of the Karfunkel family collectively own over 44% of AmTrust's common stock.

30.     AmTrust, through its subsidiaries, operates through three business segments: Small Commercial Business Insurance, Specialty Program Business Insurance, and Specialty Risk and Extended Warranty.

31.     The Company's Small Commercial Business segment provides worker's compensation to small businesses that operate in low and medium hazard classes, such as restaurants, retail stores, physicians and other professional offices.

32.     The Company's Specialty Program Business Insurance segment provides workers' compensation, general liability, commercial auto liability, excess surplus lines insurance programs and other specialty commercial property and casualty insurance through managing general agents.

33.     The Company's Specialty Risk and Extended Warranty segment provides custom designed coverage, such as accidental damage plans and payment protection plans sold in connection with the sale of consumer and commercial goods in the United States and Europe.

## III.     Officer Defendants

34.     Defendant Barry D. Zyskind has served as a director on the Company's Board since 1998 and as the Chairman of the Board since May 2016.  Zyskind has also served as Chief Executive Officer ("CEO") and President of AmTrust since 2000.  As of March 24, 2017, Zyskind beneficially owned 44,876,575 shares of AmTrust common stock, approximately 26.2% of the Company's issued and outstanding shares.  Zyskind is a founding stockholder of the Company and is son-in-law of director Leah Karfunkel ("L. Karfunkel").  Zyskind signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  As explained in more detail in paragraphs 287 to 288, a large portion of Zyskind's compensation is directly tied to the Company's financial results.  For the 2013, 2014, 2015, and 2016 fiscal years, Zyskind received total compensation of $4,916,858, $22,130,044, $13,942,205, and $4,902,193 respectively.  As acknowledged by the Company, Zyskind is not an independent director under the NASDAQ listing rules.

35.     Defendant Ronald E. Pipoly, Jr. ("Pipoly") served as Executive Vice President and Chief Financial Officer of AmTrust from 2005 to June 5, 2017.  As of March 24, 2017, Pipoly beneficially owned 593,358 shares of AmTrust common stock.  A large portion of Pipoly's compensation is tied to the Company's financial results.  Pipoly's employment agreement provides that each year, he will receive an annual bonus comparable to other senior executives subject to a cap of three times his annual salary.  Moreover, Pipoly is eligible for an annual discretionary bonus as determined each year by the Compensation Committee.  In 2013 and 2014, Pipoly received a bonus of $2.1 million, including a $300,000 discretionary bonus granted upon the recommendation of Zyskind, with one-third of the value paid in the form of restricted stock units.  In 2015, Pipoly received a bonus of $2.5 million, including a $400,000 discretionary bonus granted upon the recommendation of Zyskind, with 44% of the value paid in the form of restricted stock units.  Moreover, the Company attributed Pipoly's increased bonus in 2015 to "the increase in the size of our finance department and his contributions in overseeing updates to certain accounting systems."  For the 2013, 2014, and 2015, fiscal years, Pipoly received total compensation of $2,685,521, $2,709.281, and $3,215,181, respectively.

36.     Defendants Zyskind and Pipoly are referenced collectively in this Complaint as the "Officer Defendants."

## IV.     Director Defendants

37.     Defendant George Karfunkel has served as a director on the Company's Board since 1998.  G. Karfunkel is a founding stockholder of the Company.  According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on April 11, 2017 ("2017 Proxy Statement"), G. Karfunkel beneficially owns 32,438,408 shares of the Company's common stock, approximately 19.0% of the Company's issued and outstanding shares.  G. Karfunkel is the brother-in-law of Leah Karfunkel.  G. Karfunkel is not considered an independent director

under the NASDAQ listing rules.  G. Karfunkel signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

38.   Defendant Leah Karfunkel ("L. Karfunkel") has served as a director since May 2016.  According to the 2017 Proxy, L. Karfunkel beneficially owns 22,252,098 shares of AmTrust common stock, approximately 13.0% of the Company's issued and outstanding shares. L. Karfunkel is the sister-in-law of G. Karfunkel and the mother-in-law of Zyskind.  She is also the widowed wife of M. Karfunkel.  L. Karfunkel is not considered an independent director under the NASDAQ listing rules.

39.   Defendants Zyskind, G. Karfunkel, and L. Karfunkel (together, the "Control Group") act as a controlling group of the Company.  As such, Zyskind, G. Karfunkel, and L. Karfunkel file a Schedule 13D/As with the SEC indicating that each was a member of a "group" for purposes of reporting beneficial ownership under Section 13 of the Exchange Act. According to the last such Schedule 13D/A filed on June 7, 2017, the Control Group collectively owns 84,062,519 shares of AmTrust common stock, or 44% of the total outstanding shares. However, they owned 49% of the Company's outstanding shares prior to a May 25, 2017 private placement of $300 million of AmTrust stock, 24,096,384 shares, to undisclosed family members of the Control Group.  When these shares are added to the Control Group's shares as disclosed in SEC filings, the Karfunkel family owns approximately 55% of the Company's outstanding shares.

40.   AmTrust's most recent Form 10-K states in relevant part, that the Control Group "acting together, [has] the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation

14

and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."

41.     Defendant Abraham Gulkowitz ("Gulkowitz") has served as a director on the Company's Board since 2006.  At all relevant times, Gulkowitz has served as a member and the Chair of the Board's Audit Committee.  He is also a director of several of AmTrust's subsidiaries.  Gulkowitz signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  Moreover, Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis.  The Hod Foundation, a private foundation owned and controlled by the Control Group, was the beneficial owner of at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint").  FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group.

42.     Defendant Susan C. Fisch ("Fisch") has served as a director on the Company's Board since 2010, as well as a director of several AmTrust subsidiaries.  At all relevant times, Fisch has served as a member of the Board's Audit Committee.  She also currently serves as a member on the Board's Compensation Committee and Nominating and Corporate Governance Committee.  Fisch signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  Based on public disclosures by AmTrust, Fisch has not been employed since joining AmTrust's Board, nor has she served on the Board of any other companies (beside AmTrust's subsidiaries).  As such, all of her publicly reported income is from AmTrust.

43.     Defendant Donald T. DeCarlo ("DeCarlo") has served as a director on the Company's Board since 2006.  At all relevant times, DeCarlo has served as a member of the

15

Board's Audit Committee.  DeCarlo signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  DeCarlo is also a director of National General Holdings Corp. ("NGHC").

44.     Defendant Raul Rivera ("Rivera") has served as a Company director since August 2016.

45.     Defendant Jay Miller ("Miller") served as an AmTrust director from its founding in 1998 until August 1, 2016 and was AmTrust's corporate secretary from 1998-2005.  Miller has extremely close ties to the Karfunkel family.  Miller is the Chairman of the board of directors of Gulf USA Corporation, a property and natural resource company controlled by the Karfunkels.  Furthermore, Miller is the trustee of The George Karfunkel 2007 Grantor Retained Annuity Trust #1 and The George Karfunkel 2007 Grantor Retained Annuity Trust #2, of which G. Karfunkel is a beneficiary.  Miller was also a director of American Stock Transfer & Trust Company, which was founded and owned by the Karfunkel family, until the Karfunkels sold it in 2008.  Miller serves as an advisor to GK Acquisition, a private investment company co-founded by George Karfunkel.  Miller has also previously served as litigation counsel for the Karfunkel Family.

46.     Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, DeCarlo, Rivera, and Miller are collectively referred to hereinafter as the "Director Defendants."   In addition, Defendants Pipoly, Gulkowitz, and DeCarlo comprise the "Insider Selling Defendants."

## V.     Relevant Non-Parties

47.     M. Karfunkel co-founded AmTrust in 1998 and served as the Company's Chairman of the Board from 1998 until his death in April 2016.  According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on March 29, 2016 ("2016 Proxy Statement"), as of March 23, 2016, M. Karfunkel beneficially owned 2,192,824 shares of

AmTrust common stock, approximately 1.3% of the Company's issued and outstanding shares. The Company also disclosed in the 2016 Proxy Statement that M. Karfunkel was not considered an independent director under the NASDAQ listing rules. During the Relevant Period, and before his death, M. Karfunkel was involved in at least thirteen separate related-party transactions involving AmTrust and other entities he was affiliated with or owned in part, as outlined further herein.

48.     According to the 2016 Proxy Statement, M. Karfunkel was also a member of the controlling stockholder group, along with Zyskind, G. Karfunkel, and L. Karfunkel. He was the husband of L. Karfunkel, brother to G. Karfunkel, and father-in-law to Defendant Zyskind.

49.     The Michael Karfunkel Family 2005 Trust (the "Karfunkel Trust") held 15,504,562 shares of the Company's common stock as of March 27, 2017, which represents approximately 9.06% of the Company's total shares of common stock. The shares held by the Karfunkel Trust are beneficially owned and effectively controlled by L. Karfunkel and Zyskind. Defendants Zyskind and L. Karfunkel are co-trustees of the Karfunkel Trust, with the ultimate beneficiaries of the Karfunkel Trust being M. Karfunkel's children, one of whom is married to Defendant Zyskind. The Karfunkel Trust is involved in several related-party transactions concerning AmTrust, as described below.

50.     Maiden Holdings, Ltd. ("Maiden") is a publicly held Bermuda insurance holding company that has various reinsurance and service agreements with AmTrust. Maiden was formed by M. Karfunkel and Defendants G. Karfunkel and Zyskind. As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden. As of December 31, 2016, Defendants L. Karfunkel and Zyskind

owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden.  Defendant Zyskind serves as chairman of Maiden's board of directors.

51.     Defendants Zyskind, L. Karfunkel, and G. Karfunkel are thus involved and interested in any related-party transactions involving the Company and Maiden.  For instance, in 2007, AmTrust and Maiden entered into a reinsurance agreement that required a Bermuda subsidiary of AmTrust to retrocede an amount equal to 40% of its premiums written for certain lines of business (net the cost of unaffiliated inuring reinsurance) to a Bermuda subsidiary of Maiden.  According to the 2017 Proxy, AmTrust recorded approximately $595.7 million of ceding commission under this agreement, which is effective until June 2019.  Additionally, there are at least four more related-party transactions involving Maiden and AmTrust, which are referenced on pages 42-44 of the 2017 Proxy Statement, and incorporated by reference herein.

52.     NGHC is a publicly held specialty personal lines insurance holding company that provides a variety of insurance products, including homeowners, umbrella, personal, and commercial automobile.  AmTrust has an approximately 12% ownership interest in NGHC.  The two largest stockholders of NGHC are the Karfunkel Trust and a grantor retained annuity trust controlled by L. Karfunkel.  M. Karfunkel served as NGHC's chairman and CEO until his death in April 2016.  M. Karfunkel's son, NGHC president Barry Karfunkel, replaced him as CEO. Defendants Zyskind and DeCarlo are also members of the Board of NGHC.

53.     Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and NGHC.  For instance, AmTrust, pursuant to a master services agreement, provides NGHC and its affiliates with information technology services in connection with the development and licensing of a policy management system, as well as additional administrative services in connection with the same.  In return, AmTrust

18

receives 1.25% of National General's gross written premium, plus AmTrust's costs for development and support services. In 2016, AmTrust earned over $46 million in fees related to the master services agreement with NGHC, up from $25.6 million in 2014 and $35.9 million in 2015. As a director of both NGHC and AmTrust, DeCarlo was not independent and disinterested in approving this agreement.

54. These figures do not correspond to NGHC's financial reporting. For instance, in 2016, NGHC recorded $51.4 million in expenses related to the master services agreement with AmTrust. Additionally, there are at least five more related-party transactions involving NGHC and AmTrust, which are referenced on pages 44-45 of the 2017 Proxy Statement, and incorporated by reference herein.

55. ACP RE Ltd. ("ACP") is a privately held company solely owned by the Karfunkel Trust and thus is considered an AmTrust affiliate. In 2014, ACP usurped a corporate opportunity from AmTrust when it acquired Tower Group International, Ltd. ("Tower") after AmTrust had already performed due diligence on Tower and submitted acquisition offers.

## SUBSTANTIVE ALLEGATIONS

### I. Defendants Both Encouraged and Failed to Address the Fraudulent Accounting Scheme

56. Throughout the Relevant Period, Defendants knew or consciously disregarded that AmTrust lacked proper internal controls over its financial reporting, and that its financial statements were materially inflated by pervasive and wide-ranging accounting fraud. Defendants manipulated AmTrust's financials by improperly accounting for, *inter alia*: i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from

19

one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables. Further, Defendants were utilizing an array of complicated and fraudulent maneuvers that included chronic underreserving of liabilities and inconsistent reporting of ceded losses in reinsurance agreements between AmTrust and the other Karfunkel family's businesses. Notwithstanding their significant obligations as members of the Board or as corporate officers, and as members of committees charged with overseeing AmTrust's corporate governance and other critical aspects of the Company's business and operations, Defendants failed to investigate, remedy or disclose the illicit accounting schemes or their significant impact on the Company. This wholesale abnegation of their oversight responsibilities constituted a breach of the duties of loyalty and good faith. Further, Defendant Pipoly, as the Company's CFO, breached his duties of loyalty, good faith, and care by actively participating in accounting manipulation and fraud. These fraudulent practices ultimately harmed the Company, leading to investigations by the FBI, SEC and NYDFS, costly litigation against the company, harm to the Company's business and reputation, and erosion of its stock price. It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation. Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

57.     Even as a series of articles and letters called various aspects of the Company's reserve accounting and financial statements into serious doubt, Defendants failed to take any action to uphold their fiduciary duties, instead ignoring or denying the problems until the Company was finally forced to restate nearly three years of financial statements in 2017, and to

take multiple reserve charges totaling hundreds of millions of dollars. The red flags Defendants received through these articles and letters not only put them on notice of the overall weaknesses of the Company's accounting, but of specific accounting problems that later contributed to the Company's need to restate its financial statements. Nonetheless, the Defendants did nothing to comply with their fiduciary duties.

### A.   Defendants Ignored Blatant Red Flags of Improper Accounting

#### 1.   *Geo Investing* December 2013 Article

58.    On December 12, 2013, GEO Investing ("GEO") published an article accusing AmTrust of inflating earnings and net equity through the use of offshore entities.[4] According to GEO, from 2009-2012, AmTrust failed to disclose a total of $276.9 million in losses ceded to Luxembourg subsidiaries. Moreover, GEO accused the Company of improperly valuing its life settlement contracts "by using egregiously aggressive assumptions relative to peers despite lawsuit documents showing [AmTrust] holds many policies which are probably worthless." The article stated that these accounting issues "could result in large losses and regulatory scrutiny for the company." GEO estimated that using industry standard discount rates to value the life settlement contracts would result in a $90-$135 million impairment.

59.    In reaction to the GEO article, AmTrust's shares dropped $2.32, or 12%, from a close of $19.15 on December 11, 2013 to a close of $16.83 on December 12, 2013. Defendant Zyskind publicly denied GEO's allegations, affirming that the Company had "never been stronger" and was being targeted by short sellers looking to profit from a decline in AmTrust's share price.

_____

[4] The GEO article was titled "AmTrust Financial Services: A House of Cards?"

2.     *Barron's* February 2014 Article

60.     On February 8, 2014, *Barron's* published an article questioning whether AmTrust's profits were the result of smart management or aggressive accounting.[5]  The article asserted that AmTrust's bookkeeping was likely not as sound as it appeared, noting that even one of the Company's own investment bankers, FBR Capital Markets, was confused about AmTrust's accounting practices.  The concerns expressed in the article were raised after "long interviews with AmTrust executives," and Bill Alpert, the article's author was left "with questions about some cost deferrals and reinsurance maneuvers that [other] critics highlighted."

61.     The article explored AmTrust's intricate web of deals with related-parties involving members of the Karfunkel family.  Specifically, *Barron's* discussed the streamlined commissions AmTrust received from Tower Group International, NGHC, and Maiden, as well as the Karfunkel family's ownership interest in each entity.  Because of AmTrust's various arrangements with these related-parties, certain AmTrust critics expressed serious doubts as to whether AmTrust's businesses were performing as well as the Company reported them to be: "We think that they're using a grab bag of ways to make the business look much better than it really is," says Mark Roberts, head of Off Wall Street.

62.     *Barron's* illustrated one example of the Company's questionable accounting scheme:

> Before AmTrust cedes business to outside reinsurers like Maiden, it sends premiums and losses to its wholly owned captive reinsurer in Bermuda called AmTrust International Insurance.  This captive in turn sends some losses to other reinsurance captives that AmTrust has in Luxembourg, where tax benefits can be

---

[5] *Barron's* February 8th article was titled "An Insurer's Feat: Turning Losses Into Gains" and subtitled "Insurer AmTrust has a key earnings call on Thursday.  Can it persuade investors its profits result from smart management, and not aggressive accounting?  Watch the stock."

gained by charging those losses against a particular kind of reserve that's not available under U.S. accounting rules.

63.     Through these "unusual" arrangements, AmTrust used the Luxembourg tax benefits to lower the Company's reported operating expenses by roughly $28 million from 2010 through 2012, a tactic that increased its pretax profits by half a percent.   The accounting irregularity, *Barron's* noted, stemmed from the fact that the profits from these transactions appeared in AmTrust's financial statements, while the Company's corresponding losses ceded to its Luxembourg subsidiaries did not.   AmTrust argued that "those losses are inflated 'artificially' or 'synthetically' and don't reflect the real world claims on its primary insurance subsidiaries." Defendant Zyskind further justified this practice as "a way to draw down theses reserves," and that "[t]hey are self-created losses within our organization, so they get completely eliminated in consolidation."

64.     While AmTrust contended that this arrangement was proper under U.S. and Luxembourg accounting rules, in reality the Company was reporting "loss numbers to auditors and insurances commissioners that it acknowledges aren't authentic."   The article also expressed concerns with the way AmTrust calculated its profits by deferring costs more aggressively than its matching revenues.   *Barron's* wrote that the corresponding accounting ratios for these variables should be "more or less steady across time and comparable business—but in the years following AmTrust's IPO, its ratio of deferred acquisition costs to unearned premiums . . . has climbed from a below-average 17% to as high as 41%."

3.       *Barron's* May 2014 Article

65.       On May 31, 2014, Barron's published another article questioning "AmTrust's capital footing."[6]  The article, in relevant part, asserted:

> Multimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital.  That's worrisome, because poorly controlled reserving can prove to be a snakebite to an insurer if growth slows–triggering a double whammy as underwriting losses demand new capital while rendering earnings less attractive to investors.  If AmTrust's accounting is found wanting, its tangible book multiple could drop back to the industry average of 1.4, bringing shares down below $15.
>
> * * *
>
> Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

66.       According to *Barron's*, AmTrust's head of investor relations, Beth Malone, emphasized that "AmTrust is more than adequately reserved."

67.       Barron's also questioned AmTrust's relationship with Maiden, the publicly traded insurer controlled by the Karfunkel family.  The reinsurance relationship between AmTrust and Maiden is substantial, with the Company steering 40% of its premiums and losses to Maiden.  However, AmTrust's year-end balance sheet showed approximately $1.9 billion in assets receivable from Maiden, whereas Maiden's balance sheet showed that the liabilities due to AmTrust were less than $1.5 billion.  According to Barron's, "[t]hat $400 million variance seems to lie mainly in the companies' different reserve estimates for policyholder losses not yet

---

[6] *Barron's* May 31st article was titled "Balance-Sheet Risk Makes AmTrust Shares Vulnerable" and subtitled "Property and casualty insurer AmTrust has shone by growing faster with seemingly better margins than rivals.  But its accounting raises questions."

24

reported to the insurers. But such a large disagreement invites the question of whether Maiden is understating its liabilities or AmTrust is overstating its assets."

68.     Barron's May 31, 2014 article also accused the Company of manipulating its financials by funneling losses through its subsidiaries, three of which had triggered multiple warning flags in the IRIS database operated by the National Association of Insurance Commissioners:

> State insurance filings of AmTrust units show that the Bermuda captive has lost about $400 million under its reinsurance agreements with its AmTrust counterparts in the last five years. The Bermuda unit's regulatory capital fell last year from $499 million to $416 million, a level just over two-times the minimum required for "solvency" under Bermuda's relatively lenient standards. By contrast, Maiden ended the year with more than four times Bermuda's capital requirement.

> AmTrust's Bermuda unit is more than adequately capitalized, says Malone, and its numbers shouldn't be compared with those of any other reinsurer. That's because it reinsures only stable, predictable risks, she says.

> In its 2013 10-K, AmTrust disclosed that three of the company's U.S. subsidiaries have triggered four or more warning flags in the IRIS database operated by the National Association of Insurance Commissioners. IRIS readings indicate abnormal financial ratios at those insurers, which AmTrust attributed to its reinsurance structure.

> AmTrust clearly has its own ways of counting. As *Barron's* previously reported ("An Insurer's Feat: Turning Losses Into Gains," Feb. 10, 2014), AmTrust and its sister company National General have enhanced their operating margins by making more than $200 million in underwriting losses go unreported to investors. It did that by sending the losses to wholly-owned Luxembourg reinsurance companies. After our story, the AmTrust restated its past financials to remove the operating profit boost. Before National General's recent initial public offering, the Securities and Exchange Commission challenged its accounting for the Luxembourg transactions and National General restated its financials, while admitting in its SEC correspondence that its unusual Luxembourg accounting was "counterintuitive." Businesses designed to lose money, like the Luxembourg reinsurers, had never been "contemplated by the accounting literature," the insurer told the SEC.

> Perhaps AmTrust and its sibling companies are just smarter than everyone else in the business.

69.     In reaction to *Barron's* May 31, 2014 article, AmTrust's stock price dropped $0.60 per share, or 2.81%, over the next two trading days, from $21.35 per share on Friday, May 30, 2014 to $20.75 per share on Tuesday, June 3, 2014.

70.     During the summer and fall of 2014, several investors sharply questioned the accounting and financial statements of AmTrust.   On December 11, 2014, AmTrust filed a summons and notice in New York State Supreme Court, New York County, against Alistair Capital and others alleging, *inter alia*, defamation for "dissemination of actionable false and misleading statements concerning plaintiff's business . . . ."

### 4.     The Alistair Capital Letter

71.     In response, on December 18, 2014, Alistair Capital sent a letter to the Audit Committee—Defendants Gulkowitz, DeCarlo, and Fisch—alerting them to "numerous instances of improper accounting and indications of material weaknesses in internal controls over financial reporting" at AmTrust.   The letter highlighted both of *Barron's* 2014 articles, as well as several reports published by the independent research firm Off Wall Street, raising "serious questions with respect to AmTrust's accounting practices."   In Alistair Capital's view, "management's responses to these articles have done little to refute the troubling assertions set forth therein.   In fact, the Company's responses appear to corroborate the detailed and specific allegations that AmTrust's accounting is severely flawed."   Instead of refuting these allegations, AmTrust has opted to "pursue litigation scare tactics designed to silence those who raise difficult questions about the Company's practices."   Given the "lengths to which management has gone in an attempt to silence its critics, one has to wonder what the Company is hiding.   As members of AmTrust's Board of Directors, and specifically its Audit Committee, we believe it is your duty to find out."

72.     The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts Maiden reports for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions.

73.     Alistair Capital questioned the efficacy of AmTrust's internal controls over financial reporting for a number of reasons.  First, Alistair Capital was "concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K . . . and amounts reported to the SEC in the Company's Forms 10-K and 10-Q."  Second, Alistair Capital believed that the Company's "loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative remaining services) or, more likely, AmTrust's disclosures reflect flawed data that validate [Alistair Capital's] skepticism of the Company's reported financial statements."  Third, Alistair Capital noticed that "amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations 'for Accrued Expenses and Other Liabilities' appear to be irreconcilable."  Lastly, the Alistair Capital Letter noted that, during Defendant Pipoly's tenure as CFO of Maiden, PricewaterhouseCoopers concluded that Maiden had material weaknesses in its internal controls over financial reporting.

74.     The Alistair Capital Letter further highlighted that "AmTrust appears to understate its expense ratio, and therefore overstate its net income, as a result of a mismatch in the Company's recognition of acquisitions costs and premiums in a way that may violate U.S. GAAP."  When questioned by *Barron's* about this specific issue, AmTrust's management

provided a misleading answer, improperly comparing AmTrust's *net* deferred acquisition costs to *gross* unearned premiums, which artificially lowered the Company's expense ratio. GAAP rules require that acquisition costs be recognized *proportionate to* a company's recognition of deferred revenue.

75. Moreover, Alistair Capital informed the Audit Committee that AmTrust is improperly valuing its life settlement contracts "by ignoring readily available information about the inputs market participants use to value life settlement contracts." AmTrust purportedly applies a significantly lower discount rate than industry peers to estimate the fair value of its life settlement contracts, thereby overvaluing the contracts.

76. Another significant deficiency with respect to AmTrust's accounting, in Alistair Capital's view, "related to the sizeable differences between balance sheet accounts reported in AmTrust's financial statements and the amounts Maiden reports for the corresponding accounts in its financial statement." As set forth in the chart below, there is a significant variance between AmTrust's Reinsurance Recoverable and Maiden's Unpaid Loss and LAE Reserves:

| Description | Amount (mm)[31] |
|---|---|
| AmTrust Reinsurance Recoverable (vis-à-vis Maiden) | $ 1,144.2 |
| Maiden Unpaid Loss & LAE Reserves (AmTrust Q.S. Segment) | $ 796.0 |
| **Difference in Loss & LAE Reserves Ceded (Assumed)** | **$ 348.2** |
| AmTrust Prepaid Reinsurance Premiums (vis-à-vis Maiden) | $ 739.7 |
| Maiden Unearned Premiums (AmTrust Q.S. Segment) | $ 687.4 |
| **Difference in Unearned Premiums (Assumed)** | **$ 52.4** |
| AmTrust Ceded Reinsurance Premiums Payable (vis-à-vis Maiden) | $ (393.9) |
| Maiden Reinsurance Balance Receivable (AmTrust Q.S. Segment) | $ (278.6) |
| **Difference in Ceded Premiums Payable (Assumed)** | **$ (115.4)** |
| AmTrust Net Assets (vis-à-vis Maiden) | $ 1,489.9 |
| Maiden Net Liabilities (AmTrust Q.S. Segment) | $ 1,204.8 |
| **Difference in Unearned Premiums Ceded (Assumed)** | **$ 285.2** |

77.     The Alistair Capital Letter accentuated that "[i]f AmTrust is over-estimating the amount it will recover from Maiden in proportion to AmTrust's gross reserves, then AmTrust's equity is directly over-stated by a material amount, particularly relative to tangible equity."  The Company would also be in violation of U.S. GAAP if its reinsurance recoverables and gross reserves are inconsistent.   Alistair Capital urged the Audit Committee to investigate this discrepancy in light of the important quota share agreement between the two companies and the related-party nature of its relationship—Defendant Zyskind is the Chairman of Maiden's Board of Directors.

78.     Alistair Capital further asserted that AmTrust's accounting for loss and loss adjustment reserves assumed in conjunction with its acquisitions was problematic given the $102 million irreconcilable difference between AmTrust's reserve reconciliation disclosure ($807.6 million) and its purchase price allocation disclosures ($705.3 million).

| Loss & LAE Reserves Assumed in Conjunction with Acquisitions | Gross Loss & LAE Reserves | Reinsurance Recoverable (Paid & Unpaid) | Net Loss & LAE Reserves | Source: |
|---|---|---|---|---|
| Purchase Price Allocation ("PPA") | $        761.3 | $           56.0 | $      705.3 | *From Above* |
| Financial Stmt Comparison | $        764.2 | $           63.8 | $      700.4 | *From Above* |
| Inorganic (Acquired) per Reserve Reconciliation | * | ** | $      807.6 | *2013 Form 10-K, Footnote 9* |
| Minimum Difference in Acquired Reserves | * | ** | $      102.3 | *Calculation* |
| *While the Reserve Reconciliation does not provide an amount for Gross Loss & LAE Reserves acquired, there should be no difference across methodologies.* | | | | |
| **Because the Reserve Reconciliation references underlined{unpaid} losses only, it could slightly understate reinsurance recoverables. With that said, even if one were to assume that all Reinsurance Recoverables acquired (max: $63.8 million) related to losses already paid by AmTrust, one still would not be able to bridge the $104.8 million minimum difference in Net Loss & LAE calculated above.* | | | | |

79.     When confronted with Alistair Capital's detailed letter to the Audit Committee regarding accounting and financial irregularities at AmTrust, the Company quietly backed down from its lawsuit.  A review of the court docket shows no action was ever taken nor was any other filing made.  If AmTrust truly believed that the allegations were without basis, it would and should have pursued its lawsuit.  Instead, the Company and the Board knew the truth, that the detailed allegations were well founded.  The Defendants' action in this regard is an admission

that they knew the truth, which they would only admit years later with the 2017 financial restatement.

### 5.   *Barron's* April 2016 Article

80.     On April 23, 2016, *Barron's* once again challenged the adequacy of AmTrust's reserves and its accounting, asserting that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside."[7]   As such, *Barron's* explained that the Company "has had to increase substantially its estimates of the cost of settling claims, in contrast with the decreases enjoyed by P&C insurance leaders like Chubb (CB) and Travelers (TRV)."   *Barron's* further noted that even analysts at AmTrust's investment banker, KBW, wondered whether the insurer's underwriting margins were overstated.

81.     The article also reexamined the Luxembourg accounting transactions. Specifically, the article asserted that even though the Company's insurance losses that were ceded to AmTrust's Luxembourg subsidiary "netted more than $900 million since 2008, according to AmTrust's filings with insurance regulators, [those losses] aren't reflected in the consolidated financials that AmTrust files" with the SEC.

82.     In reaction to *Barron's* April 23 article, AmTrust's stock price dropped $1.22 per share, or 5%, from $26.01 per share on Friday, April 22, 2016 to $24.79 per share on Monday, April 25, 2016.

83.     As a result of these articles, Defendants knew of AmTrust's fraudulent accounting scheme.   Defendants were unquestionably aware of the *Barron's* articles, as the Company

---

[7] *Barron's* April 23rd article was titled "Is AmTrust Stock Worth the Premium?" and subtitled "The property & casualty insurer has grown rapidly. But questions persist about its reserve adequacy and accounting."

publicly responded to the articles.  In addition, AmTrust's management provided written responses to ten questions posed by *Barron's* in 2014.[8]  The Alistair Capital letter was addressed directly to certain Defendants, namely Gulkowitz, DeCarlo and Fisch.

> **B.**      **Defendants Ignored Red Flags Regarding The Specific Fraudulent Accounting Practices, Internal Controls Weaknesses, and Auditor Deficiencies that Led to the 2017 Financial Restatements**

84.      As a result of the above-discussed articles and letters, as well as other red flags, Defendants were directly on notice of the overall weakness of AmTrust's internal controls over its financial reporting, which, as the Alistair Capital Letter said, was "indicative of an environment in which an accounting fraud could be perpetuated."   Further, the red flags described below concerned the very same fraudulent and improper accounting practices that later led AmTrust to restate its financials and that subjected them to securities fraud lawsuits and investigations by government agencies.

> 1.      Red Flags Concerning AmTrust's Auditor

85.      On September 12, 2014, AmTrust filed a Form 8-K with the SEC disclosing certain details about NYDFS's approval of ACP's acquisition of Tower Group International, Ltd.  ACP is a privately held company solely owned by the Karfunkel Trust and thus is considered an AmTrust affiliate.  Because of AmTrust's affiliation with ACP, NYDFS recommended and the

---

[8] On May 18, 2016, the Southern Investigative Reporting Foundation published a report, entitled "Barry Zyskind's High Stakes Three Card Monte Game," that further highlighted Zyskind and the Karfunkel family's persistent desire to navigate financial regulations for their own personal gain.  The report stated that Zyskind, in an attempt to avoid massive tax liabilities and simultaneously maintain his substantial ownership stake in the Company, transferred over $378 million of AmTrust stock to a purportedly phantom charitable foundation in 2016.  According to the report, a transfer of this magnitude, when taken together with the current AmTrust holdings of other charitable foundations, would violate IRS rules and require Zyskind and the Karfunkel family to sell over 23 million shares of AmTrust stock.  The report's author contacted various AmTrust representatives but no further investigation by the Company ensued.

Karfunkel Trust purportedly agreed that AmTrust would take certain actions due to "the significant recent growth in AmTrust's gross written premium and the likely further future growth resulting from its participation in transactions related to ACP's acquisition of Tower…." Among these was a statement implying that BDO was no longer sufficient as the Company's external auditor:

> In light of AmTrust's growth and increased geographic footprint, **AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015**. Before the engagement is undertaken, the selection of the auditing firm shall be subject to the review and prior approval of the Department.

(emphasis added).  In spite of not only receiving this red flag from NYDFS, but *agreeing* to replace its auditor, AmTrust maintained BDO as its external auditor for the year ended December 31, 2015, and did not replace them until April 2016, when it replaced BDO with KPMG.  A year later, the *Wall Street Journal* reported that a whistleblower at BDO had collected evidence of AmTrust's accounting manipulation regarding its reserves and had divulged the evidence to the FBI.

### 2. Red Flags Regarding Internal Controls

86. The December 18, 2014 Alistair Capital Letter devoted nearly five pages to addressing red flags about the *overall inadequacy* of AmTrust's internal accounting controls over financial reporting.  That section of the letter raised several significant reasons to doubt the efficacy of AmTrust's internal controls:

> First, we are concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K, filed with the SEC in conjunction with quarterly earnings reports, and amounts reported to the SEC in the Company's Forms 10-K and 10-Q.  We believe these frequent and often material discrepancies indicate the Company is reporting inaccurate information in one or both of the filings for a given period.
>
> Second, we believe AmTrust's loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative

remaining reserves) or, more likely, AmTrust's disclosures reflect flawed data that validate our skepticism of the Company's reported financial statements.

Third, we have noticed that amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations for "Accrued Expenses and Other Liabilities" appear to be irreconcilable, as discussed further below. In addition, the amount AmTrust reports for Accrued Expenses and Other Liabilities in the footnotes to the Company's financial statements does not even correspond to the amount reported in the balance sheet.

Fourth, we note that Ronald Pipoly, Jr., AmTrust's Chief Financial Officer ("CFO"), served as the CFO of Maiden Holdings, Ltd. ("Maiden") during the period that PricewaterhouseCoopers determined Maiden had "deficiencies which aggregate to a material weakness in internal control over financial reporting".

87.     The Alistair Capital Letter then elaborated on each of these issues in detail, providing specific examples from financial statements and other documents. Consequently, the letter determined, "these signs of weak internal controls for financial reporting purposes are *indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care* in diligently monitoring the Company's control environment" (emphasis added). As alleged further herein, such fraud was, indeed, perpetrated, and when Defendants could no longer continue to conceal the fraud, they were forced to restate several years' worth of financial statements, including 2012-2016. As part of AmTrust's February 27, 2017 press release, the Company specifically stated that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization." Thus, the Alistair Capital Letter put Defendants on notice of the overarching and severe problems with the Company's internal controls and its related impact on the Company's financial reporting.

88.     Further, AmTrust's restatement of financials going back to 2012 not only corrected errors related to deferred acquisition costs *and* the understatement of expenses, but also corrected warranty services revenue and foreign exchange adjustment.  This led to several years' worth of wide-ranging restatements of everything from net income to cash.  Thus, the depth and breadth of the restatement validated Alistair's claims that AmTrust's "internal controls over financial reporting are materially deficient."

### 3.     Red Flags Regarding Reserves

89.     In addition to internal controls red flags—which put Defendants on notice of a problem underlying *all* of *Defendants'* accounting issues—Defendants also were made aware of red flags regarding improper accounting regarding reserves.

90.     For instance, a *May* 31, 2014 *Barron's* article questioned the Company's reserves, stating, "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital."  Specifically, the article noted that:

> Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

91.     In response, Beth Malone, head of investor relations, stated, "AmTrust is more than adequately reserved[.]"

92.     A subsequent April 23, 2016 *Barron's* article specifically addressed the inadequacy of AmTrust's reserves, stating that AmTrust's statutory filings on behalf of its insurance units "show it has consistently underestimated the cost of settling claims."  The article

34

continued, "[i]f the company reserved for claims as *conservatively* as some bigger insurers do, its profits would probably be lower, and so would its shares."  Defendants not only were aware of this red flag, but specifically responded to it in order to falsely deny it, stating that the Company's "reserving is conservative and rigorous."  Yet, a mere ten months later, on February 27, 2017, AmTrust announced that it was taking a reserve charge of $65.0 million, or approximately $0.24 per diluted share, due to the fact that "this [Specialty Program] segment has underperformed relative to our expectations, which led us to install new leadership and to adjust our approach to writing programs for commercial auto, general liability, and workers' compensation."  As *Barron's* pointed out in a subsequent March 4, 2017 article, titled "Our Skepticism on AmTrust Reserves Borne Out," this meant that their prior warnings about AmTrust's reserves had proven correct:

> On Monday, property and casualty insurer AmTrust Financial Services announced disappointing December-quarter earnings and a $65 million reserve charge that shouldn't have surprised anyone familiar with questions Barron's raised about its accounting and reserve levels (most recently in "Is AmTrust Stock Worth the Premium?" April 23, 2016).[9]

93.     Defendants not only read this *Barron's* article, but issued a document on April 24, 2016 titled "AmTrust Response to 4/22/16 [sic] *Barron's* Article."  Thus, they were not only on notice of these red flags but responded to some of them within 24 hours.  Defendants' quick response also belies any suggestion that they thoroughly investigated the claims made in the article.

94.     Moreover, despite the $65 million charge in Q4 2016, resulting in total reserve charges of $258 million for 2016, and the restatements of its previously filed financial

---

[9] http://www.barrons.com/articles/our-skepticism-on-amtrust-reserves-borne-out-1488611788

statements, Defendants continue to under-reserve.  A May 9, 2017 *Barron's* article highlighted the issue of under-reserving:

> [A]nalysts asked a lot of questions about the adequacy of the insurer's loss reserves.  That's because the March quarter showed a continuation of AmTrust's practice of setting aside seemingly-low reserves against future claims, despite a decade of state insurance filings that show "adverse development" in its reserves – meaning that insurance losses have exceeded the company's earlier estimates.[10]

95.      The fact that AmTrust materially understated its reserves for years was further confirmed on November 6, 2017, when AmTrust announced prior year adverse loss and allocated loss adjustment expenses ("loss") reserve development of $327 million for the third quarter ended September 30, 2017.  Significantly, the increase in loss reserves was driven not by recent developments, but on cases the Company had known about for years – namely its program business and for the 2013 through 2016 accident years.  The $327 million reserve increase was so large, and so material that it effectively wiped out 68% of the Company's 2016 net income attributable to common stockholders of $482.2 million, and was more than ***five times*** greater than the $61.6 million net income reported for the six months ended June 30, 2017.

96.      The Company's disclosure confirmed precisely what *Barron's* had explicitly warned about 18 months earlier – namely, that the Company had been massively underreserved.  As *Barron's* made clear on November 7, 2017, "Numbers contained in the latest announcement suggest that most of the newly-announced adverse development occurred on cases already known to the company – something that we warned about, in our 2016 story."  In other words, the Board was on notice that the Company did not adequately account for loss reserves, but did nothing until after the accounting fraud was publicly disclosed.

---

[10] http://www.barrons.com/articles/why-amtrust-financial-services-is-tumbling-1494360098

97.     Indeed, *Barron's* 2016 story expressly warned that, despite continued adverse development since 2006, AmTrust continued to use unreasonably low claim estimates:

> ***The insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside***.  Though AmTrust defends its reserving, it has had to increase substantially its estimates of the cost of settling claims, in contrast with the decreases enjoyed by P&C insurance leaders like Chubb (CB) and Travelers (TRV).

<p style="text-align:center">* * *</p>

> ***Since 2006, adverse development in the reserves of AmTrust's three biggest units has topped $750 million, before reinsurance.  Despite this experience, AmTrust has continued to use low claim estimates for their recent years***.  AmTrust cautioned [*Barron's*] against "a simplistic extrapolation of historical development" and said its reserves "reflect our expectation of ultimate losses based on a rigorous actuarial analysis."

98.     A further confirmation of the truth of the *Barron's* warning is that AmTrust's November 6, 2017 announcement of the $327 million charge consumed exactly the amount of reserve reinsurance coverage AmTrust obtained five months prior, in July 2017.  On July 6, 2017, AmTrust entered into a reinsurance agreement with Bermuda reinsurer Premia Reinsurance Ltd. for $400 million in adverse loss reserve development.  The net loss of $327 million announced on November 6, 2017, consumed precisely the amount of reinsurance coverage still available to AmTrust under that agreement.  As the *Wall Street Journal* reported on November 6, "Counting $73 million in similar [reserve] charges earlier this year, the new reserves take AmTrust up to the maximum of $400 million in reserve coverage that the Premia agreement provides for."  AmTrust's acquisition of reinsurance coverage worth exactly the amount by which the Company's loss reserves were reported to be understated is no coincidence. The Board knew the Company did not adequately account for loss reserves well before it entered into the Premia transaction.

<p style="text-align:center">37</p>

99.     *Barron's* was not alone in alerting AmTrust's Board to the fact that the Company underreserved.  Indeed, the Board was confronted with a plethora of red flags alerting them to the Company's massive underreserving.  For example, the Alistair Capital Letter specifically warned that reserves for certain accident years were negative, "***an accounting impossibility***," and that AmTrust's accounting of its related party agreements with Maiden indicated that AmTrust was underreporting its necessary reserves:

> If AmTrust is over-estimating the amount it will recover from Maiden in proportion to AmTrust's gross reserves, then AmTrust's equity is directly over-stated by a material amount, particularly relative to tangible equity. ***Furthermore, AmTrust would be in violation of U.S. GAAP if its reinsurance recoverables were not consistent with its gross reserves.***

100.     The Alistair Capital Letter also raised concerns that AmTrust was underreporting reserves in connection with acquisitions in order to artificially inflate earnings as indicated by inconsistent disclosures of reserve allocation:

> The inconsistency among disclosures raises troubling questions about whether ASC 944-805 was applied correctly throughout the financial statements.  In addition, one has to wonder about the origin of the over $100 million of additional Net Loss & LAE Reserves and whether the additional Net Loss & LAE Reserves should have been recognized as income statement expenses.  ***Because the other two methodologies line up with one another, it appears likely that AmTrust may have simply mischaracterized over $100 million of Net Loss & LAE Reserves – overstating earnings by a substantial amount in the process.***

101.     Moreover, as quoted above, the May 2014 *Barron's* article warned that inconsistent and irreconcilable financial reporting between AmTrust's and Maiden's regulatory filings indicated that the Company may have been inadequately accounting for its reserves in order to inflate income.  Finally, as far back as 2013, GEO warned that AmTrust appeared to be inaccurately reporting its reserve figures:

> The reported loss reserves in the 10-K (**$449.448 million**) are different from the sum of subsidiary loss reserves ($592.88 million) by the exact amount sitting at ACHL ($93.975 million).   This is potentially a $93.43 million hole in the [AmTrust] balance sheet. . . .   Using the same AM Best filings we have been

using throughout our article, we can also show that ACHL's net loss reserves appear to not be reflected in [AmTrust's] 2010 10K.  *As one would expect, since the premium earned ties out (as discussed earlier, unearned premiums tie out between AM Best and 10k from the above table, it is revealing that net loss reserves do not even closely match.*  (emphasis in original).

102.    The revelations concerning the state of the Company's reserves had a dramatic effect on the Company's financial condition.  Following the November 6 disclosure, the price of AmTrust stock fell almost 25%.  Moreover, AmTrust's losses forced the sale of its profitable fee business and endangered its credit ratings.  In this regard, also on November 6, 2017, AmTrust announced the sale of a majority stake in some of its U.S. fee businesses to private-equity firm Madison Dearborn Partners for $950 million in cash.  According to the WSJ, the fee businesses generated net income of about $53 million for AmTrust for the 12 months ended June 30, 2017. The Company also admitted that the sale of its U.S. fee businesses "helps AmTrust strengthen its balance sheet."[11]

103.    Following the announcement of AmTrust's reserve strengthening and its plan to sell some of its businesses, A.M. Best placed under review with negative implications the Company's credit and financial strength ratings.   In connection with AmTrust's increased reserved charges, A.M. Best commented:

> the actions raise questions about the potential future movement of reserves for these accident years . . . and about price adequacy and underwriting practices for the current and more recent accident years.[12]

---

[11] https://www.wsj.com/articles/amtrust-sells-stake-in-u-s-fee-businesses-to-private-equity-firm-1510013235
[12] http://www3.ambest.com/ambv/bestnews/presscontent.aspx?altsrc=1&refnum=25899

4.    Red Flags Regarding Improper Accounting for Deferred Acquisition Costs

104.    At least as early as February 2014, Defendants received red flags about problems

with the way the Company accounted for its deferred acquisition costs – one of the accounting

issues that was the subject of both the underlying fraud and the 2017 restatements.

105.    Specifically, a February 8, 2014 *Barron's* article titled "An Insurer's Feat:

Turning Losses Into Gains" discussed, *inter alia*, the ways in which "AmTrust gets an even

bigger profit boost by deferring costs more aggressively than the matching revenues":

> Insurers put a portion of their premium revenues into a balance sheet reserve
> called "unearned premiums," while deferring a matching portion of commissions
> and other premium-generating expenses into an asset called "deferred policy
> acquisition costs" —amortizing each over the course of the coverage.  The ratio of
> these line items should be more or less steady across time and comparable
> businesses—*but in the years following AmTrust's IPO, its ratio of deferred
> acquisition costs to unearned premiums, net of reinsurance items, has climbed
> from a below-average 17% to as high as 41%*.  Some of that rise surely reflects
> acquisition accounting, which puts the deferred costs of companies bought by
> AmTrust into the separate category of goodwill.  But Off Wall Street suggests that
> *AmTrust has also been violating the matching principle by capitalizing costs
> more aggressively than revenues like the ceding commission that AmTrust gets
> from Maiden*.
>
> AmTrust's Chief Financial Officer Ronald Pipoly describes its deferral accounting
> as "very conservative."  He notes that AmTrust didn't have to restate deferrals
> when accounting rules tightened in 2011, unlike some rivals.  The company
> produced for Barron's a chart showing AmTrust's cost/revenue deferrals ratio as
> 18% in the September quarter, around the middle of its peers*.  But the ratios used
> by the company were actually an apples-to-oranges comparison of net costs to
> gross revenues, in which the deferred cost numerator was reduced by
> reinsurance commissions. However, the unearned premium denominator was
> not reduced by the corresponding prepaid reinsurance premiums*.  (emphasis
> added).

106.    This article was among the red flags that put Defendants on notice of the

Company's improper accounting for deferred acquisition costs.  Further, Defendants were

*already* on notice of this issue, as Zyskind specifically spoke with *Barron's* for purposes of the

article and the Company provided *Barron's* with a chart purporting to show its cost/revenue

deferrals ratio.  Improper deferral of acquisition costs throughout the Relevant Time Period was also one of the issues that caused Defendants to later restate the Company's financials.

## II.  DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO REPURCHASE STOCK AT INFLATED PRICES, AND, IN THE CASE OF THE SELLING DEFENDANTS, BY SELLING STOCK TO THE COMPANY AT INFLATED PRICES

107.   In breach of their fiduciary duties to AmTrust and its stockholders, and, as explained below, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the illicit accounting scheme detailed above, were materially false or misleading when made.  Defendants' misrepresentations artificially inflated the price of AmTrust shares, causing the Company to purchase shares at artificially inflated prices, through its significant stock repurchase program.[13]

108.   Defendants' misconduct had at least three primary aims, ball of which were realized:

*First*, by causing AmTrust to conduct share repurchases, Defendants signaled to investors their purported belief that AmTrust shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.  This was particularly important to the Control Group which owned half of the Companies' shares.  Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.  The artificial inflation of AmTrust shares helped mask the illicit accounting scheme (and thus helped perpetuate it);

*Second*, *as* detailed below, as a result of the artificial inflation of the price of AmTrust shares, the Insider Selling Defendants sold shares at higher prices, and in some instances sold

---

[13] Defendants' materially false and misleading statements throughout the Relevant Period are documented in paragraphs 125 to 136.

41

them to the Company, thus reaped greater proceeds than they would have absent the artificial inflation; and

*Third,* as described in detail below, Zyskind, the CEO and a member of the Control Group, received tens of millions of dollars in compensation that was based in part on financial results that were later restated.

A.   **Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program**

109.   AmTrust's Board periodically authorizes the Company to repurchase its own shares of common stock.  The Board authorized a series of share repurchases during the Relevant Period that, collectively, were substantially higher than any other repurchases in the Company's history.

110.   In December 2013, AmTrust's Board of Directors approved a $150 million share repurchase program.  In April 2016, the Board of Directors approved an increase of $200 million to the Company's existing stock repurchase authorization.   As detailed in the chart below, between June 2014 and August 2016, AmTrust repurchased approximately 8,045,787 shares of its stock, paying over $227 million for them:

| Month/Year of Repurchase | Shares Repurchased[14] | Weighted-Average Price | Amount |
|---|---|---|---|
| June 2014 | 266,886 | $41.08 | $10,963,677 |
| August 2014 | 1,771 | $42.50 | $75,268 |
| September 2014 | 841,131 | $39.83 | $33,502,248 |
| October 2014 | 367,379 | $39.69 | $14,581,273 |
| December 2014 | 92,448 | $56.25 | $5,200,200 |
| January 2015 | 10,505 | $55.00 | $577,775 |
| February 2015 | 37,783 | $55.60 | $2,100,735 |
| December 2015 | 184,898 | $30.79 | $5,693,009 |
| February 2016 | 658,552 | $24.90 | $16,397,945 |
| March 2016 | 5,539 | $24.96 | $138,253 |
| April 2016 | 2,096,017 | $24.79 | $51,960,261 |
| May 2016 | 448,506 | $25.93 | $11,629,761 |
| June 2016 | 1,031,337 | $24.57 | $25,339,950 |
| July 2016 | 1,899,645 | $24.39 | $46,332,342 |
| August 2016 | 103,390 | $24.34 | $2,516,513 |
| **Total** | **8,045,787** | | **$227,009,210** |

111.    After the November 2017 announcements, concerning additional reserve charges and a surprise 3Q 2017 loss, AmTrust's share price fell to $10.04.  This reflected the true price per share of AmTrust stock had Defendants not engaged in the illicit accounting scheme detailed herein.  Therefore, any repurchases by the Company should have been made valuing their

---

[14] Includes shares that were withheld to satisfy tax withholding amounts due from certain employees upon the vesting of previously issued restricted shares.

43

common stock at $10.04. As such, during the Relevant Period, AmTrust overpaid for repurchases of its own stock by approximately $146 million.

112. In conducting share repurchases, Defendants falsely signaled to the public that they believed AmTrust's shares were undervalued and that the repurchases were the best use of the Company's cash. The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics. Together, these actions helped inflate AmTrust's share price.

### B. The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By Selling Back Shares to the Company at Artificially Inflated Prices

113. During the Relevant Period, the Insider Selling Defendants (Pipoly, Gulkowitz, and DeCarlo) – who were the CFO and the majority of the Audit Committee – took advantage of the artificial inflation of AmTrust's shares caused by Defendants' false or misleading statements. These Defendants collectively sold or otherwise disposed of over $5,625,000 in AmTrust stock during that time, all while in the possession of material, non-public information. The Company's share price was also lifted during that time by the share repurchase program, which was approved despite Defendants' knowledge or conscious disregard of the unlawful practices detailed in this Complaint.

114. As detailed in the chart below, Defendant Pipoly sold or otherwise disposed of 89,780 shares of AmTrust common stock for a total of $3,152,561:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 02/15/2014 | 2,045 | $33.33 | $68,160 |
| 02/15/2014 | 1,959 | $33.33 | $65,293 |

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 03/05/2014 | 1,812 | $38.16 | $69,146 |
| 03/22/2014 | 378 | $38.87 | $14,693 |
| 01/02/2015 | 14,393 | $56.029 | $806,425 |
| 01/02/2015 | 481 | $56.6358 | $27,242 |
| 02/15/2015 | 2,841 | $55.60 | $157,960 |
| 02/15/2015 | 2,770 | $55.60 | $154,012 |
| 03/05/2015 | 2,238 | $53.87 | $120,561 |
| 03/05/2015 | 2,288 | $53.87 | $123,255 |
| 01/04/2016 | 2,000 | $60.154 | $120,308 |
| 02/04/2016 | 4,000 | $27.3534 | $109,414 |
| 02/15/2016 | 3,970 | $25.05 | $99,449 |
| 03/04/2016 | 4,000 | $25.605 | $102,420 |
| 03/05/2016 | 4,475 | $25.73 | $115,142 |
| 03/05/2016 | 4,575 | $25.73 | $117,715 |
| 03/05/2016 | 3,241 | $25.73 | $83,391 |
| 04/04/2016 | 4,000 | $26.4044 | $105,618 |
| 05/04/2016 | 4,000 | $25.6055 | $102,422 |
| 01/03/2017 | 4,000 | $27.1845 | $108,738 |
| 02/03/2017 | 4,000 | $26.7312 | $106,925 |
| 03/03/2017 | 4,000 | $22.6708 | $90,683 |
| 03/05/2017 | 3,210 | $23.03 | $73,926 |
| 03/05/2017 | 3,282 | $23.03 | $75,584 |
| 03/05/2017 | 2,325 | $23.03 | $53,545 |

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 03/05/2017 | 3,497 | $23.03 | $80,536 |
| **Total** | **89,780** | | **$3,152,563**[15] |

115.    As detailed in the chart below, Defendant Gulkowitz sold or otherwise disposed of 22,251 shares of AmTrust common stock for a total of $859,600:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 11/24/2015 | 7,125 | $61.84 | $440,610 |
| 12/20/2016 | 15,126 | $27.70 | $418,990 |
| **Total** | **22,251** | | **$859,600**[16] |

116.    As detailed in the chart below, Defendant DeCarlo sold or otherwise disposed of 46,673 shares of AmTrust common stock for a total of $1,613,795:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 05/21/2014 | 21,689 | $44.4438 | $963,942 |
| 09/15/2016 | 2,200 | $26.5299 | $58,366 |
| 10/03/2016 | 3,114 | $26.1925 | $81,563 |
| 11/01/2016 | 3,200 | $25.8859 | $82,835 |
| 12/01/2016 | 3,420 | $25.7497 | $88,064 |

---

[15]  As of April 11, 2017, Defendant Pipoly's ownership interest in AmTrust was worth $5,085,077.

[16]  As of April 11, 2017, Defendant Gulkowitz's ownership interest in AmTrust was worth $595,445.

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 01/03/2017 | 4,620 | $27.1896 | $125,616 |
| 02/01/2017 | 4,830 | $26.6686 | $128,809 |
| 03/01/2017 | 3,600 | $23.50 | $84,600 |
| **Total** | **46,673** | | **$1,613,795**[17] |

117.    At the time of these stock transactions, the Insider Selling Defendants knew about or consciously disregarded material, non-public information regarding the illicit accounting scheme, but nonetheless sold or otherwise disposed of AmTrust common stock on the basis of that information.

**C.      In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading Statements**

118.    In repurchasing shares in connection with the stock repurchase program, AmTrust relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

119.    Throughout the Relevant Period, AmTrust justifiably expected Defendants to disclose material *information* as required by law and SEC regulations in the Company's periodic filings with the SEC.  AmTrust would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by AmTrust should be presumed with respect to Defendants'

---

[17] As of April 11, 2017, Defendant DeCarlo's ownership interest in AmTrust was worth $1,711,121.40.

omissions of material information as established under the *Affiliated Ute* presumption of reliance.

120. Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

121. At all relevant times, the market for AmTrust's common stock was efficient, for the following reasons, among others:

    a) AmTrust's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b) As a regulated issuer, AmTrust filed periodic reports with the SEC and the NASDAQ;

    c) AmTrust regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    d) AmTrust was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public market place; and

    e) The market price of AmTrust's stock reacted rapidly to new information entering the market.

122. As a result of the foregoing, the market for AmTrust's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of AmTrust's stock. The foregoing facts indicate the existence of an efficient market for trading of AmTrust stock and support application of the fraud-on-the-market doctrine.

123. AmTrust relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

124.    Had AmTrust known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased AmTrust stock at artificially inflated prices.

### III.    DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

125.    Throughout the Relevant Period, Defendants engaged in fraudulent manipulation of a wide range of AmTrust's accounting metrics, in violation of GAAP, SEC regulations, and AmTrust's own internal policies.  Among other things, AmTrust failed to properly estimate its loss reserves, account for bonuses paid, adjust foreign currency transaction gains and losses, and recognize revenue.  Instead of properly and conservatively reserving for its losses as it had repeatedly claimed, Defendants fraudulently failed to adequately reserve for losses in the Company's Specialty Program segment.  For each of the fiscal years discussed below (2014, 2015, and 2016), AmTrust has admitted to improperly accounting for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result, the Company has restated its annual financial results for each of the years 2014, 2015 and 2016, as well as its quarterly results for each quarter of 2015 and 2016.[18] These restatements included substantial downward revisions of net income attributable to common stockholders in 2014 and 2015 by 7.2% and 11.2%, respectively, as well as downward

---

[18] Because the Company has only restated its annual results, rather than each quarterly result individually, for 2014, Plaintiffs plead on information and belief that AmTrust's financials for each quarter of 2014 were false.

revisions of net income attributable to common stockholders for the first three quarters of 2016 by 19.38%, 6.00%, and 28.39%, respectively.  In addition, AmTrust was forced to take a $65 million reserve charge during Q4 2016 due to improper reserving practices in its Specialty Program segment.

126.    AmTrust's press releases, investor presentations and public filings with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included consistently touting that it was adequately reserved.  These false and misleading statements created a false impression concerning AmTrust's business and operational status and future growth prospects and caused AmTrust to repurchase $227 million worth of stock at artificially inflated prices.

127.    Defendants' knowing or reckless issuance of these false statements inflated the Company's stock price throughout the Relevant Period.  These practices also defrauded the Company, as it repurchased approximately 8 million shares at inflated prices via its buyback program.

### A.    **False Statements**

#### 1.    First Quarter 2014 Financial Results

128.    On May 1, 2014, the Company issued a press release announcing its first quarter 2014 earnings results ("Q1 2014").  The Company reported total service and fee income of $91.0 million; net income of $101.7 million; net income attributable to AmTrust common stockholders of $99.9 million; and diluted earnings per share (EPS) of $1.27.  Gross written premium was $1.67 billion, an increase of $722.3 million, or 76.5%, from $943.9 million in the same prior year period.  The Company also reported loss and loss expense reserves of $4.75 billion.

129.    On May 12, 2014, the Company filed its Form 10-Q for Q1 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.

130.    Defendants' financial results summarized in paragraph 128 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph 128.  In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.  The details of each of these improper accounting items are discussed further below at paragraphs 211 to 236.

131.    In addition, the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) contained certifications signed by Defendants Zyskind and Pipoly pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

132.    For example, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) that:

> [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report.

133.    With respect to AmTrust's reported financial information, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

134.    With respect to AmTrust's internal controls, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) that they personally: (i) were responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused AmTrust's controls or procedures to be designed to ensure that material information relating to AmTrust and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused AmTrust's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of AmTrust's disclosure controls and procedures; and (v) presented in AmTrust's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

135.    Defendants' statements cited in paragraphs 132 to 134 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized at paragraphs 217 to 236 below.

2.     Second Quarter 2014 Financial Results

136.     On August 7, 2014, AmTrust issued a press release announcing its second quarter 2014 earnings results ("Q2 2014").  The Company reported total service and fee income of $99.5 million; net income of $104.2 million; net income attributable to AmTrust common stockholders of $106.3 million; and diluted earnings per share (EPS) of $1.33.  In addition, "[l]oss and loss adjustment expense totaled $587.2 million in the second quarter 2014, compared to $364.1 million in the second quarter 2013 and resulted in a loss ratio of 67.1% compared with 67.9% for the second quarter 2013."  Loss and loss adjustment expense reserves were approximately $5.08 billion as of June 30, 2014.

137.     Defendants' financial results summarized in paragraph 136 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph 136.  In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.  The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.

138.     On August 7, 2014, the Company held a conference call to discuss its financial results for the second quarter of 2014, wherein Defendants Pipoly and Zyskind discussed 2014 loss reserves:

53

**Ron Pipoly**

You know 2014, we evaluate our loss reserves in all of our lines of business on a monthly basis and we're certainly encouraged about the trends that we see in prior excellent years as low as the current excellent year at seven month of valuation period. We'd encouraged about the trends we see in frequency, trends we see in average severity. We are holding steady with our loss picks. And, again we evaluate it on a monthly basis and have a lot of internal discussion about direction and the trends that we see and look to take advantage of the market.

**Barry Zyskind**

Just to add to it, as I said it in some previous call. [20]12, obviously, we started seeing a lot of improvement in the [20]12 compare to the [20]11 year, [20]13 was much improved over [20]12 and I would say [20]14 is tracking very similar to [20]13 and may be in some cases even better. So we're looking at the trends, we're seeing now for the [20]13, [20]14 and the [20]12 year and really we see very solid performance and again we think very conservative and discipline where we have to pick but we think that the performance is very, very solid and we think there's a lot of profitability in those lines.

139.    This statement was false and misleading because, in fact, Defendants were not "conservative" with respect to their loss reserves, but rather were deliberately and fraudulently under-reserving and manipulating the Company's accounting in order to hide this fact.

140.    On August 11, 2014, the Company filed its Form 10-Q for Q2 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q2 2014 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q2 2014 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q2 2014 Form 10-Q included Defendants Zyskind and Pipoly's certification pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 132 to 133.

141.    Defendants' statements cited in paragraphs 138 to 140 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements,

AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP described in detail below in paragraphs 217 to 236.

### 3.   Third Quarter 2014 Financial Results

142.    On November 3, 2014, AmTrust issued a press release announcing its third quarter 2014 earnings results ("Q3 2014").  For the quarter, the Company reported total service and fee income of $117.6 million; net income of $157.2 million; net income attributable to AmTrust common stockholders of $156.6 million; and diluted earnings per share (EPS) of $1.97. In addition, "[l]oss and loss adjustment expense totaled $609.4 million in the third quarter 2014, compared to $410.6 million in the third quarter 2013 and resulted in a loss ratio of 66.6% compared with 66.9% for the third quarter 2013."  As of September 30, 2014, loss and loss adjustment expense reserves totaled $5.298 billion.

143.    Defendants' financial results summarized in paragraph 142 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph 142.  In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.  The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.

144.     On November 10, 2014, the Company filed its Form 10-Q for Q3 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q3 2014 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q3 2014 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q3 2014 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 132 to 133.

145.     Defendants' statements cited in paragraph 144 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in pargraphs 217 to 236.

### 4.     Fourth Quarter and Full Year 2014 Financial Results

146.     On February 11, 2015, AmTrust issued a press release announcing its fourth quarter and full year 2014 earnings results ("Q4 2014").  For the quarter, AmTrust reported service and fee income of $101.7 million; net income of $83.5 million; net income attributable to AmTrust common stockholders of $71.6 million; and diluted earnings per share (EPS) of $0.88. In addition, "[l]oss and loss adjustment expense totaled $587.5 million in the fourth quarter 2014, compared to $470.4 million in the fourth quarter 2013 and resulted in a loss ratio of 64.7% compared with 66.5% for the fourth quarter 2013."  As of December 31, 2014, loss and loss adjustment expense reserves totaled $5.66 billion.

147.    For the full year 2014, the Company reported total service and fee income of $409.7 million; net income of $446.6 million; net income attributable to AmTrust common stockholders of $434.3 million; and diluted earnings per share (EPS) of $5.45.

148.    Defendants' financial results summarized in paragraphs 146 to 147 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.  In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

149.    Indeed, as described further in paragraphs 197 to 236, Defendants subsequently admitted, via the Company's 2017 financial restatements, that their financials were dramatically overstated for 2014, including, *inter alia*, net income attributable to common stockholders, which was overstated by 7%, or $31.3 million; and total service and fee income for 2014, which was overstated by 10.8%, or $44.38 million.

150.    With respect to AmTrust's accounting for warranty fee revenue, the 2014 Form 10-K stated  as follows:

> Warranty Fee Revenue – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable.  The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries.  Under the

terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP.  These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice.  The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. *However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods.* (emphasis added).

151.    This statement was false and/or misleading because, as was later revealed, the Company was fraudulently recognizing excessive amounts of warranty fee revenue up front and not deferring sufficient portions of the revenue.

152.    On February 11, 2015, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2014 financial results.  During the call, Defendant Zyskind commented on AmTrust's loss reserves:

Again, I think, you get kind of the fourth quarter as if you think about exiting the year 2014, I am not suggesting that a 12-month period makes it a seasoned book of business but you start to see trends emerging in terms of loss cost and claim focus of ratio and the thing that as you move through the year, you get more comfortable from a loss pick perspective.  So I think that the fourth quarter benefits on a quarterly basis from any revisions you make during that quarter. So I really think when you look at the loss ratios, I think that the year is more reflective of our overall view of where we're at, but again we as I mentioned we continue to look at our reserves on a monthly basis. *We like where we are from a – think we're very conservative from actuarial pick perspectives, as I mentioned we've added over $800 million of net reserves.*  Our IBNR is really nearly 50% of our gross reserves as we sit here at December 31st 2014.  Again I think things are encouraging thought price environment continues to remain firm.  We like the trends that we see in comp package some of our other commercial products specialty risk and extended warranty, so I think 2015 is shaping up to be a very solid year from a loss pick perspective.  (emphasis added).

153.    This statement was false because, in fact, the Company was not "conservative" with respect to its reserving but rather engaged in fraudulent under-reserving practices.

154.    On March 2, 2015, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2014, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.   The 2014 Form 10-K represented that

AmTrust's financial results were accurate and presented in accordance with GAAP. The 2014 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The 2014 Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 132 to 133.

155.    These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

5.    First Quarter 2015 Financial Results

156.    On May 5, 2015, AmTrust issued a press release announcing its first quarter 2015 earnings results ("Q1 2015"). For the quarter, AmTrust reported total service and fee income of $112.9 million; net income of $164.1 million; net income attributable to AmTrust common stockholders of $154.7 million; and diluted earnings per share (EPS) of $1.85. In addition, "[l]oss and loss adjustment expense totaled $613.3 million in the first quarter 2015, compared to $558.6 million in the first quarter 2014, and resulted in a loss ratio of 64.6% compared with 67.4% for the first quarter 2014." As of March 31, 2015, loss and loss adjustment expense reserves totaled $5.886 billion.

157.    Defendants' financial results summarized in paragraph 156 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration

owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables. Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $10.767 million, or 9.5%; net income was revised downward by $21.179 million, or 12.9%; net income attributable to common stockholders was revised downward by $21.179 million, or 13.7%, and diluted earnings per share was revised downward by $0.13, or 14%. The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236. In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

158. On May 5, 2015, AmTrust held a conference call with analysts and investors to discuss Q1 2015 financial results. During the conference call, Defendant Zyskind commented on the Company's loss reserves, stating in pertinent part:

> I don't think there is any one event or anything. I think we do believe they are based on where we are now, that it's definitely, in our opinion, cash flowing positive. ***And as we mentioned in the last call, we think we have sufficient, if not, excess reserves in terms of a lot of reserves we've put up against contestability in these things.*** So we think we're in very good position on the portfolio.

159. During the May 5 conference call, Defendant Pipoly also emphasized AmTrust's conservative approach in estimating loss reserves: "Well, yes, I think at the end of the day, when you look at reserves and consistent with our practice over the years, we've taken a conservative approach as we enter these new accident years."

160. The statements in paragraphs 158 to 159 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

60

161. On May 11, 2015, the Company filed its Form 10-Q for Q1 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q1 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q1 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q1 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 132 to 133.

162. These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

6.     Second Quarter 2015 Financial Results

163. On August 4, 2015, AmTrust issued a press release announcing its second quarter 2015 earnings results ("Q2 2015"). For the quarter, AmTrust reported total service and fee income of $107.7 million; net income of $80.7 million; net income attributable to AmTrust common stockholders of $70.7 million; and diluted earnings per share (EPS) of $0.84. In addition, "[l]oss and loss adjustment expense totaled $638.5 million in the second quarter 2015, compared to $587.2 million in the second quarter 2014, and resulted in a loss ratio of 65.9% compared with 67.1% for the second quarter 2014." As of June 30, 2015, loss and loss adjustment expense reserves totaled $6.38 billion.

61

164.     Defendants' financial results summarized in paragraph 163 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.   Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $11.577 million, or 10.7%; net income was revised downward by $24.962 million, or 30.9%; net income attributable to common stockholders was revised downward by $24.962 million, or 25.3%, and diluted earnings per share was revised downward by $0.15, or 35.7%. The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.  In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

165.     On August 10, 2015, the Company filed its Form 10-Q for Q2 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q2 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q2 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q2 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 132 to 133.

166.    These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.   Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

### 7.    Third Quarter 2015 Financial Results

167.    On November 3, 2015, AmTrust issued a press release announcing its third quarter 2015 earnings results ("Q3 2015").   For the quarter, AmTrust reported total service and fee income of $126.1 million; net income of $193 million; net income attributable to AmTrust common stockholders of $182.7 million; and diluted earnings per share (EPS) of $2.17.   In addition, "[l]oss and loss adjustment expense totaled $709.6 million in the third quarter 2015, compared to $609.4 million in the third quarter 2014, and resulted in a loss ratio of 67.9% compared with 66.6% for the third quarter 2014."   As of September 30, 2015, loss and loss adjustment expense reserves totaled $6.69 billion.

168.    Defendants' financial results summarized in paragraph 167 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.   The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.   Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $13.22 million, or

63

10.5%; net income was revised upward by $3.349 million, or 1.7%; net income attributable to common stockholders was revised upward by $3.349 million, or 1.4%, and diluted earnings per share was revised upward by $0.02, or 1.4%.

169.   In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

170.   On November 9, 2015, the Company filed its Form 10-Q for Q3 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.   The Q3 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q3 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.   The Q3 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 132 to 133.

171.   These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.   Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 211 to 236.

### 8.   Fourth Quarter and Full Year 2015 Financial Results

172.   On February 10, 2016, AmTrust issued a press release announcing its fourth quarter and full year 2015 earnings results.   For the quarter, AmTrust reported total service and fee income of $131.4 million; net income of $72.6 million; net income attributable to AmTrust

common stockholders of $63.9 million; and diluted earnings per share (EPS) of $0.37.   In addition, "[l]oss and loss adjustment expense totaled $720.8 million in the fourth quarter 2015, compared to $587.5 million in the fourth quarter 2014, and resulted in a loss ratio of 68.1% compared with 64.7% for the fourth quarter 2014."   As of December 31, 2015, loss and loss adjustment expense reserves totaled $7.2 billion.

173.   For the full year 2015, the Company reported service and fee income of $478.2 million; net income of $510.5 million; net income attributable to AmTrust common stockholders of $472 million; and diluted earnings per share (EPS) of $2.80.

174.   Defendants' financial results summarized in paragraphs 172 to 173 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.   The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.   Indeed, as revealed by the Company's 2017 financial restatements: for the fourth quarter service and fee income was later revised downward by $14.499 million, or 11%; net income was revised downward by $10.097 million, or 13.9%; net income attributable to common stockholders was revised downward by $10.097 million, or 15.8%, and diluted earnings per share was revised downward by $0.06, or 16.2%.

175.   In addition, Defendants fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

176.     Indeed, as described further in paragraphs 197 to 236, Defendants subsequently admitted that their financials were dramatically overstated for 2015, including, *inter alia*, net income attributable to common stockholders, which was overstated by 11%, or $52.9 million; and total service and fee income for 2014, which was overstated by 10.5%, or $50 million.

177.     On February 10, 2016, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2015 financial results.  During the call, Defendant Pipoly discussed "loss picks for 2016":

> ***But I think we are talking a conservative view at where we are on the trend***. And I think that's really reflected in the fact that as we sit here at December 31, 2015, 53.3% of our total gross reserves were in IBNR, which is up over 4% from year-end 2015. ***So I think we are taking a conservative view towards loss picks for 2016.*** But we continue to be encouraged by the trends that we see and discuss on a monthly basis.

178.     The statements in paragraph 177 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

179.     On February 29, 2016, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2015, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.  The 2015 Form 10-K represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The 2015 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The 2015 Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 132 to 133.

180.     These statements were false and misleading because, as was later revealed, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.

Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

9.      First Quarter 2016 Financial Results

181.    On May 3, 2016, AmTrust issued a press release announcing its first quarter 2016 earnings results ("Q1 2016"). For the quarter, AmTrust reported total service and fee income of $144.2 million; net income of $113 million; net income attributable to AmTrust common stockholders of $100.3 million; and diluted earnings per share (EPS) of $0.56. In addition, "[l]oss and loss adjustment expense totaled $715.1 million in the first quarter 2016, compared to $613.3 million in the first quarter 2015, and resulted in a loss ratio of 66.6% compared with 64.6% for the first quarter 2015." As of March 31, 2016, loss and loss adjustment expense reserves totaled $7.516 billion.

182.    Defendants' financial results summarized in paragraph 181 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables. The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236. Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $15.396 million, or 10.7%; net income was revised downward by $16.279 million, or 14.4%; net income attributable to common stockholders was revised downward by $16.279 million, or 16.2%, and diluted earnings per share was revised downward by $0.09, or 16.1%. In addition, Defendants

fraudulently understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

183.    On May 3, 2016, AmTrust held a conference call with analysts and investors to discuss Q1 2016 financial results.  During the call, Defendant Pipoly expressed that AmTrust was taking "a conservative view on our current accident year," and discussed the following:

> I think at the end of the day and maybe the commentary we gave on the third quarter call and the fourth quarter call last year, hopefully would have led to this kind of idea of somewhere in the low 90s from a combined ratios. If you think about any reserve movement that you may have within a truncated period whether from the third quarter, fourth quarter of last year, I mean expect those loss ratios in that quarter, so I think what you see is really stabilizing of the overall loss ratio and I think that reflects where we think we are at from a pricing environment not only in US workers comp, but in Italian med mal. So I think we are very comfortable at the 66.6% loss ratio we are able to achieve and I think expenses remain virtually unchanged at 24.6 which really is consistent with you know there hasn't been a significant shift in business mix.

184.    The statements in paragraph 183 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

185.    On May 10, 2016, the Company filed its Form 10-Q for Q1 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q1 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q1 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q1 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 132 to 133.

186.    These statements were false and misleading because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness

in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

### 10.  Second Quarter 2016 Financial Results

187.  On August 2, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q2 2016").  For the quarter, AmTrust reported total service and fee income of $138.3 million; net income of $152.2 million; net income attributable to AmTrust common stockholders of $134.8 million; and diluted earnings per share (EPS) of $0.78.  In addition, "[l]oss and loss adjustment expense totaled $784.4 million in the second quarter 2016, compared to $638.5 million in the second quarter 2015, and resulted in a loss ratio of 66.4% compared with 65.9% for the second quarter 2015."  As of June 30, 2016, loss and loss adjustment expense reserves totaled $9.097 billion.

188.  Defendants' financial results summarized in paragraph 187 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $13.965 million, or 10.1%; net income was revised downward by $7.635 million, or 5.0%; net income attributable to common stockholders was revised downward by $7.635 million, or 5.7%, and diluted earnings

69

per share was revised downward by $0.04, or 5.1%.   The details of each of these improper

accounting items are discussed further below in paragraphs 211 to 236.   In addition, Defendants

fraudulently understated their loss reserves, which has already resulted in the Company taking

multiple reserve charges totaling approximately $585 million.

189.   On August 2, 2016, AmTrust held a conference call with analysts and investors to

discuss Q2 2016 financial results.   During the call, Defendant Zyskind touted AmTrust's ability

to properly calculate loss reserves:

> Again on an overall basis I think we do a very good job of setting reserves at
> adequate levels in order to take the claims to conclusion. I mean you'll see
> pockets of movements within Officer lines of business on an aggregate basis,
> there was no any material adverse development related to prior accident years.

190.   This statement was false and misleading, because, in fact, Defendants were using

fraudulent methods to understate their reserve needs and under-reserve for losses.

191.   On August 9, 2016, the Company filed its Form 10-Q for Q2 2016 with the SEC,

which was signed and certified by the Officer Defendants and reiterated AmTrust's previously

reported financial results.   The Q2 2016 Form 10-Q represented that AmTrust's financial results

were accurate and presented in accordance with GAAP.   The Q2 2016 Form 10-Q also

represented that the Company's internal controls were effective and disclosed any material

changes to the Company's internal controls over financial reporting.   The Q2 2016 Form 10-Q

included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all

material aspects to the certification quoted in paragraphs 132 to 133.

192.   These statements were false and misleading because, as was later revealed in

connection with the Company's 2017 financial restatements, AmTrust had a material weakness

in its internal controls throughout the Relevant Time Period.   Further, Defendants failed to

ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly

allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

### 11.   Third Quarter 2016 Financial Results

193.   On November 3, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q3 2016").  For the quarter, the Company reported total service and fee income of $146.6 million; net income of $118.1 million; net income attributable to AmTrust common stockholders of $103.6 million; and diluted earnings per share (EPS) of $0.60. In addition, "[l]oss and loss adjustment expense totaled $811.0 million in the third quarter 2016, compared to $709.6 million in the third quarter 2015, and resulted in a loss ratio of 67.8% compared with 67.9% for the third quarter 2015."  As of September 30, 2016, loss and loss adjustment expense reserves totaled approximately $9.428 billion.

194.   Defendants' financial results summarized in paragraph 193 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 211 to 236.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $12.754 million, or 8.7%; net income was revised downward by $22.9 million, or 19.4%; net income attributable to common stockholders was revised downward by $22.9 million, or 22.1%, and diluted earnings per share was revised downward by $0.01, or 1.7%.  In addition, Defendants fraudulently

understated their loss reserves, which has already resulted in the Company taking multiple reserve charges totaling approximately $585 million.

195.    On November 14, 2016, the Company filed its Form 10-Q for Q3 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.   The Q3 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q3 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.   The Q3 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 132 to 133.

196.    These statements were false and misleading because, as later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.   Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 217 to 236.

**B.     False Accounting and Breaches of Fiduciary Duty Start to be Revealed**

1.      February 27, 2017 Press Release

197.    On February 27, 2017, AmTrust reported fourth quarter 2016 earnings that fell well short of Wall Street expectations due, in large part, to a $65 million reserve charge primarily related to strengthening of prior year loss and loss adjustment reserves in its "Specialty Program" segment.   The Company also identified and corrected errors during the three months ended December 31, 2016 related to prior periods in 2015 and 2016.   These errors included accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gains

and losses and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront. AmTrust also disclosed that it expected to make corrections "to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed."

198. The February 27, 2017 press release also revealed that AmTrust would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016 relating to its ineffective assessment of the risks associated with the financial reporting and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization. The Company also warned that additional adjustments and/or material weaknesses could be identified.

2.    <u>February 27, 2017 Conference Call</u>

199. On February 27, 2017, the Company held a conference call with analysts and investors to discuss its financial results for the fiscal quarter ended December 31, 2016. During the conference call, Defendant Pipoly discussed AmTrust's internal controls over financial reporting:

> Additional time is needed for us to conclude our consolidated financial statements and assess internal controls over financial reporting for fiscal year 2016. And as a consequence for KMPG to complete its audit procedures and to audit the consolidated financial statements included in Form 10-K we will need a little additional time. As such, we expect to file our 10-K on or before March 16th, which we can still be considered a timely filer for SEC reporting purposes.

> In addition as part of our year-end close work, we've reviewed our internal controls of our financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 and identify material weaknesses in our internal control structure over financial reporting.

These specifically relate to ineffective assessment of risk associated with financial reporting in an insufficient complement of corporate accounting and corporate financial reporting resources within the organization.

We expect to complete the remaining work quickly and file the 10-K within a 15 day expansion period. We've started the process to improve our internal controls over financial reporting. We are expanding and enhancing our senior financial leadership team so we have the expertise and resources AmTrust needs.

200.     In reaction to these disclosures, AmTrust's stock plummeted $5.32 per share, or 19.23%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on Monday, February 27, 2017—wiping out over $900 million in Company market capitalization in one trading day.

### 3.     March 16, 2017 Press Release

201.     On March 16, 2017, after the close of the financial markets, the Company announced that it would need additional time to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016. The Company also disclosed that its consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon. The press release stated that the Form 10-K filing delay and restatement "largely relate to the timing of recognition of revenue . . . in the Company's service and fee business." These errors related to the upfront recognition of a portion of warranty contract revenue and bonuses that were expended in the year paid but that should have been accrued in the year earned.

202.     On this news, AmTrust's share price fell $4.03, or almost 19%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017.

4.      April 4, 2017 Disclosures

203.      On April 4, 2017, AmTrust informed investors that the impact of the restatements, which primarily involve the timing of recognition of revenue in the Company's service and fee business, "to net income attributable to common stockholders in 2014 and 2015 was a decline of 7.2% and 11.2%, respectively. Net income attributable to common stockholders in fiscal years 2014, 2015, and 2016, was $402.9 million, $419.1 million, and $363.1 million, respectively."

204.      On that same date, the Company filed its 2016 Annual Report on Form 10-K with the SEC explaining "the impact of the Restatement on the Consolidated Statements of Income primarily resulted in decreased service and fee income, increased acquisition costs and other underwriting expenses, and decreased interest expense, which ultimately resulted in decreases to net income."  With regards to the Company's balance sheets, the restatements "resulted in an increase of premiums receivable and other assets, a reduction of deferred policy acquisition costs and property plant and equipment, an increase in accrued expenses and other liabilities, and a decrease in stockholders' equity."  The restatements also decreased previously reported stockholders' equity by $88.4 million as of December 31, 2013.

205.      As part of the restatements, AmTrust made adjustments to correct errors in: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii)  unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.

C.    **AmTrust's Financial Reporting Through the Relevant Period was Materially False and Misleading in Violation of GAAP and SEC Regulations Governing Financial Reporting**

206.    During the Relevant Period, defendants violated GAAP and SEC regulations governing the reporting of AmTrust's financial results and the maintenance of an effective system of internal control over financial reporting and public disclosure.[19]   Throughout the Relevant Period, AmTrust issued to investors and filed with the SEC, financial statements that the Officer Defendants and the Director Defendants falsely represented were prepared in conformity with GAAP.

207.    At issue in this case are the Company's financial statements for years ended December 31, 2012 through December 31, 2015, along with each of the quarters included therein, as well as the first three quarters of fiscal year 2016.

208.    AmTrust violated GAAP standards and SEC rules because, as AmTrust has admitted, the financial statements contained in AmTrust's SEC filings were not prepared in conformity with applicable GAAP and SEC requirements, nor was the financial information a fair presentation of the Company's operations.

209.    Indeed, AmTrust has now admitted that the financial statements issued to investors during the Relevant Period were materially false and misleading and "***should no longer be relied upon***." (emphasis added).

---

[19] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states ***that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate***, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP.

210.    In fact, AmTrust has acknowledged that the Company's Relevant Period financial statements were riddled with accounting errors and/or financial manipulations, resulting in overstatements of net income attributable to stockholders by as much as 13% in certain years.

211.    AmTrust has restated multiple years of its financial statements to correct myriad GAAP violations and financial reporting improprieties, including:

(a) <u>Warranty Fee Revenue</u> – During the preparation of its financial statements for the year ended December 31, 2016, management became aware of a potential misapplication of the revenue recognition guidance in relation to its accounting for warranty contract revenue associated with promotion, marketing and administration services (collectively, "administration services") provided as part of extended service plans ("ESPs").  The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts.  This correction of an error, which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods, required a restatement of the Company's previously issued financial statements.

(b) <u>Accrual of Bonuses</u> – In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual.  Upon review of ASC 270, Interim Reporting, and ASC 450, Contingencies, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.  This created an error resulting in an overstatement of acquisition costs and other underwriting expenses, requiring a restatement of the Company's previously issued financial statements.

(c) <u>Deferred Acquisition Costs</u> – The Company corrected errors in its calculation of deferred acquisition costs related to (i) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (ii) the capitalization of certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (iii) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (iv) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

(d) <u>Foreign exchange gain/(loss)</u> – The Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income. Given the monetary nature of some of these assets, the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements.

(e) <u>Capitalized software</u> – The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, Intangibles - Goodwill and Other.  This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses.

(f) <u>Imputed interest</u> – The Company corrected an error related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015.

(g) <u>Intercompany eliminations</u> – The Company corrected an error related to internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

(h) <u>Other Items</u> – The Company corrected other errors that impacted the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, unrealized loss on investments, and proper year end cut-off related to premiums and claims.

(i) <u>Balance Sheet Items</u> – The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities.  In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

> 1.     <u>AmTrust Admitted Its Financial Statements Were Materially False and Misleading</u>

212.   AmTrust's March 16, 2017 press release and Form 8-K revealed that the Company's previously issued consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 should be restated and "should no longer be relied upon."

213.    AmTrusts's Form 10-K filed April 4, 2017 confirmed and expanded the numerous and varied violations of GAAP and financial reporting improprieties necessitating the restatement of AmTrust's financial statements for the following ten consecutive reporting periods: (1) years ended December 31, 2012; (2) December 31, 2013; (3) December 31, 2014; (4) December 31, 2015; as well as the quarters ended (5) March 31, 2015; (6) June 30, 2015; (7) September 30, 2015; (8) March 31, 2016; (9) June 30, 2016; and (10) September 30, 2016. Defendants perpetrated these improprieties by deliberately employing a host of accounting schemes and manipulations, the majority of which can be generally classified under the following categories: (a) overstatement of reported revenues; (b) understatement of reported expenses; and (c) other GAAP violations that the Company's deficient controls did not and could not prevent.

214.    There is no dispute that AmTrust's Relevant Period financial statements were false.  Nor is there any dispute that those false financial statements were reported in AmTrust's quarterly and annual SEC filings, and included in the various offering documents issued during the Relevant Period.

215.    Defendants have restated AmTrust's prior financial results and admitted that they were materially false as to, among other things: (i) AmTrust's Income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest; (ii) net income; and (iii) earnings per share, as detailed in AmTrust's 2016 Form 10-K.  The restatement reveals that the reported net income attributable to AmTrust common stockholders was overstated for years ended December 31, 2012 through December 31, 2015:

**Net Income attributable to AmTrust common stockholders**
($000)

| Year | Reported | Adjusted | Restated | Diff. |
|------|----------|----------|----------|-------|
| 2012 | $177,987 | ($22,786) | $155,201 | -13% |
| 2013 | $286,874 | ($38,056) | $240,181 | -14% |
| 2014 | $434,276 | ($31,334) | $402,942 | -7% |
| 2015 | $472,004 | ($52,889) | $419,115 | -11% |

216.  The fact that AmTrust restated its previously issued financial statements is an admission that (i) the financial results as originally reported during the Relevant Period and its public statements regarding those results were materially false and misleading; and (ii) the financial statements reported during the Relevant Period were incorrect based on information available to defendants at the time the results were originally reported.

217.  As noted by the SEC, GAAP only allows a restatement of prior financial statements based upon information "that existed at the time the financial statements were prepared," and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[20] The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined "restatement" as "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements."  *See* FASB Accounting Standards Codification ("ASC") Topic 250-10-20, *Accounting Changes and Error Corrections*.  FASB also defines "errors" that may be corrected through a restatement as: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting

---

[20]  *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.- (S.D. Fla. filed Feb. 22, 2002), SEC *Amicus Curiae* Brief regarding Defendants Motion *In Limine* to Exclude Evidence of the Restatement and the Restatement Report at 11, ECF No. 870.

from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time that the financial statements were prepared."  *Id.*

### 2. Defendants Overstated AmTrust's Reported Revenue

218.   Defendants violated GAAP and SEC regulations by engaging in certain practices that overstated AmTrust's reported revenues, in particular the Company's Service and Fee Income.  First, AmTrust improperly accelerated the recognition of Warranty fee revenue, rather than recognizing it ratably over the term of the ESP contracts.

219.   GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectibility is probable.  SEC Staff Accounting Bulletin ("SAB") No. 104.  Moreover, in order for revenue to be recognized, it must be earned and realized or realizable.  Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83, ASC 605-10-25-1(a).  Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  *Id.*  Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  *Id.*  If collectibility is not reasonably assured, revenues should be recognized on the basis of cash received.  Concepts Statement No. 5, ¶ 84g; *see also* ASC 605-10-25-1.  If payment is subject to a significant contingency, revenue recognition is improper.  ASC 450-30-25-1, *Loss Contingencies*.

220.   Second, defendants overstated AmTrust's total revenues during the Relevant Period in violation of GAAP by improperly accounting for certain intercompany transactions. ASC Topic No. 810, *Consolidation*, provides that intercompany profits and losses are to be eliminated from consolidated financial statements.  But in contravention of GAAP, AmTrust improperly recognized internal brokerage commissions paid from one of its subsidiaries to

another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

221.   In improperly recognizing warranty fees and commission income, Defendants overstated AmTrust's revenues, specifically Service Fee Income during the Relevant Period.

| (in thousands) | Year Ended December 31, | | | |
|---|---|---|---|---|
| Service and fee income | 2015 | 2014 | 2013 | 2012 |
| As originally reported | $478,206 | $409,743 | $331,559 | $172,174 |
| As restated | 428,143 | 365,356 | 287,254 | 138,662 |
| $ Change | (50,063) | (44,387) | (44,305) | (33,512) |
| % Change | -10.5% | -10.8% | -13.4% | -19.5% |

### 3.   Defendants Understated AmTrust's Reported Expenses

222.   In violation of some of the most basic and fundamental rules of accounting, defendants repeatedly devised ways to artificially overstate AmTrust's net income by improperly, systematically and continually understating expenses throughout the Relevant Period.  GAAP requires expenses to be recorded in the period they are incurred.  *See* FASB Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶ 85-87, and ASC Topic 450-20, *Loss Contingencies*.  This concept, that expenses be recorded in the same period in which the corresponding benefit is realized, is one of, if not the, most basic tenet underlying accrual accounting.  But defendants deliberately ignored this most basic rule and instead systematically engaged in a scheme of improper timing of expense recognition, typically understating its expenses in a current period and/or improperly delaying expense recognition for as long as possible.

223.   Defendants overstated the Company's net income by improperly deferring current period expenses to subsequent periods, as follows:

a)   improperly deferred bonuses and commissions;

b) improperly capitalized certain expenses as Deferred Acquisition Costs;

c) improperly capitalized internal software costs and other expenses;

d) improperly accounted for interest expense; and

e) failed to record expenses impacting fiscal years 2014 and 2015.

a. Defendants Improperly Deferred Bonuses

224. Defendants admittedly failed to record bonus expenses on a timely basis. In prior years, the Company had improperly expensed discretionary bonuses paid to its employees in the year the bonuses were paid rather than in the period the bonus expense was incurred. ASC 270, *Interim Reporting*, and ASC 450, *Contingencies*, require companies to estimate bonuses and assign the expense to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

b. Defendants Improperly Capitalized Certain Deferred Acquisition Costs

225. AmTrust also admitted that it improperly capitalized certain expenses as Deferred Acquisition Costs, such as (a) salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (b) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses, and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (c) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

226. ASC Topic No. 944, *Financial Services – Insurance*, establishes specific limitations on the deferral of those costs incurred in acquiring insurance contracts and notes that any such deferred costs are to be expensed over time via amortization.

227.    In improperly accounting for Deferred Acquisition Costs, Defendants overstated AmTrust's assets and earnings during the Relevant Period.

c.    Defendants Improperly Capitalized Internal Software Costs and Other Expenses

228.    AmTrust improperly capitalized software development costs and failed to disclose a change in accounting principle related to these costs.   These actions caused AmTrust to overstate its assets by approximately $13.6 million at December 31, 2015.  According to GAAP, in ASC Topic No. 350, *Intangibles – Goodwill and Other*, to properly capitalize software development costs, the costs must be measurable and relate to a product that has reached technological feasibility.  AmTrust admitted that it improperly capitalized internally developed software expenses as assets that did not meet the criteria for deferral, and improperly amortized them over time rather than properly expensing them at the time they were incurred and, and thereby overstating net income, assets, and stockholders' equity.  But as reflected in the table below, Defendants also improperly capitalized expenses related to Land and Building.

| Property and Equipment, Net at December 31, 2015 | | | |
|---|---|---|---|
| (in thousands) | As Originally Reported | As Restated | $ Change |
| Land | $     21,068 | $     18,618 | $ (2,450) |
| Building | 97,667 | 84,090 | (13,577) |
| Software | 144,920 | 131,356 | (13,564) |
| Computer equipment | 62,160 | 62,160 | - |
| Other equipment | 57,767 | 57,767 | - |
| Leasehold improvements | 31,613 | 31,613 | - |
| | 383,582 | 353,991 | (29,591) |
| Less: Accumulated depreciation and amortization | (133,739) | (128,476) | 5,263 |
| | $ 249,843 | $ 225,515 | $(24,328) |

229.    Indeed, the restatement reflects that defendants not only improperly capitalized software costs, but also land and building costs amounting to approximately $16 million.  ASC Topic 360, *Property, Plant, and Equipment*, states that property and equipment are tangible property used in a productive capacity that will benefit the company for a period exceeding one year.  Concepts Statement No. 6 states that a company shall capitalize costs that provide "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."[21]  As part of the restatement, defendants admitted that these costs did not provide probable future economic benefit.

4.    Defendants Improperly Accounted for Interest Expense

230.    AmTrust admitted that it improperly accounted for interest expense related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015 of approximately $7.3 million, in violation of ASC Topic 835, *Interest*.

a.    Defendants Failed to Record Other Expense Items

231.    AmTrust also admitted that it had failed to properly record expenses impacting the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, and unrealized loss on investments.

*        *        *

232.    As a result of Defendants' improper, systematic and continual violations of GAAP, AmTrust understated expenses in excess of $27 million between 2012 and 2015.

---

[21] Concepts Statement No. 6, *Elements of Financial Statements - A Replacement of FASB Concepts Statement No. 3 (Incorporating an Amendment of FASB Concepts Statement No. 2)* ¶ 25.

5.      Defendants' Other GAAP Violations

a.      Defendants' Improper Accounting and Reporting of Foreign
        Currency Gains and Losses

233.    AmTrust admitted that its financial statements during the Relevant Period were presented in violation of GAAP by improperly accounting for foreign currency gains and losses. ASC Topic No. 830, *Foreign Currency Matters*, states that gains and losses on monetary balances ensuing from changes in currency exchange rates are generally required to be included in determining net income for the period in which the exchange rate changes.  In contravention of GAAP, however, AmTrust reported the re-measurement of monetary balances denominated in foreign currencies into their functional currencies as other comprehensive income, rather than as a foreign currency transaction gain/(loss) in the Company's income statements.

b.      Defendants Improper Accounting of Certain Balance Sheet Items

234.    The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities.  In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

6.      AmTrust's Contravention of GAAP Violated SEC Regulations

235.    By failing to file financial statements with the SEC that complied with GAAP as discussed herein, AmTrust disseminated financial statements that were presumptively misleading and inaccurate according to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)).  In addition, the Officer Defendants, and the Director Defendants violated the dictates of §13 of the Exchange Act, which provides:

Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall –

A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

     i.     transactions are executed in accordance with management's general or specific authorization;

     ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

     iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

     iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

236.     In addition, the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### D.     AmTrust's Material Weaknesses in Internal Controls

237.     Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit [the] preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Invs.*, Ltd., 567 F. Supp. 724, 746, 750 (N.D. Ga. 1983).  But as admitted by the Company, AmTrust did not have a sufficient complement of personnel, in certain geographic locations, with an appropriate level of knowledge and experience to help ensure proper selection and application of U.S. GAAP in the following areas: (i) Warranty Fee Revenue; (ii) Accrual of Bonuses; (iii) Deferred Acquisition Costs; (iv) Foreign exchange gain/(loss); (v) Capitalized software; (vi) Imputed interest; (vii) Intercompany eliminations; (viii) Other Items; and (ix) Balance Sheet Items.

238.     Internal control is a process designed by, or under the supervision of, the CEO and CFO and carried out by a company's board of directors, management and other personnel, to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

239.     As acknowledged in the Company's SEC filings, management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in §§13a-15(f) and 15d-15(f) under the Exchange Act.

240.    Under §302 of the SOX, Defendants Zyskind and Pipoly were required to certify that:    (i) they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; (ii) they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and (iii) they have included information in the issuer's quarterly and annual reports about their evaluation.

241.    Under §906 of the SOX, Defendants Zyskind and Pipoly were required to certify each periodic report containing financial statements filed by an issuer with the SEC pursuant to §§13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

242.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains: (a) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant; (b) a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §13a-15 or §15d-15 under the Exchange Act; (c) management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective – this discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management, and management is not permitted to conclude that the

registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and (d) a statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

243. AmTrust has admitted that its internal controls over financial reporting were plagued with material weaknesses. A material weakness is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis," as defined by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard ("AS") No. 5 ¶A7.

244. Among the key controls AmTrust has admitted were improperly designed or implemented are controls over the preparation, analysis, and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures. Specifically, management did not appropriately assess the risks associated with the financial reporting of foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income.

245. AmTrust further admitted that there were material weaknesses in its internal control over financial reporting relating to (i) warranty services revenue, (ii) accrual of bonuses, (iii) foreign exchange adjustments, (iv) deferred acquisition costs, (v) and period-end accruals.

246. With regard to the calculation of deferred acquisition costs, AmTrust improperly (a) over-amortized certain deferred acquisition costs in 2015, resulting in an overstatement of

expenses in 2015, (b) capitalized certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) treated certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) included deferred warranty administration fees and obligor liabilities associated with the administration services provided to its ESPs.

247.    Further, the material weakness resulting from business process level control activities affected the consolidation process and preparation of financial statements, specifically subsidiary close and consolidation adjustments, segregation of duties related to the creation and posting of a discrete number of journal entries, foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income, and associated disclosures.

248.    Additionally, the Company admitted that its "internal control[s] over financial reporting was not effective as of December 31, 2015."

249.    Accordingly, AmTrust violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its expenses and net income.   Moreover, AmTrust's inaccurate and false records were not an isolated or unique instance because they were improperly maintained for multiple years and reporting periods.

250.    In addition, AmTrust violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  For example, AmTrust failed to ensure that controls were in place to develop necessary accounting policies and procedures, to properly account for (i) warranty services revenue, (ii) accrual of bonuses,

(iii) foreign exchange adjustments, (iv) deferred acquisition costs, and (v) period-end accruals.  It failed to ensure that transactions were reported in accordance with its own policies and with GAAP.

251.    Zyskind and Pipoly provided the required SOX certifications described in paragraphs 132 to 133, as well as the report of their "assessment" of the effectiveness of the Company's internal controls during each quarter of the Relevant Period.

### E.    Further Fallout from Defendants' Accounting Manipulation

#### 1.    Wall Street Journal April 11, 2017 Article

252.    On April 11, 2017, *The Wall Street Journal* reported that the FBI, SEC, and NYDFS were probing AmTrust's accounting practices.  One of AmTrust's prior auditors is assisting the FBI in its investigation.  Although the status of the FBI probe, which is focused on whether BDO tried to bury poor practices in AmTrust's audits, is unclear, the SEC's investigation into AmTrust's accounting scheme is ongoing.

253.    According to the former BDO auditor quoted by *The Wall Street Journal*, "AmTrust has overstated its profits and financial health by understating what it may need to pay policyholders in the future."  In that regard, *The Wall Street Journal* article asserted:

> To mask this, they contend, the company has used complicated financial maneuvers, some involving related offshore companies.

> In a 2013 submission to the SEC, which has been reviewed by the Journal, the group claimed it used internal documents gathered by the whistleblower to calculate that $277 million in losses had been shifted to an offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount. This accounted for 38% of net income in 2012 alone, the group calculates.

> In a presentation that the group says it gave to the FBI and federal prosecutors in 2014, Mr. Markopolos's team called one set of alleged accounting moves "The Washing Machine" for its purported cleansing effect on the bottom line, and another "The Loss Cemetery," for its alleged effectiveness in burying losses in offshore affiliated entities.

In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

       2.    <u>Keefe, Bruyette & Woods' May 2017 Note</u>

254.    On May 2, 2017, KBW stressed that investor confidence in AmTrust could only be rebuilt if the Company takes a reserve charge in the hundreds of millions of dollars and commits to providing more in-depth disclosures.  KBW analyst Meyer Shields noted that he was "very uncomfortable" with AmTrust's reserves because its 2016 underwriting results seemed inconsistent with management's guidance.  Shields further asserted that a review of loss triangles suggest a substantial deficiency, meaning that AmTrust will likely have to strengthen reserves in the near future.

255.    KBW also recommended that AmTrust increase the size of its Board, reconstitute the Audit Committee, and select an investor friendly management team.

       3.    <u>AmTrust Reports Another Massive Reserve Charge and an Unexpected 3Q Loss.</u>

256.    Following the announcement of AmTrust's reserve strengthening on November 6, 2017 of $327 million, A.M. Best placed the Company's credit and financial strength ratings under review with negative implications.  In connection with AmTrust's increased reserved charges, A.M. Best commented:

> the actions raise questions about the potential future movement of reserves for these accident years . . . and about price adequacy and underwriting practices for the current and more recent accident years.

F.    **Additional Allegations Contributing to a Strong Inference of Scienter**

257.    As described further in, *supra* paragraphs 58 to 106, Defendants were repeatedly put on notice of myriad examples of improper accounting in the Company as well as overall weaknesses in the Company's internal controls over financial reporting.

258.    Defendants Gulkowitz, Fisch and DeCarlo, as the members of the Audit Committee, were in direct receipt of the Alistair Capital Letter, which was addressed to them. As such, they had extensive notice of problems with the Company's internal controls as well as numerous other examples of improper accounting.  Defendants on the Audit Committee were also likely to be made aware of the *Barron's* articles, inasmuch as the Company issued press releases responding to them, and inasmuch as they addressed accounting issues.

259.    Defendant Zyskind was not only aware of the *Barron's* articles, but communicated with *Barron's* regarding them.  Further, the Company publicly responded to the May 31, 2014 and April 23, 2016 *Barron's* articles via press releases.  In addition, AmTrust's management provided written responses to ten questions posed by *Barron's* in 2014.

260.    AmTrust's Audit Committee Charter specifically charged the committee's members with monitoring: "1) the accounting and financial reporting processes of AmTrust Financial Services, Inc. and its subsidiaries…and the audits of its financial statements; 2) the independent auditor's qualifications and independence; 3) the performance of the Company's internal audit function and independent auditors; and 4) the compliance by the Company with legal and regulatory requirements."[22]

261.    Indeed, the Audit Committee members had extensive duties relating to overseeing and interacting with the Company's auditor, and had the ability to recommend selection and

---

[22] The duties outlined in the Audit Committee Charter are described in further detail below in paragraphs 331 to 333.

dismissal of independent auditors. This is particularly significant since, here, the Company's independent auditor, BDO, has been implicated in the Company's accounting manipulation by a whistleblower, and further, Defendants were informed by NYDFS in September 2014 that they needed to replace their auditor, and *agreed* to do so (but did not do so).

262. Two of the three Audit Committee members – Gulkowitz and DeCarlo – were also Insider Selling Defendants, and thus benefitted directly from the fraud by selling their shares back to the Company at prices they knew were inflated by the Company's false statements.

263. Defendant Pipoly, as the Company's CFO, signed the Company's financial statements that contained the accounting errors, and was thus directly involved in the Company's accounting manipulations. Pipoly also took advantage of the stock prices he knew were inflated by the accounting manipulation by selling over $3 million worth of his stock at inflated prices.

264. Finally, improper accounting practices were so pervasive and widespread in the Company that Defendants could not plausibly have been unaware of them; indeed, as reported by the *Wall Street Journal*, a whistleblower within BDO collected evidence that even the Company's auditor was aware of fraudulent accounting taking place in the Company.

### G.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply to Defendants' Misrepresentations

265. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about AmTrust's present financial condition and its internal controls, among other things.

266.     Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of AmTrust or a Defendant who knew the statement was materially false or misleading when made.

## H.     The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions

267.     While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (*see, e.g.,* ¶¶ 121, 122, 127-29, 133, 139-43, 147-50, 154, 159, 166-68, 172-74, 178-80 & 184), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.  Defendants participated in the drafting, preparation, or approval of the various stockholder and investor reports and other communications concerning AmTrust identified in this Complaint, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature.  Each Defendant, by virtue of his or her position(s) at AmTrust, had access to adverse undisclosed information about the Company's business prospects and financial condition and performance as alleged in this Complaint, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

268.     Defendants, because of their positions of control and authority as officers or directors of AmTrust, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged in this Complaint to be false or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, each Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed in this Complaint, and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

## I.     Defendants' Misstatements and Omissions Caused Damage to AmTrust

269.     Throughout the Relevant Period, the price of AmTrust's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on AmTrust, which repurchased shares at artificially inflated prices.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AmTrust stock fell as the prior artificial inflation dissipated.  As a result of its purchases of AmTrust shares during the Relevant Period, the Company suffered damages under the federal securities laws.  *See* ¶¶ 99-101.

270.     The decline in AmTrust's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by AmTrust were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

271.     On May 8, 2017, AmTrust held a conference call with analysts and investors to discuss Q1 2017 financial results.  During the call, Defendants Zyskind and Pipoly each stated that AmTrust incurred estimated costs of $17 million associated with the Company's restatement of its financials during the first quarter of 2017.  These additional costs for professional services were a direct result of the Defendants' misconduct described herein and have damaged the Company as a result.

272.     In addition to causing massive and devastating financial restatements, Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC, and NYDFS.  It also caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

## DERIVATIVE ALLEGATIONS

273.     Plaintiffs bring this action derivatively in the right and for the benefit of AmTrust to redress the breaches of fiduciary duty and other violations of law by the Defendants, as alleged herein.

274.     Plaintiffs will adequately and fairly represent the interests of AmTrust and its stockholders in enforcing and prosecuting the Company's rights.  Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.

275.     Plaintiffs have owned AmTrust shares since prior to AmTrust's disclosure that it issued false and misleading financial statements and continue to hold shares of AmTrust stock.

## DEMAND IS EXCUSED AS FUTILE

276.     Plaintiffs did not make a demand on the Board to bring suit asserting the claims set forth herein because pre-suit demand would have been futile.  The facts alleged herein show that, at a minimum, reasonable doubt exists as to whether a majority of the Board lacks the requisite disinterest to determine fairly whether these claims should be pursued.

277.     At the time of the filing of this action, the Board consisted of the following seven directors:  Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, Rivera and DeCarlo.  To establish demand futility, Plaintiffs need only to allege that demand is excused as futile as to four of these seven directors.  However, as explained below, Plaintiffs have sufficiently alleged that none of these seven directors are capable of independently and fairly evaluating a demand.

## I.     Demand is Excused as to the Control Group and Those That Lack Independence From It

278.     AmTrust has been controlled by the Karfunkel family since it was founded in 1998 by brothers George and Michael, along with Michael's son-in-law Barry Zyskind.  Currently, the Control Group consists of Defendants Zyskind, L. Karfunkel (M. Karfunkel's Widow), and G. Karfunkel, who, in addition to their close familial connections, consider themselves a "group" for SEC-required beneficial ownership reporting purposes.  According to the most recent Schedule 13D filed by the Control Group with the SEC, as of May 25, 2017, the Group collectively owned 84,062,519 shares of AmTrust common stock, or 44% of the total outstanding shares.[23]

---

[23] The true ownership of the Karfunkel family is higher than 44%.  On May 25, 2017, AmTrust sold 24,096,384 shares of common stock for $12.45 per share, or a total of $300 million, to undisclosed certain members of the families of Barry Zyskind and G. Karfunkel.  The Control Group's SEC filings did not count these shares in its calculation of the Control Group's ownership.  Counting these shares, the Karfunkel family owns approximately 55% of AmTrust's outstanding stock.

279.   In its Form 10-K for the fiscal year ended December 31, 2016, AmTrust admits that the Control Group has "the ability to control our business" as well as "all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."   Given their control over the Company, AmTrust admits in its annual proxy filings that the members of the Control Group are not independent directors and as such cannot impartially evaluate a demand to bring the claims asserted herein.

280.   The Control Group has dominated the Company since its inception and the members of the Board have made clear that they will not act independently from the Control Group.   For example, the Company is currently a party to an inordinate amount of agreements with parties related to the Control Group, including Maiden and NGHC.   This includes a reinsurance agreement with Maiden that has been in place since 2007 and under which the Company recorded approximately $596 million of "ceding commissions" in 2016 alone, a loan from Maiden with an outstanding balance of $168 million, and a master services agreement with NGHC where AmTrust recorded $46 million in fee income in 2016.   All told, AmTrust's 2017 annual proxy statement disclosed at least 22 related party deals with Control Group-related entities.   This does not even include a September 2017 agreement whereby AmTrust sold a personal lines policy management system and related intellectual property to NGHC for $200 million.   The sheer volume and size of these related party transactions show how the Company's purportedly independent directors simply accede to the demands of the Control Group.   Attached as Exhibits 1, 2 and 3 are the relevant pages of the 2015, 2016 and 2017 proxies, respectively, listing the inordinate number and value of the related party transactions.

281.    The Control Group's domination of the Board is perhaps best illustrated by the events surrounding the acquisition of Tower by ACP, which is wholly owned by the Control Group.   During 2013, Tower experienced a significant decline in its business, making it an acquisition target.   In the fall of 2013, AmTrust itself submitted an indication of interest whereby it would acquire certain of Tower's business units and make a preferred equity investment in Tower.   Shortly thereafter, AmTrust amended its proposal and offered to acquire the entirety of Tower for $5.50 per share in cash, or in excess of $500 million.   Thereafter, AmTrust engaged in due diligence of Tower.   However, by the end of 2013, Tower was told that AmTrust was withdrawing its proposal and the Control Group-owned ACP would be making an acquisition proposal instead.

282.    Those parties would sign a merger agreement on January 3, 2014 where ACP acquired Tower for only $3 per share.[24]   Therefore, the Control Group usurped a corporate opportunity from AmTrust, misappropriated AmTrust's due diligence, and relied on AmTrust's financial advisor, all with the blessing of the purportedly independent directors.   Moreover, the Control Group forced AmTrust and NGHC to enter into a series of related agreements in support of ACP's acquisition of Tower, including agreements whereby ACP foisted Tower's poorest performing business segment onto AmTrust for $125 million.[25]

283.    Not only did the Control Group steal this corporate opportunity from AmTrust and force AmTrust to enter into suspect related transactions, but as a result, the NYDFS imposed

---

[24] This purchase price would later be reduced to $2.50 per share.

[25] This transaction structure would later be modified so that ACP acquired ownership of Tower's business units, but AmTrust and NGHC each provided ACP with $125 million in financing to complete the deal and agreed to cover excess losses of up to $250 million incurred by a former Tower subsidiary.

requirements on AmTrust, including the retention of a new independent auditor, before it approved ACP's acquisition.

284.    The Board did nothing to protect the interests of AmTrust's public stockholders and simply rubber stamped the Control Group's machinations based solely on a presentation by the patently conflicted Zyskind.  The Company's board minutes indicate that the Board did not even discuss the Control Group's conflicts of interest related to the Tower deal before blessing it. Notably, despite the fact that the Audit Committee, which consisted of the same directors as it does now (Defendants DeCarlo, Fisch, and Gulkowitz), is required to oversee all related party transactions, it abdicated its responsibility.  Instead, the Audit Committee allowed the Board, which was comprised of a majority of directly conflicted individuals, to conduct all key deliberations.  Immediately after the conflicted Board blessed the deal on January 3, 2014, and mere hours before the initial merger agreement was signed, the Audit Committee then met for only fifteen minutes, without independent legal or financial advisors, to rubber stamp a transaction that had already been structured and agreed to.  The minutes from that Audit Committee meeting indicate that the Committee failed to even review the transaction documents. Shockingly, Defendant DeCarlo was permitted to participate in that Audit Committee meeting despite the fact that he is also a director of NGHC, which was a party to the transactions related to the Tower deal.[26]  He would only belatedly recuse himself months later shortly before the Audit Committee approved a revised transaction structure.

285.    Unsurprisingly, the Control Group's flagrant abuses of their fiduciary duties in connection with the Tower deal led to the filing of a derivative complaint in the Delaware Court

---

[26] When the parties renegotiated the terms of the signed deal in May 2014, the Audit Committee finally retained a financial advisor.  However, its choice of advisor, Griffin Partners, was conflicted as it was simultaneously advising NGHC on the same transactions.

of Chancery captioned *Cambridge Retirement System v. DeCarlo, et al.,* C.A. No 10879-CB (Del. Ch.). On June 16, 2016, Chancellor Bouchard denied the motion to dismiss filed by one of the Company's purportedly independent directors from the bench, expressed deep skepticism regarding the actions of the Audit Committee, and stated that what the Audit Committee did "doesn't really look like a bona fide process."

286.    Based on the repeated acquiescence of Defendants DeCarlo, Gulkowitz, and Fisch to the Control Group, the Control Group exercises control over them so that all of its members are incapable of considering a pre-suit demand to bring the claims asserted herein so long as the Control Group itself is incapable of considering such demand.

287.    Moreover, the Control Group was incentivized to perpetuate the Company's fraudulent accounting practices and false statements during the Relevant Period so as to render its members incapable of impartially evaluating a pre-suit demand.

288.    *First*, Barry Zyskind, as the Company's CEO during the Relevant Period, was incentivized to keep AmTrust's financial results and stock price artificially high so that he could personally benefit through excessive executive compensation. In each of the Company's annual proxy statements since at least 2013, AmTrust stated that "[w]e believe that bonuses should be dependent on and tied to our financial performance, and should be paid only when we have met pre-determined performance criteria. Our annual profit bonus program is designed to reward each named executive officer for his contributions to our profitability for the fiscal year."

289.    Specifically, Zyskind's employment agreement currently entitles him to an annual profit bonus so long as the Company's pre-tax profit exceeds $75 million. If AmTrust reaches that threshold in any given year, then Zyskind receives 2% of the Company's pre-tax profit

subject to an annual cap equal to four times his base salary.[27]  Additionally, Zyskind is also entitled to receive annual incentive awards based on the Company's performance as measured by three financial metrics: operating earnings, combined ratio, and return on equity.  As shown in the chart provided below, Zyskind, and through him the Control Group, has profited enormously by artificially inflating the Company's performance.

| Year | Profit Bonus | Incentive Award | Total Compensation |
|---|---|---|---|
| 2013 | $3,900,000 | $8,469,750 | $4,916,858[28] |
| 2014 | $3,900,000 | $7,680,000 | $22,130,044[29] |
| 2015 | $3,900,000 | $9,000,015 | $13,942,205 |
| 2016 | $2,000,000 | $0 | $4,902,193[30] |

---

[27] Notably, Zyskind's employment agreement was amended twice to increase his potential annual profit bonus.  Initially, on October 6, 2010, Zyskind's employment agreement was amended to increase the pre-tax threshold to trigger a bonus payment from $29.3 million to $75 million and to increase the multiplier on the cap from 2.5x to 3x his base salary.  Then, on March 22, 2013, Zyskind's employment agreement was amended to increase the multiplier on the cap from 3x to 4x his base salary.  The increased cap on Zyskind's profit bonus allowed him to further profit from the Company's fraudulent accounting practices.

[28] The Company's incentive award program was not in place until 2014.  The incentive award figure listed in this table for 2013 is the value of a performance share award the Company paid Zyskind in restricted stock based on the Company's performance in both 2012 and 2013.  The Company included the full value of this award in its calculation for Zyskind's 2012 compensation.  As such, the total compensation column for 2013 does not reflect the value of this incentive performance share award.

[29] In addition to his Profit Bonus and Incentive Award, in February 2014, the Compensation Committee decided to grant Zyskind a discretionary award of 250,000 restricted stock units worth $9.54 million "in recognition of significant domestic and foreign acquisitions in 2012 and 2013."

[30] Notably, Zyskind was eligible to receive a $3.9 million profit bonus and a $6 million incentive bonus in 2016.  However, Zyskind and the Company agreed that he would forgo any bonus beyond the $2 million he was already paid in September 2016 "solely as a matter of good corporate governance."  Given the fact that the Company's compensation committee paid him $2 million of his bonus just a few months before the Company admitted its financial statements were fraudulent, it is fair to infer that Zyskind agreed to forgo his remaining bonus for public relations purposes to merely create the appearance of a concern for good corporate governance.

| Total | $13,700,000 | $25,149,765 | $45,891,300 |
|-------|-------------|-------------|-------------|

290.    As such, Zyskind, and through him the rest of the Control Group, is directly incentivized to artificially inflate the Company's profit to ensure he receives the highest bonus possible.

291.    Furthermore, Zyskind owes fiduciary duties to AmTrust in his role as the Company's CEO, in addition to his role as a director.  In his capacity as CEO, he, at a minimum, was grossly negligent by failing to ensure that AmTrust issued accurate financial statements and, as such, breached his duty of care.  Although directors of AmTrust cannot be held monetarily liable for breaches of their duty of care due to the Company's exculpatory Section 102(b)(7) charter provision, corporate officers, such as Zyskind, are not protected from such liability. Therefore, Zyskind faces a substantial likelihood of liability as a result of his breaches of his duty of care as an AmTrust officer.

292.    *Second*, during the time the Company's financial statements were artificially inflated, AmTrust engaged in numerous debt and equity offerings.  Specifically, solely since the beginning of 2013 and excluding certain note and stock exchange transactions, AmTrust issued: (i) $115 million of 6.75% Non-Cumulative Series A Preferred Stock on June 10, 2013; (ii) $250 million of 6.125% notes due 2023 on August 15, 2013; (iii) $105 million of depository shares representing interests in its 7.25% Non-Cumulative Preferred Stock, Series B on July 1, 2014; (iv) $80 million of depository shares representing interests in its 7.625% Non-Cumulative Preferred Stock, Series C on September 16, 2014; (v) $76 million of 2.75% notes due 2044 on December 11, 2014; (vi) $172.5 million of common stock in January and February 2015; (vii) $182.5 million of depository shares representing interests in its 7.50% Non-Cumulative Preferred Stock, Series D on March 19, 2015; (viii) $150 million of 7.25% notes due 2055 on June 18,

2015; (ix) $135 million of 7.5% notes due 2055 on September 16, 2015; (x) $320 million of common stock in November and December 2015; (xi) $143.75 million of depository shares representing interests in its 7.75% Non-Cumulative Preferred Stock, Series E on March 15, 2016; and (xii) $287.5 million of depository shares representing interests in its 6.95% Non-Cumulative Preferred Stock, Series F on September 27, 2016.

293.    These offerings, totaling over $2 billion, resulted in significantly higher proceeds than the Company could have received had it issued accurate financial statements. As a result, the offerings substantially increased the value of AmTrust by allowing it to grow through numerous acquisitions and broaden the Company's operations. For example, these offerings helped fuel an enormous growth in AmTrust's gross written premiums from $2.75 billion in 2012 to $7.95 billion in 2016, a 189% increase. In turn, the Control Group benefited through an increase in the value of its AmTrust holdings and by allowing it to run a much larger company. Although AmTrust's fraudulent accounting was revealed before they could fully take advantage of it, any controlling stockholder, including the Control Group, is incentivized to grow the Company as much as possible and to maximize the perceived value of its holdings so that it can eventually exit the Company through a sale of its stock at a profit. As such, the Control Group directly benefited from the Company's failure to issue accurate financial statements and cannot impartially consider a pre-suit demand.

294.    *Third*, a portion of AmTrust's many accounting improprieties resulted from its accounting treatment of its warranty business, a portion of which was a public company called Warrantech before AmTrust acquired it in 2010. Prior to its acquisition by AmTrust, Warrantech was admonished by the SEC for improperly accelerating the recognition of revenue on service contracts. As a result, Warrantech was forced to restate its financial statements and change its

accounting practices. After AmTrust acquired Warrantech, it then proceeded to utilize the very same practices that led to the SEC admonishment and prior restatement. Unsurprisingly, these improper accounting practices were among those that led to the AmTrust restatement at issue herein.

295. The Control Group was incentivized to artificially inflate the revenues from this warranty business because it was looking to sell the business or spin it off. For example, at a November 15, 2016 Investor Day, in response to a question concerning whether the Company was looking to sell or spin off the warranty business, Defendant Zyskind said "[w]e're always open. We're always looking at that." Then, on February 27, 2017, Zyskind admitted that AmTrust had talked to third parties about the value of the business, which he pegged at over $2 billion, and that AmTrust "continuously evaluate[s] strategic options for this business to unlock shareholder value." Finally, on August 8, 2017, Zyskind expressly acknowledged that AmTrust was looking to monetize this business, stating "[w]e continue to explore our options here, including the potential sale of a stake in parts of this highly valuable business." Any sale or spin-out of the warranty business would have been very lucrative to the Control Group.

296. The Company finally achieved its goal of monetizing this portion of its business on November 6, 2017, when it announced that it reached an agreement with Madison Dearborn Partners ("MDP") to sell 51% of certain of its U.S-based fee businesses in a transaction that values the businesses at $1.15 billion.[31] All told, AmTrust will receive gross cash proceeds of approximately $950 million at closing. In commenting on the deal, Defendant Zyskind stated: "For AmTrust, it delivers on our stated objective to unlock the value of our Fee Businesses,

---

[31] The fee based businesses included in the deal provide warranty and services contracts for the automotive, consumer products, and specialty equipment industries, among others, and administer niche workers' compensation and contractor liability coverage in the United States on behalf of AmTrust and other carriers.

while also enabling AmTrust to participate in the future success of the new company and ongoing upside as a significant shareholder." If AmTrust was able to sell this business before its fraudulent accounting was revealed, it likely would have generated even larger proceeds.

297. *Fourth*, as explained above, AmTrust engaged in numerous related party transactions with entities affiliated with the Control Group in order to disguise the true state of the Company's financials. For example, Maiden was formed by members of the Control Group, who still own approximately 15% of Maiden's outstanding shares. Zyskind serves as Maiden's Chairman and Yehuda Neuberger, G. Karfunkel's son-in-law, serves as a Maiden director. Since 2007, AmTrust and Maiden have engaged in numerous related party transactions, including a Reinsurance Agreement that has been in place since 2007. Under this agreement, during just 2016, AmTrust recorded approximately $596 million of "ceding commissions." Maiden also served as a creditor to AmTrust. As of December 31, 2016, AmTrust owed Maiden $168 million and AmTrust recorded $2.4 million in interest expense.

298. Therefore, as a result of these related party transactions, the Control Group was able to simultaneously artificially inflate AmTrust's performance and increase the value of their personal holdings in companies such as Maiden by stripping revenue from AmTrust in favor of Maiden.

299. In light of the numerous ways the Control Group benefited from the Company's fraudulent accounting practices, as well as the Company's admission that its members are not independent and the substantial liability Zyskind faces for his breaches of fiduciary duty as an officer of AmTrust, the members of the Control Group could not impartially evaluate a pre-suit demand to bring the claims asserted herein. As such, demand is excused with respect to its members.

300.    Furthermore, as demand is excused with respect to the Control Group, demand is also excused with respect to any other director that lacks independence from the Control Group, *i.e.,* Defendants DeCarlo, Gulkowitz, and Fisch, as exhibited by their past acquiescence to the Control Group as explained above.  Moreover, at least two directors have personal ties to the Control Group so as to render them not independent.

301.    Specifically, Defendant Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis.  The Hod Foundation, a private foundation owned and controlled by the Control Group, was the beneficial owner of at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint"). FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group.  Additionally, Defendant DeCarlo has served as a director of NGHC since it was founded by members of the Control Group in 2010.  As a director of NGHC, DeCarlo earns annual director fees of approximately $120,000 per year.  He owes that income to his relationship with the Control Group.  As a result, neither Gulkowitz nor DeCarlo are independent of the Control Group and demand is excused as to them.

## II.    Demand is Excused as to the Insider Selling Defendants

302.    While the Company's stock price was artificially inflated by the issuance of inaccurate and fraudulent financial statements, Defendants DeCarlo and Gulkowitz sold large amounts of AmTrust stock during the Relevant Period, thus reaping an undeserved windfall. From December 12, 2013, the date of the GeoInvesting Report, until the Company announced it was restating its financial statements, DeCarlo and Gulkowitz sold stock for proceeds of $1.6 million and $860,000 respectively.  Moreover, these sales occurred during the period when the Company was repurchasing its own stock in the market at inflated prices.  Therefore, they

personally profited from the Company's accounting failures and their improper approval of stock repurchases. As such, they cannot fairly and independently consider a pre-suit demand.

## III. Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability on the Claims Asserted Herein

303.    A majority of the members of the Board face a substantial likelihood of liability for the claims asserted herein because they: (i) consciously disregarded known red flags concerning the Company's improper accounting practices; and/or (ii) failed to exercise valid business judgment when they actively approved the Company's accounting practices and related actions.

304.    The misconduct at the heart of Plaintiffs' allegations is the Board's failure to ensure the Company was accurately reporting its financial results despite being on notice since no later than December 2014 that AmTrust's financial statements were not reliable. Specifically, the Board was aware of numerous articles and other information that made clear the Company was not issuing accurate financial statements, including:

- A December 12, 2013 public report issued by GeoInvesting, LLC that questioned the Company's accounting practices in detail, including the apparent understatement of losses by failing to properly account for losses related to intercompany transactions;

- A February 8, 2014 article in *Barron's* titled "Turning Losses Into Gains" that attributed AmTrust's financial performance to creative bookkeeping and the use of related party transactions rather than legitimate superior operations and noted AmTrust's own investment bankers at FBR Capital Markets were confused by the Company's accounting;

- A May 31, 2014 article in *Barron's* titled "Balance Sheet Risk Makes AmTrust Shares Vulnerable" that again questioned AmTrust's accounting and noted that "[m]ultimillion-

dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital" and that there were "puzzling accounting disparities" with respect to related party transactions;

- The September 12, 2014 decision by the NYDFS to condition its approval of the acquisition of Tower by ACP on AmTrust agreeing to hire a new auditor to replace BDO even though AmTrust was not a party to that acquisition as ACP is a separate private company wholly owned by the Control Group;

- A December 18, 2014 extremely detailed public letter issued by Alistair Capital to AmTrust's Audit Committee in response to the Company's frivolous defamation lawsuit explaining "numerous instances of improper accounting and indications of material weaknesses of internal controls over financial reporting," including irreconcilable discrepancies in AmTrust's public filings (some of which imply accounting impossibilities), and demanding the Audit Committee launch an investigation into AmTrust's accounting; and

- An April 23, 2016 article in *Barron's* titled "Is AmTrust Stock Worth the Premium?" that again questioned AmTrust's accounting practices and highlighted significant discrepancies in the Company's regulatory filings.

305.   Those members of the Board who were directors at the relevant times, *i.e.,* Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo were aware of all of these red flags as the Company issued public responses to each one of them.   Moreover, the Alistair Capital letter caused AmTrust to abandon its frivolous defamation lawsuit.   Nonetheless, in response to these red flags, these directors acted in bad faith by consciously disregarding their

fiduciary duties and doing nothing to ensure the Company issued accurate financial statements until the Company announced it would have to restate its financial statements on March 16, 2017. Any Board acting in good faith would have immediately launched an independent investigation to determine if the allegations in the *Barron's* articles and the Alistair Capital letter were accurate. However, the AmTrust Board did nothing. As a result, Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo breached their fiduciary duties and face a substantial likelihood of liability for the claims asserted herein, and, as such, cannot impartially consider a pre-suit demand, and such demand is excused. [32]

306. Further evidence of these directors' awareness of the Company's fraudulent accounting practices surfaced when the Company announced, on November 6 and 8, 2017, its loss reserve development of $327 million, which was driven not by recent events but primarily by cases known to AmTrust from the 2013-2016 accident years, and which it ceded to its adverse development cover, Premia Reinsurance Ltd. As the adverse development was related to cases already known to the Company, the directors overseeing the Company at the time of the articles cited in paragraph 303 were on notice that the Company had not been adequately accounting for loss reserves at that time. Moreover, that the cession to Premia consumed exactly the amount of reinsurance coverage remaining under the Company's July 2017 reinsurance agreement with

---

[32] At a minimum, the members of the Audit Committee (Defendants DeCarlo, Fisch, and Gulkowitz) received the December 18, 2014 letter issued by Alistair Capital as it was specifically addressed to them. Moreover, as explained in paragraphs 331 to 333 below, members of the Audit Committee have a heightened obligation to ensure the Company's accounting practices are proper and its financial statements are accurate. Thus, at least these directors were warned about the Company's improper accounting practices by December 2014 and took no steps whatsoever to correct them. As such, at least these three directors face a substantial likelihood of liability for consciously disregarding red flags and failing to adequately oversee BDO, and cannot fairly and impartially consider a pre-suit demand to bring the claims asserted herein. Moreover, as explained in paragraphs 275 to 307, the members of the Audit Committee have made clear through their past actions, or lack thereof, that they are unwilling or unable to act independently from the Control Group.

Premia, as alleged above, also supports that the subsequently reported understatement of loss reserves was known to these directors well before July 2017.

307.    Alternatively, if these directors did not sit idly by as the Company continued to defraud the public with inaccurate financial statements, then they acted in bad faith by affirmatively approving the continued use of improper accounting in order to artificially inflate the Company's performance.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.  Similarly, it is not a valid exercise of business judgment to:

- Authorize the issuance of false financial statements in bad faith;

- Continue to rely on BDO's past audits of the Company's financial statements, and allow it to continue to conduct future audits, after the NYDFS stated on September 12, 2014 that it would only approve the acquisition of Tower by ACP, a private company entirely owned by the Control Group, if the Company agreed to hire a new auditor beginning with the audit for the 2015 fiscal year;[33] and

- Utilize a $150 million share repurchase program approved in December 2013 and authorize a new $200 million share repurchase program in April 2016 under which AmTrust repurchased millions of shares of stock for $227 million at artificially inflated prices resulting in overpayments of approximately $104 million.

308.    By authorizing actions that were not the valid exercise of business judgment, a majority of the members of the Board breached their fiduciary duties and face a substantial

---

[33] Additionally, on April 11, 2017, *The Wall Street Journal* published an article revealing that BDO actively tried to bury AmTrust's poor accounting practices, ignored the fact that AmTrust provided it with inconsistent figures, signed off on audits before completing important checks, and manipulated the electronic metadata of certain documents so as to deceptively misstate the date a document was created.

likelihood of liability for the claims asserted herein. Therefore they cannot impartially consider a pre-suit demand and such demand is excused.

## IV.    Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Related Violations of Federal Securities Laws

309.    Throughout the Relevant Period, AmTrust issued numerous false and misleading statements concerning its finances. For example, in connection with the Company's November 2015 $320 million common stock offering and its September 2016 $287.5 million preferred stock offering, the Company filed prospectus supplements (the "Prospectus Supplements") that included and/or incorporated its then current inaccurate financial statements. Each prospectus is considered part of a shelf registration statement the Company filed with the SEC on June 11, 2015 (the "2015 Registration Statement"). The Registration Statement was signed by a majority of the current Board: Defendants Zyskind, DeCarlo, Fisch, Gulkowitz, and G. Karfunkel (collectively, the "Section 11 Defendants").

310.    Section 11 of the Securities Act of 1933 ("Section 11") provides a private cause of action to security purchasers if any part of a Registration Statement covering such securities is materially false or misleading. Section 11 provides for strict liability and does not require defendants to act with scienter. Rather, a plaintiff need only prove that statements in a Registration Statement are materially false or misleading in order to establish liability under Section 11.

311.    As explained above, the Company later admitted the financial statements contained in the Prospectus Supplements were materially false and misleading and thus issued a restatement. This admission subjects the Section 11 Defendants, as well as any other persons who signed the Registration Statement, to substantial liability for losses incurred by purchasers in the November 2015 and September 2016 Offerings. In fact, purchasers in those offerings

have instituted a putative class action captioned *In re AmTrust Financial Services, Inc. Securities Litigation*, C.A. No.: 1:17-cv-01545-(LAK) (S.D.N.Y.) against, among others, the Section 11 Defendants in order to recover damages resulting from the false statements.

312.    Because Section 11 does not contain a scienter requirement and the Company has already admitted its financial statements were materially false and misleading, the Section 11 Defendants, who comprise a majority of the Board, face a substantial risk of liability in connection with the Company's failure to issue accurate financial statements and maintain adequate controls over financial reporting, which forms the basis of the claims asserted herein. Therefore, a majority of the Board is incapable of impartially and fairly assessing a pre-suit demand to bring the claims asserted herein.

<center>*      *      *</center>

313.    For the reasons stated above, a majority of the Board is incapable of fairly and impartially evaluating a pre-suit demand to bring the claims asserted herein.  As such, demand is excused.

<center>**PLAINTIFFS ATTEMPTED TO UTILIZE THE**
**220 PROCESS TO OBTAIN DOCUMENTS FROM AMTRUST**</center>

314.    On May 16, 2017, Plaintiff Pompano served a books and record demand on AmTrust, pursuant to 8 Del. C. § 220.  Pompano sought documents concerning, *inter alia*, AmTrust's related-party transactions with Maiden and NGHC, respectively.  On May 24, 2017, despite the opportunity this demand presented the Board to produce exculpatory documents evidencing the fairness of the Company's transactions with other Karfunkel-dominated companies, the Board refused to produce anything in response to Pompano's demand.

315.    On June 5, 2017, Plaintiff Lauderhill served a books and records demand on AmTrust, pursuant to 8 Del. § 220.  It was an extremely narrowly tailored demand, seeking only

<center>115</center>

Board minutes and materials concerning (i) the Board's reaction to, assessment of and investigation concerning the *Barron's*, *Wall Street Journal* and GEO articles and the Alistair Capital Letter; and (ii) the Board's decision to terminate BDO as its auditor in April 2016. The demand was designed to give the Board an opportunity to present documents showing it acted appropriately in the face of serious allegations and when confronted by its auditor immediately prior to a restatement. Instead, the Company stonewalled. By letter dated June 13, 2017, the Company refused Lauderhill's demand.

316.    In light of the fact that the Board met 8, 12, 15, and 9 times in 2013, 2014, 2015 and 2016 respectively and the Audit Committee met 8, 15, 17, and 14 times in 2013, 2014, 2015, and 2016 respectively, the Company's failure to produce any exculpatory documents showing the Board took any action whatsoever to ensure the Company issued accurate financial statements is telling and gives rise to an inference that no such documents exist, further demonstrating the Board's breaches of their duty. *See In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *20 (Del. Ch. May 21, 2013) (denying motion to dismiss pursuant to Rule 23.1; noting that the complaint supported its allegations "with references to books and records obtained using Section 220, and with inferences that this Court can reasonably draw from the *absence* of books and records that the Company could be expected to produce"); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 578 (Del. Ch.2007) (explaining that "it is more reasonable to infer that exculpatory documents would be provided [in response to a Section 220 demand] than to believe the opposite: that such documents existed and yet were inexplicably withheld").

317.    It is clear that the Control Group is blocking stockholders' efforts to ensure their board of directors act in compliance with its fiduciary duties. In light of the Control Group's

stonewalling and divergent interests, as well as the exigencies created by the ongoing multiple federal investigations into the Company's accounting practices, Plaintiffs were forced to file this complaint.

## DEFENDANTS WERE OBLIGATED TO SAFEGUARD
## THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS

### I.     Duties of All Defendants

318.    By reason of their positions as officers or directors of AmTrust and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed AmTrust and its stockholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that AmTrust operated in compliance with all applicable federal and state laws, rules, and regulations. Defendants were and are required to act in furtherance of the best interests of AmTrust and its stockholders so as to benefit all stockholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to AmTrust and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

319.    Because of their positions of control and authority as directors or officers of AmTrust, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Complaint.  Due to their positions with AmTrust, Defendants had knowledge of material non-public information regarding the Company.

320.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and

corporate affairs of the Company. By virtue of such duties, the officers and directors of AmTrust were required to, among other things:

a)     Manage, conduct, supervise, and direct the employees, businesses, and affairs of AmTrust in accordance with laws, rules, and regulations, as well as the charter and by-laws of AmTrust;

b)     Ensure that AmTrust did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c)     Remain informed as to how AmTrust was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d)     Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by AmTrust, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e)     Preserve and enhance AmTrust's reputation as befits a public corporation;

f)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g)     Refrain from unduly benefiting themselves and other AmTrust insiders at the expense of the Company.

321. Defendants also owed to AmTrust and its stockholders the duty of loyalty, mandating that each favor the interests of AmTrust and its stockholders over their own personal interests, and refrain from using their positions, influence or knowledge of the affairs of the Company to gain personal advantage.

322. Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had access to adverse, non-public information about the Company.

323. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AmTrust.

## II.     Conspiracy, Aiding and Abetting, and Concerted Action

324.     In committing the wrongful acts complained of herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

325.     During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was manipulating its financial metrics, including loss reserves, revenue, and net income; (ii) facilitate Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 14(a) of the Exchange Act; (iii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iv) artificially inflate AmTrust's stock price while the Company repurchased its own stock and the Insider Selling Defendants engaged in lucrative insider sales.

326.     Defendants engaged in a conspiracy, common enterprise, and/or course of conduct during the Relevant Period.  During this time, Defendants concealed the true fact that AmTrust was misrepresenting its financial results.

327.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by reviewing, participating in, and/or allowing the Company to purposefully or recklessly engage in an improper and illegal course of conduct.  Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

328.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### III.    The Company's Code of Business Ethics

329.    The Company's Code of Business Conduct and Ethics (the "Code of Ethics") "applies to all AmTrust employees, officers, directors and contractors" and "sets out the values and principles to guide all employees, directors and officers."

330.    Specifically, with regard to "maintaining accurate books and records," the Code of Ethics states, in pertinent part:

> We are required to maintain accurate books and records in accordance with the securities and accounting laws of the U.S., the countries in which our subsidiaries are incorporated, as well as the countries in which we operate.  These documents form the basis of our earning statements, financial reports and other public disclosures and should be maintained accurately, completely, and in a timely and understandable manner.  In addition, they guide our Company's business actions and decisions.  Each of us is responsible for keeping accurate records.  In addition, we must comply with AmTrust's system of internal controls for financial reporting.
>
> We may never make a false representation in our Company's books or otherwise mischaracterize such information.  This means we cannot:
>
> - Intentionally distort or disguise the true nature of a transaction in any accounting entries;
>
> - Make a representation, whether in a document or verbally, that is not fully accurate;
>
> - Establish any undisclosed or unrecorded funds or assets, such as "slush funds," for any purpose.

331.    Defendants, however, violated the Company's Code of Ethics by affirmatively adopting, implementing, and condoning a business strategy based on deliberate and widespread violations of applicable laws.

## IV.    The Audit Committee

332.    The Board's Audit Committee is currently comprised of Defendants DeCarlo (Chair), Fisch, and Gulkowitz.  According to the Audit Committee Charter, the Committee shall provide assistance to the Board with respect to its oversight of:

- the accounting and financial reporting processes of AmTrust and its subsidiaries and the audits of its financial statements;

- the independent auditor's qualifications and independence;

- the performance of the Company's internal audit function and independent auditors; and

- the Company's compliance with legal and regulatory requirements.

333.    Moreover, the Audit Committee is responsible for preparing the audit committee reports in the Company's annual proxy statements that, among other things, stated the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Annual Report on Form 10-K for each year during the Relevant Period.

334.    The Audit Committee is also tasked with the obligation to oversee and monitor the Company's compliance with laws and regulations.  The Audit Committee Charter in effect during the Relevant Period specifically provides that the Audit Committee "shall be directly responsible for the compensation and oversight of the work of the independent auditor . . . for the purpose of preparing or issuing an audit report or related report."  With respect to financial statements and disclosure matters, the Audit Committee Charter explicitly requires the Audit Committee to:

a)   Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

b)   Review and discuss annually reports from the independent auditors on:

   i.    All critical accounting policies and practices to be used in the audit.

   ii.   All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

   iii.  Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

c)   Review and discuss with management and the independent auditor any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, and the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

d)   Discuss with the independent auditor the matters required to be discussed by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e)   Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

f)   To consider questions of possible conflicts of interest; to review, approve and oversee all related party transactions as defined in applicable rules of

the national securities exchange on which the Company's securities are listed; to discuss with the independent auditor significant related party transactions, and the auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties, as required by PCAOB Auditing Standard No. 2410; and to develop policies and procedures for the Committee's approval of related party transactions.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty Against the Director Defendants**

335.  Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

336.  Each of the Director Defendants owed and owe fiduciary duties to AmTrust and its stockholders.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe AmTrust the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

337.  Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags that the Company's accounting practices were fraudulent and that it lacked adequate internal controls.

338.  These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

339.  Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and the charters of various Board committees that, had they been discharged in accordance with Director

Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

340. Accordingly, to the extent AmTrust's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability, (ii) monetary liability for their breaches of the duty of loyalty, (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the illicit accounting scheme (i) involved breaches of their duty of loyalty; (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; and (iii) at least with respect to the Insider Selling Defendants, occurred in connection with a transaction from which those Defendants derived improper personal benefits. AmTrust's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

341. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages. In addition to causing massive and devastating financial restatements, the Director Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC and NYDFS. The Director Defendants' misconduct has dramatically eroded the Company's stock price, invited securities fraud litigation, and harmed the Company's reputation and business. It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation. Moreover, the misconduct caused A.M.

Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

342.    As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## COUNT II
### Breach of Fiduciary Duty Against the Officer Defendants

343.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.  This Count is brought against Defendants Zyskind and Pipoly solely in their capacity as officers.

344.    Each of the Officer Defendants owed and owe fiduciary duties to AmTrust and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe AmTrust the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

345.    The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags that the Company's accounting practices were fraudulent and that it lacked adequate internal controls.

346.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

347.    Additionally, the Officer Defendants are not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against them in their capacity as officers of the Company.

348.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages.  In addition to causing massive and devastating financial restatements, the Officer Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC and NYDFS.  The Officer Defendants' misconduct has dramatically eroded the Company's stock price, invited securities fraud litigation, and harmed the Company's reputation and business.  It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

349.    As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III
### Unjust Enrichment Against All Defendants

350.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

351.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from AmTrust that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

352.    Plaintiffs, as stockholders and representatives of AmTrust, seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other

compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV
### Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against the Insider Selling Defendants

353.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

354.    At the time of the stock sales set forth in paragraphs 113 to 117, the Insider Selling Defendants—Pipoly, Gulkowitz, and DeCarlo—knew or consciously disregarded the information described in this Complaint regarding the illicit accounting scheme and sold AmTrust common stock on the basis of that information.

355.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its accounting.  The information was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AmTrust common stock.

356.    The Insider Selling Defendants' sales of AmTrust common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

357.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V
**Violations of Section 10(B) of the Exchange Act and Sec Rule 10b-5 Promulgated Thereunder Against All Defendants**

358.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

359.   During the Relevant Period, in connection with AmTrust's repurchases of AmTrust shares, Defendants disseminated or approved false or misleading statements about AmTrust, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

360.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.  Defendants engaged in a scheme to defraud AmTrust by causing the Company to purchase at least $227 million in shares of AmTrust stock at artificially inflated prices.

361.   Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon AmTrust in connection with the Company's purchases of AmTrust stock during the Relevant Period.

362.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made

various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of AmTrust stock, which were intended to, and did: (a) deceive AmTrust regarding, among other things, its accounting practices, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of AmTrust stock; and (c) cause AmTrust to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the illicit accounting scheme.

363.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

364.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

365.     Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

366.     As a result of Defendants' misconduct, AmTrust has and will suffer damages in that it paid artificially inflated prices for AmTrust common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the illicit accounting scheme were disclosed beginning in February 2017.  AmTrust would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

367.     As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of AmTrust stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

368.     Plaintiffs brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT VI
### Violations of Section 20a of the Exchange Act Against the Insider Selling Defendants

369.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

370.     The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

371.     The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

372. The Insider Selling Defendants sold AmTrust securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

373. As part of AmTrust's publicly disclosed share repurchase program, the Company purchased over 8 million shares of its common stock throughout the Relevant Period. AmTrust was a contemporaneous purchaser of AmTrust securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold AmTrust securities, as set forth above.

374. As a contemporaneous purchaser, AmTrust was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements. At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

## COUNT VII
### Violations of Section 29(B) of the Exchange Act Against the Officer Defendants

375. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

376. As a result of their conduct, as alleged in this Complaint, the Officer Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with AmTrust regarding their compensation.

377. AmTrust has a compensation clawback policy that allows the Company to claw back compensation in certain circumstances.

378.   If AmTrust attempts to claw back compensation from the Officer Defendants, the Officer Defendants might assert a breach of contract claim.

379.   Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

380.   The Officer Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with AmTrust.

381.   AmTrust was and is an innocent party with respect to the Officer Defendants' Exchange Act violations.

382.   Plaintiffs, on behalf of AmTrust, seek rescission of the contracts between the Officer Defendants and AmTrust due to Defendants' violations of the Exchange Act while performing their job duties.

383.   Even if the contracts are not rescinded by the Court as a result of the Officer Defendants' Exchange Act violations, the Court can and should award equitable remedies in the form of injunctive relief barring the Officer Defendants from asserting breach of contract by AmTrust in any action by Plaintiffs on behalf of AmTrust to claw back compensation from the Officer Defendants.

384.   Plaintiffs seek only declaratory, injunctive, and equitable relief in this claim.

## COUNT VIII
### Corporate Waste Against All Defendants

385.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

386.    The Director Defendants have a fiduciary duty to protect AmTrust's assets from waste.

387.    By approving the stock repurchase program, the Director Defendants breached this fiduciary duty and have caused AmTrust to waste its corporate assets on the repurchase of stock at artificially inflated prices.

388.    As a result of the Director Defendants' corporate waste, the Company has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand for a judgment as follows:

A.    Determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.    Declaring that Defendants have breached their fiduciary duties to AmTrust;

C.    Declaring that the Defendants have been unjustly enriched;

D.    Declaring that the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5;

E.    Declaring that the Insider Selling Defendants violated Section 20A of the Exchange Act;

F.    Declaring that the other Defendants violated Section 29(b) of the Exchange Act;

G.    Declaring that the Defendants committed waste;

H.    Determining and awarding to AmTrust the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

I.    Directing AmTrust to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and

to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

  1. a proposal to strengthen Board oversight and supervision of AmTrust's financial reporting procedures;

  2. a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

  3. a proposal to ensure that all Board members take appropriate action to rid the Company of its lawless culture; and

  4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

J. Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of AmTrust, have an effective remedy;

K. Awarding to AmTrust restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

L.     Ordering an accounting of all compensation awarded to the Officer Defendants during the Relevant Period;

M.     Increasing the size of AmTrust's Board of Directors and reconstituting the Audit Committee;

N.     Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

O.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 11, 2017

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

David Wales
John Vielandi
1251 Avenue of the Americas
44th Floor
New York, NY 10020
 (212) 554-1400
davidw@blbglaw.com
John.Vielandi@blbglaw.com


**SAXENA WHITE P.A.**

Joseph E. White, III
Jorge A. Amador
Adam D. Warden
155 East Palmetto Park Road
Suite 600
Boca Raton, Florida 33432
(561) 394-3382
jwhite@saxenawhite.com
jamador@saxenawhite.com
awarden@saxenawhite.com

**GRANT & EISENHOFER P.A.**

*/s/ Michael J. Barry*
Jay W. Eisenhofer (Del I.D. No. 2864)
Michael J. Barry (Del I.D. No. 4368)
Kyle J. McGee (Del I.D. No. 5558)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
jeisenhofer@gelaw.com
mbarry@gelaw.com
kmcgee@gelaw.com

*Counsel for Co-Lead Plaintiffs*

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576
ssinger@saxenawhite.com

*Counsel for Co-Lead Plaintiffs*

# EXHIBIT DD

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. STOCKHOLDER LITIGATION | Consolidated C.A. No. 2018-0396-AGB **CONFIDENTIAL FILING** PUBLIC VERSION DUE MAY 15, 2019 |

## <u>AMENDED VERIFIED CONSOLIDATED CLASS ACTION COMPLAINT</u>

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE.**

If you are not authorized by Court Order to view or retrieve this document, read no further than this page.  You should immediately contact the following person(s):

**LABATON SUCHAROW LLP**
Ned Weinberger (#5256)
Mark Richardson (#6575)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, DE  19801
(302) 573-2540

**PRICKETT, JONES & ELLIOTT, P.A.**
Marcus E. Montejo (# 4890)
John G. Day (#6023)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Kyle J. McGee (#5558)
Joseph L. Christensen (#5146)
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

**WOLF POPPER LLP**
Carl L. Stine
Adam J. Blander
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600

*Attorneys for Plaintiffs*

**A PUBLIC VERSION OF THIS DOCUMENT WILL BE FILED ON OR BEFORE MAY 15, 2019**

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. STOCKHOLDER LITIGATION | Consolidated C.A. No. 2018-0396-AGB<br><br>**CONFIDENTIAL FILING**<br><br>PUBLIC VERSION DUE MAY 15, 2019 |

**<u>AMENDED VERIFIED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................... 1

    A.   THE TOWER TRANSACTION – USURPING OF A VALUABLE
        CORPORATE OPPORTUNITY ..................................................8

    B.   THE ACCOUNTING RESTATEMENT ........................................11

    C.   THE UNFAIR TAKE-PRIVATE TRANSACTION ........................12

II.  PARTIES ..................................................................................... 18

III. RELEVANT NON-PARTIES ...................................................... 30

    A.   AMTRUST ...........................................................................30

    B.   MICHAEL KARFUNKEL FAMILY 2005 TRUST .......................33

    C.   MAIDEN HOLDINGS, LTD. ...................................................34

    D.   ACP .....................................................................................34

    E.   NGHC .................................................................................35

    F.   ESTATE OF MICHAEL KARFUNKEL .......................................36

IV.  SUBSTANTIVE ALLEGATIONS .............................................. 38

    A.   BACKGROUND OF AMTRUST AND THE CONTROL GROUP .....38

    B.   BACKGROUND OF DERIVATIVE LITIGATION PENDING AGAINST
        MEMBERS OF THE KARFUNKEL-ZYSKIND FAMILY AND AMTRUST
        BOARD AT THE TIME OF THE TAKE-PRIVATE TRANSACTION ...............40

        1.   The Cambridge Derivative Action ...........................................40

            a.   Without Telling the AmTrust Board, The
                Karfunkel-Zyskind Family Disloyally Decided The
                Karfunkel-Zyskind Family's Other Businesses
                Should Profit from the Tower Opportunity. ................. 42

            b.   The AmTrust Board Failed to Protect the Interests
                 of the Company and its Minority Stockholders............. 47

            c.   The Cambridge Derivative Claims Were Worth
                 Hundreds of Millions of Dollars..................................... 62

        2.   Defendants' Financial Restatement Causes the
            Company's Stock Price to Crater, Setting the Stage for
            An Unfair Merger........................................................................67

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

       3.     Defendants Ignored Red Flags that Led to the 2017 Financial Restatements ............................................78

       4.     AmTrust Takes Steps to Strengthen Its Balance Sheet ............82

V.    THE TRANSACTION WAS A PRODUCT OF AN UNFAIR PROCESS .................................................................................. 84

    A.    THE CONTROL GROUP TIMES ITS OFFER TO TAKE ADVANTAGE OF ITS OWN MISCONDUCT ....................................................85

    B.    THE SPECIAL COMMITTEE FAILS TO PROTECT THE PUBLIC STOCKHOLDERS OF AMTRUST ............................................89

       1.     The Special Committee Is Belatedly Formed and Inadequately Empowered..........................................89

       2.     Zyskind Finally Informs the Board of a Potential Take-Private Transaction Involving Stone Point; In Response, the Conflicted Board Forms the Conflicted Special Committee ..................................................93

       3.     The Special Committee Was Conflicted................................108

       4.     Given Its Capture by The Karfunkel-Zyskind Family, the Special Committee Unsurprisingly Ignores Its Informational Vacuum to Justify the Transaction and Blesses the Unfair Transaction ...............................114

       5.     Zyskind and AmTrust Management Manipulate the Special Committee's Valuation Through Threats of a Ratings Downgrade..................................................119

       6.     The Special Committee and Company Hire Conflicted Advisors ..............................................................137

          a.     Deutsche Bank's Conflicts ......................... 137

          b.     BOA's Conflicts ......................................... 139

VI.   THE UNFAIR PROCESS YIELDED AN UNFAIR PRICE.................... 142

    A.    AMTRUST'S STOCKHOLDERS AND MARKET COMMENTATORS AGREE THE INITIAL PRICE WAS UNFAIR ............................154

    B.    THE SPECIAL COMMITTEE FAILED TO ADEQUATELY VALUE THE DERIVATIVE CLAIMS ..........................................................163

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

|  | 1. | The Special Committee Made No Good Faith Valuation of the Cambridge Derivative Claims ......................................163 |

1. The Special Committee Made No Good Faith Valuation of the Cambridge Derivative Claims ......................................163

2. The Special Committee Did Not Value the Accounting Derivative Claims at All .........................................................168

3. Defendants Are Forced to Improve the Terms to Buy Stockholder Support, but Still Fail to Provide an Entirely Fair Price ................................................................................170

VII.  THE STOCKHOLDER VOTE WAS COERCED....................................176

VIII.  DEFENDANTS HAVE FAILED TO DISCLOSE ALL MATERIAL INFORMATION ......................................................................... 180

IX.  TROUBLING POST-MERGER DEVELOPMENTS .....................187

X.  CLASS ACTION ALLEGATIONS ............................................ 192

XI.  COUNTS ...................................................................... 194

COUNT I BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS ........................................................194

COUNT II BREACH OF FIDUCIARY DUTY AGAINST ZYSKIND AS AN OFFICER ................................................................196

COUNT III BREACH OF FIDUCIARY DUTY AGAINST ZYSKIND, G. KARFUNKEL, AND L. KARFUNKEL ..........................197

XII.  RELIEF REQUESTED ........................................................... 201

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Plaintiffs Arca Investments, a.s., Arca Capital Bohemia, a.s., and Krupa Global Investments f/k/a Arca Venture Capital a.s. (together, "Arca"), Pompano Beach Police & Firefighters' Retirement System ("Pompano"), Cambridge Retirement System ("Cambridge" and, together with Arca and Pompano, the "Lead Plaintiffs"), City of Lauderhill Police Officers' Retirement System and West Palm Beach Police Pension Fund ("Plaintiffs"), by and through their undersigned attorneys, submit this Amended Verified Consolidated Class Action Complaint against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, investigations undertaken by Lead Plaintiffs' counsel, including demands for the production of documents pursuant to Section 220 of the Delaware General Corporation Law, discovery taken in related matters, consultation with financial advisors, and retention of private investigators, as to all other allegations herein, as follows:

## I.     INTRODUCTION

1.     Pursuant to an Agreement and Plan of Merger, dated as of March 1, 2018 (the "Initial Merger Agreement") between AmTrust, Evergreen Parent, L.P. ("Parent"), and Evergreen Merger Sub., Inc. ("Merger Sub"), the Karfunkel-Zyskind Family (defined below) and private equity firm Stone Point Capital LLC (collectively, the "Acquiring Group" or "MBO Group") was to acquire AmTrust's

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

minority shares for $13.50 per share (the "Merger"). The Karfunkel-Zyskind Family owned or controlled approximately 55% of the outstanding common shares of AmTrust, and all of AmTrust's directors are either members of the Karfunkel-Zyskind Family, have close affiliations to the Karfunkel-Zyskind Family, or are beholden to the Karfunkel-Zyskind Family.

2.      The Karfunkel-Zyskind Family attempted to structure the Merger to qualify for business judgment review under *M&F Worldwide* by conditioning the proposed going-private transaction on special committee approval and a majority-of-the-minority vote. Under *M&F Worldwide*

> in controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.

88 A.3d at 645 (emphasis in original).

3.      The effort failed spectacularly.

4.      In reality, the Merger was negotiated between the Karfunkel-Zyskind Family —a 55% controlling stockholder—and a brief interloping minority common stockholder with no access to or cooperation with AmTrust management, no due

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

diligence, no authority to seek alternatives, no power to say "no," and no fiduciary duties.

5.      The four-person special committee, established purportedly to negotiate on behalf of minority stockholders (the "Special Committee" or the "Take Private Special Committee") failed to do any such thing.  The Special Committee was comprised of members who, as described below, had conflicting loyalties and plainly lacked independence from the Karfunkel-Zyskind Family.  Moreover, they were each named defendants in pending derivative actions arsing from the Towers Transaction and Accounting Restatement (each defined below), *i.e.*, mismanagement and self-dealing at AmTrust, and thus expected to benefit directly from any going-private transaction by the extinguishment of their derivative liability to AmTrust.  Worse, these directors—all of whom still serve as AmTrust directors and continue to collect directorship fees material to them from AmTrust and other companies affiliated with the Karfunkel-Zyskind Family —further managed to engage a conflicted financial advisor that peddled financial alchemy.

6.      Not surprisingly, this hapless and conflicted Special Committee purportedly charged with advancing the minority stockholders' interest failed to garner majority-minority support to ratify the unfair Initial Merger Agreement. Instead, the Initial Merger Agreement was met with outrage.  Arca, the Company's largest minority stockholder, launched a public opposition compaign, encouraging

-3-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

and meeting with market-movers such as Carl Icahn to oppose the Initial Merger Agreement.  Recognizing that the Karfunkel-Zyskind Family was,  as he described it in his May 17, 2018 press release, "blatantly taking advantage" of minority stockholders, Carl Icahn emphatically expressed his view that the Initial Merger Agreement clearly "undervalue[d]" the Company.  So intrigued was Mr. Icahn by the obvious discrepancy between the true value of AmTrust stock and the price being offered pursuant to the Initial Merger Agreement, that between April 26 and May 17, 2018, he quickly deployed resources to acquire a more than 9.3% interest in the Company, and solicited proxies to oppose the deal.

7.      In the face of strong public opposition, the Karfunkel-Zyskind Family and the Company were unable to obtain the *M&F Worldwide* required majority-of-the-minority approval of the Initial Merger Agreement negotiated and agreed to between the Karfunkel-Zyskind Family and the Special Committee.

8.      Instead, the Karfunkel-Zyskind Family negotiated directly with Carl Icahn to reach a new deal.  On June 6, 2018, the terms of the Initial Merger Agreement were amended to a price of $14.75 per share (the "Merger Price") and approved by the AmTrust Board (as amended, the "Merger Agreement").  While Mr. Icahn fared better than the interested and conflicted Special Committee, his efforts were no substitute for the arm's-length bargaining contemplated by *M&F Worldwide*.  Mr. Icahn, among other things: was armed with nothing but public

-4-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

information; did not have the benefit of due diligence; did not have the cooperation of, or even access to, AmTrust management; had no authority to shop for alternatives; had no ability to say "no"; and, critically, he had no fiduciary duties to other stockholders.  To be sure, Mr. Icahn had been a stockholder of the Company for all of four weeks, yet, he still managed to extract a higher price—*albeit, still a grossly unfair price*—from the Karfunkel-Zyskind Family than the interested and conflicted Special Committee.

9.      As explained below, the interested and conflicted Special Committee's halfhearted negotiations were plagued by missteps demonstrating a "controlled-mindset," disloyally advancing only the Karfunkel-Zyskind Family's interests.  For example, the Special Committee, without prompting from the Acquiring Group, repeatedly sought downward revisions to the projections management provided to it, in essence negotiating against itself.  Moreover, despite being aware that AmTrust's CEO Barry Zyskind—the leader of the Acquiring Group—had publicly affirmed in SEC filings that AmTrust's stock price was *not* indicative of AmTrust's fair value, the Special Committee nevertheless accepted the Acquiring Group's anchoring of negotiations at Amtrust's historically low trading prices (which, of course, were driven to such levels by all of the AmTrust directors' disloyal conduct and mismanagement of AmTrust, priming and timing the Karfunkel-Zyskind Family's grossly unfair squeeze-out effort).

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10.     Nor were the advisors retained by the Special Committee independent. Rather, the team from Deutsche Bank that advised the Special Committee had numerous prior engagements with several of the Special Committee's counterparties, and also anticipated earning a considerable amount of fees from these counterparties in the future.

11.     After Mr. Icahn's brief interloping, the Defendants continued to stack the deck against the minority, obtaining the majority of the minority approval of the Zyskind-Icahn negotiated Merger Price through a materially misleading proxy statement recommending the Merger, filed on Schedule 14A  (as amended, the "Proxy") with the Securities and Exchange Commission ("SEC").  For example, the Proxy failed to disclose that the Special Committee's financial advisor did not consider hundreds of millions of dollars in projected stock repurchases as part of its dividend discount analysis, for the so-called "Case 1" projections (the most realistic set of projections provided by management), which would have significantly altered its fairness conclusions.   The Proxy also failed to disclose certain significant affiliations between members of the Special Committee.  For example, the Proxy did not disclose that AmTrust was one of Defendant Susan Fisch's ("Fisch") clients prior to joining the AmTrust Board.   Moreover, the Proxy assured stockholders that, despite the buyout of all minority common stockholders, AmTrust would continue to be subject to regulatory scrutiny from the SEC post-Merger, as the Company's

-6-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

preferred stock would continue to be listed on the New York Stock Exchange. That representation proved to be patently false.

12.     Defendants also purposefully disenfranchised stockholders who purchased over 20 million AmTrust shares in April through their manipulation of the record date of the stockholder vote, rendering the vote coercive.

13.     Indeed, the Merger represents the final and most egregious example over the past several years of the Karfunkel-Zyskind Family exerting its control over AmTrust in order to benefit itself and its affiliates at the expense of minority stockholders.

14.     For example, in addition to taking the Company private at an unfair price, through an unfair process and a coerced vote, the Karfunkel-Zyskind Family: (i) usurped a valuable corporate opportunity for their own benefit, in a transaction this Court has described as "very troubling" in resulting derivative litigation (the "Tower Transaction"); and (ii) caused the Company to file with the United States Securities and Exchange Commission (the "SEC") a series of false and misleading accounting statements that ultimately needed to be restated, leading to a host of regulatory investigations and a derivative lawsuit against the Company's directors and officers (the "Accounting Restatement").

15.     In light of these circumstances, *M&F Worldwide* affords Defendants no protection. Accordingly the Merger is subject to entire fairness review, which

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

requires both the price and process to be entirely fair.  As demonstrated herein, both the consideration provided to AmTrust's minority stockholders and the process that led to the Merger were not entirely fair to Plaintiffs and the Company's other minority stockholders.

### A. THE TOWER TRANSACTION – USURPING OF A VALUABLE CORPORATE OPPORTUNITY

16.    AmTrust is a property and casualty insurer founded by members of the Karfunkel-Zyskind Family. Members of the Karfunkel-Zyskind Family have controlled AmTrust since its founding and have long occupied multiple seats on the Board and key roles in AmTrust management.

17.    In the fall of 2013, AmTrust identified an opportunity to acquire then-struggling property and casualty insurer, Tower Group International, Ltd. ("Tower"). Unbeknownst to the full Board, however, members of the Karfunkel-Zyskind Family determined that their family's other enterprises should profit from Tower as well. Ultimately, in December 2013, the Karfunkel-Zyskind Family decided that ACP Re, Ltd. ("ACP"), a private, Bermuda-based investment vehicle owned by a Karfunkel-Zyskind Family trust, would buy Tower. Members of the Karfunkel-Zyskind Family also determined that another entity they controlled, National General Holdings Corp. ("NGHC"), would acquire certain valuable Tower assets that AmTrust had been negotiating to purchase from Tower. With NGHC set

-8-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

for an initial public offering ("IPO") in February 2014, the Karfunkel-Zyskind Family knew that the addition of certain of Tower's assets would boost the value of NGHC and thereby increase NGHC's stock price (as well as the value of the Karfunkel-Zyskind Family's majority stake in NGHC).

18.    *After* ACP submitted an offer for Tower, the Board finally learned that AmTrust would no longer be pursuing the Tower opportunity and that AmTrust management now contemplated that Karfunkel-Zyskind Family-owned ACP would acquire Tower in AmTrust's stead. The Board did not react.

19.    Following one 25-minute meeting, and based solely on representations by plainly-conflicted Karfunkel-Zyskind Family member and AmTrust Chief Executive Officer ("CEO"), President and Director Barry Zyskind ("Zyskind"), that an AmTrust acquisition of Tower would purportedly be undesirable for the Company, the Board and its so-called "independent" Audit Committee—charged with reviewing and approving all related-party transactions like the Tower Transaction—acquiesced and allowed the Karfunkel-Zyskind Family to misappropriate the Tower opportunity.

20.    By facilitating ACP's and NGHC's acquisition of highly valuable Tower assets in exchange for no consideration to AmTrust, the Karfunkel-Zyskind Family usurped a valuable corporate opportunity belonging to AmTrust and otherwise breached their duties of loyalty. The AmTrust Board likewise failed to

-9-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

advance or protect the best interests of the Company, and instead undertook a process that this Court has described as "very troubling," "very unusual," not "bona fide," and culminating in "delegation of transaction approval" to a "conflicted audit committee that appeared predestined to approve an already-baked transaction."[1] Indeed, Defendant Donald T. DeCarlo ("DeCarlo"), a member of the Audit Committee, has testified that the Board "didn't take any steps" to manage any conflicts concerning the Tower Transaction, and DeCarlo and his fellow Audit Committee member Abraham Gulkowitz ("Gulkowitz") somehow did not believe there were any conflicts associated with the Tower Transaction despite the Karfunkel-Zyskind Family's interests in ACP, NGHC and AmTrust.

21.    As discovery in the Cambridge Derivative Action has shown, the Tower Transaction was but one example of the Karfunkel-Zyskind Family—who treat AmTrust as their personal fiefdom and a mere component of one giant family enterprise—exploiting AmTrust resources for their personal benefit rather than the exclusive benefit of AmTrust and its minority stockholders.

---

[1] *See Cambridge Ret. Sys. v. DeCarlo*, *et al.*, C.A. No. 10879-CB, at 36:23-24, 46:22-48:7 (Del. Ch. June 16, 2016) (TRANSCRIPT).

-10-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**B.**     **THE ACCOUNTING RESTATEMENT**

22.     From at least December 2013 through November 2017, AmTrust used accounting techniques that caused the Company to restate nearly three years' worth of revenue, total service and fee income, net income, and other important metrics by double-digit percentages in 2017.  The restatement was not completed until the spring of 2018, on the same day the Take-Private Transaction was announced.  The restatement also led to numerous governmental investigations, including investigations conducted by the New York Department of Financial Services, the Federal Bureau of Investigation (the "FBI"), and the SEC.

23.     As detailed below, the Audit Committee—whose members comprised a majority of the Tower Transaction Special Committee (as defined below) and the Take Private Special Committee—received numerous red flags over a period of years of the Company's improper accounting practices, including: (i) reports by institutional investors; (ii) articles in the highly respected financial publication *Barron's* detailing the accounting issues; (iii) being instructed by regulators to replace the Company's auditor—which the Audit Committee delayed doing for a year; and (iv) when AmTrust sued an investor for writing a report raising the accounting problems, that investor wrote a detailed letter to the Audit Committee substantiating the accounting misconduct, and in response the Company dropped the lawsuit, but the Audit Committee failed to address the accounting misconduct.

-11-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

### C.   THE UNFAIR TAKE-PRIVATE TRANSACTION

24.    Like the Tower Transaction, the Board capitulated to the Karfunkel-Zyskind Family desires – this time to take the Company private, allowing the family to impose its will on AmTrust to the detriment of the Company's minority stockholders.  Having driven down the price of AmTrust stock by their own actions, the Karfunkel-Zyskind Family sought to take advantage of the situation they created by taking the Company private at an unfair price.

25.    Once the Board learned of the Karfunkel-Zyskind Family's intention to take the Company private (which the Karfunkel-Zyskind Family had been planning for some time), it formed a special committee to "negotiate" the deal with the Karfunkel-Zyskind Family (the "Take-Private Special Committee" or "Special Committee"). The same three Audit Committee members who "approved" (and breached their fiduciary duties in connection with) the Tower Transaction (*i.e.*, Defendants DeCarlo, Gulkowitz, and  Fisch), and were the members of the Audit Committee that oversaw the accounting issues that casued the restatement, were appointed to the four-member Take-Private Special Committee, with DeCarlo acting as its Chairman.

26.    As discovery in the Cambridge Derivative Action has underscored, there was never any hope of the Take-Private Special Committee protecting minority stockholders' interests because the committee members were not independent of the

-12-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Karfunkel-Zyskind Family, disinterested, or even capable of running a well-functioning committee.

27.    While the Karfunkel-Zyskind Family's own actions caused severe damage to the Company's stock price, which plummeted from more than $27 at the beginning of 2017 to $13.46 at the end of the third quarter of 2017, the Company admitted that the severe downward pressure on the stock price was an overreaction that did not represent the true value of the Company.  AmTrust's third quarter 2017 Form 10-Q, signed by Zyskind and approved by the Audit Committee, filed on November 9, 2017, stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, ***we believe the share price decline in the nine months of 2017 is relatively short-term in nature*** and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, ***and is not indicative of an actual decline in our fair value*** or our reporting units' fair value.[2]

28.    At the end of the third quarter of 2017, AmTrust's share price was $13.46.  This is essentially the same as the unfair $13.50 per share price for the Take-Private Transaction that was initially announced as the result of negotiations between the Karfunkel-Zyskind Family and the Take-Private Special Committee. The statement in the Company's Form 10-Q, filed on November 9, 2017, confirms

---

[2] Unless otherwise stated herein, all emphasis in quoted material is added.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

that the Karfunkel-Zyskind Family and the Audit Committee (i.e., DeCarlo, Gulkowitz and Fisch) believed that the Company's shares were worth far in excess of $13.50. Yet the Take-Private Special Committee recommended that the Company's public stockholders accept the $13.50 per share offer, despite the statement in the 10-Q that the equivalent stock price did ***not*** reflect the value of the Company.

29.    Plaintiffs made demands pursuant to Section 220 of the Delaware General Corporation Law (the "220 Demand"), and the productions made by the Company pursuant to these demands reflect that neither the Take-Private Special Committee nor its advisers either discussed or considered the fact that AmTrust's management explicitly stated that the Company's share price decline to $13.46 at the end of the third quarter of 2017 was artificially low and short term. In the face of this statement in the November 9, 2017 10-Q, it was impossible to conclude that the proposed $13.50 deal price was fair to the public stockholders.

30.    After a perfunctory process led by the hopelessly conflicted Take-Private Special Committee, on March 1, 2018, the Board announced the first iteration of the Take-Private Transaction, a deal whereby all of the publicly held shares of AmTrust would be acquired by the Karfunkel-Zyskind Family and Stone Point Capital LLC ("Stone Point") for $13.50 per share in cash, less than half of the Company's trading price before the revelation of the accounting issues.

-14-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

31.     The process leading to that $13.50 per share price bore no resemblance to true arms'-length dealing:

32.     *First*, the Board waited nearly two months to form the Take-Private Special Committee to negotiate with the Company's controllers after they began exploring the take-private deal with potential suitors and facilitating due diligence with those interested parties.

33.     *Second*, the Take-Private Special Committee was told by the Control Group (defined below) that they should not bother speaking to any other prospective buyer because the Karfunkel-Zyskind Family would refuse to sell their control block of shares under any circumstances.

34.     *Third*, the resolutions creating the Take-Private Special Committee limited its mandate exclusively to transactions proposed by the Karfunkel-Zyskind Family and did not permit the Take-Private Special Committee to consider whether a merger with a third party or an investment by a third party (or no deal at all) might be in the Company's best interest.

35.     *Fourth*, the Take-Private Special Committee hired a financial advisor that was conflicted.

36.     *Fifth*, instead of seeking the highest possible price for the public stockholders, the Take-Private Special Committee repeatedly asked for **lower** Company projections, to justify a **lower** price for the Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

37.    *Sixth*, the Take-Private Special Committee did not fully inform itself, failing to even address the Company's own statements that $13.46 undervalued the Company, or ask for draft financial statements and other key documents and information until days prior to the Transaction being approved by them.

38.    *Seventh*, the Take-Private Special Committee predictably failed to (i) value in good faith, or obtain fair consideration for, AmTrust's valuable and material litigation assets, *i.e.*, the claims asserted in the Cambridge Derivative Action and the derivative claims arising out of the accounting restatement (the "Accounting Derivative Claims," and together with the Cambridge Derivative Claims, the "Derivative Claims"), or (ii) take any measures to preserve those claims, such as establishing a litigation trust. The documents produced pursuant to the 220 Demand and the Take-Private Transaction proxy purport that the Take-Private Special Committee ascribed an estimated range of value of $15 million to $25 million for an unspecified "contingent litigation asset" of the Company.  It is thus unclear what value, if any, the Special Committee assigned to the Derivative Claims.  Assuming, *arguendo*, that the "contingent litigation asset" referred to either or both sets of claims, the Special Committee nonetheless fell woefully short of assigning value to them.

39.    The Take-Private Special Committee had a strong motivation for disposing of these material assets for modest value: any valuation of the Cambridge

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Derivative Claims or Accounting Derivative Claims reflected in the Take-Private Transaction price would have implicated their own misconduct (as well as that of the Karfunkel-Zyskind Family) and conceded their liability to AmTrust.   Thus, DeCarlo, Fisch and Gulkowitz—three of the four members of the Take-Private Special Committee—were incapable of disinterestedly and independently valuing the Derivative Claims and knew that the Karfunkel-Zyskind Family would not, in the future, prosecute those claims against them or their fellow family members and entities.

40.   *Eighth*, the stockholder vote in favor of the Transaction was manipulated, uninformed and coerced.

41.   After public outcry from certain large AmTrust stockholders, including Plaintiff Arca and Carl Icahn ("Icahn"), the Karfunkel-Zyskind Family and Stone Point agreed to increase the Take-Private Transaction consideration by $1.25 per share, bringing the buyout price to $14.75 per share. While this modest increase helped secure the support of Icahn and, eventually, minority stockholder approval of the Take-Private Transaction, this did not address the unfair process, the coerced vote, or that the merger consideration remains well outside of the range of fairness.

42.   Without relief from this Court, the Karfunkel-Zyskind Family will never have to answer to AmTrust's minority stockholders.

-17-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## II.    PARTIES

43.    Plaintiffs Arca Investments, a.s., Arca Capital Bohemia, a.s., and Krupa Global Investments, which is formerly known as Arca Venture Capital, are related private equity firms with offices in the Czech Republic and the Slovak Republic. Arca Investments, AC Bohemia, and AVC separately and beneficially held AmTrust common stock at all relevant times.   Collectively, these three stockholders (collectively, "Arca") held 4,831,477 shares of AmTrust common stock, which constituted approximately 2.4% of all AmTrust shares outstanding.   Arca held AmTrust common stock through the closing of the Transaction ("Closing").

44.    Plaintiff Pompano held AmTrust common stock through Closing.

45.    Plaintiff Cambridge held AmTrust common stock through Closing.

46.    Plaintiff City of Lauderhill Police Officers' Retirement System held AmTrust common stock through the closing of the Transaction.

47.    Plaintiff West Palm Beach Police Pension Fund held AmTrust common stock through the closing of the Transaction.

48.    **<u>Zyskind</u>**: Defendant Barry D. Zyskind, the son-in-law of the late Michael Karfunkel, who was one of the founders of AmTrust, has served as a director on the Company's Board since 1998 and as the Chairman of the Board since May 2016.  Zyskind has served as Chief Executive Officer ("CEO") and President of AmTrust since 2000.  Zyskind serves as an officer and director of many of

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

AmTrust's wholly-owned subsidiaries.   Zyskind is a member of the board of directors of NGHC, a company that is also part of the Karfunkel-Zyskind web of entities. Zyskind is also the non-executive chairman of Maiden Holdings Ltd. ("Maiden Holdings"), a publicly-held Bermuda insurance holding company formed by Michael Karfunkel ("M. Karfunkel"), George Karfunkel ("G. Karfunkel") and Zyskind in 2007 that has several reinsurance and service agreements with AmTrust. Zyskind is M. Karfunkel and Leah Karfunkel's ("L. Karfunkel") son-in-law (together members of the Zyskind and Karfunkel family are referred to herein as the "Zyskind-Karfunkel Family").   As of the Closing, Zyskind beneficially owned 44,864,556 shares of AmTrust common stock, approximately 22.8% of the Company's issued and outstanding shares and his wife owned a further 2,945,113 shares.  As acknowledged by the Company, Zyskind was not an independent director under the NASDAQ listing rules.

49.   **George Karfunkel**: Defendant George Karfunkel has served as a director on the Company's Board since 1998.  G. Karfunkel is, with his brother, Michael Karfunkel, one of the co-founders of the Company.  G. Karfunkel is the chairman of Sabr Group, a purported consulting company which has served as the subscription agent for certain of AmTrust's stock offerings. According to the Company's public filings, G. Karfunkel owns various real estate holdings, including "major office buildings in New York, Chicago and several other cities," through

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

entities co-owned by him and L. Karfunkel. Through these entities, G. Karfunkel and L. Karfunkel lease various properties to AmTrust and NGHC, including corporate headquarters. As of the Closing, G. Karfunkel beneficially owned 32,438,408 shares of the Company's common stock, approximately 16.5% of the Company's issued and outstanding shares. G. Karfunkel is M. Karfunkel's younger brother and the brother-in-law of L. Karfunkel. G. Karfunkel was not considered an independent director under the NASDAQ listing rules.

50. **Leah Karfunkel**: Defendant Leah Karfunkel has served as a director on the Company's Board since May 2016. As of the Closing, L. Karfunkel beneficially owned 22,101,025 shares of AmTrust common stock, approximately 11.3% of the Company's issued and outstanding shares. L. Karfunkel is the sister-in-law of G. Karfunkel and the mother-in-law of Zyskind. She is also the widow of M. Karfunkel. On a director questionnaire filled out and submitted to the Company's attorneys, L. Karfunkel stated that she is also a co-founder of AmTrust. L. Karfunkel was not considered an independent director under the NASDAQ listing rules.

51. Defendants Zyskind, G. Karfunkel, and L. Karfunkel (together, the "Control Group") act as a controlling group of the Company. As such, Zyskind, G. Karfunkel, and L. Karfunkel have filed Schedule 13Ds and amendments thereto with the SEC indicating that each is a member of a "group" for purposes of reporting

-20-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

beneficial ownership under Section 13 of the Exchange Act. According to a Schedule 13D/A filed on April 30, 2018, the Control Group collectively owned 86,844,540 shares of AmTrust common stock, or approximately 44% of the total outstanding shares and such disclosure was not amended by later Schedule 13D/As filed on July 25 and November 30, 2018. However, they owned 49% of the Company's outstanding shares prior to a May 25, 2017 private placement of $300 million of AmTrust stock, 24,096,384 shares, to previously undisclosed family members of the Control Group. When these shares are added to the Control Group's shares, the Karfunkel-Zyskind Family "and its affiliates and certain related parties currently own or control approximately 55% of the outstanding shares of Common Stock of the Company" as disclosed in connection with the announcement of the Transaction.

52.     **Gulkowitz**: Defendant Abraham Gulkowitz has served as a director on the Company's Board since 2006 and is a director of several of AmTrust's subsidiaries. Gulkowitz also has ties to the Karfunkel-Zyskind Family of businesses and social causes and resides within a mile of the Karfunkels and Zyskinds. For example, Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis. The Hod Foundation, a private foundation owned and controlled by the Control Group (one of three through which the Control Group held shares), was the beneficial owner of

-21-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint"). FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group.  Gulkowitz also served on the advisory board of Gryphon Investors when its portfolio company, Orchid Underwriters, entered into a partnership with a subsidiary of NGHC, a company that is part of the Karfunkel-Zyskind web of entities.  Gulkowitz has sat on the boards of many other AmTrust affiliates (along with members of the Karfunkel-Zyskind Family), including AmTrust Title Insurance Company, Republic Underwriters Insurance Company, Southern County Mutual Insurance Company, Republic Fire & Casualty Insurance Company, Republic-Vanguard Insurance Company, Southern Insurance Company, and Southern Underwriters Insurance Company. Gulkowitz is the chair of the Board's Audit Committee, is a member of its Nominating and Corporate Governance Committee, and served on the Special Committee that approved the Transaction.  Gulkowtiz was a named defendant in the Derivative Actions.

53.     Gulkowitz is beholden to the Karfunkel-Zyskind Family.  For example, in 2016 alone, Gulkowitz received $217,586.00 in director compensation from AmTrust.  According to public information reflected on Bloomberg, it appears that all the boards Gulkowitz sits on are affiliated with AmTrust.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

54. **Fisch**: Defendant Susan C. Fisch has served as a director on the Company's Board since 2010, as well as a director of several AmTrust subsidiaries. Based on public disclosures by AmTrust, Fisch has not been employed since joining AmTrust's Board, nor has she served on the Board of any other companies (aside from AmTrust's subsidiaries). As such, all of her publicly reported income is from AmTrust.

55. Fisch testified at her deposition in the Cambridge Derivative Action that her relationsip with the Karfunkel-Zyskind Family dates back to 2003 when Fisch was working at Willis Reinsurance Brokers ("Willis") and "asked for an appointment to meet Mr. Zyskind, and we had a long conversation, and I asked to be given an opportunity to place his reinsurance." Fisch testified that AmTrust was a Willis client from at least 2003 until Fisch's retirement in 2009. Fisch further testified that Willis received from AmTrust approximately $250,000 in "brokerage[s], or commission[s] that w[ere] a percentage of the overall premium that was paid to reinsurers." Fisch also testified that she interacted with Zyskind and numerous AmTrust executives during the course of the Willis-AmTrust relationship.

56. Fisch further testified that, after her retirement, Zyskind personally invited her to join the Board, and later in 2016, invited her to join the board of directors of several of AmTrust's subsidiaries. Fisch testified that she currently serves on the board of at least 20 AmTrust subsidiaries, including: Sequoia Insurance

-23-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company; CorePoint Insurance Company; Developers Surety and Indemnity Company; Associated Industries Insurance Company; Republic Underwriters Insurance Company; and Rochdale Insurance Company. Fisch further testified that she serves on the board of directors of these companies alongside DeCarlo, Gulkowitz, and "senior level" AmTrust employees. According to an SEC filing, Fisch received $256,845.00 in director compensation from AmTrust in 2016 alone. At her deposition, Fisch estimated that she receives approximately $300,000 in annual compensation for serving on the AmTrust Board, more than triple the $100,000 she received when she joined the AmTrust Board in 2010. Fisch also testified that she has been compensated $100,000 annually for her service on the board of directors of AmTrust's subsidiaries. Further, Fisch testified in the Cambridge Derivative Action that she has voted on approximately 20-30 related-party transactions involving the Karfunkel-Zyskind Family and has never voted against any such transaction. Nor was she aware of any other Board member having ever voted against any such transaction.

57.     The director fees received by Fisch are material to her. Fisch testified that her other sources of income (i.e., non-AmTrust director fees) include (1) Social Security payments payable to she and her husband; (2) pension payments from Willis to Fisch totaling $50,000 per year; and (3) investment income earned by she and her husband averaging approximately $700,000 per year. Utilizing these

-24-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

figures, and excluding Social Security payments, the director fees received by Fisch from AmTrust and its subsidiaries total just under 35% of Fisch's current annual income.

58.     Fisch is a member of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees and also served on the Take-Private Special Committee that approved the Transaction.

59.     **DeCarlo**: Defendant Donald T. DeCarlo has served as a director on the Company's Board since 2006.  DeCarlo has also served as a director of NGHC since it was founded by members of the Control Group in 2010.

60.     DeCarlo testified at his deposition in the Cambridge Derivative Action that his relationship with the Karfunkel-Zyskind Family dates back to in or around 2000 when DeCarlo was a partner at the law firm Lord Bisell & Brook and "Barry Zyskind and Michael Karfunkel wanted to get into the insurance business. . . ." DeCarlo advised Zyskind and M. Karfunkel in connection with their acquisition of Rochdale Insurance Company ("Rochdale"), which was their first insurance company acquisition.  DeCarlo "helped them decide what [Rochdale] was going to write going forward, what line of business."   Following the acquisition Zyskind personally asked DeCarlo to join the Board, which DeCarlo did.  DeCarlo testified that following the acquisition of Rochdale, he continued to regularly advise Zyskind

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and M. Karfunkel on legal and insurance matters until they founded AmTrust and AmTrust hired its own general counsel.

61.    DeCarlo further testified that he worked on between 20 to 30 separate matters for AmTrust between 2000 and 2005. When DeCarlo left Lord Bissell & Brook in or around 2004 and started his own law firm, AmTrust and the Karfunkel-Zyskind Family came with him as a client.  DeCarlo testified that he continued to advise M. Karfunkel and Zyskind approximately monthly, until he joined the AmTrust Board in 2006.

62.    DeCarlo also testified that he attended the wedding of Zyskind's daughter and continues to have dinner with Zyskind once or twice a year.  DeCarlo testified that he serves on the boards of at least 17 AmTrust subsidiaries, including: Associated Industries Insurance Company; Milwaukee Casualty Insurance Company; Wesco Insurance Company; Technology Insurance Company; Security National Insurance Company; First Nonprofit Insurance Company; Core Pointe Insurance Company; ARI Insurance Company Inc.; AmTrust Title Insurance Company; ARI Casualty Company; Developers Surety and Indemnity Company; Republic Underwriters Insurance Company; Republic Vanguard Insurance Company; Indemnity Company of California; Southern County Mutual Insurance Company; Southern Insurance Company; and Southern Underwriters Insurance

-26-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company.  DeCarlo testified that Zyskind or a member of his management team personally asked DeCarlo to serve on each board.

63.    DeCarlo was likewise appointed to the NGHC board at the time of its founding in 2010.  DeCarlo testified that M. Karfunkel personally asked him to join the NGHC board.   DeCarlo is or has been a director of at least four NGHC subsidiaries:  National Health Insurance Company, Imperial Fire and Casualty Insurance Company, National Automotive Insurance Company, and Century-National Insurance Company.   AmTrust's 10-K filed on March 16, 2018, acknowledged that DeCarlo's dual representation of AmTrust and NGHC "may present, and make [AmTrust] vulnerable to, difficult conflicts of interest, business opportunity issues and legal challenges."   M. Karfunkel or a member of his management team personally asked DeCarlo to join each of those boards.

64.    DeCarlo is the chairman emeritus and founder of the American Society of Workers' Compensation Professionals, Inc. ("AmComp") where Zyskind serves as a director.[3]   As a director of NGHC, DeCarlo earns annual director fees of approximately $120,000 per year and owes that income to his relationship with the Control Group.  DeCarlo is a member of the Board's Audit Committee, is the Chair

---

[3] In addition to Zyskind, AmComp is staffed by other AmTrust executives and/or individuals affiliated with the Karfunkel-Zyskind Family. For example, AmTrust Senior Vice President Jeffrey Fenster serves as the President of AmComp.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of the Board's Compensation and Nominating and Corporate Governance Committees, and served as the Chair of the Take-Private Special Committee.

65.    In 2016 alone, DeCarlo was paid $318,086.00 for being employed as a director of AmTrust and its affiliates.  This is in addition to the amount DeCarlo is paid annually for being employed as a director of NGHC, according to NGHC's proxy statement.  These amounts would have been material to DeCarlo.

66.    **Rivera:** Defendant Raul Rivera ("Rivera") has served as a Company director since August 2016.  Rivera retired in January 2017 after working for several years at National Benefit Life Insurance Company. Rivera is a current director of the Insurance Federation of New York, where he has concurrently served with DeCarlo. Rivera is a member of the Board's Compensation Committee and served on the Take-Private Special Committee. According to public information reflected on Bloomberg, it appears that all the boards Rivera sits on are affiliated with AmTrust. In 2016, Rivera received $61,667.00 in director compensation.  Rivera continues to be employed as a director of AmTrust, now a private company.

67.    Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, DeCarlo, and Rivera are collectively referred to herein as the "Director Defendants." References to the "Board" for actions before M. Karfunkel's passing include him as a director, and references to the "Board" for actions following his passing exclude him.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

68.   **Stone Point and Trident**: Defendant Stone Point Capital LLC ("Stone Point") is a Delaware limited liability company and private equity firm headquartered in Greenwich, Connecticut.   Stone Point manages Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P. and Trident VII Parallel Fund, L.P (collectively, the "Trident Funds").   The Trident Funds participated in the Transaction with the Control Group through Trident Pine Acquisition LP.

69.   Defendant Trident Pine Acquisition LP ("Trident Pine") is a Delaware limited partnership, affiliate of Stone Point and participant in the Transaction. According to a Definitive Proxy filed by AmTrust with the SEC on May 4, 2018 (the "Proxy"), Trident Pine, along with the Karfunkel-Zyskind Family, proposed the Transaction.

70.   Defendants Trident Funds are private equity funds managed by Stone Point and participated in the Transaction.

71.   **Evergreen**: Defendant Evergreen Parent, L.P. ("Evergreen Parent") is a limited partnership formed under the laws of Delaware and controlled by Stone Point and the Karfunkel-Zyskind Family. It was one of their merger vehicles for the Transaction.

72.   Defendant Evergreen Merger Sub, Inc. ("Merger Sub") is a corporation formed under the laws of Delaware, is a wholly owned subsidiary of Evergreen

-29-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Parent, and is controlled by Stone Point and the Karfunkel-Zyskind Family.  It was one of their merger vehicles for the Transaction.

73.     Defendant K-Z Evergreen, LLC ("K-Z Evergreen") is a limited liability company formed under the laws of Delaware and owned by Zyskind, G. Karfunkel and L. Karfunkel. K-Z Evergreen is a limited partner of Evergreen Parent. It is the Karfunkel-Zyskind Family's investment vehicle for the Transaction.

74.     Defendants Evergreen Parent, Merger Sub, K-Z Evergreen, Stone Point and Trident Pine may be referred to herein as the "Merger Partner Defendants."

## III.    RELEVANT NON-PARTIES

### A.    AMTRUST

75.     AmTrust is a Delaware corporation with its principal executive offices located at 59 Maiden Lane, 43rd Floor, New York, NY 10038.  AmTrust underwrites and provides, among other things, property and casualty insurance products, including workers' compensation, commercial automobile, general liability and extended service and warranty coverage, in the United States and internationally, to niche customer groups. AmTrust has also expanded its business to include personal lines insurance.   In a 2014 report by the Southern Investigative Reporting Foundation, a not-for-profit focused on corporate accountability issues, AmTrust was described as "literally a family business — apart from Barry Zyskind, several of Michael and George [Karfunkel]'s children hold important positions in its

-30-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

subsidiaries — and their massive stake in the company makes it immune to takeover or raids from activist investors."  Prior to the Closing, AmTrust's common shares traded on the NASDAQ Global Select Market under the ticker symbol "AFSI."

76.    AmTrust and its subsidiaries operate through three business segments: Small Commercial Business, Specialty Program, and Specialty Risk and Extended Warranty.

77.    AmTrust has grown significantly over the years and has been highly acquisitive. Since its inception, "AmTrust has grown organically and through more than 40 acquisitions to become one of the largest property and casualty insurers in North America."

78.    While AmTrust touts commercial lines insurance as its specialty, AmTrust has acquired and operated personal lines insurance businesses as well. In recent years, both before and after the Tower Transaction that is the subject of the Cambridge Derivative Action, AmTrust has acquired and operated at least two personal lines businesses.

79.    In April 2013, AmTrust completed the acquisition of Sequoia Insurance Company and its subsidiaries ("Sequoia") for a purchase price of $60 million. In the transaction, AmTrust acquired a wholly-owned subsidiary of Sequoia called Personal Express Insurance Company ("Personal Express"). Personal Express is a

-31-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

California-domiciled property and casualty insurance carrier that offers personal lines insurance products.

80.     Recognizing the opportunity to profit from a sale of Personal Express, AmTrust determined to sell it.  On April 25, 2013, the Board adopted resolutions establishing a special committee comprised of Defendants Gulkowitz and Fisch. The committee was advised by Griffin Financial Group LLC ("Griffin") and Richards, Layton & Finger, P.A. ("RLF").  Audit Committee member and Defendant DeCarlo testified at his deposition that he was not a member of the Personal Express special committee because he harbored an actual conflict as a result of his simultaneously serving on the board of NGHC, which was potentially interested in acquiring Personal Express.

81.     In or around November 2013 (i.e., during the early stages of the Tower Transaction process), AmTrust sold Personal Express to Integon National Insurance Company, a wholly-owned subsidiary of NGHC. The sale closed in April 2015 and the Company recorded a gain of $6.6 million in connection therewith.

82.     AmTrust also acquired a personal lines insurance business from Republic Companies, Inc. ("Republic"). Republic is a commercial and personal lines property and casualty insurance provider based in Texas.  In 2014, Republic recorded total direct premiums of approximately $711 million.  Approximately half of Republic's total direct premiums on an annual basis were attributable to its

-32-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

personal lines business. On September 27, 2015, AmTrust announced that it had agreed to acquire Republic for approximately $233 million, consisting of cash and a promissory note. AmTrust completed its acquisition of Republic on April 18, 2016.

83.     AmTrust continues to own and operate Republic, including its personal lines business, and Republic continues to offer a wide array of personal lines insurance, including automotive, homeowners, condominiums, renters, dwelling fire, umbrella, and identity theft insurance. AmTrust recorded approximately $484.3 million in gross written premiums and $5.9 million in service and fee income for the portion of 2016 that it owned Republic (April 18, 2016 through December 31, 2016). For 2017, AmTrust recorded approximately $537 million in gross written premiums and $8.2 million in service and fee income as a result of the Republic acquisition.

## B.    MICHAEL KARFUNKEL FAMILY 2005 TRUST

84.     The Michael Karfunkel Family 2005 Trust (the "Karfunkel Trust") held 15,504,562 shares of the Company's common stock as of the Closing, which represented approximately 9.06% of the Company's total outstanding shares of common stock.  The shares held by the Karfunkel Trust were beneficially owned and effectively controlled by L. Karfunkel and Zyskind.  Defendants Zyskind and L. Karfunkel are co-trustees of the Karfunkel Trust, with the ultimate beneficiaries of the Karfunkel Trust being M. Karfunkel's children, one of whom is married to

-33-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Defendant Zyskind.   The Karfunkel Trust is involved in several related-party transactions concerning AmTrust.

### C.   MAIDEN HOLDINGS, LTD.

85.     Maiden Holdings, Ltd. is a publicly-held Bermudian insurance holding company that has various reinsurance and service agreements with AmTrust. Maiden was formed by M. Karfunkel, G. Karfunkel and Zyskind.  As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden.   As of December 31, 2016, Defendants L. Karfunkel and Zyskind owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden.  Defendant Zyskind serves as chairman of Maiden's board of directors.

### D.   ACP

86.     Relevant non-party ACP is a Bermuda insurer owned by the Karfunkel Trust.  ACP is wholly-owned by ACP Re Holdings, LLC, and the Karfunkel Trust owns 99.9% of the issued and outstanding stock of ACP Re Holdings, LLC.  L. Karfunkel is the sole trustee of the Karfunkel Trust as well as a beneficiary of the trust.  Until his passing in April 2016, M. Karfunkel was the Chairman and a Director of ACP.  Barry Karfunkel, the son of M. Karfunkel and L. Karfunkel, is currently the Chairman and a director of ACP.  ACP was formed and capitalized by M.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Karfunkel in 2010 to support NGHC.  ACP operates as an investment vehicle for the Karfunkel-Zyskind Family.

87.    ACP has no officers or employees and instead relies upon employees of AmTrust, NGHC, and other Karfunkel-Zyskind Family companies to manage its assets and otherwise provide services on a regular basis.

### E.    NGHC

88.    NGHC is a publicly-held specialty personal lines insurance holding company that is controlled by the Karfunkel-Zyskind Family and provides a variety of insurance products, including homeowners, umbrella, personal, and commercial automobile.  As of March 28, 2018, L. Karfunkel was the beneficial owner of 41.7% of NGHC.   Until June 2017, AmTrust subsidiaries owned an additional approximately 12% of NGHC.  M. Karfunkel served as NGHC's chairman and CEO until his death in April 2016.  M. Karfunkel's son, NGHC president Barry Karfunkel, replaced him as CEO.   Barry Karfunkel's brother Robert Karfunkel is NGHC's Executive Vice President and Chief Marketing Officer.  Defendants Zyskind and DeCarlo are also members of the board of NGHC along with Barry and Robert Karfunkel.  From their positions on NGHC's compensation committee Zyskind and DeCarlo enriched Barry and Robert Karfunkel with outsized shares and bonuses.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

F.   ESTATE OF MICHAEL KARFUNKEL

89.    The Estate of Michael Karfunkel (the "Karfunkel Estate") is the estate

of the deceased M. Karfunkel, who passed away in April 2016 while serving as

Chairman of the AmTrust Board.  The Karfunkel Estate was substituted for M.

Karfunkel as a defendant in the Cambridge Derivative Action on August 16, 2017.

M. Karfunkel was one of the co-founders of AmTrust. According to the Company's

public filings immediately prior to his passing, M. Karfunkel beneficially owned

2,192,824 shares, or approximately 1.3%, of the Company's outstanding common

stock.   M. Karfunkel was also the founder, Chairman, President, CEO, and

controlling stockholder of NGHC. Additionally, the Karfunkel Trust[4] owns 99.9%

of the outstanding stock of ACP's parent company.[5]   M. Karfunkel was also the

Chairman and a director of ACP. M. Karfunkel was G. Karfunkel's older brother, L.

Karfunkel's husband, and Zyskind's father-in-law. The Karfunkel Estate was among

the defendants potentially liable for the Cambridge Derivative Claims.

90.    The Control Group has dominated the Company since its inception, and

the members of the Board have made clear that they will not act independently from

---

[4] The Michael Karfunkel 2005 Grantor Retained Annuity Trust owned 99.9% of the
outstanding stock of ACP's parent company until July 28, 2015, at which time it was
transferred to the Michael Karfunkel Trust.

[5] ACP is 100% owned by ACP Re Holdings, LLC, which is 99.9% owned by the
Michael Karfunkel Trust.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

the Control Group.  For example, as explained below, the Company is currently a party to a constellation of agreements with parties related to the Control Group, including Maiden and NGHC.  The below diagram illustrates the incestuous nature of various Karfunkel-Zyskind affiliated entities, with AmTrust at the center.



(1) AmTrust's quarterly dividend was raised on August 2, 2016, just months before the company was forced to raise cash through low priced equity sales and began selling assets.
(2) AmTrust originally entered into a $250mm loan to ACP Re, Ltd, a company owned by the family. As of December 2017, the loan had a balance of $128 million, a maturity date of 2036 and a fixed interest rate of 3.7% (a portion of which may be paid-in-kind). At AmTrust's discretion the loan may even be repaid in publicly traded stock instead of cash.
(3) 70% of Maiden's business is reliant on AmTrust as a customer.
6

91.    The sheer volume and size of these related party transactions show how the Company's purportedly independent directors simply accede to the demands of the Control Group.

---

6 Proxy Statement, Form 14A (DFAN14A of Icahn Group), available at https://www.sec.gov/Archives/edgar/data/921669/000114420418030400/tv494868 ex-1.htm.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

92.    Based on the repeated acquiescence of Defendants DeCarlo, Gulkowitz, and Fisch to the Control Group, it is clear the Control Group exercises control over them.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND OF AMTRUST AND THE CONTROL GROUP

93.    AmTrust was founded in 1998 by Defendant G. Karfunkel and his late brother M. Karfunkel.   Currently, AmTrust is controlled by Defendants G. Karfunkel, L. Karfunkel (M. Karfunkel's widow), and Zyskind (M. and L. Karfunkel's son-in-law), who together with their affiliates and family members own 55% of AmTrust's common stock.[7]

94.    Karfunkel-Zyskind Family members also occupy a number of the Company's most powerful and influential positions. Zyskind is the Company's CEO, President and Chairman of the Board. M. Karfunkel was Chairman of the Board until his passing in April 2016. G. and L. Karfunkel are both Board members. Until April 2016, M. Karfunkel, G. Karfunkel, and Zyskind formed the Board's executive committee.

---

[7] On May 25, 2017, AmTrust sold 24,096,384 shares at $12.45 per share for a total of $300 million to family members of the Control Group, increasing their ownership percentage from 49% to 55%.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

95.   As admitted in the Company's Form 10-K for the 2017 fiscal year, the Control Group, "acting together, have the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."  The Form 10-K goes on to concede that "[t]hese stockholders may have interests that are different from our other stockholders."

96.   The Control Group has used its dominance of AmTrust to pursue interests that differed from the Company's other stockholders for its own personal benefit for years.  In addition to the tens of millions of dollars Zyskind has extracted in compensation over recent years, the Company is currently a party to a startling number of agreements with entities related to the Control Group, including Maiden and NGHC.  This includes: (i) a reinsurance agreement with Maiden (despite its subpar rating) that has been in place since 2007 and under which the Company recorded approximately $596 million of "ceding commissions" in 2016 alone;[8] (ii) a loan from Maiden with an outstanding principal balance of $168 million; (iii) a recently terminated master services agreement with NGHC where AmTrust recorded

---

[8] AmTrust failed to disclose the amount of ceding commissions recorded in 2017 in its disclosure of related party transactions in the Form 10-K/A it filed on April 23, 2018.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

$46 million in fee income in 2016; (iv) a September 2017 sale to NGHC of a personal lines policy management system and related intellectual property for $200 million; (v) a loan to ACP that resulted in AmTrust recording $128.5 million in loan and interest receivables in 2017; and (vi) leasing AmTrust's corporate headquarters from the Control Group for $2 million per year.  All told, the Company generally discloses more than twenty related party transactions in its annual proxy filings.

**B.    BACKGROUND OF DERIVATIVE LITIGATION PENDING AGAINST MEMBERS OF THE KARFUNKEL-ZYSKIND FAMILY AND AMTRUST BOARD AT THE TIME OF THE TAKE-PRIVATE TRANSACTION**

### 1.    The Cambridge Derivative Action

97.    AmTrust has been beset by scandal and mismanagement in recent years.  For example, in April of 2015, Cambridge Retirement System, an AmTrust stockholder, commenced a derivative action in the Delaware Court of Chancery on behalf of AmTrust against (among other defendants) Zyskind, DeCarlo Fisch, Gulkowitz, G. Karfunkel, and L. Karfunkel for breaching their fiduciary duties of loyalty and usurping a corporate opportunity from AmTrust in connection with the Company's and the Karfunkel-Zyskind Family's dealings with insurance company Tower Group International, Ltd. (the "Cambridge Action").[9]  The Court noted that

---

[9] Despite being named as a defendant in the Cambridge Derivative Action, L. Karfunkel claimed in her 2016 director questionnaire that she did not believe she was an "adverse" party in that litigation.

-40-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the allegations of the Karfunkel-Zyskind Family's self-dealing and the AmTrust Board's acquiescence to the Karfunkel-Zyskind Family's demands at the expense of the Company due to conflicts of interest were "very troubling" and "very unusual," and denied the sole motion to dismiss filed.

98.     The Cambridge Action alleged that in 2013, members of the Karfunkel-Zyskind Family stole AmTrust's opportunity to acquire valuable businesses and assets from distressed insurer Tower.  Their misconduct gave rise to meritorious derivative claims for money damages that this Court sustained in June 2016.  As shown below, discovery taken in the Cambridge Action confirms that: (1) the Company possessed a hugely valuable asset (*i.e.,* the Cambridge Derivative Claims) that Company fiduciaries were duty-bound to value in good faith and secure value for in connection with the Take-Private Transaction in 2018; and (2) the four-member Take-Private Special Committee—which included all three members of the Audit Committee responsible for reviewing and approving the Tower Transaction—was not independent of the Karfunkel-Zyskind Family and was otherwise incapable of protecting minority stockholders' interests in connection with the Take-Private Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

        **a.**    **Without Telling the AmTrust Board, The Karfunkel-Zyskind Family Disloyally Decided The Karfunkel-Zyskind Family's Other Businesses Should Profit from the Tower Opportunity.**

99.    Tower was a publicly-traded, diversified casualty and property insurance company that was highly regarded within the industry and broader market. In the first three quarters of 2013, however, Tower suffered significant losses and commenced a strategic review.

100.    In response to these developments, AmTrust, led by CEO Zyskind and Chairman M. Karfunkel, became one of a number of companies interested in acquiring some or all of Tower.

101.    On October 21, 2013, AmTrust submitted a formal letter of intent ("LOI") to acquire two Tower insurance subsidiaries for $50 million cash and make a $100 million preferred stock investment in Tower.  While AmTrust was devoting substantial resources to pursuing Tower, including retaining and paying Guggenheim Securities, LLC ("Guggenheim") to advise the Company, members of the Karfunkel-Zyskind Family determined that certain of the Karfunkel-Zyskind Family's other businsses should profit from Tower as well. In particular, NGHC was preparing for an IPO at the time, and profitable, near-term opportunities for NGHC helped ensure a successful IPO.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

102.   On October 30, 2013, Justin Rubinstein of Guggenheim emailed AmTrust in-house counsel John Titley a draft engagement letter that alluded to the Karfunkel-Zyskind Family's disloyal plan.

103.   The email states:

John,

Given *that National General Holdings will be acquiring one of the subsidiaries [of Tower]* and AmTrust the other we have revised the engagement letter *to include both companies*. Please let us know if you have any comments.

Best,

Justin

104.   The plan—to divert at least a part of the Tower opportunity to NGHC— revealed through Rubinstein's email is corroborated by other communications produced in the Cambridge Derivative Action. For example, an internal November 4, 2013 AmTrust email among Karfunkel-Zyskind Family subordinates explicitly refers to an "understanding with Nat Gen [i.e., NGHC]" regarding Tower. AmTrust also demanded that its non-disclosure agreement ("NDA") with Tower include an express carve out allowing NGHC access to due diligence.

105.   In response to AmTrust's demand, one of Tower's lawyers at Willkie Farr & Gallagher LLP ("Willkie Farr") commented, "Did we anticipate that they would do a joint bid with something called National General Holdings Corp., which seems to have the same CEO as AmTrust?"

-43-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

106.   Of course, throughout October and November 2013, none of this was communicated to either the full AmTrust Board, or the standing Audit Committee, whose charter expressly required the committee to "oversee all related party transactions.…"

107.   To the contrary, Zyskind, Michael Karfunkel, and their subordinates in AmTrust management were actively working to conceal their plan.

108.   For example, as noted above, AmTrust demanded that the Tower NDA include a carve-out for NGHC. Willkie Farr responded by requesting that NGHC execute a joinder to the NDA, which elicited the following response from one of Zyskind's subordinates in management:

> We will have [NGHC] sign a joinder once we get them involved. *I don't want to get them involved yet so draft language that says when we get them involved it will only be after they sign something.*

109.   Discovery in the Cambridge Derivative Action further suggests a concerted effort to keep Michael Karfunkel's fingerprints off of the Tower Transaction process because of his position as CEO of both ACP and NGHC, which ultimately received the lion's share of Tower's businsses and assets.

110.   For example, on December 3, 2013, Michael Constantino ("Constantino") of Guggenheim emailed Michael Karfunkel directly concerning Tower at his NGHC email address.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

111.   Upon learning of Constantino's email to M. Karfunkel, Zyskind exploded.

112.   A December 4, 2013 email from Peter Van der Meer of Guggenheim to Constantino states, "As I told you Barry [Zyskind] called me and was extremely upset that you send [sic] email to Michael Karfunkel….This is very serious [sic] Barry said that if this happen [sic] again he will not work with Guggenheim going forward."

113.   The email also states, "As I have told you now several times this is a sensitive…transaction" and then "reiterate[s]" the "very delicate nature" of the transaction. The email concludes by demanding that Constantino cease contacting both Zyskind or Michael Karfunkel.

114.   Meanwhile, on December 2, 2013, AmTrust submitted a new LOI proposing to acquire 100% of Tower's outstanding stock for $5.50 per share.

115.   Ten days later, on December 12, 2013, AmTrust abrupty withdrew the bid. AmTrust claimed the reason was Tower's inability to timely make quarterly filings with the SEC. But others, including members of Tower's audit committee, believed that AmTrust's explanation was pretext. One Tower audit committee member emailed internally: "My view is that their withdrawal at this point has less to do with Tower's filing of the 3rd Qtr. 10-Q than it does with the recent news regarding their situation and the significant drop in their stock price."

-45-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

116.   The "situation" referred to in this email was the publication of a short-seller report by GeoInvesting on December 12 (*i.e.*, the same day AmTrust withdrew its bid) alleging various accounting improprieties at AmTrust (the "GeoInvesting Article").[10] Details of the report were published in numerous media outlets and caused a significant drop in AmTrust's share price (*see* § B.2.a, *infra*).

117.   By December 20, 2013, following an announcement that Tower would increase its loss reserves for the third quarter of 2013 and that A.M. Best, an influential insurance rating service, was again downgrading Tower's credit rating, Tower was trading at $2.65 per share—a 35% decrease from its trading price as of when AmTrust submitted its December 2, 2013 LOI to acquire Tower for $5.50 per share.

118.   That same day, representatives of AmTrust, including Zyskind, "expressed [to Tower management] their renewed interest in making a bid to purchase the entire company," but advised that it would be "in partnership with National General Insurance Company and a privately-owned Bermuda reinsurance company [i.e., ACP] owned by Mr. Michael Karfunkel."

---

[10] At 10:22 a.m. on December 12, 2013, an AmTrust employee forwarded the GeoInvesting Article to Zyskind. The short seller report was then published approximately a half hour later on Seeking Alpha under the title "AmTrust Financial Services: A House of Cards?" Karkowsky called Lee about an hour and half after the report was published to inform him that AmTrust was pulling its bid.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

119.   On December 29, 2013, in-house counsel for AmTrust, Stephen Ungar, sent Tower's legal advisors at Willkie Farr an LOI for ACP to acquire Tower for $3.00 per share, or $2.50 per share less than the $5.50 per share that AmTrust had offered in its December 2 LOI.

120.   The December 29, 2013 LOI contemplated that ACP would acquire Tower and retain its legacy business. ACP would then (i) sell certain of Tower's going-forward commercial lines business to AmTrust, as well as enter certain reinsurance agreements with AmTrust relating to the commercial lines business, and (ii) sell Tower's going-forward personal lines business to NGHC as well as enter certain reinsurance agreements with NGHC relating to the personal lines business.

### b.   The AmTrust Board Failed to Protect the Interests of the Company and its Minority Stockholders

121.   The following day, on December 30, 2013 AmTrust's Board convened for its first of only two meetings before approving the Tower Transaction. Each meeting lasted under 30 minutes. The Audit Committee convened only once—on January 3, 2014—the same day the Tower merger agreement was signed, and for only 15 minutes. Despite his conflicts, Zykind was the sole presenter at each meeting. No Board member—including the three members of the Karfunkel-Zyskind Family—recused themselves from any portion of the December 30 or January 3 meetings. Zyskind was also present for the entire January 3 Audit

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Committee meeting. No outside advisors were retained before the merger agreement was signed.

122.   In denying the motion to dismiss in the Cambridge Derivative Action, this Court considered the Board and Audit Committee minutes and materials for the December 30 and January 3 meetings, and described them as reflecting a process that did not appear to be "bona fide" and that included failures to address "obvious conflicts of interest," and "delegation of transaction approval" to a "conflicted audit committee that appeared predestined to approve an already-baked transaction."[11]

123.   Deposition testimony from the Cambridge Derivative Action is even more damning than the documentary record considered by the Court when denying the motion to dismiss. For example, the testimony of Audit Committee member DeCarlo, who purports to be an "independent" Board member and who would later be named Chair of the Take-Private Special Committee, reflects a fundamental unwillingness or inability to recognize, let alone manage, conflicts when dealing with the members of the Karfunkel-Zyskind Family.

124.   For example, DeCarlo testified that he does not believe that members of the Karfunkel-Zyskind Family harbored any conflicts of interest in connection with the Tower Transaction:

---

[11] *See Cambridge Ret. Sys. v. DeCarlo*, *et al.*, C.A. No. 10879-CB, at 36:23-24, 46:22-48:7 (Del. Ch. June 16, 2016) (TRANSCRIPT).

-48-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Q.  Would you agree that by the time of this [December 30, 2013] meeting when Mr. Zyskind was leading discussion concerning this transaction, that Mr. Zyskind had a conflict of interest?

A.   No.

\* \* \*

Q.   The fact that his family had an ownership interest in ACP Re, you don't think that created a conflict for Mr. Zyskind?

A.   No, not in a negotiation, no.

\* \* \*

Q.   Would you agree that Michael Karfunkel had a conflict at the time of the meeting?

A.   No, the same.  They were negotiating -- until the point in time it got serious, they were going to go forward and they brought it to us, then -- then the potential conflicts come up.

Q.   So while they're negotiating, no conflict, right?

A.   Yes.

\* \* \*

Q.   If -- so in your view, if Barry Zyskind didn't have a conflict, Michael Karfunkel didn't have a conflict, so I take it at this time that it's your view that George Karfunkel did not have a conflict either?

A.   Correct.

125.   DeCarlo likewise believed he was not conflicted in a potential Tower

***deal irrespective of his board position at NGHC***:

Q.   Do you think you had any conflict at this time?

A.   No.

-49-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

126.   Audit Committee member Gulkowitz—who likewise was later appointed to the Take-Private Special Committee—shared DeCarlo's bizarre and problematic views, testifying that he too did not think Zyskind, Michael Karfunkel or George Karfunkel were conflicted with respect to a potential Tower transaction involving ACP, AmTrust, and NGHC.

127.   DeCarlo further testified that the Board chose to remain willfully blind. At his deposition, he stated he could not recall any Board member asking any questions at the December 30 meeting, such as asking when NGHC or ACP became involved in the Tower Transaction. DeCarlo also took no steps to educate himself following the meeting.

128.   DeCarlo testified as follows:

Q.    Following the December 30 board meeting, did you do anything to, I guess, educate yourself on the background or history of the Tower transaction at AmTrust?

[OBJECTION OMITTED]

A.    No, I was not going to get in and do management's job for them. I wanted Barry to do what he said he was going to do, continue to negotiate and expect him to come back to us when he was ready to go forward or not.

Q.    So did you sort of, I guess, sit tight and wait for another -- another board meeting to be called; is that fair?

A.    That's correct.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

129.   Instead, DeCarlo testified that he was content to allow the members of the Karfunkel-Zyskind Family to structure the Tower Transaction among themselves:

> Q.   You mentioned you expected Barry Zyskind would continue to negotiate.  Who did you expect Mr. Zyskind to negotiate with?
>
> A.   Well, Michael, because the way he's describing it is Michael is taking the laboring oar on this deal and then secondly with Tower to make sure they'd go along with it.
>
> Q.   And when you say "Michael", you mean Michael Karfunkel?
>
> A.   Michael Karfunkel.
>
> Q.   You would have expected Barry Zyskind to continue to negotiate with Michael Karfunkel?
>
> A.   Yes.
>
> Q.   And would Michael Karfunkel be representing both ACP and NGHC in those negotiations?
>
> [OBJECTION OMITTED]
>
> A.   I would expect, yes.
>
> Q.   And Barry Zyskind would be the representative for AmTrust?
>
> A.   Correct.

130.   By January 3, 2014, a merger agreement between ACP and Tower was final and ready to be signed.

131.   The members of the Karfunkel-Zyskind Family knew the AmTrust Board and Audit Commmittee would blindly approve it.

-51-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

132.   On the morning of January 3, 2014, before the final Board and Audit Committee meetings, Michael  Karfunkel sent family members a celebratory email stating, "Guys stay home & play with the kids…Tower is closing today."

133.   Later that morning, AmTrust's Board held a perfunctory 15-minute telephonic meeting at 10:30 a.m., which was immediately followed by a similarly perfunctory 15-minute telephonic Audit Committee meeting at 10:45.

134.   The Board and Audit Committee received a single PowerPoint presentation via email less than two minutes before the 10:30 a.m. meeting.  DeCarlo was asked at his deposition whether he saw the presentation materials before the meeting:

Q. Do you know whether you saw this e-mail before the 10:30 meeting?

A. I'm speculating, but probably not.

Q. Do you see that this e-mail attaches a presentation? Did you see this presentation at any time before the meeting?

A. I don't recall seeing it, no.

Q. Is it possible that you didn't see the presentation?

A. Yes.

135.   The 10:30 a.m. AmTrust Board meeting was the first and only time prior to signing that the Board was informed of any of the details of the transaction. As DeCarlo testified at his deposition:

Q.   [] Was the January 3rd meeting the first you learned of any I guess specifics regarding potential transaction terms, things like price.

-52-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.   To the best of my knowledge, yes.

Q.   And so before January 3rd, you were not aware what, for example, AmTrust was anticipating paying in the Tower transaction?

[OBJECTION OMITTED]

A.   Again, to the best of my knowledge, no.

Q.   How about with respect to NGHC, prior to January 3rd?

A.   The same.

Q.   Did you have any understanding, prior to January 3rd, what ACP would be paying in connection with the Tower transaction?

A.   Yeah, to the best of my knowledge, no.

136.   DeCarlo's testimony makes clear that Audit Committee delegation was a pointless exercise, as the members of the Audit Committee did not recognize any conflicts of interest and therefore did not consider taking any steps to manage them:

Q.   Fair to say no steps were taken to address any conflict with respect to Barry Zyskind up to that point in time, January 3, 2014?

A.   No, we didn't believe there was a conflict, so we didn't take any steps, no.

Q.   And as for Michael Karfunkel, fair to say the Audit Committee didn't take any steps prior to January 3, 2014 to address any conflicts –

A.   Same.

Q.   -- with respect to Michael Karfunkel?

A.   Same.

Q.   And then with respect to George Karfunkel, no steps were taken prior to the vote on January 3, 2014 to address any conflict with respect to George Karfunkel?

-53-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.   No.

137.   Even now, DeCarlo maintains that neither himself, nor Zyskind, nor M. Karfunkel, had ever had a conflict in connection with any aspect of the Tower Transaction.  Instead, he believes the deal was not conflicted and was negotiated at "arm's-length":

> Q.   You know, I had asked you questions before about conflicts, but -- so at the time of the Audit Committee's approval, January 3, 2014, I guess, in your view, did -- by that point did Mr. Zyskind have a conflict of interest?
>
> [OBJECTION OMITTED]
>
> A.   No, because this helped us sort of conflicts out [SIC], this structure.
>
> Q.   Uh-huh.
>
> A.   If this structure was done differently, he might have had a conflict. And what was happening here was that ACP Re which was neither Nat Gen nor AmTrust, was going to buy Tower. So that fact, Zyskind had no conflict.  Then once ACP bought Tower, we were going to buy commercial lines from ACP Re.  We weren't interested in personal lines. We were going to get -- ACP was going to pick up legacy liability. All of that was a sweetheart deal for AmTrust.  I didn't see any conflict at all.  I thought it was a great deal.  Tower was known to be writing business in our sweet spot, excluding the personal lines, which we didn't write.  They were writing workers' comp in the same -- a lot of the same geographical areas.  This was a great opportunity for us. So I didn't see any conflict. I saw this as an opportunity for AmTrust.
>
> Q.   I think you said Mr. Zyskind actually prevented a conflict; there could have been a conflict?  Did you say that?
>
> A.   There could have been if we didn't structure it like this.
>
> Q.   I guess sitting here -- what structures would -- what potential structures would cause a conflict in your mind?

<div align="center">-54-</div>

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

A.   There -- I -- I don't want to speculate on what they would be. This is the clearest upfront structure that would avoid a conflict.  Anything short of that, if -- say, for example, if we had to buy the whole company, there might be a conflict there, if it wasn't priced right.   And we wouldn't do that because we don't write personal lines. If the legacy liability was still involved where it wasn't being taken over by ACP Re, that would concern me immensely, and I would say that would be a reason not to vote for the deal. So this -- the better way of putting it, Ned, is that the way they presented it made what could be a nasty deal and conflicted deal, a perfectly acceptable deal.

138.   Gulkowitz too, at his deposition, testified that he does not believe the members of the Karfunkel-Zyskind Family—including M. Karfunkel, G. Karfunkel, and Zyskind—possessed any conflict of interest relating to the Tower Transaction as of January 3, 2013.  He viewed NGHC and AmTrust as "sitting on the same side of the table."  Moreover, Gulkowitz testified that he did not even know for sure whether any member of the Karfunkel-Zyskind Family was an executive of NGHC or on the NGHC Board.

139.   Nor, as DeCarlo testified, did the Audit Committee endeavor to determine whether a multitude of other reasonably available transaction alternatives would have been more financially favorable to AmTrust:

Q.    Prior to the Audit Committee vote on January 3, 2014, did the Audit Committee undertake any assessment of alternative transaction structures involving Tower that AmTrust could potentially pursue?

A.   No, we weren't involved.  It was -- management was doing all the work. This is the first time we saw this structure.  We didn't get into it before this.

-55-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Q.   So in terms of how to structure a transaction, would you view that as the job of management, I guess rather than the job of the board?

A.   Yes.

Q.   And management would include Barry Zyskind?

A.   Yes.

140.   Similarly, Gulkowitz could not recall any consideration of alternative transaction structures other than the one presented by Zyskind and went so far as to testify that he "can't understand or fathom anything else."

141.   At the end of the Audit Committee's January 3, 2014 meeting, the Audit Committee, based solely on Zyskind's presentation and the facts he communicated, (i) determined that ACP's acquisition of Tower, and NGHC's acquisition of Tower's personal lines segment, were not corporate opportunities for the Company; and (ii) approved the Tower Transaction.

142.   Later that day, ACP executed the merger agreement with Tower to acquire all of Tower's outstanding stock for $3.00 per share.  AmTrust and NGHC executed interrelated agreements providing for, among other things: (1) ACP's sale of Tower's personal lines business to NGHC for approximately $125 million; and (2) ACP's sale of Tower's commercial lines business to AmTrust for approximately $125 million.

-56-

143.   The price per share paid by ACP was well below Tower's estimated tangible book value, which Compass Point analyst Kenneth Billingsley estimated in early January 2014 as $7.50 per share.

144.   Nonetheless, in light of a deterioration in Tower's operations in the first quarter of 2014, however, the Karfunkel-Zyskind Family began negotiating modifications to the Tower Transaction. As with the negotiations with Tower up to that point, the Karfunkel-Zyskind Family concealed from the Board their plan to modify the deal terms. The AmTrust Board convened meetings in February 2014 and March 2014, and the Karfunkel-Zyskind Family chose not to disclose their ongoing negotiations to the Board at these meetings.

145.   Despite the deterioration in Tower's business in the first quarter, the Tower Transaction remained profitable for the Karfunkel-Zyskind Family. Even before revised deal terms had been reached, on February 16, 2014, Zyskind wrote to M. Karfunkel, "I am sure you are making money on [T]ower."

146.   Ultimately, on May 8, 2014, ACP and Tower executed an amendment to their original merger agreement which, among other things, reduced the merger price from $3.00 per share to $2.50 per share.

147.   Despite the fact that ACP had secured a significant price reduction (*i.e.*, a $0.50 (or 16.66%) reduction from $3.00 per AmTrust share to $2.50 per AmTrust share) in what was an acquisition identified, facilitated, and ultimately financed by

-57-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

AmTrust, the Karfunkel-Zyskind Family passed none of those savings onto AmTrust.

148.   Instead, the transaction was simply restructured such that ACP would retain Tower's subsidiaries following its acquisition, with AmTrust and NGHC retaining renewal rights of the commercial lines and personal lines businesses, respectively, and financing ACP's acquisition of Tower through a $250 million loan, with AmTrust and NGHC each providing up to $125 million.

149.   Other modifications to the Tower Transaction shifted additional risks onto AmTrust that had previously been allocated to ACP. In addition to AmTrust's commitment to provide ACP with up to $125 million in financing, upon terms to be negotiated and determined at a later date (the "Credit Agreement"), AmTrust and NGHC also agreed to cover losses of up to $250 million incurred by a former Tower subsidiary, CastlePoint Reinsurance Company, Ltd. (the "Stop-Loss Agreements").

150.   In connection with the transaction restructuring, AmTrust's Audit Committee determined to finally retain legal and financial advisors, but the process was no less abysmal than before. The Audit Committee retained Griffin as its financial advisor, but Griffin *was simultaneously advising the NGHC board of directors in connection with modifications to the Tower Transaction*.   At his deposition in the Cambridge Derivative Action, DeCarlo testified that it was acceptable for Griffin to represent both AmTrust and NGHC because he understood

-58-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Griffin would erect a "Chinese wall" to manage Griffin's potential conflict. In reality, however, the same individual at Griffin, Jeffrey Harenza, led Griffin's work on behalf of both AmTrust and NGHC.

Q.     Was Griffin also retained by NGHC in connection with the term loan?

A.     Yes.

Q.     Did that cause any concern to you?

A.     Well, we talked about it and Griffin assured us -- and I don't know whether they used this term but it was going to be a Chinese wall, but they were negotiating with Nat Gen and we were negotiating with AmTrust and ACP Re but they were totally independent negotiations; the Audit Committee on behalf of AmTrust, and if I remember correctly, a special committee of Nat Gen on behalf of Nat Gen.

<div align="center">*     *     *</div>

Q.     When you say "Chinese wall", what do you mean by "Chinese wall"?

A.     Griffin was supposed to keep their documents, their negotiations, the developments in connection with the negotiation on behalf of each party separate and apart and not share.

Q.     Did the Audit Committee take any steps to ensure that that occurred?

A.     No, but -- you know from -- no, we didn't, no.

Q.     Who at Griffin advised AmTrust audit committee?

A.     I think his last name is Harenza or Farenza.  I don't know exactly, yeah.

Q.     Who at Griffin advised NGHC's Audit Committee?

A.     Same individual.

<div align="center">-59-</div>

<div align="center">THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.</div>

Q.    Same individual, Mr. Harenza?

A.    Yeah.

Q.    Was it Jeff Harenza?

A.    Sounds right.

151.   The Audit Committee's chosen legal advisor, Stevens & Lee, was also conflicted. Stevens & Lee and Griffin are affiliates of the same parent company, Stevens & Lee/Griffin, which touts itself as a "multidisciplinary professional services platform with approximately 150 attorneys and 50 non-lawyer business and consulting professionals." Internal communications show that Griffin recommended that the Audit Committee hire Stevens & Lee. DeCarlo testified he was wholly unaware of the relationship between Stevens & Lee and Griffin:

Q.   Do you know whether Stevens & Lee has any affiliation with Griffin?

A.   I don't.

152.   Yet, DeCarlo testified that the Audit Committee relied on Stevens & Lee to advise the committee members concerning Griffin's conflicts:

Q.    So Stevens & Lee advised with respect to potential conflicts with Griffin; fair to say?

A.    I believe that's the case.

* * *

Q.   [] If Stevens & Lee and Griffin were affiliated with one another, do you think that would make it difficult for Stevens & Lee to really independently assess whether Griffin has any conflicts of interest?

-60-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[OBJECTION OMITTED]

Yeah, I don't know. I'd leave it up to them to decide. It's not the best of arrangements, but I'd leave it up to them to sort that out.

Q.  When you say "leave it up to them," you mean Stevens & Lee?

A.  I mean Stevens & Lee and Griffen, if there was an arrangement to tell us about it, and then give us an opportunity to opine on it.

The Audit Committee also failed to manage DeCarlo's conflict.  As noted above, DeCarlo was also a director of NGHC, which was interested in the Tower Tranaction. Not until May 29, 2014, did DeCarlo finally suggest to his fellow Audit Committee members that he recuse himself from further deliberations regarding the Tower Transaction given his affiliation with NGHC. At his deposition in the Cambridge Derivative Action, DeCarlo testified that Stevens & Lee had pointed out the "appearance of a conflict" created by his dual role in April 2014.  He testified that he waited the additional month to recuse himself because "he didn't think there was an urgency" because "it wasn't a real conflict":

Q.   Just so I understand your testimony clearly, in your view -- or is it your view that at no point in the transaction process did you have -- in fact have a conflict at AmTrust?

[OBJECTION OMITTED]

A.   Okay.  I -- from beginning to end, I thought this was a home run deal for AmTrust, and independently, a home run deal for Nat Gen, the way it was structured with ACP Re. So I never thought I had a conflict.

153.   The Audit Committee then formed a subcommittee consisting of the Audit Committee's two remaining members, Gulkowitz and Fisch (the

-61-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"Subcommittee"), but it had no ameliorative effect.  The Subcommittee ultimately authorized the Company to agree to pay ACP contingent consideration in the form of a three year earn-out (the "Earn-Out"), payable semi-annually on the last day of January and July, of 3% of gross written premiums of the Tower commercial lines business written or assumed by the Company following the merger.[12]

154.  On September 15, 2014, ACP and Tower consummated the Tower Transaction.

### c.      The Cambridge Derivative Claims Were Worth Hundreds of Millions of Dollars

155.  The Karfunkel-Zyskind Family prevented the AmTrust Board from implementing procedural devices to protect the interests of the Company and its minority stockholders. Had such devices—such as a fully empowered and informed independent committee that could hire advisors, say "no" to the Karfunkel-Zyskind Family and/or consider alternative transactions—been in place when the conflict with NGHC arose in October 2013, AmTrust could have negotiated for an alternative transaction that would have provided the Company with substantially more value than it ultimately received through the Tower Transaction. Instead, the Karfunkel-Zyskind Family orchestrated a transaction among their various entities in

---

[12] Through the Earn-Out, AmTrust and NGHC each agreed to pay ACP up to $30 million in contingent payments to ACP over a three-year period.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the manner that best enriched them, a pattern that repeated itself in the Take-Private Transaction.

156.   Each of Tower's component parts—the personal lines business, commercial lines business and legacy business—were perceived to be highly valuable up through the September 2014 closing of the Tower Transaction.

157.   According to Griffin's July 22, 2014 fairness opinion presentation to NGHC, Tower's personal lines business was valued between approximately $340.7 million to $662.6 million.

158.   According to Griffin's July 22, 2014 fairness opinion presentation to the AmTrust [Sub-Committee], Tower's commercial lines business was valued between approximately $294.59 million and $629.4 million.

159.   According to a September 2014 presentation delivered to A.M. Best, ACP valued Tower's legacy business (which ACP retained after the Tower Transaction) at approximately $136 million.[13, 14]

---

[13] Unless ACP was knowingly lying to the ratings agencies, this September 2014 presentation dispels any notion that the Karfunkel-Zyskind Family was playing the role of "white-knight" in the Tower Transaction. To the contrary, M. Karfunkel/ACP saw significant profit potential in Tower's legacy business and wanted to secure those profits for himself and his family.

[14] Further, a draft ACP presentation from May 2014, states that "[p]rojected [Tower] loss reserves on June 30, 2014 are $1.38bn with a surplus position of $431mm" and concludes that "ACP Re is therefore well protected," and that the Tower "Acquisition results in surplus increase for ACP Re group of companies." In its

-63-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

160.   The perceived value of Tower's component parts dwarfed the $307.8 million paid by ACP at closing to acquire Tower in its entirety, and that excess value was not fairly allocated among AmTrust, NGHC and ACP because of an abuse of power by the Karfunkel-Zyskind Family. AmTrust's Board and Audit Committee should have tried to—and but-for the Karfunkel-Zyskind Family's misconduct likely could have—negotiated an alternative transaction structure vastly more favorable to the Company.

161.   For example, AmTrust could have proceeded with an acquisition of Tower in its entirety and, as ACP did, sold off parts of Tower to NGHC and ACP, resulting in the distribution of Tower's assets and liabilities just as they ultimately were through the Tower Transaction: (1) AmTrust would receive Tower's commercial lines business, (2) NGHC would receive Tower's personal lines business, and (3) ACP would receive Tower's legacy business. Having acquired Tower in its entirety, however, AmTrust could have sold the personal lines and legacy businesses to NGHC and ACP, respectively, each at a substantial profit.[15]

---

September 2014 presentation to A.M. Best, ACP stated that it planned to "Earn investment income on $1.7 billion of Tower reserves and surplus."

[15] Given that NGHC and ACP bought Tower's personal lines and legacy businesses, respectively, through the Tower Transaction, there can be no dispute that they were willing buyers of those assets.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

162.    Another potential alternative transaction available to AmTrust was for the Company to acquire Tower in its entirety, and then sell Tower's personal lines and legacy businesses to third parties rather than NGHC and ACP. Discovery plainly shows significant third-party interest in Tower's assets, which continued after entry into the Tower Transaction on January 3, 2014. Among other things, (a) 22 third parties executed NDAs in connection with a potential acquisition of Tower, (b) Tower received three "Whole company proposals" (including AmTrust's), and (c) Tower received four "Other proposals" (including AmTrust's).

163.    A representative of one of these interested parties, Catalina Holdings, emailed Zyskind on January 21, 2014:

> [W]e had a good look at the [Tower] business and were interested in acquiring parts of it. If you/ACP Re are interested in selling any of the companies or reserves post acquisition please let me know. We would be happy to work with you.

164.    Thus, AmTrust could have acquired Tower in its entirety, and then sold certain Tower subsidiaries and/or assets—including the personal lines and legacy businesses—to third parties. Those third parties would have likely valued Tower's personal lines and legacy businesses similarly to Griffin and been willing to pay prices commensurate with those valuations. Like NGHC and ACP, third parties would therefore likely have been willing to purchase those assets from AmTrust for

-65-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

between $340.63 million to $798.6 million, allowing AmTrust to turn a quick but substantial profit on the Tower Transaction.

165.   A third potential alternative transaction could have been structured so that AmTrust acquired and operated Tower's personal lines business—whether just long enough for AmTrust to sell the personal lines at a profit, or indefinitely—in addition to the commercial lines business. AmTrust had previously owned and operated personal lines businesses before selling them for a profit, so this structure was known by the AmTrust Board to be feasible at the time.[16] ACP agreed to effectively sell Tower's personal lines business to NGHC for $125 million, suggesting ACP would have been willing to sell the personal lines to AmTrust on similar terms. As noted above, Griffin valued Tower's personal lines business at between $340.7 million to $662.6 million. By acquiring a business valued at $340.7 million to $662.6 million for only $125 million, AmTrust could have received an additional multi-hundred-million-dollar benefit.

166.   Finally, in addition to the specific examples set forth above, there are a nearly infinite number of alternative transactions more favorable to AmTrust than the Tower Transaction that could have been structured and agreed-upon through independent, informed, arms-length negotiations. The opportunity to acquire Tower

---

[16] As noted above, AmTrust has acquired Sequoia and Republic.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

belonged to AmTrust, which had conducted the due diligence on Tower and was a necessary party to any transaction involving the Karfunkel-Zyskind Family (including NGHC, ACP and/or any of its related entities) on the one hand, and Tower on the other. Neither NGHC nor ACP could acquire any portion of Tower absent AmTrust's involvement and/or approval, providing AmTrust immense negotiating leverage. As such, any transaction involving Tower on the one hand and NGHC and/or ACP on the other hand reached through arms'-length negotiations in which AmTrust was represented by independent and informed representatives could and would have resulted in terms more favorable to AmTrust than the transaction ultimately entered into.

> ### 2. Defendants' Financial Restatement Causes the Company's Stock Price to Crater, Setting the Stage for An Unfair Merger

167. During the year prior to the announcement of the Transaction, AmTrust's stock price dove from $27 to $13 at the end of the 3Q 2017 because of a series of negative disclosures stemming from the Company's accounting. These disclosures included restatements of multiple years of the Company's financials stemming from issues with its financial reporting, increases in the Company's loss reserves, and the public revelation of a long-running SEC investigation.

168. In April 2013, the financial publication *Off Wall Street* ("OWS") questioned the Company's accounting for acquisition costs and life settlement

-67-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

contracts ("LSCs").  Then, on December 12, 2013, GeoInvesting published its article alleging that the Company was hiding losses in offshore entities and improperly accounting for its LSCs.

169.   In February 2014,  *Barron's* issued an article titled "An Insurer's Feat: Turning Losses Into Gains" (the "February 2014 Barron's Article") noting that "[a]fter long interviews with AmTrust executives"—including Zyskind and Pipoly—"[*Barron's*] still ha[s] questions about some cost deferrals and reinsurance maneuvers that critics [such as OWS and GeoInvesting] highlighted," and that "[e]ven staunch defenders like its investment bankers FBR Capital Markets acknowledge confusion in their recent attempts to rebut AmTrust's critics."

170.   In May 2014, *Barron's* published an article titled "Balance-Sheet Risk Makes AmTrust Shares Vulnerable" (the "May 2014 Barron's Article") questioning the Company's loss reserves and estimates and noting that "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings…."  The article noted numerous accounting discrepancies between AmTrust and its reinsurance partner, Karfunkel-Zyskind Family-controlled Maiden Holdings, one of which *Barron's* described as "impossible."

171.   A key agency involved in the regulatory approval of the Tower Transaction was the New York State Department of Financial Services ("NYDFS"). By letter dated September 12, 2014 (the "Approval Letter"), the NYDFS expressly

-68-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

conditioned its approval of the Tower Transaction on representations from a predecessor to the M. Karfunkel Trust that it would cause the Company to enhance its actuarial processes and replace the Company's auditor, BDO USA LLP ("BDO"), for the 2015 financial reporting period. Nonetheless, the Company ignored the NYDFS's directive and retained BDO as the Company's external auditor for the fiscal year 2015 reporting period.

172. In December 2014, AmTrust commenced a defamation lawsuit against Alistair Capital Management, LLC ("Alistair Capital"), a sophisticated institutional investor, for alleging accounting issues at AmTrust. In response, on December 18, 2014, Alistair Capital sent a 16-page letter (the "Alistair Capital Letter") directly to the Audit Committee of the Board, alerting them to a panoply of accounting issues. The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts reported by a related-party for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions. Five pages of this letter were devoted to signs that the Company's overall internal controls over financial reporting were weak. These signs were

-69-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care in diligently monitoring the Company's control environment." After receiving the Alistair Capital Letter, AmTrust quietly dismissed its defamation suit.

173.   In early April 2016—almost a year and a half after receiving the Approval Letter from the NYDFS—the Audit Committee dismissed BDO and retained KPMG US LLP ("KPMG") as the Company's new external auditor.

174.   In April 2016, *Barron's* published an article titled "Is AmTrust Stock Worth the Premium?" (the "April 2016 Barron's Article"), again questioning the Company's accounting and underwriting practices. The article asserted that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside." The article noted that "the analysts at AmTrust's investment banker, Keefe, Bruyette & Woods, wondered in recent notes whether the insurer's underwriting margins were overstated."

175.   On February 27, 2017, AmTrust issued a press release announcing its fourth quarter 2016 results, which disclosed that the Company (1) anticipated a delay in the filing of its annual report on Form 10-K for fiscal year 2016 (the "2016 10-K") and (2) expected to make "immaterial corrections" to errors in its financial statements for fiscal years 2015 and 2014 and "certain financial information" for

-70-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

fiscal years 2013 and 2012. The Company further disclosed that it "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization" and warned that "additional adjustments and/or material weaknesses could be identified."

176.   The February 27, 2017 press release also disclosed a $65 million reserve charge in the fourth quarter of 2016 relating to the Company's Specialty Risk and Extended Warranty business segment. The reserve charge confirmed *Barron's* (and others') suspicions about the inadequacy of the Company's loss reserves. *Barron's*, in a March 4, 2017 article titled "Our Skepticism on AmTrust Reserves Borne Out," stated that the reserve charge announced on February 27, 2017 "shouldn't have surprised anyone familiar with questions Barron's raised about [AmTrust's] accounting and reserve levels[.]"

177.   After closing at $27.66 per share on the last trading day prior to this announcement, AmTrust's common stock price dropped nearly 20% on this news, closing at $22.34 per share on February 27, 2017.

178.   Two weeks later, on March 16, 2017, AmTrust announced that its Audit Committee had concluded that its consolidated financial statements for the years

-71-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ended December 31, 2014 and 2015 and the first three quarters of 2016 "should be restated and should no longer be relied upon."  AmTrust also stated that audit reports concerning the effectiveness of its internal control over financial reporting for the years ended December 31, 2014 and 2015 "likewise should also no longer be relied upon."  On this news, AmTrust stock fell from $21.61 per share on March 16, 2017 to close at $17.58 per share on March 17, 2017, a decrease of $4.03 per share, or 18.6%.

179.    Zyskind described the restatement as a momentary blip in the Company's path towards long-term growth:

> *. . . We believe that AmTrust remains financially strong, and we continue to see opportunities for organic growth within our existing operations, as demonstrated by the gross written and net earned premiums that we recently reported….We are confident in our ability to successfully move through this period and remain focused on leveraging our proprietary technology and efficient operating structure to enhance shareholder returns, best serve our customers and create exciting career growth and development opportunities for AmTrust employees.*

180.    On April 4, 2017, AmTrust filed the 2016 10-K with the SEC revealing that the restatement resulted in a decrease in net income in fiscal years 2014 and 2015 of 7.2% and 11.2%, respectively. The 10-K also disclosed updated reserve charges of $257.9 million for fiscal year 2016 as a result of "unfavorable loss development due to higher actuarial estimates based on actual losses in the Company's Small Commercial Business and Specialty Program segments."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

181.   On April 4, 2017, following AmTrust's filing of its 2016 10-K, which contained the Company's restated financials, AmTrust stock rebounded, closing at $21.95 per share.

182.   Also on April 4, 2017, Plaintiff Arca began purchasing AmTrust common stock, believing that the fundamentals of the Company were sound, despite the recent revelations of impropriety and mismanagement.   Arca believed that AmTrust's fair value was not reflected in its trading price. As discussed herein, AmTrust management shared this belief.

183.   However, the stock rebound AmTrust experienced in connection with the release of its 2016 10-K would be short-lived.  On April 11, 2017, the *Wall Street Journal* reported that the SEC, the FBI and the New York Department of Financial Services were each investigating AmTrust, and that a former auditor of AmTrust had been assisting the FBI through secretly recording conversations about AmTrust.  The former auditor stated that he witnessed "seemingly unsupported adjustments to financial schedules by a senior AmTrust executive."  The *Wall Street Journal* also reported that Harry Markopolos (the forensic accountant who had over a decade earlier alerted the SEC to Bernard Madoff's fraud) had been investigating AmTrust's finances for years.   On this news, AmTrust's shares fell from $18.87 per share the previous day, to close at $15.30 per share on April 11, 2017, down approximately $3.57 per share, or 18.9%.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

184.   AmTrust's downward movement in February, March, and April of 2017, which, as discussed in the preceding paragraphs, was primarily due to delays of management's own making, is reflected in the following image produced by the *Wall Street Journal*:



185.   The revelations of financial irregularities precipitated a number of lawsuits against AmTrust and its leadership.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

186.   For example, in March and April of 2017, investors filed three putative securities class actions in the U.S. District Court for the Southern District of New York against AmTrust and certain of its officers and directors.  The actions, which are pending, were ultimately consolidated under the case name *In re AmTrust Financial Services, Inc. Securities Litigation*.  The stockholders seek damages under Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act"), and Rule 10b-5 promulgated thereunder and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.

187.   Additionally, on April 27, 2017, an AmTrust stockholder filed a derivative action in the Supreme Court of the State of New York for the County of New York seeking damages on behalf of the Company (*Shaev v. DeCarlo et al.*).

188.   Also, on May 11, 2017, and on June 28, 2017, two derivative actions were filed by AmTrust stockholders in the U.S. District Court for the District of Delaware.  The District Court consolidated these two actions (collectively, the "Accounting Derivative Action," discussed herein) under the case name *In re AmTrust Financial Services, Inc. Derivative Litigation*.

189.   Despite this tumult, analysts shared Arca's and management's belief that the Company was still poised for growth.  For example, JMP Securities LLC ("JMP"), in a report dated October 4, 2017 (when AmTrust stock was trading at $14.12) acknowledged that "there are still steps that need to take place for the stock

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to work from here – mainly improved financial disclosures (including better fee income and reserving disclosures) and remediation of the material weaknesses cited by its auditor at year-end."  JMP Securities LLC, *Update Following Meetings with Management* (Oct. 4, 2017).  JMP also acknowledged that AmTrust had entered "into several related-party transactions, mostly with members of or entities controlled by the Karfunkel-Zyskind Family," which it identified as investment risks.  Nevertheless, JMP gave AmTrust a "Market Outperform" rating and a price target of $18.00 per share of common stock, stating that the "$300 [million] in capital raised earlier this year and the recently purchased $400 [million] adverse development cover" led it to believe that "management is committed to making progress on the remaining outstanding items in coming quarters."

190.   The $300 million referenced by JMP was from a May 25, 2017 private placement in which AmTrust issued 24,096,384 shares of common stock, solely to members of the Karfunkel-Zyskind Family, at $12.45 per share (reflecting AmTrust's May 25, 2017 closing price of $12.45 per share) (the "Private Placement").  As the trading price of AmTrust common stock experienced a significant drop earlier that month, the timing of the Private Placement benefitted the Karfunkel-Zyskind Family.

191.   The Karfunkel-Zyskind Family's orchestration specifically of the Private Placement, rather than another form of financing (such as a public offering)

-76-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

in which unaffiliated investors could benefit from AmTrust's temporary stock drop, is symptomatic of the Karfunkel-Zyskind Family taking advantage of dips in the market for their own selfish ends.  Moreover, the Private Placement had the effect of further consolidating the Karfunkel-Zyskind Family's control over AmTrust, which, in the event of a going-private proposal, would provide it additional leverage when compared to the minority stockholders, as well as a larger rollover stake in any future private company, all at a cost considerably lower than the $14.75 per share Merger Price.  Specifically, as a result of the Private Placement, the Karfunkel-Zyskind Family substantially increased its control of AmTrust, which, of course, could be of considerable utility in a future buyout.  The Karfunkel-Zyskind Family, however, in a subsequent Section 13 filing dated June 7, 2017, denied this was its intention, stating that it did "not have any present plans or proposals that relate to, or that would result in, any of the events described in paragraphs (a) to (j) of the instructions to Item 4 of Schedule 13D," which included "[a]n extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries."

192.  On November 6, 2017, AmTrust announced that it was forced to increase its reserves for Q3 2017 by an additional $327 million. This confirmed that the Company had materially understated its reserves in prior years.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

### 3.      Defendants Ignored Red Flags that Led to the 2017 Financial Restatements

193.   The AmTrust Board faced a substantial likelihood of liability to AmTrust for the damage their inaction caused to the Company.

194.   Not only was the Company taken private at an unfair price due to the Defendants' misconduct, but all of the Defendants were incentivized to see AmTrust taken private so that they could escape liability from their breaches of fiduciary duty as pursued in the Derivative Actions.

195.   The Defendants, including the Audit Committee and Take Private Special Committee, were on notice of the red flags of the improper accounting practices.  As a result, the Defendants knew of the unfairness of the Take Private price and also were not independent.

#### a.      Red Flags Concerning AmTrust's Auditor

196.   As noted above, on September 12, 2014, AmTrust disclosed that the NYDFS recommended, among other things, that AmTrust replace BDO as its auditor.  In spite of not only receiving this red flag from NYDFS, but agreeing to replace its auditor, AmTrust maintained BDO as its external auditor for the year ended December 31, 2015, and did not replace them until April 2016.  A year later, the *Wall Street Journal* reported that a whistleblower at BDO had collected evidence of AmTrust's accounting manipulation regarding its reserves and had divulged the

-78-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

evidence to the FBI.  And in 2018, the SEC charged certain BDO auditors with signing off on AmTrust's 2013 audit prior to actually completing the audit, in violation of applicable SEC rules and regulations.

### b.     Red Flags Regarding Internal Controls

197.   The December 18, 2014 Alistair Capital Letter addressed red flags about the overall inadequacy of AmTrust's internal accounting controls over financial reporting:

> First, we are concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K, filed with the SEC in conjunction with quarterly earnings reports, and amounts reported to the SEC in the Company's Forms 10-K and 10-Q.  We believe these frequent and often material discrepancies indicate the Company is reporting inaccurate information in one or both of the filings for a given period.

> Second, we believe AmTrust's loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative remaining reserves) or, more likely, AmTrust's disclosures reflect flawed data that validate our skepticism of the Company's reported financial statements.

> Third, we have noticed that amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations for "Accrued Expenses and Other Liabilities" appear to be irreconcilable, as discussed further below.  In addition, the amount AmTrust reports for Accrued Expenses and Other Liabilities in the footnotes to the Company's financial statements does not even correspond to the amount reported in the balance sheet.

> Fourth, we note that Ronald Pipoly, Jr., AmTrust's Chief Financial Officer ("CFO"), served as the CFO of Maiden Holdings, Ltd. ("Maiden") during the period that PricewaterhouseCoopers determined

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Maiden had "deficiencies which aggregate to a material weakness in internal control over financial reporting."

198.   As noted above, as part of AmTrust's February 27, 2017 press release, the Company admitted that it had identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016.

### c.   Red Flags Regarding Reserves

199.   The Defendants were also made aware of red flags regarding improper accounting regarding reserves.

> A May 31, 2014 *Barron's* article questioned the Company's reserves, stating, "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital." The article noted that:Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

200.   The April 23, 2016 *Barron's* article specifically addressed the inadequacy of AmTrust's reserves, stating that AmTrust's statutory filings on behalf of its insurance units "show it has consistently underestimated the cost of settling claims."   The Defendants were not only aware of this red flag, but specifically responded by falsely denying it, stating that the Company's "reserving is

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

conservative and rigorous." Yet, a mere ten months later, on February 27, 2017, AmTrust announced that it was taking a reserve charge of $65.0 million, or approximately $0.24 per diluted share. As *Barron's* pointed out in a subsequent March 4, 2017 article, titled "Our Skepticism on AmTrust Reserves Borne Out," this meant that their prior warnings about AmTrust's reserves had proven correct.

201.  Moreover, despite the $65 million charge in Q4 2016, resulting in total reserve charges of $258 million for 2016, and the restatements of its previously filed financial statements, the Board continued to under-reserve. A May 9, 2017 *Barron's* article highlighted the issue of under-reserving:

> [A]nalysts asked a lot of questions about the adequacy of the insurer's loss reserves. That's because the March quarter showed a continuation of AmTrust's practice of setting aside seemingly-low reserves against future claims, despite a decade of state insurance filings that show "adverse development" in its reserves – meaning that insurance losses have exceeded the company's earlier estimates.

202.  That AmTrust had materially understated its reserves for years was further confirmed on November 6, 2017, when AmTrust announced prior year adverse loss and allocated loss adjustment expenses ("loss") reserve development of $327 million for the third quarter ended September 30, 2017. Significantly, the increase in loss reserves was based on cases the Company had known about for years – namely its program business for the 2013 through 2016 accident years. The $327

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

million reserve increase was so large, and so material that it effectively wiped out 68% of the Company's 2016 net income attributable to common stockholders.

### 4.    AmTrust Takes Steps to Strengthen Its Balance Sheet

203.   In late spring 2017, rumors arose that the Karfunkel-Zyskind Family was positioning itself to take AmTrust private.  Specifically, in a May 10, 2017 article titled "Amtrust, private company," *The Insurance Insider* reported that the Karfunkel-Zyskind Family would likely seek to take the Company private with private equity assistance.

204.   The Karfunkel-Zyskind Family took advantage of the Company's historically low stock prices to further increase their stake in AmTrust.  On May 25, 2017, AmTrust issued a press release announcing its entry into the $300 million Private Placement, discussed above.  In the May 25, 2017 press release announcing the Private Placement, Zyskind praised the transaction and the Company's future:

> The capital contribution gives AmTrust a higher capital base to support our business platform and organic growth opportunities. In addition to enhancing our balance sheet and capital base, this sizeable investment of $300 million should also provide confidence to all of our stakeholders that we are well capitalized to grow and write business.

205.  On June 5, 2017, the Karfunkel-Zyskind Family also moved Karkowsky, Zyskind's long-time right-hand associate (who was also a key AmTust employee involved in the Tower Transaction) to the position of Executive Vice President and CFO. By appointing Karkowsky to this important position as the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company's principal financial officer and principal accounting officer, the Karfunkel-Zyskind Family ensured that he would be directly involved in any going-private transaction. This move was surprising to investors, given Karkowsky's dearth of accounting and financial reporting experience. Indeed, Karkowsky is a lawyer with a history of mergers and acquisitions work in the insurance industry.

206.  Throughout 2017, AmTrust took several steps to strengthen its balance sheet and position itself for long-term growth, while also simplifying its balance sheet in advance of a going-private transaction. For example, during a May 8, 2017 earnings call, Zyskind revealed that the Company was "exploring several ways to monetize the value of [AmTrust's] fee business" and that the Company had been in discussions with "several interested parties" and was seeking to sell a 51% stake to a "private equity-like partner" (the "Fee Business Sale"). Zyskind further indicated during the May 8, 2017 earnings call that the Company's fee business was potentially worth more than $2 billion.[17]  Thereafter, on June 9, 2017, AmTrust announced that it had agreed to sell over 10 million shares of NGHC in a third-party transaction valued at almost $212 million.  According to Karkowsky, AmTrust undertook the sale "in order to simplify [its] balance sheet and investment portfolio composition."  Then, on July 6, 2017, AmTrust disclosed that it had entered into an

---

[17] Two days later, *The Insurance Insider* reported that the Company retained BOA to advise it in connection with the Fee Business Sale.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

agreement for a loss development cover with Premia Reinsurance Ltd. providing for up to $400 million of reinsurance for adverse net loss reserve development in excess of AmTrust's stated net loss reserves (the "Cover Agreement").

207.   Zyskind continued to assure the market that AmTrust was financially strong and had great long-term potential. For example, in a July 6, 2017 press release, Zyskind touted the benefits of the Cover Agreement and stated that

> By entering into [this transaction], we are providing confidence to all of our stakeholders that we are well insulated from any potential reserve volatility in the future….*We are committed to acting in the long-term interests of the Company and our shareholders, supporting opportunities for growth and success across our global operations and continuing to be a strong, stable partner for our brokers, agents, and policyholders.*

208.   Nonetheless, just as the stock hit a 52-week low in November 2017 on an announcement of the enormous loss reserve increases, the Karfunkel-Zyskind Family immediately pounced on the opportunity to take the Company private on the cheap.  In fact, the *same week* he filed with the SEC his *signed admission* (approved by the Audit Committee) in the Company's Form 10-Q that AmTrust's $13.46 stock price at the end of 3Q 2017 was well below its fair value, Zyskind went before the Board to propose taking the Company private.

## V.    THE TRANSACTION WAS A PRODUCT OF AN UNFAIR PROCESS

209.   In their public filings, the Defendants have attempted to create the impression that an independent special committee was zealously advocating for

-84-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

stockholders' rights in negotiating the Transaction and that the Transaction was otherwise negotiated according to the dictates of *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).  Contrary to this impression, the process leading to the Transaction must be viewed against the ugly backdrop of the Defendants' long record of misconduct.  The committee that was formed for the stated purpose of negotiating on behalf of the Company's stockholders was not independent, lacked necessary information, and was not empowered to seriously negotiate.  It allowed itself to be pushed around by the Control Group to approve the transaction under timing constraints that were coercive, exhibiting the very "controlled mindset" of a fatally-conflicted and deficient special committee of the kind critiqued by the Court of Chancery and the Delaware Supreme Court in the Southern Peru litigation.  *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).  Like the committee there, the Take-Private Special Committee viewed its mandate narrowly and seriously considered only one option: endorsing the Control Group's going-private transaction.

### A. THE CONTROL GROUP TIMES ITS OFFER TO TAKE ADVANTAGE OF ITS OWN MISCONDUCT

210.  The Proxy discloses that Zyskind and Stone Point initiated discussions regarding a going-private transaction in September 2017, but that Zyskind unilaterally suspended such discussions until after the Company announced its

-85-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

disappointing third quarter 2017 financial results in early November 2017, which caused the stock price to plummet and created the opportunity for the Control Group to pursue privatization at a lower price.

211.   Defendants' delays and manipulation of the Company's accounting afforded the Control Group an opportunity to acquire the Company at a lower price when it finally came to light.  Knowing that the market was not properly judging the value of the Company given the uncertainty caused by the revelation of the improper accounting practices they had overseen, the Control Group pounced.

212.   Specifically, on November 6, 2017, the Company announced a $327 million loss reserve charge that resulted in a 25% stock price drop (nearly $3 per share on heavy trading).  Only two days later, on November 8, 2017, Zyskind suggested to the Board that the Company should explore strategic alternatives, including a potential going-private transaction, and resumed communications with Stone Point the very next day.  The Proxy does not indicate that Zyskind informed the Board at its November 8, 2017 meeting that he had been approached by Stone Point about a potential take-private transaction in September 2017.[18]

213.   On November 8, 2017, during an earnings call to discuss the Company's third quarter financial results, both Karkowsky and Zyskind touted the

---

[18] Despite Lead Plaintiffs' specific request, the Company did not produce meeting minutes for a November 8, 2017 Board meeting as part of the 220 Documents.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company's prospects for fiscal year 2018. Indeed, Karkowsky noted that various actions taken by the Company in 2017 to strengthen its balance sheet "have allowed us to set AmTrust up for a strong and successful 2018," and that the Company's improved reserve practices "position[ed] AmTrust for much greater profitability and predictability in 2018." Karkowsky noted:

> Now turning to our outlook…the takeaway is that we are carrying our 2017 accident year loss ratio above the average loss ratios of the affected accident years 2012 to 2016, excluding Specialty Program. ***This gives us a high degree of confidence in our current reserve position, and we expect that we won't need to provide much in the way of earnings adjustments going forward.*** We believe that the year-to-date adjusted underlying combined ratio of 95.5% is a better proxy for the likely go-forward profile of our business, allowing for a degree of positive or negative variance driven by marketing conditions in our core lines, particularly workers' compensation, business picks by quarter and some seasonality. ***This combined ratio profile, combined with continued solid investment income results, will allow us to generate our targeted 12% to 15% operating return on equity on our adjusted book value and generate the consistently profitable results our shareholders can rely on.***

214.   In slides presented during the same call, AmTrust management touted the Fee Business Sale (which would close at the end of February 2018, just before the Merger Agreement was signed), stating that the transaction "unlocks significant shareholder value," and "enhances AmTrust's balance sheet strength and financial flexibility."  The slides stated that the "~$950 million of gross cash proceeds" from the Fee Business Sale would "enhance [AmTrust's] ability to pursue attractive underwriting opportunities," enabling the Company to generate "operating ROE of

-87-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

12-15%." Further, the deal would be "accretive to book value and tangible book value by approximately $3.50 and $6.00 respectively through the gain on the transaction and reduction in goodwill and intangibles."

215.   On November 9, 2017, A.M. Best announced that AmTrust was "under review with negative implications." Almost four months later, just two days before the deal was signed, AmTrust's management used the prospect of a downgrade by A.M. Best (known of since early November) to justify a dramatically depressed set of projections, even though, as explained further below, management knew it was fully within their power to cure the defects leading to A.M. Best's concerns, and that a ratings downgrade was thus highly unlikely.

216.   A.M. Best indicated that the Fee Business Sale would positively affect its review of AmTrust. While A.M. Best was wary of the Company's reserve charge, the ratings agency observed that the Fee Business Sale was "expected to significantly improve the equity position and balance sheet strength of [AmTrust] upon completion of the transaction." A.M. Best also noted that: (1) "[t]he improvement in financial leverage on a total and tangible basis is projected to be significant once the transaction closes;" (2) "risk-adjusted capitalization…also is expected to strengthen materially"; and (3) "[t]he overall improvement in the holding company's position upon closure of the sale will be a net positive to [AmTrust's] ratings and those of its

-88-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

subsidiaries." A.M. Best further positively observed the many actions taken by the Company in 2017 to improve its balance sheet.

217.    A.M. Best concluded its analysis by stating that AmTrust would remain under review with negative implications until: (1) the Fee Business Sale closed, and A.M. Best assessed the transaction's impact on risk-adjusted capital; and (2) the Company's annual report on Form 10-K for fiscal year 2017 (the "2017 10-K") was filed, and A.M. Best assessed the full-year reserve information contained therein.

### B.    THE SPECIAL COMMITTEE FAILS TO PROTECT THE PUBLIC STOCKHOLDERS OF AMTRUST

#### 1.    The Special Committee Is Belatedly Formed and Inadequately Empowered

218.    According to the Proxy, on November 16, 2017, Zyskind discussed with the Board the potential association of Stone Point and the Control Group. *See* Proxy at 22.  The next day, Stone Point signed a non-disclosure agreement to obtain access to the Company's non-public information. *Id.*  The Board did not form a special committee or delegate the approval of matters relating to the Control Group's plans to take the Company private to the purportedly independent directors.  While the Proxy claims that "Mr. Zyskind advised the Board of Stone Point's interest in a potential transaction at a meeting of the Board on November 16, 2017" and that "the Board determined to permit Stone Point to conduct due diligence," the November 16, 2017 Board minutes make no reference at all to Stone Point or the Board's

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

purported determination; rather, the November 16, 2017 Board minutes state that Zyskind informed the Board that "the Company had begun to receive unsolicited calls from potential investors," and that "senior management was in the process of negotiating non-disclosure agreements with certain parties so they could commence due diligence and have discussions with Company management."

219.   During the November 16, 2017 Board meeting, various alternative transactions were discussed, including not only a going-private transaction, but also "a significant investment from an unrelated third party or possibly a combination of a third party investor with the Karfunkel and Zyskind families participating." (AFSI-220FDP_0694).   Ultimately, the Special Committee was not authorized to consider any of these other alternative transactions.   Instead, it was limited to considering a going-private transaction with the Control Group and their partners at Stone Point (with the Control Group, the "MBO Group" or "Acquiring Group").

220.   Furthermore, the November 16, 2017 Board minutes do not identify the "potential investors" who had approached the Company, nor the parties with whom "senior management" was negotiating non-disclosure agreements.   Accordingly, it is unclear whether the Board was ever apprised of these critical details in the first instance.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

221.   Nonetheless, the Proxy claims that the following day, November 17, 2017, Stone Point entered into a confidentiality agreement with the Company and thereafter began conducting due diligence.  Proxy at 22.[19]

222.   According to a research note issued by investment bank SunTrust Humphrey Robinson ("SunTrust") on November 27, 2017, "[t]he [C]ompany has not seen any material change in the flow of new business submissions or its binding ratio, either of which might signal some change in appetite among brokers to work with AmTrust (a possibility in light of recent events)."  The note also observed that AmTrust's workers' compensation lines possessed "less sensitivity around financial strength ratings, especially at the smaller end of the market that is AFSI's specialty (where brokers have low incentive to move accounts because of the low commission dollars involved)."

223.   The SunTrust note also stated that AmTrust's new capital provided it with profit-enhancing opportunities.  Among these opportunities was the expiration of the Company's reinsurance agreement with Maiden Holdings, which could "provid[e] the option for AmTrust to use its own capital to support premium and thereby drop more profit to the bottom line."

---

[19] Lead Plaintiffs specifically requested, but did not receive, this confidentiality agreement as part of one of the Section 220 document productions.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

224.   SunTrust observed that "[w]ith the stock trading at a meaningful discount to post-fee deal tangible book value, AFSI is a noteworthy value idea." Indeed, SunTrust observed that "[o]n price-to-earnings, the company trades at 7.2X, well below its P&C industry peers . . . ."  SunTrust assigned AmTrust a price target of $16 per share.

225.   The notion that a robust market existed for potential fundamental corporate transactions involving the Company is further corroborated by minutes from the Board's December 21, 2017 meeting.  The minutes state that Karkowsky noted that unidentified members of "senior management had been approached by a handful of interested parties considering investment in the Company or financing alternatives," and that "[s]enior management had entered into non-disclosure agreements with several parties."

226.   At this meeting, the Board was presented with financial projections prepared by the Company with the assistance of the Company's financial advisor on the Fee Business Sale, Bank of America ("BOA"), which "had assisted the Company in preparing the financial projections." Further, the December 21, 2017 Board minutes indicate that Karkowsky offered to discuss the projections at a future meeting.

227.   The December 21, 2017 Board minutes do not identify the "handful of interested parties" or describe the "investments" or "financing alternatives" these

-92-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

parties were interested in pursuing.  The December 21, 2017 Board minutes also do not identify the members of "senior management" who entered into the aforementioned non-disclosure agreements, nor the circumstances under which these agreements were entered.  In fact, the Proxy does not reference the December 21, 2017 Board meeting at all.  There is no record that the Board was ever apprised of any material details regarding these alternative transactions.

228.   The Proxy claims that, on December 22, 2017, Stone Point spoke to unnamed "representatives of the Karfunkel-Zyskind Family" to discuss Stone Point's "interest in pursuing a take-private transaction" with the Karfunkel-Zyskind Family and "to provide more information about Stone Point."  Proxy at 22.

**2.      Zyskind Finally Informs the Board of a Potential Take-Private Transaction Involving Stone Point; In Response, the Conflicted Board Forms the Conflicted Special Committee**

229.   The Board met on December 27, 2017 to discuss a request from the MBO Group to waive Section 203 of the DGCL with respect to discussions between the Control Group and Stone Point regarding their designs to take the Company private.  The December 27, 2017 Board meeting minutes mark the first time in the 220 Documents that Stone Point was identified to the Board as one of the "potential investors" pursuing a potential transaction with the Company and/or the Karfunkel-Zyskind Family.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

230.    The December 27, 2017 Board minutes further state that Zyskind told the Board that he had been contacted by other unidentified parties who "inquired about the Company's or the Karfunkel Family's interest in a potential transaction." However, the Board minutes reflect that Zyskind only discussed Stone Point as "he and the Karfunkel Family have known Stone Point for many years." The meeting minutes do not reflect discussion about the other potential investors or the identities of such investors.

231.    At the December 27, 2017 meeting, the Board was asked to consider granting Stone Point a waiver under 8 *Del. C.* § 203 to permit Stone Point to discuss a joint proposal with the Karfunkel-Zyskind Family (the "Waiver"). Oddly, the Karfunkel-Zyskind Family's counsel at Paul, Weiss, Rifkind, Wharton and Garrison LLP ("Paul Weiss") counseled the Board on "the requirements for the Waiver."

232.    The December 27, 2017 Board minutes further state that the Audit Committee—*i.e.*, DeCarlo, Fisch and Gulkowitz—would meet later that day or the following morning with its counsel at Simpson, Thacher & Bartlett LLP to discuss the Waiver.

233.    The Board met again the next day and formed a limited special committee with effectively no powers other than to consider whether to grant the Waiver requested by the MBO Group.  This committee was comprised of DeCarlo, Fisch, Gulkowitz and Rivera "subject to a final determination that each of them is

-94-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

independent and disinterested." With the exception of Rivera, these were the same Audit Committee members who approved the Tower Transaction. The resolutions also appointed DeCarlo as Chairman of the committee. As discussed further herein, DeCarlo, Fisch, and Gulkowitz could not act independently of the Karfunkel-Zyskind Family and/or one another in considering matters connected with a potential going-private transaction.

234.    Stone Point and the Control Group's need for the Waiver created leverage for the committee. The committee could have obtained, but failed to obtain, concessions from Stone Point or the Control Group for the Waiver. As Institutional Shareholder Services, Inc. ("ISS") would note, the "special committee would have been in a much stronger negotiating position had it obtained a binding commitment from the Karfunkel-Zyskind Family to vote in favor of a 'superior proposal' as a condition for granting the family a waiver." Such a condition "could have led to a much more open process and prevented the family from potentially blocking a better outcome for unaffiliated shareholders." Instead, on January 8, 2018, this limited special committee gifted the MBO Group the Waiver for no consideration, failing to use the MBO Group's request as negotiating leverage, and gratuitously agreeing to waive the obligations of the non-disclosure agreement the Company had entered into with Stone Point. (AFSI_220FDP_0861).

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

235.   The Proxy indicates that on January 8, 2018, Paul Weiss contacted Willkie Farr, who had been selected as the committee's counsel on January 2, to request that the committee permit the Karfunkel-Zyskind Family to make a joint proposal with Stone Point to take AmTrust private.

236.   At a January 8, 2018 meeting of this limited special committee, it passed a resolution granting Stone Point and the Karfunkel-Zyskind Family the requests above.

237.   Minutes from the Special Committee's January 8, 2018 meeting reflect that the "selection of an appropriate independent financial advisor for the Special Committee" was discussed.  During the course of this discussion, it was noted that "Bank of America Corporation had … declined the potential engagement when previously approached."  This statement is remarkable as it demonstrates that the Special Committee was considering retaining a financial advisor that it knew was already serving as a financial advisor for AmTrust management, and that had existing loyalties that *conflicted* with the Special Committee's interest.  While Bank of America declined this representation, the mere fact that the Special Committee "approached" it demonstrates the Committee's lack of independence from the Karfunkel-Zyskind Family, and also demonstrates its failure to act in the furtherance of the interests of minority stockholders.

-96-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

238.   The following day, on January 9, 2017, representatives of Stone Point and the Karfunkel-Zyskind Family met with a "ratings agency" (presumably, A.M. Best) and made a "confidential presentation" disclosing that the group intended to make an offer to take AmTrust private.  The Proxy does not explain why such a meeting was held without the involvement or supervision of the Board or Special Committee and whether it was appropriate or necessary.  Nor does the Proxy describe the nature of the confidential presentation.

239.   Also, on January 9, 2017—approximately two months after Zyskind notified the Board of his intent to take AmTrust private—the Karfunkel-Zyskind Family-dominated Board adopted resolutions formally appointing the Special Committee to negotiate and evaluate the imminent offer from the Acquiring Group. While the December 28, 2017 resolution referenced (at least perfunctorily) the Special Committee's authority to explore "other strategic alternatives," the January 9, 2017 resolution, as described herein, made clear that the Special Committee would only be authorized to consider a "proposal from the Karfunkel Family or any other bidder affiliated or working with the Karfunkel Family."

240.   The Special Committee's limited authority would also come as a surprise to the financial advisor it would soon retain (Deutsche Bank), which anticipated pursuing "strategic alternatives," including a "sale to [a] third party." Pursuing such strategic alternatives would, at a minimum, have had the benefit of

-97-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"facilitat[ing] price discovery." Moreover, according to Deutsche Bank, "[s]trategic buyers may identify potential synergies through consideration of [AmTrust]'s platform." Deutsche Bank also observed that AmTrust could benefit from a strategy of maintaining the status quo and foregoing a transaction altogether, as the Company could "[b]enefit from remedial actions that are already underway."[20]

241.   Moreover, the December 9, 2017, resolution made clear that it was "understood" that any definitive agreement it would negotiate was nonetheless "subject to the approval of the [Karfunkel-Zyskind Family-dominated] Board." In other words, the Special Committee, from its inception, recognized that its authority was severely limited.

242.   The Special Committee thereafter "determined to retain Deutsche Bank as its financial advisor." Remarkably, the Proxy notes that the Special Committee made this decision based on the perceived "absence of potential conflicts of interest that would prevent Deutsche Bank from acting as [an] independent financial advisor" even though it had not yet received a conflict disclosure letter from Deutsche Bank. In fact, it would be *another week* until Deutsche Bank would deliver

---

[20] In this same presentation, Deutsche Bank identified as "considerations" weighing against the Merger 1) the fact that AmTrust had already "communicated to regulators and rating agencies that it has no near-term plans for M&A" and 2) that a merger process would "distract from ongoing initiatives to right-size the business and restore profitability."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to the Special Committee a letter disclosing its relationships to the Special Committee's counterparties (i.e., the Karfunkel-Zyskind Family and Stone Point). As discussed herein, Deutsche Bank was not independent.

243.   In the late afternoon of January 9, 2018, Stone Point and the Karfunkel-Zyskind Family submitted to the Board a letter proposing to acquire all of the outstanding shares of AmTrust common stock that the Karfunkel-Zyskind Family did not already own or control for $12.25 per share in cash (the "Proposal").

244.   Stone Point and the Karfunkel-Zyskind Family attempted to design their Proposal to comport with *M&F Worldwide*, nominally conditioning the proposal on approval by an independent special committee and a fully informed majority of AmTrust's minority stockholders.  The Proposal also ominously stated:

> [T]he Family Stockholders have no interest in selling any of the shares of common stock of AmTrust owned or controlled by them. As such, the Family Stockholders would not expect, in their capacity as stockholders of AmTrust, to vote in favor of any alternative sale, merger or similar transaction involving AmTrust. If the special committee does not recommend, or the stockholders of AmTrust do not approve, the proposed transaction, the Family Stockholders currently intend to continue as long-term stockholders of AmTrust.

245.   The proposal made clear that the Karfunkel-Zyskind Family, as the controlling stockholder of AmTrust, would veto any transaction not to its liking, even if that alternative transaction was in the interest of AmTrust stockholders.  Such a coercive dynamic is the ultimate "deal protection."   All parties—the Special

-99-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Committee, minority stockholders, the controlling stockholder, and potential acquirers—discern this dynamic, which would prevent any superior proposals from even arising.

246.   As the following slide from one of Deutsche Bank's presentations makes clear, the Karfunkel-Zyskind Family and Stone Point deliberately timed their Proposal to coincide with the time period in which AmTrust was trading at its lowest price in five years:[21]

---

[21] In the very next slide from Deutsche Bank's presentation, displayed below, the false impression is given that the Special Committee succeeded in obtaining a revised merger price at the unique time (i.e., the "sweet spot") in which AmTrust was trading above its peers.  In fact, the slide, which reflects only a three month window that started only after the Company's substantial stock drop, does not account for the several immediate preceding years in which AmTrust substantially *outperformed* its peers.  This brief three-month snapshot is troubling in that it appears to intentionally mask the fact that AmTrust's low stock price was historically uncharacteristic:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



247.   The chart also reflects that (at least compared to AmTrust) there had

been minimal stock movement by AmTrust's peer companies over the past several

years (in fact, the industry peers had slightly outperformed the S&P 500).  This fact

calls into question the Special Committee's repeated decisions (as described more

fully *infra*) to request downward projections to reflect "adverse industry trends."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

248.   The viewer of this slide should also bear in mind that only two months earlier—on November 9, 2017 (when Zyskind was already engaging in discussions to take the Company private), Zyskind assured public investors that AmTrust's stock price was not indicative of the Company's fair value.

249.   Only then, on January 9, 2018—following receipt of the proposal, two months after Zyskind first disclosed his interest in taking AmTrust private, and after squandering the opportunity to leverage the Waiver—did the Board take action to officially form a special committee consisting of DeCarlo, Fisch, Gulkowitz and Rivera (the "Special Committee"), as described above.   Despite the fact that the Board's resolution at its December 28, 2017 meeting expressly authorized the limited special committee to consider "other strategic alternatives available to the Company" in addition to a potential transaction with Stone Point and the Karfunkel-Zyskind Family, the resolution provided by the actual Special Committee and approved by the Board the following day on January 9, 2018 severely restricted the Special Committee's authority, authorizing it only to "consider any proposal from the [Control Group] or any other bidder affiliated or working with the [Control Group] to acquire all or a material portion of the outstanding common stock of the Company or enter into any business combination transaction with the Company." (AFSI_220FDP_1224).  Neither the January 8, 2018 committee meeting minutes nor the Proxy identify the reasons for the Special Committee's decision to severely

-102-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

restrict its authority.  The resolution appointed DeCarlo as chair of the Special Committee.  On November 9, 2017, AmTrust stock opened at $11.78 and closed at $10.90.

250.  The four directors appointed to the Special Committee were not independent for purposes of satisfying the requirement that a controller's takeout offer be conditioned on approval by a fully independent committee to shift the applicable standard of review, as alleged in detail below.

251.  The Special Committee's mandate was extremely limited.  Despite its original authorization to consider other strategic alternatives available to the Company, the Special Committee, seemingly of its own accord, was now only authorized to consider offers if they were made by or with the Control Group.  The Special Committee was not authorized to consider, for example, other business combinations with, or investments by, third parties, despite that the Board had previously been informed that there existed third parties interested in pursuing a strategic transaction with the Company.

252.  In connection with these discussions, on January 9, 2018, Stone Point and the Karfunkel-Zyskind Family—*i.e.*, Zyskind, G. Karfunkel and L. Karfunkel— entered into a joint bidding agreement (the "JBA").  Notably, the exclusivity provisions of the JBA precluded the parties from working with any other person or entity, which like the Special Committee's choked mandate, served to effectively

-103-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

foreclose the Company from pursuing alternative transactions.  Indeed, Section 5 of

the JBA provides that:

> No Party shall negotiate or initiate or continue discussions with (a) any
> other person or entity or otherwise solicit, encourage (including by
> providing any information to), or enter into any agreement (written or
> oral) with, any other person or entity relating to the acquisition of all or
> any material part of AmTrust, its subsidiaries or any material portion of
> the AmTrust and its subsidiaries' assets[.]

253.  On January 9, 2018, the Special Committee determined to engage

Deutsche Bank as its financial advisor. According to the Proxy, the Special

Committee approved the retention of Deutsche Bank "approximately one week"

before purportedly receiving a disclosure letter from Deutsche Bank describing the

relationships between Deutsche Bank, on the one hand, and the Company, Stone

Point, and the Karfunkel-Zyskind Family, on the other.  Proxy at 24.[22]

254.  The Proxy states that "[i]n the late afternoon of January 9, 2018," *id.*,

the MBO Group submitted a letter to the Board containing the Initial Proposal to

take AmTrust private at $12.25 per share (the "Proposal Letter"). The Proposal

Letter contemplated a merger of AmTrust with a wholly-owned subsidiary of an

acquisition vehicle formed by the MBO Group.  The Proposal Letter also assumed

that the proposed transaction would include the roll-over of shares held by the

---

[22] The Proxy does not disclose the contents of the Disclosure Letter, and the
Company did not produce the Disclosure Letter as part of the 220 Documents despite
Plaintiffs' specific request.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

Karfunkel-Zyskind Family, including those shares acquired in the Private Placement, as well as an additional cash contribution by the Karfunkel-Zyskind Family into the acquisition vehicle.

255.   Later that evening of January 9, 2018, the Board met to discuss proposed Special Committee resolutions setting forth the Special Committee's powers and mandate.  Despite the Proxy's assertion that the Proposal Letter was submitted to the Board earlier that day, the minutes from this meeting make no reference to the Initial Proposal or the Proposal Letter.  Instead, the minutes merely state that the purpose of the meeting was to adopt the proposed Special Committee resolutions.  At the conclusion of the meeting, the full Board approved the proposed Special Committee resolutions.

256.   The following day, on January 10, 2017, the Board's receipt of the Proposal was disclosed to the public.  Stone Point and the Karfunkel-Zyskind Family announced that their going private Proposal would allow "Amtrust to focus on the long term without the emphasis on short-term results," which was consistent with management's statement that the fair value of AmTrust common stock was not reflected in its trading price.

257.  In the wake of this news, an analyst from SunTrust Robinson Humphrey Inc. ("SunTrust") identified a price target of $16.00 for AmTrust.  The analyst also included the following Industry Valuation Comparison, which

-105-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

demonstrates that AmTrust's price/earning ratio ("P/E Ratio") and price-to-book ratio ("P/B Ratio") were *far* below the P/E Ratio and P/B Ratio for comparable companies, and  absent some compelling reason why AmTrust's fundamentals were significantly inferior to the comparable companies,[23] suggests that the market was significantly undervaluing AmTrust's stock:

**Figure 1:  P&C Industry Valuation Comparison**

| Ticker | Company Name | 2016 P/E | 2017E P/E | 2018E P/E | P/B |
|--------|--------------|----------|-----------|-----------|-----|
| *Specialty P&C:* | | | | | |
| AFSI | AmTrust Financial Services Inc.* | 5.2x | 13.0x | 9.4x | 0.8x |
| HIG | Hartford Financial Services Group, Inc. | 16.3x | 17.7x | 12.9x | 1.1x |
| TRV | Travelers Companies, Inc. | 13.1x | 19.5x | 13.0x | 1.5x |
| AIZ | Assurant, Inc. | 22.2x | 28.4x | 14.1x | 1.3x |
| AFG | American Financial Group, Inc. | 17.9x | 17.8x | 14.6x | 1.8x |
| JRVR | James River Group Holdings Ltd | 14.9x | 16.1x | 12.5x | 1.5x |
| EIG | Employers Holdings, Inc. | 16.8x | 17.7x | 17.6x | 1.5x |
| AMSF | AMERISAFE, Inc. | 14.7x | 19.0x | 19.9x | 2.3x |
| WRB | W. R. Berkley Corporation | 20.2x | 28.6x | 19.3x | 1.5x |
| NAVG | Navigators Group, Inc. | 20.6x | 54.0x | 18.6x | 1.2x |
| KNSL | Kinsale Capital Group, Inc. | 35.5x | 38.4x | 26.0x | 4.2x |
| PRA | ProAssurance Corporation | 22.5x | 26.9x | 24.8x | 1.6x |
| RLI | RLI Corp. | 28.4x | 39.2x | 28.2x | 3.0x |
| MKL | Markel Corporation | 35.8x | 201.9x | 35.4x | 1.7x |
| **Average:** | | **20.3x** | **38.4x** | **19.0x** | **1.8x** |
| **Median:** | | **19.0x** | **23.2x** | **18.1x** | **1.5x** |

*\*Valued at $12.25 proposed takeout price*
*Source: FactSet, SunTrust Robinson Humphrey Estimates*

SunTrust Robinson Humphrey Inc., *Management-Led Takeout Proposed* (Jan. 9, 2018).

258.   As described herein, Deutsche Bank, the Special Committee's financial advisor, made similar findings with respect to AmTrust and its peers.

---

[23] Deutsche Bank's benchmarking analysis indicates that, if anything, AmTrust's fundamentals were in line, or better, than the comparable companies.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

259.   Similarly, on January 12, 2018, when AmTrust stock was trading at $12.55, Compass Point Research & Trading, LLC ("Compass Point") identified a price target of $15.00, noting that "the decision to take AFSI private leads us to the assumption that short-term headlines may create more headaches for management, but long-term, the upside is obviously higher.  Otherwise it is unlikely private equity firm Stone Point Capital (with many investments in the insurance space) would have teamed up with AFSI family insiders to take the company private." Compass Point Research & Trading, LLC, *Market Assumes Offer Could Rise…But By How Much?* (Jan. 12, 2018).

260.   In fact, the *modus operandi* of most private equity firms—and Stone Point is no exception—is to identify companies they perceive to be undervalued, and acquire them through taking advantage of market timing, which Stone Point and the Karfunkel-Zyskind Family were able to do here, but without the inconvenient possibility of having to compete with other potential bidders.

261.   Compass Point noted that a higher offer of $13.50 (the consideration ultimately reflected in the initial Merger Price) "still represents more than 40% upside to Stone Point and the investor group," observing that several large transactions by AmTrust in 2017 had "strengthened [the Company's] capital position" and that AmTrust "maintains a competitive advantage on the expense side of their operations within the small commercial Workers Comp business through

-107-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

their IT platform, as well as being a leader in the Warranty business," which Compass Point identified as "long term upsides," given its belief that the market for both Workers Comp and warranty products would be expanding.

### 3.   The Special Committee Was Conflicted

262.   The four directors appointed to the Special Committee were not independent.  Thus, for that reason alone, the Defendants must bear the burden to prove that the Transaction was entirely fair to AmTrust's public stockholders.

263.   *First*, DeCarlo appears to make his livelihood serving companies affiliated with the Control Group.  DeCarlo has served as a close associate and trusted advisor of M. Karfunkel and Zyskind for nearly 20 years—dating back to before they had even entered the insurance industry.  DeCarlo recently testified that Zyskind and M. Karfunkel had personally appointed him to upwards of 20 boards of directors and that he has *never* voted against a related-party transaction involving the Karfunkel-Zyskind Family.

264.   Further, discovery in the Cambridge Derivative Action has established that DeCarlo, Gulkowitz, and Fisch—a majority of the Special Committee—are fundamentally incapable of exercising appropriate independent judgement in the context of conflicted transactions involving members of the Karfunkel-Zyskind Family.  As described at length above, the Tower Transaction was riddled with conflicts, and yet DeCarlo and Gulkowitz to this day insist that neither M. Karfunkel,

-108-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

nor G. Karfunkel, nor Zyskind *ever* harbored any conflict of interest in connection with the Tower Transaction.  DeCarlo, moreover, voiced a fundamentally distorted view of the nature of conflicts of interest.  He testified that, essentially, there can be no conflict in a transaction if the transaction appears to be a good deal for the Company—even if the only person telling you it is a good deal is conflicted.

265.   In addition to his role in facilitating misconduct by the Control Group at AmTrust, he has served as a director of NGHC, which is another Karfunkel creation and continues to be operated as another branch of the Karfunkel Family of companies, currently by its CEO, Barry Karfunkel.  DeCarlo has served as a director of NGHC since its founding and he serves on the boards of three other NGHC subsidiaries by virtue of his relationship with the Karfunkels: National Health Insurance Company, Imperial Fire and Casualty Insurance Company and Century-National Insurance Company.  DeCarlo is also a director of "several of [AmTrust's] subsidiaries."  In 2017, DeCarlo earned a total of $318,086 from his service on the AmTrust Board and another $118,395 from his NGHC board service.   As acknowledged by the Court, the transactions at issue in the Cambridge Derivative Action involved DeCarlo taking part in transactions involving "obvious conflicts of interest."  DeCarlo is not independent of the Control Group.

266.   Moreover, DeCarlo is named as a Defendant and faces a substantial likelihood of liability in both the Cambridge Derivative Action and Accounting

-109-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Derivative Action.  Therefore, he sought to personally benefit from the Transaction by attempting to deprive the Plaintiffs in those derivative actions of standing to continue prosecuting those actions.  This conflict was partially recognized by AmTrust and DeCarlo as he "recused himself from all discussions and decisions made by the Special Committee in respect of the Cambridge Derivative Action." Proxy at 31.  However, this was woefully insufficient as he participated in all deliberations that did not directly reference the Cambridge Derivative Action, despite the fact that those deliberations, and ultimately his approval of the Transaction, resulted in his receipt of unique benefits through the dismissal of those derivative actions.

267.  *Second*, Gulkowitz served as a director on the Company's Board since 2006 and was also a director of several AmTrust subsidiaries.  The Karfunkel-Zyskind Family, through the Hod Foundation (which they control), owns a 10% interest in a fund managed by Brookville, the firm founded by Gulkowitz and of which he remains a partner.  Gulkowitz also served on the advisory board of Gryphon Investors when its portfolio company, Orchid Underwriters, entered into a partnership with a subsidiary of NGHC.

268.  Gulkowitz has significant ties to Deutsche Bank and its affiliates. Gulkowitz previously served as a Senior Managing Director and member of the partners' management group at Bankers Trust, an investment bank, before it was

-110-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

acquired by Deutsche Bank in 1999. Following the acquisition, Gulkowitz remained at Deutsche Bank, where he served as Chief Global Strategist for Corporate Finance. Gulkowitz's prior affiliations with Deutsche Bank AG raise serious questions as to whether he could act impartially and independently when selecting the Special Committee's financial advisor. Neither the Proxy nor the 220 Documents indicate that Gulkowitz's affiliations with Deutsche Bank were disclosed to the Special Committee.

269.   Moreover, Gulkowitz is named as a Defendant and faces a substantial likelihood of liability in both the Derivative Actions. Therefore, he sought to personally benefit from the Transaction by attempting to deprive the Plaintiffs in those derivative actions of standing to continue prosecuting those actions.

270.   *Third*, Fisch served as a director on the Company's Board since 2010, as well as a director of at least 20 of AmTrust's subsidiaries. Based on public disclosures by AmTrust and her deposition testimony in the Cambridge Derivative Action, a material portion of Fisch's annual income is derived from these director fees. In addition, Fisch has long-standing ties to Zyskind during her time at Willis, and owes her current directorships at AmTrust and its subsidiaries to Zyskind. Fisch was not independent of the Control Group. Further, Fisch testified in the Cambridge Derivative Action that she has voted on approximately 20-30 related-party transactions involving the Karfunkel-Zyskind Family and has never voted against

-111-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

any such transaction.  Nor was she aware of any other Board member having ever voted against any such transaction.

271.   Furthermore, neither DeCarlo nor Gulkowitz testified that Fisch ever raised concerns regarding any conflict of interest despite the web of such conflicts. Before approving the Tower Transaction, Fisch, like DeCarlo and Gulkowitz, never identified any conflict of interest, never considered alternatives, never considered hiring outside advisors, did not ask for more time, and was content to rely solely on a presentation by the conflicted Zyskind.  Moreover, Fisch is named as a Defendant and faces a substantial likelihood of liability in both the Derivative Actions. Therefore, she sought to personally benefit from the Transaction by attempting to deprive Plaintiffs in those derivative actions of standing to continue prosecuting those actions.

272.   Moreover, Fisch is named as a Defendant and faces a substantial likelihood of liability in both of the Derivative Actions.  Therefore, she personally benefits from the consummation of the Transaction if the Plaintiffs in those derivative actions lose standing to continue prosecuting those actions.[24]

---

[24] The final member of the Special Committee, Defendant Rivera, is also named as a Defendant and faces a substantial likelihood of liability in the Accounting Derivative Action.  Therefore, he too personally benefits from the consummation of the Transaction if the Plaintiffs in that action lose standing to prosecute the same.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

273.   *Further*, each of DeCarlo, Fisch, and Gulkowitz were incapable of independently and disinterestedly valuing the Derivative Claims. Each was a defendant in the Derivative Actions and each faces a substantial likelihood of liability for breaches of fiduciary duty in their own right. Indeed, DeCarlo—the Chairman of the Special Committee—effectively admitted as much when he belatedly recused himself from "all discussions and decisions made by the Special Committee in respect of the Cambridge Litigation." While the January 8, 2018 Special Committee meeting minutes indicate that the Special Committee determined that each individual was independent with respect to a potential transaction proposal submitted by the Karfunkel-Zyskind Family and Stone Point, the Special Committee failed to consider the obvious and disabling conflicts of DeCarlo, Fisch, Gulkowitz as defendants in the Cambridge Derivative Action.  In its resolutions forming the Special Committee, the Board resolved to compensate the members of the Special Committee (a) $20,000 per month up to the time a definitive proxy or offer to purchase was mailed, (b) thereafter, $10,000 per month until closing, and (c) $1,000 per hour in connection with time spent "in connection with any dispute, litigation, claim, proceeding or obligation" arising out of a transaction.  Knowing that this transaction, which was the result of an improper process and was riddled with conflicts, would be the subject of litigation, the Board ensured that the Special Committee would be further enriched to the tune of $1,000 per hour in connection

-113-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the litigation and would actually have an incentive to approve a transaction that resulted in litigation.

274.   The result of these conflicts was an unfair process (and unfair price) where the Special Committee acted like a controlled board and did everything it could to justify bowing to the Control Group's wishes, including repeated downward revisions to the Company's projections.

> **4.   Given Its Capture by The Karfunkel-Zyskind Family, the Special Committee Unsurprisingly Ignores Its Informational Vacuum to Justify the Transaction and Blesses the Unfair Transaction**

275.   According to the 220 Documents, the projections provided to the Board at its December 21, 2017 meeting represented Company's management's best estimates as to the Company's future performance and which were a product of the Company's ordinary course planning and were provided to potential suitors, including Stone Point, interested in pursuing a potential transaction with the Control Group (the "Ordinary Course Projections").  Once the Control Group obtained a strategic partner in Stone Point, these projections would be repeatedly pushed downward over the course of the "negotiations" that followed the Initial Proposal to help justify the preordained endorsement of the MBO Group's proposal.

276.   According to the Proxy and 220 Documents, the Company's management, together with BOA, created the Ordinary Course Projections during

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the Company's annual budgeting process.  In fact, the financial planning process had been redesigned to be even more robust after the current CFO took office in mid-2017.  The individual business units provided their expertise on the budgets and projections pertaining to their units, which were then rolled up into a consolidated set of projections.  This process was subject to several layers of review and approvals, culminating in a meeting of business executives in November and specific approval by Karkowsky and Defendant Zyskind.  These projections were then "accelerated and finalized" on December 20, 2017 with the help of BOA, the Company's financial advisor on the Fee Business Sale, "in light of the discussions with potentially interested parties," and were subsequently shared with Stone Point and others.  Despite this rigorous process of constructing and validating the Ordinary Course Projections, once the process of selling the Company to the Control Group began in earnest, the Special Committee and management determined to set aside the Ordinary Course Projections and instead rely on newly created projections that were crafted to justify the Transaction.

277.  The Proxy claims that the Special Committee met on January 16, 2018 to discuss, among other things, the Initial Proposal and the Ordinary Course Projections.  Proxy at 27-28. With regard to the Ordinary Course Projections, the Proxy states that:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

> After discussion, the Special Committee determined that the Budget Projections were no longer current, and that updated projections from Company management would be necessary because, among other things, the Budget Projections were prepared before the enactment of the Tax Cuts and Jobs Act of 2017 and did not take into account subsequent transactions involving the Company or the Company's latest expectations regarding operating results for the fourth quarter of 2017 and the full year 2017.

*Id.* The minutes from the January 16, 2018 telephonic Special Committee meeting, however, do not evidence any such discussions or determinations.

278.   The Proxy indicates that Deutsche Bank and BOA met with Zyskind's right-hand associate, Karkowsky, on January 23, 2018 to conduct a due diligence overview of AmTrust.  Proxy at 28. In connection with the Special Committee's purported determination that the Ordinary Course Projections were outdated, the Proxy states that:

> Mr. Karkowsky orally provided representatives of Deutsche Bank and representatives of [BOA] with Company management's current estimates of the future operating and financial performance of the Company, and advised that management's assumptions upon which the Budget Projections were based, had changed as a result of developments in the fourth quarter of 2017 that were not contemplated in the preparation of the Budget Projections.

*Id.* Thereafter, the Proxy indicates that Karkowsky agreed that AmTrust management would provide updated projections "to reflect those items not contemplated in preparation of the Budget Projections." *Id.*

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

279.   According to the Proxy, the following day, January 24, 2018, AmTrust management provided the Special Committee and Deutsche Bank with Company management's updated financial projections, which were downwardly adjusted from the Ordinary Course Projections (the "Case 1 Projections").  Proxy at 28.

280.   On January 29, 2018, the Special Committee met telephonically with Deutsche Bank and Willkie Farr to request yet another set of downwardly-adjusted projections. Specifically, the Proxy states that the Special Committee and Deutsche Bank "noted that the Case 1 Projections were inconsistent with financial analysts' consensus estimates for the Company and the Company's peer group," and "did not appear to reflect certain adverse industry trends and Company issues discussed with the Company management at a January 23, 2018 Audit Committee meeting."[25]

281.   The Proxy further claims that DeCarlo and representatives of Deutsche Bank spoke again with Karkowsky the following day, January 30, 2018, about the Case 1 Projections.    Proxy at 29.  Apparently after realizing the Case 1 Projections would still not justify the unfairly low price sought by the MBO Group, Defendant DeCarlo specifically requested revised financial performance projections reflecting

---

[25] Curiously, the January 29, 2018 Special Committee meeting minutes do not evidence any such discussions or conclusions. And, despite Plaintiffs' specific request, the Company did not produce the January 23, 2018 Audit Committee meeting minutes as part of the 220 Documents.  The Proxy does not disclose any further information about this meeting.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

both negative industry trends and negative operational and reputational issues specific to the Company. Purportedly, DeCarlo "noted the Special Committee's discussions regarding whether the Case 1 Projections were inconsistent with adverse industry trends and recent issues at the Company discussed during the January 23, 2018 Audit Committee meeting,"[26] and "requested, on behalf of the Special Committee, that Company management prepare an alternate case of financial projections to reflect such trends and issues." *Id.* DeCarlo's request—which is not referenced in Special Committee meeting minutes—marked the second time in two weeks that the Special Committee sought downwardly-adjusted projections from the Company. The Special Committee was purportedly formed to advance the interests of AmTrust's public stockholders. Accordingly, it should have been focused on securing the highest possible take-out price. Instead, it appears that the Special Committee acted to *drive down* the take-out price by proactively rejecting management's projections as too high and seeking downwardly revised projections. Simply put, the Special Committee was effectively negotiating *against* the interests of the stockholders it was supposed to be representing—something that would be inexplicable but for the Special Committee members' conflicts of interest.

---

[26] Plaintiff specifically asked that the Company provide the meeting minutes from the January 23, 2018 Audit Committee meeting; however, the Company did not produce the minutes as part of the 220 Documents.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

282.    The following day, January 31, 2018, AmTrust management responded to the Special Committee's request for downwardly-revised projections by providing the Special Committee and Deutsche Bank with a new set of projections (the "Case 2 Projections"). The Proxy claims that the Case 2 Projections "reflect[ed] a more challenging operating environment[,] reputational and business pressures faced by the Company, slower growth, more conservative projected underwriting assumptions reflecting recent loss reserve activity and a more conservative balance sheet in light of the rating agency placing the Company under review with negative implications." Proxy at 29.

### 5.    Zyskind and AmTrust Management Manipulate the Special Committee's Valuation Through Threats of a Ratings Downgrade

283.    On February 1, 2018, the Special Committee and Deutsche Bank held a telephonic meeting and were joined by "Company management"—namely, Zyskind, Karkowsky and Deputy CFO Zachary Wolf (Karkowsky's right-hand associate in connection with the negotiation of the Tower Transaction)—to discuss the Case 1 Projections and Case 2 Projections.  According to the meeting minutes, the discussion concerned, among other things, the background of the preparation of the Case 1 Projections and Case 2 Projections, bases, models and assumptions used in these projections, the status of the Company's reserves, and the status of the Company's relationship with reinsurers, regulators and rating agencies.

-119-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

284.   The Special Committee met in person on February 5, 2018.  At this meeting, Deutsche Bank presented its preliminary financial analyses utilizing the Case 1 Projections and Case 2 Projections, the latter of which contained significant downward adjustments purportedly predicated on "the rating agency placing the Company under review with negative implications." At the February 5, 2018 meeting, Deutsche Bank also discussed the status of the Company's fourth quarter 2017 financial results, as well as the anticipated timing of the audit by KPMG, AmTrust's auditor.

285.   The Special Committee met telephonically on February 7, 2018. According to the Proxy, after noting a purported lack of "'in-bound' inquiries from third parties related to a potential alternative acquisition or other strategic transaction proposals" (which the Special Committee was not authorized to consider anyway) and, previously, the Karfunkel-Zyskind Family's unwillingness to sell its shares in connection with a third-party transaction, the Special Committee directed Deutsche Bank to provide Stone Point and the Karfunkel-Zyskind Family with a counterproposal of $17.50 per share.  Proxy at 30.

286.   The Proxy states that, on February 8, 2018, Deutsche Bank communicated the $17.50 per share counterproposal and "reviewed certain valuation analyses" supporting this proposal.  Proxy at 30. Notably, the $17.50 per share counterproposal was predicated on a discount dividend model contained in the Case

-120-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

1 Projections that was actually upwardly adjusted from the relevant figures contained in Deutsche Bank's February 5, 2018 preliminary presentation.

287.   The Special Committee met telephonically later that day on February 8, 2018. While the Proxy states that the Special Committee "directed" Deutsche Bank to meet with representatives of Stone Point and the Karfunkel-Zyskind Family to further discuss the counterproposal, Proxy at 30, the minutes from the Special Committee's meeting indicate that Deutsche Bank informed the Special Committee that it was already "in the process of scheduling a follow-up meeting" with Stone Point and the Karfunkel-Zyskind Family.

288.   The Proxy states that, on February 11, 2018, Deutsche Bank met with representatives of Stone Point, the Karfunkel-Zyskind Family, and BOA.  The Proxy further indicates that Karkowsky also attended this meeting and provided an "update…on the Company's anticipated 2017 fourth quarter and full year 2017 financial results."  Proxy at 30.  The Proxy does not disclose the substance of what Karkowsky conveyed at this meeting.  Although not disclosed in the Proxy, the minutes from a Special Committee meeting held later that day indicate that Deutsche Bank's discussion with Karkowksy also included "recent correspondence between the [SEC] and the Company," and "preliminary reports on the 2018 Q1 financial results."

-121-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

289.   Three days later, on February 14, 2018, the Special Committee held a meeting with "certain representatives of Stone Point and the Karfunkel-Zyskind Family," as well as Karkowsky and representatives of BOA, to discuss the Special Committee's counterproposal. The meeting minutes indicate that the meeting was called at the request of the Karfunkel-Zyskind Family and Stone Point.  According to the minutes, James Carey ("Carey") of Stone Point explained "Stone Point's position in respect of the [potential going-private transaction], including Stone Point's views on the Company's financial position and the effect that the [going private transaction] could have on the Company's rating by A.M. Best Company." Meanwhile, Zyskind "explained the Karfunkel-Zyskind Family's view on the [potential going-private transaction]," and Karkowsky provided an update on "the status of the 2017 Q4 financial statements and when they would be available."  While not reflected in the meeting minutes, the Proxy nevertheless indicates that Stone Point and the Karfunkel-Zyskind Family expressed their intent to submit a revised proposal within the range of $12.85 to $12.90 per share.  Proxy at 31.[27]

290.   According to the Proxy, sometime prior to February 16, 2018, the Special Committee requested that "Company management provide a determination

---

[27] A Deutsche Bank presentation dated February 26, 2018 indicates that the "Buyer Group increase[d] offer to $12.90" on February 15, 2018, but neither the Proxy nor 220 Documents evidence that the Special Committee was apprised of this offer or discussed it during its meetings.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

as to which financial projections represented management's best current estimates of the future financial performance of the Company"—that is, the Case 1 Projections or the Case 2 Projections.  Proxy at 31. The Proxy states that, in response to this inquiry, "management" informed the Special Committee on February 16, 2018 that "in light of developments that had become apparent since the Case 1 Projections were prepared," the more extreme Case 2 Projections were a better estimate of the Company's expected financial performance.  *Id.*

291.   The only relevant "development" that occurred between the preparation of the Case 1 and Case 2  Projections was that, on February 14, 2018, the MBO Group indicated that they would reject the Special Committee's counterproposal and revert with an offer of $12.85–12.90 per share.

292.   The Proxy indicates that on February 18, 2018, the Special Committee met with "Company management" to further discuss the latter's view on the Case 2 Projections.  The Special Committee specifically inquired as to "what the impact would be on the Case 2 Projections if the Company's insurance company subsidiaries' ratings were downgraded to below an 'A' and/or the Company's 2017 year-end results when finalized were worse than Company's management's current expectations regarding such results[.]"  Proxy at 31.   According to the Proxy, Karkowsky stated that the Company's projections would be revised lower from the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 2 Projections.[28]  *Id.*  At the direction of the Special Committee, AmTrust's management then prepared yet another set of financial projections (the "Special Committee Case Projections") with still more aggressive negative assumptions concerning loss ratios, net investment yield, capital return, and anticipated premium growth.  Proxy at 32.

293.   The same day it was provided with the Special Committee Case Projections, the Special Committee delivered a revised counteroffer of $15.10 per share to the MBO Group, despite receiving no formal rejection of the $17.50 per share counteroffer, *see* Proxy at 32, but rather a shakedown from the Karfunkel-Zyskind Family, Stone Point, and Karkowsky at the February 14, 2018 Special Committee meeting.  *See* Proxy at 30-32.  The MBO Group rejected the $15.10 per share counteroffer on February 23, by countering at $13 per share.  Proxy at 32.  The MBO Group also rejected the inclusion of a "go shop" period, during which the Company would have been permitted to solicit potential acquirers, and of a voting agreement requiring the Control Group to vote in favor of any superior proposal from a third party.  Proxy at 33.

294.   After discussing the events of February 21, 2018, the Proxy indicates that, "over the next several days," the Special Committee, Deutsche Bank and

---

[28] The Company did not produce any minutes from a February 18, 2018 Special Committee meeting in the 220 Productions.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Willkie Farr met with the "Company's management" to discuss the delay in the filing of the 2017 10-K and "the Company's discussions with the rating agency"—presumably, A.M. Best.  Proxy at 31.  During these discussions, the Proxy states that "***Company management*** indicated that, given the status of the year-end audit process," it was possible that the Company would not meet the March 1, 2018 deadline by which to timely file its 2017 10-K, but that it expected to make said filing by March 16, 2018, the new deadline if AmTrust sought an extension under Rule 12b-25 of the Exchange Act ("Rule 12b-25").  *Id.*

295.   The February 25, 2018 Special Committee meeting minutes further state that the Special Committee discussed outstanding issues in the draft merger agreement and that the Special Committee directed Deutsche Bank to request that the Company provide it with 1) the current draft of the 2017 10-K; 2) a draft of the Company's Q4 2017 financial statements; and 3) yet another set of downwardly-adjusted financial projections based on the scenario that the Company's rating was downgraded by A.M. Best (the "Downside Projections").  The real design of the Downside Projections was to make the Special Committee Case Projections look more reasonable than they actually were.

296.   According to a Deutsche Bank presentation dated February 26, 2018, the Downside Projections specifically "reflect[ed] consequences of a delayed 10-[K] filing and a potential ratings downgrade by A.M. Best[.]"  This was a farce.  The

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Special Committee knew that A.M. Best had only put the Company's rating under review until it filed its full year 2017 results and completed the Fee Business Sale. Moreover, the Special Committee knew that the Fee Business Sale would be consummated by the end of February 2018 and the Company would file its 2017 10-K after a brief fifteen-day extension.  If it had simply waited for these events to happen, the market would have likely rewarded AmTrust with a higher stock price.  Thus, it appears the Special Committee manufactured illusory negative factors to, once again, drive down the Company's projections so that it could reach a deal with the Control Group before the market could begin rewarding AmTrust for its turnaround.

297.   While not mentioned in the Proxy, the February 25, 2018 Special Committee meeting minutes indicate that the Special Committee contemplated Deutsche Bank's placement of outbound calls to third parties for purposes of gauging market interest in a transaction with the Company. The Proxy and 220 Documents, however, do not evidence that Deutsche Bank ever took any such action.

298.   According to the Proxy, on February 26, 2018, the Special Committee participated in a teleconference with "the Company's management" in order "to receive an update on Company management's anticipated timing of the filing of the 2017 10-K and the Company's discussions with the ratings agency."  Proxy at 33.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

The minutes from a 5:00 p.m. meeting of the Special Committee[29] that day indicate that the teleconference participants included, among others, (1) Zyskind; (2) Karkowsky; (3) Robert Giammarco ("Giammarco") of BOA; and (4) the Karfunkel-Zyskind Family's counsel at Paul Weiss.

299.   The Proxy states that "[o]n the call, Mr. Karkowsky indicated that the Company would not be filing the 2017 Form 10-K by March 1, 2018, but that Company management currently expected to file the 2017 10-K within the 15-day grace period available under the SEC's rules but there was no certainty that the Company would be able to do so."  Proxy at 33. The minutes from the 5:00 p.m. meeting, do not, however, reflect that Karkowsky communicated such information to the Special Committee at this meeting.

300.   Moreover, while the Proxy states that "Mr. Karkowsky also advised the Special Committee that management had informed the ratings agency about the delay in the filing of the 2017 10-K," Proxy at 33, the minutes from the 5:00 p.m. Special Committee meeting reveal that Karkowsky *and* Carey of Stone Point participated in this meeting with A.M. Best.  The minutes from the meeting also do not reflect that Karkowsky advised the Special Committee of his discussions with

---

[29] While not referenced in the Proxy, the 220 Documents indicate that the Special Committee actually met at 11:00 a.m. The minutes from the 11:00 a.m. meeting merely state that its purpose was to discuss the Transaction and provide no information regarding the substance of this meeting.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.M. Best about the delay in the filing of the 2017 10-K.  Indeed, the minutes vaguely state that Karkowsky "summarized" the call with A.M. Best, "during which the representatives of AM Best informed the Company that AM Best was 'going to committee to consider ratings action' on the Company."  Neither the Proxy nor the 220 Documents evidence that the Special Committee or any of its advisors contacted A.M. Best to verify such information.

301.   Furthermore, according to the Proxy, this marked the second time that the Karfunkel-Zyskind Family and Stone Point met with a ratings agency.  The Proxy indicates that on January 9, 2018, certain unidentified "representatives of Stone Point and the Karfunkel-Zyskind Family" attended a meeting with a "ratings agency"—again, presumably A.M. Best—at which time they made a "confidential presentation" advising the agency that they were considering a potential going-private transaction with the Company.  Proxy at 24.  Neither the Proxy nor the 220 Documents provide any additional information regarding this meeting. By all measures, Stone Point and the Karfunkel-Zyskind Family were heavily involved in and influenced the Company's interaction with A.M. Best.

302.   The meeting minutes further indicate that Zyskind, Karkowsky, Giammarco and Givertz left the call and the Special Committee then proceeded to discuss the Special Committee Projections with Deutsche Bank.  The presentation prepared by Deutsche Bank for that meeting reflect that, in addition to the draft of

-128-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the 2017 10-K, fourth quarter financial statements, and Downside Projections, the Special Committee and/or its advisors purportedly requested a "back-up plan" and the "presentation/ talking points in the A.M. Best discussion on Feb 26th, 2018[.]" The Special Committee then determined to make a counter-offer of $14.00 per share.

303.   The Proxy suggests that, sometime after the 5:00 p.m. Special Committee meeting but before its next meeting at 9:45 p.m. that night, Deutsche Bank communicated the $14.00 per share offer to Zyskind.  *See* Proxy at 33.

304.   The Proxy further indicates that, "in order to induce Stone Point [] to support a transaction at a higher price," the Karfunkel-Zyskind Family agreed to a deal modification, including an agreement to cause the Company to pay Stone Point a transaction fee of $15.0 million if the Transaction was consummated.  Proxy at 33. The Proxy indicates that Stone Point and the Karfunkel-Zyskind Family agreed to a "best and final" offer of $13.50 per share. *See id.*  As later events revealed, this was merely bluster that the Special Committee accepted.

305.   While the Proxy claims that Zyskind relayed the $13.50 offer to the Special Committee and that the committee met on the "evening" of February 26, 2018 to discuss the offer, the minutes from the 9:45 p.m.  February 26, 2018 Special Committee meeting merely indicate that "Mr. Stynes [of Deutsche Bank] provided the Special Committee with an overview of the call with Barry Zyskind and his feedback to the Special Committee's counteroffer proposal" of ***$14.00*** per share.

-129-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

306.   The Proxy also states that at a February 26, 2018 Special Committee meeting, the committee "resolved to approve and adopt the Special Committee Case Projections," and directed Deutsche Bank to use these projections in its financial analysis. Proxy at 34.   The meeting minutes, however, do not reflect any such resolution.  Rather, the minutes indicate that the Special Committee was still without several critical pieces of information at this time including, among other things, an updated draft of the 2017 10-K and a draft of the Company's financial statements for the fourth quarter of 2017.

307.   The 220 Documents evidence that the Special Committee met twice telephonically on the following day, February 27, 2018.   According to the 220 Documents, the Special Committee met first at 11 a.m. and "discussed their ongoing review of the financial projections modeled by the Company and the potential need for additional information from the Company."   Neither the Proxy nor the meeting minutes identify the potential "additional information" that was needed from the Company at this time, nor whether it was received.

308.   The 220 Documents further evidence that the Special Committee met telephonically later that day on February 27, 2018 at 9:15 p.m. to discuss the "Revised Merger Agreement" including with respect to the "termination rights, termination fee and expense reimbursements" sought by Stone Point and the Karfunkel-Zyskind Family.

-130-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

309.   The Proxy claims that, on February 27 and 28, 2018, Willkie Farr and Skadden negotiated the terms of the merger.  One of the remaining terms subject to negotiation was a provision relating to termination rights proposed by Stone Point and the Karfunkel-Zyskind Family that would be triggered in the event that: (1) any of the Company's insurance subsidiaries is downgraded below "A"; and (2) the Company failed to file the 2017 10-K by a specified date following the 15-day grace period offered under Rule 12b-25.  Thus, while Zyskind was pressuring the Special Committee to strike a deal to stave off a purported looming ratings downgrade, he was simultaneously negotiating a way to get out of the deal in the event a ratings downgrade occurred and would not be required to pay any termination fee in such event.

310.   Throughout the entire process of negotiating the Transaction, the Special Committee lacked current financial information about AmTrust, which makes its decision to revise the projections all the more inexplicable.  It was not until February 25—just days before completing negotiations—that the Special Committee finally resolved to ask the Company's management for the current draft of the Company's Form 10-K.  The Special Committee apparently did not receive a draft of the Form 10-K until February 27, one day before it approved the Transaction.  According to a presentation provided by Deutsche Bank in connection with a February 28, 2018 Special Committee meeting, while February 28, 2018 marked the

-131-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"target transaction signing date," the Special Committee was still awaiting the receipt of "updated consolidated financials."

311.   Without accurate current financial information, the Special Committee lacked the most fundamental information necessary to engage in negotiations to sell the Company.  This is all the more true given that the counterparty with which the Special Committee was supposed to be negotiating consisted of insiders who would have superior knowledge even if the Special Committee had accurate financial statements.

312.   Again, the Special Committee could have waited for this information before agreeing to sell the Company.  But the members of the Special Committee had an interest in finalizing a sale of the Company and operated under the influence of members of the Control Group.  Accordingly, they willingly acceded to the artificial time constraints imposed by the Control Group.

313.   Further, even if the Special Committee were independent—and it was not—the Special Committee's informational vaccum rendered it fundamentally incapable of carrying out its duties to effectively represent AmTrust's minority stockholders.  The Special Committee acted in bad faith by failing to act in the face of its known duty to apprise itself of all relevant financial information and allowing the Control Group to rush it into a transaction before the Company's financial statements were current.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

314.   At 3:30 p.m. on February 28, 2018, the Special Committee met with Willkie Farr and Deutsche Bank. At the meeting, Deutsche Bank provided its views on the potential transaction.  While Deutsche Bank's fairness presentation claims that the Special Committee received "the latest draft of the 10-K" on February 27, 2017, the presentation and 220 Documents do not evidence that the Company provided to the Special Committee the "updated consolidated financials" or any of the other information requested by the Special Committee such as the talking points from the February 26, 2018 A.M. Best presentation or the "back-up plan." According to the 220 Documents, this presentation also marked the first time that the Special Committee was apprised of the $13.50 per share offer.

315.   At 5:00 p.m., AmTrust issued a press release announcing the consummation of the Fee Business Sale. In the press release, Zyskind stated that the close of the Fee Business Sale "mark[ed] a significant milestone in our efforts to unlock value and build a stronger capital base for AmTrust, while positioning both AmTrust and the U.S. fee companies for continued, profitable growth[.]"

316.   At 9:00 p.m. that day, the Special Committee met again telephonically with Deutsche Bank and Willkie Farr. The Proxy claims that the Special Committee discussed the "risks and consequences of rejecting" the proposed transaction. The Proxy further indicates that Deutsche Bank approved the $13.50 per share counteroffer provided by Stone Point and the Karfunkel-Zyskind Family.

-133-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

317.   At the conclusion of the meeting, the Special Committee purportedly approved resolutions recommending that the Board adopt draft resolutions approving the Transaction at a price of $13.50 per share. The 220 Documents, however, do not evidence an executed version of these resolutions.

318.   Sometime after the 9:00 p.m. Special Committee meeting, the Board executed resolutions approving the Transaction.

319.   The Proxy claims that shortly after midnight on the morning of March 1, 2018, the parties executed and delivered the merger agreement governing the Transaction (the "Take-Private Merger Agreement" or "Merger Agreement"). Proxy at 35.

320.   The $13.50 per share consideration represented an increase of only $1.25 from the price offered in the Acquiring Group's $12.25 proposal.  As  the below chart from Deutsche Bank's analysis demonstrates, the Special Committee obtained only 3 price "bumps" from the Acquiring Group during its short tenure:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.



321.    Later on March 1, 2018, AmTrust issued a press release announcing it had entered into the Take-Private Merger Agreement.  In the press release, Zyskind was quoted as saying: "I believe that this transaction represents an exciting step forward for AmTrust, our employees, and the agents, brokers, partners, and customers we serve. ***As a private enterprise, we will be able to focus on long-term decisions, without the emphasis on short-term results.***"

322.    Also on March 1, 2018, the Company filed a Form NT 10-K with the SEC disclosing that AmTrust was seeking relief under Rule 12b-25. The Form NT

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10-K discloses that "additional time is needed for the [Company] to complete its consolidated financial statements for the fiscal year ended December 31, 2017, and as a consequence, for [KPMG] to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K."[30]

323.   Two weeks later, on March 16, 2018, AmTrust filed the 2017 10-K within the extension period provided by Rule 12b-25, which was signed by Zyskind, Karkowsky, and each of the Special Committee members, among others.  The 2017 10-K reiterated AmTrust's "overall financial objective" of "produc[ing] a return on equity of 12.0% - 15.0% over the long term."

324.   The 2017 10-K also reemphasized the notion that 2017 was an outlier in terms of the Company's financial performance.  Indeed, the 2017 10-K stated that "[a]lthough we did not achieve our key growth and profitability measures for the year ended December 31, 2017, *we do not consider this to be a trend*," and attributed this negative performance to various unique events, such as "catastrophe losses in our Small Commercial Business segment from Hurricanes Harvey, Irma and Maria and the earthquake in Mexico, prior period adverse reserve development in all of our segments and higher professional service fees."  The 10-K assured investors that

---

[30] Shortly after the Company's announcement that it had entered into the Take-Private Merger Agreement, on March 5, 2018, Lead Plaintiffs separately issued 220 demands to inspect certain books and records of the Company in connection with the Private Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"[m]anagement believes that significant progress has been made in enhancing internal control over financial reporting through the period ended December 31, 2017." In other words, management was representing that it was addressing the risks that gave rise to the shareholder litigation commenced in 2017.

### 6. The Special Committee and Company Hire Conflicted Advisors

#### a. Deutsche Bank's Conflicts

325. The Special Committee's financial advisor, which issued a fairness opinion endorsing the Transaction, was conflicted. The Proxy disclosed that Deutsche Bank and its affiliates provided services to Stone Point and its affiliates and the Company itself (meaning its management led by the Control Group). In the preceding two years, Deutsche Bank had earned $9.7 million from services provided to Stone Point and its affiliates and $1.4 million from services provided to AmTrust and its affiliates. Deutsche Bank was incentivized to provide a fairness opinion blessing the Transaction so that it could continue to earn fees from Stone Point and the Control Group in the future. Furthermore, $6.5 million of its $8.5 million fee was contingent on the consummation of the Transaction, thus giving it a further incentive to provide its blessing to the Transaction regardless of its merits.

326. While the full extent of Deutsche Bank's conflicts is unknown at this time, several connections between Stone Point and Deutsche Bank raise serious

-137-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

questions as to whether Deutsche Bank was independent from Stone Point.  For example, Stone Point's CEO Charles Davis is a member of the Advisory Board of Deutsche Bank and earns $100,000 per year from that service.  Prior to Stone Point, Davis was a partner at Goldman, Sachs & Co., where he spent 23 years.  One of Deutsche Bank's lead bankers advising on the Transaction, Celeste Guth, is a Managing Director and Co-Head of the Global Financial Institutions Group at Deutsche Bank.  From 1986 to 2015, Guth worked at Goldman Sachs.  According to a May 23, 2018 Icahn presentation filed with the SEC, during her tenure at Goldman Sachs, Guth worked directly for Charles Davis.  Icahn also stated that he believed that "other of [Guth's] colleagues at Goldman during this time period included Stephen Friedman and Nicolas Zerbib, both of whom sit with Chuck Davis on Stone Point's investment committee."

327.  Furthermore, Deutsche Bank has a long history of advising AmTrust and NGHC. By way of example, the LinkedIn profile for Meir Lewis, a member of the Deutsche Bank team that advised the Special Committee, lists several notable transactions involving AmTrust and NGHC, including:

- "Acquisition of Direct General by National General (Jun '16)"

- "Sale of U.S. Specialty Homeowners business by QBE to National General (Sep '15)"

- "Follow-on equity offering for National General (Mar '15)"

- "Follow-on equity offering for AmTrust (Jan '15, Nov '15)"

-138-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

328.   Notably, the presentation materials provided by Deutsche Bank in connection with its January 4, 2018 meeting with the Special Committee do not identify Lewis' involvement in the NGHC-Direct General transaction, nor do the Proxy or the 220 Documents evidence that this transaction was otherwise disclosed to the Special Committee.

329.   Given Deutsche Bank's numerous ties to Stone Point and the other members of the Control Group, it is doubtful that Deutsche Bank could have recommended against this Transaction.

### b.   BOA's Conflicts

330.   The Company's retention of BOA also created conflicts. As acknowledged in the Proxy, BOA had a pecuniary interest in the Transaction and the private entity contemplated by the Transaction. Indeed, the Proxy admits that "an affiliate of [BOA]…engaged in preliminary discussions with the Karfunkel-Zyskind Family about providing debt financing in connection with the [Transaction]," and that "the Company and Stone Point have asked [BOA] to participate in a new credit facility that the Company may enter into at the closing of the [Transaction], the proceeds of which [BOA] understands will be used, among other things, to refinance the Company's convertible notes."  Proxy at 57-58.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

331.   Finally, the Company's financial advisor, BOA, has longstanding and strong ties to Stone Point and the Karfunkel-Zyskind Family. For example, the Proxy discloses that:

> The senior member of the [BOA] deal team advising the Company in connection with the [Transaction] (who we refer to in this section of the proxy statement as the "[BOA] Representative") has also participated in coverage activities and the provision of services with respect to [BOA's] relationship with Stone Point and affiliates and investees of the Karfunkel-Zyskind Family. The [BOA] Representative has had an ongoing relationship with Stone Point and its senior principals over many years and has also served as the relationship manager with respect to [BOA's] relationship with Stone Point. In addition to participating on [BOA] deal teams advising Stone Point in connection with transactions by its portfolio companies, he has also advised other parties in connection with their transactions with Stone Point and its portfolio companies. In addition, the spouse of the [BOA] Representative serves as a principal of Stone Point. The [BOA] Representative introduced Stone Point to the Company as a potential transaction counterparty in connection with the Fee Business sale process.[31]

332.   While the Proxy claims that the relationships described in the foregoing paragraph were disclosed to the Board and the Special Committee, there are a number of relationships involving BOA and its affiliates which the Proxy suggests were not disclosed to the Special Committee. Those relationships involving BOA include, but are not limited to:

- With regard to AmTrust, (i) acting as financial advisor to the Company in connection with mergers and acquisitions (including the Fee

---

[31] Proxy at 59.   Upon information and belief, the "[BOA] Representative" is Giammarco and the "spouse of the [BOA] Representative" is Jacqueline M. Giammarco, a Principal and Chief Compliance Officer at Stone Point.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Business Sale), (ii) having acted or acting as a lender to the Company, (iii) having provided or providing certain distressed and mortgage trading services to the Company, and (iv) having provided or providing certain treasury and management services and products to the Company.

- With regard to the Karfunkel-Zyskind Family, (i) having acted as a bookrunner on certain offerings of senior notes and preference shares by Maiden Holdings, (ii) currently acting (including certain senior members of the deal team advising the Company in connection with the [Transaction]) as a financial advisor to the board of directors of Maiden Holdings in evaluating strategic alternatives, (iii) having acted or acting as a lender to Maiden Holdings; and (iv) having provided or providing certain treasury and management services to, another of the Karfunkel-Zyskind Family's affiliates.

- With regard to Stone Point, (i) having acted as financial advisor to Stone Point and certain of its affiliates and portfolio companies in connection with certain mergers and acquisitions, (ii) having acted or acting as administrative agent, collateral gent, arranger, bookrunner and/or lender for Stone Point and certain of its affiliates and portfolio companies, (iii) having acted or acting as underwriter, initial purchaser and placement agent for various equity and debt offerings undertaken by Stone Point and its affiliates, (iv) having provided or providing certain foreign exchange and mortgage trading services to the Stone Point and its affiliates and (v) having provided or providing certain treasury and trade services and products to Stone Point and certain of its affiliates and portfolio companies. [32]

333. The structure of BOA's compensation in connection with the Transaction created a further conflict. The entirety of BOA's aggregate $10 million fee was contingent upon completion of the Transaction. Thus, even putting aside its deep connections to the Karfunkel-Zyskind Family and Stone Point, BOA was

---

[32] *See* Proxy at 58-59.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

financially incentivized to steer negotiations towards consummation of the Transaction.

## VI.   THE UNFAIR PROCESS YIELDED AN UNFAIR PRICE

334.   The MBO Group's initial purchase price of just $13.50 per share was unfair to the Company's minority stockholders and provoked widespread stockholder opposition.  It represented a clear attempt to take AmTrust private at an unfair price.  The Icahn bump to $14.75 per share did not result in a fair price.  It was merely enough to satisfy Icahn and enough other short term holders, many of whom likely entered their investments after the announcement of the initial proposal, to support the deal.[33]  As described herein, the Company's stock price was artificially depressed prior to the Transaction's announcement due to uncertainty created by the Company's disclosures regarding material weaknesses in its financial reporting, its loss reserves, and the restatement of its financials.

335.   The buyout price was announced in the immediate wake of troubling disclosures, locking in a rough price "ceiling" of $13.50 per share for AmTrust stock before the market could adequately evaluate the Company's prospects based on further financial reporting and the closing of the Fee Business Sale, which would

---

[33] Icahn had his own investment and tactical reasons to negotiate a quick settlement in consideration for a $1.25 price bump.  In less than one month, Icahn's investment in 18.4 million AmTrust shares netted him approximately $23 million in profits.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

have removed the overhang caused by the A.M. Best ratings review.  Defendants' own statements belie that the price could have been fair.  The ceiling likely would have held if not for vigorous public outcry against the unfairness of the $13.50 per share price.

336.   In the November 6, 2017 press release announcing a large reserve charge, Zyskind continued to emphasize the Company's financial stability and long-term growth prospects. Specifically, Zyskind observed that "[w]ith this reserving action and the transactions we have announced earlier this year and today, *we have transformed the Company's balance sheet and established the strongest capital profile in AmTrust's history*….With our large capital base and disciplined underwriting approach, we are well positioned to continue to be a leading provider of small commercial business insurance and warranty coverage globally." Meanwhile, Karkowsky noted that "[e]ven after recognizing the prior year development, primarily in accident years 2013 through 2016, our overall underwriting business was profitable."

337.   Later on November 6, 2017, the Company issued a second press release announcing that the Company found a partner for the Fee Business Sale in MDP.  In connection with the Fee Business Sale, AmTrust agreed to transfer a 51% interest in certain U.S.-based fee businesses to MDP in a transaction valued at $1.15 billion. In return, AmTrust received gross cash proceeds of $950 million and retained a 49%

-143-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

equity interest in the business. According to the November 6, 2017 press release regarding the Fee Business Sale, the transaction was approved by the Board and expected to close in the first half of 2018. BOA served as AmTrust's financial advisor in connection with the Fee Business Sale.

338.   Zyskind also touted the Fee Business Sale. Among other things, Zyskind stated that "[t]he transaction…aligns with our recent initiatives to further strengthen our balance sheet and simplify our organization, and provides us with capital to support AmTrust's meaningful organic growth opportunities."

339.   Defendant Zyskind himself stated that the decline in AmTrust's share price as of November 2017 was "***relatively short-term in nature***" and "***not indicative of an actual decline in our fair value or our reporting units' fair value***." Specifically, Zyskind signed AmTrust's Form 10-Q for the third quarter of 2017, dated November 9, 2017, which stated as follows:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, ***we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value***.

340.   Indeed, just one month earlier, on October 6, 2017, AmTrust's common stock had traded as high as $14.35 per share—$0.85 per share above the initial deal

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

price—and just three months earlier, on August 3, 2017, it had traded as high as $16.21 per share—$2.71 per share above the initial deal price.  And as recently as February 2017, AmTrust's common stock traded above $27 per share—more than twice the initial buyout price of $13.50 per share.  The proposed $13.50 takeout price was 62.0 percent below the company's all-time high closing price and 41.7 percent below the company's highest closing price in the 52 weeks before the deal was announced.

341.   Based on AmTrust's purported December 31, 2017 book value of $16.23—as calculated by the Special Committee's financial advisor, Deutsche Bank—AmTrust's predicted generation of 12-15% operating ROE would imply operating earnings per share of $1.95 to $2.44.

342.   In spite of this, even the most optimistic projections used by the Special Committee—the "Case 1 Projections"—showed the Company's operating earnings per share failing to reach even the low end of this range until 2021.  For comparison, the various sets of projections used by the Special Committee are listed below:

**Operating Earnings Per Share**

|  | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| **Special Committee Case** | 0.87 | .98 | 1.25 | 1.52 | 1.88 |
| **Case 1** | 1.21 | 1.44 | 1.71 | 1.98 | 2.28 |
| **Case 2** | 0.87 | 0.94 | 1.05 | 1.18 | 1.31 |
| **Downside Case** | 0.21 | -0.13 | 0.23 | 0.48 | 0.69 |

-145-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

343.   As such, it appears that AmTrust management created unrealistically negative projections once it realized that its goal was to take the Company private on the cheap—only to revise those projections downward even further to help justify accepting the meager offer from the MBO Group.

344.   Further, the projections used by the Special Committee and by Deutsche Bank were based on the assumption that AmTrust's best days are over, and that the Company will continue to dramatically lag its peer companies in the coming years.  However, the buyout price does not account even for the possibility of improvement, which was already occurring as exhibited by the Fee Business Sale, thus allowing insiders—who have greater knowledge of the Company's true financial picture and prospects—to capture all of the returns from any improvement in performance after they take the Company private.

345.   The creation of the absurdly pessimistic "Downside Projections" in particular had no purpose other than to make the Special Committee Case Projections appear more reasonable and thus to make the MBO Group's unfair offer look more attractive.  Specifically, the Downside Projections were based on the possibility of a ratings downgrade by A.M. Best.  But by February 27, 2018, when these "downside" projections were first presented to the Special Committee, management already knew that A.M. Best would likely not downgrade AmTrust's

-146-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ratings further. Specifically, AmTrust management knew that the reason A.M. Best was considering further ratings action on AmTrust was the late filing of its 10-K. But AmTrust management also knew that the Company *would* soon file its Form 10-K and thus that an A.M. Best ratings downgrade was highly unlikely. Indeed, the ***same day the Merger Agreement was signed***, March 1, 2018, AmTrust filed a Form NT 10-K stating that AmTrust was merely seeking a fifteen-day extension to file its Form 10-K. AmTrust then abided by this extension, filing its Form 10-K on March 16, 2018. Thus, the "Ratings Downgrade Case" has never been a realistic possibility, but rather has been used as a boogeyman to scare the Company's minority stockholders into accepting an unfair price.

346.    Indeed, as ISS—which initially opposed the Transaction—noted, while the Board's interest in pursuing a sale of the Company at such a low price "implies that the company's problems would be long lasting," in reality "the publicly available information paints a less dire picture of the company's prospects." Importantly, ISS noted, "the board did not conclude that the near-term prospects appeared dim and thus the best solution was to sell the company; its decision to begin the sale process was in response to an inquiry from a potential buyer after AmTrust's stock had fallen sharply." And because the MBO Group includes the CEO, ISS asked: ***"if he is willing to buy at this price, does that not imply that the company's challenges are not so severe?"***

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

347.   ISS further noted that the Company itself stated, in its 2017 Form 10-K, that "[m]anagement believes that significant progress has been made in enhancing internal control over financial reporting." ISS also noted that even the Special Committee's unduly negative projections show the Company's diluted operating earnings per share rising 44% between 2018 and 2020.

348.   Ironically, the Company's downwardly-manipulated projections were not enough on their own to justify a low deal price. Deutsche Bank was also forced to rely on an unrealistically high cost of equity in order to justify their low valuation of AmTrust. Specifically, Deutsche Bank used a Cost of Equity/Discount Rate range of 12-16% to justify the buyout price of $13.50 per share. In order to derive this discount rate, Deutsche Bank created a range of equity risk premiums with AmTrust's company-specific risk premium on one end and a peer-company risk premium on the other. However, Delaware courts have expressed strong preference for the use of supply-side equity risk premiums.[34] Using a supply-side equity risk premium results in a substantially lower cost of equity range of 10%-12%. Relying on the same Special Committee Case Projections used by Deutsche Bank, and

---

[34]   *See, e.g.*, *In re Orchard Enterprises, Inc.*, No. CIV.A. 5713-CS, 2012 WL 2923305, at \*19 (Del. Ch. July 18, 2012), *judgment entered sub nom. In re Appraisal of the Orchard Enterprises, Inc.* (Del. Ch. July 26, 2012), *and aff'd sub nom. Orchard Enterprises, Inc. v. Merlin Partners LP*, No. 470, 2012, 2013 WL 1282001 (Del. Mar. 28, 2013) (recognizing the Chancery Court's "default acceptance of the supply-side equity risk premium.").

-148-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

keeping all other assumptions the same as they were in Deutsche Bank's analysis (including using the same artificially low perpetuity growth rate of 1.5%), this cost of equity range implies a per-share valuation of $15.09–$18.75 (with a midpoint of $16.72), i.e. anywhere from 11.7% to 38.8% higher than the buyout price.

349.    There are further reasons to question Deutsche Bank's analysis. Among other things, Deutsche Bank's analysis is filled with inappropriate adjustments and assumptions that are driven by (1) AmTrust's currently depressed market price (which is more of a reflection of investor mistrust of Company management than it is of the underlying profitability of the Company), and (2) the many events which made 2017 an atypical year for AmTrust, such as its abnormally high reserve charges and the catastrophic losses incurred in the third quarter of 2017.

350.    Deutsche Bank's multiples analysis is also flawed. In conducting this analysis, Deutsche Bank inappropriately "discounts" median P/E multiples by 57% and 36%, and transforms what would be genuine "comps" into essentially "AmTrust" driven estimates (driven primarily by recent AmTrust pricing). Said differently, the two price-to-earnings approaches that Deutsche Bank presents are really just one approach after this non-standard discounting. Deutsche Bank also inappropriately applies these "discounts" to its calculation of price-to-book-value and price-to-tangible-book-value calculations.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

351.  In addition, Deutsche Bank's analysis incorrectly assumes that AmTrust's anomalous 2017 year is indicative of future performance during the projection period, which results in a gross undervaluation of AmTrust. As AmTrust acknowledged in its 2017 10-K, the conditions driving the Company's 2017 financial performance are not expected to continue going-forward. Deutsche Bank knew or should have known of this information and advised the Special Committee to accord little weight to the anomalous events of 2017 when conducting its valuation. Deutsche Bank, however, appears to have done the opposite and instead advised the Special Committee to consider conditions in 2017 to be typical for AmTrust going forward.

352.  Deutsche Bank also conducted a flawed dividend discount analysis that undervalued AmTrust. For example, Deutsche Bank's assumption that AmTrust will continue with its current market value to debt ratio significantly impacts all the implied valuation ranges. The assumption is entirely inappropriate on several levels, is grossly inflated from AmTrust's capital structure pre-2017, and is grossly inflated relative to AmTrust's peers. Indeed, the abnormally high market value to debt ratio is driven primarily by the current depressed AmTrust pricing.  The use of this inappropriate assumption generates significant upward bias in the cost of equity and, as a result, downward bias in all the calculated valuation ranges.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

353.   Moreoever, as ISS pointed out, Deutsche Bank improperly compared the Merger to 15 buyouts of "stressed" property and casualty insurers, even though "AmTrust's fundamental appear to be improving, which may make comparisons to 'stressed' situations not that relevant."

354.   In addition, Deutsche Bank's treatment of stock repurchases appears to fail to account for the additional value that investors will receive, aside from dividends.

355.   Specifically, in a financial supplement dated January 24, 2018, BOA, AmTrust's financial advisor, provided the Company with updated financial projections.  Those projections were thereafter forwarded to the Special Committee. As described in the Proxy:

> On January 24, 2018, Company management provided the Special Committee and representatives of Deutsche Bank with Company management's updated estimates of the future financial performance of the Company (the "Case 1 Projections"), reflecting certain adjustments to the Budget Projections as a result of the Tax Cuts and Jobs Act of 2017, recent transactions involving the Company, and updated estimates of the Company's operating results for the fourth quarter of 2017 and the full year 2017.

356.   For clarity and for completeness, AmTrust's Summary Financial Projections of the Case 1 projections from the financial supplement are displayed herein:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| | Historical | | | | 2017E | Adjustments[1] | Pro Forma | Projected | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | YTD 9/30/17 | Q4'17E | 2017E | | Pro Forma | 2018E | 2019E | 2020E | 2021E | 2022E |
| Gross written premium | $6,799.5 | $7,949.3 | $6,456.8 | $5,947.3 | $8,404.1 | – | $8,404.1 | $8,907.7 | $9,311.0 | $9,757.1 | $10,244.9 | $10,757.2 |
| % Change | 11.6% | 16.9% | 6.9% | 2.0% | 5.7% | NM | 5.7% | 6.0% | 4.5% | 4.5% | 5.0% | 5.0% |
| Net retention ratio | 62.7% | 61.0% | 60.3% | 61.5% | 60.6% | | 60.6% | 61.8% | 61.8% | 61.8% | 61.8% | 61.8% |
| Net written premium | $4,261.9 | $4,851.3 | $3,891.2 | $1,197.9 | $5,089.6 | | $5,089.6 | $5,504.4 | $5,753.7 | $6,028.4 | $6,329.8 | $6,646.3 |
| % Change | 8.2% | 13.8% | 3.0% | 4.5% | 4.9% | | 4.9% | 8.2% | 4.5% | 4.5% | 5.0% | 5.0% |
| Net earned premium | $4,021.2 | $4,668.0 | $3,796.1 | $1,310.5 | $5,106.6 | ($375.5) | $5,106.6 | $5,495.0 | $5,639.9 | $5,879.7 | $6,168.8 | $6,477.2 |
| Service and fee revenue | 345.6 | 439.0 | 389.4 | 115.6 | 505.0 | | 125.6 | 140.6 | 147.6 | 155.0 | 162.7 | 170.9 |
| Net investment income | 156.3 | 208.0 | 173.7 | 60.7 | 234.3 | 15.6 | 249.9 | 280.7 | 304.8 | 333.4 | 364.1 | 397.1 |
| Net realized gains (losses) | 8.1 | 36.5 | 56.6 | – | 56.6 | | 56.6 | | | | | |
| Corporate and other revenue [2] | 82.5 | 99.0 | 97.0 | 25.3 | 122.3 | (17.1) | 105.2 | 108.2 | 90.3 | 93.2 | 97.4 | 101.7 |
| Total revenues | $4,613.8 | $5,450.4 | $4,512.8 | $1,512.0 | $6,024.8 | ($377.0) | $5,647.8 | $5,997.6 | $6,182.6 | $6,461.2 | $6,793.0 | $7,146.9 |
| % Change | 14.8% | 18.1% | 12.0% | 6.5% | 10.5% | NM | 3.6% | 6.2% | 3.1% | 4.5% | 5.1% | 5.2% |
| Interest expense | ($55.4) | ($79.5) | ($70.7) | ($24.5) | ($95.2) | – | ($95.2) | ($95.2) | ($95.2) | ($95.2) | ($95.2) | ($95.2) |
| Income tax (expense) benefit | (38.9) | (85.3) | 61.0 | (63.1)[3] | (2.2) | (42.9) | (45.1) | (74.1) | (87.1) | (102.7) | (115.7) | (130.1) |
| Effective tax rate | 8.2% | 27.1% | 28.5% | NM | 12.2% | 5.9% | 8.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% |
| Net income to common stockholders | $419.1 | $361.1 | ($246.2) | ($533.6) | ($379.8) | $678.8 | $499.0 | $239.1 | $270.2 | $334.5 | $387.6 | $445.7 |
| Net operating income to common stockholders | $469.5 | $408.7 | $321.1 | $37.9 | $359.0 | ($107.3) | $51.6 | $243.6 | $289.9 | $343.3 | $390.9 | $441.5 |
| Return on equity (operating) | 24.4% | 17.8% | 6.5% | 6.2% | 6.5% | (4.7%) | 1.8% | 7.3% | 8.5% | 9.7% | 10.6% | 11.5% |
| Diluted EPS (operating) | $2.79 | $2.34 | $0.66 | $0.20 | $0.84 | ($0.57) | $0.27 | $1.21 | $1.44 | $1.71 | $1.98 | $2.28 |
| % Change | 3.1% | (16.0%) | (68.7%) | (8.4%) | (63.9%) | NM | (88.3%) | 340.3% | 19.0% | 19.1% | 15.5% | 15.4% |
| Loss & LAE ratio - calendar year | 66.8% | 67.2% | 82.5% | 69.3% | 79.1% | | 79.1% | 67.2% | 66.8% | 66.6% | 66.6% | 66.6% |
| Favorable (unfavorable) development | (0.8%) | (5.5%) | (11.0%) | (8.2%) | (8.2%) | | (8.2%) | | | | | |
| Loss & LAE ratio - accident year | 66.0% | 61.8% | 71.4% | 69.3% | 70.9% | 0.5% | 70.9% | 67.2% | 27.0% | 26.9% | 26.7% | 26.6% |
| Expense ratio | 24.8% | 26.4% | 27.3% | 27.2% | 27.3% | 0.5% | 27.8% | 27.0% | 26.9% | 26.8% | 26.7% | 26.6% |
| Combined ratio - accident year | 90.8% | 88.1% | 98.7% | 96.5% | 98.2% | 0.5% | 98.7% | 94.2% | 93.7% | 93.6% | 93.3% | 93.1% |
| Combined ratio - calendar year | 91.6% | 93.7% | 109.8% | 96.5% | 106.4% | 0.5% | 106.9% | 94.2% | 93.7% | 93.6% | 93.3% | 93.1% |
| NPW / Total stockholders' equity | 1.47x | 1.40x | 1.40x | 1.38x | 1.46x | (0.26x) | 1.20x | 1.28x | 1.30x | 1.33x | 1.35x | 1.36x |
| Share repurchases | 85.9 | – | – | – | – | | – | – | – | – | – | – |
| Dividends | $58.9 | $108.2 | 95.7 | 33.3 | 129.0 | | 129.0 | 144.7 | 151.9 | 157.6 | 162.5 | 166.3 |
| Total capital management | $144.7 | $108.2 | 95.7 | $33.3 | $129.0 | | $129.0 | $144.7 | $115.9 | $120.7 | $232.6 | $267.4 |
| Payout ratio (net income to common stockholders) | 20.5% | 29.8% | NM | NM | NM | | 25.9% | 66.0% | 56.2% | 60.0% | 60.0% | 60.0% |
| Investment yield | 2.48% | 2.56% | 2.47% | 2.47% | 2.47% | | 2.47% | 2.60% | 2.70% | 2.80% | 2.90% | 3.00% |
| **Balance Sheet** | | | | | | | | | | | | |
| Total cash and investments | $7,211.6 | $9,235.7 | $9,632.7 | $9,976.8 | $9,976.8 | $851.0 | $10,827.8 | $11,213.4 | $11,827.8 | $12,473.7 | $13,155.5 | $13,876.9 |
| Invested assets / Total stockholders' equity | 3.5x | 3.2x | 2.6x | 2.9x | 2.9x | (0.3x) | 2.6x | 2.6x | 2.7x | 2.7x | 2.8x | 2.8x |
| Goodwill and intangibles | $800.0 | $1,243.1 | $1,329.1 | $1,334.7 | $1,334.7 | ($474.6) | $840.1 | $790.6 | $721.4 | $714.4 | $698.1 | $672.2 |
| Loss & LAE reserves | $7,208.4 | $10,140.7 | $12,086.6 | $12,297.2 | $12,297.2 | | $12,297.2 | $12,991.0 | $13,697.5 | $14,427.1 | $15,175.5 | $15,952.2 |
| Net paid to incurred ratio | 69.4% | 87.0% | 84.0% | 93.2% | 85.0% | | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| Unearned premiums | $4,014.4 | $4,881.1 | $5,322.2 | $5,139.1 | $5,139.1 | (51.6) | $5,137.5 | $5,196.1 | $5,380.2 | $5,620.9 | $5,881.6 | $6,155.2 |
| Total debt | $1,161.0 | $1,402.9 | $1,287.7 | $1,287.7 | $1,287.7 | | $1,287.7 | $1,287.7 | $1,287.7 | $1,287.7 | $1,287.7 | $1,287.7 |
| Debt to total capitalization | 27.0% | 27.7% | 27.1% | 27.2% | 27.2% | (1.5%) | 23.7% | 23.4% | 22.9% | 22.4% | 21.8% | 21.2% |
| Common stockholders' equity | $2,241.3 | $2,599.4 | $3,684.5 | $3,532.5 | $3,532.5 | $746.9 | $3,279.4 | $3,353.9 | $3,472.2 | $3,606.0 | $3,761.0 | $3,939.3 |
| Total stockholders' equity | $2,900.2 | $3,465.6 | $3,684.5 | $3,477.6 | $3,477.6 | $746.9 | $4,224.5 | $4,298.5 | $4,416.3 | $4,549.6 | $4,704.1 | $4,881.9 |
| Book value per share (primary) | $12.74 | $13.81 | $13.26 | $12.92 | $12.92 | $3.81 | $16.73 | $17.11 | $17.71 | $18.61 | $19.77 | $21.24 |
| % Change | 22.9% | 8.4% | (4.0%) | (6.5%) | (6.5%) | | 22.1% | 2.3% | 3.5% | 5.1% | 6.2% | 7.4% |
| Tangible book value per share (primary) | $8.20 | $6.50 | $6.48 | $6.21 | $6.21 | $6.23 | $12.44 | $13.07 | $14.92 | $16.15 | $17.62 | |
| % Change | (24.1%) | (20.7%) | (33.0%) | (4.5%) | (4.5%) | | 92.4% | 5.1% | 6.5% | 7.3% | 8.2% | 9.1% |

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

357.   The particular line item at issue is the one marked "share repurchases" which reflects that the Company projected share repurchases in the terminal years of 2020, 2021, and 2022 of $43.1, $70.1, and $101.1 million.

358.   It is remarkable that management could issue projections reflecting future share repurchases, which are invariably dependent on the trading price of the common stock, *without also predicting AmTrust's trading prices during those anticipated future repurchases*.  The basis for these projected share repurchases was not disclosed to stockholders.

359.   Crucially, the Special Committee and Deutsche Bank failed to consider these share repurchases.  Rather, Deutsche Bank's analysis in its Case 1 projections, relied on the "dividends" line item, but did not include the projected share repurchases.  Analytically, the monetary effect on a company's decision to issue dividends is the same as its decision to repurchase stock.  Cash available for share repurchases is the same as cash available for dividends.  Yet the repurchases were not treated the same as dividends.  The failure to account for share buybacks in the terminal years had a significant decreasing impact on AmTrust's implied fair value.

360.   The share repurchases were deliberately placed by management and BOA into a separate line item for the Case 1 projections.  And the Special Committee's and Deutsche Bank's analysis, which minimized the importance of the

-153-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

projected share repurchases, had the effect of manipulating downward the dividend discount model for the Case 1 projections.

361.   Correction of these flaws alone indicates that AmTrust common stock is worth significantly more than the Transaction consideration, even without including the hundreds of millions of dollars of value attributable to the Derivative Claims.

362.   Finally, the Transaction undervalued the Company because it fails to properly account for the value of derivative claims brought on the Company's behalf.   Specifically, while the Special Committee assigned a low value to the Cambridge Derivative Claims, they failed to assign any value to the Accounting Derivative Action.

363.   In sum, the MBO Group used unrealistically negative projections and assumptions to justify their unfairly low buyout price, taking advantage of their insider knowledge of AmTrust's true prospects while relying on excessive pessimism to scare the Company's public stockholders into accepting far less than fair value for their shares.

A.   AMTRUST'S STOCKHOLDERS AND MARKET COMMENTATORS AGREE THE INITIAL PRICE WAS UNFAIR

364.   Major AmTrust stockholders including Carl Icahn, who held more than 9.3% of the Company's outstanding shares, came out emphatically against the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

buyout, and Icahn solicited proxies to oppose the deal.  In a press release dated May 17, 2018, Icahn emphasized that the deal was "blatantly taking advantage" of minority stockholders, and that it clearly "undervalues" the Company.  Icahn also criticized Defendants for creating a "stealth" record date (discussed further herein), which disenfranchised minority stockholders and which made a "sham" of Delaware law, and which had the effect of depriving Defendants' of any "business judgment treatement" in connection with the Merger.  Public stockholders apparently agreed that $13.50 was less than the value of the stock, as on the day that Icahn publicly filed his letter to the Board with the SEC, AmTrust's stock traded above $13.50 throughout the day, rising as high as $14.00 and closing at $13.76.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

365.   On May 23, 2018, Icahn's investment firm, Icahn Capital, L.P. ("Icahn Capital"), filed a Form DFAN14A incorporating a slide presentation that laid out Icahn's case for why the Transaction grossly undervalued AmTrust.  First, Icahn noted that AmTrust's stock was under "heavy pressure" at the time the Transaction was announced, due to a rapid series of negative disclosures:



366.   However, in spite of these "challenges," Icahn Capital pointed out, AmTrust's Combined Ratio[35] was in line with its peers, and was far ahead of its peers in annual growth.  Moreover, AmTrust had maintained a steady level of total reserves to total capital, similar to that of its peers:

---

[35] The combined ratio is equal to loss and loss adjustment expenses plus acquisition costs and other underwriting expenses divided by net earned premiums.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- Despite these recent recent challenges, AmTrust has historically led the industry in Loss Ratio, Combined Ratio and premium growth.



Not only is AmTrust in-line with its peers in Combined ratio, it has blown the group away in terms of annual growth

Note: peer group consists of same companies utilized by Deutsche Bank in its Fairness Opinion: AFG, ARGO, AIZ, AMSF, CNA, EIG, JRVR, MKL, NAVG, PRA, SIGI, THG and WRB.

- ..and contrary to the recurring narrative that AmTrust's reserves are inadequate, the Company has actually maintained a steady level of Total Reserves To Total Capital, in line with its peers.



367.   As such, Icahn Capital concluded that the main reason that AmTrust's common stock had traded at a discount compared to its peers was that "investors haven't wanted to own the company believing that a transaction like the proposed

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

going private could occur, particularly given the historical disregard the Karfunkel/Zyskinds have demonstrated toward public shareholders."

368.  Nonetheless, Icahn Capital showed management's ***own claim*** that the Company expected a future return on operating equity of 12–15% implied a valuation significantly higher than $13.50 per share based on the Company's book value per share as of March 31, 2018:

| AmTrust P/E Valuation | Low | High | Average | |
|---|---|---|---|---|
| Management Long-Term Target ROE | 12.0% | 15.0% | 13.5% | ← |
| x Book Value Per Share (3/31/18) | $14.48 | $14.48 | $14.48 | |
| = Earnings Per Share | $1.74 | $2.17 | $1.95 | |
| | | | | |
| x AmTrust Historical Earnings Multiple[2] | 8.5x | 11.0x | 9.9x | |
| = Equity Value Per Share | $14.77 | $23.89 | $19.33 | |
| or | | | | |
| x Peer Historical Earnings Multiple[2] | 16.0x | 20.0x | 18.2x | |
| = Equity Value Per Share | $27.80 | $43.44 | $35.62 | |

"Our overall financial objective is to produce a return on equity of 12.0%-15.0% over the long-term."

- Q1 2018 10Q

(1) Per Deutsche Banks Fairness Opinion Special Committee Case Projections.
(2) AmTrust and Peer earnings multiple ranges based on 3, 5 and 10 year historical multiples. Data from Bloomberg.

369.  Moreover, Icahn Capital showed (building on Deutsche Bank's own analysis of return on equity compared with price/book value per share) that AmTrust should trade at 1.8x-2.2x book value (implying a price of $26.06 to $31.86 per share) based on the March 31, 2018 book value of $14.48 per share.  Icahn Capital illustrated this through a graph based on Deutsche Bank's own graph in its February

-158-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

28, 2018 presentation to the Special Committee, modified to reflect management's statements about projected return on equity:



370.   Icahn Capital also pointed out certain of the serious errors in the Deutsche Bank Fairness Opinion relied on by the Special Committee, which in turn improperly lowered Deutsche Bank's valuation of the Company.  For example, Deutsche Bank "uses a flawed concept where they look at the *one* and *five year* discount of AmTrust's Price to Earnings multiple vs. its peer group," which Deutsche Bank then applies "to the peers['] *current* trading multiple to derive a per share value for AmTrust."  This method is fatally flawed, however, because (1) "five years (and certainly one year) is not long enough to cover the entire insurance cycle," and (2) 2017 was a disastrous and admittedly transitional year for the company,"

-159-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

meaning that its one-year and five-year P/E multiples are unusually low compared to peers and not representative of the true value and prospects of the Company.

371.   In sum, Icahn Capital emphasized that it was "strongly against the transaction at the rock bottom price of $13.50 per share."

372.   Days after Icahn announced his opposition to the deal, Plaintiff Arca—which owned 2.4% of the Company's outstanding shares—publicly expressed its agreement with Icahn that the initial Transaction dramatically undervalued the Company in a press release, which read, in relevant part:

> PRAGUE, May 21, 2018 /PRNewswire/ -- Arca Capital, one of the largest shareholders of AmTrust Financial Services, Inc., plans to work with Carl Icahn and other minority shareholders in opposing the proposed privatization transaction.
>
> *          *          *
>
> Arca Capital has long held the view that **AmTrust Financial Services is a fundamentally strong business and has questioned the justification for its decline of over 50% since January 2017**.  During that 15 month period, the stock has declined from over $27 per share to under $13 per share amidst no significant changes to the business. While ordinary shareholders have lost retirement and college funds, **Barry Zyskind and his in-laws are now trying to privatize the firm at what Arca believes is an absurdly low valuation**.
>
> Arca Capital, which owns approximately 2.4% of outstanding shares of AmTrust Financial, has led an advocacy campaign since March of 2018, when the privatization plan was announced, on behalf of ordinary investors to oppose the transaction.  The campaign has involved creating an organization, ProtectAmTrustInvestors.org, meeting with relevant influencers, advertising, and even conducting demonstrations of angry shareholders and allies outside of AmTrust Headquarters.  The

-160-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

purpose of this campaign has always been to build a strong coalition to oppose privatization.  Arca is continuing to meet with other minority shareholders to bolster this coalition. Arca has led the way in demanding transparency and reform at AmTrust through its numerous demands for documents from management to assess if the decline in share price may have been due to purposeful manipulations pushed by Barry Zyskind.

"***AmTrust Financial is a fundamentally strong company but actions by Mr. Zyskind and his allies have undermined it. Whether or not these actions were purposeful, the result was a significant stock devaluation that hurt ordinary investors but allowed the prospect of a cheap sale to the very same Barry Zyskind. At very minimum, AmTrust management took advantage of the uncertainty in the company's situation and the unfavourable market conditions to attempt to take AmTrust private on the cheap***," said Pavol Krúpa, Chairman of Arca Capital.

373.   Several days later, Plaintiff Arca urged its fellow stockholders to reject the Transaction and reiterated that "AmTrust is a fundamentally strong company that we believe is on the cusp of a major rebound in share price."

374.   On May 25, 2018, ISS issued its greatly anticipated report on the Merger, which criticized the Special Committee's "less-than-robust sale process," and which concluded that "a standalone scenario seems to be a preferable alternative to the currently proposed transaction" and, accordingly, "a vote AGAINST the merger is warranted." ISS suggested a valuation range between *$14.35 and $20.82* per share.

375.   Among many other things, ISS questioned the Special Committee's independence, observing that its leader, Defendant DeCarlo, "has served since 2006

-161-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

as an AmTrust director and since 2010 as a director of [NGHC], an insurance company where Zyskind has been a director since 2013 and whose CEO is Barry Karfunkel, [Barry] Zyskind's brother-in-law." ISS also noted that "[a]nother concerning item is the long gap between when Stone Point approached Chairman/CEO Barry Zyskind with its offer to jointly bid for the company and when Zyskind informed directors." All told, "[t]he board appears not to have prepared for the possibility that its management would be involved in purchasing the company" and that "[o]ne result of that lack of preparation was that after the special committee was formed, it did not formally engage a financial advisor for three weeks, during which the buyer group made its initial offer for the company."

376.    ISS also took issue with the Proxy's suggestion that AmTrust's growth was slowing down:

> However, the publicly available information paints a less dire picture of the company's prospects. It's important to recall that the board did not conclude that near-term prospects appeared dim and thus the best solution was to sell the company; its decision to begin the sale process was in response to an inquiry from a potential buyer after AmTrust's stock had fallen sharply. The buyer group eventually included the company's CEO, who would appear to know the company as well as anyone; if he is willing to buy at this price, does that not imply that the company's challenges are not so severe?

377.    Accordingly, and consistent with analyst observations—as well as Zyskind's own acknowledgment that AmTrust's stock price was "not indicative" of the Company's "fair value"—it was clear that the Karfunkel-Zyskind Family and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Stone Point took advantage of the 2017 market-overreaction, and would acquire AmTrust at a considerable discount, at the expense of AmTrust's minority stockholders.

378.   Even after Icahn's involvement and intense opposition to the Merger, there is no indication that the Special Committee reconsidered its decision to recommend the Merger Agreement.   Indeed, the Proxy notes that in the week following ISS's May 25, 2018 recommendation against the Merger, the Special Committee "met with representatives of the Company's largest stockholders [not including Arca] to solicit their support for the merger and also met with representatives of the proxy advisory firms to seek such firms' endorsement of the merger."

## B.   THE SPECIAL COMMITTEE FAILED TO ADEQUATELY VALUE THE DERIVATIVE CLAIMS

### 1.   The Special Committee Made No Good Faith Valuation of the Cambridge Derivative Claims

379.   On January 18, 2018, eight days after the Company publicly disclosed the potential Transaction, counsel to Cambridge sent a letter to Willkie Farr requesting that the Special Committee ensure that AmTrust's shareholders receive appropriate value for the Cambridge Derivative Claims in connection with any going-private transaction (the "Cambridge Letter"). The Cambridge Letter advised

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

that Cambridge's experts valued the Cambridge Derivative Claims in excess of $300 million.

380.   The Special Committee, however, failed to negotiate for or receive appropriate value for the Cambridge Derivative Claims or the Accounting Derivative Claims as part of the Transaction consideration. Indeed, the Special Committee wholly failed to conduct any meaningful analysis about the value of such claims as they were required to do as fiduciaries. Rather, the 220 Documents evidence only vague discussions at a few Special Committee meetings about the Derivative Claims.

381.   For example, according to the meeting minutes for a telephonic Special Committee meeting held on January 24, 2018, Willkie Farr merely "addressed" the Cambridge Letter and the meeting minutes provide no further information about the substance of this address.

382.   The Proxy then states that on February 1, 2018, the Special Committee purportedly received an update from "the Special Committee's Delaware counsel, [RLF]" concerning "the various pre-existing shareholder lawsuits involving the Company, including the Cambridge Derivative Action, and counsel's analysis concerning the valuation of certain shareholder derivative claims asserted on the Company's behalf." Proxy at 29. The Special Committee minutes do not, however, reflect that any such an update ever took place and RLF is not even listed as an attendee at any of the three Special Committee meetings held that day. While there

-164-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

was an "update" about derivative claims at the 2:15 p.m. Special Committee meeting, it was given by Willkie Farr and the meeting minutes merely state that it concerned "an update regarding the status of the Company's pending federal and state litigation proceedings and the investigation of the Company by the [SEC]."

383.  On February 15, 2018, the Special Committee held a telephonic meeting at which Willkie Farr addressed the Cambridge Derivative Claims, among other things. The meeting minutes reflect that at the end of Willkie Farr's update, DeCarlo informed the Special Committee that he was recusing himself "from all discussions and decisions made by the Special Committee in respect of the Cambridge Litigation" as a result of his "involvement" in that litigation. DeCarlo's admission of his inability to disinterestedly and independently consider the Cambridge Derivative Claims (after having participated in two prior Special Committee meetings where derivative claims were mentioned), is equally applicable to the other members of the Special Committee who are also defendants in the Derivative Actions who never recused themselves.

384.  On February 20, 2018, the same day that the Special Committee received a draft merger agreement from the Karfunkel-Zyskind Family and Stone Point, counsel for Cambridge finally received a response to the January 18, 2018 Cambridge Letter from Willkie Farr, who asked to set up a call. The next day, attorneys from Willkie Farr and counsel for Cambridge held a conference call, but

-165-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

very early in the call it became clear that Willkie Farr had not taken even the most basic steps to assess the value of the claims asserted in the Cambridge Derivative Action. In fact, neither Willkie Farr nor RLF had signed-on to the existing confidentiality and protective order in the Cambridge Derivative Action as was necessary in order for them to review the actual litigation record. Neither firm did so until February 22, 2018, at Cambridge's counsel's request.

385.   Cambridge's counsel also asked Willkie Farr on the February 21, 2018 call about the timing of the Special Committee's process, and Willkie Farr responded that the committee "was working through the various issues with its advisors."  Later developments reveal the lack of candor in that representation, as Willkie Farr had to know at the time that negotiations were in the very final stages and that the Transaction—which was publicly announced on March 1, 2018—was imminent.

386.   As the Special Committee was racing to finalize the Take-Private Merger Agreement on February 27, 2018, the Proxy claims that the Special Committee met with "representatives of Willkie Farr and RLF to discuss their legal advisors' review and analysis concerning the valuation of the claims asserted in the Cambridge Derivative Action, which included review of the litigation record, mediation submissions and other relevant documents as well as discussions with plaintiff's and defendants' counsel in the Cambridge Derivative Action." Proxy at 34. The Special Committee meeting minutes, however, reflect otherwise.

-166-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

387.  First, RLF is not listed as an attendee at the February 27, 2018 telephonic Special Committee meeting. In fact, contrary to the Proxy, the 220 Documents do not evidence that the Special Committee ever met with RLF. Second, the meeting minutes merely state that a representative from Willkie Farr "discussed the current status of the [Cambridge Derivative Action], the associated claims and defenses as well as potential outcomes, including the potential range of settlement."

388.  On the final day when the Special Committee was finalizing the terms of the Take-Private Merger Agreement, a February 28, 2018 Deutsche Bank presentation vaguely made reference to a "contingent litigation asset (based on upper end of Willkie [Farr] estimate)" worth between $15 million and $25 million. This purported value lacks any reasonable basis and the Special Committee did not demand, negotiate for or receive even remotely sufficient value for the Cambridge Derivative Claims or any other Company asset, such as the Accounting Derivative Claims, as part of the Transaction consideration.  In sum, the eleventh hour mention of the Cambridge Derivative Claims at a Special Committee meeting and no substantial discussion or evaluation of the value of these claims or the Accounting Derivative Claims does not comport with the fiduciary duties of the Special Committee which required them to "'value and get full consideration for all of the corporation's material assets,' including litigation assets." *In re Primedia, Inc.*

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

*S'holders Litig.*, 67 A. 3d 455, (Del. Ch. 2013) (quoting *In re Massey Energy Co.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *3 (Del. Ch. May 31, 2011)).

### 2. The Special Committee Did Not Value the Accounting Derivative Claims at All

389.   While the process surrounding the sham evaluation of the Cambridge Derivative Action shows that it was not undertaken in good faith, the situation regarding the Accounting Derivative Action is worse still.  The Board and Special Committee did not value the Accounting Derivative Claims ***at all***.  The documents Lead Plaintiffs obtained pursuant to Section 220 reveal no discussion whatsoever of the recovery the Company could obtain from the Accounting Derivative Action. This failure is due to the self-interest of each of the Special Committee members. Each is a defendant in the Accounting Derivative Action and each would stand to gain if they could successfully cut off plaintiffs' standing to pursue the Accounting Derivative Claims through the Transaction.

*      *      *

390.  As shown by the many deficiencies in the process and various disclosures in the Proxy, the Special Committee viewed its mandate as an extremely narrow one—to justify the MBO Group's proposed going-private deal—and never seriously considered any alternative option, nor did it proactively take steps to expand its mandate to include a market check or to obtain authorization to solicit

-168-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

other proposals, despite the fact that Zyskind had informed the Board that he had been contacted by several parties concerning a going-private transaction.  Indeed, in the Proxy, the Company disclosed that the Special Committee consciously hemmed itself in to its limited view of its responsibilities, constraining itself in advance rather than seeking to defend the interests of minority public stockholders.

391.   In considering the MBO Group's initial bid, "[t]he Special Committee discussed the limited potential alternatives available to the Company given that the Karfunkel-Zyskind Family had indicated … that it was not interested in selling the shares of common stock it held or controlled to a third party[.]"  Proxy at 30.  This is not a legitimate factor for consideration (or, at a minimum, should not have been the predominant factor that the Special Committee made it), because the Special Committee was duty-bound, in the Court of Chancery's language from *Southern Peru*, to "aggressively test[] the assumption that the [Transaction] was a good idea in the first place." *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 801 (Del. Ch. 2011), aff'd sub nom. *Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

392.   The Special Committee was not empowered to say "no" unconditionally.  It was there to bless a foregone conclusion, as demonstrated by its own conduct in, inter alia, negotiating against itself, continually revising financial

-169-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

projections downward, and giving away valuable benefits to the MBO Group for nothing.

393.   These deficiencies in process are all the more glaring in that the Take Private Special Committee—3/4 of which comprise the members of the Audit Committee (DeCarlo, Fisch, and Gulkowitz)—never considered the Company's November 2017 Form 10-Q representation that the then-current trading price ($13.46) undervalues the Company and reflects a short-term market overreaction to an earnings miss or the other statements by Zyskind and other management touting the Company's prospects.   According to the Audit Committee Charter, that committee was required to discuss that 10-Q with Company management.   Audit Committee Charter at 2.  The lack of any explanation or attempted harmonization of the Special Committee's March 1, 2018 endorsement of a $13.50 per share deal price, in light of the approval of a November 2017 statement forcefully arguing that a $13.46 share price undervalues the Company, speaks volumes about the fairness of the Transaction and the process deficiencies complained of herein.

### 3.   Defendants Are Forced to Improve the Terms to Buy Stockholder Support, but Still Fail to Provide an Entirely Fair Price

394.   Even after June 3, 2018, the day the majority of minority stockholders rejected the $13.50 per share offer, the Special Committee failed to negotiate at all for a better price from the Acquiring Group.  In fact, there is no suggestion whatsover

-170-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in the Proxy that the Special Committee even attempted to negotiate against the Acquiring Group for an improved offer.  Instead, negotiations (which lasted less than one day)[36] were solely between the Acquiring Group and Icahn.  The failure to meaningfully participate in negotiations for a better offer (despite the tremendous leverage obtained by minority stockholders as a result of the June 3, 2018 vote adjournment) constituted, at the very least, an abdication the Special Committee's responsibilities to AmTrust's public shareholders and a violation of its duty of care.

395.  Despite Icahn's success in obtaining a $1.25 price increase for AmTrust's minority stockholders (something the Special Committee failed to even attempt to accomplish) it must be noted that Icahn was merely a large minority stockholder, who acted for his own interests and who, unlike the Special Committee members, owed no fiduciary duties to other stockholders.  Minority stockholders should not have to rely on a well-resourced activist investor to advocate indirectly for their interests.

396.  On June 7, 2018, the Company announced that it had entered into an amendment to the Merger Agreement, whereby the Acquiring Group increased its

---

[36] According to the Proxy, on June 4, 2018, "Mr. Icahn advised [Zyskind] that he would support the merger if the merger consideration was increased to $14.75, an increase of $1.25 per share" and by the evening, Zyskind informed Icahn that the Acquiring Group was "prepared to increase the merger consideration to $14.75 per share subject to entering into a satisfactory Support Agreement with the Icahn Group."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

offer from \$13.50 to \$14.75 per share.  In connection with the Amended Merger Agreement, Defendants entered into a settlement with Icahn, whereby Icahn would agree to support the Merger, voluntarily dismiss his breach of fiduciary duty action with prejudice, and forego any appraisal rights.

397.   One stockholder that was not satisfied, however, was Plaintiff Arca, which still maintained the offer price was far below AmTrust's true value (which Arca believed to be \$22 per share).  Pavol Krúpa ("Krúpa"), chairman of Arca, told Reuters after the announcement of the Amended Merger Agreement that "[Arca is] still opposed to the \$14.75 [per share] deal value – we think this still undervalues the company and it's still not enough."  Krúpa went on to clarify that "[t]he increased offer is just a cosmetic change to sway some shareholder's view."

398.   The Arca chairman also noted that based on Arca's valuations, the original \$13.50 transaction price was equivalent to a 0.93x Price to Book Value Ratio (P/BV), "but AmTrust should be trading at 1.8-2.2x P/BV which represents a share price of \$26 to \$31.  This argument is supported by the Deutsche Bank initial analysis.  In light of these figures, we feel like \$22 per share is fair value."

399.   The increased offer price, however, caused ISS to modify its recommendation, and now advise a vote in favor of the Merger, given that the \$14.75 Merger Consideration was (barely) between its original valuation range of \$14.35 and \$20.82 per share.  ISS's updated analysis was far from a ringing endorsement of

-172-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

the Merger's fairness.  Specifically, ISS noted that "[t]he revised offer does not fully alleviate concerns related to the company's sales process highlighted in our original report. This may contribute to the skepticism among certain shareholders regarding the value that they are scheduled to receive, including Arca Capital, which continues to oppose the transaction." ISS also observed that AmTrust's June 11, 2018 filing submitted in opposition to Icahn's proxy campaign had walked back management's previous representation that it expected to produce a return on equity of 12.0%-15.0% over the long-term.

400.   On June 21, 2018, the Company reconvened the special meeting of its stockholders to vote on the adoption of the Amended Merger Agreement.[37]  While the Company had amended the Take-Private Merger Agreement between the adjournment of the special meeting and the reconvening, they did not set a new record date.  The proposal to adopt the Merger Agreement purportedly was approved by the requisite votes of all AmTrust stockholders (79.8%) and of the unaffiliated stockholders (67.4%).

401.   On July 3, 2018, A.M. Best removed AmTrust from "under review with negative implications" and downgraded the financial strength of AmTrust's

---

[37] The Special Meeting was previously adjourned from its originally scheduled date of June 4, 2018 after AmTrust failed to garner adequate stockholder support for the $13.50 deal price.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

insurance companies from an "A" to "A-."  Notwithstanding the downgrade, A.M. Best noted that "[t]he rating actions reflect AmTrust's balance sheet strength, which A.M. Best categorizes as very strong[.]"  A.M. Best also commented that AmTrust's risk-adjusted capitalization improved in the first quarter of 2018 due to "a reduction in investment risk following the sale of certain private and related party investments that carried substantial risk charges," and that AmTrust possesses "relatively modest exposure to natural catastrophe and terrorism events, which is reflected in favorable performance on stress tests[.]"  Thus, the ratings downgrade, the possibility of which management repeatedly used to strong-arm the Special Committee and public stockholders into accepting an inadequate merger offer, was not nearly as consequential as management had described.

402.   A.M. Best also noted that "[t]he recently approved plan under which AFSI will be privatized has a neutral impact on the rating . . . ."[38]

403.   Moreover, as reflected in the Amended Merger Agreement, the Acquiring Group had negotiated for the right to terminate the Merger in the event of a ratings downgrade.  But in the July 3, 2018 press release, the Acquiring Group stated that it would not be asserting that right:

---

[38] AmTrust stock price did not move based on this news, likely because the $14.75 per share Merger Agreement had already been approved by stockholders and was a *fait accompli*.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Barry Zyskind, Chairman and CEO of AmTrust, said, "With the completion of A.M. Best's review and the issuance of an "A-" (Excellent) rating, with a Stable outlook, we can move forward with certainty and confidence in AmTrust's ability to support its business globally and capitalize on opportunities for the long term. *On behalf of the Karfunkel-Zyskind Family and our partner Stone Point Capital, we remain fully committed to our proposed transaction to take AmTrust private and are looking forward to continuing to serve our clients, agents, partners and policyholders.*"

404.   In other words, after having secured approval of the Merger, the Acquiring Group acknowledged that a ratings downgrade was a distraction, and not relevant to AmTrust's fair value and the overall financial merits of the Merger.

405.   On July 23, 2018, Evergreen Parent, K-Z Evergreen, and Trident Pine entered into agreements with Enstar Group Limited ("Enstar") and MDP pursuant to which MDP and Enstar would partially fund the Transaction by contributing $200 million and $150 million, respectively, to Evergreen Parent in exchange for equity interests.  Enstar is an affiliate of Stone Point.

406.   On August 9, 2018, AmTrust filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2018, which was signed by Zyskind and Karkowsky and reviewed by the Audit Committee (*i.e.*, DeCarlo, Fisch and Gulkowitz).  In stark contrast to Zyskind and Karkowsky's prior portrayal of a potential ratings downgrade as disastrous to AmTrust's business in connection with the Special Committee's consideration of the Transaction, the Form 10-Q essentially

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

admitted that the downgrade had no material impact on the Company's business.

Indeed, the Form 10-Q states:

> On July 3, 2018, A.M. Best Company ("A.M. Best") removed our rating from under review with negative implications and assigned our insurance companies a financial strength rating of "A-" (Excellent) with a stable outlook.

> Although a ratings downgrade occurred, A.M. Best categorizes our balance sheet as very strong with a high-quality capital profile. In addition, our risk-adjusted capitalization, as measured by A.M. Best's Capital Adequacy Ratio (BCAR) strengthened materially through the first quarter of 2018. From a credit strength perspective, we are not aware of any significant implications to our business as a consequence of the downgrade, and do not believe it has materially impacted our access to the capital markets. We are not aware of any significant loss of business or change in business mix related to this event. The downgrade had no impact on any of our debt covenants or credit facilities, as we did not fall below any minimum credit rating requirements.

407. Accordingly, the Form 10-Q confirms that a potential ratings downgrade was nothing more than pretext designed to coerce the Special Committee into agreeing to the Transaction promptly on terms favorable to the Karfunkel-Zyskind Family and Stone Point.

408. The Transaction closed on November 29, 2018.

## VII. THE STOCKHOLDER VOTE WAS COERCED

409. The Transaction was subject to the condition that "the holders of at least a majority of all outstanding shares of Common Stock" held by the public stockholders vote in favor of the Transaction (*i.e.*, a majority-of-the-minority voting

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

condition), but the Defendants manipulated the vote so as to render it coercive and meaningless.

410.   *First*, the Defendants manipulated the record date to determine who was entitled to vote on the Transaction to disenfranchise millions of shares held by those stockholders with a true economic interest in the outcome of the vote.

411.   The Defendants first filed the Preliminary Proxy concerning the Transaction on April 9, 2018.  The Preliminary Proxy had blanks inserted for the record date on the stockholder vote and the date of the vote itself, thus falsely implying they had not yet been set.  However, the final proxy statement that was filed on May 4, 2018 (previously defined as the "Proxy"), disclosed a back-dated record date of April 5, 2018 and that the vote would be held on June 4, 2018.  Since companies are prohibited from retroactively setting a record date, the Board necessarily must have set the date prior to the filing of the Preliminary Proxy and consciously and deliberately decided not to disclose that fact to stockholders.

412.   By failing to disclose that it had already set a record date, the Board disenfranchised the holders of tens of millions of shares bought between April 5 and May 4, unfairly tilting the scales in favor of approval.  As a result of its strategically timed, late disclosure of the record date, many of the "votes" cast on the Transaction were cast by holders who no longer had a financial interest in the outcome of the vote and were unlikely to scrutinize its merits.  The Board also maximized the

-177-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

number of empty votes that could be cast at the stockholder meeting by scheduling it sixty days after the record date, the maximum time permitted by Delaware law.

413.   For example, funds affiliated with Carl Icahn, who initially announced his strong opposition to the Transaction at the initial price, beneficially owned approximately 18.4 million AmTrust shares, or 9.3% of the Company's total outstanding shares, all of which were acquired after the belatedly disclosed record date.  Icahn's funds acquired beneficial ownership of nearly 8.6 million of these shares between the time the Company set and disclosed the record date because he thought the Transaction undervalued AmTrust and intended to vote against it.  In total, nearly 24 million shares were traded between the record date and its disclosure on May 4.[39]  As a result, despite his strong and vocal opposition to the Transaction, Icahn and other stockholders who may have opposed the deal lacked the ability to vote their stakes to defeat the Transaction directly.

414.   Thus, the Control Group ensured that the public stockholder vote on the Transaction was heavily tilted in its favor, thus depriving numerous stockholders of

---

[39] The 24 million shares traded number is based on total daily trading volumes published by *Yahoo! Finance* and may include shares that have been double counted if they traded hands multiple times.  Approximately 88 million shares were held by the public, half plus one of which, or approximately 44 million, must have been voted in support of the Transaction to satisfy the closing conditions.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the ability to vote with their wallets as Delaware law typically encourages. It is extremely unusual for a company to manipulate a vote in this manner.

415.   For example, ISS reviewed a sample of thirty-eight stockholder meetings held within the last two years by S&P 1500 companies to seek stockholder approval of a merger. While a large number of these entities filed a preliminary proxy, not a single one set a record date preceding that preliminary proxy. The Control Group has no justification, let alone a compelling one, for its unique manipulation of the vote in this manner.

416.   *Second*, stockholders were more likely to vote to approve the Transaction because they were at an informational disadvantage to the Control Group. Insurance companies, like AmTrust, primarily receive income through insurance premiums and investment returns. The value of insurance companies is dependent on estimates of how much they will have to pay out to resolve claims associated with those premiums. While the amount of premiums is known and disclosed, insurance companies only disclose summary information about the claims they receive. Moreover, the quality of an insurance company's reinsurance is unknown to public stockholders. This informational vacuum is heightened here since AmTrust utilized companies related to the Control Group for half of its reinsurance. These critical pieces of information only known to corporate insiders, like the Control Group, are necessary to determine whether established loss reserves

-179-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and reinsurance will cover incoming claims.   Thus, the Control Group took advantage of the uncertainty in the market resulting from AmTrust's accounting issues to exploit their informational advantage.

417.   *Third*, the Board prematurely scheduled the stockholder vote to be held before the expected bounce back in the Company's performance.   The Transaction required numerous regulatory approvals before it could close, and ultimately the Closing did not occur until November 29, 2018.   This had the effect of causing more stockholders to vote in favor of the Transaction than would have if the Company waited to hold the vote until its financial results began to improve.

418.   Finally, stockholders were coerced by the Control Group's pervasive and long-running misconduct.   Stockholders were artificially more likely to vote to approve the Transaction not on its merits, but rather to seize whatever premium they could and escape what had proven to be a Control Group that prioritized its own interests, as explained above, over its fiduciary duties.

## VIII.  DEFENDANTS HAVE FAILED TO DISCLOSE ALL MATERIAL INFORMATION

419.   In addition to being coercive, the stockholder vote on the Transaction was not fully informed, as the Defendants have failed to accurately disclose all material information in the Proxy.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

420.   For example, the Proxy failed to disclose that in its 10-Q for the third quarter of 2017, which was signed by Defendant Zyskind, the Company explained that it conducted an analysis to determine whether it had to write down its goodwill and stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, *we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value*.  As a result, we have concluded that goodwill is not impaired as of September 30, 2017.  We will continue to monitor the share price and underlying fundamentals of each of our reporting units during the remainder of 2017.

421.   In other words, the Company declared that, as of September 30, 2017, mere weeks before the Control Group began exploring taking the Company private, its trading price did not reflect its fundamental fair value because the market overreacted to its accounting issues.  Additionally, on an investor conference call to discuss the Q3 2017 results, the Company's management touted that the Company would be able to generate its targeted 12-15% annual operating return on equity on its adjusted book value.

422.   At no time since the filing of that 10-Q on November 9, 2017, did the Company reverse course and disclose that it had taken a goodwill impairment or that it would not be able to generate its target returns, thus reflecting that AmTrust's

-181-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

management and Board had not changed its view.  Rather, the Company's 10-Q for the first quarter of 2018, which it filed on May 10, 2018 (after the Proxy), reaffirmed that AmTrust's "overall financial objective is to produce a return on equity of 12.0%-15.0% over the long term."[40]  This is irreconcilable with the Proxy.

423.   On the last trading day prior to September 30, 2017, AmTrust's share price closed at $13.46, a mere four cents below the initial deal price.  At no point does the Proxy disclose that the Company's CEO, who is also the leader of the Control Group attempting to take the Company private, signed a 10-Q stating that he believes a price of $13.46 per share undervalues the Company.[41]  Nor does it disclose that the Company's management expected AmTrust to generate annual returns of 12-15%, which would justify a deal price well over $20 per share.  In fact, the projections that are disclosed in the Proxy reflect materially lower returns without disclosing any explanation for such a large discrepancy.

---

[40] The Company excised such disclosure from its later 10-Q filings, stating instead that "We have historically evaluated our operations by monitoring key measures of growth and profitability, including combined ratio and return on equity. However, in light of the Merger, management is re-evaluating these key measures and respective operation targets with the partners of Evergreen Parent."  AmTrust Form 10-Q filed August 9, 2018 at 40; AmTrust Form 10-Q filed November 9, 2018 at 42.

[41] Nor is the 10-Q among the specific SEC filings incorporated by reference in the Proxy.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

424.   This is material information to any stockholder considering whether to vote to approve a sale of the Company to corporate insiders and must be disclosed. Failing to do so rendered the Proxy materially false and/or misleading.[42]

425.   In addition to failing to disclose that the Company and its insiders believe that what is effectively the deal price undervalues the Company, the Proxy also failed to disclose or misrepresented a litany of other material information.

- The Proxy failed to disclose the basis for management's projected share repurchases.  As discussed earlier, the Special Committee and Deutsche Bank failed to consider share repurchases reflected in the Case 1 projections, which had the effect of significantly manipulating downward the dividend discount model.

- As discussed herein, the Proxy falsely assured investors that AmTrust would continue to be bound by SEC regulations by virtue of the fact that the preferred stockholders would remain listed on the New York Stock Exchange.  Given that a chief concern for those voting common stockholders who were also preferred stockholders was that the Karfunkel-Zyskind Family was orchestrating the Merger in order to evade public scrutiny, the Proxy's representation that preferred stock would remain listed worked to dispel these concerns.  Those assurances have now been proven to be false.  Also, many common stockholders also owned preferred stock, and likely voted with the interests of their preferred stock holdings in mind.  Indeed, publicly available information available from Bloomberg demonstrates that several of the largest holders of AmTrust common stock also had significant holdings of preferred stock.  Defendants did not state their true intentions regarding the delisting as they feared alienating those large and

---

[42] Notably, the Proxy does disclose that the day prior to the release of this 10-Q and the same day as the above-referenced investor conference call, the Board held a meeting to discuss the release of the financial results for the third quarter of 2017, where Zyskind raised for the first time the possibility of a going-private transaction.

-183-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

influential shareholders of common stock who also owned large holdings of preferred stock.

- The Proxy stated that the Merger was fair, given "the risk of a potential ratings downgrade by A.M. Best below 'A', especially in light of the fact that such ratings [are] 'under review with negative implications.'" As noted earlier, the Acquiring Group's conduct once a downgrade was announced and after the Merger was already approved suggests that this "risk" was illusory.

- The Proxy failed to disclose the true pervasive extent of the conflicts of interest faced by members of the Special Committee as discussed herein.

- The Proxy disclosed that one purported reason for forcing a downward revision of the Company's projections from its Ordinary Course Projections was the effect of the Tax Cuts and Jobs Acts of 2017 (the "Tax Bill"). However, the Tax Bill was widely regarded as providing an enormous benefit to corporations as it reduced the corporate tax rate from 35% to 21%. The Proxy did not explain why or how the Tax Bill would have had a negative impact on AmTrust.

- The Proxy disclosed that Deutsche Bank used the present value of an estimated range of $15-$25 million for a "contingent litigation asset," but the Proxy failed to explain this term or this valuation.[43] It also failed to disclose any information regarding the value the Company placed on the Accounting Derivative Action.

---

[43] AmTrust issued supplemental disclosures on May 24, 2018 stating that (supplemental disclosure in bold):

> On February 24, 2018, representatives of Deutsche Bank, Willkie Farr and Richards Layton met to discuss the review and analysis undertaken by Willkie Farr and Richards Layton concerning the valuation of claims asserted in the Cambridge Derivative Action, **which were estimated to be between $15 million and $25 million.**

However, Lead Plaintiffs did not receive any meeting minutes or other documents in the 220 Production evidencing this meeting or this valuation. Furthermore, this disclosure does not state when this estimate was made, nor by whom.

-184-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- Charles Davis, the CEO of Stone Point, is a member of Deutsche Bank's Advisory Board.  However, the Proxy failed to disclose that Celeste Guth, the Co-Head of Deutsche Bank's Global Financial Institutions Group and the lead banker on the Transaction, worked directly for Davis at Goldman Sachs from 1986-2015.

- The Proxy disclosed that BOA, which was engaged by the Company in connection with the Fee Business Sale in November 2017 and the Transaction, had discussions with the Control Group about also providing debt financing in connection with the Transaction.  However, the Proxy failed to disclose any details on the nature of such discussions.  Additionally, the Proxy disclosed that the senior member of the BOA team advising AmTrust in connection with the Transaction "has had an ongoing relationship with Stone Point and its senior principals over many years," but did not disclose any details regarding that ongoing relationship.  Moreover, the Proxy failed to disclose that BOA assisted management in preparing the Ordinary Course Projections.  (AFSI_220FDP_0679).

- The Proxy also fails to note that the Special Committee had sought to retain BOA as its financial advisor, even though it was AmTrust management's advisor.   This fact demonstrates the Special Committee's lack of independence from AmTrust management, which is material, given that stockholders are relying on the recommendation of the Special Committee when voting on whether to approve the Merger.

- The Proxy failed to disclose the details of any employment related negotiations that occurred between Stone Point and its affiliates and the Company's senior management, including Zyskind.

- The Proxy claimed that at a November 16, 2017 Board meeting, "the Board determined to permit Stone Point to conduct due diligence in connection with a potential going-private transaction."   However, nothing in that meeting's minutes indicates the Board ever gave such authorization.  (AFSI_220FDP_0694).

- The Proxy disclosed that the Company held discussions with five strategic and financial sponsor parties in November and December 2017 related to a potential going-private transaction, that some parties

-185-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

made inquiries about a potential going private transaction, and that some of those parties entered into confidentiality and standstill agreements. However, the Proxy failed to disclose any details regarding those discussions, whether any parties indicated interest in exploring a transaction, and whether any party was able to publicly disclose interest in submitting a superior offer. The Proxy also did not disclose that on December 21, 2017, the Board was advised that "senior management had been approached by a handful of interested parties," and that on December 27, 2017, Zyskind advised the Board that he had been contacted by "other parties" aside from Stone Point.

- The Proxy disclosed that on January 16, 2018, the Special Committee authorized Stone Point and the Control Group to engage in discussions with a potential co-investor in the Transaction, but it failed to disclose that the co-investor in question was MDP, the same entity to which the Company sold a majority stake in its fee business concurrently with Zyskind declaring his intent to explore a going private transaction. (AFSI_220FDP_0886).

- The Proxy is littered with vague, generic references, such as to "representatives of the Karfunkel-Zyskind Family" or "Company management," but frequently does not identify these individuals. Knowing the identities of these individuals was material to the minority stockholders in deciding how to vote on the Transaction because of Zyskind's conflicting roles as Chairman and CEO of the Company, on the one hand, and as a member of the Karfunkel-Zyskind Family and/or MBO Group, on the other.

- The Proxy disclosed that "representatives of Stone Point and the Karfunkel-Zyskind Family met with the ratings agency" on January 9, 2018. The Proxy also references "the Company's discussions with the ratings agency" in late February 2018, but fails to disclose that Stone Point participated in these meeting. Since one of the purported reasons for the Special Committee's support of the Transaction was "the risk of a potential ratings downgrade," minority stockholders deciding how to vote on the deal would have considered information regarding the substance of these meetings—including the identities of each meeting's attendees—material.

-186-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- The Proxy disclosed that Defendant DeCarlo recused himself from Special Committee discussions concerning the Cambridge Derivative Action "[i]n light of the allegations against him as a defendant" therein. However, the Proxy does not discuss why Defendants Gulkowitz and Fisch determined not to recuse themselves from the same discussions as they are also named defendants in the Cambridge Derivative Action.

- The Proxy disclosed that the Special Committee and its advisors valued the Cambridge Derivative Claims at approximately $15 million to $25 million. The Proxy did not, however, disclose that Cambridge had asserted that the value of the claim was greater than $300 million. Nor did the Proxy provide any explanation or support for the dramatically lower valuation ascribed to the claim by the Special Committee and its advisors.

426. Furthermore, as noted extensively herein, there are material factual discrepancies between the Proxy and the internal documents produced by the Company in response to the 220 Demand.

427. The coercive nature of the vote and the omission of material information makes the Proxy false and/or misleading as stockholders were unable to make a fully informed decision regarding whether to approve the Transaction on its merits. As such, the Defendants cannot rely on the outcome of the stockholder vote to avoid entire fairness review of the Transaction.

## IX.  TROUBLING POST-MERGER DEVELOPMENTS

428. Developments since the closing of the Merger have made clear that the Acquiring Group seeks to freeze out all remaining public stakeholders in AmTrust, and with it, any corresponding regulatory scrutiny.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

429.   As noted earlier, the Proxy stated that preferred shares of AmTrust would continue to be listed on the New York Stock Exchange and that "the reporting obligations with respect to such shares under the Exchange Act will therefor continue."  Those statements were repeated in subsequent quarterly reports filed in August 2018 and November 2018, which assured that preferred shares would "remain outstanding."

430.   Defendants made the same assurances to state regulators when seeking approval of the Merger.  As reported in *Barron's*, the group's application to the state insurance commissions represented that "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger."

431.   Moreover, on or about January 22, 2018, earlier in the merger process, and in connection with the Acquiring Group's initial merger offer, the Karfunkel-Zyskind Family filed Amendment Number 14 to their Schedule 13D, which assured that "it is the Group's current intention that, following completion of the proposed transaction, each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange."  The Amendment appears to have been in response to inquiries raised by *Barron's* concerning the status of preferred stockholders under the Acquiring Group's January 9, 2018 Offer.

-188-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

432.   Notwithstanding these representations, on January 18, 2019, less than two months after the Merger closed, AmTrust announced that its Board (which contained all the same members pre-Merger, in addition to Karkowsky; Mark Serock, who joined the Board following the execution of the Merger Agreement; and two Stone Point executives) had approved "the delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange."

433.   The delisting became effective on or about February 7, 2019, "at which time AmTrust's SEC reporting obligations with respect to the [securities] will be suspended."

434.   The Board purportedly made this decision based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume."   The press release also identified "the Company's new ownership structure" since the Merger, and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting.   No explanation was given as to why these facts were only anticipated *after* approval for the Merger was already secured.

435.   The announcement's effect on the trading price of preferred shares (of which there were over $1 billion outstanding) was swift.   As *Barron's* reported, "The

-189-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

announcement of the delisting resulted in a 40% decrease in the trading price of the preferred stock and some of AmTrust's notes." *Barron's* also noted that the delisting was a "seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators."   Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 23, 2019.

436.   Investors were apoplectic.  For example, Jan Martinek, the principal of Central European Capital Partners and holder of preferred stock issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to the delisting decision, which enriched it and the Karfunkel-Zyskind Family at the expense of "retail" investors.  Martinek also submitted a letter to the SEC objecting to the delisting, and noting that he purchased preferred equity specifically in reliance on AmTrust's assurances that the shares would remain listed, and urging the SEC to commence an investigation.

437.   Other investors have expressed similar sentiments, and have contacted AmTrust directly to note their disapproval.

438.   Others have commenced litigation. For example, Mark Gottlieb, a holder of Series B and C Preferred Stock commenced suit against Defendants in this Court alleging breaches of fiduciary duty in connection with the delisting.  Gottlieb alleges that Defendants have approved the delisting

-190-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in order to pave the way for the Karfunkel-Zyskinds and Stone Point to become the only resort for would-be sellers of Preferred Stock at an extraordinarily depressed price, a depressed price that they caused. By taking out the Preferred at these depressed prices, the Karfunkel-Zyskinds will have effectively transferred the hundreds of millions of dollars of value they destroyed through the Delisting away from the Preferred Stock and into their own pockets.

439.   And it was not only investors who expressed outrage at this squeeze-out of the remaining public equity-holders.   Specifically, On February 4, 2019, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust preferred securities and debt notes, sued AmTrust in New York State Supreme Court, asserting claims for breach of contract (among others) and alleging reputational harm in connection with AmTrust's delisting announcement.  KBW moved to preliminarily enjoin AmTrust from moving forward with the delisting and also contacted the SEC, urging it to postpone the effectiveness of the delisting.  As explained in its complaint:

> One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE. A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934. The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes. Listing on the NYSE also provides securities holders with a liquid trading market.

> In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE. AmTrust gave the exact same covenant in the Underwriting

-191-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Agreements for all of the Preferred Shares (series A-F) and the two issues of Subordinated Debt Notes.

440.   KBW alleges that "it is extremely important that investors have faith in [its] strategies and solutions" and that the delisting deprived the holders of the preferred securities of "material company information," and "remove[d] a liquid trading market for these securities."  As a result, "the delisting will significantly damage KBW's and its affiliate's customer relationships" and "significantly impair KBW's and its affiliate's reputation and goodwill."

441.   On February 6, 2019, a justice in New York State Supreme Court, New York County, denied KBW's request for a temporary restraining order to enjoin the delisting, stating that a resulting decrease in share price was a harm to be suffered by investors, not an underwriter like KBW.

442.   The following day, on February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of the preferred stock.

## X.   CLASS ACTION ALLEGATIONS

443.   Lead Plaintiffs bring this action pursuant to Rule 23 of the Rules of the Court of Chancery, individually and on behalf of all other holders of AmTrust's common stock (except defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

are or will be threatened with injury arising from defendants' wrongful actions, as more fully described herein.

444. This action is properly maintainable as a class action.

445. The Class is so numerous that joinder of all members is impracticable. The Company has thousands of stockholders who are scattered throughout the United States. As of the April 5, 2018 record date, there were 196,355,229 shares of AmTrust's common stock outstanding.

446. There are questions of law and fact common to the Class including, *inter alia*, whether:

  a. The Individual Defendants breached their fiduciary duties by agreeing to the Transaction;

  b. The Individual Defendants acted in furtherance of their own self-interests to the detriment of the Class;

  c. Stone Point and its affiliates aided and abetted the wrongful conduct alleged herein; and

  d. Lead Plaintiffs and the other members of the Class have been injured by the wrongful conduct alleged herein and, if so, what is the proper remedy and/or measure of damages; and

  e. Lead Plaintiffs and the other members of the Class have been damaged irreparably by Defendants' conduct.

447. Lead Plaintiffs are committed to prosecuting the action and have retained competent counsel experienced in litigation of this nature. Lead Plaintiffs' claims are typical of the claims of the other members of the Class, and Lead Plaintiffs

-193-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

have the same interests as the other members of the Class.  Lead Plaintiffs are adequate representatives of the Class.

448.   Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class.

## XI.   COUNTS

### COUNT I
### BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

449.   Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

450.   The Director Defendants, as AmTrust directors, owe the Class the fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as directors of AmTrust, the Director Defendants had the power to influence and/or cause, and did influence and/or cause, the Company to engage in the practices complained of herein.  Each Director Defendant was required to: (a) use their ability to manage AmTrust in a fair, just and equitable manner; (b) act in furtherance of the best interests of AmTrust and its stockholders and not their own; and (c) fully disclose the material circumstances, procedures, and terms of the Transaction so that stockholders can make a fully informed decision.

451.   The Director Defendants breached their fiduciary duties by supporting and/or acquiescing to the Transaction that greatly undervalued AmTrust and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided consideration to AmTrust's minority stockholders that was grossly unfair. The Director Defendants knowingly supported and/or acquiesced to the Transaction even though the transaction process was woefully deficient given that, among other things: (a) the Karfunkel-Zyskind Family were permitted to manipulate and control the transaction process, including the Company's financial projections and valuation process used by the Special Committee and its respective advisors; (b) the Special Committee was conflicted; and (c) the financial advisors retained by the Company and the Special Committee were conflicted.

452.   The Director Defendants also utterly failed to (a) ascribe appropriate value to the Derivative Claims and (b) insist that the Karfunkel-Zyskind Family compensate the minority stockholders for that value. Instead of conducting any meaningful investigation into the value of the lost corporate opportunities in the Tower Transaction and instead of hiring a financial advisor to assess such value, the Director Defendants unreasonably relied upon an uninformed valuation of a "contingent litigation asset" by a lawyer at a time when the deal price for the Transaction was virtually agreed upon.

453.   The Director Defendants failed to fulfill their fiduciary duties in connection with the inadequate and unfair Transaction, which resulted in an unfair price through an unfair process.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

454.   As a result of the AmTrust directors' breaches of fiduciary duty in agreeing to the Transaction, the Class has been harmed.

## COUNT II
## BREACH OF FIDUCIARY DUTY
## AGAINST ZYSKIND AS AN OFFICER

455.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

456.   Defendant Zyskind, in his capacity as an AmTrust officer, owed the public stockholders of AmTrust the fiduciary duties of loyalty, due care and good faith.  To fulfill these fiduciary duties, Defendant Zyskind is obligated to act in the best interests of AmTrust's public stockholders and not sacrifice those interests in favor of his own interests.

457.   In negotiating the unfair Transaction, Zyskind breached his fiduciary duties by placing his own interests ahead of those of AmTrust's public stockholders. Zyskind abused his position of trust by orchestrating a deal that guaranteed that AmTrust's insiders would take the Company private at an artificially low price rather than seeking the best transaction available for AmTrust's public stockholders.

458.   As a result of Zyskind's breaches of fiduciary duty, the Class has been harmed.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## AGAINST ZYSKIND, G. KARFUNKEL, AND L. KARFUNKEL

459.   Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

460.   Zyskind, G. Karfunkel, and L. Karfunkel, as controlling stockholders of AmTrust, owed the Class the fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as controlling stockholders (in addition to being directors and/or officers) of AmTrust and their exercise of control and ownership over the business and corporate affairs of the Company, they at all relevant times had the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.

461.   AmTrust had an interest in acquiring Tower, as evidenced by the Company's overtures to Tower and its advisors, including but not limited to the offer to purchase Tower submitted by the Company in December 2013.

462.   An acquisition of Tower and/or its ongoing business lines, including both Tower's commercial and personal lines, was a business opportunity that AmTrust was financially able to undertake.

463.   Without first informing the AmTrust Board, the Karfunkel-Zyskind Family improperly and self-interestedly caused the Company to abandon its pursuit of Tower and instead initiated its own pursuit of Tower in a manner that diverted

-197-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

valuable business opportunities away from AmTrust and redirected them to two other Karfunkel-Zyskind Family-controlled entities, ACP and NGHC.

464.   In connection with the Tower Transaction, the Karfunkel-Zyskind Family's improper conduct included, among other things, (a) misappropriating due diligence conducted by AmTrust in connection with its exploration of a deal with Tower; (b) usurping a corporate opportunity from the Company through ACP and NGHC, including by siphoning the valuable Personal Lines businesses to NGHC; (c) simultaneously representing AmTrust, ACP, and NGHC in connection with the Tower Transaction; (d) shifting additional risk to AmTrust through the modifications to the Tower Transaction; (e) causing the Company to participate in a $250 million loan to ACP to facilitate its acquisition of Tower, and (f) demanding the Earn-Out. This conduct constitutes a breach of the Karfunkel-Zyskind Family's fiduciary duties owed to the Company and its stockholders.

465.   AmTrust has been and continues to be harmed by the Karfunkel-Zyskind Family's improper usurpation of the Company's corporate opportunity to acquire Tower and breaches of fiduciary duty in causing the Company to enter into related agreements unfair to the Company.

466.   The Company is entitled to restitution including disgorgement of any profits received by ACP or the Karfunkel-Zyskind Family as a result of the Tower Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

467. Cambridge informed the Karfunkel-Zyskind Family and the Special Committee's counsel that Cambridge's financial advisor valued the Cambridge Derivative Claims in excess of $300 million.

468. Nevertheless, the Special Committee and its advisors valued a "contingent litigation asset" at between $15 million and $25 million. The Special Committee apparently took no action to value the Accounting Derivative Action. While it is unclear what the "contingent litigation asset" refers to, to the extent it refers to the Cambridge Derivative Claims or Accounting Derivative Claims, singularly or collectively, such a valuation is wholly inadequate and uninformed.

469. As detailed above, the minority stockholders of AmTrust received grossly inadequate compensation for the valuable derivative claim asset of AmTrust while the Karfunkel-Zyskind Family intended to receive the valuable benefit of extinguishing the Derivative Claims upon the consummation of the Transaction. It is inconceivable that the Karfunkel-Zyskind Family would choose to pursue the Derivative Claims on AmTrust's behalf now.

470. Additionally, as detailed above, the Transaction is neither procedurally nor financially fair to AmTrust's minority stockholders. The Karfunkel-Zyskind Family manipulated and controlled the Transaction process, including the Company's financial projections and the valuation process used by the conflicted Special Committee. The Transaction also greatly undervalued AmTrust and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided severely inadequate and unfair compensation to AmTrust's minority stockholders. The financial unfairness of the Transaction stems in part from the failure of the Karfunkel-Zyskind Family to fairly compensate AmTrust's minority stockholders for the valuable Derivative Claims.

471.   As a result of the Karfunkel-Zyskind Family's conduct in this regard, AmTrust's minority stockholders have suffered and will continue to suffer substantial harm.

472.   The Transaction was inadequate and unfair, reflecting an unfair price and an unfair process.

473.   Zyskind, G. Karfunkel, and L. Karfunkel failed to fulfill their fiduciary duties in connection with the unfair Transaction.

474.   As a result of the breaches of fiduciary duty by Zyskind, G. Karfunkel, and L. Karfunkel in connection with the Transaction, the Class has been harmed.

**COUNT IV**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
**AGAINST STONE POINT, TRIDENT PINE, AND THE TRIDENT FUNDS**

475.   Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

476.   Stone Point, Trident Pine, and the Trident Funds knowingly assisted, by reason of their status as parties to the Take Private Merger Agreement, their possession of non-public information, and their involvement with the Control Group

-200-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

throughout the deal negotiation process, and have aided and abetted the Director Defendants and Zyskind as an officer defendant, in the aforesaid breach of their fiduciary duties.  Such breaches of fiduciary duties could not and would not have occurred but for the conduct of Stone Point, Trident Pine, and the Trident Funds,

477.   As a result of this conduct, the Class has been harmed.

478.   Lead Plaintiffs and the Class have no adequate remedy at law.

## XII.   RELIEF REQUESTED

**WHEREFORE**, Lead Plaintiffs demand judgment as follows:

a.      Finding the Director Defendants liable for breaching their fiduciary duties to the Class;

b.      Finding the Officer Defendant Zyksind liable for breaching his fiduciary duties to the Class;

c.      Finding Zyskind, G. Karfunkel, and L. Karfunkel liable for breaching their fiduciary duties to the Class;

e.      Finding that Stone Point, Trident Pine, and the Trident Funds aided and abetted the other breaches of fiduciary duty by the other Defendants;

f.      Awarding the Class damages, together with pre- and post-judgment interest;

g.      Awarding Lead Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

h.      Awarding such other and further relief as is just and equitable.

OF COUNSEL:

FRIEDMAN OSTER & TEJTEL PLLC
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY  10075
(888) 529-1108

KESSLER TOPAZ MELTZER
  & CHECK, LLP
Eric L. Zagar
Robin Winchester
Michael C. Wagner
Christopher M. Windover
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706

BERNSTEIN LITOWITZ
  BERGER & GROSSMANN LLP
David Wales
Edward Timlin
1251 Avenue of the Americas
44th Floor
New York, NY  10020
(212) 554-1400

SAXENA WHITE P.A.
Joseph E. White, III
Adam D. Warden
150 East Palmetto Park Road, Suite 600
Boca Raton, Florida 33432
(561) 394-3382

LABATON SUCHAROW LLP

*/s/ Thomas Curry*
Ned Weinberger (#5256)
Mark D. Richardson (#6575)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, Delaware 19801
(302) 573-2540

GRANT & EISENHOFER P.A.

*/s/ Michael J. Barry*
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Kyle J. McGee (#5558)
Joseph L. Christensen (#5146)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

PRICKETT, JONES & ELLIOTT, P.A.

*/s/ Marcus E. Montejo*
Marcus E. Montejo (# 4890)
John G. Day (#6023)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500

WOLF POPPER LLP
Carl L. Stine
Adam J. Blander
Antoinette Adesanya
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
*Co-Lead Counsel for Plaintiffs*

-202-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576

*Counsel for Plaintiffs*

Dated: May 8, 2019

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

## CERTIFICATE OF SERVICE

I, Marcus E. Montejo, do hereby certify on this 8th day of May, 2019, that I caused a copy of the Amended Verified Consolidated Class Action Complaint to be served by eFiling via File & ServeXpress upon the following counsel of record:

Ned Weinberger
Thomas Curry
Labaton Sucharow LLP
300 Delaware Avenue
Suite 1340
Wilmington, Delaware 19801

Jay W. Eisenhofer
Michael J. Barry
Kyle J. McGee
Joseph L. Christensen
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, Delaware 19801

Edward B. Micheletti
Bonnie W. David
Skadden, Arps, Slate, Meagher &
  Flom LLP
920 North King Street
Wilmington, Delaware 19801

Daniel A. Mason
Paul, Weiss, Rifkind, Wharton &
  Garrison LLP
500 Delaware Avenue
Suite 200
Wilmington, Delaware 19801

Gregory P. Williams
Blake Rohrbacher
Daniel E. Kaprow
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

/s/ Marcus E. Montejo
Marcus E. Montejo (DE Bar No. 4890)

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# EXHIBIT EE

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| Jan Martínek, Individually and on Behalf of All Other Persons Similarly Situated<br><br>_____<br>*Plaintiff(s)*<br>v.<br>AmTrust Financial Services, Inc., Barry D. Zyskind, George Karfunkel, and Leah Karfunkel<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.  1:19-cv-8030 |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  AmTrust Financial Services, Inc. - 59 Maiden Lane, New York, NY 10038
Barry D. Zyskind - 59 Maiden Lane, New York, NY 10038
George Karfunkel - 59 Maiden Lane, New York, NY 10038
Leah Karfunkel - 59 Maiden Lane, New York, NY 10038

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:      WOLF POPPER LLP
845 THIRD AVENUE
12th Floor
New York, NY 10022

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   9/3/2019                                          s/ G. Pisarczyk
_____                      _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:19-cv-8030

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                   *Server's signature*

                                                   _____
                                                   *Printed name and title*


                                                   _____
                                                   *Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAN MARTÍNEK,<br><br>                    Plaintiff<br><br>                v.<br><br>AMTRUST FINANCIAL SERVICES, INC.,<br>BARRY D. ZYSKIND, GEORGE<br>KARFUNKEL, AND LEAH KARFUNKEL,<br><br>                  Defendants | **CLASS ACTION COMPLAINT** |

1.      Plaintiff, Jan Martínek ("Plaintiff"), alleges the following upon information and belief, except for those allegations as to his own acts, which are based upon Plaintiff's personal knowledge, against AmTrust Financial Services, Inc. ("AmTrust" or "the Company"), its chief executive officer ("CEO"), and certain of its directors. Plaintiff's information and belief is based on, among other things, the independent investigation of his counsel. This investigation included, but was not limited to, a review and analysis of: (a) AmTrust's public filings with the Securities and Exchange Commission ("SEC"); (b) research reports by securities and financial analysts; (c) transcripts of AmTrust's conferences; (d) other publicly available presentations by AmTrust; (e) AmTrust's press releases; (f) news and media reports concerning AmTrust and other facts related to this action; (g) data reflecting the pricing and trading volume of AmTrust preferred shares; and (h) other publicly available material and data, including as identified herein.

## NATURE OF THE ACTION

2.      Plaintiff, by his attorneys, brings this class action on behalf of a Class consisting of himself and all other persons who purchased any of AmTrust's six series of preferred stock (some represented by depositary shares) on the open market on a U.S. stock exchange during the period January 22, 2018, through January 18, 2019 ("Class Period").

3.      AmTrust is essentially a family-run business. Before taking the Company private in November 2018, Defendants Barry D. Zyskind ("Zyskind"), George Karfunkel, Leah Karfunkel, and their family members and affiliates (collectively, the Karfunkel-Zyskind Family) owned approximately 55% of AmTrust. Pursuant to an Agreement and Plan of Merger, dated as of March 1, 2018, as amended by an amendment dated June 6, 2018 (the "Amended Merger Agreement," collectively, the "Merger Agreement"), between AmTrust, Evergreen Parent, L.P. ("Parent"), and Evergreen Merger Sub., Inc. ("Merger Sub"), the Karfunkel-Zyskind Family and

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | |
| Plaintiff | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | |
| | ) | |
| Defendants | ) | |

1.     Plaintiff, Jan Martínek ("Plaintiff"), alleges the following upon information and belief, except for those allegations as to his own acts, which are based upon Plaintiff's personal knowledge, against AmTrust Financial Services, Inc. ("AmTrust" or "the Company"), its chief executive officer ("CEO"), and certain of its directors.  Plaintiff's information and belief is based on, among other things, the independent investigation of his counsel.  This investigation included, but was not limited to, a review and analysis of: (a) AmTrust's public filings with the Securities and Exchange Commission ("SEC"); (b) research reports by securities and financial analysts; (c) transcripts of AmTrust's conferences; (d) other publicly available presentations by AmTrust; (e) AmTrust's press releases; (f) news and media reports concerning AmTrust and other facts related to this action; (g) data reflecting the pricing and trading volume of AmTrust preferred shares; and (h) other publicly available material and data, including as identified herein.

## NATURE OF THE ACTION

2.     Plaintiff, by his attorneys, brings this class action on behalf of a Class consisting of himself and all other persons who purchased any of AmTrust's six series of preferred stock (some represented by depositary shares) on the open market on a U.S. stock exchange during the period January 22, 2018, through January 18, 2019 ("Class Period").

3.     AmTrust is essentially a family-run business.  Before taking the Company private in November 2018, Defendants Barry D. Zyskind ("Zyskind"), George Karfunkel, Leah Karfunkel, and their family members and affiliates (collectively, the Karfunkel-Zyskind Family) owned approximately 55% of AmTrust.  Pursuant to an Agreement and Plan of Merger, dated as of March 1, 2018, as amended by an amendment dated June 6, 2018 (the "Amended Merger Agreement," collectively, the "Merger Agreement"), between AmTrust, Evergreen Parent, L.P. ("Parent"), and Evergreen Merger Sub., Inc. ("Merger Sub"), the Karfunkel-Zyskind Family and

private equity firm Stone Point Capital LLC ("Stone Point") acquired the 45% of AmTrust's minority common shares that the Family did not own, for $14.75 per share (the "Merger" or the "Buyout").

4.      Only the common stock was acquired in the Merger.  However, AmTrust also had approximately a billion dollars' worth of issued preferred stock outstanding, which had only been issued a few years before (from 2013 to 2016). The cost to acquire the recently issued preferred stock, had the merger been so designed, would have materially increased the cost of the Merger to the Karfunkel-Zyskind Family and Stone Point ("Acquirers").  Upon the announcement of a potential Merger, stockholders and stock market professionals repeatedly expressed concern over the future of the preferred stock.  Further, many holders of preferred stock also owned common stock that was being solicited by AmTrust and the Karfunkel-Zyskind Family to vote in favor of the Merger.  Accordingly, in order to allay concerns of those common stock investors who also owned preferred stock and the market about the future of the preferred stock, and to encourage preferred stockholders who also held common stock to vote in favor of the Merger, Defendants publicly and repeatedly reassured investors about the future for AmTrust's preferred stocks. Specifically, Defendants informed the investing market that, unlike the common shares, which were being acquired in the Buyout, the six series of publicly traded AmTrust preferred stock— which had been sold to public retail investors with the explicit commitment in the underwriting documents that they would be listed on the New York Stock Exchange ("NYSE")—were not being purchased in the Merger, but, as represented in the Buyout proxy, would continue to be listed on the NYSE and would remain listed and outstanding following the Merger. *See, e.g.,* ¶¶ 48, 56-58, 64-68, *infra*.  Contrary to these numerous and oft-issued public representations, less than two months following the close of the Merger, on January 18, 2019, AmTrust announced it would

delist all six series of AmTrust preferred stock from the NYSE, attempting to legitimize the delisting based on the contrived excuse "that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits" and that there was a new "ownership structure" due to the Merger. Since these costs and burdens and new ownership structure were known or had to have been known during the entire time Defendants were publicly proclaiming that the preferred stock would remain listed, the only logical conclusion is that Defendants never intended or were deliberately reckless when making their public statements that the preferred stock would remain listed on the NYSE.

5.      Immediately upon the announcement of the delisting, the prices of the preferred stocks dropped by almost 40% the very next trading day, with the preferred stocks losing hundreds of millions of dollars in value.

6.      AmTrust had been under intense investigation and scrutiny for several years with respect to its accounting methods and business practices by several governmental and regulatory agencies, including the Federal Bureau of Investigations ("FBI") and the SEC. The delisting coming on the heels of the Buyout means that AmTrust would no longer be subject to regulatory public disclosure requirements under the Securities Exchange Act of 1934 and is thus able to impede or thwart investigations into its alleged misconduct.

## JURISDICTION AND VENUE

7.      This action arises under Sections 10(b) (15 U.S.C. § 78j(b)) and 20(a) (15 U.S.C. § 78t(a)) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and is brought on behalf of investors who purchased AmTrust preferred shares on the open market during the Class Period.

8.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail and facilities of a national exchange.

9.     Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. This action arises out of the laws of the United States. The Courts of the United States have exclusive jurisdiction of claims brought under the Exchange Act under 15 U.S.C. § 78aa.

10.     This Court has personal jurisdiction over Defendants pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Defendants have sufficient contacts with the United States through their regular and substantial transaction of business therein and exercising jurisdiction over those Defendants is reasonable.

11.     Venue is proper in this District because AmTrust maintained offices in this District during the Class Period and many of the acts and transactions constituting the violations of law herein complained of occurred within this District, including the preparation and dissemination of materially false and misleading statements and corporate documents.

## PARTIES

12.     Plaintiff is a resident of the Czech Republic. As set forth in the attached certification, Plaintiff purchased shares or depositary shares of all six series of preferred stock of AmTrust on the NYSE during the Class Period. Plaintiff made the purchases in reliance on Defendants' material false and misleading statements and omissions of material facts and on the integrity of the market for AmTrust's preferred stock at artificially inflated prices, and was damaged upon the disclosure of Defendants' intent to delist all the series of preferred stock.

Plaintiff suffered losses of approximately $177,800 as a result of Defendants' federal securities law violations and the material false and misleading statements and omissions alleged herein.

13.     Defendant AmTrust is an insurance holding company headquartered in New York, New York and incorporated in Delaware. Through its subsidiaries, AmTrust provides specialty property and casualty insurance products. AmTrust provides insurance services in all fifty states, the District of Columbia, and Puerto Rico.

14.     Defendant Zyskind is the son-in-law of the late Michael Karfunkel, one of the co-founders of AmTrust, and Leah Karfunkel. Zyskind served as a director on AmTrust's Board of Directors since 1998 and as the Chairman of the Board since May 2016. He has also served as CEO and President of AmTrust since 2000. Zyskind also serves as an officer and director of many of AmTrust's wholly owned subsidiaries, as well as on the boards of various other entities owned or controlled by the Karfunkel Family. Zyskind is also the non-executive chairman of Maiden Holdings Ltd. ("Maiden Holdings"), a publicly held Bermuda insurance holding company formed by Michael Karfunkel, George Karfunkel, and Zyskind in 2007, which has several reinsurance and service agreements with AmTrust.

15.     Defendant George Karfunkel has served as a director of AmTrust since 1998. George Karfunkel is also, with his brother Michael Karfunkel, a co-founder of AmTrust. George Karfunkel is the chairman of Sabr Group, a purported consulting company that has served as the subscription agent for certain of AmTrust's stock offerings. According to the Company's public filings, George Karfunkel owns various real estate holdings, including "major office buildings in New York, Chicago and several other cities," through entities he controls with Leah Karfunkel. Through these entities, George Karfunkel and Leah Karfunkel lease various properties to AmTrust, including its corporate headquarters.

- 5 -

16.     Defendant Leah Karfunkel, the widow of Michael Karfunkel, has served as a director of AmTrust since May 2016.

17.     Defendants Zyskind, George Karfunkel, and Leah Karfunkel are collectively referred to herein as the "Individual Defendants."

18.     Defendants Zyskind, George Karfunkel, and Leah Karfunkel and their affiliates ("Karfunkel-Zyskind Family") are and were a controlling group of AmTrust at the time of the statements complained of herein, directly or indirectly owning a majority of the common stock of AmTrust.  As such, they jointly filed a Schedule 13D and amendments thereto with the SEC indicating that each is a member of a "group" for purposes of reporting beneficial ownership under Section 13 of the Exchange Act, including Schedule 13D/As filed  on January 10, 2018 (Amendment No. 13), January 22, 2018 (Amendment No. 14), March 2, 2018 (Amendment No. 15), April 30, 2018 (Amendment No. 16), July 25, 2018 (Amendment No. 17), and November 30, 2018 (Amendment No. 18).

**Non-Defendant Relevant Parties**

19.     The following entities are participants in one or more of the actions described in this Complaint, but are not named as defendants herein.  For convenience sake they are identified below:

> (a)     Stone Point Capital LLC ("Stone Point"), a Delaware limited liability company headquartered in Connecticut, is a private equity firm specializing in management buyouts.  Stone Point was a participant in the Buyout of the common stock of AmTrust with the Karfunkel-Zyskind Family.

(b)     Evergreen Parent L.P. ("Parent") is a Delaware limited partnership. Its limited partners are Trident Pine Acquisition LP ("Trident Pine"), a Delaware limited partnership, which, in turn, has limited partners, to wit, Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P. and Trident VII Parallel Fund, L.P. Collectively, these are referred to as the "Trident Funds." Each of them is managed by Stone Point and K-Z Evergreen, LLC, a Delaware limited liability company owned by the Karfunkel-Zyskind Family. Parent was formed solely for the purpose of effectuating the Merger and other related transactions. The Trident Funds were established in 2016 to make private equity investments. Parent was a party to the Merger Agreement with AmTrust, and remains following consummation of the Merger.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and persons who purchased any series of AmTrust preferred stock on the open market on a U.S. stock exchange during the Class Period (January 22, 2018, to January 18, 2019, inclusive) and were damaged as a result of Defendants' announcement of the delisting of the preferred stock. Excluded from the Class are Defendants, present and former executive officers of AmTrust and any parent, subsidiary, or affiliate of AmTrust, and the Individual Defendants' immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), and the legal representatives, heirs, successors, or assigns of any such excluded person.

21.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class. There are many millions of shares of each series of preferred stock issued and outstanding, and purchased during the Class Period. Each series of AmTrust preferred stock was actively traded on the New York Stock Exchange throughout the Class Period, and each series traded on every day of the Class Period. During the Class Period, over 3.3 million shares of Preferred Series A, over 3.9 million of Preferred Series B, over 3.5 million of Preferred Series C, almost 6 million of Preferred Series D, almost 5 million of Preferred Series E, and over 9 million of Preferred Series F, traded. Members of the Class may be identified from records maintained by AmTrust or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection; he is a member of the Class; his claims are typical of the claims of all Class members; and he does not have interests antagonistic to, or in conflict with, those of the Class.

24.     There are numerous questions of law and fact that are common to the Class and predominate over any questions affecting individual members of the Class, including:

- 8 -

a.  Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  Whether Defendants misrepresented or omitted material facts concerning their plans regarding the continued listing of AmTrust preferred stock;

c.  Whether Defendants' statements omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made;

d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.  Whether the prices of AmTrust's preferred shares were artificially inflated during the Class Period; and

f.  Whether members of the Class were damaged by virtue of their investments in AmTrust's preferred shares during the Class Period, and if so, the appropriate measure of damages.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

## GENERAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

**The Preferred Stock**

26.     Between 2013 and 2016, AmTrust issued six different series of preferred stock and depositary shares, which represented a $1/40^{th}$ interest in one share of the preferred stock, raising almost a billion dollars from the public. The preferred stock was issued pursuant to a prospectus and registration statement and prospectus supplements, all filed by AmTrust with the SEC. AmTrust also filed a Certificate of Designation with the SEC for each of the series of preferred stock. The six series of preferred stock that AmTrust offered for sale to the public consisted of:

- 9 -

(a)  6.75% Non‑Cumulative Preferred Stock, Series A, consisting of 4,600,000 (plus a potential over-allotment option of 690,000) shares, at an offering price of $25 per share, for aggregate gross proceeds of $132,250,000, which were listed and traded on the NYSE beginning in June 2013;

(b)  7.25% Non-Cumulative Preferred Stock, Series B, consisting of 115,000 shares, represented by 4,000,000 (plus a potential over-allotment option of 600,000) depositary shares, each representing a 1/40th interest in a share of the Series B Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $115,000,000, which were listed and traded on the NYSE beginning in June 2014;

(c)  7.625% Non-Cumulative Preferred Stock, Series C, consisting of 92,000 shares, represented by 3,200,000 (plus a potential over-allotment option of 480,000) depositary shares, each representing a 1/40th interest in a share of the Series C Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $92,000,000, which were listed and traded on the NYSE beginning in September 2014;

(d)  7.50% Non-Cumulative Preferred Stock, Series D, consisting of 189,750 shares, represented by 6,600,000 (plus a potential over-allotment option of 990,000) depositary shares, each representing a 1/40th interest in a share of the Series D Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of

$189,750,000, which were listed and traded on the NYSE beginning in March 2015;

(e)   7.75% Non-Cumulative Preferred Stock, Series E, consisting of 143,750 shares, represented by 5,000,000 (plus an over-allotment of 750,000) depositary shares, each representing a 1/40th interest in a share of the Series E Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $143,750,000, which were listed and traded on the NYSE beginning in March 2016; and

(f)   6.95% Non-Cumulative Preferred Stock, Series F, consisting of 287,500 shares, represented by 10,000,000 (plus an over-allotment of 1,500,000) depositary shares, each representing a 1/40th interest in a share of the Series F Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $287,500,000, which were listed and traded on the NYSE beginning in September 2016.

27.   As part of each of the preferred stock offerings, AmTrust entered into Underwriting Agreements with the underwriters of the offerings in which AmTrust covenanted with respect to each series of preferred stock, in order to induce investors to purchase the preferred stock, in words or substance, ***"[t]o use its commercially reasonable efforts to list the Securities on the NYSE within 30 days of the Closing Date and to maintain the listing of the Securities on the NYSE."*** *E.g.,* Underwriting Agreements ¶ 6(j). Emphasis added. These Underwriting Agreements were attached as exhibits to the prospectus supplements (and other documents) filed with the SEC and available to the investing public.

28.     The listing and the continuation of that listing of the series of preferred stock on the NYSE was such a critical component of the preferred stock that the underwriters who sold the preferred stock for AmTrust included in the Underwriting Agreements provisions stating that their obligations were subject to there being no suspension or material limitation in the trading of the preferred stock, and the underwriters maintained the right to terminate the agreement, if prior to the closing date on the underwritings, there was a suspension or trading limitation on the NYSE with respect to the preferred stocks. *E.g.*, Underwriting Agreements ¶¶ 5(iii) and 9.

29.     The first page of each prospectus supplement for each of the series of preferred stock stated that AmTrust "***intend[s] to apply to list the depositary shares representing the Series Preferred Stock on the New York Stock Exchange....*" Emphasis added.

30.     Further, the terms of each of the series of preferred stock included in the respective prospectus supplements (on several pages in each supplement, including the cover pages) and on their term sheets as filed with the SEC the representation that AmTrust intended to list the respective series of preferred stock on the NYSE.  Moreover, each of the prospectus supplements repeatedly told investors that they should rely on the statements in the prospectus supplements.

31.     Additionally, the underwriting agreements pursuant to which the six series of preferred stock were publicly sold contained the agreement by AmTrust "to maintain the listing[s] of the [preferred stock] on the NYSE."

32.     The NYSE timely approved the listing of each of the AmTrust series of preferred stock, and all of AmTrust's six series of preferred stock were listed and publicly traded on the NYSE.  According to the NYSE rules, a listing on the NYSE is continuous once it is approved, as long as fees are paid by the listing company.

33.     The shares of preferred stock were redeemable or callable at various times in the

future, but none of the Series were redeemable or callable prior to August 2019.  Specifically, the

preferred stock was subject to optional redemption (each series subject to a redemption date, but

none prior to August 2019) at a redemption price equal to $1,000 per share.  (The $1,000 was

equivalent to $25 per depositary share.)  Moreover, upon any liquidation, dissolution or winding-

up of AmTrust, holders of preferred stock would be entitled to the liquidation preference (after

payment of liabilities) of $1,000 per share.

**Defendants Time the Buyout to Take Advantage of a Depressed Stock Price to Benefit
Themselves**

34.     As noted earlier, AmTrust was founded and controlled by members of the

Karfunkel-Zyskind Family.

35.     For years prior to the Buyout Proposal, AmTrust engaged in accounting practices

that, when finally called into question and investigated by the SEC, as well as the New York

Department of Financial Services, and the FBI, resulted in AmTrust having to restate

approximately three years of financial statements from 2013 to 2017.  As a result of adverse

disclosures resulting from the restatement of several years of AmTrust's financial statements,

increases in loss reserves, and the disclosure of an investigation by the SEC, AmTrust's stock price

dropped in half in 2017, from $27 to approximately $13.46 by the end of the third quarter of 2017,

roughly equivalent to the Initial Buyout Proposal of $13.50.  Despite the disappointing

performance of AmTrust common stock, AmTrust's Form 10-Q for the third quarter of 2017 (filed

on November 9, 2017) stated:

> Based on the consideration of all available evidence, including analysis of
> quantitative and qualitative factors, *we believe the share price decline in the nine
> months of 2017 is relatively short-term in nature* and is primarily related to the
> restatement of prior period results and associated material weaknesses disclosed in
> our Annual Report on Form 10-K for the year ended December 31, 2016, *and is*

- 13 -

> *not indicative of an actual decline in our fair value or our reporting units' fair*
> *value.*

(Emphasis added).

36.     The Form 10-Q was signed by Defendant Zyskind.

37.     At the same time AmTrust management was representing to the investing public that the poor performance of AmTrust stock was to be short-lived, the Karfunkel-Zyskind Family and Stone Point were approaching the AmTrust Board, disclosing their intention to take the Company private.

38.     In fact, the Karfunkel-Zyskind Family had been gearing up for a take-private acquisition for months. For example, by late May 2017, AmTrust's common stock had experienced a significant drop to $12.45 per share. As a result, on May 25, 2017, AmTrust issued 24,096,384 shares of AmTrust common stock in a private placement, solely to the Karfunkel-Zyskind Family, at $12.45 per share. This private placement occurred only days after a significant drop in the market price of the stock, thus clearly benefitting the Karfunkel-Zyskind Family by millions of dollars. It increased the Karfunkel-Zyskind Family's control over AmTrust by about 10% of the Company, bringing them over 50% ownership of AmTrust, and did so at a price less than the Merger price, all a mere matter of months before the Family fully disclosed its intent to the Board to acquire AmTrust and take it private. There was no effort by the Karfunkel-Zyskind Family to make this a public offering and allow anyone other than the Family to benefit from the depressed stock price.

39.     A few months later, in September 2017, Zyskind and Stone Point engaged in discussions about the possibility of taking AmTrust private. However, the Company's third quarter 2017 disappointing financial results caused a decline in the price of the stock and the

discussions were halted as the Family saw the opportunity to take the Company private at a lower price.

40.     The Karfunkel-Zyskind Family and Stone Point resumed discussions and, on November 8, 2017, only a day before he would sign the 10-Q stating that AmTrust's stock performance "was not indicative of an actual decline in [AmTrust's] fair value or our reporting units' fair value," Zyskind approached the Board, suggesting a potential going-private transaction.

41.     During this time and for several years beginning in, at least, June 2013 (the month when AmTrust started issuing its preferred stock with the Series A), AmTrust had been responding to an investigation by the SEC into the Company's accounting practices, including accounting for loss and loss adjustment expense reserve estimates for AmTrust's major business lines and segments, internal controls, investment in life settlement contracts, and certain acquisitions. Although the *Wall Street Journal* had reported in April 2017 that AmTrust's accounting had been investigated by the SEC and some accounting matters had been disclosed, the SEC's five-year long investigation into AmTrust was not disclosed until AmTrust filed its 2018 proxy statement on May 4, 2018 soliciting approval of its Buyout Proposal set out below. The SEC investigation had not been concluded and was ongoing. The preferred stocks were not being bought out in the Proposal and their NYSE listing mandated continued public SEC filings and, thus, continued SEC scrutiny into AmTrust's accounting misconduct.

42.     Further disclosures from the SEC's investigation into AmTrust's accounting practices continued to come to light. In mid-October 2018, the SEC announced that it had barred three former accountants at BDO USA LLP from auditing publicly traded companies because they had released an audit report for AmTrust before the underlying auditing work had been performed. BDO had been hired by AmTrust in 2013 to perform a consolidated audit of its financial statements

and internal controls.  The audit report was issued and publicly disclosed in early 2014, but the work papers were backdated and the underlying work supporting the audit report was not performed until months after AmTrust's annual report had been publicly issued.

43.    There had been no public disclosure of any final conclusions of the continuing investigations.  However, the delisting of the preferred stocks would render AmTrust no longer subject to mandatory SEC filings under the Securities Exchange Act of 1934 that would ordinarily be issued for the benefit of these stockholders.

**The Buyout Proposal**

44.    On January 9, 2018, Trident Pine Acquisition LP, an affiliate of Stone Point (by Stone Point GP Ltd, its general partner), together with Defendants Zyskind, George Karfunkel, and Leah Karfunkel and certain entities controlled by them (the "Acquisition Group"), sent a letter ("Proposal Letter") to the Board of Directors of AmTrust proposing the potential acquisition of all of the outstanding shares of common stock of AmTrust not already owned or controlled by the Karfunkel-Zyskind Family at a purchase price of $12.25 per share in cash (the "Proposal") – the lowest price for AmTrust common stock in the preceding five years.  This initial proposal was signed by David Wermuth (Vice President and Secretary of the general partner of Trident), Zyskind, George Karfunkel, and Leah Karfunkel.

45.    The Proposal contemplated only the acquisition of the Company's common stock and not any of AmTrust's preferred stock.  The Proposal Letter stated, at pg. 1:  "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms."

46.    On January 10, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D (Amendment No. 13) in which they disclosed the Proposal, attaching copies

of the Proposal Letter and a January 9, 2018 press release announcing the Proposal. The press release made no mention of the preferred stock. The Schedule 13D further announced that, as indicated in the Proposal, the Karfunkel-Zyskind Family expected that a special committee of the Board of Directors of AmTrust would consider the Proposal and make a recommendation to the Board of Directors of AmTrust.

47.      On January 10, 2018, AmTrust issued a press release announcing the formation of a special committee of AmTrust directors to review the Proposal, appointing AmTrust directors Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, and Raul Rivera to serve as the committee.

48.      Shortly after the announcement of the Proposal, *Barron's* and investors queried Defendants as to the future of the preferred stock in light of the Buyout. Indeed, observers were puzzled regarding why the Karfunkel-Zyskind Family intended to keep the preferred stock listed, given that it would defeat a central justification for going private – to avoid the regulatory and public scrutiny and associated expense inherent in any publicly traded company. To clarify the position, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 14, with the SEC on January 22, 2018, to address the preferred stock and confirm that the intent of the proposal was that all the series of the preferred stock would remain outstanding and continue to be listed on the NYSE. On January 22, 2018, the prices of each series of Preferred Stock rose following this announcement, to close between 4.2% and 6.4% higher than the preceding trading day (January 19, 2018), and by the end of that trading week had closed between 6% and 9.8% higher than the closing price on January 19, 2018.

49.      Following several weeks of negotiations with the Board, a special committee thereof, and others, on March 1, 2018, AmTrust announced ("March 1, 2018 Press Release") that

- 17 -

it had entered into a definitive merger agreement with Evergreen Parent, L.P., an entity formed by the Acquisition Group ("Merger Agreement") whereby the Karfunkel-Zyskind Family, the Company's majority controlling stockholder, and private equity firm Stone Point would acquire the Company's minority common shares for $13.50 per share (the "Proposed Merger") (the "Merger Price").

50.    The March 1, 2018 Press Release stated with respect to the preferred stock:

Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction.

51.    Stone Point and the Karfunkel-Zyskind Family also announced in the March 1, 2018 press release that their going private Proposal would allow AmTrust "to be able to focus on long term decisions, without the emphasis on short-term results."

52.    As of March 1, 2018, the Stone Point Capital website contained the following representation concerning the AmTrust Merger: "Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."

53.    Given (i) the exceedingly low per-share merger price reflected in the Merger, (ii) the unmistakable (and undeniable) fact that the Karfunkel-Zyskind Family and Stone Point were opportunistically trying to take AmTrust private at the moment AmTrust's stock was trading at historic and uncharacteristic lows, and (iii) the fact that the Karfunkel-Zyskind Family already had a history of being accused of self-dealing in connection with AmTrust, Defendants realized that the Merger would face intense opposition, and that stockholder approval of the Merger by a majority of unaffiliated stockholders (a condition of the Merger closing) would be no *fait accompli*. AmTrust understood that in order to secure approval of the Merger, it would need to assuage the

- 18 -

concerns of many large AmTrust common stockholders who also happened to own considerable stakes of AmTrust preferred stock. These large stockholders would be voting not only as common stockholders, but also with the interest of their preferred stock holdings in mind.[1]

54.     As expected, the Buyout Proposal was heavily criticized following its announcement. For example, one large AmTrust stockholder launched a public relations campaign in which it urged activist investor Carl Icahn to invest in AmTrust and wage a proxy battle opposing the Buyout.

55.     On May 17, 2018, Icahn publicly disclosed that he had acquired approximately 9.4% of AmTrust's common stock and sent a letter to the AmTrust board of directors informing it that other stockholders had requested his assistance in "oppos[ing] your opportunistic going-private transaction" and that Icahn determined that the Buyout was "blatantly taking advantage of AmTrust's minority shareholders." Icahn not only publicly implored stockholders to vote against the Buyout, but also filed a lawsuit against the Karfunkel-Zyskind Family for breaches of fiduciary duty. Ironically, despite owning 9.4% of AmTrust common stock (the equivalent of nearly one-fifth of all unaffiliated stock), Icahn was unable to vote his stock against the Merger, as he bought the stock following the merger vote record date set by the AmTrust Board. As described below, AmTrust did not disclose the record date in its initial proxy (leaving instead blank placeholder text), even though the date had already been set at the time of that proxy.

56.     AmTrust publicly filed a preliminary proxy to encourage stockholders to vote in favor of the Merger. In seeking to convince stockholders to vote "FOR" the Merger, the preliminary proxy represented that the preferred shares would continue to be listed on the NYSE

---

[1] Indeed, publicly available information available from Bloomberg demonstrates that several large holders of AmTrust common stock also have significant holdings of preferred stock.

following the Merger and, thus, the Company's reporting obligations under the Securities
Exchange Act of 1934 would continue.  This statement was a firm, unqualified commitment that
the preferred stock "will continue to be listed."  This Preliminary Proxy, filed with the SEC in a
Schedule 14A on April 9, 2018, stated, at page 17:

> **Q: What effects will the merger have on AmTrust Financial?**
>
> A: The shares of common stock of the Company are currently registered under the
> Exchange Act, and such shares are quoted on the NASDAQ Stock Market under
> the symbol "AFSI." As a result of the merger, all of the shares of common stock of
> the Company will cease to be publicly traded and will be owned by Parent.
> Following the consummation of the merger, the registration of the shares of
> common stock of the Company and our reporting obligations with respect to such
> shares under the Exchange Act will be terminated upon application to the SEC. In
> addition, upon the consummation of the merger, such shares will no longer be listed
> on any stock exchange or quotation system, including on the NASDAQ Stock
> Market. ***However, each outstanding share of preferred stock of the Company will
> remain outstanding and will continue to be listed on the New York Stock
> Exchange following the merger and the reporting obligations with respect to such
> shares under the Exchange Act will therefore continue.***  (Emphasis added.)

57.     Defendants repeated this exact same unqualified false and misleading statement in
a definitive proxy statement, issued by Defendants and filed with the SEC in a Schedule 14A on
May 4, 2018, on pages 17-18.

> **Q: What effects will the merger have on AmTrust Financial?**
>
> A: The shares of common stock of the Company are currently registered under the
> Exchange Act, and such shares are quoted on the NASDAQ Stock Market under
> the symbol "AFSI." As a result of the merger, all of the shares of common stock of
> the Company will cease to be publicly traded and will be owned by Parent.
> Following the consummation of the merger, the registration of the shares of
> common stock of the Company and our reporting obligations with respect to such
> shares under the Exchange Act will be terminated upon application to the SEC. In
> addition, upon the consummation of the merger, such shares will no longer be listed
> on any stock exchange or quotation system, including on the NASDAQ Stock
> Market. ***However, each outstanding share of preferred stock of the Company will
> remain outstanding and will continue to be listed on the New York Stock
> Exchange following the merger and the reporting obligations with respect to such
> shares under the Exchange Act will therefore continue.***  (Emphasis added.)

58.     The definitive proxy also reprinted, at page 26, as part of the Background of the Merger section, the entirety of the original January 9, 2018 initial proposal letter in which the Individual Defendants had stated: "***Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms.***"

59.     On May 25, 2018, Institutional Shareholder Services ("ISS") issued its greatly anticipated report on the Merger, which criticized the Special Committee's "less-than-robust sale process," and which concluded that "a standalone scenario seems to be a preferable alternative to the currently proposed transaction" and, accordingly, found that "a vote AGAINST the merger is warranted." ISS suggested a valuation range between $14.35 and $20.82 per share.  Among other things, ISS questioned the independence of the Special Committee's chairperson, Donald DeCarlo, and criticized certain missteps by the Committee during negotiations. ISS also disputed AmTrust's suggestion that the Company's growth was slowing down, noting that "the publicly available information paints a less dire picture of the company's prospects."  ISS noted that Zyskind "would appear to know the company as well as anyone," and that his willingness to buy the Company at $13.50 per share implied that "the company's challenges are not so severe."

60.     The Proposal was so heavily criticized that it became clear to Defendants that it was likely that the vote on the Proposal would not satisfy the majority-of-the-minority condition that the Defendants had agreed to in order to comply with Delaware law.  Accordingly, the vote on the Merger was adjourned.

61.     Following adjournment of the Merger, Icahn and Zyskind engaged in negotiations, and within a day, the Acquisition Group agreed to increase its offer by $1.25 per share, to $14.75 per share.

62.     Specifically, the Merger Agreement was amended by an amendment dated June 6, 2018 (collectively, the "Amended Merger Agreement"), pursuant to which the Acquisition Group would acquire AmTrust's minority shares for $14.75 per share (the "Amended Merger") (the "Amended Merger Price").   In less than a month, Icahn's investment in 18.4 million AmTrust common shares netted him approximately $23 million.  This quick profit was sufficient to satisfy Icahn, and he agreed to support the Proposal, terminate his proxy battle, and dismiss his lawsuit.

63.     Thus, for a nominal increase in the offering price, the Karfunkel-Zyskind Family was able to cement its control over the common stock of AmTrust.  In light of this nominal increase the Amended Merger consideration now barely fell within ISS's fairness range as identified above. Consequently, and despite its considerable misgivings regarding the Merger, ISS modified its determination, recommending the Merger.

**Defendants' Additional Representations Concerning the Post-Buyout Continued Listing of the Preferred Stocks on the NYSE**

64.     Listing of a stock on a national securities exchange is an important feature to investors, the absence of which adversely affects the market and trading price of the stock.  Listing on a national securities exchange triggers a company's reporting requirements under the Securities Exchange Act of 1934.   Such reporting requirements provide stockholders with material information about their stocks.  NYSE listing also provides stockholders with a liquid trading market.  Notably, most institutional investors cannot invest in unlisted securities. Most brokerage houses cannot trade unlisted securities for their clients.  (Often, brokers would send a letter to clients advising that they need to sell the delisted instruments within very short period after the delisting.)  Investing in delisted securities is thus possible for only a very small universe of investors through a very limited number of financial intermediaries.  Delisting of a security has very negative consequences with respect to its liquidity, transferability, and price.

65.     The investing public places great reliance on the protections afforded by being listed. Listing on the NYSE helps protect the liquidity of shares and reassures stockholders and potential purchasers that the NYSE requirements are being met. Listing and trading on a national exchange carries implicit guarantees of trustworthiness, financial stability, and fair disclosure, as well as assurance that investors will be dealt with fairly and pursuant to law. Among other things, the NYSE requires a majority of directors on a company board to be independent.

66.     Against the background of the initial representations that the preferred stock when offered would be listed on the NYSE and that listing would be maintained on the NYSE, any uncertainty about the future of the preferred stock arising from the initial announcement of the proposed Buyout was put firmly to rest by Defendants. Beginning with the initial proposal to buy out the common stockholders and continuing on through the negotiations of the proposed transaction, the announcements of the entry into the definitive merger agreement, an adjournment of the special meeting to vote on the proposal, the announcement of the entry into the Amended Merger Agreement, and filings of quarterly financial results made until almost the time the Merger closed in November 2018, Defendants repeatedly represented in filings with the SEC, press releases, and in responses to questions from investors, as well as reporting in filings with state insurance commissions, that AmTrust would continue to maintain the listings on the NYSE of AmTrust's six series of preferred stock following the Merger. Defendants consistently stated that AmTrust's preferred stock would continue to be outstanding and listed on the NYSE following the Merger, and that AmTrust would continue to pay dividends and would continue to file reports with the SEC:

(a)     The initial January 9, 2018 proposal letter, attached as Exhibit 99.3 to the Schedule 13 D, Amendment No. 13 signed by Defendants Zyskind,

George Karfunkel, and Leah Karfunkel, and filed with the SEC on January 10, 2018, stated, "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms." The January 9, 2018 press release announcing the proposal made no mention of the preferred stock. (Exhibit 99.4 to the Schedule 13D, Amendment No. 13.)

(b)     According to an article in *Barron's* written by Bill Alpert, dated January 28, 2019, when the Buyout of the common stock was first proposed in January 2018, "*Barron's* asked the insurer about the status of holders of the more than $1 billion in preferred shares and baby-bond notes. . . . [and as a consequence the] buyout group later updated its SEC filings to say they intended to pay the [preferred] dividends and maintain the preferred listings on the NYSE." *Barron's* further reported that "[b]efore the June 2018 shareholder approval of the buyout, the Zyskind group proxy said that AmTrust preferred shares would remain listed. So did the group's application to state insurance commissions, saying: '*AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger.*'" (Emphasis added).

(c)     On January 22, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 14, to address the

- 24 -

preferred stock and confirm that the intent of the proposal was that the preferred stock would remain outstanding and continue to be listed on the NYSE, amending the "Purpose of Transaction" section of the prior Schedule 13D, stating:

> Item 4 of Schedule 13D is amended by inserting the following at the end of the fourth paragraph of Item 4 in Amendment No. 13:
>
> "The proposal contemplates that each series of the Issuer's preferred stock will remain outstanding following completion of the proposed transaction in accordance with its terms. In addition, it is the Group's current intention that, following completion of the proposed transaction, *each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange, the Issuer will continue to file reports with the SEC and the Issuer will continue to pay dividends on each series of preferred stock on a current basis. In the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock."* (Emphasis added.)

(d)   The Agreement and Plan of Merger dated March 1, 2018, stated, at pg. 15 (under the Section, pg. 14, titled "Effect of Merger on Capital Stock"), that "(c) each share of Preferred Stock shall remain outstanding in accordance with its terms."

(e)   On March 1, 2018, AmTrust filed a Form 8-K with the SEC and attached a copy of the Merger Agreement reflecting that the listing of the preferred stock would not be affected.

(f)   On March 1, 2018, AmTrust issued a press release announcing that the Individual Defendants and Stone Point Capital had entered into a definitive agreement to acquire the approximately 45% of AmTrust that the Individual Defendants and their affiliates did not already own or

- 25 -

control.  The release further stated that "[e]ach share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."  The press release was also filed with the SEC with the Company's Form 8-K filed on March 1, 2018.

(g)     On March 2, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 15, dated March 1, 2018, in which they certified as true, complete and correct that "each share of preferred stock of the Issuer shall remain outstanding in accordance with its terms."

(h)     On March 16, 2018, AmTrust filed its annual report on Form 10-K for 2017, in which it stated (at page 1) that "[e]ach share of our currently outstanding preferred stock will remain outstanding and it is expected that the preferred stock will continue to be listed on the New York Stock Exchange following the consummation of the transaction."

(i)     On April 9, 2018, AmTrust filed a Schedule 13E-3, signed by, among others, AmTrust, the Individual Defendants, Evergreen Merger Sub, Inc. (by Defendant Zyskind, Co-President), Evergreen Parent, L.P. (by Defendant Zyskind, Manager of its General Partner, Evergreen Parent, GP, LLC), K-Z Evergreen, LLC (by Zyskind, its Manager), which stated (at pg. 2 of the January 16, 2018 presentation slides to the Organizational Meeting of the Special Committee), "… this proposal

also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms," and explicitly recognized that this would require "[o]ngoing disclosure and other obligations of the preferred securities."

(j)    On April 23, 2018, Henry Reinhold, Manager of the GKarfunkel Family LLC, a holding company for certain irrevocable trusts established by Defendant George Karfunkel, filed a Schedule 13D with respect to their AmTrust stockholdings, which stated, "each share of preferred stock of the Issuer shall remain outstanding in accordance with its terms."

(k)    On May 4, 2018, Defendants (together with Evergreen Merger Sub, Inc., Evergreen Parent, L.P., Evergreen Parent GP, LLC, K-Z Evergreen, LLC, Rollover Stockholders, Trident Pine Acquisition LP, Trident Pine GP, LLC, Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P., and Trident VII Parallel Fund, L.P.) jointly filed a Schedule 13E-3 (Amendment No. 1) with the SEC and attached a copy of AmTrust's 2017 Form 10-K, which stated (at pg. 1): "[e]ach share of our currently outstanding preferred stock will remain outstanding and it is expected that the preferred stock will continue to be listed on the New York Stock Exchange following the consummation of the transaction." This 13E-3 Amendment also attached a copy of the January 16, 2018 presentation slides to the Organizational Meeting of the Special Committee, discussed above, which stated (at pg. 2): "... this proposal also contemplates that the

outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms," and explicitly recognized that this would require **"*[o]ngoing disclosure and other obligations of the preferred securities.*"** (Emphasis added).

(l)     On August 9, 2018, AmTrust filed its quarterly report on Form 10-Q for the quarter ended June 30, 2018, signed by Defendant Zyskind and Adam Karkowsky, AmTrust's Chief Financial Officer. The 10-Q stated that "[e]ach share of the Company's preferred stock will remain outstanding in accordance with its terms through consummation of the proposed merger transaction [pg. 28]" and "[e]ach share of our preferred stock will remain outstanding in accordance with its terms through consummation of the Merger [pg. 57]." Zyskind certified that the 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

(m)     On November 9, 2018, AmTrust filed its quarterly report on Form 10-Q for the quarter ended September 30, 2018, signed by Defendant Zyskind and Adam Karkowsky. This 10-Q similarly reported that "[e]ach share of the Company's preferred stock will remain outstanding in accordance with its terms through consummation of the proposed merger transaction [pg. 30]" and "[e]ach share of our preferred stock will remain outstanding in accordance with its terms through

- 28 -

consummation of the Merger [pg. 60]." AmTrust further stated in this 10-Q (at pg. 58) that "[m]anagement believes we will have sufficient liquidity to satisfy our needs over the next twelve months, including the ability to pay interest on our debt and dividends on our preferred shares." Zyskind certified that the 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

(n)     It has also been publicly reported by *Barron's* and in the complaint filed in the *Keefe, Bruyette & Woods, Inc. v. AmTrust Financial Services, Inc.* action discussed herein, that AmTrust made a similar representation "to state insurance commissions in connection with seeking approval of the 2018 Merger stating: "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger."

67.     Moreover, in the preliminary and final Merger proxies, Defendants represented to the investment community that the preferred stock would continue to be listed on the NYSE following the Merger. The Preliminary Proxy, filed with the SEC in a Schedule 14A on April 9, 2018, before the market opened, stated, at page 18:

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.*** (Emphasis added.)

68.     Defendants repeated this false and misleading statement in a definitive proxy statement, issued by Defendants and filed with the SEC in a Schedule 14A on May 4, 2018, before the market opened, on pages 17-18:

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.*** (Emphasis added.)

69.     On June 21, 2018, a majority of unaffiliated stockholders (67.4%) voted to approve the Amended Merger Agreement.

**The Merger Closing and Almost Immediate Delisting of All the Preferred Stocks**

70.     The Buyout closed on November 29, 2018, and the Acquisition Group acquired the remaining unaffiliated shares of common stock of AmTrust.

- 30 -

71.     Less than two months later, after the close of business on Friday, January 18, 2019, just before the three-day Martin Luther King holiday weekend, and contrary to Defendants' representations throughout 2018 in the Merger Agreement, the Proxies, other SEC filings and public statements, AmTrust issued a press release announcing the delisting of all six series of the preferred stock (as well as two series of subordinated notes), the last remaining publicly traded AmTrust equity securities.

72.     Following the procedure under Exchange Act Section 12(d) and Rule 12d2-2(c) (17 CFR 240.12d2-(c)) and NYSE Rules 806.02 and 808.00, AmTrust began the delisting process by filing a Form 8-K with the SEC announcing its intent to delist the Preferred Securities from the NYSE and issuing a press release to the same effect.

73.     The January 18, 2019 press release announced that AmTrust's board of directors had approved the voluntary delisting and deregistration of all six series of its publicly traded preferred stock, Series A, B, C, D, E, and F.  The press release stated, *inter alia*,

> AmTrust Financial Services, Inc. ("AmTrust" or the "Company") today announced that its Board of Directors has approved the voluntary delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange.
>
> The Company intends to voluntarily delist the Series A Preferred Stock (NYSE: AFSI-PA) (the "Listed Preferred Stock"), the Company's Depositary Shares representing 1/40th of a share of its Series B, C, D, E and F Preferred Stock, respectively (NYSE: AFSI-PB, AFSI-PC, AFSI-PD, AFSI-PE, AFSI-PF) (collectively, the "Listed Depositary Shares"), the Company's 7.25% Subordinated Notes due 2055 (NYSE: AFSS) and the Company's 7.50% Subordinated Notes due 2055 (NYSE: AFST) (collectively, the "Listed Subordinated Notes", and with the Listed Preferred Stock and the Listed Depositary Shares, the "Listed Securities").
>
> The Company intends to file with the Securities and Exchange Commission ("SEC") a notification on Form 25 on or about January 28, 2019 to delist and deregister the Listed Securities under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Company expects the delisting of the Listed Securities to become effective on or about

- 31 -

February 7, 2019 at which time AmTrust's SEC reporting obligations with respect to the Listed Securities will be suspended.

***AmTrust's decision to delist and deregister the Listed Securities was based on its determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume. In addition, this decision was made in light of the Company's new ownership structure and the resulting changes to its longterm strategy, following the completion of AmTrust's go-private transaction on November 29, 2018 and the delisting of its common stock.*** (Emphasis added.)

74.     Thus, despite all the representations about the listing of the preferred stock, barely seven weeks after the Merger closed, and less than three years since the last preferred instruments were issued (with the condition that the preferred stock be listed on the NYSE), AmTrust announced that its Board—which contained the same members pre-Merger, in addition to certain additional board members from Stone Point who joined the Board following the closing of the Merger Agreement—had approved the delisting.

75.     The delisting was to become effective on or about February 7, 2019, "at which time AmTrust's SEC reporting obligations with respect to the [preferred stock] will be suspended."

76.     The publicly professed rationalization for why AmTrust's Board made this decision to delist was based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume." The press release also identified "the Company's new ownership structure" since the Merger, and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting. The "administrative costs and burdens associated with maintaining the listings on the NYSE and the registration" were certainly facts that were knowable and known or ignored with deliberate recklessness at the time when Defendants were publicly stating throughout 2018 that the preferred stock would remain

listed. Moreover, if such "costs" were an actual issue, the listing could have been moved to another exchange, such as NASDAQ. Instead, the preferred stocks are now traded on the "pink sheets," with none of the protections afforded by being listed on the NYSE or another national exchange. Defendants' prior statement that the preferred stock "will remain" listed was an implicit acknowledgment that they had conducted an adequate investigation of the costs of retaining that listing and would not delist the preferred stock based on known or knowable facts at the time of their false statements.

77.     Similarly, it was absolutely known during 2018 what AmTrust's "new ownership structure" would be post-Merger. No indication or explanation was given by any Defendant as to how these facts only arose after the Merger was approved, and suddenly became known by them less than two months after the closing of the Merger, and only became a consideration shortly before they would have had to publicly disclose their financial results and file their annual and quarterly reports with the SEC.

78.     The vague, passing reference to the "small number of record holders" is deceptive since Defendants know that the majority of purchasers own the stock in street name through, for example, Cede & Co. and that there are undoubtedly thousands of persons who purchased the billion dollars of preferred stock.

79.     Further, none of these "explanations" for the delisting were included as "risks" related to the preferred stock in AmTrust's 2017 Form 10-K or any other submission made to the SEC by any Defendant that was filed during the Class Period.

80.     In truth, no explanation was or has been given as to why these justifications and rationalizations for the delisting were only anticipated *after* approval for the Merger was already secured and *after* the Merger had closed.

81.     The effect of the announcement of the delisting on the trading prices of the preferred stock was quick and devastating.  There was approximately $1 billion worth of preferred stock outstanding.  As *Barron's* reported, "The announcement of the delisting resulted in a 40% decrease in the trading price of the preferred stock and some of AmTrust's notes." *Barron's* also noted that the delisting was a **"*seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators.*"** Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 28, 2019. (Emphasis added).

82.     Specifically, the very next trading day following the announcement of the delisting, the prices of all the series of the preferred stock dropped, as Barron's reported, by almost 40%, losing over $300 million in value in one day as a result of the announcement of the delisting.  The following table illustrates the closing price and the extent of the immediate and devastating decline for each preferred stock series:

| Series | January 18, 2019 closing price | January 22, 2019 closing price | % Decline |
|--------|-------------------------------|-------------------------------|-----------|
| A | $14.13 | $8.88 | 37% |
| B | $14.71 | $9.30 | 38% |
| C | $15.96 | $9.50 | 37% |
| D | $14.97 | $9.62 | 36% |
| E | $16.02 | $9.85 | 39% |
| F | $14.18 | $8.94 | 37% |

83.     This market reaction clearly demonstrates the materiality of the Defendants' false and misleading statements and the damage to Plaintiff and the other purchasers of the preferred stocks, once the truth was revealed.

84.     Not only was the price decline sharp and immediate, the fact of delisting eliminated financial reporting protections under the Securities Exchange Act of 1934 afforded by the listing. Thus, the preferred stockholders would no longer receive material information about AmTrust and its financial condition, which would continue to undermine any trading market for the preferred stock, and the Karfunkel-Zyskind Family would no longer be subject to the regulatory scrutiny that had plagued them in the past.

85.     The "cost savings" obtained by the delisting was, in actuality, a transfer of wealth from the holders of the preferred shares to the Acquisition Group, the new 100% equity holders. These savings presumably went straight to the new AmTrust's bottom line, potentially increasing profits that benefitted the post-closing equity holders, while the almost 40% drop in the value of the preferred that was caused by the delisting damaged the public holders of those preferred shares.

86.     Unsurprisingly, preferred stockholders were shocked and angry. For example, Plaintiff, a principal of Central European Capital Partners, (and purchaser of all six series of AmTrust preferred stock during the Class Period) issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to the delisting decision, which enriched it and the Karfunkel-Zyskind Family at the expense of "retail" investors. Plaintiff also submitted a letter to the SEC objecting to the delisting, and noting that he purchased preferred equity specifically in reliance on AmTrust's assurances that the shares would remain listed, and urging the SEC to commence an investigation.

87.     Other investors have expressed similar sentiments, and have contacted AmTrust directly to note their disapproval, including others who have commenced litigation.

88.     Further, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust preferred securities and debt notes, sued AmTrust in New York State Supreme Court, Index No.,

650695/2019, asserting claims for breach of contract (among other things) and alleging reputational harm in connection with AmTrust's delisting announcement. KBW moved to preliminarily enjoin AmTrust from proceeding with the delisting, urging it to postpone the effectiveness of the delisting. It also contacted the SEC. As alleged in its complaint:

> 4. One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE. A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934. The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes. Listing on the NYSE also provides securities holders with a liquid trading market.

> 5. In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE. AmTrust gave the exact same covenant in the Underwriting Agreements for all of the Preferred Shares (series A-F) and the two issues of Subordinated Debt Notes.

89.    KBW alleged that the delisting deprived the holders of the preferred securities of "material company information," and "remove[d] a liquid trading market for these securities." As a result, KBW alleged that "the delisting will significantly damage KBW's and its affiliate's customer relationships," "damage KBW's reputation as an underwriter," "significantly impair KBW's and its affiliate's reputation and goodwill," and that "it is obvious that tens of thousands of retail investors have already been negatively impacted by AmTrust's public announcement of its intent to delist its Preferred Shares."

90.    On February 7, 2019, a justice in New York State Supreme Court, New York County, denied KBW's request for a temporary restraining order to enjoin the delisting, stating that "[w]ith respect to the decrease in [preferred] share price, *this is a harm to the investor*" (such as Plaintiff), not an underwriter like KBW. (Emphasis added.). On July 29, 2018, the New York

Supreme Court Justice dismissed KBW's complaint without prejudice, reiterating the points raised

in its February 7, 2019 ruling, and stating that KBW failed to properly allege that it, as AmTrust's

underwriter, suffered direct injury as a result of the delisting.

91.     Several preferred stockholders also filed an action against AmTrust in New York

State Supreme Court, alleging, among other things, breach of contract and other common law

claims. *See Matlick v. AmTrust Financial Services, Inc.*, Index No. 651349/2019.  AmTrust has

moved to dismiss the complaint.

92.     On February 7, 2019, AmTrust filed a Form 15 advising that it had terminated

listing of all the series of preferred stock.  The Form 15, signed by Stephen Ungar, Senior Vice

President, General Counsel and Secretary of AmTrust, was entitled "Certification And Notice Of

Termination Of Registration Under Section 12(g) Of The Securities Exchange Act of 1934 or

Suspension of Duty [*sic*] to File Reports Under Sections 13 And 15(d) of the Securities Exchange

Act of 1934."

**Scienter**

93.     In addition to the foregoing facts, Defendants' scienter is further illustrated by the

following:

       (a)     Defendants manipulated the record date for the vote on the Merger.

AmTrust filed the preliminary proxy to solicit votes in favor of the

Merger on April 9, 2018.  When AmTrust filed the preliminary proxy,

the record date for the stockholder vote was left blank, as is typically

done in preliminary proxies.  The blank date gave the clear impression

that a record date had not then yet been determined.  On May 4, 2018,

AmTrust filed a definitive proxy, which indicated that the record date

for being entitled to vote on the Merger was April 5, 2018, a date several days prior to the filing of the preliminary proxy on April 9th. Under applicable Delaware law, a record date cannot be set prior to the board adopting a resolution setting the date. Thus, when the preliminary proxy was issued there had already been a resolution setting the date and Defendants knew, and failed to disclose, what the record date was. Thus, Defendants prevented stockholders from buying shares in order to vote against the Buyout and ensured that potentially tens of millions of shares purchased in April 2018 were unable to vote on the Merger. For example, Icahn, the chief agitator against the Merger and holder of approximately 9.4% of AmTrust stock (and nearly double that percentage when considering only unaffiliated shares entitled to vote on the Merger) could not vote his shares at the stockholder meeting. By setting the record date and not disclosing it until a month later, Defendants were successfully able to reduce the number of shares that might have voted against the Merger. ISS called this tactic into question, and, upon an investigation comparing it with other precedent transactions, found it to be "out of the ordinary" and "anomalous."

(b)     Preferred stockholders holding millions of shares of preferred stock also owned common stock that was being solicited by the Karfunkel-Zyskind Family to vote in favor of the Merger. In order to allay concerns of investors and the market about the future of the preferred stock, as well as to encourage preferred stockholders who also held

- 38 -

common stock to vote their common shares in favor of the Merger, Defendants publicly represented that the six series of publicly traded AmTrust preferred stock that were not being purchased in the Merger would continue to be listed on the NYSE.

**Loss Causation**

94.     As alleged herein, Defendants engaged in a scheme to deceive investors in preferred shares during the Class Period by misrepresenting and omitting material facts concerning the future of the preferred shares, including their continued listing on the NYSE.

95.     Relying upon the integrity of the market price of AmTrust's preferred shares and public information relating to AmTrust and the continuation of the listing of the preferred shares on the NYSE, Plaintiff and the other Class Members purchased or otherwise acquired AmTrust's Series A, B, C, D, E, and/or F preferred shares at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact, as alleged herein.

96.     Plaintiff and the Class suffered actual economic loss and were damaged when the foreseeable risks of Defendants' fraudulent scheme and concealment by the Defendants' misstatements and omissions were disclosed upon the disclosure of the planned delisting of all the series of preferred stock.

97.     As a direct and proximate result of the announcement of the delisting, the price of every series of AmTrust preferred stock dropped almost 40% in a single day, a market loss of over $300 million.

98.     As set forth herein, Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiff and the Class.  Throughout the Class Period, the prices at which Plaintiff and the Class purchased AmTrust preferred stock were artificially inflated as a result of

Defendants' materially false and misleading statements and omissions of material fact concerning the future viability and market for AmTrust's preferred shares. Had Defendants disclosed complete, accurate, and truthful information during the Class Period concerning their intent and future plans to delist the preferred shares, Plaintiff and the Class would not have purchased or otherwise acquired AmTrust's preferred shares either at all or at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that engaging in the fraud designed to tout the continued listing on the NYSE of the preferred shares likely enabled the successful affirmative vote approving of the Merger, and the concealment of their intent from the public would cause the prices of AmTrust's preferred shares to be artificially inflated, or would maintain existing artificial inflation. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omission, would cause the price of AmTrust's preferred shares to decline.

99.     Thus, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the Class who purchased or otherwise acquired AmTrust's preferred shares during the Class Period.

100.     The economic losses, i.e., damages, suffered by Plaintiff and the Class are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact; (ii) the perpetuation of the fraudulent scheme; and (iii) the subsequent declines in the prices of AmTrust's preferred shares when the truth was revealed upon the announcement of the delisting.

**Presumption of Reliance**

101.     At all relevant times, the market for AmTrust's preferred shares was efficient for the following reasons:

(a)   The preferred shares met the requirements for listing, and were listed and traded daily on the NYSE, a highly efficient and automated market.

(b)   As a regulated issuer, AmTrust filed periodic reports with the SEC and the NYSE.

(c)   AmTrust regularly communicated with public investors via established market communication mechanisms, including the regular issuance of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, as further evidenced by AmTrust's communications with *Barron's* and subsequent filing with the SEC in response to inquiries from *Barron's* concerning AmTrust's plans with respect to the continued listing of AmTrust's preferred shares on the NYSE.

(d)   AmTrust was followed by market professionals, rating agencies, and securities analysts including *Barron's*, A.M. Best, JMP Securities LLC, SunTrust Humphries Robinson, and Compass Point Research & Trading LLC, which wrote reports that were distributed to the market, brokerage firms' sales force, and various customers.   Each of these reports was publicly available and entered the public market place.

102.   As a result of the foregoing, the market for AmTrust's preferred shares promptly digested current information from all publicly available sources and reflected such information in the prices of AmTrust's preferred shares.   Under these circumstances, purchasers of AmTrust's

preferred shares who purchased during the Class Period suffered similar injury through their purchase of preferred shares at artificially inflated prices, and a presumption of reliance applies.

103.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their statements in violation of a duty to disclose such information.

## COUNT I

### Against Defendants for Violation of Sections 10(b) of
### The Exchange Act and Rule 10b-5 Thereunder

104.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

105.    Defendants participated in a course of conduct involving misrepresentation and concealment of adverse material information about the continued listing of the preferred shares of AmTrust as specified herein.

106.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of fraudulent conduct as alleged herein in an effort to assure investors of the continued listing of AmTrust's preferred securities, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statement made about listing of the shares, in light of the circumstances under which they were made, not misleading.  This conduct operated as a fraud and deceit upon the purchasers of AmTrust's preferred shares during the Class Period.

107.    Defendants are liable as direct participants in the wrongs complained of herein.

108.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or had they been aware of Defendants' material

misstatements, they would not have purchased AmTrust's preferred shares at artificially inflated prices.

109.   Plaintiff and the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions, and other fraudulent conduct alleged herein.  The material decline in the price of AmTrust's preferred shares was caused by the public dissemination of the true facts, which were previously concealed or hidden.   Absent Defendants' wrongful conduct, Plaintiff and the Class would not have been injured.

110.   The price of AmTrust's preferred shares declined materially upon public disclosure of the true facts, which had been misrepresented or concealed, as alleged in this complaint. Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

111.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Against the Individual Defendants
Pursuant to Section 20(a) of the Exchange Act**

112.   Plaintiff incorporates by reference and realleges each of the foregoing allegations.

113.   The Individual Defendants had direct involvement in the day-to-day operations of the Company and had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

114.   As set forth above in Count I, AmTrust violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

- 43 -

115.    By virtue of his positions as Chairman, President and CEO of AmTrust, and a member of the group that controlled AmTrust, Defendant Zyskind is liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

116.    By virtue of their positions as directors and controlling stockholders of AmTrust, Defendants George Karfunkel and Leah Karfunkel are liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

117.    As a result of the deceptive practices and false and misleading statements and omissions, the market price of AmTrust's preferred shares was artificially inflated during the Class Period.  In ignorance of the materially false and misleading nature of the representations described above and the deceptive and manipulative devices employed by Defendants, Plaintiff and the other members of the Class, in reliance on either the integrity of the market and/or directly on the statements and reports of Defendants, purchased AmTrust's preferred shares at artificially inflated prices.

118.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

119.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

120.    Plaintiff and the other members of the Class have been damaged by the violations as described in this Count and seek recovery for the damages caused thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

1.     Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(b)(3) and declaring Plaintiff to be a proper Class representative;

2.     Awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein, together with appropriate interest;

3.     Awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

DATED: August 28, 2019

WOLF POPPER LLP

By:     *Patricia I. Avery*
　　　　 Patricia I. Avery
Carl L. Stine
Adam J. Blander
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600

*Counsel for Plaintiff*

- 45 -

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Jan Martinek, hereby state:

1.      I have reviewed the complaint against AmTrust Financial Services, Inc. ("AmTrust"), Barry D. Zyskind, George Karfunkel, and Leah Karfunkel. I have authorized the filing of the complaint and a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

3.      The attached document sets forth all of my transactions in the securities that are the subject of the complaint during the class period specified in the complaint.

4.      I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5.      During the three-year period preceding the date of signing this certification, I have not sought to serve, and have not served, as a representative on behalf of a class in any private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the Class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7 day of August, 2019

By:_____

Jan Martinek

| Security | Date | # shares purchased | # shares sold | price per share |
|---|---|---|---|---|
| AFSI PRA | 2018-12-12, 09:33:45 | 100 | | $13.05 |
| AFSI PRA | 2018-12-12, 09:41:52 | 500 | | 13.15 |
| AFSI PRA | 2018-12-19, 16:02:00 | 100 | | 12.6 |
| AFSI PRA | 2018-12-20, 09:41:01 | 300 | | 12.6 |
| AFSI PRA | 2019-01-30, 09:51:23 | | -1000 | 7.8 |
| AFSI PRA | 2019-02-06, 09:37:12 | 1,000 | | 9.25 |
| AFSI PRA | 2019-02-06, 15:55:18 | | -1000 | 10.2002 |
| | | | | |
| AFSI PRB | 2018-12-12, 09:35:05 | 13 | | $13 |
| AFSI PRB | 2018-12-12, 10:38:53 | 1,704 | | 13.55 |
| AFSI PRB | 2018-12-14, 11:38:18 | 113 | | 13.42 |
| AFSI PRB | 2018-12-17, 10:04:39 | 170 | | 13.54 |
| AFSI PRB | 2018-12-27, 09:31:04 | 1,000 | | 12.66 |
| AFSI PRB | 2019-01-18, 11:11:13 | 1,000 | | 14.85 |
| AFSI PRB | 2019-01-30, 10:31:20 | | -2000 | 7.79 |
| AFSI PRB | 2019-02-06, 09:38:07 | 1,000 | | 9.29 |
| AFSI PRB | 2019-02-06, 15:55:39 | | -3000 | 10.25 |
| | | | | |
| AFSI PRC | 2018-12-20, 09:54:28 | 2,000 | | $12.85 |
| AFSI PRC | 2019-01-29, 10:06:50 | | -600 | 8.15 |
| AFSI PRC | 2019-01-30, 11:14:01 | | -1,400 | 8.15 |
| | | | | |
| AFSI PRD | 2018-12-12, 09:44:31 | 89 | | $13.80 |
| AFSI PRD | 2018-12-12, 09:45:50 | 2,755 | | 13.899902 |
| AFSI PRD | 2018-12-12, 10:32:14 | 156 | | 14.0973 |
| AFSI PRD | 2018-12-12, 10:38:13 | 1,000 | | 13.9 |
| AFSI PRD | 2018-12-12, 15:01:40 | 1,000 | | 14.12 |

| Type | Date/Time | Quantity | Signed Qty | Price |
|---|---|---|---|---|
| AFSI PRD | 2018-12-13, 11:27:41 | 163 | | 14.55 |
| AFSI PRD | 2018-12-13, 11:27:52 | 2,837 | | 14.4120374 |
| AFSI PRD | 2018-12-20, 09:48:33 | 2,000 | | 12.56 |
| AFSI PRD | 2018-12-26, 12:46:45 | 300 | | 12.65 |
| AFSI PRD | 2018-12-26, 13:12:05 | 700 | | 12.8 |
| AFSI PRD | 2018-12-26, 13:25:45 | 400 | | 12.81 |
| AFSI PRD | 2018-12-26, 13:42:38 | 600 | | 12.82 |
| AFSI PRD | 2019-01-29, 09:41:58 | | -2000 | 7.78 |
| AFSI PRD | 2019-01-30, 10:20:59 | | -2000 | 7.88 |
| AFSI PRD | 2019-02-05, 10:32:34 | | -2000 | 9.1 |
| AFSI PRD | 2019-02-05, 14:56:15 | | -1000 | 9.2 |
| AFSI PRD | 2019-02-06, 09:31:37 | 1,000 | | 9.3 |
| AFSI PRD | 2019-02-06, 15:55:50 | | -6000 | 10.25 |
| AFSI PRE | 2018-12-12, 09:36:16 | 1,860 | | $13.48 |
| AFSI PRE | 2018-12-12, 09:57:59 | 1,140 | | 14.1 |
| AFSI PRE | 2018-12-12, 10:33:35 | 1,000 | | 14.39892 |
| AFSI PRE | 2018-12-13, 11:02:10 | 100 | | 14.72 |
| AFSI PRE | 2018-12-13, 11:03:00 | 2,533 | | 14.7451678 |
| AFSI PRE | 2018-12-13, 11:03:51 | 1,300 | | 14.7930769 |
| AFSI PRE | 2018-12-13, 11:05:59 | 67 | | 14.94 |
| AFSI PRE | 2018-12-13, 14:20:45 | 1,845 | | 14.65 |
| AFSI PRE | 2018-12-14, 10:22:10 | 85 | | 14.41 |
| AFSI PRE | 2018-12-14, 10:27:50 | 70 | | 14.42 |
| AFSI PRE | 2018-12-20, 09:51:55 | 1,000 | | 13.01 |
| AFSI PRE | 2018-12-26, 12:34:02 | 400 | | 13.05 |
| AFSI PRE | 2018-12-26, 13:17:26 | 600 | | 13.2 |
| AFSI PRE | 2019-01-29, 09:51:22 | | -2,000 | 8.3 |
| AFSI PRE | 2019-01-29, 09:55:10 | | -1,000 | 8.30261 |
| AFSI PRE | 2019-01-29, 10:10:06 | | -1,000 | 8.3 |
| AFSI PRE | 2019-01-29, 11:27:17 | | -1,000 | 8.2623 |
| AFSI PRE | 2019-01-30, 10:16:05 | | -300 | 8.29 |

| Symbol | Timestamp | Qty | Qty | Price |
|---|---|---|---|---|
| AFSI PRE | 2019-01-30, 10:21:05 | | -1,700 | 8.25 |
| AFSI PRE | 2019-02-05, 11:59:09 | | -1,000 | 9.25 |
| AFSI PRE | 2019-02-06, 15:56:05 | | -4,000 | 10.25075 |
| AFSI PRF | 2018-12-12, 09:45:10 | 300 | | $13.35 |
| AFSI PRF | 2018-12-12, 09:46:10 | 100 | | 13.39 |
| AFSI PRF | 2018-12-12, 09:47:02 | 2,100 | | 13.5 |
| AFSI PRF | 2018-12-12, 09:59:20 | 500 | | 13.4 |
| AFSI PRF | 2018-12-19, 15:40:17 | 2,000 | | 12.45 |
| AFSI PRF | 2018-12-26, 12:14:14 | 989 | | 11.9989889 |
| AFSI PRF | 2018-12-26, 12:24:56 | 11 | | 12.0845 |
| AFSI PRF | 2018-12-26, 12:44:53 | 1,000 | | 12.02 |
| AFSI PRF | 2019-01-18, 10:20:32 | 1,879 | | 14.1544545 |
| AFSI PRF | 2019-01-18, 11:18:05 | 1,121 | | 14.25 |
| AFSI PRF | 2019-01-30, 10:01:25 | | -2,000 | 7.75 |
| AFSI PRF | 2019-02-05, 14:56:27 | | -2,000 | 9.22 |
| AFSI PRF | 2019-02-06, 09:38:08 | 1,600 | | 9.3 |
| AFSI PRF | 2019-02-06, 09:42:58 | 253 | | 9.42 |
| AFSI PRF | 2019-02-06, 09:43:08 | 147 | | 9.45 |
| AFSI PRF | 2019-02-06, 15:56:26 | | -1,600 | 10.001875 |
| AFSI PRF | 2019-02-06, 15:56:33 | | -2,300 | 9.9043478 |
| AFSI PRF | 2019-02-06, 15:56:42 | | -4,100 | 9.85 |

# EXHIBIT FF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAN MARTINEK,<br><br>             Plaintiff,<br><br>        -v.-<br><br>AMTRUST FINANCIAL SERVICES, INC.,<br>BARRY D. ZYSKIND, GEORGE KARFUNKEL,<br>and LEAH KARFUNKEL,<br><br>             Defendants. | 19 Civ. 8030 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

    Plaintiff Jan Martinek brings this putative securities class action against AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), and AmTrust executives Barry D. Zyskind, George Karfunkel, and Leah Karfunkel (together, the "Individual Defendants," and with AmTrust, "Defendants"). Plaintiff alleges that he and other putative class members suffered losses when Defendants made false and misleading statements regarding the Company's preferred stock trading on the New York Stock Exchange ("NYSE") following the Individual Defendants' buyout of the Company's common stock. Plaintiff has brought securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants have moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to state a claim. As set forth in the remainder of this Opinion, while the Court does not believe that each of Plaintiff's proffered

misstatements and omissions suffices to state a claim for securities fraud, several do. Defendants' motion to dismiss is accordingly denied.

<div align="center">

**BACKGROUND**[1]

</div>

### A. Factual Background

### 1. AmTrust's Issuance of Preferred Stock

AmTrust is an insurance company founded and controlled by the Karfunkel-Zyskind Family. (Compl. ¶¶ 14-18). As relevant here, the Family consists of Barry Zyskind, AmTrust's CEO and Chairman of the Board, and AmTrust directors George Karfunkel and Leah Karfunkel. (*Id.* at ¶ 14).

Between 2013 and 2016, AmTrust issued six different series of preferred stock and depositary shares, raising almost $1 billion from the public. (Compl. ¶ 26). The preferred stock was issued pursuant to a prospectus, registration statement, and prospectus supplements, all filed by AmTrust with the SEC. (*Id.*). AmTrust also filed a Certificate of Designation with the SEC for each series of preferred stock. (*Id.*).

---

[1] The facts in this Opinion are drawn primarily from Plaintiff's Complaint ("Complaint" or "Compl." (Dkt. #5)), which is the operative pleading in this case, and the Declaration of Kevin S. Reed ("Reed Decl." (Dkt. #29)) and attached exhibits. The documents attached to the Reed Declaration are documents that have been publicly filed with the United States Securities and Exchange Commission (the "SEC"). *See Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("The Court may [] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." (internal quotation marks omitted)).

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #29); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #30); and Defendants' reply brief as "Def. Reply" (Dkt. #31).

As part of each of the preferred stock offerings, AmTrust entered into underwriting agreements in which it covenanted, with respect to each series of preferred stock, "[t]o use its commercially reasonable efforts to list the Securities on the NYSE within 30 days of the Closing Date and to maintain the listing of the Securities on the NYSE." (Compl. ¶ 27; *see id.* at ¶¶ 28, 31). These underwriting agreements were attached as exhibits to the prospectus supplements (and other documents) filed with the SEC and were available to the investing public. (*Id.*). The first page of each prospectus supplement for each series of preferred stock stated that AmTrust "intend[s] to apply to list the depositary shares representing the Series Preferred Stock on the New York Stock Exchange[.]" (*Id.* at ¶ 29).

Following the issuance of the preferred stock, AmTrust applied to list its stock on the NYSE. (*See* Compl. ¶ 32). The NYSE timely approved the listing of each of the AmTrust series of preferred stock, and all six series of preferred stock were listed and publicly traded on the NYSE. (*Id.*). Plaintiff purchased shares of all six series of preferred stock of AmTrust on the NYSE. (*Id.* at ¶ 12). According to NYSE rules, a listing on the NYSE is continuous once it is approved, as long as fees are paid by the listing company. (*Id.*).

The shares of preferred stock were redeemable or callable at various times in the future, but none of the series was redeemable or callable prior to August 2019. (Compl. ¶ 33). Specifically, the preferred stock was subject to optional redemption (each series subject to a redemption date, but none prior to August 2019) at a redemption price equal to $1,000 per share. (*Id.*).

3

Moreover, upon any liquidation, dissolution, or winding up of AmTrust, holders of preferred stock would be entitled to the liquidation preference (after payment of liabilities) of $1,000 per share.  (*Id.*).

### 2. The SEC Investigation and the Genesis of the Going-Private Transaction

For years prior to the Individual Defendants' buyout proposal, AmTrust engaged in accounting practices that, when finally investigated by the SEC, the New York Department of Financial Services ("DFS"), and the Federal Bureau of Investigation (the "FBI"), resulted in AmTrust having to restate approximately three years of financial statements from 2013 to 2017.  (Compl. ¶ 35).  As a result of adverse publicity resulting from the restatement of several years of AmTrust's financial statements, increases in loss reserves, and the disclosure of the SEC investigation, AmTrust's stock price dropped by half — from $27 to approximately $13.46 — over the first three quarters of 2017.  (*Id.*).  Despite the disappointing performance of AmTrust common stock, AmTrust's Form 10-Q for the third quarter of 2017 (filed on November 9, 2017) stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value.

(*Id.*).

At the same time AmTrust management represented to the investing public that the poor performance of AmTrust stock was to be short-lived, the Karfunkel-Zyskind Family and Stone Point Capital LLC ("Stone Point"), a private equity firm specializing in management buyouts, approached the AmTrust Board, disclosing their intention to take the Company private. (Compl. ¶ 37; *see also id.* at ¶ 19). The Individual Defendants began preparing for a take-private acquisition on May 25, 2017, when AmTrust issued 24,096,384 shares of common stock in a private placement, solely to the Karfunkel-Zyskind Family, at $12.45 per share. (*Id.* at ¶ 38). This transaction increased the Karfunkel-Zyskind Family's control over AmTrust by about 10%, bringing them to a position of over 50% ownership of AmTrust. (*Id.*).

A few months later, in September 2017, Zyskind and Stone Point engaged in further discussions about the possibility of taking AmTrust private. (Compl. ¶ 39). However, the Company's financial performance in the third quarter of 2017 was disappointing and caused a further decline in the price of the stock. (*Id.*). The parties halted discussions about taking AmTrust private as the Karfunkel-Zyskind Family saw an opportunity to achieve the same goal at a lower price. (*Id.*). On November 8, 2017, only a day before he would sign the 10-Q stating that AmTrust's stock performance "was not indicative of an actual decline in [AmTrust's] fair value or our reporting units' fair value," Zyskind approached the Board, suggesting a potential going-private transaction. (*Id.* at ¶ 39).

5

During this time and for several years prior (beginning in at least June 2013, the month when AmTrust started issuing its preferred stock), AmTrust responded, on an ongoing basis, to an investigation by the SEC into the Company's accounting practices. (Compl. ¶ 41). The practices under scrutiny included accounting for loss and loss adjustment expense reserve estimates for AmTrust's major business lines and segments, internal controls, investment in life settlement contracts, and certain acquisitions. (*Id.*). Although the *Wall Street Journal* reported in April 2017 that AmTrust's accounting had been investigated by the SEC and some accounting matters had been disclosed, the SEC's five-year-long investigation into AmTrust was not disclosed until AmTrust filed its 2018 proxy statement on May 4, 2018, soliciting approval of the buyout proposal set out below. (*Id.*).

Further disclosures from the SEC's investigation into AmTrust's accounting practices came to light throughout 2018. (Compl. ¶ 42). In mid-October 2018, the SEC announced that it had barred three former accountants at BDO USA LLP ("BDO") from auditing publicly traded companies because they had released an audit report for AmTrust before the underlying auditing work had been performed. (*Id.*). In brief, BDO had been hired by AmTrust in 2013 to perform a consolidated audit of its financial statements and internal controls. (*Id.*). The audit report was issued and publicly disclosed in early 2014, but the work papers were backdated and the underlying work supporting the audit report was not performed until months *after* AmTrust's annual report had been publicly issued. (*Id.*).

6

### 3. The Individual Defendants' Buyout Proposal

On January 9, 2018, Trident Pine Acquisition LP, an affiliate of Stone Point, together with the Individual Defendants and certain entities controlled by them (collectively, the "Acquisition Group"), sent a letter (the "Proposal Letter") to the Board of Directors of AmTrust proposing the potential acquisition of all of AmTrust's outstanding shares of common stock not already owned or controlled by the Karfunkel-Zyskind Family (the "Proposal"). (Compl. ¶ 44). In the Proposal Letter, the Acquisition Group offered a purchase price of $12.25 per share in cash — the lowest price for AmTrust common stock in the preceding five years. (*Id.*). The Proposal Letter was signed by David Wermuth (Vice President and Secretary of the general partner of Trident), Zyskind, George Karfunkel, and Leah Karfunkel. (*Id.*).

Importantly, the Proposal contemplated only the acquisition of the Company's common stock, and not any of AmTrust's preferred stock. (Compl. ¶ 45). To that end, the Proposal Letter stated: "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms." (*Id.*).

On January 10, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D (Amendment No. 13) in which they disclosed the Proposal, attaching copies of the Proposal Letter and a January 9, 2018 press release announcing the Proposal. (Compl. ¶ 46). The press release made no mention of the preferred stock. (*Id.*). The Schedule 13D further announced that, as indicated in the Proposal, the Karfunkel-Zyskind Family expected that

7

a special committee of the Board of Directors of AmTrust would consider the
Proposal and make a recommendation to the Board.  (*Id.*).  On January 10,
2018, AmTrust issued a press release announcing the formation of a special
committee of AmTrust directors (the "Special Committee") to review the
Proposal.  (*Id.* at ¶ 47).

Shortly after the announcement of the Proposal, the financial press and
investors queried Defendants as to the future of the preferred stock in light of
the contemplated buyout.  (Compl. ¶ 48; *id.* at ¶ 66(b)).  Indeed, observers were
puzzled as to why the Karfunkel-Zyskind Family intended to keep the preferred
stock listed, given that it would defeat a central justification for going private —
to avoid the regulatory and public scrutiny and associated expense inherent in
any publicly traded company.  (*Id.* at ¶ 48; *see id.* at ¶ 41).

To clarify the position, on January 22, 2018, the Individual Defendants
filed a Schedule 13D (Amendment No. 14), to address the preferred stock and
confirm that the intent of the Proposal was that all the series of the preferred
stock would remain outstanding and continue to be listed on the NYSE.
(Compl. ¶ 48; *see also id.* at ¶ 66(c)).  On January 22, 2018, following this
announcement, the prices of each series of preferred stock rose to close
between 4.2% and 6.4% higher than the preceding trading day (January 19,
2018); by the end of that trading week, each series of preferred stock closed
between 6% and 9.8% higher than the closing price on January 19, 2018.  (*Id.*
at ¶ 48).

8

Following several weeks of negotiations between and among the Board, the Special Committee, and others, AmTrust announced on March 1, 2018 (the "March 1, 2018 Press Release"), that it had entered into a definitive merger agreement with Evergreen Parent, L.P., an entity formed by the Acquisition Group whereby the Karfunkel-Zyskind Family, the Company's majority controlling stockholder, and Stone Point would acquire the Company's minority common shares for $13.50 per share (the "Merger"). (Compl. ¶ 49). The March 1, 2018 Press Release stated with respect to the preferred stock:

> Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction.

(*Id.*). Stone Point and the Karfunkel-Zyskind Family also announced in the March 1, 2018 Press Release that the Merger would allow AmTrust "to be able to focus on long term decisions, without the emphasis on short-term results." (*Id.* at ¶ 51). As of March 1, 2018, the Stone Point website contained the following representation concerning the Merger: "Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction." (*Id.* at ¶ 52).

### 4. The Merger's Reception

The Merger was heavily criticized following its announcement. (Compl. ¶ 54). For example, one large AmTrust stockholder launched a public relations campaign in which it urged activist investor Carl Icahn to invest in AmTrust

and wage a proxy battle opposing the Merger. (*Id.*). On May 17, 2018, Icahn publicly disclosed that he had acquired approximately 9.4% of AmTrust's common stock and sent a letter to the AmTrust Board of Directors informing it that (i) other stockholders had requested his assistance in "oppos[ing] your opportunistic going private transaction," and (ii) Icahn had determined that the Merger was "blatantly taking advantage of AmTrust's minority shareholders." (*Id.* at ¶ 55). Icahn not only publicly implored stockholders to vote against the Merger, but also filed a lawsuit against the Karfunkel-Zyskind Family for breaches of fiduciary duty. (*Id.*). However, despite owning 9.4% of AmTrust common stock (the equivalent of nearly one-fifth of all unaffiliated stock), Icahn was unable to vote his stock against the Merger, as he had purchased the stock following the Merger vote record date set by the AmTrust Board. (*Id.*).

AmTrust publicly filed a preliminary proxy statement to encourage stockholders to vote in favor of the Merger. (Compl. ¶ 56). The preliminary proxy statement represented that the preferred shares would continue to be listed on the NYSE following the Merger and, thus, the Company's reporting obligations under the Securities Exchange Act of 1934 would continue. (*Id.*). Specifically, the preliminary proxy filed with the SEC in a Schedule 14A on April 9, 2018, stated, at page 17:

> Q: What effects will the merger have on AmTrust Financial?
>
> A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to

> be publicly traded and will be owned by Parent.
> Following the consummation of the merger, the
> registration of the shares of common stock of the
> Company and our reporting obligations with respect to
> such shares under the Exchange Act will be terminated
> upon application to the SEC. In addition, upon the
> consummation of the merger, such shares will no longer
> be listed on any stock exchange or quotation system,
> including on the NASDAQ Stock Market. *However, each
> outstanding share of preferred stock of the Company will
> remain outstanding and will continue to be listed on the
> New York Stock Exchange following the merger and the
> reporting obligations with respect to such shares under
> the Exchange Act will therefore continue.*

(*Id.* (emphasis added)). Defendants repeated this statement in a definitive

proxy, issued by Defendants and filed with the SEC in a Schedule 14A on May

4, 2018. (*Id.* at ¶ 57). The definitive proxy also reprinted the entirety of the

original Proposal Letter, in which the Individual Defendants had stated:

"Finally, this proposal also contemplates that the outstanding series of

AmTrust preferred stock will remain outstanding in accordance with their

terms." (*Id.* at ¶ 58).

On May 25, 2018, Institutional Shareholder Services ("ISS") issued its

report on the Merger, which criticized the Special Committee's "less-than-

robust sale process," and which concluded that "a standalone scenario seems

to be a preferable alternative to the currently proposed transaction";

accordingly, ISS concluded that "a vote AGAINST the merger is warranted."

(Compl. ¶ 59). ISS suggested a valuation range between $14.35 and $20.82

per share. (*Id.*). Among other things, ISS questioned the independence of the

Special Committee's chairperson, and criticized certain missteps by the

Committee during negotiations. (*Id.*). ISS also disputed AmTrust's suggestion

11

that the Company's growth was slowing down, noting that "the publicly available information paints a less dire picture of the company's prospects." (*Id.*). ISS noted that Zyskind "would appear to know the company as well as anyone," and that his willingness to buy the Company at $13.50 per share implied that "the company's challenges are not so severe." (*Id.*).

The Merger was so heavily criticized that it became clear to Defendants that the vote on the Proposal would likely not satisfy the majority-of-the-minority condition to which Defendants had agreed in order to comply with Delaware corporate law. (Compl. ¶ 60). Accordingly, the vote on the Merger was adjourned. (*Id.*). Following adjournment, Icahn and Zyskind engaged in negotiations, and within a day, the Acquisition Group agreed to increase its offer by $1.25 per share, to $14.75 per share. (*Id.* at ¶ 61). In less than a month, Icahn's investment in 18.4 million AmTrust common shares had netted him approximately $23 million; he agreed to support the Merger at the revised price, terminate his proxy battle, and dismiss his lawsuit. (*Id.*).

In light of this nominal increase the Merger consideration now fell (albeit barely) within ISS's fairness range as identified above. (Compl. ¶ 63). Consequently, ISS modified its determination, recommending the Merger. (*Id.*). On June 21, 2018, a majority of unaffiliated stockholders (67.4%) voted to approve the Merger. (*Id.* at ¶ 69).

### 5. The Merger's Closing and Defendants' Delisting of the Preferred Stock

The Merger closed on November 29, 2018, and the Acquisition Group acquired the remaining unaffiliated shares of AmTrust's common stock.

12

(Compl. ¶ 70). Less than two months later, on January 18, 2019, AmTrust issued a press release announcing the delisting of all six series of preferred stock (as well as two series of subordinated notes), the last remaining publicly traded AmTrust equity securities. (*Id.* at ¶ 71).

AmTrust began the delisting process by filing a Form 8-K with the SEC announcing its intent to delist the preferred stock from the NYSE and issuing a press release to the same effect. (Compl. ¶ 72). The press release, issued on January 18, 2019, announced that AmTrust's Board had approved the voluntary delisting and deregistration of all six series of its publicly traded preferred stock. (*Id.*). The press release stated, *inter alia*,

> AmTrust Financial Services, Inc. ("AmTrust" or the "Company") today announced that its Board of Directors has approved the voluntary delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange.
>
> ***
>
> The Company expects the delisting of the Listed Securities to become effective on or about February 7, 2019 at which time AmTrust's SEC reporting obligations with respect to the Listed Securities will be suspended.
>
> AmTrust's decision to delist and deregister the Listed Securities was based on its determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume. In addition, this decision was made in light of the Company's new ownership structure and the resulting changes to its longterm strategy, following the completion of AmTrust's go-private transaction on November 29, 2018 and the delisting of its common stock.

13

(*Id.*).[2]

According to Plaintiff, the impact of the announcement was devastating to the approximately $1 billion worth of preferred stock then outstanding. (Compl. ¶ 81). Specifically, on the next trading day following the announcement of the delisting, the prices of all series of preferred stock dropped, as *Barron's* reported, by almost 40%, losing over $300 million in value in one day. (*Id.* at ¶ 82; *see also id.* at ¶ 81). *Barron's* also noted that the delisting was a "seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators." (*Id.* at ¶ 81 (quoting Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 28, 2019)).[3]

### 6. The Response to the Delisting Decision

Investors were shocked and angry. (Compl. ¶ 86). Plaintiff issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to delist, which enriched it and the Karfunkel-Zyskind Family at the expense of retail investors. (*Id.*). Plaintiff also submitted a letter to the SEC objecting to the delisting and noting that he had purchased preferred equity specifically in reliance on

---

[2]    Following the delisting, AmTrust's preferred stocks became traded on "pink sheets," without the protections afforded to the shareholders by being listed on the NYSE or another national exchange. (Compl. ¶ 76).

[3]    Specifically, *Barron's* reported that the Acquisition Group's application to state insurance commissions stated that "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange post-merger." (Compl. ¶ 66(b)).

14

AmTrust's assurances that the shares would remain listed and urging the SEC to commence an investigation. (*Id.*). Other investors, including those who have commenced litigation, expressed similar sentiments, and contacted AmTrust directly to note their disapproval. (*Id.*).

Further, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust's preferred securities and debt notes, sued AmTrust in New York State Supreme Court, asserting claims for breach of contract and alleging reputational harm in connection with AmTrust's delisting announcement. *See Keefe, Bruyette & Woods, Inc.* v. *AmTrust Fin. Serv., Inc.*, Index No. 650695/2019 (N.Y. Sup. Ct. 2019). (Compl. ¶ 88). KBW moved to preliminarily enjoin AmTrust from proceeding with the delisting, urging it to postpone the effectiveness of the delisting. (*Id.*). It also contacted the SEC. (*Id.*). As alleged in its complaint:

> 4. One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE. A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934. The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes. Listing on the NYSE also provides securities holders with a liquid trading market.
>
> 5. In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE. AmTrust gave the exact same covenant in the Underwriting Agreements for all of the

15

Preferred Shares (series A-F) and the two issues of
Subordinated Debt Notes.

(*Id.* at ¶ 88). KBW alleged that the delisting deprived the holders of the

preferred securities of "material company information," and "remove[d] a liquid

trading market for these securities." (*Id.* at ¶ 89). As a result, KBW alleged

that "the delisting will significantly damage KBW's and its affiliate's customer

relationships," "damage KBW's reputation as an underwriter," "significantly

impair KBW's and its affiliate's reputation and goodwill," and that "it is obvious

that tens of thousands of retail investors have already been negatively impacted

by AmTrust's public announcement of its intent to delist its Preferred Shares."

(*Id.*).

On February 7, 2019, a judge of the New York County Supreme Court

denied KBW's request for a temporary restraining order to enjoin the delisting,

stating that "[w]ith respect to the decrease in [preferred] share price, this is a

harm to the investor," not an underwriter like KBW. (Compl. ¶ 90). On

July 29, 2018, the court dismissed KBW's complaint without prejudice,

reiterating the points raised in its February 7, 2019 ruling, and stating that

KBW had failed to allege that it, as AmTrust's underwriter, had suffered a

direct injury as a result of the delisting. (*Id.*).[4]

---

[4]     Several preferred stockholders also filed an action against AmTrust in New York State
        Supreme Court, alleging, among other things, breach of contract and other common law
        claims. (Compl. ¶ 91 (citing *Matlick* v. *AmTrust Financial Services, Inc.*, Index
        No. 651349/2019 (N.Y. Sup. Ct. 2019))). AmTrust also moved to dismiss the complaint
        in that action, and on March 16, 2020, the court granted its motion. *See Matlick*, Index
        No. 651349/2019, Dkt. #187 (Sup. Ct. N.Y. Cty. Mar. 16, 2019). The claims in that
        case — brought under Sections 11 and 12 of the Securities Exchange Act of 1934 and
        New York State law, *see id.* — are different from the claims at issue here and, for the
        most part, do not bear on the Court's analysis.

On February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of all series of preferred stock. (Compl. ¶ 92). The Form 15, signed by Stephen Ungar, Senior Vice President, General Counsel and Secretary of AmTrust, was entitled "Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934." (*Id.*).

## B.    Procedural History

Plaintiff filed the Complaint, styled as a putative class action, on August 28, 2019. (Dkt. #1; *see also* Dkt. #5). On September 6, 2019, Plaintiff reported that the notice required to be published by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(A), had been published on August 30, 2019, in *PR Newswire*. (Dkt. #10). On September 9, 2019, the Court issued a motion schedule for any party wishing to be appointed as lead plaintiff. (Dkt. #11). The Court received a motion only from Plaintiff Jan Martinek. (*See* Dkt. #18-21). Accordingly, on November 18, 2019, the Court issued an order appointing Martinek as lead plaintiff, to represent purchasers of AmTrust preferred stock from January 22, 2018, to January 18, 2019, inclusive (the "Class Period"), and approving his selection of Wolf Popper LLP as lead counsel. (Dkt. #23).

On January 27, 2020, Defendants filed their motion to dismiss the Complaint. (Dkt. #27-29). Plaintiff filed his opposition brief on March 13, 2020. (Dkt. #30). Defendants filed their reply brief on April 3, 2020. (Dkt.

#31).  On April 6, 2020, Defendants submitted a request for oral argument on
their motion.  (Dkt. #32).  The Court endorsed Defendants' letter explaining
that the Court would order oral argument if and when it decided that oral
argument would aid the Court in resolving the motion.  (Dkt. #33).  The Court
has now reviewed the motion papers and has determined that oral argument is
unnecessary.

## DISCUSSION

### A.  Applicable Law

#### 1.  Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court
should "draw all reasonable inferences in [the plaintiff's] favor, assume all
well-pleaded factual allegations to be true, and determine whether they
plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648
F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan*
v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  Thus, "[t]o survive a
motion to dismiss, a complaint must contain sufficient factual matter, accepted
as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v.
*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S.
544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it
does require enough facts to 'nudge [a plaintiff's] claims across the line from
conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d
Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a

18

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Securities Fraud Under Section 10(b), Rule 10b-5, and Section 20(a)

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC under Section 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] ... make any untrue statement of a material fact or ... omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;] or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in connection with the purchase or sale of any security.

19

17 C.F.R. § 240.10b-5. "Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under [Section] 10(b).")).

To prevail on a Section 10(b) or a Rule 10b-5 claim, a plaintiff must prove "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'" *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See, e.g., ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (same).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This requires that a plaintiff's complaint: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements

20

were made, and [iv] explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). In contrast, "intent, knowledge, and other conditions of mind may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A claim under Section 20(a) is thus dependent on the validity of an underlying securities violation. Indeed, to establish control-person liability, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

### 3. The Challenged Elements of Plaintiff's Securities Fraud Claim

Defendants' motion attacks two elements of Plaintiff's claims, arguing that Plaintiff failed to allege adequately: (i) a material misrepresentation or omission and (ii) scienter. The Court addresses each in turn.

21

### a.    Material Misrepresentations or Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "A statement is misleading if a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)).  "The 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017) (quoting *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).

"Section 10 'do[es] not create an affirmative duty to disclose any and all material information.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)).  "Thus, generally, 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'"  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 609 (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)).  "A duty to disclose under Rule 10b-5 may arise 'when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or

22

misleading.'" *Id.* (alteration in original) (quoting *Stratte-McClure*, 776 F.3d at 101).

Even where a company is not under a duty to disclose, however, once it "chooses to speak, it has a 'duty to be both accurate and complete.'" *Sharette* v. *Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78-79 (S.D.N.Y. 2015) (quoting *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010)).  This obligation only extends, however, to facts necessary to render "what was revealed [to] not be so incomplete as to mislead." *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)).  Indeed, a company need not "accuse itself of wrongdoing," nor disclose an ongoing investigation, where the failure to do so would not make the company's statements misleading.  *Id.* (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 511 (S.D.N.Y. 2017) ("For such a duty [to disclose uncharged wrongdoing] to arise, … there must be a connection between the illegal conduct and the misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." (quoting *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016))).

To be actionable, a misstatement or omission must also be material, meaning that "a reasonable investor would have considered [it] significant in

23

making investment decisions." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).  This is so where "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  "[W]hether an alleged misrepresentation is material necessarily depends on all relevant circumstances," and "[b]ecause materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (last alteration in original) (quoting *ECA*, 553 F.3d at 197)).

### b.    Scienter

As mentioned above, pursuant to the PSLRA, "no defendant may be held liable for any … false or misleading statements unless [a] [p]laintiff has stated 'with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 664 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added).  Scienter includes "a mental state embracing intent to deceive, manipulate, or defraud," or

"recklessness." *Id.* at 664 (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *ECA*, 553 F.3d at 198). A "strong inference" that a defendant acted with scienter need not be an irrefutable inference, though it "must be more than merely plausible or reasonable[.]" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]" *Id.* at 323. A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

To evaluate whether the PSLRA's standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"). And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "Ascribing a state of mind to a corporate entity is a difficult and sometimes confusing task ... because the hierarchical and differentiated corporate structure often muddies the distinction between

25

deliberate fraud and an unfortunate (yet unintentional) error caused by mere mismanagement." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

Ultimately, the facts pleaded must: (i) show "that the defendants had the motive and opportunity to commit fraud," or (ii) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some *concrete and personal way* from the purported fraud.'" *Id.* (emphasis added) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[.]" *Id.*; *accord, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, a plaintiff must plead conscious misbehavior or recklessness. Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis omitted) (quoting *Novak*, 216 F.3d at 312). To plead conscious recklessness adequately, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme

26

departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311).  Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

## B.    Analysis

### 1.    Plaintiff Has Adequately Pleaded an Actionable Misstatement

Plaintiff argues that each of Defendants' representations about AmTrust's preferred stock remaining listed on the NYSE following the Merger was a material misstatement.  In response, Defendants argue that Plaintiff has not shown that these statements were false when made, and in any event, such statements are protected forward-looking statements that cannot give rise to a Section 10(b) claim.  (Def. Br. 14).  Both sides group such alleged misstatements into five groups (*see* Def. Br. 9-15; Pl. Opp. 12), which groupings the Court adopts for purposes of this Opinion.

27

### a. Defendants' Representations That the Preferred Stock "Will" Continue to Be Listed Are Actionable

While Plaintiff proffers several types of alleged misstatements, the representations that are most clearly actionable are Defendants' statements that the preferred stock "will" continue to be listed post-Merger. In their April 9, 2018 preliminary proxy, Defendants stated that the preferred stock "*will* continue to be listed on the [NYSE] following the merger and the reporting obligations with respect to such shares under the Exchange Act *will* therefore continue." (Compl. ¶ 67 (emphases added)). This statement was then repeated in AmTrust's final proxy and in subsequent Form 10-Qs. (*See id.* at ¶ 68). These statements laid to rest any investor doubt regarding the certainty of Defendants' "expectations" regarding the preferred stock.

Defendants posit two arguments with respect to these alleged misstatements. *First*, Defendants argue that "Plaintiff does not allege any facts suggesting that this statement was false when made, particularly as the go-private transaction by its own terms had no effect on the Preferred Stock, which remained listed for a time after the transaction closed." (Def. Br. 14). But the very fact that Defendants decided to delist the preferred shares barely two months after the Merger closed — on bases that were known to Defendants at the time they represented that they "will" maintain the listings — strongly suggests that Defendants knew this statement to be false when made.

Further, Defendants' interpretation of this statement is strained and inconsistent with how an investor would reasonably interpret this statement. Defendants' statement that they "will" maintain the preferred stock's listing

28

indicated to investors that Defendants had evaluated the pros and cons of continuing to list the preferred stock on the NYSE and had made a reasoned determination to continue. *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 ("The 'veracity of a statement … is measured … by its ability to accurately inform rather than mislead prospective buyers.'" (quoting *Kleinman*, 706 F.3d at 153)). No investor would reasonably understand Defendants' representation of "continuing" to maintain the listing post-buyout as leaving open the possibility of delisting a mere seven weeks after the Merger closed — even though such a period is, as Defendants strain to argue, "a time." *See Omnicare, Inc.* v. *Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186-87 (2015) ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry … is objective."). Defendants' representations were, at best, misleading. *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[S]o-called 'half-truths' — literally true statements that create a materially misleading impression — will support claims for securities fraud."); *In re Sadia,* 269 F.R.D. 298, 302 (S.D.N.Y. 2010) (noting, in the materiality context, the need to analyze "how information would be viewed by a reasonable investor," which is "influenced by considerations of fairness, probability, and common sense" (citing *Basic* v. *Levinson*, 485 U.S. 224, 231-32 (1988))).

*Second*, Defendants claim that they expressly identified statements in the "Questions and Answers" section of these proxy statements as forward-looking

statements protected by the PSLRA.  (Def. Br. 14).[5]  But the only cautionary

language in the proxies was that certain unidentified statements within a

dense five-page Q&A section may be forward-looking.  (*See* Reed Decl., Ex. 12

at 82).  As an initial matter, it is questionable that a reasonable investor would

have understood assurances that Defendants "will" take certain action within

their control to be forward-looking.  *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857

F. Supp. 2d 367, 380, 388, 397 (S.D.N.Y. 2012) (finding that CEO's statement

that investors could "count on a great dividend" was actionable and not

protected by safe harbor for forward-looking statements, when the dividend

was cut some ten weeks later).

---

[5]   Plaintiff contends that the safe harbor provision of the PSLRA would not apply to
Defendants' statements because such an affirmative defense does not protect
statements "made in connection with a going private transaction."  (Pl. Opp. 11 (quoting
15 U.S.C. § 78u-5(b)(1)(E))).  Plaintiff also points to another statutory exemption to the
safe harbor rule for statements "made in disclosure of beneficial ownership in a report
required to be filed … pursuant to section 13(d)." (*Id.* (quoting 15 U.S.C. § 78u-
5(b)(2)(F)).  Plaintiff purports that this exemption applies to the Schedule 13D that
Defendants filed on January 22, 2018, at the beginning of the Class Period.  (*See id.*).

Defendants respond that Plaintiff's claims are not based on the "going private" part of
the transaction, but are based solely about shares that remained public.  (Def. Reply 2).
Defendants are correct that "Plaintiff offers no authority suggesting that the PSLRA safe
harbor exception was intended to apply to representations about shares that were
publicly traded before and after the transaction, nor any reason that an investor should
be able to consider forward-looking statements about publicly traded shares that are
accompanied by cautionary language to be material in one context but not the other."
(*Id.*).  Defendants also argue that even if Plaintiff were correct that the PSLRA's safe
harbor provision did not apply, it is of no moment because the same result obtains
under the judicially created "counterpart" to the PSLRA's safe harbor, the "bespeaks
caution" doctrine, which covers forward-looking statements regarding intention and
expectation.  (*See id.* at 3 (citing *Rombach* v. *Chang*, 355 F.3d 164, 173 (2d Cir. 2004)
and *Johnson* v. *Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at
*15 (S.D.N.Y. Jan. 17, 2013)).

The Court need not decide which of the safe harbor provision or the bespeaks caution
doctrine applies because, as explained in this Opinion, Defendants' statements were
either: (i) not adequately cautionary or (ii) knowingly false.

In any event, this generalized warning is insufficient to invoke the safe harbor provision of the PSLRA.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii) (stating that forward-looking statement must be "accompanied by *meaningful* cautionary statements *identifying important* factors that could cause actual results to differ materially from those in the forward-looking statement" (emphases added)); *see also Slayton* v. *Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) (rejecting boilerplate and generalized warnings as insufficient to invoke safe harbor); *In re Skechers USA, Inc. Sec. Litig.*, No. 18 Civ. 8039 (NRB), 2020 WL 1233759, at \*7-8 (S.D.N.Y. Mar. 12, 2020) (explaining that to trigger PSLRA safe harbor, warnings must contain sufficiently meaningful information about specific risks addressed by alleged misstatements).

> **b.    Defendants' Statements of Expectation or Current Intention That the Preferred Stock Would Continue to Be Listed Are Actionable**

Plaintiff's next category of misstatements involves Defendants' "expectation" that the preferred stock would continue to be listed on the NYSE. Specifically, Plaintiff alleges that on three occasions between March 1 and May 4, 2018, AmTrust stated that "[e]ach share of the Company's currently outstanding preferred stock will remain outstanding and it is *expected* that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."  (Compl. ¶¶ 50, 52, 66(f), (h), (k)).

Defendants contend that Plaintiff has failed to plead any facts suggesting that this statement of expectation was false when made, particularly as the preferred stock *did* remain outstanding for a time after the go-private

transaction closed.  (Def. Br. 12).  Further, Defendants argue that each time AmTrust made this statement, it simultaneously cautioned investors that "[w]hen we use words such as … 'expect' … we do so to identify forward-looking statements … [and] [a]ctual results may differ materially from those expressed or implied in these statements."  (Reed Decl., Ex. 7 at 1; *id.* at Ex. 8 at 5; *id.* at Ex. 14 at 5).  According to Defendants, "[t]his cautionary language means that AmTrust's statements of its expectations are protected by the PSLRA's safe harbor, which protects forward looking statements that are either 'identified and accompanied by meaningful cautionary language *or* [are] immaterial *or* the plaintiff fails to prove that [they were] made with actual knowledge that it was false or misleading.'"  (Def. Br. 12-13 (quoting *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 237 (S.D.N.Y. 2018)).

While there are, of course, circumstances where "expectations" are forward-looking and protected by the PSLRA's safe harbor provision, *see, e.g.*, *Ong*, 294 F. Supp. 3d at 237, this case presents a much closer question.  At the outset of its analysis, the Court finds it worth noting that while the "cautionary" language here refers to the word "expect," it does not meaningfully address the specific risk that AmTrust would decide to delist the preferred stock.  *See In re Skechers USA, Inc. Sec. Litig.*, 2020 WL 1233759, at *8.  But even if the Court were to accept Defendants' contention that these statements fall within the PSLRA's safe harbor provision, the Court would still find the statements actionable.  As explained herein, Plaintiff has pleaded that the Defendants' proffered reasons for delisting the stock that were known or

32

knowable to Defendants at the time they held their "expectations" and that, therefore, these statements were made with actual knowledge that they were false or misleading.

Defendants claimed that AmTrust's decision to delist was based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume." (Compl. ¶ 76). The press release announcing the delisting also identified "the Company's new ownership structure" since the Merger and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting. (*Id.*). The Individual Defendants were the founders, long-time controlling stockholders, and directors and officers of AmTrust, who spent months planning to take the Company private. (*See* Compl. ¶¶ 37-40). The Acquisition Group conducted extensive due diligence as early as November 17, 2017, in advance of its January 9, 2018 Proposal, for the Merger that closed on November 29, 2018. Thus, both the "administrative costs and burdens associated with maintaining the listings on the NYSE" and the Company's "new ownership structure" were certainly facts known to Defendants throughout 2018, when they publicly stated that the preferred stock would remain listed. Moreover, as Plaintiff argues, to the extent "costs" were the actual issue, the listing could have been moved to another exchange such as NASDAQ. Instead, the preferred stocks were left to be traded on pink sheets with none of the protections afforded by being listed on the NYSE or another national

33

exchange.[6]  Notably, none of these "explanations" for the delisting was included as a "risk" related to the preferred stock in AmTrust's 2017 Form 10-K or any other SEC filing by any Defendant during the Class Period.  (*Id.* at ¶ 79).

Defendants respond that "even if the facts supporting the delisting were knowable when Defendants made these statements, that would not create a strong inference that Defendants (i) had those facts in mind in 2018, (ii) concluded they justified delisting the preferred stock, (iii) decided to delist, and (iv) falsely stated that they did not expect to delist."  (Def. Reply 5-6).  But Defendants' had an obligation to avoid half-truths, *see Wilson*, 671 F.3d at 130, and by perpetuating the "expectation" that the preferred stock would continue to be listed, Defendants fostered the misimpression that they had contemplated what would happen with the preferred stock following the Merger and had made a conscious decision that the preferred stock would remain listed.  Accordingly, the Court finds Defendants' statements regarding their "expectations" that the preferred stock will continue to remain listed to be actionable.

### c. Plaintiff's Remaining Proffered Misstatements Are Not Actionable

The remainder of Plaintiff's alleged misstatements are non-actionable.  *First*, Plaintiff points to nine statements made by AmTrust between January and November 2018, that the Merger "contemplates that the outstanding series

---

[6]     Further, the vague gesture to the "small number of record holders" was deceptive, per Plaintiff, because, as Defendants know, the majority of investors are not the actual record holders of the stock they beneficially own — most investors own the stock in street name through financial institutions.  (*See* Compl. ¶ 78).

of AmTrust preferred stock will remain outstanding in accordance with their terms." (Compl. ¶¶ 45, 58, 66(a), (d), (g), (i)-(m)).  Plaintiff claims that this statement is untrue because the prospectus supplements, which describe the terms of the governing certificates of designation and deposit agreements for the preferred stock, stated that AmTrust "intends to apply to list" the stock's depository shares on the NYSE, and because AmTrust made statements in the underwriting agreements that it would use commercially reasonable efforts to list the stock.  (Pl. Opp. 17-18).

Defendants rejoin that, as an initial matter, the prospectus supplements and underwriting agreement that contain the representation that Defendants intend to apply to list the preferred stock, are not terms of the preferred stock, which are contained solely in the certificates of designation and depositary agreements.  (*See* Def. Br. 10).  Defendants also contend that regardless of whether these terms are technically part of the preferred stocks, the prospectus supplements contain no promise that the preferred stock would remain listed, much less remain listed in perpetuity.  The Court agrees with the latter argument, and the reasoning of *Matlick* v. *AmTrust Fin. Servs., Inc.*, 67 Misc. 3d 1202(A), 2020 WL 1294669 (Sup. Ct. N.Y. Cty. Mar. 16, 2020), in which the court explained that at the time of issuing the preferred shares, "AmTrust had no duty to inform investors of the fact that it could one day voluntarily delist its Securities, a fact which federal law has always made clear[.]"  *Id.* at *8.

*Second*, Plaintiff points to a presentation prepared by the Special Committee's financial advisor, Deutsche Bank.  The presentation contained a

slide identifying, as a "key term" of the Proposal, that the preferred shares would "remain outstanding in accordance with their terms," and indicating under the heading "comments/areas for clarification" this meant the "[o]ngoing disclosure and other obligations of the preferred securities." (Compl. ¶ 66(i), (k)). As noted above, the Court has found statements indicating that the preferred stock would remain outstanding in accordance with its terms not to be actionable. Further, the fact that Deutsche Bank raised AmTrust's disclosure and other obligations of the preferred stock as a "comment" or "area for clarification" is not an affirmative statement by Defendants that the preferred stock would continue to be listed on the NYSE and is far too vague to induce reasonable reliance by an investor. *See, e.g., Abuhamdan* v. *Blyth, Inc.*, 9 F. Supp. 3d 175, 192 (D. Conn. 2014) (finding reference to "growth at ViSalus" too vague to induce reasonable reliance by an investor).

Plaintiff's final category of misstatements are those that were published in a *Barron's* article regarding representations that AmTrust made to insurance regulators, which article became public *after* AmTrust announced the delisting. (*See* Compl. ¶¶ 66(b), (n), 81, 88-91). Plaintiff does not allege that he was aware of these statements until they were published, and a "plaintiff cannot rely on acts of which [he] was unaware." *Arco Capital Corp. Ltd.* v. *Deutsche Bank AG*, 986 F. Supp. 2d 296, 306-07 (S.D.N.Y. 2013) (citing *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta Inc.*, 552 U.S. 148, 161, 171 (2008)). As Plaintiff could not have relied on these statements until after AmTrust announced its decision to delist the Preferred Stock, these alleged statements

36

cannot give rise to a Section 10(b) claim. However, as explained below, such statements may be relevant when considering Defendants' scienter.

### 2. Plaintiff Has Adequately Pleaded Scienter

As explained above, a strong inference of scienter can be pleaded in two ways: "[i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citations omitted). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. In determining whether Plaintiff has adequately pleaded scienter, "[t]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

Plaintiff provides the following narrative explaining Defendants' motive and opportunity to commit fraud: AmTrust was plagued by accounting scandals during its time as a public company. (*See* Compl. ¶ 35). On February 27, 2017, AmTrust announced that it had identified "material weaknesses" in its financial reporting internal controls. *Id.* Then, on March 6, 2017, AmTrust announced that it would be increasing its loss reserves, and that its financial statements for 2014, 2015, and 2016 were unreliable and would need to be restated. (*See id.*). On April 11, 2017, the *Wall Street Journal* reported that the SEC, the FBI, and DFS were, with the help of a former

37

AmTrust auditor, investigating AmTrust's finances. (*Id.*; *id.* at ¶ 41).[7] These disclosures caused the price of AmTrust common shares to plummet from $27.66 on February 24, 2017, to $15.30 by market close on April 11, 2017, and caused the filing of several lawsuits, including a consolidated securities fraud action and a derivative action. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17 Civ. 1545 (LAK) (S.D.N.Y.); *In re AmTrust Fin. Servs., Inc. Deriv. Litig.*, No. 17 Civ. 553 (MN) (D. Del.).[8]

According to Plaintiff, the Individual Defendants seized on the opportunity to take AmTrust private at the moment its common stock was trading at an uncharacteristic low. (Compl. ¶ 53). A private buyout would obviate the need for AmTrust to comply with the periodic public financial reporting that is required of public companies under the Securities Exchange Act. (*Id.* at ¶ 43). Furthermore, a buyout would extinguish any derivative liability arising out of the accounting scandal that could expose the Individual Defendants to significant personal liability. (*Id.*). Thus, the only thing exposing Defendants to SEC reporting and derivative liability was the listing of the preferred shares on the NYSE. However, acquiring the preferred stock in the buyout, in addition to the common stock, would materially increase the cost of

---

[7] Despite the report, Defendants did not acknowledge the existence of the SEC's five-year-long investigation until May 2018, when they were soliciting approval of the Merger. (*See* Compl. ¶¶ 41-42 (identifying additional disclosures in October 2018 regarding the SEC's findings against AmTrust's accountants)).

[8] Further, the Individual Defendants had been defending against a stockholder derivative action in the Delaware Court of Chancery since 2015, arising from their alleged usurpation of a valuable insurance business from AmTrust. *See In re AmTrust Fin. Servs., Inc. S'holder Litig.*, No. 2018-0396 (AGB), 2020 WL 914563, at *3 (Del. Ch. Feb. 26, 2020).

such a buyout.  As told by Plaintiff, the listing of the preferred stock posed a problem for the Individual Defendants, who wished to take AmTrust private and evade the financial reporting obligations that had plagued them and the Company in recent years.  (*Id.* at ¶¶ 6, 41, 48, 84).

Precisely for this reason, when the Individual Defendants proposed the Merger, investors and the public questioned their motives: maintaining the preferred stocks on the NYSE would require AmTrust to continue complying with regulations governing public companies and would defeat a seemingly central justification for any going-private acquisition.  In order to ensure that the Merger was approved, Defendants had to assuage the market, state insurance commissions, and stockholders voting on the Merger by representing that the preferred stock would remain listed and that AmTrust would continue to be subject to reporting requirements.  Notably, many of the investors in preferred stock were also shareholders of AmTrust's common stock: in assessing whether to vote for the Merger, those investors needed to be reassured that their preferred stock would remain listed and, therefore, liquid. In order to ensure that the Merger was approved, Defendants maintained that they "expected" the preferred stock to remain listed and later stated that it "will" remain listed.

Defendants respond to Plaintiff's allegations of motive by citing cases in which courts have held that motives common to corporate officers are insufficient to show scienter.  (*See* Def. Br. 17-18).  It is true that motives such as the desire for a corporation to appear profitable, the desire to complete a

39

merger, and the desire to keep stock prices high to increase officer

compensation do not suffice to constitute "motive."  *See ECA,* 553 F.3d at 198.

At the same time, motive can be proven through a showing that the defendant

"benefitted in some concrete and personal way from the purported fraud."  *Id.*

The motive Plaintiff ascribes to the Individual Defendants here — to

squeeze out minority stockholders to acquire a highly profitable business, at a

time when AmTrust common stock was trading at historic lows, and in the

process to extinguish existing derivative securities fraud claims exposing each

of the Individual Defendants to personal liability — is particular, unique, and

indicative of Defendants benefiting in a concrete and personal way from the

purported fraud.  *See id.* ("'[M]otive' showing is generally met when corporate

insiders allegedly make a misrepresentation in order to sell their own shares at

a profit."); *Moon Joon Yu* v. *Premiere Power LLC*, No. 14 Civ. 7588 (KPF), 2015

WL 4629495, at *9 (S.D.N.Y. Aug. 4, 2015) (concluding that defendant's need to

generate money to pay off a $2.4 million settlement obtained against him

constituted a personal and concrete motive).  As Plaintiff explains, the cases

cited by Defendants are inapposite, as they do not address the situation here,

where AmTrust's controlling stockholders were not effecting a typical

transaction with a third party for the benefit of the Company and its

stockholders, but rather were seeking a transaction to benefit *themselves*, to

squeeze out minority stockholders, which would also extinguish their derivative

liability.  *Cf. Kalnit* v. *Eichner*, 99 F. Supp. 2d 327, 337-39 (S.D.N.Y. 2000)

(acknowledging that allegations that directors "hoped to receive increased

40

compensation, lucrative executive positions and other corporate perquisites" were reasonable, but insufficient to demonstrate scienter, as such a rule would expose independent directors to liability for virtually any merger), *aff'd*, 264 F.3d 131 (2d Cir. 2001); *Elliott Assocs., L.P.* v. *Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) (rejecting inference of scienter where controlling stockholders were attempting to "maximize their equity control over a company" while raising "much needed capital").

The fact of the matter is that, prior to the Merger, Defendants repeatedly assured investors that the preferred stock would remain listed, and then, less than two months after the transaction closed, decided to delist the preferred stock. Defendants' professed reasons for delisting the stock — which, as explained above, were known to the Individual Defendants before the Merger — only strengthen Plaintiff's argument this was a classic bait and switch. Accordingly, the Court finds that Plaintiff's narrative of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts as alleged." *See In re Adv. Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *Tellabs*, 551 U.S. at 324).

### 3. Plaintiff Has Adequately Stated a Claim for Control Person Liability Under Section 20(a)

The Complaint also alleges that the Individual Defendants violated Section 20(a). A *prima facie* case of control person liability under Section 20(a) of the Exchange Act requires "[i] a primary violation by the controlled person; [ii] control of the primary violator by the defendant; and [iii] that the defendant

was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

In moving to dismiss, Defendants argue that the Section 20(a) claim must fail because Plaintiff has: (i) failed to plead a Section 10(b) or Rule 10b-5 claim against AmTrust; and (ii) not adequately pleaded that any Individual Defendant culpably participated in securities fraud. (Def. Br. 23). However, as explained above, the Court has already found that Plaintiff has stated a primary violation of Section 10(b) and adequately pleaded scienter. Plaintiff has certainly alleged facts showing that the Individual Defendants "knew or should have known that [AmTrust], over whom [the Individual Defendants] had control, was engaging in fraudulent conduct." *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014). Accordingly, Plaintiff has adequately pleaded his Section 20(b) claim.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is DENIED.

Defendants are hereby ORDERED to file a responsive pleading on or before **September 4, 2020**. Further, the parties are hereby ORDERED to submit a proposed case management plan to the Court on or before **September 11, 2020**.

SO ORDERED.

Dated:     August 14, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

42

**EFiled: Apr 01 2022 12:17PM EDT**
**Transaction ID 67446229**
**Case No. N22C-04-010 MMJ CCLD**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

AMTRUST FINANCIAL SERVICES, INC.,

        Plaintiff,

        v.

FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY,

        Defendants.

C.A. No. N22C-_____ CCLD

**TRIAL BY JURY OF TWELVE DEMANDED**

## PRAECIPE

TO:     Prothonotary
        Superior Court of the State of Delaware
        Leonard L. Williams Justice Center
        500 North King Street
        Wilmington, DE 19801

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 524.  At the time of service, the

sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**FORGE UNDERWRITING LIMITED**

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 524.  At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**ASPEN SYNDICATE 4711**

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 525.  At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**MARKEL BERMUDA LIMITED**

2

**PLEASE ISSUE** a summons to the Plaintiffs' counsel of record, commanding him to summon and direct the below-named Defendants to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 with copies of the Summons and Complaint as follows:

> **MARKEL BERMUDA LIMITED**
> 10275 W. Higgins Road, Suite 750
> Rosemont, IL 60018

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 525. At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**ALLIANZ GLOBAL US RISKS INSURANCE COMPANY**

**PLEASE ISSUE** a summons to the Plaintiffs' counsel of record, commanding him to summon and direct the below-named Defendants to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 with copies of the Summons and Complaint as follows:

**ALLIANZ GLOBAL US RISKS INSURANCE COMPANY**
225 W. Washington St., #1800
Chicago, IL 60606-3484

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 525. At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**ARCH INSURANCE COMPANY**

**PLEASE ISSUE** a summons to the Plaintiffs' counsel of record, commanding him to summon and direct the below-named Defendants to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 with copies of the Summons and Complaint as follows:

**ARCH INSURANCE COMPANY**
210 Hudson Street, Suite 300
Jersey City, NJ 07311-1107

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the

4

Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 525.  At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**IRONSHORE INDEMNITY, INC.**

**PLEASE ISSUE** a summons to the Plaintiffs' counsel of record, commanding him to summon and direct the below-named Defendants to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 with copies of the Summons and Complaint as follows:

**IRONSHORE INDEMNITY, INC.**
175 Berkeley Street
Boston, MA 02116

**PLEASE ISSUE** summons to the below-named Defendant for service by the Sheriff of Kent Castle County upon the Defendant listed below by serving two (2) copies of the Summons, Praecipe, and Complaint for the Defendant on the Department of Insurance, State of Delaware, 1351 West North Street, Dover, Delaware 19904, in accordance with 18 *Del. C.* § 525.  At the time of service, the sheriff will deliver a check payable to the Commissioner of Insurance in the amount of $25.00, representing the required fee.

**U.S. SPECIALTY INSURANCE COMPANY**

**PLEASE ISSUE** a summons to the Plaintiffs' counsel of record, commanding him to summon and direct the below-named Defendants to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 with copies of the Summons and Complaint as follows:

> **U.S. SPECIALTY INSURANCE COMPANY**
> 13403 Northwest Freeway
> Hoston, TX 77040

> **BERGER HARRIS LLP**
>
> */s/ David J. Baldwin*
> David J. Baldwin (No. 1010)
> Peter C. McGivney (No. 5779)
> Zachary J. Schnapp (No. 6914)
> 1105 N. Market Street, 11th Floor
> Wilmington, Delaware 19801
> Phone: (302) 655-1140
> Fax: (302) 655-1131
> dbaldwin@bergerharris.com
> pmcgivney@bergerharris.com
> zschnapp@bergerharris.com
>
> *Attorneys for Plaintiff*

Dated:  April 1, 2022

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## SUMMONS

**THE STATE OF DELAWARE**
**TO THE SHERIFF OF KENT COUNTY**

**YOU ARE COMMANDED:**

1. To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.     To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

**ALLIANZ GLOBAL US RISKS INSURANCE COMPANY**

**TO THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

EFiled: Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – LONG A

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## <u>SUMMONS</u>

TO:   **PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

1.     To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.      To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

**ALLIANZ GLOBAL US RISKS INSURANCE COMPANY**

**THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

EFiled: Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## SUMMONS

**THE STATE OF DELAWARE**
**TO THE SHERIFF OF KENT COUNTY**

**YOU ARE COMMANDED:**

1.     To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.     To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                    *LISA FONTELLO* _____
                                          Prothonotary


                                          _____
                                          Per Deputy

**ARCH INSURANCE COMPANY**

**TO THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                    *LISA FONTELLO* _____
                                          Prothonotary


                                          _____
                                          Per Deputy

2

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – LONG A

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## SUMMONS

TO:   **PLAINTIFF'S COUNSEL**

 **YOU ARE COMMANDED:**

1. To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.     To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

**ARCH INSURANCE COMPANY**

**THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                    *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

2

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY,<br><br>    Defendants. | C.A. No. N22C-_____ CCLD<br><br>**TRIAL BY JURY OF TWELVE DEMANDED** |

## SUMMONS

**THE STATE OF DELAWARE
TO THE SHERIFF OF KENT COUNTY**

**YOU ARE COMMANDED:**

1.      To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.      To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                          *LISA FONTELLO* _____
                                                Prothonotary


                                                _____
                                                Per Deputy

**ASPEN SYNDICATE 4711**

**TO THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                          *LISA FONTELLO* _____
                                                Prothonotary


                                                _____
                                                Per Deputy

2

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## SUMMONS

**THE STATE OF DELAWARE
TO THE SHERIFF OF KENT COUNTY**

**YOU ARE COMMANDED:**

1.      To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.      To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                    _LISA FONTELLO_____
                                          Prothonotary


                                          _____
                                          Per Deputy

**FORGE UNDERWRITING LIMITED**

**TO THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                    _LISA FONTELLO_____
                                          Prothonotary


                                          _____
                                          Per Deputy

2

EFiled: Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY,<br><br>Defendants. | C.A. No. N22C-_____ CCLD<br><br>**TRIAL BY JURY OF TWELVE DEMANDED** |

**<u>SUMMONS</u>**

**THE STATE OF DELAWARE**
**TO THE SHERIFF OF KENT COUNTY**

    **YOU ARE COMMANDED:**

    1.    To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.　　To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022　　　　　　　　_LISA FONTELLO_____
　　　　　　　　　　　　　　　　　　Prothonotary


　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Per Deputy

**IRONSHORE INDEMNITY, INC.**

**TO THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022　　　　　　　　_LISA FONTELLO_____
　　　　　　　　　　　　　　　　　　Prothonotary


　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Per Deputy

2

**EFiled:  Apr 01 2022 12:17PM EDT**
**Transaction ID 67446229**
**Case No. N22C-04-010 MMJ CCLD**

SUMMONS – LONG A

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, <br><br> Defendants. | C.A. No. N22C-_____ CCLD <br><br> **TRIAL BY JURY OF TWELVE DEMANDED** |

## <u>SUMMONS</u>

TO:   **PLAINTIFF'S COUNSEL**

        **YOU ARE COMMANDED:**

        1.      To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.      To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022    *LISA FONTELLO*_____
           Prothonotary


           _____
           Per Deputy

**IRONSHORE INDEMNITY, INC.**

**THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022    *LISA FONTELLO*_____
           Prothonotary


           _____
           Per Deputy

EFiled: Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

### SUMMONS

**THE STATE OF DELAWARE
TO THE SHERIFF OF KENT COUNTY**

**YOU ARE COMMANDED:**

1.     To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

    2.    To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022              *LISA FONTELLO*_____
                                       Prothonotary

                                 _____
                                         Per Deputy

**MARKEL BERMUDA LIMITED**

**TO THE ABOVE-NAMED DEFENDANT**

    In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022              *LISA FONTELLO*_____
                                         Prothonotary

                                 _____
                                         Per Deputy

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – LONG A

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., <br><br>      Plaintiff, <br><br>      v. <br><br> FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, <br><br>      Defendants. | C.A. No. N22C-_____ CCLD <br><br> **TRIAL BY JURY OF TWELVE DEMANDED** |

## SUMMONS

TO:   **PLAINTIFF'S COUNSEL**

     **YOU ARE COMMANDED:**

     1.   To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.     To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                     *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

**MARKEL BERMUDA LIMITED**

**THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                     *LISA FONTELLO*_____
                                          Prothonotary


                                          _____
                                          Per Deputy

2

EFiled:  Apr 01 2022 12:17PM EDT
Transaction ID 67446229
Case No. N22C-04-010 MMJ CCLD

SUMMONS – INSURANCE COMMISSION

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## SUMMONS

**THE STATE OF DELAWARE
TO THE SHERIFF OF KENT COUNTY**

    **YOU ARE COMMANDED:**

    1.    To summon the below-named Defendants so that, within twenty (20)

days after serve hereof upon Defendants, exclusive of the day of service, Defendants

shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger

Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.      To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                          *LISA FONTELLO*           
                                                Prothonotary


                                                _____
                                                Per Deputy

## U.S. SPECIALTY INSURANCE COMPANY

## TO THE ABOVE-NAMED DEFENDANT

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                          *LISA FONTELLO*           
                                                Prothonotary


                                                _____
                                                Per Deputy

2

**EFiled:  Apr 01 2022 12:17PM EDT**
**Transaction ID 67446229**
**Case No. N22C-04-010 MMJ CCLD**

SUMMONS – LONG A

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | |
| v. | C.A. No. N22C-_____ CCLD |
| FORGE UNDERWRITING LIMITED, ASPEN SYNDICATE 4711, MARKEL BERMUDA LIMITED, ALLIANZ GLOBAL US RISKS INSURANCE COMPANY, ARCH INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., and U.S. SPECIALTY INSURANCE COMPANY, | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

### SUMMONS

TO:  **PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

1.      To summon the below-named Defendants so that, within twenty (20) days after serve hereof upon Defendants, exclusive of the day of service, Defendants shall serve upon David J. Baldwin, Plaintiff's attorney, whose address is c/o Berger Harris LLP, 1105 N. Market Street, 11th Floor, Wilmington, DE 19801, answers to

the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense).

2.    To serve upon Defendants a copy hereof and of the Complaint (and of the Affidavit of Demand if any has been filed by Plaintiff).

Dated: April ___, 2022                     *LISA FONTELLO*_____
                                           Prothonotary


                                           _____
                                           Per Deputy

**U.S. SPECIALTY INSURANCE COMPANY**

**THE ABOVE-NAMED DEFENDANT**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney names above answers to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

Dated: April ___, 2022                     *LISA FONTELLO*_____
                                           Prothonotary


                                           _____
                                           Per Deputy